# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CIVIL COMPLAINT FOR** |
| c/o United States Attorney's Office | ) | **FORFEITURE *IN REM*** |
| **555 Fourth St., N.W.,** | ) | |
| **Washington, DC 20530,** | ) | **Civil Action No.:** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **8 GILCREASE LANE, QUINCY** | ) | |
| **FLORIDA 32351,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **ONE CONDO LOCATED ON** | ) | |
| **NORTH OCEAN BOULEVARD IN** | ) | |
| **MYRTLE BEACH, SOUTH** | ) | |
| **CAROLINA,** | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **ALL FUNDS, INCLUDING** | ) | |
| **APPROXIMATELY $53 MILLION,** | ) | |
| **HELD ON DEPOSIT AT BANK OF** | ) | |
| **AMERICA ACCOUNTS IN THE NAMES** | ) | |
| **OF (1) THOMAS A. BOWDOIN, JR.,** | ) | |
| **SOLE PROPRIETOR, DBA** | ) | |
| **ADSURFDAILY, (2) CLARENCE** | ) | |
| **BUSBY, JR. AND DAWN STOWERS,** | ) | |
| **DBA GOLDEN PANDA AD BUILDER,** | ) | |
| **AND (3) GOLDEN PANDA** | ) | |
| **AD BUILDER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by and through its attorney, the United States

Attorney for the District of Columbia, brings this Complaint and alleges as follows in

accordance with Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or

Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"):

1.    This is a civil forfeiture action, *in rem*, brought to enforce 18 U.S.C. §
981(a)(1)(C), which authorizes the forfeiture of any property that constitutes or is derived from
proceeds traceable to, among other offenses, any offense, or conspiracy to commit such offense,
that is a "specified unlawful activity" of the federal anti-money laundering statutes, including a
wire fraud (18 U.S.C. § 1343).  This action also is brought to enforce 18 U.S.C. § 981(a)(1)(A),
which authorizes the forfeiture of any real or personal property that is involved in a money
laundering offense (18 U.S.C. §§ 1956 or 1957).

2.    This Court has jurisdiction over an action commenced by the United States under
28 U.S.C. § 1345 and over an action for forfeiture under § 1355(a).  This Court has *in rem*
jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

3.    Venue is proper in this district by virtue of 28 U.S.C. § 1355(b)(1), because acts
or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. §
1395, because the defendant personal property will be located here while the action remains
pending.

4.    The defendant real properties, with all appurtenances and improvements thereon,
are:  (a) 8 Gilcrease Lane, Quincy, Florida 94590 ("Gilcrease Lane"); and (b) One condominium
owned by Thomas A. Bowdoin, Jr. in Myrtle Beach, South Carolina  ("Myrtle Beach Condo"),
and are more fully described as:

**8 Gilcrease Lane**

A TRACT OF LAND LYING IN LOT 76 OF THE LITTLE
RIVER SURVEY IN THE FORBLS PURCHASE IN GADSDEN
COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED
AS FOLLOWS: FOR A POINT OF REFERENCE, BEGIN AT A

2

TERRA COTTA MONUMENT LOCATED AT THE
INTERSECTION OF THE WEST LINE OF SAID LOT 76 AND
THE EASTERN RIGHT OF WAY OF STATE ROAD 65-C;
THEN GO 698.72 FEET ALONG A CURVE IN SAID RIGHT
OF WAY (SAID CURVE BEING CONCAVE
SOUTHWESTERLY WITH A RADIUS OF 4633.75 FEET, AN
INTERIOR ANGLE OF 08 DEGREES 38 MINUTES 23
SECONDS, A CHORD LENGTH OF 698.06 FEET, AND A
CHORD BEARING OF SOUTH 32 DEGREES 08 MINUTES 42
SECONDS EAST) TO A SRD RIGHT OF WAY MONUMENT;
THEN GO SOUTH 27 DEGREES 41 MINUTES 40 SECONDS
EAST FOR 929.06 FEET ALONG SAID RIGHT OF WAY TO A
SRD R/W MONUMENT AT A POINT OF CURVATURE; THEN
GO 661.41 FEET ALONG A CURVE IN SAID RIGHT OF WAY
(SAID CURVE BEING CONCAVE NORTHEASTERLY WITH
A RADIUS OF 17,138.80 FEET, AN INTERIOR ANGLE OF 02
DEGREES 12 MINUTES 40 SECONDS, A CHORD LENGTH
OF 661.36 FEET, AND A CHORD BEARING OF SOUTH 28
DEGREES 48 MINUTES 00 SECONDS EAST) TO A SRD R/W
MONUMENT; THEN GO SOUTH 29 DEGREES 54 MINUTES
20 SECONDS EAST FOR 1160.67 FEET ALONG SAID RIGHT
OF WAY TO A SRD R/W MONUMENT AT A POINT OF
CURVATURE; THEN GO 615.27 FEET ALONG A CURVE IN
SAID RIGHT OF WAY (SAID CURVE BEING CONCAVE
NORTHEASTERLY WITH A RADIUS OF 5679.65 FEET, AN
INTERIOR ANGLE OF 06 DEGREES 12 MINUTES 24
SECONDS, A CHORD LENGTH OF 614.97 FEET, AND A
CHORD BEARING OF SOUTH 33 DEGREES 02 MINUTES 55
SECONDS EAST) TO A SRD R/W MONUMENT; THEN GO
SOUTH 36 DEGREES 06 MINUTES 50 SECONDS EAST
ALONG SAID RIGHT OF WAY FOR 419.17 FEET TO A SRD
R/W MONUMENT; THEN LEAVING THE RIGHT OF WAY
GO SOUTH 34 DEGREES 26 MINUTES 12 SECONDS EAST
FOR 650.61 FEET TO A CONCRETE MONUMENT MARKING
THE POINT OF BEGINNING; THEN GO NORTHERLY FOR
83.23 FEET ALONG THE ARC OF A CURVE (SAID CURVE
BEING CONCAVE SOUTHWESTERLY WITH A RADIUS OF
1040.59 FEET, AN INTERIOR ANGLE OF 04 DEGREES 34
MINUTES 57 SECONDS, A CHORD LENGTH OF 83.20 FEET
AND A CHORD BEARING OF NORTH 02 DEGREES 17
MINUTES 28 SECONDS WEST) TO A CONCRETE
MONUMENT; THEN GO NORTH 78 DEGREES 00 MINUTES
00 SECONDS EAST 340 FEET, MORE OR LESS, (PASSING A
CONCRETE MONUMENT AT 330.00 FEET) TO THE

BOUNDARY OF LAKE TALQUIN STATE PARK AS
DEFINED IN OR BOOK 218, PAGE 149; THEN FOLLOW
SAID BOUNDARY SOUTHERLY TO A POINT LYING
NORTH 81 DEGREES 00 MINUTES 00 SECONDS EAST
FROM THE POINT OF BEGINNING.  THEN GO SOUTH 81
DEGREES 00 MINUTES 00 SECONDS WEST FOR 15 FEET,
MORE OR LESS, TO A CONCRETE MONUMENT; THEN
CONTINUE SOUTH 81 DEGREES 00 MINUTES 00 SECONDS
WEST FOR 325.00 FEET TO THE POINT OF BEGINNING.

Parcel Identification Number:  5-0L-0R-0S-0000-76401-0100

Together with all the tenements, hereditaments and appurtenances
thereto belonging or in any way appertaining.

### **Myrtle Beach Condo**

FURTHER DESCRIPTIVE INFORMATION CONCERNING
THIS REAL PROPERTY WILL BE ADDED TO AN AMENDED
COMPLAINT UPON ITS RECEIPT.

5.     The defendant personal properties consist of approximately $53 million in funds

(U.S. Dollars) from Bank of America ("BOA") accounts, (hereafter collectively "the BOA

Accounts").  The funds in the BOA Accounts are or will be seized/frozen pursuant to warrants

issued by the United States District Court for the District of Columbia and are more fully

described as:

(a)     All funds held in account #005483933650 at Bank of America, in the name of
Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(b)     All funds held in account #005483933016 at Bank of America, in the name of
Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(c)     All funds held in account #005483933553 at Bank of America, in the name of
Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(d)     All funds held in account #005483933605 at Bank of America, in the name of
Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(e)     All funds held in account #005483933634 at Bank of America, in the name of

Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(f)     All funds held in account #005562565949 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(g)     All funds held in account #005562566896 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(h)     All funds held in account #91000116796961 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(i)     All funds held in account #91000116797038 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(j)     All funds held in account #91000116797070 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

(k)     All funds held in account #334011130192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

(l)     All funds held in account #334011130200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account;

(m)      All funds held in account #334015765704 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account;

(n)     All funds held in account #91000113401039 at Bank of America, in the name of Golden Panda Ad Builder; and

(o)      All funds held in account #91000113404188 at Bank of America, in the name of Golden Panda Ad Builder.

6.     Thomas A. Bowdoin, Jr. is an owner of the defendant real properties and controlled the Ad Surf Daily BOA Accounts from which those funds were seized.  Clarence Busby Jr. and/or Dawn Stowers appear to have controlled the Golden Panda Ad Builder BOA Accounts from which those funds were seized.

7.     After filing this Complaint, the government will serve notice on the defendant real

5

properties and warrants of arrest in rem on the personal properties, and will notify putative

claimants, pursuant to Rule G of the Supplemental Rules and 18 U.S.C. § 985(c)(1).  In

accordance with 18 U.S.C. § 985(b)(1)(A), the defendant real properties will not be seized until

the entry of orders of forfeiture.  The funds seized from the BOA Accounts will be held in a U.S.

Treasury account pending their forfeiture.

## BASES FOR FORFEITURE

8.      The defendant properties (the above-identified real and personal properties) are

subject to forfeiture because, as further set forth herein, they:  (1) constitute proceeds or are

derived from proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud), a "specified

unlawful activity" (as referenced in 18 U.S.C. § 981(c) and defined in 18 U.S.C. § 1956(c)(7)(A)

(incorporating § 1961(1)); and/or (2) constitute property involved in money laundering, in

violation of 18 U.S.C. § 1956; and/or (3) constitute proceeds or property involved in

conspiracies to commit these offenses, in violation of 18 U.S.C. §§ 371 and 1956(h).  As set

forth herein, there is reasonable cause to believe that the funds that were contained in the

above-identified BOA Accounts and the funds that were used to acquire or maintain the real

properties at issue here constitute proceeds of a wide-spread Internet-based Ponzi scheme that

operated in violation of Title 18, United States Code, Section 1343 (wire fraud).  All such

property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a).

## FACTS

9.      Computers are frequently used to perpetrate fraud schemes and several fraud

schemes have successfully been implemented over the Internet, including (1) advance fee

schemes, (2) chain letters schemes, and (3) Ponzi schemes.  Advance fee schemes occur when an

6

offender advertises the availability of goods or services and requires payment in advance. Only after paying do victims discover that the goods and services are defective, inferior, or nonexistent. With chain letters, victims may receive, either via postal mail or now by email, a letter containing a list of names and addresses to whom the recipients are urged for various reasons to send money. Recipients may add their names to the list (sometimes removing the topmost name to keep the number of participants constant) before redistributing the updated letter. Ponzi schemes promote allegedly lucrative business opportunities, often involving foreign currency exchange, precious metals trading, or other high-return investments. But, in a Ponzi scheme, there is in fact no underlying profitable business to support the payments promoters say they will make to the investors/participants. Instead, unbeknownst to many of the participants, the promoters use the money obtained from a growing base of later investors/participants to pay so-called "profits" to earlier investors. Schemes that depend on growing the base of new participants to support payments to prior participants are also commonly referred to as pyramids. The Internet is increasingly used as a vehicle to promote each of these types of frauds.

10.    Ponzi schemes have evolved with the development of the Internet, but their basic premise remains the same: later investors' funds are used to pay the earlier investors. A version of the Ponzi scheme that law enforcement officials have encountered in recent years and that has been replicated in the instant case is referred to as an "auto-surf program." "Auto-surf" claims to be a form of an online advertising program that generates revenue from so called "advertisers" who pay fees to have their websites displayed, or channeled to other viewers, through the "host's" web-based operation. As part of the program and to encourage more "advertisers" to pay the membership fee, the "host" pays the "advertisers" a so-called "rebate" for viewing fellow

"advertisers'" webpages.  Moreover, the "host" encourages "advertisers" to recruit new "advertisers" by paying existing "advertisers" a referral fee.  In this Ponzi model, the "host" generates most, if not all, of its funding from membership fees, and therefore must use money received from later "advertisers" to pay "rebates" and referral fees to earlier "advertisers."  These programs collapse when new "advertisers" membership fees fail to cover the payouts promised to existing "advertisers."

11.     In early 2006, for example, the United States Securities and Exchange Commission ("SEC") successfully prosecuted a lawsuit against an Internet-based auto-surf Ponzi operation identified as "12daily Pro."  According to the SEC's Complaint, 12daily Pro purported to be a "paid Autosurf program" whereby members would earn money for "viewing the websites owned or promoted by other online professionals."  As described by the SEC in its Complaint, members purportedly paid money (membership fees) to 12daily Pro as the host, in return for which 12daily Pro promised to pay its members to view advertisers' rotating websites.  Although the operators of 12daily Pro purported to be paying members from earnings that were "financed by multiple income streams, including advertising and off-site investments," the SEC's investigation determined that almost all of the funds that the operators paid to members came from new investments (in the form of additional fees paid by upgraded memberships and newly-referred members).  The operators of 12daily Pro did not generate any significant independent revenue to support the payouts it promised to its membership.  Instead, it operated as a pure Ponzi scheme that could not sustain its promised payments absent an ever-increasing number of upgraded members, or investors.  The SEC estimated that before it successfully intervened the operators of the 12daily Pro website took in over $50 million from approximately

300,000 "investors" nationwide and overseas. The SEC's Complaint against 12daily Pro and its operators was widely publicized, yet Internet-based auto-surf Ponzi programs have continued to proliferate. A copy of the SEC's Complaint is attached. *See* **Exhibit 1**.

12.     In July 2007, the SEC successfully prosecuted another securities fraud lawsuit against the operators of a similar Internet-based auto-surf Ponzi scheme, known as "Phoenixsurf," that offered "investors" a 120% return in just eight days on investments ranging from $8 to $6,000. To receive the promised returns, the investors had to purchase advertising and view at least 15 webpages of advertising per day during the eight-day period. Although the website operators represented that they would pay the promised returns with funds received from other businesses and programs within its network, the SEC charged the operators with operating Phoenixsurf.com "primarily as a pure Ponzi scheme – using for the most part only new investor funds to pay the promised returns to existing investors." In its Complaint, the SEC alleged that, during its operation, this Ponzi scheme paid to the earlier investors $36.7 million of the $41.9 million it raised. A copy of the SEC's Complaint against Phoenixsurf.com and its operators is attached. *See* **Exhibit 2**.

13.     In July 2008, a United States Secret Service task force became aware of another entity operating an auto-surf Ponzi scheme that is, in all material aspects, no different from the 12daily Pro and Phoenixsurf Ponzi schemes. That entity has been known as "Ad Surf Daily" and at the time of the filing of this Complaint is known as "Ad Surf Daily Cash Generator" (hereinafter, "ASD").

<u>Introduction</u>

14.    On or about July 3, 2008, agents working as part of a Secret Service task force received information from a reliable source regarding ASD. The source believed that ASD was a pyramid or Ponzi scheme operating via the Internet. The source indicated that ASD also operates a Spanish version of its "paid autosurfing" program at a website called "La Fuente Dinero" (The Fountain of Money).

15.    The Secret Service task force confirmed that ASD operates over the Internet (thereby engaging in transmissions by wire) at www.asdcashgenerator.com, that related persons operate La Fuente Dinero over the Internet at www.lafuentedinero.com and that related persons operate at least one more auto-surf Internet site, Golden Panda Ad Builder, at www.goldenpandaadbuilder.com. All three sites claim that members can earn large profits simply (1) by paying fees to advertise webpages, (2) by surfing other members' webpages, and (3) by recruiting more members to do the same.

16.    ASD is in fact operating a paid auto-surfing program and that program is, in reality, merely a Ponzi scheme. Although ASD appears to be careful to avoid calling its members "investors," in an apparent effort to avoid regulatory scrutiny, ASD promotes paid membership by offering its members a 125% return on their membership fees. In addition, ASD encourages members to recruit new members by paying commissions for referrals. ASD pays the source of a referral a percentage of each newly referred member's fees. ASD's webpage proclaims that each weekday in May and June it "rebated" to its members at least 1% of the money they had paid to ASD, and each weekend day it "rebated" at least .50%.

17.    ASD does not appear to sell any independent products or services sufficient to

generate an income stream needed to support the rebates and commissions that it promises its members. Further, most of the so-called advertisers are not paying ASD for advertising services at all; instead, they are paying ASD with the expectation that ASD will provide a full rebate and additional revenue. Thus, absent continuous membership growth (an impossibility) ASD has no means to generate the returns it represents. For example, for the month of June 2008, ASD claims to have taken in (through new money and member "upgrades") over $90 million. See http://www.adsurfdailybreakingnews.com/rebateforasd.htm. To fulfill its promise to rebate 125% of that revenue, ASD must now generate a total of $112.5 ($90 million plus $22.5 million to cover the 25% return). Assuming ASD continues to pay on average 1% daily, ASD should have rebated the full amount to members in about four months (125 days at 1% per day). In other words, ASD must spend approximately $28 million per month for the four months after June to cover the rebates owed from June's receipts. But, ASD states that it allocates only 50% of its revenue to cover its rebate program. Accordingly, for the quarter (four months) that it takes ASD to cover the $112.5 million outlay it must take in, each month, not just $28 million, but $56 million. ASD must generate new revenues of a quarter of a billion dollars in the four months after June 2008 to keep its promises to its membership even though it has no apparent significant revenue source except from its membership. There is reasonable cause to believe that ASD is a sophisticated Ponzi scheme that will, by its very nature, result in the loss of millions of dollars from its participants. ASD boasts that its Internet operation provides income to individuals across the United States. According to its promoters, ASD is in several other countries and is continuing to grow worldwide.

Thomas Anderson Bowdoin, Jr.

18.     Thomas Anderson Bowdoin, Jr., also known as "Andy" (hereinafter "Bowdoin"),
controls and, with others, operates ASD.  Bowdoin filed or caused to be filed papers to
incorporate AdSurf Daily, in Nevada, on December 14, 2006.  From October 2006 through
March 2007, Bowdoin was the CEO and President of AdSurf Daily, and from March 2007 until
the filing of this Complaint, he was the CEO and President of AdSurf Daily Cash Generator.
Bowdoin has operated ASD under these two names from a former flower shop in Quincy,
Florida, and he has continued to use the same BOA Accounts to support the ASD operation.

19.     Bowdoin is 74 years old.  On the Internet, ASD promotes him as an astute
businessman with a long and remarkable record of successes in numerous business ventures, but
such successes are remarkably absent from his true work history.  Just prior to concocting ASD,
Bowdoin was arrested in Alabama for one or more felony violations related to Fraud in
Connection with the Offer and Sale of Securities by an Unregistered Agent.  Bowdoin and
several co-defendants were accused of having been promoters of a company called "Mobile
International, Inc."  The Alabama defendants said they had developed a mobile telephone system
that was a cheaper alternative to the then-current cellular systems.  That venture collapsed and
Bowdoin and his co-defendants were charged with having sold unregistered securities to
investors and with failing to state material facts to the investors that would have impacted the
victims' decisions to invest.  In particular, Alabama officials asserted that Bowdoin instigated a
scheme by which he took money from some victims to pay off prior investors.  On October 6,
1997, in Montgomery County, Bowdoin resolved this criminal matter by agreeing to enter
Pre-Trial Diversion with three years of supervised probation and pay restitution of $15,000.

12

Bowdoin completed his Pre-Trial requirements and the charges were dismissed.  Furthermore, on

January 11, 1999, in Wilcox County, Bowdain plead guilty to one count of sale of unregistered

securities and was sentenced to 1 year in prison, however the sentence was suspended and he

was placed on 3 years supervised probation and ordered to pay restitution of $75,000.

20.     A public search on the Florida Department of State, Division of Corporations'

website of registered corporations revealed that from November 14, 1983, to September 14,

2007, Bowdoin was a Registered Agent ("RA"), President, Chief Executive Officer ("CEO") or

Director of the following defunct corporations:  (1) RA for ReTube-Lite International, Inc.,

incorporated from 9/14/83 to 11/21/84 (involuntary dissolved); (2) RA for Crosby Enterprises of

Lakeland, incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (3) RA for KDJ

Enterprises, Inc., incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (4) RA for South

Polk Investors, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary dissolved); (5) RA for

Ridge-Tec, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary dissolved); (6) RA for

MI-Com, Inc., incorporated from 4/2/84 to 11/1/85 (admin. dissolved); (7) President of Creative

Retailing Services, Inc., incorporated from 3/5/98 to 9/19/03 (admin. dissolved); (8) CEO of

Global Tech Marketing, Inc., incorporated from 6/26/00 to 9/13/0 (admin. dissolved); (9)

Director of GPS Tech, Inc., incorporated from 3/26/04 to 9/15/06 (admin. dissolved); (10) RA

for GPS Development & Manufact., incorporated from 11/12/04 to 9/16/05 (admin. dissolved);

(11) Director of EADNetwork, Inc., incorporated from 12/1/06 to 9/14/07 (admin. dissolved);

and (12) Director of World Payment Systems, Inc., incorporated from 12/1/06 to 9/14/07 (admin.

dissolved).  It does not appear that any of these corporations operates, today.  It also appears that

Bowdoin earned no significant income from legal employment in the twenty years prior to his

commencement of ASD's operation.  But, no information about Bowdoin's record of business failures and fraud accusations is contained on ASD's website.  Nor was Bowdoin's true past mentioned to prospective members during the ASD rally at which he spoke (further discussed below) or during the conference calls that he, or others promoting ASD on his behalf, participated in during ASD's operations (further discussed below).  Instead, ASD's promoters tell prospective recruits that Bowdoin's business genius distinguishes ASD from other Internet-based Ponzi operations.  Indeed, ASD's operators and promoters assert that the President of the United States recently awarded Bowdoin a medal of distinction for Bowdoin's lifetime of success as a businessman.  In reality, in June 2008, the National Republican Congressional Committee awarded Bowdoin the "Medal of Distinction" as a "marketing tool" after Bowdoin made a substantial monetary contribution to the party.  Despite representations by ASD and/or its employees to the contrary, Bowdoin has never received an award from the President of the United States based on his business acumen.

<u>ASD's Original Website</u>

21.    On or about October 2006, shortly after 12daily Pro collapsed, Bowdoin and co-conspirators launched the original ASD website.  It became operational on the Internet at http://www.adsurfdaily.com.  This original ASD website operated until March 2007.  In its initial form, ASD offered to repay 150% of the membership fee a member paid to purchase an "ad package."  ASD referred to the repayment to "members" as "rebates."  ASD agreed to reserve 60% of the gross revenue it received from each day's advertisement sales (additional member money and new member money) to pay member rebates.  Additionally ASD claimed that it would pay 10% for each "1st level" referral (whereby members would receive a 10%

14

commission on the funds paid to ASD by any new member they had sponsored) and an additional 5% for each "2nd level" referral (whereby members would receive a smaller commission for members brought in by those for whom they had been the initial sponsor).  In short, for each $1.00 that a person paid to ASD, it agreed to pay back $1.50, provided the person agreed to view several websites that ASD rotated through that person's browser, and to pay even more if the person referred others who paid their dollars to ASD.

22.     The original website accepted e-Gold and Virtual Money as payment.  e-Gold and Virtual Money are online digital currency payment systems.  e-Gold was once a highly-favored method of payment by operators of investment scams, including pyramids, Ponzis, high yield investment programs, and other "get rich quick" schemes because of its relative anonymity and refusal to engage in chargebacks (where payment to a vendor is disallowed or reversed).  Indeed, 12daily Pro and Phoenixsurf utilized e-Gold as their primary payment method before those Ponzi schemes collapsed.  The operators of the e-Gold system were indicted in April 2007, by a Grand Jury sitting in the United States District Court for the District of Columbia, for money-laundering and for operating an unlicensed money transmitting business.  Publicity about the government's scrutiny of the e-Gold system's operation began in December 2005, after federal agents participated in the execution of warrants to search e-Gold's offices and seize (for forfeiture) funds from its bank accounts.  Shortly after publicity surrounding the government's investigation into e-Gold appeared, ASD discontinued using the e-Gold system as a means for receiving member funds.  In July 2008, e-Gold operators pled guilty to various criminal charges (for some, including money laundering) in the District of Columbia.

<u>ASD's Current Website</u>

23.     On or about March 2007, after 12daily Pro was sued and just prior to e-Gold's

indictment, Bowdoin and co-conspirators moved ASD's operations to a new website,

http://www.asdcashgenerator.com.  Although the website was new, the auto-surf operation that

had been deployed as Ad Surf Daily continued to be conducted by Bowdoin from the former

flower shop in Quincy, Florida, using the same BOA Accounts that Bowdoin opened when he

began his business as Ad Surf Daily.  The only significant change to this second version of ASD

was to the payouts that members were promised.  Now, ASD offered to repay 125%, not 150%,

of the membership fee.  Further, ASD agreed to reserve only 50% of the gross revenue it

receives from each day's advertisement sales to pay member rebates.  ASD was agreeing to pay

less and to keep more.  ASD retained its referral fee structure.  It continued to claim that it would

pay up to 10% for each level one referral and an additional 5% for each level two referral, with

some modification, as discussed below.

24.     In July 2008, on its website, ASD said its operations enabled its members to "sell

more products and recruit more Distributors" because the operation:

> is a generator of internet traffic to web site owners.  Web site
> owners purchase ad packages and place their web site in rotation
> for consumers and business owners to view.  ASD pays its
> advertisers a rebate to view a minimum number of sites each day,
> therefore, insuring that prospects will be viewing each site.

A printout of the ASD webpage containing these representations is attached.  *See* **Exhibit 3**.

25.     ASD – Bowdoin and his associates – offered two different types of memberships

that are also referred to as "participantships":  (1) a free membership (during which the

member's account is referred to as a "training" account ); and (2) an "upgraded" membership,

16

which requires *the purchase of "ad packages."*  "Ad packages" consist of credits and each credit

is worth $1.  ASD imposed a minimum "ad purchase" of $10 and a maximum "ad purchase" of

$12,000, but on its website ASD has indicated that by contacting Bowdoin larger purchases were

possible.  ASD claimed that an upgraded member receives one showing of their advertisement

(the website the member chooses to link) per "credit."  ASD explained that if an upgraded

member used an ad package to advertise a website, for each $1 ad package purchased, ASD

directs one member to visit that purchaser's website by inserting the website into ASD's rotator

program.

26.    ASD's upgraded (ad purchasing) members were provided with more opportunities

to send ASD their money and get money back.  ASD divided its paying "advertisers" into four

additional categories as a means for collecting additional funds from participants - not as

additional "advertising" charges - but as membership fees.  ASD's membership fees allowed its

so-called advertisers to (1) increase their referral commissions, (2) increase the frequency of

their pay-out opportunities, and (3) decrease their "cashout" costs.  For the first category, a

"Trainee,"  a member was not required to pay monthly dues.  A "trainee" would receive a 5%

commission for "1st level" referrals (a new member the trainee sponsored) and 0% commission

for "2nd level"  referrals (new members sponsored by a trainee's 1st level sponsor).  A "trainee"

must pay a 2% withdrawal fee on "rebate" earnings and withdrawals from the system can only

occur on Mondays.  ASD termed its second membership category an "Executive

participantship."  This member paid a $10 monthly fee.  In return, the "executive" member was

promised a 5% commission on his or her 1st level referrals and 3% commissions on 2nd level

referrals.  ASD imposed no withdrawal processing fees, but withdrawals could only be made on

Mondays.  ASD's third category for upgraded memberships was termed a "VIP participantship."
To qualify for this membership a member paid ASD a $25 monthly fee, in return for which the
"VIP" member receives a 7% commission on 1st level referrals and a 4% commission on 2nd level
referrals.  There were, again, no withdrawal processing fees imposed, and now withdrawals
could occur on Mondays, Wednesdays and Fridays.  The fourth category of upgraded
membership was "Executive VIP participantship."  By paying a $100 monthly fee, the Executive
VIP members were entitled to a 10% commission on 1st level referrals and a 5% commission on
2nd level referrals.  The Executive VIP was not charged any withdrawal processing fee and could
withdraw funds on any weekday.

27.    Over the Internet, ASD claims to have a business model with an "innovative
rebate structure that will enable [it] to continue indefinitely."  During July 2008, ASD stated that:

> rebates are paid from ad purchase sales of the Cash Generator, the
> sale of banner ads on the Cash Generator, commissions from the
> sale of the Ad Placement Service at our sister site "Attract
> Marketing System" by Cash Generator members, sale of ebooks
> and any other products that ASD decides to market.

But, in July 2008, no independent banner ads appeared on the Cash Generator website, the sister
site did not appear to be operational, and no other products appeared.  Instead, rebates appeared
to derive exclusively from fees paid by rebate participants.  Indeed, members' fees appear to be
the pot from which ASD agrees to pay its rebates.  ASD explains that it will divide 50% of the
daily profit amongst members who have active "ad packages."  The gross profits from the day
will be totaled and active member will receive a percentage based on their current active "ad
packages."  To receive a portion of the profit as a "rebate", an upgraded member must view at
least 24 webpages per day, and each webpage must be viewed for 15 seconds.  ASD estimates

that viewing the webpages should take about 6 minutes per day.  Upgraded participants are

encouraged to use their daily rebates to purchase more "ad packages" so their rebates are

compounded.  ASD states that the daily rebate will be capped at 8% and although the rebates are

not guaranteed ASD will also put 5% of the profits in a reserve account to be used to pay the

rebate when new "ad package" sales are extremely low.  ASD's News webpage lists daily

rebates to investors for the time period for March 2008 to June 2008 as averaging roughly 1%

each weekday, and at least .5% for each weekend day.  Under that rebate scenario, it would take

a participant who paid $100 to purchase "ads" at least 125 days to get his or her $125.00 (125%)

ad-surf payout.  Of course, the slow payout schedule allows ASD time to expand its base of

paying members and perpetrate this scheme for a longer period of time.

   28.  In July 2008, ASD's webpage also stated that:

> All payments made to ASD are considered advertising purchases,
> not investments or deposits of any kind.  All sales are final.  ASD
> does not guarantee any earnings or profits.  Any commissions paid
> to Members are for the service of viewing other Member web sites
> and for referring Members to AdSurfDaily.  All advertising
> purchases are non-refundable.

This disclaimer language is ASD's effort to avoid being recognized as an unregistered issuer of

securities and to avoid liability to participants, for breaking promises it makes elsewhere, when

the Ponzi is revealed.

   29.  In addition to recruiting new members from its webpage, during the six months

prior to the filing of this Complaint, ASD has hosted live membership drives in Las Vegas,

Nevada, Tampa and Miami, Florida, and in Chicago, Illinois.  Another drive was promised for

Tulsa, Oklahoma.  According to ASD, these rallies fueled its recent rapid expansion.

Federal Agents Join ASD

30.     On or about July 7, 2008, a Task Force Agent ("TFA") with the St. Cloud, Florida IRS-Secret Service Task Force visited ASD's website, created a free "training" account with ASD, and began to visit its paid advertisements.  The TFA was directed to ASD's own website's "News" section, to other sites promoting ASD, to sites promoting multi-level marketing programs generally, and to sites of individuals purportedly selling services, such as phone meditation.

31.     On or about July 14, 2008, a TFA opened an "upgraded member" account with ASD.  ASD directs new members either to mail a money order or cashier's check to its Florida office, or to deposit a certified check, money order or cash at "your nearest branch of Bank of America," directly into ASD's BOA account and, thereafter, to fax a copy of the deposit receipt along with their membership number to ASD.  On its website, ASD provides its BOA account number as 0000005483933016.  Another TFA made a direct deposit to ASD'S BOA account by delivering a check to a BOA branch in downtown Orlando, Florida.  Thereafter, a TFA faxed a copy of the deposit receipt via facsimile to ASD's headquarters in Quincy, Florida.

32.     When one of the TFA's signed up for the upgraded ASD account, he was required to list a website to advertise.  But ASD did not require, or even verify, that the TFA had any product or service to sell.  The TFA was able to link his undercover "My Space" page as his business webpage he wanted advertised.  Despite professing a business model that involves the provision of Internet advertising to businesses, ASD did nothing to ensure that real businesses were joining its program as advertisers.  The TFA determined that between July 7, 2008, and July 11, 2008, he had approximately 12 visits to his "MySpace" page, but the TFA was unable to

determine who had visited his "My Space" or how they were directed to his page.

33.     On or about July 20, 2008, a TFA opened another "upgraded member" account with ASD from a location in the District of Columbia, also via the Internet.  The next day, a TFA made a direct deposit into ASD's BOA account, this time by delivering a check to the BOA branch at 700 13th Street, NW, Washington, DC.  Thereafter, a TFA faxed a copy of the deposit receipt from the District of Columbia to ASD's office in Florida.  The ability to access ASD over the Internet from different states, and to open accounts from multiple locations by delivering payment to "your nearest Branch of Bank of America" as directed by ASD confirms that ASD knows it operates in multiple states, and so intends.

<u>Few Legitimate Advertisers</u>

34.     On July 11, 2008, a TFA logged into his ASD account.  On this first visit, it became apparent that most of the advertisements that ASD displayed to its members did not come from legitimate advertisers.  The first advertisement ASD displayed was a webpage from another ASD member promoting ASD.  Above the advertisement was an ASD toolbar displaying a counter showing how many webpages the TFA had viewed, a statement indicating whether the TFA had viewed his quota of websites for the day to earn his credit, and a timer counting down 15 seconds.  The next two "advertisements" that ASD displayed for this TFA also promoted ASD and were apparently, again, from other ASD members.  These alleged "advertisers" had <u>no independent product or service to sell</u>, no web-based business, and thus no legitimate reason to have paid ASD to advertise for them except to secure ASD's "rebates."  Instead of touting products or services for sale, these webpages contained videos, graphs and text that explained the benefits of buying "ad packages" from ASD.  A link on each page redirected the viewer to the

21

ASD website in order to join ASD under that members referral number.  By advertising a webpage that seeks to secure an ASD referral, a member might hope to increase his or her chance of securing 1st level and 2nd level referral fees, thereby increasing their returns from ASD.

35.     The fourth and fifth webpages that were rotated into the TFA browser involved websites that promoted the sale of other multi-level marketing products, such as the sale of Acai Berry Juice and "Bio Petro Improver."  The sixth page that he viewed brought up a website that was no longer in operation.  For this "advertiser," the browser instead stated "site 404 error", which means that the server no longer exists.

36.     Moreover, ASD does not require members to purchase legitimate advertising in order to participate in its "rebate" program – it only requires members to pay ASD, and refer others, to profit.  On ASD's "Getting started" webpage it provides potential "ad package" the following option "[f]or those joining ASD who do not have a personal business to advertise, you may advertise either www.pay.com or www.mobillecash.com.  These are only suggestions, as there may be other companies/products that you find to advertise."  This option to select a webpage provided by ASD completely undermines ASD's claim that it is providing its members a portal to advertise their webpages.  Clearly, members would not agree to pay ASD to advertise others' webpages and ASD would not suggest it, unless (1) ASD was attracting members that were more interested in qualifying for the rebates and referral payments than in securing advertising for their independent businesses, and (2) ASD was more concerned with collecting money from an expanding base than with providing a sustainable advertising solution to customers.  Indeed, despite operating for over a year, ASD has acknowledged that it is only well-positioned now to secure advertising business from so-called "national" advertisers.

37.     On each day since TFAs opened ASD accounts, they have sought to access the ASD website.  On those occasions when ASD's website was operational, TFAs viewed several members' websites that were displayed to them by ASD.  The TFAs found a consistent pattern.  On each occasion, several of the websites were pages from ASD's website or websites that promoted ASD (thus selling nothing but the scheme), and several websites promoted other high-yield investment programs ("HYIPs") or were auto-surf monitoring newletters.  The TFAs saw few websites of individual participants selling proposed services or products.  Most of these websites operated as referral sources – they contained a link to sign up with ASD in order to be deemed to have been sponsored by that website's owner or operator.

<u>Members Upgrade for Returns</u>

38.     On or about July 22, 2008, from the District of Columbia, a TFA logged onto one of the ASD accounts law enforcement officers created and visited several websites to which ASD's rotator program directed him.  As was the case when other TFAs surfed ASD, several of the websites either promoted ASD or sold no service or product.  One site that did appear to offer products for sale was a gardening equipment webpage.  A TFA called the telephone number listed on the webpage and spoke to a male.  According to this person, his mother is an ASD member and she posted his gardening shop webpage on ASD.  He stated that his mother has been an ASD member for the last four months and she earns around  $130 per day.  He explained that he believes ASD is a pyramid or Ponzi scheme that it is purporting to sell advertising.  He understood that like any Ponzi scheme, sooner or later ASD will crash.  He said he told his mother to pull her money out before that happens.  He stated that the whole idea around surfing sites is ridiculous and that a "monkey could do it."  He said he has a business, that

23

he knows advertisement, and that he does not see any real value in having someone visit your website for 15 seconds.

39.     He continued to explain that since his webpage was posted on ASD he has seen a small spike in traffic to his website but cannot determine if that is a result of ASD.  He also did not know whether his sales had increased as a result of his affiliation with ASD.  He ended the call by asking the TFA if he needed a sponsor and offered his own ASD member number.  This person invited the TFA to join ASD's Ponzi scheme as his referral even though he knew it was a Ponzi.

40.     On or about July 16, 2008, a TFA interviewed an ASD participant at his residence in Orlando, Florida.  The participant stated that in June 2008 he joined ASD by making a direct deposit into ASD's BOA account and linking his website, a newsletter promoting different HYIP's or auto-surf programs, to his ASD account.  The participant acknowledged that he joined ASD for its returns – not to advertise his webpage.  The participant explained that he logged onto his ASD account and looked at advertisement as part of ASD's requirements, but said that the advertisement side of ASD was a "joke" and that he just clicked a button and stayed on a site for a few seconds and moved on to another site.  The participant said there is no requirement to actually view the websites or purchase products promoted by the websites.  He explained that ASD was an "auto-surf" program that he learned about from the Internet and other individuals. According to the participant, he was familiar with online investing and in the past he had participated in other scams that were HYIPs and "auto-surfs."  Specifically, he mentioned 12daily Pro, and claimed to have lost $9,000 in that Ponzi scheme.  Although the participant understood that ASD was not enabling its members to sell more products and recruit more

distributors as was claimed, he explained that he believed that ASD was not a Ponzi scheme like 12daily Pro. He differentiated 12daily Pro from ASD because of Bowdoin's acumen. He stated that Bowdoin recently received an award from the President of the United States, he had made millions of dollars on previous businesses he created, and he was planning on investing in real estate.

41.     On or about July 18, 2008, a TFA interviewed another ASD participant by phone. The TFA identified this participant from the ASD website where she had posted a testimonial regarding the large amount of profit she had made within the program. The participant stated that she had recouped all of her initial investment. The participant stated that this was the easiest program she had ever been involved with and that it only took a few minutes a day on the Internet. The participant said she would sponsor the TFA and provide a website if he needed one. The participant explained that a member is not required to sell anything and that she does not sell items from the website she uses to participate in ASD. The participant stated that Bowdoin was a very wealthy man and had been a successful business man for over 30 years and had recently received an award from the President of the United States. The participant said she was familiar with online scams but this was different because the company was planning on investing in real estate and other business ventures.

42.     On July 22, 2008, while using a member number to participate with ASD's auto-surf program from the District of Columbia, a TFA came across what appeared to be a consulting company advertisement. This webpage simply linked visitors to other websites and offered nothing for sale. The TFA called and spoke to a male who identified himself as the webpage's creator. He said he had just joined ASD at the end of July and had only invested $50. He said

25

he was receiving his 1% a day for surfing 14-24 websites a day.  He said that anyone could set

up a free website at www.freeservice.com with little to no information and just have the website

link to another website.  He explained that just as he had done, there was no need to have a

business to advertise and no need to purchase any items from the websites one visited through

ASD.  He said the best way to make money in the system is to keep putting your money back

into the system as it accumulates.  He asked the TFA if he needed a sponsor and he offered the

TFA his ASD member number for that purpose.

43.    On or about July 22, 2008, also while surfing websites via the ASD website from

the District of Columbia, a TFA came across a site that appeared to sell weight loss products.  A

TFA called and spoke to its creator.  She told the TFA that she started with ASD on May 30,

2008, that she was up to 12,000 "ad packages", and that she was making $150 a day with ASD.

She explained that she has seen an increase in the traffic on her website but did not know if it

was a result of ASD.  She explained that she normally "upgrades" (reinvests) 75% and cashes out

25%.  This allows her to make more money because she can purchase more "ad packages."  The

TFA asked her about investing with ASD.  She immediately said, "Don't call it investing, you

know what I mean, we can get in trouble if we say that, we have to be careful."  She explained

that ASD is doing very well and that it recently took in $40 million at a rally in Miami and even

more at a Chicago rally.

<u>Rebates Paid Even When No Ads Viewed</u>

44.    Another indicia that ASD is not designed to promote legitimate business

customers' webpages comes from the fact that ASD promises to pay daily rebates even on dates

when ASD's webpage is inaccessible.  Frequently during the month of July 2008, TFAs

26

attempted to access their accounts in order to surf websites through ASD, but the ASD website was not operating.  Yet, routinely, ASD placed a banner titled, "ASD WORLD WIDE WEALTH BUILDER."  The following statement was posted, "We are currently working on the ASD website.  During the time the site is down you will earn global credits for surfing.  There is no need to submit a ticket or call the office.  We apologize for the inconvenience."  There was no mention of compensation that might be due back to advertisers who suffered a loss of advertising exposure during periods when the ASD website was down.  But, there was reassurance that, despite an inability to visit members' advertisements, members would continue to earn the credits they would have earned had the ASD site been functioning.

<u>Illusory Customer Service and Invalid Street Address</u>

45.     Further indicia that ASD is not a valid advertising business can be deduced from the numerous occasions when TFAs have attempted, unsuccessfully, to contact ASD's customer service.  Each time, a call to the telephone number posted on ASD's website goes unanswered, just continuing to ring and eventually cutting off with no option to leave a voice mail.  In addition, the address listed on ASD's webpage is not a valid mailing address.  The address 13 S. Calhoun Street, Quincy, Florida does not exist.  A building located at 11 S. Calhoun Street is a now defunct flower shop that used to be run by Bowdoin's wife.  It appears that Bowdoin or one of his associates merely posted the number 13 on another door attached to the same building.  ASD has been receiving mail there.  A picture of ASD's Quincy, Florida headquarters building, from which ASD says, over the internet, that it operates one of the Internet's most successful advertising businesses, is attached.  *See* **Exhibit 4**.

27

<u>Additional Misrepresentations to Promote Expansion</u>

46.     On or about July 22, 2008, a TFA contacted another ASD member.  The participant invited the TFA to participate in a conference call, offered to any willing participant, related to "Golden Panda," (said to be an Asian version of ASD).  The participant said that "Golden Panda" was coming online in the next couple of days and it was going to be big.  The participant further stated that Bowdoin is the creator of this new venture, along with a man by the name of Clarence Busby.

47.     Later that day, from the District of Columbia, a TFA participated in the "Golden Panda" conference call.  During the call, a person who identified himself as Busby said that Bowdoin approached him about running "Golden Panda."  Busby stated that he and Bowdoin were 50% partners but that Busby would be in charge of the daily operations of Golden Panda.  Busby explained that Golden Panda was going to be the Chinese version of ASD, operated over the Internet from Acworth, Georgia.  Busby claimed to have been a minister for 30 years and to have started six successful businesses.  Busby said that he has been a participant in the ASD program for nine  months and reaped great benefits.  Busby said Bowdoin promoted Golden Panda at the ASD's Chicago rally which took place on July 18, 2008.  Busby said that Golden Panda already has 11,000 participants and that they have 50-100 individuals coming into their Acworth office each day to deposit funds with the new operation.  He said the website, www.goldenpandaadbuilder.com, will be operational on July 23, 2008.  Busby said, "For those people overseas, we are setting up Solid Trust Pay (Alert Pay)," who will wire any monies, in excess of $500.  Busby addressed the issue of current and future income for ASD and the new Asian version by explaining:

28

First of all Andy has run his company **pretty much for two years without a lot of income streams**, he's had some money here and there. The building of [Bowdoin's] company is based on a great business model, the business model says if you'll do your work and buy 'ad packages' we'll be successful. It's not different than any other company, every company out there has to have some kind of sale, it doesn't matter if it's a mom and pop grocery store, or a Walmart, or a Bell South, or your local church, you got to have some money coming in a consistent manner. The way this money comes into Golden Panda is we sell 'ad packages' and those 'ad packages' create an opportunity for you to surf and look at other people's ads and also you get rebates from that. With that, if this company doesn't have sales, it's not a viable company. Every company has to have sales that's what makes this company work because the great business model, **not because it has a lot of outside resources, but with that said we have a lot of things planned** in the next weeks and months ahead. This will create lots more wealth for you. (Emphasis added.)

Busby claimed that the new operation was processing 300-400 checks a day and depositing those regularly. Busby said, "We want to put a good site that you will be proud of and that will allow you to make good returns on your rebates and the activities that you're a part of and if we do that well, you won't really care who runs this program."

48.    A TFA reviewed the Golden Panda's website, www.goldenpandaadbuilder.com, and identified a BOA account that the company listed as their depository account. The BOA account, 334011130192, is in the name of Golden Panda Ad Builder, in Acworth, Georgia. Per the website, participants can wire funds to this BOA account in order to purchase "ad packages." On the same website was a letter purportedly written by Bowdoin advising that he was relinquishing his role as President, as well as his ownership rights in, Golden Panda.

49.    A public Internet search of Busby revealed a 1997 SEC case (SEC v. Walter Clarence Busby, Jr. Civil Action No. 1:97-CV-2653, Northern District of Georgia). The SEC successfully charged that Busby had violated anti-fraud provisions of the Securities laws by

offering and selling investment contracts in connection with three different "prime bank"

schemes.  Busby was accused of raising money for purported trading programs in "prime bank"

notes by fraudulently representing that investments were risk-free and the ventures would result

in returns ranging from 750% to 10,000%.  In total, Busby raised nearly $1 million from more

than 70 investors.  None of the investors earned the exorbitant returns promised by Busby.

Busby was ordered to pay $15,000 in disgorgement to victims; however, after Busby filed a

financial statement to support a professed inability to pay, the court dismissed the order of

payment.  Busby filed for bankruptcy in 1997.  This information was not disclosed on Golden

Panda's webpage or mentioned by Busby during his recent conference call.

<u>Live Rallies and Further Misrepresentations to Expand the Base</u>

50.    As previously discussed, a Ponzi scheme needs new investors to succeed.  To

attract new members the fraudsters must promote the scheme's wealth building opportunity

while at the same time hiding from new members the fact that the program's survival depends on

the new member's money.  In the instant case, at rallies and on ASD's website numerous

misrepresentations are made in order to promote the operators alleged business acumen and to

disguise the source of the purported profits.

51.    For example, on or about July 12, 2008, TFAs attended an ASD rally in Miami,

Florida.  At the rally, ASD representatives were running a rally-only promotion.  New members

were told they would receive a 50% credit bonus for joining at the rally.  If a new member

purchased $500 in "ad packages" as a bonus she would be credited $750 to her account.

Representatives of ASD stated this was a "World Wide Wealth" program that was available to

anyone with Internet access.

52.    During the rally, a representative of ASD took the stage to addresses concerns that ASD might not be a legitimate business, the representative stated that Bowdoin had received the Medal of Distinction from the President of the United States for his contribution to business and that the only blemish in Bowdoin's past was a speeding ticket.  These representations were not true.

53.    Bowdoin also spoke at the rally.  He explained to the crowd that he and his ASD team were looking at various ways to help increase rebates, including purchasing distressed properties and purchasing call centers.  Bowdoin also told his audience that participants would receive 50% of the profit ASD made from these future ventures (despite contradictory disclaimers on ASD's website).  Bowdoin reported that the company was looking to purchase a South American call center, to purchase a credit card processing center, to purchase an interest in an international bank, and to profit from future investments in real estate.  Of course, none of these ventures involve selling advertising to legitimate, or as Bowdoin termed them, "national," advertisers to support rebates.  Neither on ASD's website, nor during its rallies, does ASD or its operators explain that the revenues it commits itself to paying out slowly derive almost exclusively from the same people to whom it says it will continue to pay rebates.  Indeed, while explaining that rebates built his company, and that rebates were "what creates the members that creates the interest for the national advertisers[,]" Bowdoin all but acknowledged that his so-called advertising business was a farce.  He said:  "now were at the point where national advertisers are looking."  Bowdoin then changed course, telling his audience that ASD is about "helping people build wealth."  He explained that the negative news ASD was receiving "means that we're making waves in the marketplace because we're one of the fastest growing companies

31

on the Internet today." Bowdoin claimed his lawyers would file a defamation suit against people who called ASD "the biggest scam on the internet." According to Bowdoin, "we don't have to be a network marketing company with seven levels or ten levels. Our people are making tremendous profits with two levels – which takes us out of being a network marketing company." Bowdoin essentially confirmed that contrary to what is stated on his website, advertising business websites had nothing to do with ASD's success; instead, ASD was dependant on 1st and 2nd level member referrals to survive and grow. A transcript of Bowdoin's speech was subsequently posted on the Internet – as another promotion piece – and it is attached, here. *See* **Exhibit 5**.

54.    The one thing that was notably absent from the rally was any mention of how ASD succeeded by providing advertising. No speaker that took the stage discussed or even mentioned in passing how ASD was enabling its members to sell more products or recruit more business to their websites. Although there were lines of "ASD Volunteers" handing out new member forms to rally attendees and accepting money orders and cashier's checks, there was no form to fill out about the business a member was promoting. Rather, a TFA was provided with a new member form and a sheet titled: "Getting Started Guide." *See* **Exhibits 6 and 7**. The sheet directed the TFA to a number of places, on-line, where ASD conducted training and marketing, including a place where a prospective member could "[w]atch the video of ASD Founder & CEO, Andy Bowdoin, along with ASD Attorney Robert Garner, as they speak to you from Andy's office at the company headquarters."

55.    TFAs watched Bowdoin's video where Bowdoin introduces Garner as the company's outside legal counsel. In the video, which ASD streams over the Internet, Bowdoin

32

explains that he has asked the attorney to confirm that ASD is not a Ponzi scheme. Thereafter, Mr. Garner proceeds to explain that Bowdoin hired Garner to insure that ASD's operations are legal in all aspects. Garner assures the viewer that he and "other attorneys in our offices . . . are dedicated to this work with Andy and his company." He continued by saying his attorneys "are available at any time to deal with the issues as they arise." Garner "address[ed] the concerns that new ASD members sometimes have in the area of the legality of the Ad Cash Generator opportunity," by saying:

> Andy has directed us to ensure that his company is structurally sound today and tomorrow and far into the future. My staff and I are dedicated to Andy's vision that his company will continue to rapidly grow bigger and stronger, and will continue to be an industry leader in Internet advertising in the years to come.

According to Garner, "ASD . . . complies with all laws and regulations that apply to it." In explaining that ASD is not a Ponzi scheme, Garner notes that a Ponzi scheme is "<u>illegal, because [it] use[s] money from new investors to pay the first investors in the scheme their promised returns</u>." (Emphasis added.) On behalf of ASD, on its website, Garner advises prospective members that ASD is not a Ponzi scheme because, among other things, ASD is developing other revenue sources and "[t]here is no continuing obligation to pay returns to infinity." Contrary to Garner's claim that this is not a Ponzi scheme, however, an infinite payment obligation is irrelevant and the lack of a non-member revenue source is a tell-tale sign of a Ponzi. Garner's so-called "Legality Statement" appears on ASD's website and it is attached as a printout, here. *See* **Exhibit 8**. In a further attempt to make Bowdoin's business model sound legitimate, Garner describes ASD rebates as "function[ing] something like 'loss leaders' in that advertisers are presented [with] a way[ ] to earn their money back, plus a little more, in addition to having their

ads viewed on the internet." TFAs have not found any other product or service that ASD sells, aside from new memberships, to cover the "losses" it incurs by allowing its so-called "advertisers" to "earn their money back, plus a little more." TFAs discovered that ASD's Nevada incorporation documents list Garner as a director. Garner, however, does not disclose the fact that he is an insider of ASD in his interview, in his typewritten opinion letter that appears on ASD's webpage, or anywhere else on ASD's webpage. Furthermore, although Garner is admitted to the North Carolina Bar, it appears that Garner works out of his home and that he does not employ the team of lawyers that, he claims, have worked diligently to confirm ASD's legality.

56.     At the Miami rally that TFAs attended, several participants stated that they were not investing with ASD for its advertising services; rather, they told a TFA that they were looking to make a lot of money off of the new participants they sponsored into ASD.

Economist Opinion

57.     In addition to reviewing materials available from the SEC, during the course of this investigation a TFA consulted with an Economist at the Federal Trade Commission (FTC) who explained that pyramid, Ponzi, auto-surf, and HYIP schemes are all schemes where the participants obtain their monetary benefits primarily from the recruitment of newer participants, rather than from the sale of goods or services. Because of this, the overwhelming majority of the participants cannot expect to make any money from their participation. A small minority of participants, namely those who participate at the very beginning, might make money. However, because of the nature of the pyramid scheme, those who make any money must of necessity be only a small minority of all participants.

34

58.    The FTC Economist further explained that growth of a Ponzi system does not change the fact that the large majority of participants at any point in time will have lost money. The system cannot grow indefinitely, if for no other reason than the fact that growth is limited by the finite human population of the earth.  But long before this point is reached, the number of people willing to pay to sign on as new participants will become fewer and fewer.  At this point, no further growth is possible, and the scheme will collapse.  When that happens, the majority of the participants will have lost money.

59.    The FTC Economist further explained that these scams typically have one of several indicators or "markings," including (1) the promise of abnormally high short term returns on investments; (2) all income is derived from within the investment scheme; (3) the absence of any legitimate or reasonable business investment; and (4), as described above, only a small minority of individuals can profit from the operation of the business.  When I described the details of ASD to the economist, he indicated that ASD bore all of the characteristics of a Ponzi operation.

<u>Civilian Complaints</u>

60.    On or about July 24, 2008, a TFA received information from the Tallahassee Field Office of the Federal Bureau of Investigation ("FBI") regarding complaints related to ASD. According to an FBI representative, the FBI had received three inquiries within the last two weeks in reference to ASD.  An anonymous person called to say that he/she had sent money to ASD, but the ASD account was never credited.  This person indicated that ASD customer service does not answer the phone.  A second individual said that his/her parents had deposited $4,000 into the ASD program and that he/she was worried because he/she believed it was a Ponzi

scheme.  A TFA spoke with this individual.  He/she told the TFA that he/she even called Robert

Garner (a Director and legal counsel for ASD), at his office number, which he/she found on the

Internet, at approximately 2 a.m., to leave a message for the attorney to call him/her.  He/she said

Garner answered the phone, which shocked him/her, due to the hour.  He/she asked Garner if he

was the attorney for ASD – Garner said  yes.  When he/she asked if this was his office number,

Garner hesitated and then said he forwards the calls from his office.  The caller told the TFA that

there is no way ASD is legitimate based on the research he/she has done.  Finally, the Gadsden

County Chamber of Commerce called to ask the FBI whether ASD was legitimate.  The FBI

referred the Chamber of Commerce to the Better Business Bureau for further information.  The

Chamber of Commerce call appears to be inconsistent with statements Bowdoin made at the

Miami rally that TFAs attended.  At the rally, Bowdoin said the company needed more space due

to its tremendous growth, that he thought the operation would have to move to Tallahassee, and

that the local Chamber of Commerce had begged the company not to leave and had helped it to

secure new facilities.  According to the FBI, the local Chamber of Commerce is questioning

whether the company is legitimate.

       61.    On July 25, 2008, a TFA received additional information from the FBI Internet

Crime Center ("IC3") in reference to several complaints filed against ASD.  At that time, IC3

had five (5) complaints on file from victims in Florida, Wisconsin, Pennsylvania and New York.

The individual in Florida believed that Ad Surf Daily, Inc., a.k.a. ASDcashgenerator.com, was a

Ponzi or pyramid scheme because it met all of the criteria based on the SEC's website.  The

caller said he/she was aware of the 12dailyPro.com investigation and believed ASD was

conducting the same type of business.  The individual from Wisconsin advised that he/she had

purchased "ad packages" by conducting a transaction through Solid Trust Pay (Alert Pay) and never received full credit. The caller stated that he/she was unable to get adequate help from the company's customer service. The individual from Pennsylvania said he/she had purchased "ad packages" but had never received credit. The caller believed that ASD was a sophisticated Ponzi similar to 12daily Pro. The caller explained that ASD looks like other auto-surf sites such as 12daily Pro, "when the ad packages are not bought and top earners pull their funds eventually this will all collapse leaving the late comers in the program with losses from purchasing ad packages. Personally, I don't think people are viewing sites out of interest but out of the rebate they will earn per day by surfing." The individual from New York wanted to make authorities aware of the ASD. The caller said, "It is a money-making scheme, and I believe that 'buying advertising' is just a smokescreen." The caller further stated that, due to the fact the company had a lack of information in reference to outside funding sources, it seemed that all income derived from new member sales, like a Ponzi.

<u>ASD/Bowdoin May Be Planning to Move Proceeds</u>

62.    While reviewing the ASD website in the District of Columbia, a TFA found a posting within ASD's News section, apparently posted by ASD on July 2, 2008. The title of the posting was, "Alert Pay & Direct Deposit are being phased out July 31, 2008." According to ASD's posting, "We have notified BOA not to accept cash or personal checks for deposit account – English or Spanish." ASD further stated, "Please remember that the preferred method of purchasing Ad Packages is by mailing a Check or by Solid Trust Pay."

63.    Solid Trust Pay is a Canada based money transmitting and payment company that, like the e-Gold system, operates over the Internet. It appears that beginning August 1, 2008,

Solid Trust Pay will be ASD's preferred method for receiving funds from members, and for paying rebates and commissions to members.

64.    Within the past two weeks, ASD has wired several million dollars to Solid Trust Pay from its BOA Accounts. A TFA also learned that earlier in July 2008, a bank other than BOA closed the last account that was controlled by Bowdoin or family members after that bank determined, and explained to them, that an investigation by the bank determined that Bowdoin appeared to be operating a Ponzi scheme. Bowdoin indicated that he purchased, or was seeking to purchase, a home in another country.

65.    As directed on ASD's webpage, when members migrate to Solid Trust Pay, they will also be paid through Solid Trust Pay. Thus, the accounts Bowdoin maintains at BOA will become irrelevant to ASD's operation once its members migrate to off-shore institutions. Moreover, Solid Trust Pay offers a debit card to its account holders, making the transfer and withdrawal of funds more difficult to trace for U.S. law enforcement authorities than would be the case for an entity operating its business using domestic, FDIC insured, financial institutions.

<u>Use of the BOA Accounts to Collect and Store Ponzi Proceeds</u>

66.    During the course of the investigation, TFAs identified the above listed ten (10) bank accounts as those being utilized by ASD at BOA to conduct its financial transactions, including deposits made by or on the behalf of participants for the purpose of purchasing "ad packages," and withdrawals to pay participants their rebates and commissions. The accounts are under the control and ownership of the sole proprietor Thomas A. Bowdoin Jr., D/B/A ADSURFDAILY, 13 S. Calhoun Street, Quincy, FL, 32351. Further investigation also shows that funds are regularly transferred back and forth between the ten (10) accounts. Additionally,

TFAs identified at least four (4) business check cards in the name of Thomas A. Bowdoin, Jr. linked to these accounts. TFAs are aware that numerous transactions have posted to the BOA Accounts that appear to be purchases of personal items for the benefit of Bowdoin, including a purchase of $51,000 in jewelry on a single day. These purchases came from ASD's business accounts at BOA. Thus, it appears that Bowdoin is using these accounts not just to run ASD, but also to pay his personal expenses and to launder fraud proceeds.

67.    TFAs also identified five (5) accounts at BOA that are being utilized by Golden Panda Ad Builder operators to conduct its financial transactions, including deposits made by or on the behalf of participants for the purpose of purchasing "ad packages," and withdrawals to pay participants their rebates and commissions. These BOA Accounts are under the control and ownership of Clarence Busby Jr. and/or Dawn Stowers, Acworth, Georgia. The five (5) accounts are a D/B/A Golden Panda Ad Builder Deposit Account, a Golden Panda Ad Builder Operating Account, a Golden Panda Ad Builder Cashout Account, and two CD accounts. As previously indicated, until recently, Golden Panda was under Bowdoin's control. The TFAs' investigation shows the majority of the funds deposited into these Golden Panda accounts originated from ASD's accounts at BOA. Thus, there is reasonable cause to believe that the funds in the BOA Golden Panda accounts constitute proceeds of ASD's operations that Bowdoin moved to the Golden Panda accounts in order to seed Golden Panda's nascent operation.

<u>Use Of SUA Proceeds to Purchase Real Properties</u>

68.    Bowdoin generates no substantial income except that which he pays himself from his operation of ASD. During his operation of ASD, Bowdoin purchased the Florida and South Carolina defendant properties using funds he removed from the same BOA Accounts that he

used to collect the proceeds of his Internet-based Ponzi operation.

## CONCLUSION

69.     Based on the information provided herein, there is reasonable cause to believe that ASD, Thomas A. Bowdoin, Jr. and others, devised and intended to devise a scheme or artifice to defraud, or a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and that he and they transmitted or cause to be transmitted by means of wire, communications in interstate or foreign commerce (including writings, signs, signals, pictures, or sounds), for the purpose of executing such scheme or artifice, to wit:  an Internet-based Ponzi scheme, in violation of Title 18, United States Code, Section 1343 (Wire Fraud); and in violation of Title 18, United States Code, Section 371 (Conspiracy to Commit Wire Fraud).  Further, based on the information provided herein, there is reasonable cause to believe that the defendant properties constitute proceeds of the above-specified offenses or
property involved in financial transactions, with wire fraud proceeds, that are prohibited by the federal anti-money laundering statutes.

## COUNT I

70.     All statements and averments made in paragraphs 1- 69 are re-alleged and incorporated, herein, by reference.

71.     The defendant properties are subject to forfeiture because they constitutes or are derived from proceeds traceable to a wire fraud scheme, in violation of 18 U.S.C. § 1343, a "specified unlawful activity."

72.     As such, the defendant properties are subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(C).

## COUNT II

73.    All statements and averments made in paragraphs 1- 69 are re-alleged and incorporated, herein, by reference.

74.    The defendant properties are subject to forfeiture because they constitutes or are derived from proceeds traceable to a conspiracy to violate 18 U.S.C. § 1343, in violation of 18 U.S.C. § 371.

75.    As such, the defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT III

76.    All statements and averments made in paragraphs 1- 69 are re-alleged and incorporated, herein, by reference.

77.    The defendant properties are subject to forfeiture because they were involved or are traceable to property involved in a "financial transaction" as that term is defined by 18 U.S.C. § 1956(c)(4), the purpose of which was:  (a) to promote the carrying on of the interstate travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952), a "specified unlawful activity," as that term is defined by 18 U.S.C. § 1956(c)(4); and/or (b) to conceal or disguise the nature, location, source, ownership or control of the proceeds of the interstate travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952), a "specified unlawful activity" as that term is defined by 18 U.S.C. § 1956(c)(7); and/or (c) to engage in a transaction otherwise prohibited by 18 U.S.C. § 1957.

78.    As such, the defendant properties were involved in or are traceable to property

involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and/or 1956(a)(1)(B)(i) and/or 1957 and are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT IV

79.     All statements and averments made in paragraphs 1- 69 are re-alleged and incorporated, herein, by reference.

80.     The defendant properties are subject to forfeiture because they were involved in or are traceable to property involved in a conspiracy to violate the anti-money laundering statutes (as more particularly described in Count III), in violation of 18 U.S.C. § 1956(h).

81.     As such, the defendant properties are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the defendant properties as described above and that due notice be given to all parties to appear and show cause why the forfeitures should not be decreed; that judgments be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR
United States Attorney
DC Bar No. 498610

42

_/s/_____

WILLIAM R. COWDEN
Assistant United States Attorney
DC Bar No. 426301
Chief, Asset Forfeiture Unit
555 4th Street N.W.
Washington, DC 20530
(202) 307-0258
(202) 514-8707 (fax)
william.cowden@usdoj.gov

## **VERIFICATION**

I, Roy Dotson, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct to the best of my knowledge and belief.

Executed on this _____ day of August 2008.


_/s/_____
Roy Dotson
Special Agent
United States Secret Service

1  MICHAEL A. PIAZZA, Cal. Bar No. 235881
   E-mail: PiazzaM@sec.gov
2  KELLY C. BOWERS, Cal. Bar. No. 164007
   E-mail: BowersK@sec.gov
3  DAVID J. VAN HAVERMAAT, Cal. Bar. No. 175761
   E-mail: VanHavermaatD@sec.gov
4  PETER F. DEL GRECO, Cal. Bar No. 164925
   E-mail: DelGrecoP@sec.gov

5  Attorneys for Plaintiff
   Securities and Exchange Commission
6  Randall R. Lee, Regional Director
   Briane Nelson Mitchell, Associate Regional Director
7  Michele Wein Layne, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
8  Los Angeles, California 90036
   Telephone: (323) 965-3998
9  Facsimile:  (323) 965-3908

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                    CV 06-01018  NM  PLAx

13
   SECURITIES AND EXCHANGE        Case No.
14 COMMISSION,
                                  **COMPLAINT FOR VIOLATIONS OF**
15          Plaintiff,            **THE FEDERAL SECURITIES LAWS**

16     vs.

17 CHARIS JOHNSON, LIFECLICKS,
   LLC, and 12DAILY PRO,
18
            Defendants.
19

20

21

22

23

24

25

26

27

28


GOVERNMENT
EXHIBIT

1         Plaintiff Securities and Exchange Commission ("Commission") alleges as

2   follows:

3                      **JURISDICTION AND VENUE**

4      1.      This Court has jurisdiction over this action pursuant to Sections 20(b),

5   20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§

6   77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the

7   Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

8   78u(d)(3)(A), 78u(e) & 78aa. Defendants have, directly or indirectly, made use of

9   the means or instrumentalities of interstate commerce, of the mails, or of the

10   facilities of a national securities exchange, in connection with the transactions,

11   acts, practices, and courses of business alleged in this complaint.

12      2.      Venue is proper in this district pursuant to Section 22(a) of the

13   Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

14   § 78aa, because certain of the transactions, acts, practices, and courses of conduct

15   constituting violations of the federal securities laws occurred within this district.

16                          **SUMMARY**

17      3.      This matter involves the fraudulent, unregistered offering of

18   investment contracts constituting securities in a Ponzi scheme offered and sold via

19   the Internet by two entities, defendant 12daily Pro and defendant LifeClicks, LLC,

20   and their owner, defendant Charis Johnson (collectively "Defendants").

21      4.      LifeClicks and Johnson operate the Internet website

22   www.12dailypro.com. 12daily Pro purports to be a "paid Autosurf program"

23   whose members purportedly earn money for "viewing the websites owned or

24   promoted by other online professionals." In fact, 12daily Pro's offer and sale of

25   membership units constitutes the unregistered offer and sale of securities in the

26   form of investment contracts under federal securities law. Unbeknownst to its

27   investors, 12daily Pro is, in reality, operating a massive Ponzi scheme.

28      5.      Through the 12daily Pro website, Defendants solicit investors to

1    become "upgraded members" of 12daily Pro by buying "units" for a "membership
2    fee" of $6 per unit. 12daily Pro claims to have had more than 300,000 members
3    over the life of the offering and to currently have more than 180,000 active
4    members. 12daily Pro's website was recently ranked the 352nd most heavily
5    trafficked website on the Internet.

6        6.    12daily Pro promises to pay each upgraded member 12% of his or her
7    membership fee per day for 12 days. At the end of 12 days, the member
8    purportedly will have earned a total of 144% of his or her original membership fee,
9    44% of which is profit on the membership fee.

10       7.    To receive the promised payment, an upgraded member purportedly
11   must view at least 12 web pages per day during the 12-day period. 12daily Pro
12   estimates that viewing the web pages should take five minutes per day.

13       8.    Since mid-2005, the Defendants have raised more than $50 million
14   from more than 300,000 investors nationwide and overseas.

15       9.    One of the Defendants' payment processors, StormPay, Inc., currently
16   holds approximately $50 million in investor funds, which it has voluntarily agreed
17   to freeze. The Defendants are seeking to undo the freeze.

18       10.   The Defendants have made material misrepresentations and omissions
19   in offering and selling the 12daily Pro investment program. Undisclosed to
20   investors, the Defendants are operating 12daily Pro as almost a pure Ponzi
21   scheme—at least 95% of the funds 12daily Pro uses to pay returns to upgraded
22   members come from new investments in the form of new or existing members'
23   upgrade fees.

24       11.   In addition, the Defendants are misappropriating investor funds.
25   Undisclosed to investors, Johnson has transferred approximately $1.9 million in
26   investor funds to her personal bank account since mid-2005. The bank holding
27   Johnson's account is unwilling to freeze the funds in the account without a court
28   order.

3

1    12.    Defendants, by engaging in the conduct described in this complaint,

2  have violated, and unless enjoined will continue to violate, the antifraud and

3  securities registration provisions of the federal securities laws.  By this complaint,

4  the Commission seeks a temporary restraining order, an asset freeze, an order

5  requiring accountings, an order prohibiting the destruction of documents, and an

6  order expediting discovery against each of the Defendants, and an order appointing

7  a receiver over the assets of 12daily Pro and LifeClicks; and also seeks preliminary

8  and permanent injunctions, disgorgement with prejudgment interest, and civil

9  penalties against each of the proposed Defendants.

10                     **THE DEFENDANTS**

11    13.    **12daily Pro** is purportedly located in Charlotte, North Carolina.  On

12  its website, www.12dailypro.com, 12daily Pro is described as a "paid Autosurf

13  program" whose "[m]embers earn money for viewing the websites owned and/or

14  promoted by other online professionals."  No registration statement has been filed

15  with the Commission or is in effect with respect to 12daily Pro's offer or sale of

16  securities.

17    14.    **LifeClicks, LLC** ("LifeClicks") is a North Carolina limited liability

18  company located in Charlotte, North Carolina.  LifeClicks purports to own and

19  operate 12daily Pro.

20    15.    **Charis Johnson**, age 33, is a resident of Charlotte, North Carolina.

21  Johnson is the owner of LifeClicks and the administrator of the 12daily Pro

22  website.

23                 **THE 12DAILY PRO OFFERING**

24    16.    From at least mid-2005 to the present, the Defendants have offered

25  and sold, through the 12daily Pro website, securities in the form of investment

26  contracts to approximately 300,000 investors nationwide and overseas, including

27  more than 6,400 investors who reside in California, many of whom reside in the

28  Central District of California.

4

17.   The Defendants purport to operate 12daily Pro as a "paid Autosurf program" whose members purportedly earn money by viewing websites owned or promoted by other online members.

18.   Autosurf is a form of online advertising program that purportedly generates advertising revenue by automatically rotating advertised websites into a viewer's Internet browser.  Advertisers purportedly pay money to "hosts" such as 12daily Pro, which then pay their members to view the rotated websites.

19.   Through the 12daily Pro website, the Defendants solicit investors to become members of 12daily Pro.

20.   The Defendants offer two kinds of membership—regular memberships (which are free) and "upgraded" memberships.

21.   To become an upgraded member, a member must pay 12daily Pro a "fee" of $6 per unit, with a maximum of 1,000 units.

22.   To pay for the upgraded membership, a member must open an account with one of 12daily Pro's Internet payment processors.

23.   Until recently, 12daily Pro used StormPay to process the majority of its transactions.

24.   12daily Pro provides upgraded members with three benefits not provided to regular, or non-paying, members.

25.   First, 12daily Pro pays each upgraded member (but not regular members) 12% per day on his or her membership fee for 12 days, purportedly for the upgraded member's viewing a minimum of 12 web pages per day.  At the end of 12 days, each upgraded member has purportedly earned 144% on his or her membership fee, 44% of which is profit on the membership fee.  This return equates to an annualized yield of more than 1,300%.

26.   Second, 12daily Pro pays each upgraded member a 12% "referral commission" on first level referrals.

27.   Third, 12daily Pro allows each upgraded member to submit one

5

1  website to be included in the online advertising program that automatically rotates

2  the advertising websites into the Internet browsers of other 12daily Pro members.

3  ## THE INVESTMENT NATURE OF THE 12DAILY PRO MEMBERSHIP UNITS

4      **28.**    The membership fee paid by an upgraded member of 12daily Pro

5  constitutes an investment contract because the receipt of payment from 12daily Pro

6  is dependent upon a member's payment of the membership fee, and not on his or

7  her provision of services.

8      **29.**    Under the terms of the 12daily Pro program, the Defendants pay the

9  purported 12% daily return only to upgraded (i.e., paying) members who agree to

10  view 12 web pages per day, but pay nothing to regular (i.e., non-paying) members

11  regardless of how many web pages they view.

12      **30.**    The amount of returns that 12daily Pro pays an upgraded member is

13  dependent solely upon how much money he or she has put into the program, not on

14  the amount of service he or she renders to 12daily Pro.  For instance, an upgraded

15  member receiving the purported 12% daily return on a $6,000 investment ($720

16  per day) is not required to view any more web pages than an upgraded member

17  receiving the purported 12% daily return on a $6 investment ($0.72 per day).

18      **31.**    The funds purportedly used to pay the upgraded members result

19  principally from the efforts of the Defendants, and not from the efforts of the

20  upgraded members.  The 12daily Pro website states that upgraded members'

21  earnings "are financed by multiple income streams, including advertising, and off-

22  site investments."  Upgraded members have no role, however, in negotiating

23  advertising agreements, making off-site investments, or collecting revenue from

24  any of the purported income sources.

25      **32.**    The so-called "services" purportedly rendered by the upgraded

26  members are minimal or non-existent.  The Defendants estimate that upgraded

27  members' web page surfing requirement will take five minutes per day.  There is

28  no requirement that members must evaluate, comment on, or otherwise respond to

the web pages viewed.  It is unclear whether 12daily Pro is even able to determine whether an upgraded member has actually viewed the web pages or simply turned his or her computer on and left the room.

## THE UNREGISTERED OFFERING OF SECURITIES IN THE FORM OF INVESTMENT CONTRACTS BY 12DAILY PRO

33.    The membership units in 12daily Pro that are offered and sold by the Defendants are securities in the form of investment contracts.

34.    No registration statement has been filed with the Commission or is in effect with respect to the Defendants' offer or sale of securities in the form of investment contracts with 12daily Pro.

## DEFENDANTS' OPERATION OF A PONZI SCHEME AND MISUSE OF INVESTOR FUNDS

35.    On the home page of the 12daily Pro website, Defendants represent that the earnings paid to upgraded members "are financed by multiple income streams including advertising, and off-site investments."

36.    In the Frequently Asked Questions section of the 12daily Pro website, Defendants represent that "upgrade earnings are financed not only [by] incoming member fees, but also with multiple income streams including advertising, and off-site investments."

37.    Defendants, however, fail to disclose that approximately 95% of the funds that the Defendants have paid to upgraded members have come from new investments in the form of upgrade membership fees paid by new or existing members, that the other income streams are not sufficient to pay the promised returns to upgraded members, that the Defendants are operating the 12daily Pro program as almost a pure Ponzi scheme, and that Defendants will have to obtain an ever-increasing number of upgraded members, or investors, to continue to pay the returns promised to current investors.

38.    Defendants have used substantial amounts of investor funds for

7

1  improper purposes.  Since mid-2005, Johnson has transferred approximately $1.9
2  million in investor funds to her personal bank account.  Defendants failed to
3  disclose these transfers to investors.

4     39.    There is a reasonable likelihood that Defendants' fraudulent conduct
5  will continue if they are not enjoined.

### FIRST CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

9     40.    The Commission realleges and incorporates by reference paragraphs 1
10 through 39, above.

11    41.    Defendants, by engaging in the conduct described above, directly or
12 indirectly, made use of means or instruments of transportation or communication
13 in interstate commerce or of the mails, to offer to sell or to sell securities, or to
14 carry or cause such securities to be carried through the mails or in interstate
15 commerce for the purpose of sale or for delivery after sale.

16    42.    No registration statement has been filed with the Commission or has
17 been in effect with respect to the offering alleged herein.

18    43.    By engaging in the conduct described above, Defendants violated, and
19 unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of
20 the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### SECOND CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

24    44.    The Commission realleges and incorporates by reference paragraphs 1
25 through 39, above.

26    45.    Defendants, by engaging in the conduct described above, directly or
27 indirectly, in the offer or sale of securities by the use of means or instruments of
28 transportation or communication in interstate commerce or by use of the mails:

8

a.    with scienter, employed devices, schemes, or artifices to
defraud;

b.    obtained money or property by means of untrue statements of a
material fact or by omitting to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not misleading; or

c.    engaged in transactions, practices, or courses of business which
operated or would operate as a fraud or deceit upon the
purchaser.

46.    By engaging in the conduct described above, Defendants violated, and
unless restrained and enjoined will continue to violate, Section 17(a) of the
Securities Act, 15 U.S.C. § 77q(a).

### THIRD CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

47.    The Commission realleges and incorporates by reference paragraphs 1
through 39, above.

48.    Defendants, by engaging in the conduct described above, directly or
indirectly, in connection with the purchase or sale of a security, by the use of
means or instrumentalities of interstate commerce, of the mails, or of the facilities
of a national securities exchange, with scienter:

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of a material fact or omitted to state a
material fact necessary in order to make the statements made,
in the light of the circumstances under which they were made,
not misleading; or

c.    engaged in acts, practices, or courses of business which
operated or would operate as a fraud or deceit upon other

1    persons.

2      49.    By engaging in the conduct described above, Defendants violated, and

3  unless restrained and enjoined will continue to violate, Section 10(b) of the

4  Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §

5  240.10b-5.

6                              **PRAYER FOR RELIEF**

7      WHEREFORE, the Commission respectfully requests that the Court:

8                                     **I.**

9      Issue findings of fact and conclusions of law that the Defendants committed

10  the alleged violations.

11                                    **II.**

12      Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

13  temporarily, preliminarily and permanently enjoining Defendants and their

14  officers, agents, servants, employees, and attorneys, and those persons in active

15  concert or participation with any of them, who receive actual notice of the

16  judgment by personal service or otherwise, and each of them, from violating

17  Sections 5(a), 15 U.S.C. § 77e(a), 5(c), 15 U.S.C. § 77e(c), and 17(a), 15 U.S.C. §

18  77q(a), of the Securities Act, and Section 10(b), 15 U.S.C. § 78j(b), of the

19  Exchange Act, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

20                                   **III.**

21      Issue, in a form consistent with Fed. R. Civ. P. 65, as to all Defendants, a

22  temporary restraining order, an order for accountings, an order prohibiting the

23  destruction of documents, an order expediting discovery, an order freezing their

24  assets (including, without limitation, accounts at StormPay, Inc., EMO

25  Corporation, e-gold, Ltd., and Bank of America), an order appointing a receiver

26  over the assets of 12daily Pro and StormPay, and preliminary and permanent

27  injunctions.

28  ///

                                      10

1

**IV.**

2       Order each Defendant to disgorge all ill-gotten gains from their illegal

3   conduct, together with prejudgment interest thereon.

4

**V.**

5       Order the Defendants to pay civil penalties pursuant to Section 20(d) of the

6   Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15

7   U.S.C. § 78u(d)(3).

8

**VI.**

9       Retain jurisdiction of this action in accordance with the principles of equity

10  and the Federal Rules of Civil Procedure in order to implement and carry out the

11  terms of all orders and decrees that may be entered, or to entertain any suitable

12  application or motion for additional relief within the jurisdiction of this Court.

13

**VII.**

14      Grant such other and further relief as this Court may determine to be just and

15  necessary.

16

17  DATED:  February 20, 2006               *Peter Del Greco*

18                                          MICHAEL A. PIAZZA
                                            KELLY C. BOWERS
19                                          DAVID J. VAN HAVERMAAT
                                            PETER F. DEL GRECO
20                                          Attorneys for Plaintiff
                                            Securities and Exchange Commission
21

22

23

24

25

26

27

28

1    KELLY BOWERS, Cal. Bar No. 164007
      Bowersk@sec.gov
2    MOLLY WHITE, Cal. Bar No. 171448
      Whitem@sec.gov
3    RABIA CEBECI, Cal. Bar No. 143634
      Cebecir@sec.gov
4

5    Securities and Exchange Commission
      Randall R. Lee, Regional Director
6    Michele Layne, Associate Regional Director
      5670 Wilshire Boulevard, 11th Floor
7    Los Angeles, California 90036
      Telephone:  (323) 965-3998
8    Facsimile:   (323) 965-3908

9

10             **UNITED STATES DISTRICT COURT**

            **CENTRAL DISTRICT OF CALIFORNIA**
11

12

13    SECURITIES AND EXCHANGE        Case No.
      COMMISSION,
14                        **COMPLAINT FOR VIOLATIONS OF**
           Plaintiff,          **THE FEDERAL SECURITIES LAWS**
15
          vs.
16
     PHOENIXSURF.COM, LLC, NEW
17    MILLENIUM ENTREPRENEURS,
      LLC, JONATHAN W. MIKULA, AND
18    GABRIEL J. FRANKEWICH,

19            Defendants.

20

21

22

23

24

25

26

27

28


GOVERNMENT
EXHIBIT
1

1  Plaintiff Securities and Exchange Commission ("Commission") alleges as
2  follows:

### JURISDICTION AND VENUE

4  1.    This Court has jurisdiction over this action pursuant to Sections 20(b),
5  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§
6  77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the
7  Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),
8  78u(d)(3)(A), 78u(e) & 78aa.  Defendants have, directly or indirectly, made use of
9  the means or instrumentalities of interstate commerce, of the mails, or of the
10 facilities of a national securities exchange, in connection with the transactions,
11 acts, practices, and courses of business alleged in this complaint.

12 2.    Venue is proper in this district pursuant to Section 22(a) of the
13 Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.
14 § 78aa, because certain of the transactions, acts, practices, and courses of conduct
15 constituting violations of the federal securities laws occurred within this district.

### SUMMARY

17 3.    This matter involves the fraudulent, unregistered offering of
18 investment contracts constituting securities in a Ponzi scheme offered and sold via
19 the Internet by two entities, defendant Phoenixsurf.com, LLC, also known as
20 Pheonixsurf.com, LLC ("Phoenix Surf"), defendant New Millenium Entrepreneurs,
21 LLC ("NME"), NME's owner, defendant Jonathan W. Mikula ("Mikula"), and
22 Phoenix Surf's president, Gabriel J. Frankewich ("Frankewich") (collectively
23 "Defendants").

24 4.    From February 22, 2006 through May 21, 2006 (the "offering
25 period"), the Defendants operated the Internet website www.phoenixsurf.com.
26 Phoenix Surf purported to be a "traffic exchange program" whose members
27 purportedly earned money for viewing the websites that other paying users had
28 submitted to the Phoenix Surf website.  In fact, Phoenix Surf's offer and sale of

2

1  "advertising packages" constituted the unregistered offer and sale of securities in

2  the form of investment contracts under federal securities law.  Unbeknownst to its

3  investors, Phoenix Surf, in reality, operated a massive Ponzi scheme.

4       5.    Through the Phoenix Surf website, the Defendants solicited investors

5  to become paying "advertising package users," of Phoenix Surf by purchasing

6  advertising packages, in increments of $8, with a maximum membership level of

7  $6,000.

8       6.    Phoenix Surf promised to pay each advertising package user 15% of

9  cost of his or her advertising package each day for eight days.  At the end of eight

10  days, the advertising package user purportedly earned a total of 120% of the cost of

11  his or her advertising package, 20% of which was profit on the advertising package

12  purchase.

13       7.    To receive the promised payment, an advertising package user

14  purportedly was required to view at least 15 web pages per day during the eight-

15  day period.  Phoenix Surf estimated that viewing the web pages would take two

16  and half minutes per day.

17       8.    During the offering period, the Defendants raised a total of $41.9

18  million from more than 20,000 investors nationwide and overseas.

19       9.    The Defendants made materially false and misleading statements in

20  offering and selling the Phoenix Surf investment program.  The Defendants

21  represented that they used "revenue generated by ad sales and other

22  businesses/programs within the NME/Phoenix network" to pay advertising

23  members.  In fact, the Defendants were operating Phoenix Surf as almost a pure

24  Ponzi scheme—at least 99% of Phoenix Surf's revenues were generated from

25  advertising package purchases from new or existing investors and used to pay

26  returns to investors.  During the offering period, Phoenix Surf paid a total of $36.7

27  million to investors.

28       10.   On or about May 22, 2006, the Defendants' Ponzi scheme collapsed.

1  On this date, the Defendants were unable to make payouts to investors and closed
2  the Phoenix Surf offering and stopped accepting investments.

3      11.   Defendants, by engaging in the conduct described in this complaint,
4  violated, and unless enjoined will continue to violate, the antifraud and securities
5  registration provisions of the federal securities laws.  By this complaint, the
6  Commission seeks permanent injunctions, disgorgement with prejudgment interest,
7  and civil penalties against each of the proposed Defendants.

8                           **THE DEFENDANTS**

9      12.   Phoenixsurf.com, also known as Pheonixsurf.com, is a Georgia
10 limited liability company located in Marietta, Georgia.  On its website,
11 www.phoenixsurf.com, Phoenix Surf was described as an income opportunity
12 program in the traffic exchange industry.  No registration statement was filed with
13 the Commission or was in effect with respect to Phoenix Surf's offer or sale of
14 securities.  In August 2006, Phoenix Surf ceased all business operations, but
15 remains a legally formed LLC.

16     13.   New Millenium Entrepreneurs, LLC is a Georgia limited liability
17 company located in Athens, Georgia.  NME owned and purported to operate
18 Phoenix Surf during the offering period.  In August 2006, NME ceased all business
19 operations but remains a legally formed LLC.

20     14.   Jonathan W. Mikula, age 21, is a resident of Athens, Georgia.  Mikula
21 is NME's founder and Chief Executive Officer.

22     15.   Gabriel J. Frankewich, age 29, is a resident of Byron, Georgia.
23 Frankewich was Phoenix Surf's president during the offering period.

24               **THE PHOENIX SURF OFFERING**

25     16.   From February 22, 2006 through May 21, 2006, through the Phoenix
26 Surf website, the Defendants offered and sold securities in the form of investment
27 contracts to approximately 20,000 investors nationwide and overseas, which
28 includes more than 1470 accounts of investors who reside in California, many of

1  whom reside in the Central District of California.

2        17.    The Defendants operated Phoenix Surf as a "traffic exchange
3  program" whose members purportedly earned money by viewing websites that had
4  been entered onto the Phoenix Surf website by other paying users.

5        18.    The traffic exchange program was a form of online advertising
6  program that automatically rotated certain websites into the browsers of members
7  of the traffic exchange program. The advertising websites purportedly paid money
8  to the "host," Phoenix Surf, which then paid its members to view the rotated
9  websites.

10       19.    Through the Phoenix Surf website, the Defendants solicited investors
11 to become users or members of Phoenix Surf.

12       20.    The Defendants offered two kinds of membership: (1) registered
13 users, users who registered for free to view the Phoenix Surf website, and (2)
14 advertising users, who were users that purchased advertising packages.

15       21.    To become an advertising user, a member purchased an "advertising
16 package" and paid Phoenix Surf $8 per unit. A member could purchase a
17 maximum of 750 units, or a $6,000 membership level.

18       22.    To pay for the advertising package, users were required to open an
19 account with e-Gold, an Internet payment processor. In early May 2006, users
20 were also given the option of purchasing advertising packages via a debit card
21 issued by Virtual Money, Inc., an Internet bank.

22       23.    Phoenix Surf provided advertising users with three benefits that were
23 not provided to registered users.

24       24.    First, Phoenix Surf allowed each advertising user to submit one
25 website to be included in the online advertising program. That website would then
26 automatically rotate into the Internet browsers of other Phoenix Surf members.

27       25.    Second, Phoenix Surf paid each advertising user (but not registered
28 users) 15% per day on his or her advertising package for eight days. Phoenix Surf

5

purportedly made this payment in exchange for the advertising user's agreement to view a minimum of 15 web pages per day. At the end of eight days, each advertising user purportedly earned 120% on his or her advertising package, 20% of which was profit on the advertising package. The return equated to an annualized return of more than 912%.

26.    Third, Phoenix Surf paid each advertising user an 8% "referral commission" for referring other investors to Phoenix Surf.

**THE PHOENIX SURF MEMBERSHIP UNITS WERE INVESTMENT CONTRACTS**

27.    The membership fee paid by an advertising user of Phoenix Surf constituted an investment contract because the payment that Phoenix Surf received depended on a member's payment of the membership fee, and not on his or her provision of services.

28.    Under the terms of the Phoenix Surf program, the Defendants paid the purported 8% daily return only to advertising (i.e., paying) members who agreed to view 15 web pages per day, but paid nothing to a registered (i.e., non-paying) member regardless of how many web pages they viewed.

29.    The amount of returns that Phoenix Surf paid an advertising member depended solely upon how much money he or she put into the program, not on the amount of service he or she rendered to Phoenix Surf. For instance, an advertising member who received the purported 8% daily return on a $6,000 investment ($480 per day) was not required to view any more web pages than an upgraded member receiving the purported 8% daily return on a $8 investment ($0.64 per day).

30.    The funds purportedly used to pay the advertising members resulted more from the efforts of the proposed defendants than the efforts of the advertising members. In the Frequently Asked Questions section of Phoenix Surf's website, the defendants stated that "the business model designed by NME ensures the long-term stability of Phoenixsurf.com. *In addition, we use revenue generated by ad sales and other businesses/programs within the NME/Phoenix network*" (emphasis

6

added). The advertising members did not have any role in negotiating advertising
agreements or collecting revenue from any of these purported income sources.

31.    The "services" provided by the advertising members were minimal or
even nonexistent. On the Phoenix Surf website, the defendants estimated that the
web page surfing requirement would take members only about 2 ½ minutes per
day. The advertising members did not have to evaluate, comment on, or otherwise
respond to the web pages viewed.

## THE UNREGISTERED OFFERING OF SECURITIES IN THE FORM OF INVESTMENT CONTRACTS BY PHOENIX SURF

32.    The membership units offered and sold by the Defendants were
securities in the form of investment contracts.

33.    No registration statement was filed with the Commission or was in
effect with respect to the Defendants' offer or sale of membership units in Phoenix
Surf.

## DEFENDANTS' INVOLVEMENT IN AND OPERATION OF A PONZI SCHEME

34.    In July 2005, Mikula decided to form NME to build a multiple income
stream business targeting network marketers. At its inception, Mikula, NME's
founder and CEO, appointed Frankewich as NME's head of Internet security.
Frankewich held that position until February 2006.

35.    In February 2006, Mikula appointed Frankewich as Phoenix Surf's
president. As president, Frankewich was responsible for running the day-to-day
operations of Phoenix Surf. His responsibilities included paying purported returns
to Phoenix Surf investors, paying salary to Phoenix Surf staff, and assisting in
Phoenix Surf's outside investments. Frankewich was required to update Mikula on
major expenditures and any anomalies in the Phoenix Surf account.

36.    At Mikula's instruction, Frankewich purchased a traffic exchange
"script." The script was the basis of both the Phoenix Surf website and its
database. Mikula hired outside consultants to "fill in the script's holes" and

7

1    complete the Phoenix Surf website layout and database programming. Mikula
2    helped create the website by providing the consultants the critical language
3    describing the Phoenix Surf program. Mikula also approved the forms and
4    language on the website.

5        **37.**    In the Frequently Asked Questions section of the Phoenix Surf
6    website, the Defendants represented that Phoenix Surf would earn revenues
7    through "ad sales and other businesses/programs within the NME/Phoenix
8    network." This statement was false.

9        **38.**    In reality, Phoenix Surf operated almost purely as a Ponzi scheme,
10    generating over 99% of its revenues from other investors through "ad sales."
11    During the offering period, Phoenix Surf raised $41.9 million from "ad sales" to
12    investors. In contrast, the NME network of businesses/programs generated a total
13    of only $200,000. That money was kept in accounts separate from the Phoenix
14    Surf account into which ad sales were deposited and investor payouts were
15    disbursed. During the offering period, Phoenix Surf paid a total of $36.7 million to
16    investors.

17        **39.**    **The Defendants failed to disclose to investors that new and existing**
18    investors' advertising package purchases accounted for nearly all of the funds paid
19    to investors. Nor did the Defendants disclose that the revenue generated from
20    other businesses/programs within the NME/Phoenix network constituted a very
21    small fraction of Phoenix Surf's revenue and was insufficient to pay the returns
22    Phoenix Surf owed to its advertising members.

23        **40.**    On May 22, 2006, NME closed the Phoenix Surf offering and stopped
24    accepting investments because of liquidity problems. In early June 2006, Phoenix
25    Surf, NME, and Mikula began the process of issuing refunds to those investors
26    who lost money. In mid-July 2006, Phoenix Surf's website stated that NME was
27    temporarily pausing the refund process due to the lack of available funds but that
28    refunds would resume when additional funds became available. On August 19,

1 | 2006, both NME and Phoenix Surf ceased all business operations and appointed an
2 | administrator to oversee the recovery of funds allegedly owed to NME and
3 | Phoenix Surf. A total of $4,332,400 remains owing to Phoenix Surf investors.

4 | ### FIRST CLAIM FOR RELIEF

5 | ### UNREGISTERED OFFER AND SALE OF SECURITIES

6 | ### Violations of Sections 5(a) and 5(c) of the Securities Act

7 | 41. The Commission realleges and incorporates by reference paragraphs 1
8 | through 39, above.

9 | 42. Defendants, by engaging in the conduct described above, directly or
10 | indirectly, made use of means or instruments of transportation or communication
11 | in interstate commerce or of the mails, to offer to sell or to sell securities, or to
12 | carry or cause such securities to be carried through the mails or in interstate
13 | commerce for the purpose of sale or for delivery after sale.

14 | 43. No registration statement has been filed with the Commission or has
15 | been in effect with respect to the offering alleged herein.

16 | 44. By engaging in the conduct described above, Defendants violated, and
17 | unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of
18 | the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

19 | ### SECOND CLAIM FOR RELIEF

20 | ### FRAUD IN THE OFFER OR SALE OF SECURITIES

21 | ### Violations of Section 17(a) of the Securities Act

22 | 45. The Commission realleges and incorporates by reference paragraphs 1
23 | through 39, above.

24 | 46. Defendants, by engaging in the conduct described above, directly or
25 | indirectly, in the offer or sale of securities by the use of means or instruments of
26 | transportation or communication in interstate commerce or by use of the mails:

27 | a. with scienter, employed devices, schemes, or artifices to
28 | defraud;

9

b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

47. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

48. The Commission realleges and incorporates by reference paragraphs 1 through 39, above.

49. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

50. By engaging in the conduct described above, Defendants violated, and

10

1  unless restrained and enjoined will continue to violate, Section 10(b) of the
2  Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §
3  240.10b-5.

4                            **PRAYER FOR RELIEF**

5        WHEREFORE, the Commission respectfully requests that the Court:

6                                    **I.**

7        Issue findings of fact and conclusions of law that the Defendants committed
8  the alleged violations.

9                                    **II.**

10       Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules
11 of Civil Procedure, permanently enjoining Defendants and their officers, agents,
12 servants, employees, and attorneys, and those persons in active concert or
13 participation with any of them, who receive actual notice of the judgment by
14 personal service or otherwise, and each of them, from violating Sections 5(a), 5(c)
15 of the Securities Act, 15 U.S.C. §§ 77e(a), 77(e)(c) & 77q(a), and Section 10(b) of
16 the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §
17 240.10b-5.

18                                   **III.**

19       Order each Defendant to disgorge all ill-gotten gains from their illegal
20 conduct, together with prejudgment interest thereon.

21                                   **IV.**

22       Order the Defendants to pay civil penalties pursuant to Section 20(d) of the
23 Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15
24 U.S.C. § 78u(d)(3).

25                                    **V.**

26       Retain jurisdiction of this action in accordance with the principles of equity
27 and the Federal Rules of Civil Procedure in order to implement and carry out the
28 terms of all orders and decrees that may be entered, or to entertain any suitable

                                      11

1  application or motion for additional relief within the jurisdiction of this Court.

2                                      **VII.**

3          Grant such other and further relief as this Court may determine to be just and

4  necessary.

5

6  DATED:  July 23, 2007

7                                      KELLY C. BOWERS
                                       MOLLY WHITE
8                                      RABIA CEBECI
                                       Attorneys for Plaintiff
9                                      Securities and Exchange Commission

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



| Home | Company | Opportunity | Join Free | Contact Us | FAQ |

**Program Overview Presentation!**
*Click Here!*

**Join FREE! Today!**
Click Here!

**Member Login**

Username:

Password:

[ Login ]

Forgot your password?

## Welcome To ASD Your Ad Surf Daily Cash Generator Business!

HACKER SAFE certified

### Terms of Service

THESE TERMS OF SERVICE SET FORTH THE TERMS AND CONDITIONS UNDER WHICH ADSURFDAILY, INC OR ASDCASHGENERATOR (HEREINAFTER REFERRED TO AS "ASD") WILL PROVIDE ITS SERVICES. THESE TERMS ARE AN AGREEMENT BETWEEN THE ADVERTISER AND ASD. THE TERMS DESCRIBE THE ADVERTISER'S RIGHTS AND OBLIGATIONS WHEN USING THESE SERVICES.

THE TERMS OF SERVICE ALSO DESCRIBES THE RIGHTS AND OBLIGATIONS OF ASD. THE ADVERTISER MUST READ THESE TERMS OF SERVICE CAREFULLY AND BE SURE THAT HE OR SHE UNDERSTANDS THESE TERMS OF SERVICE. IF THE ADVERTISER DOES NOT AGREE TO THESE TERMS OF SERVICE, THE ADVERTISER SHOULD NOT ACCESS OR USE THE SERVICES OF ASD.

1.1. Creation or use of an account with ASD means the Advertiser accepts ALL the terms and conditions of this agreement and is bound by the terms herein.

1.2. The parties to this agreement are ASD and the Advertiser.

1.3. In this agreement, "you" or "your" means any person or entity of whatsoever nature using the Service ("Advertisers"). Unless otherwise stated, "we," or "our" will refer collectively to ASD.

2. Although we will attempt to keep members informed of any changes in these Terms of Service, we may amend this Agreement at any time without any prior notification by posting the amended terms on our site. We may notify you via the e-mail address you have on file with ASD of any changes to the terms. ASD expressly reserves the right to make said changes and same may be posted on the website or otherwise noticed to members/advertisers in addition to or in lieu of the hereinabove mentioned e-mails.

3. We value our Advertisers and wish to provide them with a results-oriented advertising program. To offer you the best service, all advertisers need to follow the same Terms of Service. These Terms of Service are intended to make ASD the most efficient and profitable advertising program in the industry.

**Advertising Rebates**

**Testimonials**

ASD has changed my life....
**David Meade**

I can't believe how easy this is....
**Lorna Thurston**

I finally found a program that works....
**Shayla Hill**

This Cash Cow is giving me money....
**Scott Doble**

I'm finally building a great income....
**Bill Schrock**

**Read These Amazing Testimonials! And More!**

**Click Here!**



GOVERNMENT EXHIBIT 3

Rebates are paid to advertisers for viewing other advertiser's websites.

We have an innovative advertising rebate. An advertiser can receive 125% of their advertising cost in rebates by viewing 24 web sites of other advertisers on a daily basis for 15 seconds each. An advertiser must have an active ad package to earn rebates.

Sometime between 12:01 am and 9:00 am Central Standard Time (CST), we total the number of ad package sales from the previous day and the commissions received from ASD's external income sources.

We multiply the total of all these sales by 50%. We then divide this total by the total number of outstanding ad packages. This determines the amount of rebate to be paid per ad package. That amount will be multiplied by the number of ad packages in each advertiser's account and the total will be credited to his/her cash account on a daily basis. Rebates will show up in advertiser's accounts after midnight CST. If you miss a day of viewing the required number of web sites, you do not earn any rebates for that day only.

Advertisers will be paid rebates until they receive 125% of their ad purchases.

To maintain the stability of the program the daily rebate will be capped at 8%. Any excess will go into a reserve account to be used when rebates are extremely low. Five percent (5%) of ad package sales, banner ad sales, ebook sales, and or external income sources on the Cash Generator will be placed in the reserve account to be used for the same purpose.

Your ad purchase will expire when you receive a 125% rebate of your advertising cost.

Five percent will be used for contests or raffles.

Fifteen percent will be used for referral commissions.

Fourteen percent will be paid to various boards, trainers and designers.

Eleven percent will be used for administrative costs, customer support, hosting, site maintenance, advertising and profit.

**Referral Commissions:**

An advertiser may pay a monthly membership fee and eliminate fees for cash outs, increase referral commissions and decrease the number of sites to view on a daily basis. The amount of your monthly membership fee determines the number of times you can *cash out each week, the amount of your referral commissions and the number of sites you must view each day to receive your rebates.

If you do not pay a membership fee you will be paid a 3% referral commission on all of your personal sales only. Free members cannot earn commissions.

When you pay a $10.00 per month membership fee you earn a 5% referral commission on your personal sales and 3% on your second level sales. When you pay a $25.00 per month membership fee you earn a 7% referral commission on your personal sales and 4% on your second level sales. When you pay a $100.00 per month membership fee you earn a 10% referral

commission on your personal sales and 5% on your second level sales. All rebates and referral commissions can be changed at any time with a 10-day notice to Advertisers. Any such notice will be sent by email to the email address you used to join as an Advertiser, or displayed in an updated Terms of Service, on your replicated website or in our ASD News website. *Cash out privileges are explained in the Cash out Section.

**Ad Packages and Credits**

All payments made to ASD are considered advertising purchases, not investments or deposits of any kind. All sales are final. ASD does not guarantee any earnings and/or rebates. All rebates paid to advertisers are for the service of viewing other advertiser's web sites. All commissions are for referring advertisers to ASD. All advertising purchases are non-refundable after the passing of the 3 days right of rescission.

Each ad package is $1.00 and is made up of 1 credit. You get 1 showing of your web site for each credit. The minimum ad purchase is $10.00. The minimum cash out is $10.00.

You receive 1 credit (1 showing of your web site) for each site you view. Depending on your membership level, you must view up to 24 web sites each day for 15 seconds each to receive your daily rebate. Viewing up to 24 sites daily will provide you with enough credits to keep your web site showing everyday.

You can view a maximum of 72 web sites per day. This should enable you to keep 3 web sites showing on a daily basis. You can show one web site, view web sites and earn credits even as a free member.

**Maximum Ad Purchases**

You may purchase a maximum of 12000 ad packages at $1.00 each at any one time for a total of $12,000.00.  If you desire to purchase a single amount greater then this, you will need approval from the company President, Mr. Andy Bowdoin.

**Number of Web Sites that can be Advertised**

Free Members can advertise 1 web site for 10 days. If you have purchased ad packages and are not paying a membership fee, you can advertise 3 web sites for as long as you have active ad packages. If you pay a membership fee of $10.00 per month you can advertise 3 web sites for as long as you have active ad packages. If you pay a membership fee of $25.00 per month you can advertise 4 web sites for as long as you have active ad packages. If you pay a membership fee of $100.00 per month you can advertise 5 web sites for as long as you have active ad packages.  .

**Advertising and Promotion**

To maintain the integrity of advertisers advertising the ASD Advertising Program, certain requirements and guidelines governing the advertising and promotion by ASD's advertisers must be imposed. Misuse of the ASD name or logo and its affiliated products diminishes the goodwill of the Company, affects all ASD advertisers and is strictly prohibited. You may NOT copy any portion of the website(s) or ASD sponsored websites without permission from ASD.  Personal advertising that contains any of the above will need to be approved by the ASD Admin.

1. **Use of Authorized Promotional Materials:** Only the materials

that are made available directly by ASD may be used for advertising or promoting ASD. ASD will produce and offer for sale, at a reasonable price, (or at no cost) materials that can be used to promote your business. No reproduction, personalization or modification of any of these ASD materials is allowed unless approved in writing by ASD. Advertisers may not develop, publish, sell or distribute any ASD-related promotional materials they create. Any violation of this policy may result in termination of your membership.

2. **Blind Ads:** No radio or television advertising of any type is permitted without written permission of ASD. You may use Blind Ads (advertising that does not mention ASD) without approval.

3. **Other forms of Advertising:** Remember, **ASD is NOT an investment company. ASD** does **NOT** sell investments. You do **NOT** invest in **ASD**. You do **NOT** re-invest in **ASD**. As an **OPTION** you can purchase advertising packages and earn cash rebates by viewing our advertiser's websites. You do not get paid back... you earn cash rebates. **ASD** does not make any guarantees as to the amount of daily rebates. Even though sponsoring is not required to earn cash rebates, **ASD** is not a "passive" program. You are required to purchase advertising packages and view advertiser's websites to earn cash rebates. You only earn cash rebates on the days you view a required number of websites.

As an advertiser participating in our rebate program it is your responsibility to read and understand the **ASD** program. ASD currently offers on-line training as well as comprehensive details throughout our website. If you sponsor other advertisers it is your responsibility to present the program in a knowledgeable manner, giving your referrals sufficient information so they can make an informed decision. There is no excuse for false statements or misrepresentation of the program.

When you join **ASD** you are required to agree to the **TERMS and CONDITIONS.** ASD expects you to know what you are agreeing to and act responsibly when representing **ASD. To be clear, at no time can you make false claims or statements. Doing so may cause your immediate removal from the company and loss of any potential rebates.**

**ANY** and **ALL** advertising must be approved by **ASD** or taken from our pre-approved ads available for you. They are located on the ASD News site which can be found when you log in to your replicated website. Approval is required for (but not limited to) email advertising, private websites, blogs, forums, social networking sites, mailers, pamphlets, flyers, any and all printed material and all forms of verbal communications **PRIOR** to the commencement of your chosen form of advertising.

You are expressly **FORBIDDEN** from any form of **"Check Waving". This is ILLEGAL.** You can not place income charts in personal advertising. You can not show any proof of income in the form of checks or deposits you receive. Anyone caught using these methods as a way of enticing another individual to purchase advertising may **IMMEDIATELY** be dismissed and forfeit any current or future earnings.

4. **Business Cards/Stationery:** ASD offers business cards and stationery through an approved independent vendor. Advertisers may use the services of a printer of their choice, providing that ASD's guidelines are followed. The ASD logo may be duplicated on the business card or stationery, but the words "Independent Contractor" must appear immediately after the logo. All that may be printed on the card is phone number(s), two lines of address,

advertiser's name, e-mail address and web address with your referral link or redirect address.

5. **Business Names:** ASD's advertisers may not use the word AdSurfDaily or AsdCashGenerator within another business name.

6. **Copyrights:** ASD reserves ownership rights to the contents and design of all ASD's published materials and web sites.

7. **Telephone Calls:** Advertisers shall not answer the telephone "AdSurfDaily" or AsdCashGenerator, or give an answer that creates an impression that he/she has reached the corporate office of ASD.

8. **Prerecorded Telephone Solicitation Devices:** ASD's name or copyrighted material may not be used in automatic calling devices or "boiler room" operations to solicit ASD's products or services.

9. **Media Inquiries:** ASD's advertisers may not solicit coverage or publicity from the media regarding the ASD business, nor may they appear on radio or television talk shows to promote their ASD activities. If an ASD advertiser is contacted by the Media (radio, television, the press, or other), the contact should be referred to the ASD corporate office in order to maintain information accuracy and a consistent Company image.

**Member Responsibilities:**

All members are responsible for the following:

• Read our Frequently Asked Questions (FAQs)

• You must sign up with your own, unique email address.

• You must sign up with our choice of payment processors. They are listed during the sign-up process. They include but may not be limited to; ASD Approved Debit Cards, Solid Trust Pay Solutions, Alert Pay etc.

• You must sign up with your own, unique IP address.

• You may not be sponsored by or receive 1st or 2nd-level referral commissions from anyone in your same household, unless you have approval through ASD and your sponsor. (Example: Each person would have to be operating their own business, and that may be monitored). **Stacking is prohibited.**

• **In order to be an advertiser of ASD, you must have your own product, program or opportunity to advertise** or have access to a website for which you are an authorized reseller with the right to advertise.

• If you have problems viewing ads, you must submit a support ticket the SAME day you have the viewing problem.

• If you're "Home Page" or "History" page is not reflecting the proper credit, dates, rebates or commissions, you must submit a support ticket the SAME day the problem occurred.

• You must know the time zone and the cut off time for viewing web sites. You have twenty-four (24) hours to view twenty-four (24) web sites. A day at ASD begins at 12:01 a.m. CST and ends at 12:00 a.m. CST.
• You MUST be courteous to our administration staff at all times, regardless of any problems you are experiencing.

• When making an advertising purchase with any payment

processor be, sure to follow the process all the way through so that the purchase is reflected on your ASD account.

You must be willing and able to receive emails from ASD as a requirement of your membership.

• Be aware that if you use emails such as @AOL, @hotmail, @yahoo, @BellSouth or @MSN addresses, you may not always receive our emails because of their SPAM systems. If this occurs, please use a different email address or check your bulk mails. Thus far we have had no problems with @gmail.

## User-Supplied Content:

ASD's services and materials may be used for lawful purposes only.

**Spam:** If you are found to have spammed, without warning, ASD reserves the right to disable or terminate your account immediately. All funds will be forfeited. ASD may impose a penalty for each spam policy violation. ASD also reserves the right to determine what violates this policy, in which case, any violation that occurs will result in account termination without refund of any monies.

**Refusal of Service:** ASD, at its sole discretion, reserves the right to refuse or cancel service to any Advertiser. Violation of any polices, rules or regulations could result in a warning or possible account termination. Accounts may be terminated for any reason and without any prior notice to the Advertiser. Accounts terminated due to policy violations will not be subject to refunds.

**Each site that you promote on ASD's web site must comply with the following rules:**

1. Web sites advertised must not have any pop-up windows, pop-in windows, downloads, redirects, Trojans or malicious code.

2. Web sites advertised must not be broken, under-construction, or slow-loading.

3. Web sites advertised must not contain the following themes: pornography, matchmaking, mail-order brides, religion, politics, Gothic, Wicca, Satanism, war games and must not contain violent or inappropriate content. ASD reserves the right to determine unacceptable themes.

4. Do not promote your AsdCashGenerator.com referral page with the ASD rotator. Any sites submitted using ASD web site will be deleted.

5. We do not allow Rotators or URL Trackers of any kind.

6. We will accept sites in any language, but your largest target market is English.

If you break any of the above rules, your account may be deleted without notice and all funds will be forfeited.

**Waiver:** In keeping with these terms, I, the advertiser, furthermore release and forever discharge and hold harmless AdSurfDaily, Inc. AsdCashGenerator, (ASD), it's heirs, successors and assigns and employees from any liability, claims and or demands of any kind or nature either in law or in equity, which arise or hereafter arise from my advertising purchases.

**Indemnification:**

The advertiser agrees that it will protect, indemnify, save and hold ASD harmless from any and all liabilities, losses, expenses and claims, as well as reasonable attorney's fees assessed against ASD, its agents, officers, employees and administration that may arise or result from any service provided or performed or agreed to by any product sold by its advertisers or customers, agents, employees or assigns. Advertiser agrees to defend, indemnify and hold ASD harmless against liabilities arising out of, but not limited to, (1) any injury to person or property caused by any products sold or distributed by advertiser and advertised on ASD web site, (2) any material furnished by advertiser infringing or allegedly infringing on the rights of a third party, (3) copyright violation and any defective products sold to a customer from the ASD web site.

**Cash Outs and Upgrades:**

All cash outs are reviewed manually for accuracy and increased security to protect each member's money.

Cash outs are typically completed within 5-7 days after the cash out request has been made. There will not be any cash outs paid on Saturday, Sunday or Holidays. The minimum cash out is $10.00 and the minimum upgrade is $10.00.

If you do not pay a membership fee you can cash out only on Mondays but you must pay a cash out fee. There is a cash out fee if you do not pay a monthly membership fee. The fee depends upon your payment processor or the method of your cash out.

1. If you pay a monthly membership fee, ASD will not charge you a fee up and above the fee charged by your payment processor. If you pay a $10.00 per month membership fee, you can cash out your rebates every Monday without paying a fee to ASD over and above the fee charged by your payment processor. If you pay a $25.00 per month membership fee, you can cash out your rebates every Monday, Wednesday and Friday without a fee from ASD. You will only pay the fee charged by your payment processor. The same applies if you pay a $100.00 per month membership fee, you can cash out your rebates and upgrade daily without a fee from ASD, you will only pay the fee from your payment processor. If you pay a membership fee you will not be charged a cash out fee if you request to be paid by ASD's check or bank transfer.

2. Due to security reasons you may NOT call the office for cash out requests. There are a variety of options to choose from when you click on the cash out button.

3. If you have bought Ad Packages with more than one payment method, you will be asked to select the account to which your cash outs can be paid. You may request to be paid by a check from ASD or by a bank transfer. When ASD request a bank transfer online, it usually takes 2 or 3 days to go through the banking system. It is not an instant transaction.

4. We reserve the right to assess fees as per our Fee Schedule. All fees are displayed and calculated in US Dollars.

5. You understand that you will need a valid e-mail address for communication purposes, and you agree to maintain the e-mail address provided on the release form attached to this agreement so long as you use the services of ASD. If you have a change in your e-mail address, you agree to notify ASD of these changes before further using the Service offered by ASD.

5.1. If you open an ASD account, you hereby consent to receive periodic newsletters and other types of e-mail communications

from ASD, including customer service issues, new product offers and other matters. We reserve the right to e-mail you at any time regarding issues related to your account and your use of your ASD account.

5.2 You agree to and understand the full Terms of Service of ASD, and you agree to and understand that ASD has the right to terminate your account for any violations of the terms to which you have agreed, and all your funds would be forfeited.

6. You agree that all transactions involving your ASD account are final and not reversible, and you understand that there is no refund available after completing a transaction.

6.1. You agree that you are liable for any transactions made from your account, and you agree to indemnify, defend and hold harmless ASD for any transaction of whatsoever nature processed from your account.

7. You agree that you will not file a chargeback with your credit card company or bank account against ASD, and if you do file a chargeback, your account will be terminated and all funds in your ASD account will be forfeited and you will be banned from using the services of ASD in the future.

8. You acknowledge and accept that in the case of a claim of unauthorized transactions, the presumption shall be that all transactions are authorized by you and are your liability.

9. ASD agrees that we will not share your personal information with any third parties other than authoritative officials with authoritative rights. We will not surrender any of your information unless a court order and/or a Subpoena and/or a Protective Order is presented to us, and then we will abide by the laws of the United States and surrender your information only to the proper authorities who have the legal rights to said information. We view protection of Advertisers' privacy as a very important principle. We store and process your personal information on computers located in the United States and elsewhere as we deem necessary that are protected by physical as well as technological security devices.

10. Nothing contained on www.AsdCashGenerator.com should be understood as granting you a license to, but not limited to, use any of the trademarks, service marks, or logos owned by ASD or by any third party.

11. You must not divulge your password to anyone else, nor may you use anyone else's password. You agree that ASD will treat any person accessing your account using your password as you, and you understand and agree that any action taken by any person using your password shall be binding on you and all other parties involved in said action.

11.1. ASD is not responsible for any losses incurred by you as the result of the misuse of your password.

12. In order to use the service, you must register for an ASD account at www.AsdCashGenerator.com.You may hold one ASD account, and this may be used for business or personal transactions. Our services are only available to individuals or businesses that can form legally binding contracts under applicable law.

13. If you are an international Advertiser, you warrant that you are violating no law or regulation in your jurisdiction or any other jurisdiction by advertising with ASD.

14. We are not an escrow service, and we make no guarantee of a product or service or the quality of a product or service you may receive from another Advertiser after purchasing it through www.AsdCashGenerator.com account as we are not the person selling the product or service. If you have a complaint about the product or quality of the product, you agree to contact the Advertiser from whom you purchased the product or service and indemnify, defend and hold harmless ASD. We do not and cannot ensure the quality, safety, or legality of any merchandise received, nor that the seller will even ship the merchandise.

15. We agree to initiate ACH (Automated Clearing House) transfers to and from your bank account only after you request the transaction through your ASD account, and we agree that the transaction will only be for the amount you request, less any applicable fees as found in our Fee Schedule on www.AsdCashGenerator.com, additional standard transactional banking or other appropriate standard transactional fees.

16. WE AND OUR SUPPLIERS PROVIDE OUR SERVICES "AS IS" AND WITHOUT ANY WARRANTY OR CONDITION, EXPRESS, IMPLIED OR STATUTORY. WE AND OUR SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. COMPANY DOES NOT WARRANT THAT THE SITE OR THE SERVICE WILL MEET YOUR REQUIREMENTS OR THAT THE OPERATION OF THE SITE OR THE SERVICE WILL BE UNINTERRUPTED OR ERROR-FREE. THE INFORMATION AND SERVICES MAY CONTAIN BUGS, ERRORS, PROBLEMS OR OTHER LIMITATIONS. WE AND OUR AFFILIATED PARTIES HAVE NO LIABILITY WHATSOEVER FOR YOUR USE OF ANY INFORMATION OR SERVICE. ASD shall make reasonable efforts to ensure that requests for all payments and cash outs are processed in a timely manner but we make no representations or warranties regarding the amount of time needed to complete processing because our service is largely dependant upon many factors outside of our control, such as delays in the banking system or the U.S. or international mail service.

17. IN NO EVENT SHALL WE OR OUR SUPPLIERS BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH OUR WEB SITE, OUR SERVICE, OR THIS AGREEMENT (HOWEVER ARISING, INCLUDING NEGLIGENCE).

18. ASD will not be responsible for delays or failures in the transmission, receipt or execution of orders, payments, deliveries or information due to events beyond its control (acts of God). The obligations of this contract precede any government enactment.

19. We have the right to refuse service to particular individuals or entities, at our sole discretion, with or without cause.

20. We will suspend or re-activate an ASD account, if ordered to do so by an Order from a court or arbitration body of acceptable jurisdiction, as determined by ASD.

21. Solely to enable ASD to use the information with which you supply us, so that we are not violating any rights you might have in that information, you agree to grant us a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, sublicensible (through multiple tiers) right to exercise the copyright, publicity, and database rights (but no other rights) you have stored in your ASD account, in any media now known or not currently known, with respect to the information you have provided to ASD.

22. ASD and all related logos, products and services described in this website are either trademarks or registered trademarks of ASD., or its licensors, and (aside from the circumstances described below) may not be copied, imitated or used, in whole or in part, without the prior written permission of ASD. In addition, all page headers, custom graphics, button icons, and scripts are service marks, trademarks, and/or trade dress of ASD and may not be copied, imitated, or used, in whole or in part, without the prior written permission of ASD.

22.1 Notwithstanding the above, HTML logos or website payments features may be used without prior written consent for the purpose of directing web traffic to ASDcashgenerator.com. These logos may not be altered, modified, or changed in any way, or used in a manner that is disparaging to ASD. Logos may not be displayed in any manner that implies sponsorship or endorsement by ASD. ASD is an advertising company, and no partnership, joint venture, employee-employer or franchiser-franchisee relationship is intended or created by this Agreement.

23. You agree that you will not use any device, software or routine to interfere with the proper working of the site or any activities conducted on our site. You agree that you will not take any action that imposes an unreasonable or disproportionately large load on our infrastructure. Much of the information on our site is proprietary or is licensed to ASD by our Advertisers or third parties. You agree that you will not copy, reproduce, alter, modify, create derivative works, publicly display or frame any content (except for your personal information) from our web site without the prior expressed written permission of ASD or the appropriate third party. If you use, or attempt to use our web site for purposes other than sending and receiving payments and rebates and managing your account, including but not limited to tampering, hacking, modifying or otherwise corrupting the security or functionality of our site, your account will be terminated, your available funds will be forfeited, and you will be subject to damages and other penalties including criminal prosecution where available.

24. You may close your account at any time by submitting a ticket using our support system on www.ASDcashgenerator.com with the appropriate topic title: Close Account. Upon the termination of an account, any and all pending transactions will be cancelled and all unclaimed rebates are forfeited. You will remain liable for all obligations related to your account even after such account is closed.

25. Without limiting other remedies, we may update inaccurate or incorrect information you provide to us, contact you by means other than electronically, immediately warn our community of your actions, place a hold on funds in your account, limit funding sources and payments, limit access to an account and any or all of the account's functions (including but not limited to the ability to send money or making withdrawals from an account), limit withdrawals, indefinitely suspend or close your account and refuse to provide our Services to you if:

You breach this Agreement or the documents it incorporates by reference.

We are unable to verify or authenticate any information you provide to us.

We believe that your account or activities pose a significant credit or fraud risk to us or the public.

We believe that your actions may cause financial loss or legal liability for you, our Advertisers or us.

25.1. To secure your performance of this Agreement, you grant to ASD a lien on and security interest in your account.

26. You may not transfer any rights or obligations you may have under these Terms of Service without the prior written consent of ASD. ASD reserves the right to transfer these Terms of Service or any right or obligation under these Terms of Service without your consent.

27. You shall comply with all applicable U.S. and international laws, statutes, ordinances, regulations, contracts and applicable licenses regarding your use of our Services. ASD is not responsible to establish your legal right to use our services. Such requirements rest entirely on the Advertiser. Earnings over $600 per year will be reported to the IRS for US residents.

28. Any controversy or claim arising under or related to these Terms of Service shall be settled by arbitration in accordance with the International Arbitration Rules of the American Arbitration Association before a single arbitrator appointed by mutual consent of the parties to these Terms of Service. The language of the arbitration shall be English.

29.1. These Terms of Service are governed by the laws of Panama as AdSurfDaily is incorporated in Panama.

29.2. In the event that any provisions of these Terms of Service shall be determined by an arbitration body or a court of competent jurisdiction to be unenforceable in any jurisdictions, such provision shall be unenforceable in that jurisdiction and the remainder of these Terms of Service shall remain binding upon the parties as if such provisions were not contained therein. The enforceability of such provision shall otherwise be unaffected and remain enforceable in all other jurisdictions.

30. These Terms of Service are governed by and interpreted under the laws of Panama as such laws are applied to agreements entered into and to be performed entirely within Panama by residents and the jurisdiction of Panama. You agree that this Agreement and all incorporated agreements may be automatically assigned by ASD, in our sole discretion, to a third party in the event of a merger or acquisition. Our failure to act with respect to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches. These Terms of Service set forth the entire understanding between both parties with respect to the subject matter hereof.

31. The Services are offered by AdSurfDaily,Inc. located currently at 13 S. Calhoun St., Quincy, FL 32351.

32. Disputes between you and ASD regarding our Services may be reported to Customer Support using our online ticket system at any time, or by calling (850) 627-2206. Our return phone calls will only be between the hours of 8 AM and 5 PM Eastern Standard Time.

If you do not abide by these terms and conditions, ASD has the option to terminate your account immediately.

ASD reserves the right to change the terms and conditions of this site and Agreement at any time.


AdSurfDaily, Inc.

By: T. Andy Bowdoin

Title: President

Updated: May 16th 2008









Privacy Policy | Terms & Conditions | Support
Ad Surf Daily, Inc. | 13 S. Calhoun Street | Quincy, Florida | USA
Copyright © 2006 – 2008, Ad Surf Daily, Inc. All Rights Reserved

## FRONT OF BUSINESS / BUSINESS FACES WEST
### 13 S. CALHOUN ST., QUINCY, FL



## BUSINESS SIGN and "13" ON LEFT SIDE OF DOOR ON RIGHT SIDE



GOVERNMENT
EXHIBIT
4

| | | | SEARCH BLOG | ▐ FLAG BLOG | Next Blog» | | Create Blog | Sign In |



## Tuesday, July 15, 2008

## Do you want to know what Andy Bowdoin Said At the July 12 Rally?

Good Evening Aces,
As if Robert Mecham isn't amazing enough by putting together the new ASD Video Presentation that we all viewed in Miami, he also transcribed Andy Bowdoin's speech for all us too. See below...

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Andy Bowdoin July 12, 2008 in Miami, FL

Hi folks! I tell you. This is fantastic when you look out over the group. This is one of the largest rally's we've had up to this point. They told me earlier that they were blocking the expressway out there because people couldn't get in. I don't know … there's probably 5,000 to 6,000 people.

### Reward yourself GET A Free Report on Blogging. Better yet never miss a post from me.

Name: [                    ]
Email: [                    ]
Give me My free report!



Will

Will Buckley is a stay at home dad and believes if you think it so it will be. He is a jack of all trades in Internet Marketing and specifically website promotion. He retired from the U. S. Air Force in 2004 and received a Masters degree in Elementary Education in 2005. Will's other interests include Music, Self Development, and anything creative. Originally from California

GOVERNMENT
EXHIBIT
5
CANDLES 800-783-0199

Case 1:08-cv-01345-RMC    Document 12    Filed 08/05/2008

Everybody keeps giving me credit. But you people are the ones that deserve the credit. You people are making it happen, and that's great.

I going to do something today that I've never done before – that is use some notes. The reason for that is I've got some special issues that I want to cover. And I want to make sure that I don't miss any.

There are usually three talks that you give. One is the one that you prepare in your mind before you ever give the talk – that some people put down in notes. But always put it down mentally. And sometimes you leave out some things. But the second, if usually the talk that you actually give. And the third is the talk that you wish you would have given.

First of all I'd like to introduce a personal assistant that started Friday. And she'll be able to take a lot of the phone calls – for those that haven't

he lives in Germany with Cynthia, Clayton, Tinker Bell their Ragdoll cat and Sydney the Fox Terrier.

View my complete profile







been able to get thru on [my] cell phone. I have so many cell phone calls coming in that it's very difficult to take care of. She'll also be handling emails. I haven't been able to take care of all of the emails. But she'll be taking care of this for us. And you'll see a big, big, big improvement in that area. There's a lot of things that I'm no longer able to do when we first started. I was able to take a lot of the problems that you had and get them solved for you when we first got started.

Now we're at a point, I'm having to look at the big picture in the company to see how we can go to the next level. And take this company into one of the largest internet advertising companies.

We're looking at things so we can have an integrated company so that we can own our own credit card processing company. We're looking at that right now. We have companies that we're talking with.

We looking ... and this is looking very,

## Blogs to Love

9 Planet Review
Blondie Makes Money!
Gran Maddy
Hermit Jim
Make Me Money
My Highly Recommended Business Opportunities
Scott's Site

## Recommended Reading

Visitors to this page also liked:

- Wealth Attraction

Wealth Attraction System: Do you want to know what Andy Bowdoin Said at the July 12 Rally?    Page 4 of 15

Case 1:08-cv-01345-RMC    Document 12    Filed 08/05/2008    Page 40 of 57

very good at purchasing controlling interest in an international bank. So that we have our banking, our processing, and we're looking at several call centers down in some of the Latin American countries – and we'll be purchasing one of those, and one of those has about 185 people working it. [They are] making good money with a lot of contracts in the United States. And it's a company that we'll be able to go in to and train these people very quickly with us until we build ours up.

We're run out of room. We started with about 2,000 sq. feet. We filled that up. Then we rented space next door, about 2,000 sq. feet. And within a few days, we filled that up. And it was looking like we we're going to have to move to Tallahassee.

It was very difficult to find the space that we needed in Quincy. But the Chamber of Commerce really got involved, and the city of Quincy really got involved – and said, "we don't want you leaving Quincy, because you can

System: ASD Cash Generator and Andy Bowdoin.

- Wealth Attraction System: The Medal of Distinction, Andy Bowdoin, a scam?
- Wealth Attraction System: An Old School Ideas gone New update.
- Wealth Attraction System: ASD Cash Generator, Chews4Health and DownlinePartners.
- Wealth Attraction System: Tom Hua - The Viral Marketing Guy.
- Wealth Attraction System: Now I have to brainstorm a niche...
- Wealth Attraction System: make money
- Wealth Attraction System: Lawn Chair Millionaire and Rachael Long.
- Wealth Attraction System: Massive Team Build by some of the most well-known group leaders on the Internet!
- Wealth Attraction

Wealth Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally?                    Page 5 of 15

make a tremendous impact."

So they started looking around. And there's a building, which is the tallest building in Quincy – four stories. We are negotiating and processing in purchasing that building. It will be about 19,000 sq. feet, which will give us expansion, and we're looking forward to getting that started. And we have a person, George Harris who is heading up our real estate division, and he'll be working with the contractors to get the renovation going. And our customer service department should be able to move in there within the next two weeks.

So we're at a stage where we can add additional employees to be able to take care of the load.

The personal assistant is his wife, Judy Harris, and she'll be the one that you'll be talking too when you first call in on my cell number.

We will also have another stream of

System: Chews4Health and U.

Click to get  FEEDJIT



Freelance World

business and online publishing

Free Web Hosting

work at home

cool web search

best ptc site nosacm

Get Pay When You Surf Intenet

Free Money Making Website



Have this tower ↑

income for us – because of what is happening in the real estate market, [where there's] a lot of distressed property. This has happened before in the real estate industry, and it always comes back. And we're looking into properties that are in distress, properties that have been foreclosed on that we can go in and purchase for ten-cents on the dollar. And we can take these and hold on to them, until they increase which can be put into Ad Surf Daily to help increase rebates.

Now one of the things that we're looking into with one of these call centers is to increase the rebates, and the bank profits will be used help rebates. And we're always looking for other ways to increase that.

I've asked the question, time and time again – "Andy, are you ever going to reduce rebates?" Folks, this is what's built the company. It's a very unique concept we have here, and rebates is what makes it happen. This is what creates the members, that creates the



## Blog Archive

▼ 2008 (114)

  ▼ July (12)

    Do you want to know what Andy Bowdoin Said At the ...

    Massive Team Build by some of the most well-known ...

    ASD Cash Generator and Andy Bowdoin.

    Chews4Health and U.

    Now I have to brainstorm a

Wealth Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally? Page 7 of 15

Case 1:08-cv-01345-RMC   Document 1-2   Filed 08/05/2008   Page 43 of 57

interest for the national advertisers.

And right now we're at the point where national advertisers are looking. We're brought on Joseph to head this division up for us, so we can start bringing national advertisers in, and 50% of what you saw up here, of the income will go right back into rebates.

You know, it's just great to have each and everyone of you here today. Because it shows you're committed to building wealth in your life.

It's amazing to hear the stories we hear constantly everyday about how this is happening. This is what ASD is about – is helping people build wealth. This is our goal. This is what we're going to do, is to help people just like you, all over the world.

There's a great need. Where companies are going bankrupt, they are laying off people and crime is increasing constantly, constantly. Which means God has a tremendous hand in what

niche...
Be the Messenger.
Knowledge Versus Mindset.
ASD Cash Generator, Chews4Health and DownlinePartn...
Lawn Chair Millionaire and Rachael Long.
Nutrional IPOD becomes Chews4Health
Happy Fourth of JULY to my American Friends.
Nutritional iPod MLM Pre Launch
► June (16)
► May (15)
► April (15)
► March (17)
► February (24)
► January (15)
► 2007 (126)

## Favorite links

Savvica.net, get linked with a PR5 site
My Three Year Old LOVES this stuff!

we're doing.

Just like John said, we're helping thousands of people, all over the world – save their homes. We hear this everyday. Save their marriages. Enabling people to people quit their J.O.B. or job. Helping retirees enjoy retirement.

But folks, when you're doing this much good, there will always be evil forces that's coming against us, to try and stop us. But let me tell you, WE WILL NOT BE STOPPED! If God is for us, who can be against us?!!

There will always be people who are speaking out against us. But we'll just continue to grow, grow, grow.

The negative news that we're receiving, means that we're making waves in the market place. Because we're one of the fastest growing companies on the internet today. Which means that we will always have people shooting at us, and like Don said. Now, this is the first

One of the Best Sites Online.
Free Viral Traffic Page I Created Get's No Love
250 Fresh Private Label Articles Each Month



It's time to earn
more with your blog.

Malaysia    Boleh!
Singapore   Boleh!

Ads by:
Advertlets.com

BlogCatalog

Recent Viewers

Anilg
2 days ago

johnisfit
3 days ago

maxgxl
8 days ago

kaira
11 days ago

porchdog
13 days ago

Powered By BlogCatalog

time that I've ever been shot at.

This is not a real blessed experience, but I've always tried to analyze why certain things happen. This morning, during my quite time, I was asking, "why are we receiving this bad publicity?" And I came up with about three reasons.



My blog is worth
$3,387.24
How much is your
blog worth?

POWERED BY
Technorati

#1 – it's because our people start making money the very first day that their ad packages are credited to their account. There's no selling to make that money. There's no recruiting that you have to do to make that money. How many network marketing companies can make that claim? So we're always going to have a lot of these big network marketers and companies that own network marketing companies shooting at us.



I understand that Robert [Fava] was telling me that some of the network marketers are saying that [ASD] is the biggest scam on the internet. But people from these companies are

Vealth Attraction System: Do you want to know what Andy Bowdoin Said at the July 28 Rally?   Page 46 of 57   Page 10 of 15

Case 1:08-cv-01345-RMC   Document 1-2   Filed 08/05/2008

getting involved in us, and their trying to stop it, because as you know, there are only about 5 to10% of the people in network marketing that really make much money.

#2 – Any company, where their success depends on recruiting other people to get them to sell their product, they're going to speak out about our business. Again, because a lot of their people are getting involved with us.

#3 – We just have people that are jealous of success.

Folks, you are part of making history in the financial community. Because we're revolutionizing the way people advertise their websites, and how people can earn money with a two-level payout system. We don't have to be a network marketing company with seven levels or ten levels. Our people are making tremendous profits with two-levels – which takes us out of being a network marketing company.

## Technorati

Search this blog:

[            ] [ Search ]

 » Blogs that link here
» View my profile

**Technorati**

## My Blog Log



| Recent Readers |
| --- |
| **You!** Join Our Community |
| **Jakkie** |
| **Anil G** |
| **johnisfit** |
| **CHRIS I** |
| *xbizmarketing* |
| **max** |

View Reader Community
Join this Community
(provided by MyBlogLog)

Live traffic feed

Potomac, Maryland arrived on "Wealth

Wealth Attraction System: Do you want to know what Andy Bowdoin Said at the July 12 Rally? Page 47 of 57   Page 11 of 15

Case 1:08-cv-01345-RMC   Document 1-2   Filed 08/05/2008

Each one of you here today are a leader in Ad Surf Daily. The people in your organization that look to you for guidance. You have to be strong, you have to explain to them "why the negative press" which is what we've just talked about right here.

I looked at one of the email a couple of days ago. I just picked out a couple of things that just talked about Robert Garner, and that he's not licensed to practice law in Florida. Well, we never said he was. He's licensed to practiced law in North Carolina – but that's the way they turned it around, and made it look like he wasn't even an attorney.

We retained a law firm in Miami, that have offices in Washington D.C. that have about 500 attorneys in the firm that do a lot of SEC work. We will be meeting with them Monday morning – and they are retained to keep us straight with the SEC.

And Don mentioned a national firm, an attorney firm that he was talking about

Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally?"

Jacksonville, Florida arrived from google.com on "Wealth Attraction System: The Medal of Distinction, Andy Bowdoin, a scam?"

Los Angeles, California arrived from blogsearch.google.com on "Wealth Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally?"

Anderson, South Carolina arrived from google.com on "Wealth Attraction System: An Old School Ideas gone New update."

Rushden, Northamptonshire arrived on "Wealth Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally?"

Las Vegas, Nevada arrived from williambuckley.name on "Wealth Attraction

who has experience in bringing the hammer down on people that need it, and we're given him the authority with the go ahead.

These people that are making these slanderous remarks, they are going to continue these slanderous remarks in a court of law defending about a 30 to 40 million dollar slander lawsuit.

Now, we're ready to do battle with anybody. We have a legal fund set up. Right now we have about $750,000 in that legal fund. So we're ready to get everything started and get the ball rolling.

Now there is one email that came from an ASA monitor. Let me tell you about this company. They used to monitor the real time surf sites. They monitor surf sites. A lot of people used to go to this website to see how they rated surf sites. One of our members said, "Andy, you need to advertise on this website because they have places where you can put banner advertising. This is one

System: The Medal of Distinction, Andy Bowdoin, a scam?"

📖 Minneapolis, Minnesota arrived from dogpile.com on "Wealth Attraction System: An Old School Ideas gone New update."

🇨🇦 Drumheller, Alberta arrived on "Wealth Attraction System: An Old School Ideas gone New update."

📖 United States arrived from google.com on "Wealth Attraction System: The Medal of Distinction, Andy Bowdoin, a scam?"

📖 Izola, Bohinj arrived from google.com on "Wealth Attraction System: The Medal of Distinction, Andy Bowdoin, a scam?"

Watch in Real-Time

Options>>

Click to get  FEEDJIT

## Get Hosting

of the first websites we had. And we had problems with that website and we had to come up with a new website. While we were doing that I learned that this ASA monitor would write good things about websites that would advertise [with] them. If you didn't advertise, they'd write bad things. I didn't want to be a part of that. And when we started back up last July, he called our office and said, "Now, Andy let me help you." And I said, "no thanks, not at this time." So I guess this payback time with him. So Jay will answer to that with a lawsuit.





I just want to leave a challenge with you this afternoon. Let's really give our adversaries something to talk about by continuing to set records in the financial world.





/////////////////////////////////////

Interesting Rally I am sure.



If you are interested in getting involved you may click here to find out more.

Case 1:08-cv-01345-RMC   Document 1-2   Filed 08/05/2008   Page 50 of 57

Posted by Will at 8:45 AM

Labels: make money

**0 comments:**

Post a Comment

Make $7,000 a week inviting your friends to watch a VIDEO CARTOON on Google
Watch this week's most popular video on Google and make money inviting your friends to watch it! So simple teens are doing it!

Millionaire in 16 weeks on the Internet
"I was so broke I was piling up the bills in the closet. Bailiffs were about to sell my daughter's bed to auctions. i needed to make money FAST so here's what I did..."

Retired broke now making $2,000/week
"I'm 60 and completely computer illiterate. But when I read this 5-page article, I started making money right away. I made $400 on my first day. Here's the article ... "

WE'll PAY YOU up to $4,800 /month to add these 4 Links on Your Website!
Add this banner ad on your website and make up to $170/day!! It only takes 15 minutes and it's FREE!

Home                  Older Post

Subscribe to: Post Comments (Atom)

Search Engine Optimization

Wealth Attraction System: Do you want to know what Andy Bowdoin Said At the July 12 Rally? Page 15 of 15

Case 1:08-cv-01345-RMC   Document 1-2   Filed 08/05/2008   Page 51 of 57



1000s of visitors instantly Click on the Banner now!

# Pay Per Play is The Way
## TO GO

16    ONLINE



Event Location: _____    Event Date: _____

Member Name: _____ English ID:_____ Spanish ID:_____

Member Phone: _____ Member Email:_____

Sponsor Name: _____ English ID:_____ Spanish ID:_____

Sponsor Phone: _____ Sponsor Email:_____

**** <u>ENGLISH ACCOUNT</u> ****    Make Checks Payable to: Ad Surf Daily, Inc.

Total Amount Purchased on English Account: $_____
                                           (Due on Event Date, <u>NO</u> EXCEPTIONS)

Method of Payment: _____ Amount: $_____ Check #_____
                   (Example: Check, Money Order, <u>English</u> Cash Balance)

Method of Payment: _____ Amount: $_____ Check #_____
                   (Example: Check, Money Order, <u>English</u> Cash Balance)

English Match Percentage Paid to <u>Member</u> and <u>Sponsor</u>: _____%

**** <u>SPANISH ACCOUNT</u> ****    Make Checks Payable to: Ad Surf Daily, Inc.

Total Amount Purchased on Spanish Account: $_____
                                           (Due on Event Date, <u>NO</u> EXCEPTIONS)

Method of Payment: _____ Amount: $_____ Check #_____
                   (Example: Check, Money Order, <u>Spanish</u> Cash Balance)

Method of Payment: _____ Amount: $_____ Check #_____
                   (Example: Check, Money Order, <u>Spanish</u> Cash Balance)

Spanish Match Percentage Paid to <u>Member</u> and <u>Sponsor</u>: _____%

*Member Signature:* _____    *Date:* _____
Member acknowledges that processing time may take up to 14 business days before ad packages are reflected in account.
Member also acknowledges they may not start earning rebates on new purchases until ad packages are reflected in account.

## ******** FOR OFFICE USE ONLY ********

*\*\*ASD Approval:* _____
                          *(Signature)*

NOTES: _____

_____

EXHIBIT
6



# Getting Started Guide

1) Sign up for **ASD Cash Generator** (English) Website: http://www.asdcashgenerator.com
   Get with your sponsor to obtain their English member referral link with ID number.

2) Sign up for the **La Fuente de Dinero** (Spanish) Website: http://lafuentedinero.com
   Get with your sponsor to obtain their Spanish member referral link with ID number.

3) Attend Training, Opportunity Presentations and Question & Answer sessions in the
   **ASD Web Training Room** located online at http://www.adsurfdailywebroom.com
   Follow the instructions on the website to enter the web room and view the schedule.

4) Check the **ASD News Headlines** on a daily basis to stay up to date on your ASD Business.
   Visit:  http://www.freewebs.com/dawnstowers/index.htm and click the various links
   near the top of the page for details.

5) View **ASD Training Videos** to learn how to: "Surf the Websites", "Add a Website to the
   Rotator" and "Upgrade Ad Packages".
   **Training Videos:** http://www.asdcashgenerator.com/training.php

6) **Watch the video** of ASD Founder & CEO, Andy Bowdoin, as he speaks to you from his
   home in Quincy, Florida.  http://www.designstrategies.com/adcash/page2.html

7) **Watch the video** of ASD Founder & CEO, Andy Bowdoin, along with ASD Attorney,
   Robert Garner, as they speak to you from Andy's office at the company headquarters.
   http://www.asdcashgenerator.com/thank_you.php?ocd=reg_noemail

8) Read the **"Legality Statement"** located at the top of the Frequently Asked Questions
   (FAQ) page on the ASD Cash Generator website.

9) Attend the **Monday Night Opportunity Calls** with Andy Bowdoin at 9:30 PM EST.
   Dial 1-218-486-7200 Code 459978 or join us in the Web Training Room too.

10) Attend the **Tuesday Night Company Training Call** with Andy Bowdoin at 9:30 PM EST.
    It is best to attend this in the ASD Web Training Room (address listed above).

11) Promote and attend as many **Monthly Rally Meetings** as possible.  See the link on the
    ASD News Headlines for the upcoming Rally schedule.

12) Promote and attend the **ASD Annual Convention.**

Ad Surf Daily, Inc.  13 S. Calhoun Street, Quincy, FL 32351
OFFICE:  850-627-2206 FAX: 850-627-2533



Page last modified: April 3rd, 2008

# LEGALITY STATEMENT

**Presented by Mr. Robert Garner, Attorney at Law,**

**Chief Legal Counsel for Ad Surf Daily, Inc.**

**Garner Law Office – P.O. Box 13002 – Greensboro - NC – 27415 – USA**



## INTRODUCTION

My name is Robert Garner, and I am an attorney and the principle owner of the Garner Law Office in Greensboro, North Carolina. At our Law Office we specialize in corporate, business and real estate law, and my firm represents Ad Surf Daily, Inc., or ASD, which is Andy Bowdoin's company that operates the Ad Cash Generator business opportunity.

To give you some of my background as an attorney, I am a graduate of the Law School at the University of North Carolina at Chapel Hill, and I've had thirty years experience as a North Carolina licensed attorney. I have handled everything from first degree murder cases to million dollar construction litigation. But for the past twenty years, I have primarily represented corporations and security houses, such as stock brokerage firms and investment firms.

Our work includes the handling of public stock offerings, negotiating complex mergers and acquisitions, and the preparation of filings for the Securities and Exchange Commission, also known as the SEC. In case you don't know, the SEC is a regulatory branch of the US Government created by Congress to protect investors from fraud and other abuses.

In addition to myself, we have other attorneys in our offices who are dedicated to this work with Andy and his company, and who are available at any time to deal with issues as they arise. We are working daily to advance the business plans of Andy's entire organization, and we are moving forward in a number of positive directions which will benefit everyone involved.

## LEGALITY CONCERNS

Now, I want to address the concern that new ASD members sometimes have in the area of the legality of the Ad Cash Generator opportunity. And for the record, I can say that there is no litigation, no threatened litigation, or even any inquiries from any regulatory body

GOVERNMENT EXHIBIT
CARDLS 800-788-0399

about ASD or the Ad Cash Generator opportunity.

Everyone at my law firm understands Andy's sincere commitment to honesty and integrity in all aspects of his company, and we have given those values the highest level of importance in all our activities as his legal counsel. For the past 2 years now, Andy has directed us to ensure that his company is structurally sound today and tomorrow and far into the future. My staff and I are dedicated to Andy's vision that his company will continue to rapidly grow bigger and stronger, and will continue to be an industry leader in Internet advertising in the years to come.

## LEGALITY OVERVIEW

Now, here is an overview of what ASD and the Ad Cash Generator income opportunity program are doing from a legal viewpoint:

ASD and the Ad Cash Generator opportunity provide businesses a way to advertise on the Internet. It allows them to purchase page views, where their ads can be seen by the general public. At this time, Ad Cash Generator is offering rebates to purchasers of advertising. These rebates function something like "loss leaders" in that advertisers are presented a way to earn their money back, plus a little more, in addition to having their ads viewed on the Internet. If you are not familiar with this business term "loss leader", it is when a product or service is sold at a very low price or at a loss for the purpose of attracting customers to a retail store.

Not everyone qualifies for the rebates, but for those who do participate, it is a great opportunity for them to expose their Websites to the public, and earn back some of the cost. I should tell you that like all rebates, this offer may be withdrawn at some time in the future, and the opportunity will be gone. However, the special offers will be honored for all who do participate at this time.

These ASD programs are open to everybody. ASD had a program to allow businesses to place ads on the ASD site for viewing by the general public without cost. For others who are seeking wider exposure, there are "ad packages" available for purchase which will guarantee greater numbers of page views, as selected by the advertiser. It is for those people that a rebate program is available now, to recover their cost, and perhaps earn some additional money. As ASD grows and develops, this program may change and improve as well.

## COMPANY OPERATIONS

Now, I would like to go over some legal and operational information about ASD as a company.

ASD is incorporated, pays state, federal and all other taxes, and complies with all laws and regulations that apply to it. It provides its contact information, including its physical location, on the Internet. It has customer service representatives who are responsive to customer calls. The customer service representatives are not offshore, they are right here in the United States. To provide even better customer support, ASD has implemented a "ticket" system to allow inquiries via its website, and answers every one within 24 hours, Monday through Friday. The goal is to have zero customer complaints.

In addition, ASD is continuing the expensive work of improving back office operations, so that everything will run more smoothly for everyone. And, as I stated before, there are many other exciting things coming in the future that will benefit everyone involved with the ASD income opportunities.

ASD and its related companies are not selling stock, nor are they seeking investors. Should any of the related companies elect to do so in the future, strict adherence to SEC and state regulations would be observed. At this stage, a stock offering to the general public, in compliance with SEC regulations, is at best only in the talking phase. There are no concrete plans for this right now.

If ASD or its related companies were to offer shares of stock, they would be required to file a registration statement with the SEC. If ASD, or anyone, anywhere were to offer a "security," which is defined as an investment opportunity, to US citizens, the offering would need to be first approved by the SEC before being legal. The ASD rebate program is designed to respect these regulations. It is not an investment opportunity, and should not be considered as such. ASD is seeking to build up its base of subcontractors who will continue to sell Internet advertising for them, even after the rebate program ends and is replaced with something even more exciting and beneficial. ASD also wants to acquire information about companies that will continue to purchase advertising on the Internet in the future, and ASD is willing to pay for that information through the rebate program.

Because of the rebate program, some people have asked if ASD or the Ad Cash Generator income opportunity is a "Ponzi" scheme or a pyramid. A Ponzi scheme and/or a pyramid are illegal, because they use money from new investors to pay the first investors in the scheme their promised returns. When the base of the pyramid stops growing, the pyramid collapses. While ASD commits a portion of its future revenues to pay rebates, it does not guarantee a return, and the time it takes to earn rebates is affected by the revenue stream in

the future. Not everyone elects to participate in the rebate program, and not everyone will earn rebates.

ASD's Ad Cash Generator business model is not dependent on a base that continues to expand. Plus, ASD is developing other revenue sources constantly. Even more important, the rebates are fixed, and will allow the participants to only earn a set amount, and that amount is based on performance. There is no continuing obligation to pay returns to infinity, as in illegal pyramid programs. Because of these major differences, the Ad Cash Generator business opportunity is not an illegal "Ponzi" scheme or pyramid, and it is not in violation of any SEC laws or regulations.

As the founder and president of ASD, Andy envisions a day in the near future when the company will operate as a premier distributor of Internet advertising, utilizing the information now being acquired to market its services. We understand that Andy's goal is to follow the example of other broad based companies such as Amway and Avon, and to use the methods they developed to become a recognized leader in providing Internet marketing services.

## FURTHER LEGAL QUESTIONS

If anyone has legal questions about the Ad Cash Generator opportunity, I have provided this Legality Statement on the ASD Website that you are now reading. If you cannot find answers to your questions here, you should contact the staff at ASD, or submit a ticket for a written response. For more complex legal or regulatory questions, we ask that you have your attorney contact us for more detailed discussions, and we are happy to take such calls at 336-621-3890. Note: We will only take these legality question calls from licensed attorneys, so please have your attorney call us, not you.

In closing I want to assure you that as a licensed attorney for the past 30 years, I know there is no such thing as a free lunch, meaning you can get paid money for doing nothing in exchange. But, at the same time, I do believe that opportunity still exists, and that steady work and dedication can pay off. We know that ASD is committed to creating an environment where these opportunities can be found, opportunities to earn the money necessary for the challenging economic times ahead and for those who want to achieve even higher long term goals to live a life with much more financial freedom and security for them and their families.

We wish everyone involved with the Ad Cash Generator great success, and we will do our part to help make it happen.

E
08-1345
RMC

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| | |
|---|---|
| **(a) PLAINTIFFS**<br><br>UNITED STATES of AMERICA<br><br>**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____<br>(EXCEPT IN U.S. PLAINTIFF CASES) | **DEFENDANTS** Property Identified as 8 Gilcrease Lane Quincy, Florida, 32351, et al.<br><br>COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____<br>(IN U.S. PLAINTIFF CASES ONLY) |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br><br>William R. Cowden, AUSA | Case: 1:08-cv-01345<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 8/5/2008<br>Description: General Civil |

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

⊗ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ☐ A. *Antitrust* | ☐ B. *Personal Injury/ Malpractice* | ☐ C. *Administrative Agency Review* | ☐ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

---

⊠ **E.** *General Civil (Other)* OR ☐ F. *Pro Se General Civil*

| | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>⊠ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

KB

3 warr issued

| □ **G. Habeas Corpus/ 2255** | □ **H. Employment Discrimination** | □ **I. FOIA/PRIVACY ACT** | □ **J. Student Loan** |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ **K. Labor/ERISA (non-employment)** | □ **L. Other Civil Rights (non-employment)** | □ **M. Contract** | □ **N. Three-Judge Court** |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
(X) 1 Original Proceeding □ 2 Removed from State Court □ 3 Remanded from Appellate Court □ 4 Reinstated or Reopened □ 5 Transferred from another district (specify) □ Multi district Litigation □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
18 U.S.C. Section 981(a)(1)(A) - Money Laundering

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23 **DEMAND $** Check YES only if demanded in complaint **JURY DEMAND:** □ YES (X) NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) □ YES (X) NO If yes, please complete related case form.

DATE 8/5/2008   SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.