UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    Plaintiff,<br><br>8 GILCREASE LANE, QUINCY,<br>FLORIDA 32351,<br><br>ONE CONDO LOCATED ON<br>NORTH OCEAN BOULEVARD IN<br>MYRTLE BEACH, SOUTH<br>CAROLINA<br><br>    and<br><br>ALL FUNDS, INCLUDING<br>APPROXIMATELY $53 MILLION<br>HELD ON DEPOSIT AT BANK OF<br>AMERICA ACCOUNTS IN THE NAMES<br>OF (1) THOMAS A. BOWDOIN, JR.,<br>SOLE PROPRIETOR, DBA<br>ADSURFDAILY, (2) CLARENCE<br>BUSBY, JR. AND DAWN STOWERS,<br>DBA GOLDEN PANDA AD BUILDER,<br>AND (3) GOLDEN PANDA AD BUILDER,<br><br>    Defendants, and<br><br>ADSURFDAILY, INC., THOMAS A.<br>BOWDOIN, JR., AND BOWDOIN HARRIS<br>ENTERPRISES, INC.,<br><br>    Claimants. | Case: 1:08-cv-01345<br><br>Hon. Rosemary M. Collyer<br><br><br><br><br><br><br><br><br><br>**EMERGENCY MOTION FOR RETURN<br>OF SEIZED FUNDS<br>TO SAVE BUSINESS AND JOBS<br>WITH OVERSIGHT AND<br>MONITORING<br>AND/OR  FOR EVIDENTIARY<br>HEARING,<br>AND MOTION TO DISMISS<br>AND SUPPORTING POINTS OF LAW<br>AND AUTHORITIES** |

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................. i

TABLE OF CASES AND OTHER AUTHORITIES.................................................................... ii

I. INTRODUCTION.......…………………………………………………………………...1

II. FACTUAL BACKGROUND …………………………………………… ........................ 5

III. POINTS OF LAW AND OTHER AUTHORITIES) ........................................................... 10

      A.      The Verification is defective, subjecting the Complaint to Dismissal.................. 10

      B.      ASD Is Not An Illegal Ponzi Scheme.................................................................. 12

      C.      The Court Should Order The Government to Return the Seized Funds
             With Safeguards ................................................................................................ 16

            (1)      The Affidavit Is Problematic, Requiring a *Franks v Delaware*
                   Evidentiary Hearing ................................................................................. 22

            (2)      The Affidavit and Verified Complaint Contain Misstatements and
                   Omissions................................................................................................. 24

            (3)      The Misstatements and Omissions Were Material to the Issue of
                   Probable Cause.......................................................................................... 24

            (4)      The Misstatements and Omissions Were Made Knowingly and
                   Intentionally, or With Reckless Disregard for the Truth. ......................... 24

IV.      CONCLUSION.................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................. 27

LIST OF EXHIBITS

ORDER [PROPOSED]

## TABLE OF CASES AND OTHER AUTHORITIES

**Cases**

*Cunningham v. Brown,*
    265 U.S. 1, 7 (1924) .................................................................................................... 10, 14

*Franks v. Delaware,*
    438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ............................................ 22, 23, 24, 25

*Grupo Mexicano de Deasarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 332 (1999) .................................................................................................... 16

*Hahn v. Frederick,*
    66 So.2d 823 (Fla. 1953) ............................................................................................ 11

*In re Amway Corp.,*
    93 F.T.C. 618 (1979) .................................................................................................. 14, 15

*In re Armstrong,*
    291 F.3d 517 (8th Cir. 2002) ...................................................................................... 13

*In re C.F. Foods,*
    280 B.R. 103 (E.D. Pa. 2002) .................................................................................... 13

*In Re Taubman,*
    160 B.R. 964 (Bankr. S.D. Ohio 1993) ...................................................................... 13

*In re United Energy Corp.,*
    944 F.2d 589 (9th Cir. 1991) ...................................................................................... 13

*Jones v. Preuitt and Mauldin,*
    808 F.2d 1435 (11th Cir. 1987) .................................................................................. 20

*Malek v. Martin Marietta Corp.,*
    859 F. Supp. 458 (D. Ka. 1994) .................................................................................. 11

*Ogden v. District of Columbia,*
    676 F.Supp. 324 (D.D.C. 1987) .................................................................................. 23

*Slocum v. Mayberry,*
    Wheat 10, 4 L.Ed. 169 (1817) .................................................................................... 17

*U.S. v. Gold Unlimited, Inc.,*
    177 F.3d 472 (6th Cir. 1999) ...................................................................................... 14, 15

*United States v. $277,000 U.S. Currency,*
    69 F.3d 1491 (9th Cir. 1995) ...................................................................................... 18

*United States v. $8,850,*
    461 U.S. 555 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983)............................................ 17

*United States v. 31,990 Dollars in United States Currency,*
    982 F.2d 851 (2d Cir. 1993) ............................................................................. 19

*United States v. 8215 Reese Road, Harvard, Ill.,*
    803 F. Supp. L75, 177 (N.D. Ill. 1992)............................................................. 19

*United States v. All Assets of Statewide Auto Parts,*
    971 F.2d 896 (2d Cir. 1992) ........................................................................ 18, 19

*United States v. Colkely,*
    899 F.2d 297 (4th Cir. 1990) ........................................................................... 23

*United States v. E-Gold,*
    521 F.3d 411 (D.C. Cir. April 11, 2008) ...................................................... 20, 21

*United States v. Eiland,*
    2006 WL 516743 *11 (D.D.C. 2006) ................................................................ 25

*United States v. Gaston,*
    357 F.3d 77 (D.C. Cir. 2004)............................................................................ 23

*United States v. James Daniel Good Real Property,*
    510 U.S. 43 (1993).................................................................................... 16, 17

*United States v. Jones,*
    451 F.Sup.2d 71 (D.D.C. 2006)....................................................................... 23

*United States v. Madeoy,*
    652 F.Supp. 371 (D.D.C. 1987)....................................................................... 20

*United States v. Mathison,* 157 F. 3d 541, 546 (8th Cir. 1998) .................................... 13

*United States v. Real Property Located At 110 Collier Drive,*
    793 F.Supp. 1048 (N.D. Ala. 1992) ................................................................. 19

*United States v. Richardson,*
    861 F.2d 291 (D.C. Cir. 1988)............................................................... 23, 24, 25

*United States v. Spencer,*
    530 F.3d 1003 (D.C. Cir. July 18, 2008) .......................................................... 23

*United States v. That Certain Real, Property Located At 632-636 Ninth Avenue, Calera, Alabama,*
    798 F. Supp. 1540 (N.D. Ala. 1992).................................................................. 19

*United States v. Their*,
　801 F.2d 1463 (5th Cir. 1986) ................................................................ 20

*United States v. Thompson*,
　615 F.2d 318 (5th Cir. 1980) ................................................................. 25

*United States v. Undetermined Amount of U.S. Currency*,
　376 F.3d 260 (4th Cir. 2004) ................................................................. 18

*United States v. Walters*,
　2008 WL 2235335 *7 (D.D.C. June 2, 2008) ......................................... 25

*United States v. Williams*,
　737 F.2d 594 (7th Cir. 1984) ................................................................. 23

*Washington v. District of Columbia*,
　685 F.Supp. 264 (D.D.C. 1988) ........................................................ 23, 25

*Wright v. United States*,
　963 F.Supp. 7 (D.D.C. 1997) ................................................................. 24

## **Other Authorities**

Fifth Amendment to the United States Constitution ................................... 16

*Trawick, H.,* Florida Practice & Procedure  § 9-5, at 171 ........................... 11

## **8**

18 U.S.C. § 983(f)(1)(C) ....................................................................... 1, 17

28 U.S.C. § 1747 ...................................................................................... 11

Fla. Stat. § 849.091(2) (2007) ................................................................. 15

Rule G(2)(a), Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture
　Actions ................................................................................................. 12

Claimant, AdSurfDaily, Inc. ("ASD") hereby submits this Emergency Motion for Return of Seized Funds to Save Business and Jobs With Oversight and Monitoring and/or For Evidentiary Hearing, and Motion to Dismiss, and says:[1]

## I. INTRODUCTION

ASD needs emergency relief. Without it, the company will soon collapse completely. Its member base, its most important asset, will disappear, and its employees will be out of work.

The United States (the "Government") has rushed in and seized ASD's bank accounts (10 of them, with total balances of approximately $53 million) and has filed this *in rem* civil forfeiture action. It has also seized a residential home and condominium apartment, but ASD's survival, and the economic consequences to its employees, do not turn on the seizure of these two real properties.[2]

In a matter of a few days, ASD has gone from a vibrant internet advertising business with approximately 100,000 members to a hollow shell without a working office and without the means to resume its business. It has been left a massive number of frustrated and concerned members, more than 3,000 of whom have sent supporting emails to an email address established by the undersigned law firm. It has also been unable to pay its bills (to creditors, such as its landlord) and is hurtling down into a steep financial tailspin. To provide one concrete example, on August 14, 2008, ASD's hosting company threatened to shut down the company's servers

---

[1] This motion is, in many respects, similar to a motion for release of property pursuant to 18 USC § 983 (f). But it is not *identical* to a motion under that statute, especially because ASD is proposing a release of funds pursuant to a compliance program with oversight and monitoring. In an abundance of caution, ASD is also designating this motion as one for immediate release of property under 18 USC § 983(f).

[2] The Government also has taken the presumptively punitive step of executing warrants which resulted in the wholesale seizure of ASD's basic infrastructure – more than 75 computers, several monitors and printers, and critical business and financial records. The Government has informally advised undersigned counsel that it will be amending this forfeiture lawsuit to add the computers – but that it is likely willing to permit the computers to be returned with an agreement that they will not be sold, conveyed or transferred. If the Government adds the computers (and monitors and related peripherals) to the forfeiture case and does not agree to a Court order authorizing their return, then this emergency motion will include them, as well.

because its bill is unpaid. *See* August 14, 2008 email from Juan Fernandez, the CEO of ASD (Exhibit "A.").

This motion is an emergency because the business will fold, and its member base will disappear, and more than 70 employees will be out of work, if the funds are not returned soon and if the business is not allowed to now resume.  ASD cannot wait two years to litigate this lawsuit with its assets frozen and its business shuttered.  It can't wait one year.  It can't even wait 3 months.  It likely cannot wait even one month for a trial. ASD is an internet advertising business and its valuable asset – advertiser/members who place, watch and use ads – will be long gone by the time of any trial.  Regardless of the outcome of any trial, there will be no business left to return to and because ASD would need to start rebuilding from scratch its base of advertising members and its place in the market.  Even a trial win would be a loss.

ASD is not unmindful of the Government's concerns – which is why we are proposing in this motion that ASD's funds be returned as a component of **compliance and monitoring procedures** which represent "best practices" for this industry. These procedures will provide reasonable assurances to the Court  that ASD is being operated in an ethical and  legal manner.

At bottom, ASD's emergency proposal is for the return of seized funds with less-drastic measures than the freezing of its funds.  Thus, ASD is willing to resume its business, with the return of the seized funds, under oversight conditions designed to address the Government's perceived concerns (incorrect or exaggerated as they may be):

1.     Imposition by the Court and adoption by ASD, management and each employee of compliance and monitoring procedures ("Compliance Procedures") and such other requirements as the Court may deem appropriate;

2.    Membership requirement of full compliance with the Terms and Conditions of membership agreement, including member representation that the member offers for sale bona fide products or services or that it has other bona fide need for traffic to its website;

3.    Approval and appointment by the Court of an independent monitor to supervise ASD's business operations, the implementation of Compliance Procedures, and adherence to other requirements of the Court;

4.    Submission of timely [monthly?] financial reports to the Court and the Government;

5.    ASD agreement to not transfer any of its funds offshore; and

6.    Agreement to permit reasonable inspections by the Government, including Federal Trade Commission staffers and investigators, upon reasonable notice.

7.    Required use of "know your customer" checklist for all  new ASD members.

ASD invites the Government to propose other ethics, compliance and oversight measures for consideration.

    *                                    *                                    *

The linchpin of the Government's case is its bold theory is that ASD is an illegal Ponzi scheme.  According to the August 1, 2008 affidavit (Exhibit "B," attached, at ¶ 12) submitted in support of the seizure warrants,  the Government did not even start  to investigate this case until July 3, 2008.  Based on an investigation lasting less than four weeks, the Government asked for seizure warrants which would, in effect, render ASD inoperable. Now that ASD's bank accounts have been seized, the company is effectively shut down and will be unable to ever recover unless the funds are released (and its computers returned).

The Government claims (§14, affidavit) that "there is probable cause to believe that [ASD] is in fact operating a paid auto-surfing program and that the program is, in reality, merely a Ponzi scheme." Its verified forfeiture complaint (§16) contains similar allegations, only bolder: it contends that "ASD *is in fact* operating a paid auto-surfing program and that program is, in reality, merely a Ponzi scheme." The verification was signed on August 2, 2008, the day after the affidavit was signed. The Government does not explain what facts it learned overnight to justify the significant beefing up of the critical Ponzi allegation.

Regardless of how the Government has worded its affidavit and forfeiture complaint, they both suffer from critical and fatal flaws:

1.     ASD's internet advertising program is **not** a Ponzi scheme, illegal or otherwise, as clearly explained in the attached declaration (Exhibit "C") of Gerald Nehra, Esq., one of the country's leading experts on multi-level marketing, unlawful pyramid operations and Ponzi schemes. Mr. Nehra's declaration explains exactly why ASD's business plan is not an illegal Ponzi scheme, and he provides several reasons for the conclusion.

2.     The Government's theory, outlined in both the seizure warrant affidavit and forfeiture lawsuit, is riddled with incorrect, misleading and exaggerated representations.

3.     The Government's opinion is incorrectly premised on a cursory comparison of ASD to *other* companies, in other cases, with different facts. The Government even attached copies of complaints from other cases, filed by the SEC, as exhibits to this forfeiture lawsuit – as if allegations made in other civil lawsuits are somehow binding in *this* case.

4.     The required verification on the forfeiture complaint is carefully drafted in a way to provide a safety valve to the special agent signing it if the theories outlined in the lawsuit are

wrong. However, the result of this carefully crafted wordsmithing is that the verification is defective, subjecting the lawsuit to dismissal.

5.    The Government will likely try to justify its hurried investigation and extreme measures by saying it needs to protect "victims." But it is the *Government*, not ASD, which is to blame if there are victims.  It is the Government's seizure of ASD's bank accounts which prevents the ASD members from continuing to advertise.  It is the seizure which deprives the members of the sales and marketing benefit of increased traffic to their webpage.  It is the Government which is seizing the money, in the form of checks sent to ASD by its members. And it is the seizure which prevents ASD from paying all of its general creditors, including the members who wanted to cash out their ASD memberships.

## II.  FACTUAL BACKGROUND

The Government's seizure affidavit begins with page after page of  boilerplate language, including basic explanations of how the Internet works, how connections between computers cross state borders, the definitions of words (such as internet service providers and a website), how computers can be used in crime and a hornbook definition of a Ponzi scheme.  Presumably, these generalized allegations appear in many affidavits and do not discuss the specifics of the particular case in which they are submitted.

Following seven pages of boilerplate background, the affidavit then, on page 7, starts to discuss *other* cases.  Specifically, in pages 7 through 9, the Government summarizes the allegations in SEC lawsuits against "12DailyPro" and "Phoenixsurf."

After a few additional pages, the affidavit then (§ 20) tries to insinuate that ASD *itself* is engaged in some type of nefarious criminal activity because the operators of unrelated digital currency *payment systems* used by ASD (and countless other Internet businesses) were criminally indicted and later entered guilty pleas.  The affidavit explains that ASD's original

website accepted e-Gold and Virtual Money as payment, that their operators were indicted and later convicted and that ASD , "shortly after publicity surrounding the investigation into e-Gold appeared, … "discontinued using the e-Gold system as a means for receiving member funds."

The Complaint alleges (§ 17) that "*most* of the so-called advertisers are not paying ASD for advertising services at all; instead they are paying ASD with the expectation that ASD will provide a full rebate and additional revenue." (emphasis added). The affidavit (§ 15) parrots the same sweeping statement.

The verified and sworn-to statements are **amazing.** ASD has approximately 100,000 members. "Most" means 50,001 members. Perhaps the Government has, in fact, communicated with 50,001 members who advised that they are not really interested in advertising. Perhaps. But highly unlikely. In fact, it seems as though the Government's Task Force agents spoke to *very few* members, and it appears as though the actual number of ASD members interviewed (in phone or in person) by Task Force Agents is --- *6 persons.* Even if we give the Government the benefit of the doubt by adding in the few so-called complaints received by *other* state and local agencies and the "several participants" who made comments at a Miami rally (§ 26, Complaint) , the total would be *18*.

Thus, the Government has contended, under oath, that "*most*" of the 100,000–plus members are not interested in ASD's advertising services – based on interviews or comments or complaints received involving 18 persons. 18 out of more than 100,000. That is not "*most*." That is nowhere close to being "*most*." Rather than reaching the level of "*most*," it constitutes a mere *.00018 percent* – less than one thousandth of one percent.

Moreover, the allegation is inherently at odds with the tangible fact that more than 1,000 emails extolling the advertising benefits of ASD's program were received in the week following

the seizure.  ASD is attaching a representative sample of 25 of these emails as  Exhibit "D."  It is also attaching the declaration of attorney Andrew Schwartz, who reviewed 1,241 of the 3,005 emails received as of mid-day August 15, 2008.  He determined that 646, or 52%, praised ASD's advertising benefits,  and that an additional 509 expressed support for ASD.  Mr. Schwartz's declaration is attached as Exhibit "E."  ASD did not want to create havoc in the Court Clerk's Office by filing more than 3,000 emails as a massive exhibit, but they are all available for review by the Court.

Equally as troubling is the notion that the Government can somehow know, and represent to the Court in an affidavit for a seizure warrant, what is in the minds of more than 100,000 members without speaking with them.  The Government cannot know this.  And interviews of less than two dozen is nowhere close to being an acceptable statistical sampling.

The Government's wildly exaggerated representation of the "expectations" of "most" of ASD's more than 100,000 members ignores the important point that members may have *multiple* motivations – and the advertisers may enjoy the increased traffic to their internet websites *and* the possibility of earning rebates and commissions.  That hardly means that the advertising is illusory.

The Government also contends, in both the affidavit and the Complaint, that ASD **"promised"** to rebate 125% of its revenue.  *See, e.g.,* § 17 ("to fulfill its promise") and § 23 ("the payouts that members were promised") of the Complaint and § 21 of the affidavit ("rebates that members would receive").

But the Government knows full well that ASD's "Terms Of Service" do not promise or guarantee rebates.  To the contrary, the official terms of service unequivocally say that "ASD

**does not guarantee** any earnings and/or rebates." (emphasis added).  The Terms of Service are attached to the Government's Complaint as Exhibit 3.

The Government's Complaint loudly trumpets, in a provocative headline, that ASD has "Few Legitimate Advertisers."  Apparently, this strident allegation is based on the internet surfing experience of a few Task Force agents who periodically logged onto the ASD website. But neither the Affidavit nor the Complaint explain how long the Task Force agents were logged onto their account and they do not even give a hint as to how many websites are at issue when the agents viewed "several" members' websites. (§ 37, Complaint).  Likewise, the Government's submissions are repeatedly vague, such as the allegation (§ 35, Affidavit) that the agents saw "few" websites selling proposed services or products.

When the Government's Task Force agents encountered websites selling products, they criticize the products and imply that the websites are a sham because the products happen to be involved in a multi-level marketing program, such as "Acai Berry Juice" and "Bio Petro Improver." (§ 35, Complaint).  An ASD member involved in marketing juice or health products has a legitimate product to advertise, but the Government tries to smear the advertiser by improperly implying the existence of some type of criminality merely because the products are sold through multi-level marketing programs – which are *legal.*

The vague allegations about "few" websites with actual products or services are belied by the 500-plus emails from ASD members explaining their satisfaction with increased advertising traffic to their websites.  One telling illustration is an August 10, 2008 letter from Dr. Jim Will, a Ph.D (Exhibit "F").  In this letter, Dr. Will says that ASD has generated "hundreds and hundreds of hits on my web site and have made numerous sales for my Power of Self Talk Toolkit." Pointing out that he previously spent "thousands of dollars trying to get my message out to the

masses," Dr. Will notes that "nothing, I say nothing, has worked as effectively as your company AdSurfDaily."

Under a headline entitled "Illusory Customer Service" (pg. 27, Complaint), the Government recounts the "numerous occasions" when agents unsuccessfully attempted to contact ASD's customer service number.  Not surprisingly, the Government does not say how many efforts were made to reach the nebulous level of  "numerous."  But regardless of the inherent vagueness of the allegation, the "Illusory Customer Service" headline is flat-out incorrect.

As succinctly explained in the declaration of Charles John Osmin (Exhibit "G"), ASD has (or had, until the Government effectively shut down the business)  two customer service departments:  a traditional one, with approximately 20 to 30 employees, and a special one, called CSI, which served as a bridge between the accounting and the customer service departments.  In fact, the customer service department had three shifts, and was open from 7:00 a.m. to 11:30 p.m.  The mere fact that few agents did not get through to customer service hardly means that there was no service department.  But the Government makes this huge leap in logic, without sufficient inquiry during a hasty investigation, and represents to this Court that ASD had no customer service department because it was totally "illusory."

In both the Affidavit and the Complaint, the Government attempts to prop up its Ponzi scheme theory by referring to the "FTC Opinion" (page 31, Affidavit) and the "Economist Opinion" (page 34, Complaint).  But regardless of what the Government calls the opinion, it is inherently vague and suspiciously free of any significant detail.

The economist providing the opinion is not named.  The economist's credentials are not provided.  The economist's resume or c.v. is not provided or referenced.  The economist's

professional experience is not discussed.  The Government says that "a" Task Force Agent (unidentified) had "consulted" with this anonymous, mysterious economist.  The Government does not say whether this so-called consultation was in person or over the phone.  Given the lack of detail, it seems safe to assume that the consultation was not an in-person discussion.

Everything about the unidentified economist's opinion is vague.  The Government does not explain what materials were provided to the economist.  In fact, neither the Complaint nor the Affidavit explain whether *any* materials were actually provided to the economist.  Instead, the agent who signed both the affidavit for the search warrant and the verification for the Complaint said that he "*described the details* of ASD to the economist."  Because of the phrasing, it seems safe to assume that *no* materials were provided and that the Secret Service agent merely told the unnamed economist some information in a phone conversation.

Continuing with its penchant for vagueness, the Government does not say pinpoint or even suggest the length of the so-called "consultation" with the economist.  Was this a cursory 15-minute phone chat  or a 4-hour, in-depth discussion?  Given the lack of detail, it seems safe to assume that the self-described "consultation" was brief.

Setting aside the massive amount of critical information missing in the Government's allegations about the economist's opinion, the "opinion" itself is equivocal.  It does not conclude that ASD's business *is* an illegal Ponzi scheme.[3]  Instead, the Government wraps the opinion in wishy-washy language, saying that the economist "*indicated* (another weak word) that ASD *bore all the characteristics* of a Ponzi operation."

### III.  POINTS OF LAW AND OTHER AUTHORITIES

#### A.     The Verification is defective, subjecting the Complaint to Dismissal

---

[3] The term "ponzi" originated following litigation that involved "the remarkable criminal financial career of Charles Ponzi." *Cunningham v. Brown,* 265 U.S. 1, 7 (1924).

The verification of the Complaint is purportedly based on 28 U.S.C. § 1747, which permits a statutory substitute for an affidavit if the person signing uses the language set for the in the statute: "I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct."

But the Government's verification here includes a "to the best of my knowledge and belief" qualifier. This type of equivocal language is inappropriate in an Affidavit or declaration under penalty of perjury, and renders it meaningless. In fact, courts and leading commentators brand this type of language as insufficient to demonstrate that the affiant or declarant has sufficient information to submit an affidavit on the personal knowledge which is required for an affidavit. *See, e.g., Hahn v. Frederick,* 66 So. 2d 823, 825 (Fla. 1953)(affidavit "to the best of his knowledge, information and belief" was insufficient, and noting that it violated the "well-settled rule that the facts of an affidavit must be stated in a positive, and not a qualified manner"). *Cf., Malek v. Martin Marietta Corp.,* 859 F. Supp. 458, 460 (D. Ka. 1994)(statements in affidavit described as "true and correct to the best of my knowledge and belief" were deficient because "it is the plaintiff's personal knowledge, and not his beliefs, opinions, rumors or speculation" which are "the proper subject of any affidavit"). *See generally, Trawick, H.,* ***Florida Practice & Procedure*** § 9-5, at 171 (affidavit on "information and belief" will not suffice).[4]

Given the exaggerations and incorrect statements in the Complaint, it is not surprising the Government is seeking protection by adding conditional language into the verification required for an *in rem* civil forfeiture complaint. But the Government's desire to protect its agents does not mean that it is excused from complying with Rule G(2)(a), Supplemental Rules for

---

[4] The special agent who provided this non-compliant declaration is Roy Dotson, a Secret Service based in Orlando, Florida. ASD is based in Quincy, Florida.

Admiralty or Maritime Claims and Asset Forfeiture Actions, which governs *in rem* forfeiture actions and which requires verification of the Complaint.

The Complaint must be dismissed on this procedural ground.

**B.    ASD Is Not An Illegal Ponzi Scheme**

As explained in the Nehra declaration, which does contain his c.v. and which does explain what information he reviewed, ASD is not an illegal Ponzi scheme. ASD will not repeat and rehash the entire Nehra declaration here, as it is an attached exhibit and can be reviewed. For purposes of this section of the memorandum, however, ASD notes that Mr. Nehra, in reaching the conclusion that ASD's business is not an illegal Ponzi scheme, found several things significant about the ASD business model (1) it lacks a promised return, (2) it does not use return on investment language, (3) it provides a service to its customers (internet advertising) and that the advertising works, and (4) new participants are not needed to keep the business afloat.

Therefore, as explained by Mr. Nehra, the ASD business plan "is a **legitimate** multi-level direct selling business model." (emphasis supplied).

The legitimate service being sold to ASD members is internet advertising. The advertising members purchased the ASD ad packages to increase business traffic to the web sites of their own companies and causes. By increasing web traffic, they extended the exposure of their business offerings on an international stage, thereby enhancing their potential customer basis.

As established by the e-mails (samples of which are attached as Exhibit "D"), the advertising worked and created a devoted customer base for ASD. The advertisers paid for, and received, the service they paid for.

Further, ASD is an advertisement business, not an investment fund or "scheme." ASD did not promise or guarantee returns or earnings on monies paid by members. The members paid

solely for ASD's advertising services.    The fees received from members paid for an advertisement placement -- similar to paying for a billboard or a magazine ad.  These fees, which paid for an advertising service, did not earn interest or returns.  The operative contractual language in the ASD Terms of Service contains <u>no</u> promises or guarantees in exchange for the fees for advertising paid by members.  These features of the ASD business model are distinct and different from the features of a Ponzi scheme, in every way.

Ponzi schemes are fraudulent business ventures in which investors' "returns" are generated by capital from new investors, rather than from the true success of the underlying business venture.  *In re Armstrong*, 291 F.3d 517, 520 n.3 (8th Cir. 2002).  "This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud." *Id.* (*citing United States v. Mathison,* 157 F.3d 541, 546 (8th Cir. 1998) ).  "The fraud consists of funneling proceeds received from new **investors** to previous investors in the guise of **profits** from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n. 1 (9th Cir. 1991)(emphasis supplied).

Another court described a "Ponzi scheme" as:

[A] fraudulent investment arrangement in which **returns** to investors are not obtained from any underlying business venture but are taken from monies received from new investors. Typically, investors are **promised** high rates of **return** and initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse.

*In re C.F. Foods,* 280 B.R. 103, 110 n.15 (E.D. Pa. 2002)(emphasis added)(citing *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993); see also *Eberhard v. Marcu*, 530 F. 3d

122, 132 n.7 (2nd Cir. 2008). In a Ponzi scheme, "[t]he **promised** rates of return, because they are in excess of any real investments, render a Ponzi scheme operator insolvent from the inception of the scheme." *Taubman*, 160 B.R. at 978 (emphasis supplied)(*citing Cunningham v. Brown,* 265 U.S. 1, 7, 44 S. Ct. 424, 425 (1924) (detailing the "remarkable criminal financial career of Charles Ponzi")). None of these critical elements of a Ponzi scheme ever existed at ASD.

Here, in stark contrast, the customers of the ASD business venture purchased advertising on a successful, internationally-known website, which was experiencing remarkable growth. Persons participating in the ASD business venture were able to both advertise and participate at four levels. All advertisers could participate as free or paying members. Free members were able to earn the ability to advertise by "surfing" the websites of other ASD members. Paying members immediately obtained certain benefits, but could surf other members' websites to renew or sustain their advertising. All members could participate in the referral program and the rebate program, but significantly, they were **not** required to participate. In this case, the success of the advertising business was thriving and provided sufficient revenues, through legitimate multi-level marketing, to sustain the business.

Significantly, ASD never promised "returns on investment." Indeed, the funds received from members were expressly **not** investments; they were fees paid for advertisements. And, the earnings were never promised or guaranteed to the members at all, at any level.

Courts and legislatures have recognized distinctions between legitimate multi-level marketing programs and illegal schemes. *See U.S. v. Gold Unlimited, Inc.*, 177 F.3d 472, 479-80 (6th Cir. 1999) (citing *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979) among others sources). As the court in *Gold Unlimited* explained:

> [L]egal multilevel marketing (referred to as "MLM" in some documents) programs akin to Amway. MLM programs survive by making money off product sales, not new recruits. In contrast, "pyramid schemes" reward participants for inducing other people to join the program; over time, the hierarchy of participants resembles a pyramid as newer, larger layers of participants join the established structure. Ponzi schemes operate strictly by paying earlier investors with money tendered by later investors.  No clear line separates illegal pyramid schemes from legitimate multilevel marketing programs; to differentiate the two, regulators evaluate the marketing strategy (e.g., emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted.

*Id.* at 475 (footnote omitted).

With ASD, the first order of business and the primary marketing strategy always emphasized the sale of advertisement packages, in strict accordance with federal and Florida law. *See, e.g.,* Fla. Stat. § 849.091(2) (2007) (defining illegal pyramid schemes as programs with rewards that are "not primarily contingent" on sales of goods or services).

The elements of the legal multilevel marketing program are:  (1) a product or service being sold to the consuming public **(here, advertising services)**; (2) a distribution channel choice of independent contractor representatives, selling away from fixed business establishments **(here, the more than 100,000 ASD members)**, and (3) a two-part compensation plan that both rewards the representative for generating business volume **(here, voluntary referrals and sponsorships)**, and gives the representative an incentive to introduce more representatives, by rewarding them, not for recruiting the second representative, but on the business volume generated by the second representative **(here, a graduated percentage that could potentially be earned as a commission)**.  *See In re Amway Corp.*, 93 F.T.C. 618, 670-679 (1979).

In summary, the ASD business model begins with a valuable service sold to the consuming public, accessible internet advertising. The ASD channel of distribution choice consists of independent contractor representatives, called members.  And, the ASD members can

earn commissions and rebates, based solely on their own motivation and participation, knowing that no earnings are ever promised or guaranteed. Thus, ASD is not a Ponzi scheme, as inaccurately alleged by the Government. Rather, ASD is a successful, legal, multi-level marketing internet-based program that grew rapidly because of its unique business model.

**C.    The Court Should Order The Government to Return the Seized Funds With Safeguards**

As outlined above, ASD is not, contrary to the Government's conclusory allegations, operating an illegal Ponzi scheme. Rather, it is a bona fide business providing beneficial advertising to its member advertisers – or *was* a bona fide operating business until the Government effectively stopped it from doing business by freezing its bank accounts. The Government's retention of the seized funds has jeopardized ASD's business existence and relief is required.

The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "no person shall …be deprived of life, liberty, or property, without due process of law." The United States Supreme Court has described the tactic used here – the pre-trial restraint of assets – as the "nuclear weapon" of the law." *Grupo Mexicano de Deasarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 332 (1999).

The *ex parte* seizure practice used here by the Government "creates an unacceptable risk of error." *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993). In *James Daniel Good Real Property,* the Supreme Court highlighted the dangers associated with *ex parte* seizures, such as the Government's ability to avoid presenting "potential defenses a claimant might have. to the requested forfeiture. *Id. at 55.*

Moreover, the *James Daniel Good Real Property Court* emphasized the benefits of an adversary hearing: "to ensure the requisite neutrality that must inform all governmental decision

making."  In highlighting the advantages of an adversary hearing, the Supreme Court noted that the protection of a hearing is particularly important and applicable "where the Government has a direct pecuniary interest in the outcome of the proceeding." *Id. at 55-56.*

18 U.S.C. § 983(f)(1)(C) mandates the "immediate release of seized property if the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as **preventing the functioning of a business**…." (emphasis added).  Indeed, federal courts have long before § 983 recognized a general equitable power to order the return of unlawfully seized property. *United States v. $8,850*, 461 U.S. 555, 569, 103 S.Ct. 2005, 2014, 76 L.Ed.2d 143 (1983), *citing Slocum v. Mayberry*, Wheat 10, 4 L.Ed. 169 (1817).

18 USC § 983 is, by its terms, inapplicable to "monetary instruments or electronic funds, unless they constitute "the assets of a legitimate business which has been seized."  18 USC § 983 (f)(8)(A).  In the instant case, the assets of ASD undoubtedly have been seized.  Presumably, the Government will claim that the statute does not authorize the relief of an "immediate release" of property because it will argue that ASD is "not a legitimate business."

But that likely argument begs the question.  As evidence by the Nehra declaration, ASD's business is not a Ponzi scheme.   The Government cannot prevent claimants from using a statutory remedy by arguing, in conclusory fashion, that the underlying business is illegitimate.

The danger in that was outlined by the Second Circuit, which explained that it:

> continue[s] to be enormously troubled by the **government's increasing and virtually unchecked use of the civil forfeiture statutes** and the disregard for due process that is buried in those statutes.  The district courts, in order to preserve some modicum of due process to criminal defendants (and civil forfeiture claimants) should be vigilant in approving seizures *ex parte* <u>only</u> upon a showing of the most extraordinary or exigent circumstances, and **whenever possible should favor less drastic measures, such as**

> **occupancy agreements, bonds, receiverships, lis pendens, or other means for preserving the *status quo ante* seizure until the criminality underlying the claimed forfeiture can be established** in the context of a proper criminal proceeding with its attendant constitutional protections to the accused.

*United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896, 905 (2d Cir. 1992)(emphasis added). "Through such courageous and sensitive application of their discretionary powers the district courts can then ensure that "due process" remains a reality and is not reduced to a mere encomium." *Id.*

This Court is presented with such an opportunity here – an opportunity to impose a less-drastic means of preserving the *status quo ante* seizure until the alleged criminality underlying the claimed forfeiture can be established. Specifically, the Court can order the return of the seized funds under a set of oversight conditions which will address the Government's concerns yet permit the business to get back on its feet. *See United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260, fn. 4 (4th Cir. 2004) ("A court may, of course, order release of liquid assets – currency, monetary instruments, and electronic funds – which probably would not be available for return in precisely the same form"); *see also, generally, United States v. $277,000 U.S. Currency*, 69 F.3d 1491 (9th Cir. 1995) ("District courts certainly have ample power to make orders for the maintenance of assets, as a condition of leaving them in the control of the government")

To do otherwise would only reward the exact conduct the Second Circuit cautioned against. The Government proceeded effectively to seize claimant's business without notice or a hearing. The seizure warrant was based on an self-serving affidavit, replete with material misstatements and omissions, exaggerations and unsupported conclusions. This is precisely the type of self-serving affidavit which courts have condemned. *See United States v. Real Property*

*Located At 110 Collier Drive*, 793 F.Supp. 1048, 1052 (N.D. Ala. 1992) (court acknowledging that it "shares some of the blame for this travesty of justice" because it "should have more closely examined" the affidavits submitted by the government). *See also, United States v. That Certain Real, Property Located At 632-636 Ninth Avenue, Calera, Alabama,* 798 F. Supp. 1540, 1551 (N.D. Ala. 1992) ("more and more courts are voicing frustration at what appears to be overreaching by the United States . . . particularly in forfeiture cases, where law enforcement agencies have a 'built-in' conflict of interest because they share in the product of the seizure").

There is nothing about the affidavit of a law enforcement agent which immunizes it from analysis. Likewise, the mere fact that the government submitted an affidavit here does not mean that it has *carte blanche* privilege to seize property without being challenged on the so-called grounds for the seizure. For example, in *United States v. 31,990 Dollars in United States Currency*, 982 F.2d 851, 855 (2d Cir. 1993), the appellate court rejected the affidavits of two experienced agents, reflecting their "belief" that there was a substantial connection between seized property and illegal activity justifying forfeiture. The court rejected the affidavits as "mere speculation." Similarly, in *United States v. All Assets of Statewide Auto Parts, Inc.,* 971 F.2d 896 (2d Cir. 1992), the appellate court held that the trial court's approval of an *ex parte,* pre-notice seizure warrant was improper -- even though the application for the seizure warrant was accompanied by a 93-page, 337-paragraph affidavit from a detective, who purported to detail a money laundering scheme.

The Government cannot retreat behind the warrant when ASD contests the credibility of the affidavit and the verification of the complaint. *See, e.g., United States v. 8215 Reese Road, Harvard, Ill.*, 803 F. Supp. L75, 177 (N.D. Ill. 1992) (explaining that seizure may still violate

due process rights even though the government obtained an *ex parte* seizure warrant).  *See generally Jones v. Preuitt and Mauldin*, 808 F.2d 1435 (11th Cir. 1987).

Given that this Court has full and complete discretion to exempt from any freeze order assets sufficient to pay claimant's reasonable business expenses pending disposition of this matter. *United States v. Madeoy*, 652 F.Supp. 371, 376 (D.D.C. 1987), it has discretion to return all the funds subject to oversight measures, such as a monitor acceptable to the Court and financial reporting.

The Government appears to assume that it is entitled to forfeiture of  all of ASD's bank accounts --  an assumption that cannot be justified at this preliminary stage of a civil forfeiture proceeding.  *See Madeoy*, 652 F.Supp at 376, *citing United States v. Their*, 801 F.2d 1463, 1476 (5th Cir. 1986) ("the judicial conscience is shocked by a procedure which would leave an accused without means of support for food, housing and the like, <u>solely on the basis of a prosecutorial accusation and affidavit</u>")(emphasis added).

Accordingly, claimant requests that the Court enter an order requiring the Government to return all seized funds under whatever oversight terms and conditions the Court deems reasonable.  ASD has already listed in this motion a healthy assortment of potential oversight measures that the Court can consider.

Alternatively, ASD requests an immediate evidentiary hearing to contest the pre-trial seizure of assets without a post-seizure evidentiary hearing -- a remedy this Court very recently required when the assets are necessary to retain counsel.  *United States v. E-Gold*,  521 F.3d 411 (D.C. Cir. April 11, 2008). Without an evidentiary hearing, the Government will have deprived ASD of its property without providing ASD with an opportunity to be heard -- a problematic scenario which this Court recently found to be unlawful in a somewhat similar seizure scenario.

In *E-Gold* -- the very company and case provocatively mentioned in the affidavit (§ 20) used to support the issuance of the seizure warrant in the instant case by insinuating ASD's complicity in illegality by merely using a third party's payment processing system --, the Government[5] obtained an *ex parte* seizure warrant and a post-indictment restraining order. The Defendants moved to vacate the seizure warrant and modify the restraining order and sought an evidentiary hearing. The individual defendants argued an inability to pay for counsel of their choice in the absence of seized assets. The district court denied the motion and refused to schedule an evidentiary hearing. On appeal, this Circuit held that "where the government has obtained a seizure warrant depriving defendants of assets pending a trial upon the merits, the constitutional right to due process of law entitles defendants to an opportunity to be heard at least where access to the assets is necessary for an effective exercise of the Sixth Amendment right to counsel." *E-Gold*, 521 F.3d at 421.[6]

Similar to the defendants in *E-Gold*, ASD's due process rights have been violated by the massive seizure off its bank accounts without the opportunity to be heard. Given the sweeping, negative consequences of the seizure – the virtual closing of an entire business – ASD is entitled to an evidentiary hearing. Without one, ASD will not have an opportunity to effectively challenge the *ex-parte* seizure of its assets.

Notwithstanding the Government's problematic affidavit and its strategic decision to pursue measures which would deprive ASD of assets and effectively and quickly put it out of business, ASD continues to act in good faith. In the days following the seizure of its bank

---

[5] AUSA William Cowden, the AUSA who signed the complaint in the instant case against ASD, is shown as being on the Government's brief in *E-Gold.*

[6] The *E-Gold* Court noted that it was not determining whether an evidentiary hearing would be Constitutionally required when the seized assets are not required to obtaining counsel of choice.

accounts and its computers and business records, ASD voluntarily delivered to the Government more than 560 checks, made payable to ASD and totaling more than $1.2 million, which the Government somehow overlooked in its all-day search of ASD's offices. *See* Gary Talbert Declaration (Exhibit "H").

> (1)    **The Affidavit Is Problematic, Requiring a *Franks v Delaware* Evidentiary Hearing**

In addition to requesting an evidentiary hearing to provide fundamental due process rights concerning a pre-trial, *ex-parte* seizure of assets, ASD has another ground to justify its request for an evidentiary hearing: to challenge the veracity of the affidavit and verification. As outlined above, the affidavit and Verified Complaint are replete with misstatements, exaggerations, incorrect allegations and vague arguments. This is not an isolated instance. Therefore, the Court should order an evidentiary hearing.

The test for reviewing an allegation that a warrant was based on a false affidavit derives from the United States Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Specifically, the *Franks* Court concluded that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). So while there is a "presumption of validity" with respect to affidavits in support of search and seizure warrants, a court is required to hold an evidentiary hearing "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly

false statement is necessary to the finding of probable cause." *United States v. Jones*, 451 F.Sup.2d 71, 78 (D.D.C. 2006) (*citing Franks*, 438 U.S. at 171, 155-56).

Admittedly, the rule set forth in *Franks,* however, "has limited scope, both in regard to when a exclusion of seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *United States v. Jones*, 451 F. Supp. 2d 71, 78 (D.D.C. 2006) (*citing Franks*, 438 U.S. at 167). As the District of Columbia Circuit has instructed, "a defendant is entitled to an evidentiary hearing only if his attack on the accuracy of the affidavit is 'more than conclusory' and is accompanied by 'allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. *Id., citing United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004) (*quoting Franks*, 438 U.S. at 171, 98 S.Ct. 2674) (emphasis omitted). Furthermore, even if the defendant makes the requisite preliminary showing, a hearing is not required unless the alleged misstatement was material to the finding of probable cause. *Id., citing United States v. Richardson*, 861 F.2d 291, 294 (D.C. Cir. 1988).

The *Franks* standard has been extended to include allegations of material omissions of fact, not just misstatements. *Washington v. District of Columbia*, 685 F.Supp. 264 (D.D.C. 1988) (*citing United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984) ("rational of *Franks* applies to omissions")). An omission is deemed "material" if its inclusion in the affidavit would have defeated probable cause. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. July 18, 2008) (*citing United States v. Colkely*, 899 F.2d 297, 301 (4th Cir. 1990)). Therefore, in the case of an attack based on omission, logic dictates that the affidavit be read as if the allegedly relevant material were included to determine whether probable cause would have been undetermined. *Ogden v. District of Columbia*, 676 F.Supp. 324 (D.D.C. 1987).

Claimant challenges the veracity of certain statements or omissions made by United States Secret Service Special Agent Roy Dotson in his Affidavit in Support of Seizure Warrant ("Dotson Affidavit") and in his verification of the forfeiture Complaint.  In order to successfully challenge the Dotson affidavit and verification under *Franks*, ASD must show, *supra*, that (1) the affidavit or Verified Complaint contained misstatements or omissions; (2) the misstatements or omissions were material to the issue of probable cause; and (3) the misstatements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. *United States v. Richardson*, 861 F.2d 291, 293 (C.A.D.C. 1988).  This is the case here.

 **(2)** **The Affidavit and Verified Complaint Contain Misstatements and Omissions**

Agent Dotson's 37-page affidavit is replete with misstatements and omissions of a material nature.  We have already outlined these.

 **(3)** **The Misstatements and Omissions Were Material to the Issue of Probable Cause**

Agent Dotson acted improperly when he made the above misstatements and omissions in the affidavit submitted in support of the seizure warrant and in the allegations he made in the Verified Complaint. In doing so, he altered the totality of the facts presented to the judicial officers who issued the seizure warrants and the in rem arrest warrant.  These problematic allegations undermined the constitutional procedure that requires a neutral and detached magistrate to render an informed determination of probable cause. *See Wright v. United States,* 963 F.Supp. 7 (D.D.C. 1997).  It was objectively unreasonable for Agent Dotson to exclude information from his affidavit and in the Verified Complaint.  Including accurate information would have negated probable cause.

 **(4)** **The Misstatements and Omissions Were Made Knowingly and Intentionally, or With Reckless Disregard for the Truth.**

Even where probable cause is found to exist, however, evidence obtained or seized pursuant to a warrant may nonetheless be suppressed or returned when the affiant knowingly or with a reckless disregard for the truth, included a false statement in the affidavit, or omitted a statement that would have been material. *United States v. Eiland*, 2006 WL 516743 *11 (D.D.C. 2006). Indeed, when the facts omitted from the affidavit are clearly critical to a finding of probable cause, the fact of recklessness may be inferred from proof of the omission itself. *Washington v. District of Columbia*, 685 F.Supp. 264 (D.D.C. 1988) (*citing United States v. Thompson*, 615 F.2d 318, 329 (5th Cir. 1980)). That's the case here.

Agent Dotson omitted certain unhelpful facts while touting other facts for the sole purpose of misleading the issuing court. He mentioned only facts supporting the government's position and failed to mention facts favorable to the claimants. Therefore, one must conclude that the favorable information was deliberately withheld. Although courts have upheld searches where the affidavit included material omissions and misstatements, that should not be read to suggest that all such affidavits can survive a *Franks* challenge merely by claiming "good faith". Police officers must take care to include all evidence of probable cause available to them in their affidavits, and the affidavits must accurately reflect the facts of the particular case. *United States v. Richardson*, 861 F.2d 291, 294-95 (D.C. Cir. 1988); *see also*, *United States v. Walters*, 2008 WL 2235335 *7 (D.D.C. June 2, 2008) ("[T]he court agrees with [defendant] that the issuing judge should have been given all of the relevant information for his consideration").

ASD has made a substantial preliminary showing under *Franks* and is entitled to an evidentiary hearing.

## IV.  CONCLUSION

This Court should enter an order:

1. requiring the Government to provide an expedited response to this motion, within three days of receipt of the motion.

2. requiring the seized funds to be returned within two days of entry of an order, subject to the previously-outlined seven-oversight measures (acceptable to the Court) governing ASD's resumption of business.

WHEREFORE, for the foregoing reasons, on behalf of Claimants, Counsel respectfully requests that the Court enter the attached Order.

Dated:  August 18, 2008

Respectfully submitted,

**AKERMAN SENTERFITT**


By:  /s/ Michael L. Fayad

Michael L. Fayad, Esq.
D.C. Bar No. 91694
8100 Boone Boulevard, Suite 700
Vienna, VA  22182
Telephone:  703-790-8750
Fax:  703-448-1801


Jonathan Goodman, Esq.[7]
Florida Bar Number:  371912
One Southeast Third Avenue
25th Floor
Miami, FL  33131-1714
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email:  jonathan.goodman@akerman.com


ATTORNEYS FOR CLAIMANTS

---

[7] Mr. Goodman has been permitted to Appear *Pro Hac Vice.*

**CERTIFICATE OF SERVICE**

       I hereby certify that the foregoing Motion and Memorandum of Points and Authorities was served this 18th day of August, 2008 via the Court's electronic filing system upon the following counsel:

                        William Rakestraw Cowden, Esq.
                        U.S. Attorney's Office
                        555 Fourth Street, NW
                        Washington, DC  20530

                         /s/ Michael L. Fayad
                       Michael L. Fayad, Esq.

# EXHIBIT LIST

A.  Juan Fernandez Letter dated August 14, 2008

B.  Affidavit in Support of Seizure Warrant

C.  Declaration of Gerald P. Nehra, Esq.

D.  Support Letters

E.  Declaration of Andrew E. Schwartz

F.  Dr. Jim Will letter dated August 10, 2008

G.  Declaration of Charles John Osmin

H.  Declaration of Gary Talbert

{TY044308;1}

**Goodman, Jonathan**

| | |
|---|---|
| **From:** | Juan Fernandez [juanf28@gmail.com] |
| **Sent:** | Thursday, August 14, 2008 2:23 PM |
| **To:** | Goodman, Jonathan |
| **Subject:** | Hosting Company (Rack Space) |

Jonathan,

 I was contacted today from account receivable from Rack Space our hosting company, to inform me that they are going to shut down our servers, due to our bill not getting paid. The person that contacted me from Rack Space was Chuck Garcia his contact number is 210-312-3271. Do you have any solutions on what we should do, so that our servers don't get shut down? Please advise...
Thanks,
--
Juan Fernandez

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT **08 - 464 - M - 01**
FOR THE DISTRICT OF COLUMBIA

<u>AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT</u>

I, Roy Dotson, being duly sworn, depose and state as follows:

1.      I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and

have been so employed for approximately five years.  I am currently assigned to the Orlando

Field Office.  Among my duties as an SA, I am charged with the investigation of financial

crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud and the

manufacturing, possession and passing of counterfeit United States currency.  Prior to my

employment with the USSS, I was employed by the Brevard County Sheriff's Office for nine

years.  My last assignment was that of a Federal Task Force Agent with the Drug Enforcement

Administration.  Among my duties as a Task Force Agent, I was charged with investigating large

criminal organizations that distributed and sold controlled substances and financial crimes

involving money laundering.  Several of the investigations resulted in the seizures of criminally

derived property, including, but not limited to, monetary instruments.

2.      This investigation is being conducted jointly by the United States Secret Service

and the St. Cloud IRS-USSS Financial Task Force.  Information obtained as a result of the

investigative efforts of each agency is being shared with agents from the other agency and has

been incorporated into this affidavit.  The facts set forth in this affidavit are based on my own

personal knowledge, knowledge obtained from other law enforcement officers, review of

documents and computer records related to this investigation, communications with others who

have personal knowledge of the events and circumstances described herein (including

participants), and information gained through my training and experience and the training and experience of others.

    3.    This affidavit is being submitted in support of an application for a seizure warrant, based upon 18 U.S.C. § 981(b), for all funds held on deposit in the Bank of America ("BOA") accounts listed below. The BOA accounts listed below contain property of an individual who is operating nothing but a wide-spread Ponzi fraud, over the Internet, and the funds in these accounts therefore constitute the proceeds of a wire fraud scheme and a wire fraud conspiracy, making such property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). The forfeitable property at issue here is:

a.    All funds on account #005483933650 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

b.    All funds on account #005483933016 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

c.    All funds on account #005483933553 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

d.    All funds on account #005483933605 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

e.    All funds on account #005483933634 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

f.    All funds on account #005562565949 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

g.    All funds on account #005562566896 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

h.    All funds on account #91000116796961 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

i.    All funds on account #91000116797038 at Bank of America, in the name of

Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

j.    All funds on account #9100011679707 at Bank of America, in the name of Thomas A. Bowdoin, Jr., Sole Proprietor, DBA ADSURFDAILY;

k.    All funds on account #334011130192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

l.    All funds on account #334011130200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account; and

m.    All funds on account #334015765704 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account.

Based upon the evidence uncovered, there is probable cause to believe that all of the property contained in the above-identified BOA accounts constitutes proceeds of an Internet-based Ponzi scheme operating in violation of Title 18, United States Code, Section 1343 (wire fraud). Such property is therefore subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

4.    Because this affidavit is being submitted for the limited purposes of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit. Rather, it only includes the information necessary to prove that probable cause exists for a seizure warrant to be issued for property constituting proceeds of a wire fraud scheme in violation of Title 18, United States Code, Sections 1343 and 371.

<u>Background</u>

5.    As part of my training and experience as well as information obtained from discussions with other law enforcement officers with experience in cases involving

computer use, I have become familiar with the Internet, which is a global network of computers

and other electronic devices that communicate with each other using various means, including

standard telephone lines, high speed telecommunications links (e.g., copper and fiber optic

cable), and wireless transmissions including satellite. Due to the structure of the Internet,

connections between computers on the Internet routinely cross state and international borders,

even when the computers communicating with each other are in the same state. Individuals and

entities use the Internet to gain access to a wide variety of information; to send information to,

and receive information from, other individuals; to conduct commercial transactions; and to

communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail

must first obtain an account with a computer that is linked to the Internet, for example, through a

university, an employer, or a commercial service (called an "Internet Service Provider" or "ISP"

(see definition of "Internet Service Provider" below)). Once the individual has accessed the

Internet, that individual can do a variety of things including visiting websites (see definition of

"website" below), and make purchases from websites.

      6.     Set forth below are some definitions of technical terms used within this

Affidavit, pertaining to the Internet and computers more generally:

          a.     Internet Service Providers ("ISPs") and the Storage of ISP Records: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs may provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co location of computers and other communication equipment.

          b.     Website: A website consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper Text Mark Up language ("HTML") and is transmitted from the web servers to various clients via the Hyper Text

Transport Protocol ("HTTP").

c.    Website Hosting: Website hosting provides the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Hosting can be "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a website, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co location facilities offer customers a secure place to physically house their hardware and equipment.

d.    Domain Name: Domain names are typically strings of alphanumeric characters, with each level delimited by a period that are associated with a unique Internet Protocol ("IP") addresses (defined below). For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Each level, read backwards from right to left, further identifies parts of an organization. Examples of first level or top level domain are typically .com for commercial organizations, .gov for the United States government, .org for organizations, and .edu for educational organizations. Second level names will further identify the organizations, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identified. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice, which is part of the United States government.

e.    Internet Protocol Address: Every computer or device on the Internet is referenced by a unique IP address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. ISP's can employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each

time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial up session. Once the session ends, the IP address is available for the next dial up customer. On the other hand, some ISPs employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

    f.    Log file: Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

7.    Based on my training and experience, I know that computers are frequently used to perpetrate fraud schemes and that several fraud schemes have successfully been implemented over the Internet, including (1) advance fee schemes, (2) chain letters schemes and (3) Ponzi schemes. Advance fee schemes occur when an offender advertises the availability of goods or services and requires payment in advance. Only after paying do victims discover that the goods and services are defective, inferior, or nonexistent. With chain letters, victims may receive, either via postal mail or now by email, a letter containing a list of names and addresses to whom the recipients are urged for various reasons to send money. Recipients may add their names to the list (sometimes removing the topmost name to keep the number of participants constant) before redistributing the updated letter. Ponzi schemes promote allegedly lucrative business

opportunities, often involving foreign currency exchange, precious metals trading, or other high-return investments. But, in a Ponzi scheme, there is in fact no underlying profitable business to support the payments promoters say they will make to the investors. Instead, the promoters simply use the money obtained from a growing base of later investors to pay so-called "profits" to earlier investors. Such schemes that depend on growing the base of new victims to support payments to prior participants are also referred to as pyramids. The Internet is increasingly used as a vehicle to promote each of these types of frauds.

8.      Ponzi schemes have evolved with the development of the Internet, but their basic premise remains the same: later investors' funds are used to pay the earlier investors. A version of the Ponzi scheme that law enforcement officials have encountered in recent years and that has been replicated in the instant case is referred to as an "auto-surf program." "Auto-surf" claims to be a form of online advertising program that generates revenue from so called "advertisers" who pay a membership fee to have their website displayed on the "host's" webpage. As part of the program and to encourage more "advertisers" to pay the membership fee, the "host" pays the "advertisers" a "rebate" each time they view fellow "advertisers'" webpages. Moreover, the "host" encourages "advertisers" to recruit new "advertisers" by paying existing "advertisers" a referral fee. In this model, the "host" generates most, if not all, of its funding from membership fees, and therefore must use money received from later "advertisers" to pay "rebates" and referral fees to earlier "advertisers." These programs collapse when new "advertisers" membership fees fail to cover the payouts promised to existing "advertisers."

9.      In early 2006, for example, the United States Securities and Exchange Commission ("SEC") successfully prosecuted a lawsuit against an Internet-based auto-surf Ponzi

operation identified as "12daily Pro." According to the SEC's Complaint, 12daily Pro purported

to be a "paid Autosurf program" whereby members would earn money for "viewing the websites

owned or promoted by other online professionals." As described by the SEC in its Complaint,

members purportedly paid money (membership fees) to 12daily Pro as the host, in return for

which 12daily Pro promised to pay its members to view advertisers' rotating websites. Although

the operators of 12daily Pro purported to be paying members from earnings that were "financed

by multiple income streams, including advertising and off-site investments," the SEC's

investigation determined that almost all of the funds that the operators paid to members came

from new investments (in the form of additional fees paid by upgraded memberships and

newly-referred members). The operators of 12daily Pro did not generate any significant

independent revenue to support the payouts it promised to its membership. Instead, it operated as

a pure Ponzi scheme that could not sustain its promised payments absent an ever-increasing

number of upgraded members, or investors. The SEC estimated that before it successfully

intervened the operators of the 12daily Pro website took in over $50 million from approximately

300,000 "investors" nationwide and overseas. A copy of the SEC's Complaint against 12daily

Pro and its operators is attached. *See* **Exhibit 1**.

10.     In July 2007, the SEC successfully prosecuted another securities fraud lawsuit

against the operators of a similar Internet-based auto-surf Ponzi scheme, known as

"Phoenixsurf," that offered "investors" a 120% return in just 8 days on investments ranging from

$8 to $6,000. To receive the promised returns, the investors had to purchase advertising and

view at least 15 webpages of advertising per day during the 8-day period. Although the website

operators represented that they would pay the promised returns with funds received from other

businesses and programs within its network, the SEC charged the operators with operating Phoenixsurf.com "primarily as a pure Ponzi scheme – using for the most part only new investor funds to pay the promised returns to existing investors." In its Complaint, the SEC alleged that, during its operation, this Ponzi scheme paid to the earlier investors $36.7 million of the $41.9 million it raised. A copy of the SEC's Complaint against Phoenixsurf.com and its operators is attached. *See* **Exhibit 2**.

11.    During the course of this task force investigation, it has become apparent that another entity is operating an auto-surf Ponzi scheme that is, in all material aspects, no different from 12daily Pro and Phoenixsurf. That entity has been known as "Ad Surf Daily" and "Ad Surf Daily Cash Generator" (hereinafter, "ASD").

Introduction

12.    On or about July 3, 2008, I received information from a reliable source regarding ASD. The source believed that ASD was a pyramid or Ponzi scheme operating via the Internet. The source indicated that ASD also operates a Spanish version of its "paid autosurfing" program at a website called "La Fuente Dinero" (The Fountain of Money).

13.    I confirmed that ASD operates over the Internet at www.asdcashgenerator.com, that related persons operate La Fuente Dinero over the Internet at www.lafuentedinero.com and that related persons operate at least one more auto-surf Internet site, Golden Panda Ad Builder, at www.goldenpandaadbuilder.com. All three sites claim that members can earn large profits simply by paying fees to advertise webpages, by surfing other members' webpages, and by recruiting more members to do the same.

14.    Further investigation revealed that there is probable cause to believe that ASD is

in fact operating a paid auto-surfing program and that the program is, in reality, merely a Ponzi scheme. Although ASD appears to be carefully avoiding calling its members "investors," in an apparent effort to avoid regulatory scrutiny, ASD promotes paid membership by claiming that its members can earn 125% of their membership fees. In addition, ASD encourages members to recruit new members by paying commissions for referrals. ASD pays the source of a referral a percentage of each newly referred member's fees. ASD's webpage proclaims that each weekday in May and June it "rebated" to its members at least 1% of the money they had paid to ASD, and each weekend day it "rebated" at least .50%.

15.    Our task force investigation revealed that ASD appears to sell no independent products or services sufficient to generate an income stream needed to support the rebates and commissions that it promises its members. We also have determined that most of the so-called advertisers are not paying ASD for advertising services; instead, they are paying ASD with the expectation that ASD will provide a full rebate and additional revenue. Thus, absent continuous membership growth ASD has no means to generate the returns it represents. Therefore, based on the preceding, I believe that there is probable cause that ASD is a sophisticated Ponzi scheme that will, by its very nature, result in the loss of millions of dollars from its participants. ASD boasts that its Internet operation provides income to individuals across the United States. According to its promoters, ASD is in several other countries and is continuing to grow worldwide.

<u>Thomas Anderson Bowdoin, Jr.</u>

16.    Thomas Anderson Bowdoin, Jr., "Andy," (hereinafter "Bowdoin") appears to have filed or caused to be filed papers to incorporate AdSurf Daily, in Nevada, on December 14, 2006.

From October 2006 through March 2007, Bowdoin was the CEO and President of AdSurf Daily and from March 2007 to the present he is the CEO and President of AdSurf Daily Cash Generator. Bowdoin has operated both ASD iterations from 13 S. Calhoun Street, Quincy, Florida, and continues to use the same BOA accounts to support his operation.

17.    A criminal history check for Bowdoin revealed that he was arrested in Alabama for felony violations related to Fraud in Connection with the Offer and Sale of Securities by an Unregistered Agent. Bowdoin and several co-defendants were charged with having been promoters of a company called "Mobile International, Inc." According to case-related documents, the defendants said they had developed a mobile telephone system that was a cheaper alternative to the then-current cellular systems. Bowdoin and the co-defendants were charged with having sold unregistered securities to investors and with failing to state material facts to the investors that would have impacted the victims' decisions to invest. In particular, the State of Alabama asserted that Bowdoin was behind a scheme where he took money from victims that he used to pay off prior investors. Bowdoin resolved this criminal matter by agreeing to enter Pre-Trial Diversion and to pay a fine of $20,000. A Pre-Trial investigator determined, after interviewing Bowdoin, that Bowdoin was the "mastermind and instigator" of the Alabama fraud. Bowdoin completed his Pre-Trial requirements in 2007 and the charges were dismissed.

18.    A public search on the Florida Department of State, Division of Corporations' website of registered corporations revealed that from November 14, 1983, to September 14, 2007, Bowdoin was a Registered Agent ("RA"), President, Chief Executive Officer ("CEO") or Director of the following defunct corporations: (1) RA for ReTube-Lite International, Inc., incorporated from 9/14/83 to 11/21/84 (involuntary dissolved); (2) RA for Crosby Enterprises of

Page 11 of 37

Lakeland, incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (3) RA for KDJ

Enterprises, Inc., incorporated from 2/23/84 to 11/1/85 (involuntary dissolved); (4) RA for South

Polk Investors, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary dissolved); (5) RA for

Ridge-Tec, Inc., incorporated from 4/2/84 to 11/1/85 (involuntary dissolved); (6) RA for

MI-Com, Inc., incorporated from 4/2/84 to 11/1/85 (admin. dissolved); (7) President of Creative

Retailing Services, Inc., incorporated from 3/5/98 to 9/19/03 (admin. dissolved); (8) CEO of

Global Tech Marketing, Inc., incorporated from 6/26/00 to 9/13/0 (admin. dissolved); (9)

Director of GPS Tech, Inc., incorporated from 3/26/04 to 9/15/06 (admin. dissolved); (10) RA

for GPS Development & Manufact., incorporated from 11/12/04 to 9/16/05 (admin. dissolved);

(11) Director of EADNetwork, Inc., incorporated from 12/1/06 to 9/14/07 (admin. dissolved);

and (12) Director of World Payment Systems, Inc., incorporated from 12/1/06 to 9/14/07 (admin.

dissolved). None of this information about Bowdoin is mentioned on ASD's website, nor was it

mentioned to prospective members during the ASD rally I attended (further discussed below) or

the conference call that I participated in (further discussed below).

<u>ASD's Original Website</u>

19.     On or about October 2006, shortly after 12daily Pro collapsed, Bowdoin launched

the original ASD website and it became operational on the Internet at

http://www.adsurfdaily.com. This original ASD website was operational until March 2007. In

its initial iteration, ASD offered to repay 150% of the membership fee a member paid to purchase

an "ad package." ASD referred to the repayment to "members" as "rebates." ASD agreed to

reserve 60% of the gross revenue it received from each day's advertisement sales (additional

member money and new member money) to pay member rebates. Additionally ASD claimed

that it would pay 10% for each "1st level" referral (whereby members would receive a 10%

commission on the funds paid to ASD by any new member they had sponsored) and an additional

5% for each level "2nd level" referral (whereby members would receive a smaller commission

for members brought in by those for whom they had been the initial sponsor).

    20.    The original website accepted e-Gold and Virtual Money as payment. e-Gold and

Virtual Money are online digital currency payment systems. e-Gold was once a highly-favored

method of payment by operators of investment scams, including pyramids, Ponzis, auto-surf

programs, high yield investment programs, and other "get rich quick" schemes because of its

relative anonymity and refusal to engage in chargebacks (where payment to a vendor is

disallowed or reversed). Indeed, 12daily Pro and Phoenixsurf utilized e-Gold as their primary

payment method before those Ponzi schemes collapsed. The operators of the e-Gold system

were indicted in April 2007, by a Grand Jury sitting in the United States District Court for the

District of Columbia, for money-laundering and for operating an unlicensed money transmitting

business. Publicity about the government's scrutiny of the e-Gold system's operation began in

December 2005, after federal agents participated in the execution of warrants to search e-Gold's

offices and seize (for forfeiture) funds from its bank accounts. Shortly after publicity

surrounding the investigation into e-Gold appeared, ASD discontinued using the e-Gold system

as a means for receiving member funds. In July 2008, e-Gold defendants pled guilty to various

criminal charges that, in some cases, included money laundering.

ASD's Current Website

    21.    On or about March 2007, after 12daily Pro was sued and just prior to e-Gold's

indictment, Bowdoin and ASD moved their operations to a new website:

Page 13 of 37

www.asdcashgenerator.com. The only significant change to this second version of ASD was to the rebates that members would receive. Now, ASD offers to repay 125% of the membership fee. Further, ASD agrees to reserve only 50% of the gross revenue it receives from each day's advertisement sales to pay member rebates. ASD did not, however, change its referral fee structure. It continues to claim that it will pay up to 10% for each level one referral and up to an additional 5% for each level two referral. Although the website was new, the auto-surf operation that had been deployed as Ad Surf Daily continued to be conducted by Bowdoin, from 13 S. Calhoun Street in Quincy, Florida, using the same BOA accounts that Bowdoin opened. A query of the Gadsden County Property Appraiser's website revealed that there is no 13 South Calhoun Street recorded as being a legal address. Further investigation showed that the actual address of ASD operations is 11 S. Calhoun Street. The structure is a single story three bedroom, two bath residence being used for business purposes. According to the property appraiser's site, the property is owned by Faye's (Faye Harris, Bowdoin's spouse) Florist, Inc. Based on surveillance conducted during this investigation, it appears that the entire structure is being utilized by ASD to conduct business.

22.    On its website, ASD claims that it enables its members to "sell more products and recruit more Distributors" because the operation:

> is a generator of internet traffic to web site owners. Web site
> owners purchase ad packages and place their web site in rotation
> for consumers and business owners to view. ASD pays its
> advertisers a rebate to view a minimum number of sites each day,
> therefore, insuring that prospects will be viewing each site.

A printout of the ASD webpage containing these representations is attached. *See* **Exhibit 3**.

23.    ASD offers two different types of memberships that are also referred to as

"participantships":  (1) a free membership (during which the member's account is referred to as a "training" account ); and (2) an "upgraded" membership, which requires the purchase of "ad packages."  "Ad packages" consist of credits and each credit is worth $1.  ASD imposes a minimum "ad purchase" of $10 and a maximum "ad purchase" of $12,000, but the website indicates that by contacting Bowdoin, larger purchases are possible.  ASD claims that an upgraded member receives one showing of their advertisement per "credit."  ASD explains that if an upgraded member uses an ad package to advertise a website, for each $1 ad package purchased, ASD directs one member to visit that purchaser's website by means of ASD's rotator program.

24.    Upgraded (paid) memberships are further divided into four categories.  The first category is "Trainee," this member pays no monthly dues.  A "trainee" receives a 5% commission for "1[st] level" referrals (a new member the trainee sponsors) and 0% commission for "2[nd] level" referrals (new members sponsored by a trainee's 1st level sponsor).  A "trainee" must pay a 2% withdrawal fee on "rebate" earnings and withdrawals from the system can only occur on Mondays.  The second category of upgraded membership is termed an "Executive participantship," this member must pay a $10 monthly fee.  In return, the "executive" member receives a 5% commission on 1st level referrals and 3% commissions on 2nd level referrals.  There are no withdrawal processing fees, and withdrawals can only be made on Mondays.  The third category of upgraded membership is termed a "VIP participantship."  To qualify for this membership a member must pay a $25 monthly fee, in return for which the "VIP" member receives a 7% commission on 1st level referrals and a 4% commission on 2nd level referrals. There are no withdrawal processing fees and withdrawals can be made on Mondays, Wednesdays

and Fridays. The fourth category of upgraded membership is "Executive VIP participantship"

These members pay a $100 monthly fee that earns the Executive VIP member a 10% commission

on 1st level referrals and a 5% commission on 2nd level referrals. The Executive VIP pays no

withdrawal processing fees and can withdraws funds on any weekday.

25.    ASD claims to have a business model with an "innovative rebate structure that

will enable [it] to continue indefinitely." ASD states that:

> rebates are paid from ad purchase sales of the Cash Generator, the
> sale of banner ads on the Cash Generator, commissions from the
> sale of the Ad Placement Service at our sister site "Attract
> Marketing System" by Cash Generator members, sale of ebooks
> and any other products that ASD decides to market.

ASD explains that it will divide 50% of the daily profit amongst members who have active "ad

packages." The gross profits from the day will be totaled and active member will receive a

percentage based on their current active "ad packages." To receive a portion of the profit as a

"rebate", an upgraded member must view at least 24 webpages per day, and each webpage must

be viewed for 15 seconds. ASD estimates that viewing the webpages should take about 6

minutes per day. Upgraded participants are encouraged to use their daily rebates to purchase

more "ad packages" so their rebates are compounded. ASD states that the daily rebate will be

capped at 8% and although the rebates are not guaranteed ASD will also put 5% of the profits in

a reserve account to be used to pay the rebate when new "ad package" sales are extremely low.

ASD's News webpage lists daily rebates to investors for the time period for March 2008 to June

2008 as averaging roughly 1% each weekday, and at least .5% for each weekend day.

26.    ASD's webpage also states that:

> All payments made to ASD are considered advertising purchases,

not investments or deposits of any kind. All sales are final. ASD
does not guarantee any earnings or profits. Any commissions paid
to Members are for the service of viewing other Member web sites
and for referring Members to AdSurfDaily. All advertising
purchases are non-refundable.

27.     In addition to recruiting new members from its webpage, within the past six
months ASD has hosted live membership drives in Las Vegas, Nevada, Tampa and Miami,
Florida, and in Chicago, Illinois. One is promised for Tulsa, Oklahoma. According to ASD,
these rallies have fueled its rapid expansion.

<u>Federal Agents Join ASD</u>

28.     On or about July 7, 2008, Brian Watson, a Task Force Agent ("TFA") with the St.
Cloud, Florida IRS-Secret Service Task Force, visited ASD's website, created a free "training"
account with ASD, and began to visit its paid advertisements. TFA Watson was directed to
ASD's own website's "News" section, to other sites promoting ASD, to sites promoting multi-
level marketing programs generally, and to sites of individuals purportedly selling services, such
as phone meditation.

29.     On or about July 14, 2008, TFA Watson opened an "upgraded member" account
with ASD. ASD directs new members either to mail a money order or cashier's check to its
Florida office, or to deposit a certified check, money order or cash at "your nearest branch of
Bank of America," directly into ASD's BOA account and, thereafter, to fax a copy of the deposit
receipt along with their membership number to ASD.[1] I made a direct deposit to ASD'S BOA
account by delivering a check to a BOA branch in downtown Orlando, Florida. Thereafter, I

_____

[1]On its website, ASD provides its Bank of America account number as
0000005483933016.

faxed a copy of the deposit receipt via facsimile to ASD's headquarters in Quincy, Florida.

30.    When TFA Watson signed up for the upgraded ASD account, he was required to list a website to advertise. But ASD did not require, or even verify, that TFA Watson had any product or service to sell. TFA Watson was able to link his undercover "My Space" page as his business webpage he wanted advertised. Despite professing a business model that involves the provision of Internet advertising to businesses, ASD did nothing to insure true business customers joined as members. Later, TFA Watson determined that between July 7, 2008, and July 11, 2008, he had approximately 12 visits to his "MySpace" page. TFA Watson, however, was unable to determine who had visited his "My Space" or how they were directed to his page.

31.    On or about July 20, 2008, TFA Watson opened another "upgraded member" account with ASD from a location in the District of Columbia, also via the Internet. The next day, I made a direct deposit into ASD's BOA account, this time by delivering a check to the BOA branch at 700 13th Street, NW, Washington, DC. Thereafter, I faxed a copy of the deposit receipt from the District of Columbia to ASD's office in Florida. Our ability to access ASD on the world wide web from different states, and to open accounts from multiple locations by delivering payment to "our nearest Bank of America" as directed by ASD confirms that ASD intends to operate nationwide.

<u>Few Legitimate Advertisers</u>

32.    On July 11, 2008, TFA Watson logged into his ASD account. On this first visit, it became apparent that most of the advertisements that ASD displayed to its members did not come from legitimate advertisers. The first advertisement ASD displayed was a webpage from another ASD member promoting ASD. Above the advertisement was an ASD toolbar displaying

a counter showing how many webpages the TFA Watson had viewed, a statement indicating whether TFA Watson had viewed his quota of websites for the day to earn his credit, and a timer counting down 15 seconds. The next two "advertisements" that ASD displayed for TFA Watson also promoted ASD and were apparently, again, from other ASD members. These alleged "advertisers" had no independent product or service to sell, no web-based business, and thus no legitimate reason to have paid ASD to advertise for them except to secure ASD's "rebates." Instead of touting products or services for sale, these webpages contained videos, graphs and text that explained the benefits of buying "ad packages" from ASD. A link on each page redirected the viewer to the ASD website in order to join ASD under that members referral number. By advertising a webpage that seeks to secure an ASD referral, a member might hope to increase his or her chance of securing 1st level and 2nd level referral fees, thereby increasing their returns from ASD.

33.     The fourth and fifth webpages that were rotated into TFA Watson's browser involved websites that promoted the sale of other multi-level marketing products, such as the sale of Acai Berry Juice and "Bio Petro Improver." The sixth page that he viewed brought up a website that was no longer in operation. For this "advertiser," the browser instead stated "site 404 error", which means that the server no longer exists.

34.     Moreover, ASD acknowledges that legitimate advertising is not required. On ASD's "Getting started" webpage it provides potential "ad package" the following option "[f]or those joining ASD who do not have a personal business to advertise, you may advertise either www.pay.com or www.mobillecash.com. These are only suggestions, as there may be other companies/products that you find to advertise." This option to select a webpage provided by

ASD completely undermines ASD's claim that it is providing its members a portal to advertise their webpages. Clearly, members would not agree to pay ASD to advertise others' webpages and ASD would not suggest it, unless (1) the members were more interested in qualifying for the rebates and referrals than in securing advertising, and (2) ASD was more concerned with collecting money than with providing a sustainable advertising solution.

35.    On each day since TFA Watson opened our ASD accounts, we have sought to access the ASD website. On those occasions when it was operational, we viewed members' websites displayed by ASD. We found a consistent pattern. On each occasion, several of the websites were pages from ASD's website or websites that promoted ASD, and several websites promoted other high-yield investment programs ("HYIPs") or were auto-surf monitoring newsletters. We saw few websites of individual participants selling proposed services or products. Most of these websites contained a link to sign up with ASD and be sponsored by that website's owner or operator.

### Members Upgrade for Returns

36.    On or about July 22, 2008, from the District of Columbia, I logged onto one of the ASD accounts law enforcement officers created and visited several websites to which ASD's rotator program directed me.[2] One site that did appear to offer products for sale was a gardening equipment webpage. I called the telephone number listed on the webpage and spoke to a male. According to this person, his mother is an ASD member and she posted his gardening shop webpage on ASD. He stated that his mother has been an ASD member for the last four months

---

[2] As was the case when TFA Watson surfed ASD, several of the websites either promoted ASD or sold no service or product. I did not seek to call those "advertisers."

and she earns around $130 per day. He explained that he believes ASD is a pyramid or Ponzi scheme that it is purporting to sell advertising. He understood that like any Ponzi scheme, sooner or later ASD will crash. He said he told his mother to pull her money out before that happens. He stated that the whole idea around surfing sites is ridiculous and that a "monkey could do it." He said he has a business, that he knows advertisement, and that he does not see any real value in having someone visit your website for 15 seconds.

37.    He continued to explain that since his webpage was posted on ASD he has seen a small spike in traffic to his website but cannot determine if that is a result of ASD. He also did not know whether his sales had increased as a result of his affiliation with ASD. He ended the call by asking me if I needed a sponsor and offered his own ASD member number. This person invited me to join the Ponzi scheme as his referral even though he knew it was destined to collapse.

38.    On or about July 16, 2008, I interviewed an ASD participant at his residence in Orlando, Florida. The participant stated that in June 2008, he joined ASD by making a direct deposit into ASD's BOA account and linking his website, a newsletter promoting different HYIP's or auto-surf programs, to his ASD account. The participant acknowledged that he joined ASD for its returns not to advertise his webpage. The participant explained that he logged onto his ASD account and looked at advertisement as part of ASD's requirements but said that the advertisement side of ASD was a "joke" and that he just clicked a button and stayed on a site for a few seconds and moved on to another site. The participant said there is no requirement to actually view the websites or purchase products promoted by the websites. He explained that ASD was an "auto-surf" program that he learned about from the Internet and other individuals.

According to the participant, he was familiar with online investing and in the past he had participated in other scams that were HYIPs and "auto-surfs." Specifically, he mentioned 12daily Pro, and claimed to have lost $9,000 in that Ponzi scheme. Although the participant understood that ASD was not enabling its members to sell more products and recruit more distributors as they claim, he explained that he believed that ASD was not a Ponzi scheme like 12daily Pro. He differentiated 12daily Pro from ASD because of Bowdoin's acumen. He stated that Bowdoin recently received an award from the President of the United States,[3] he had made millions of dollars on previous businesses he created, and he was planning on investing in real estate.

39.     On or about July 18, 2008, I interviewed another ASD participant by phone. I identified this participant from the ASD website where she had posted a testimonial regarding the large amount of profit she had made within the program. The participant stated that she had recouped all of her initial investment. The participant stated that this was the easiest program she had ever been involved with and that it only took a few minutes a day on the Internet. The participant said she would sponsor me and provide a website if I needed one. The participant explained that a member is not required to sell anything and that she does not sell items from the website she uses to participate in ASD. The participant stated that Bowdoin was a very wealthy man and had been a successful business man for over 30 years and had recently received an award from the President of the United States. The participant said she was familiar with online scams but this was different because the company was planning on investing in real estate and other business ventures.

---

[3] I confirmed that in June 2008, the National Republican Congressional Committee awarded Bowdoin the "Medal of Distinction" as a "marketing tool" for him having made a monetary contribution to the party.

40.    On July 22, 2008, while using my member number to participate with ASD's auto-surf program from the District of Columbia, I came across what appeared to be a consulting company advertisement. This webpage simply linked visitors to other websites and offered nothing for sale. I called and spoke to a male who identified himself as the webpage's creator. He said he had just joined ASD at the end of July and had only invested $50. He said he was receiving his 1% a day for surfing 14-24 websites a day. He said that anyone could set up a free website at www.freeservice.com with little to no information and just have the website link to another website. He explained that just as he had done, there was no need to have a business to advertise and no need to purchase any items from the websites you visited through ASD. He said the best way to make money in the system is to keep putting your money back into the system as it accumulates. He asked if I needed a sponsor and he offered me his ASD member number for that purpose.

41.    On or about July 22, 2008, also while surfing websites via the ASD website from the District of Columbia, I came across a site that appeared to sell weight loss products. I called and spoke to its creator. She told me that she started with ASD on May 30, 2008, that she was up to 12,000 "ad packages", and that she was making $150 a day with ASD. She explained that she has seen an increase in the traffic on her website but did not know if it was a result of ASD. She explained that she normally "upgrades" (reinvests) 75% and cashes out 25%. This allows her to make more money because she can purchase more "ad packages." I asked her about investing with ASD. She immediately said, "Don't call it investing, you know what I mean, we can get in trouble if we say that, we have to be careful." She explained that ASD is doing very well and that it recently took in $40 million at a rally in Miami and even more at a Chicago rally.

### Rebates Paid Even When No Ads Viewed

42.     Another indicia that ASD is not designed to promote business customers'
webpages comes from the fact that ASD promises to pay daily rebates even on dates when
ASD's webpage is inaccessible.  Frequently during the month of July 2008, I and TFA Watson
attempted to access our accounts in order to surf websites through ASD, but the ASD website
was not operating.  Yet, routinely, ASD placed a banner titled, "ASD WORLD WIDE WEALTH
BUILDER."  The following statement was posted, "We are currently working on the ASD
website.  During the time the site is down you will earn global credits for surfing.  There is no
need to submit a ticket or call the office.  We apologize for the inconvenience."  There was no
mention of compensation that might be due back to advertisers for their loss of advertising
exposure during periods when the ASD website is down.  But, there was reassurance that, despite
an inability to visit members advertisements, members would continue to earn the credits they
would have earned had the site been functioning.

### Illusory Customer Service and Invalid Street Address

43.     Further indicia that ASD is not a valid advertising business can be deduced from
the numerous occasions when agents have attempted to contact ASD's customer service.  Each
time, a call to the telephone number posted on ASD's website goes unanswered, just continuing
to ring and eventually cutting off with no option to leave a voice mail.  In addition, the address
listed on ASD's webpage is not a valid mailing address.  The address 13 S. Calhoun Street,
Quincy, Florida does not exist.  However, 11 S. Calhoun Street is a now defunct flower shop that
used to be run by Bowdoin's wife.  It appears that Bowdoin or one of his associates, merely
posted the number 13 on another door attached to the same building.  ASD has been receiving

mail there. A picture of ASD's Quincy, Florida headquarters building is attached. *See* Exhibit 4.

<u>Additional Misrepresentations to Promote Expansion</u>

44.    On or about July 22, 2008, I contacted another ASD member. The participant invited me to participate in a conference call, offered to any willing participant, related to "Golden Panda," an Asian version of ASD. The participant said that "Golden Panda" was coming online in the next couple of days and it was going to be big. The participant further stated that Bowdoin is the creator of this new venture, along with a man by the name of Clarence Busby.

45.    Later that day, I participated in the "Golden Panda" conference call. During the call, a person who identified himself as Busby said that Bowdoin approached him about running "Golden Panda." Busby stated that he and Bowdoin were 50% partners but that Busby would be in charge of the daily operations of Golden Panda. Busby explained that Golden Panda was going to be the Chinese version of ASD, operated over the Internet from Acworth, Georgia. Busby claimed to have been a minister for 30 years and to have started six successful businesses. Busby said that he has been a participant in the ASD program for nine months and reaped great benefits. Busby said Bowdoin promoted Golden Panda at the ASD's Chicago rally which took place on July 18, 2008. Busby said that Golden Panda already has 11,000 participants and that they have 50-100 individuals coming into their Acworth office each day to deposit funds with the new operation. He said the website, www.goldenpandaadbuilder.com, will be operational on July 23, 2008.[4] Busby said, "For those people overseas, we are setting up Solid Trust Pay (Alert Pay)," who will wire any monies, in excess of $500. Busby addressed the issue of current and

---

[4]It appears that as Busby predicted, the site did go operational that day.

future income for ASD and the new Asian version by explaining:

> First of all Andy has run his company pretty much for two years
> without a lot of income streams, he's had some money here and
> there. The building of [Bowdoin's] company is based on a great
> business model, the business model says if you'll do your work and
> buy 'ad packages' we'll be successful. It's not different than any
> other company, every company out there has to have some kind of
> sale, it doesn't matter if it's a mom and pop grocery store, or a
> Walmart, or a Bell South, or your local church, you got to have
> some money coming in a consistent manner. The way this money
> comes into Golden Panda is we sell 'ad packages' and those 'ad
> packages' create an opportunity for you to surf and look at other
> people's ads and also you get rebates from that. With that, if this
> company doesn't have sales, it's not a viable company. Every
> company has to have sales that's what makes this company work
> because the great business model, not because it has a lot of
> outside resources, but with that said we have a lot of things
> planned in the next weeks and months ahead. This will create lots
> more wealth for you.

Busby claimed that the new operation was processing 300-400 checks a day and depositing those

regularly. Busby said, "We want to put a good site that you will be proud of and that will allow

you to make good returns on your rebates and the activities that you're a part of and if we do that

well, you won't really care who runs this program."

46.    I reviewed the Golden Panda's website, www.goldenpandaadbuilder.com, and

identified a BOA account that the company listed as their depository account. The BOA account,

334011130192, is in the name of Golden Panda Ad Builder, in Acworth, Georgia. Per the

website, participants can wire funds to this BOA account in order to purchase "ad packages." On

the same website was a letter purportedly written by Bowdoin advising that he was relinquishing

his role as President, as well as his ownership rights in, Golden Panda.

47.    A public Internet search of Busby revealed a 1997 Securities and Exchange

Commission case (SEC v. Walter Clarence Busby, Jr. Civil Action No. 1:97-CV-2653, Northern District of Georgia). The SEC successfully charged that Busby had violated anti-fraud provisions of the Securities laws by offering and selling investment contracts in connection with three different "prime bank" schemes. Using misrepresentations and omissions in each scheme Busby raised money for purported trading programs in "prime bank" notes by fraudulently representing that investments were risk-free and the ventures would result in returns ranging from 750% to 10,000%. In total, Busby raised nearly $1 million from more than 70 investors. None of the investors earned the exorbitant returns promised by Busby. Busby was ordered to pay $15,000 in disgorgement to victims; however, after Busby filed a financial statement to support a professed inability to pay, the Court dismissed the order of payment.[5] Busby filed for bankruptcy in 1997. None of this information was disclosed on Golden Panda's webpage or mentioned during the conference call.

<u>Live Rallies and Further Misrepresentations to Expand the Base</u>

48.    As previously discussed, a Ponzi scheme needs new investors to succeed. To attract new members the fraudsters must promote the scheme's wealth building opportunity while at the same time disguising the fact that the program's survival depends on the new member's money. In the instant case, at rallies and on ASD's website numerous misrepresentations are made in order to promote the operators alleged business acumen and to

---

[5]On May 1, 1998, the Honorable Thomas W. Thrash, United States District Judge for the Northern District of Georgia, entered an order of permanent injunction and other relief against Busby. The order permanently enjoined Busby from future violations of Section 17(a) of the Securities Act of 1993 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. Busby consented to the relief without admitting or denying the allegations set forth in the Complaint.

disguise the source of the purported profits.

49.     For example, on or about July 12, 2008, I attended an ASD rally in Miami,
Florida. At the rally, ASD representatives were running a rally-only promotion. New members
were told they would receive a 50% credit bonus for joining at the rally. If a new member
purchased $500 in "ad packages" as a bonus she would be credited $750 to her account.
Representatives of ASD stated this was a "World Wide Wealth" program that was available to
anyone with Internet access.

50.     During the rally, a representative of ASD took the stage to addresses concerns that
ASD might not be a legitimate business, the representative stated that Bowdoin had received the
Medal of Distinction from the President of the United States for his contribution to business and
that the only blemish in Bowdoin's past was a speeding ticket.

51.     Bowdoin also spoke at the rally. He explained to the crowd that he and his ASD
team were looking at various ways to help increase rebates, including purchasing distressed
properties and purchasing call centers. Bowdoin also told his audience that participants would
receive 50% of the profit ASD made from these future ventures (despite contradictory
disclaimers on ASD's website). Bowdoin reported that the company was looking to purchase a
South American call center, to purchase a credit card processing center, to purchase an interest in
an international bank, and to profit from future investments in real estate. Of course, none of
these ventures involve selling advertising to legitimate, or as Bowdoin stated "national,"
advertisers to support rebates. Indeed, while explaining that rebates built his company, and that
rebates were "what creates the members that creates the interest for the national advertisers[,]"
Bowdoin acknowledged that "now were at the point where national advertisers are looking."

Bowdoin then changed course, telling his audience that ASD is about "helping people build wealth." He explained that the negative news ASD was receiving "means that we're making waves in the marketplace because we're one of the fastest growing companies on the Internet today." Bowdoin claimed his lawyers would file a defamation suit against people who called ASD "the biggest scam on the internet." According to Bowdoin, "we don't have to be a network marketing company with seven levels or ten levels. Our people are making tremendous profits with two levels – which takes us out of being a network marketing company." Bowdoin essentially confirmed, to rally participants only, that contrary to what is stated on his website, advertising business websites had nothing to do with ASD's success, instead ASD was dependant on 1st and 2nd level member referrals to survive and grow. A transcript of Bowdoin's speech was subsequently posted on the Internet and is attached, here. *See* **Exhibit 5**.

52.    The one thing that was notably absent from the rally was any mention of how ASD succeeded by providing advertising. No speaker that took the stage discussed or even mentioned in passing how ASD was enabling its members to sell more products or recruit more business to their websites. Although there were lines of "ASD Volunteers" handing out new member forms to rally attendees and accepting money orders and cashier's checks, there was no form to fill out about the business a member was promoting. Rather, I was provided with a new member form and a sheet titled: "Getting Started Guide." *See* **Exhibits 6 and 7**. The sheet directed me to a number of places, on-line, where ASD conducted training and marketing, including a place where I could "[w]atch the video of ASD Founder & CEO, Andy Bowdoin, along with ASD Attorney Robert Garner, as they speak to you from Andy's office at the company headquarters."

53.    I watched Bowdoin's video where Bowdoin introduces Garner as the company's outside counsel. Bowdoin explains that he has asked the attorney to confirm that ASD is not a Ponzi scheme. Thereafter, Mr. Garner proceeds to explain that Bowdoin hired Garner to insure that ASD's operations are legal in all aspects. Garner assures the viewer that he and "other attorneys in our offices . . . are dedicated to this work with Andy and his company." He continued by saying his attorneys "... are available at any time to deal with the issues as they arise." Garner "address[ed] the concerns that new ASD members sometimes have in the area of the legality of the Ad Cash Generator opportunity," by saying:

> Andy has directed us to ensure that his company is structurally
> sound today and tomorrow and far into the future. My staff and I
> are dedicated to Andy's vision that his company will continue to
> rapidly grow bigger and stronger, and will continue to be an
> industry leader in Internet advertising in the years to come.

According to Garner, "ASD . . . complies with all laws and regulations that apply to it." In explaining that ASD is not a Ponzi scheme, Garner notes that such a scheme is "illegal, because [it] use[s] money from new investors to pay the first investors in the scheme their promised returns." On behalf of ASD, on its website, Garner advises prospective members that ASD is not a Ponzi because, among other things, ASD is developing other revenue sources and "[t]here is no continuing obligation to pay returns to infinity." Contrary to Garner's claim that this is not a Ponzi, however, an infinite payment obligation is irrelevant and the lack of a non-member revenue source is a tell-tale sign. Garner's so-called "Legality Statement" appears on ASD's website and it is attached as a printout, here. *See* Exhibit 8. Furthermore, in attempt to make Bowdoin's business model sound legitimate, Garner describes ASD rebates as "function[ing] something like 'loss leaders' in that advertisers are presented [with] a way[ ] to earn their money

back, plus a little more, in addition to having their ads viewed on the internet." However, agents have not found any other product or service that ASD sells, aside from new memberships, to cover the "losses" it incurs by allowing advertisers to "earn their money back, plus a little more." Agents discovered that ASD's Nevada incorporation documents list Garner as a director. Garner however does not disclose this information in his interview, in his typewritten opinion letter that appears on ASD's webpage, or anywhere else on ASD's webpage. Furthermore, although Garner is admitted to the North Carolina Bar, it appears that Garner works out of his home and does not employ a team of lawyers.

54.    At the Miami rally that I attended, participants stated to me that they were not investing with ASD for its advertising services; rather, they told me that they were looking to make a lot of money off of the new participants they sponsored into ASD.

### FTC Opinion

55.    In addition to reviewing materials available from the SEC, during the course of this investigation I consulted with an Economist at the Federal Trade Commission (FTC) who explained that pyramid, Ponzi, auto-surf, and HYIP schemes are all schemes where the participants obtain their monetary benefits primarily from the recruitment of newer participants, rather than from the sale of goods or services. Because of this, the overwhelming majority of the participants cannot expect to make any money from their participation. A small minority of participants, namely those who participate at the very beginning, might make money. However, because of the nature of the pyramid scheme, those who make any money must of necessity be only a small minority of all participants.

56.    The FTC Economist further explained that growth of a Ponzi system does not

change the fact that the large majority of participants at any point in time will have lost money. The system cannot grow indefinitely, if for no other reason than the fact that growth is limited by the finite human population of the earth. But long before this point is reached, the number of people willing to pay to sign on as new participants will become fewer and fewer. At this point, no further growth is possible, and the scheme will collapse. When that happens, the majority of the participants will have lost money.

57.    The FTC Economist further explained that these scams typically have one of several indicators or "markings," including (1) the promise of abnormally high short term returns on investments; (2) all income is derived from within the investment scheme; (3) the absence of any legitimate or reasonable business investment; and (4), as described above, only a small minority of individuals can profit from the operation of the business. When I described the details of ASD to the economist, he indicated that ASD bore all of the characteristics of a Ponzi operation.

Civilian Complaints

58.    On or about July 24, 2008, I received information from the Tallahassee Field Office of the Federal Bureau of Investigation ("FBI") regarding complaints related to ASD. According to a FBI representative, the FBI had received three inquiries within the last two weeks in reference to ASD. An anonymous person called to say that he/she had sent money to ASD, but the ASD account was never credited. This person indicated that ASD customer service does not answer the phone. A second individual said that his/her parents had deposited $4,000 into the ASD program and that he/she was worried because he/she believed it was a Ponzi scheme. I spoke with this individual. He/she told me that he/she even called Robert Garner (a Director and

Page 32 of 37

legal counsel for ASD), at his office number, which he/she found on the Internet, at approximately 2 a.m., to leave a message for the attorney to call him/her. He/she said Garner answered the phone, which shocked him/her, due to the hour. He/she asked Garner if he was the attorney for ASD – Garner said yes. When he/she asked if this was his office number, Garner hesitated and then said he forwards the calls from his office. The caller told me that there is no way ASD is legitimate based on the research he/she has done. Finally, the Gadsden County Chamber of Commerce called and asked the FBI if the ASD was legitimate. The FBI referred the Chamber of Commerce to the Better Business Bureau for further information. I find the call from the Chamber of Commerce to be inconsistent with statements I heard Bowdoin make at the Miami rally that I attended. At the rally, Bowdoin said the company needed more space due to its tremendous growth, that he thought the operation would have to move to Tallahassee, and that the local Chamber of Commerce had begged the company not to leave and had helped it to secure new facilities. According to the FBI, Now the local Chamber of Commerce is questioning whether the company is legitimate.

59.    On July 25, 2008, I received additional information from the FBI Internet Crime Center ("IC3") in reference to several complaints filed against ASD. IC3 had five (5) complaints on file from victims in Florida, Wisconsin, Pennsylvania and New York. The individual in Florida believed that Ad Surf Daily, Inc., a.k.a. ASDcashgenerator.com, was a Ponzi or pyramid scheme because it met all of the criteria based on the SEC's website. The caller said he/she was aware of the 12dailyPro.com investigation and believed ASD was conducting the same type of business. The individual from Wisconsin advised that he/she had purchased "ad packages" by conducting a transaction through Solid Trust Pay (Alert Pay) and never received full credit. The

caller stated that he/she was unable to get adequate help from the company's customer service. The individual from Pennsylvania said he/she had purchased "ad packages" but had never received credit. The caller believed that ASD was a sophisticated Ponzi similar to 12daily Pro that was shut down in 2006 or 2007. The caller explained that ASD looks like other auto-surf sites such as 12daily Pro, "when the ad packages are not bought and top earners pull their funds eventually this will all collapse leaving the late comers in the program with losses from purchasing ad packages. Personally, I don't think people are viewing sites out of interest but out of the rebate they will earn per day by surfing." The individual from New York wanted to make authorities aware of the company, www.asdcashgenerator.com. The caller said, "It is a money-making scheme, and I believe that 'buying advertising' is just a smokescreen." The caller further stated that, due to the fact the company had a lack of information in reference to outside funding sources, it seemed that all income derived from new member sales, like a Ponzi.

### ASD May be Planning to Move Money or Operations

60.     While reviewing the ASD website in the District of Columbia, I found a posting within ASD's News section, apparently posted by ASD on July 2, 2008. The title of the posting was, "Alert Pay & Direct Deposit are being phased out July 31, 2008." According to ASD's posting, "We have notified BOA not to accept cash or personal checks for deposit account – English or Spanish." ASD further stated, "Please remember that the preferred method of purchasing Ad Packages is by mailing a Check or by Solid Trust Pay.".

61.     Solid Trust Pay is a Canada based money transmitting and payment company that, like the e-Gold system, operates over the Internet. It appears that beginning August 1, 2008, Solid Trust Pay will be ASD's preferred method for receiving funds from members, and for

paying rebates and commissions to members.

62.    Within the past two weeks, ASD has wired several million dollars to Solid Trust Pay from its BOA accounts. I also learned that earlier this month, a bank other than BOA closed the last account that was controlled by Bowdoin or family members after that bank determined, and explained to them, that an investigation by the bank determined that Bowdoin appeared to be operating a Ponzi scheme. I also learned that Bowdoin had purchased, or was seeking to purchase, a home in another country.

63.    Based in ASD's indication that it intends to cease accepting funds into BOA at the end of July 2008, Bowdoin's indication that he has relinquished his interest in Golden Panda, and an indication that Bowdoin intends to establish his offshore presence, and the recent complaints governmental authorities have received, I believe that Bowdoin is aware of increasing scrutiny and that he intends to move himself, his proceeds, and, until it collapses possibly his operation, offshore. As directed on ASD's webpage, when members migrate to Solid Trust Pay, the accounts Bowdoin maintains at BOA will become irrelevant to ASD's operation. Moreover, Solid Trust Pay offers a debit card to its account holders, making the transfer and withdrawal of funds more difficult to trace for U.S. law enforcement authorities than would be the case for an entity operating its business using a domestic, FDIC insured, financial institution.

<u>Use of the BOA Accounts to Collect and Store Ponzi Proceeds</u>

64.    During the course of the investigation, I identified the above listed ten (10) bank accounts as those being utilized by ASD at BOA to conduct its financial transactions, including deposits made by or on the behalf of participants for the purpose of purchasing "ad packages," and withdrawals to pay participants their rebates and commissions. The accounts are under the

control and ownership of the sole proprietor Thomas A. Bowdoin Jr., D/B/A ADSURFDAILY, 13 S. Calhoun Street, Quincy, FL, 32351. Further investigation also shows that funds are regularly transferred back and forth between the ten (10) accounts. Additionally, I identified at least four (4) business check cards in the name of Thomas A. Bowdoin, Jr. linked to these accounts. I am aware that numerous transactions have posted to the BOA accounts that appear to be purchases of personal items for the benefit of Bowdoin, including a purchase of $51,000 in jewelry on a single day. These purchases came from ASD's business accounts at BOA. Thus, it appears that Bowdoin is using these accounts to run ASD and pay his own expenses.

65.     I also identified three (3) accounts at BOA that are being utilized by Golden Panda Ad Builder to conduct its financial transactions, including deposits made by or on the behalf of participants for the purpose of purchasing "ad packages," and withdrawals to pay participants their rebates and commissions. These BOA accounts are under the control and ownership of Clarence Busby Jr. and Dawn Stowers, Acworth, Georgia. The three (3) accounts are a D/B/A Golden Panda Ad Builder Deposit Account, a Golden Panda Ad Builder Operating Account and a Golden Panda Ad Builder Cashout Account. As previously indicated, until recently, Golden Panda was under Bowdoin's control. The Task Force investigation shows the majority of the funds deposited into these Golden Panda accounts originated from ASD's accounts at BOA. Thus, there is probable cause to believe that the funds in the BOA Golden Panda accounts constitute proceeds of ASD's operations that Bowdoin moved to the Golden Panda accounts in order to seed Golden Panda's nascent operation.

66.     Based on the information provided in this affidavit, I submit that there is probable cause to believe that ASD, Thomas A. Bowdoin, Jr. and others, devised and intended to devise a

scheme or artifice to defraud, or a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and that he and they transmitted or cause to be transmitted by means of wire, communications in interstate or foreign commerce, (including writings, signs, signals, pictures, or sounds) for the purpose of executing such scheme or artifice, to wit: an internet-based Ponzi scheme, in violation of Title 18, United States Code, Section 1343 (Wire Fraud); and in violation of Title 18, United States Code, Section 371 (Conspiracy to Commit Wire Fraud). Further, there is probable cause to believe that the funds on deposit in the above-listed BOA accounts constitute proceeds of these criminal offenses.

67.    I am advised that 18 U.S.C. § 981(b)(3), provides that "a seizure warrant may be issued by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, and may be executed in any district in which the property is found . . . ." Under Section 1355(b), a forfeiture action may be brought in a district where any of the acts of omissions giving rise to the forfeiture occurred, or in any other district where venue for the forfeiture action or proceeding is specifically provided for under Section 1395 of Title 28 or any other statute. Accordingly, this District Court may issue and cause to be served in any other district the requested seizure warrant.

Roy Dotson
Special Agent, USSS

AUG 0 1 2008

Subscribed and sworn to before me this ____ day of August 2008,

United States Magistrate Judge
District of Columbia

ALAN KAY
U.S. MAGISTRATE JUDGE

## DECLARATION OF GERALD P. NEHRA, ESQ.

*In re the matter of the ASD Case: 1:08-cv-01345*

I live and practice law in Muskegon, Michigan. I have practiced law for 38 years, being admitted to practice in Michigan, New York, and Colorado, and before the Federal Courts. From 1971 to 1979, I held the positions of Attorney, Staff Attorney, Senior Attorney, and Regional Counsel for International Business Machines Corporation. From 1979 through 1982, I was Vice President and General Counsel of Church & Dwight, also known as the Arm & Hammer Company. Since 1982, my law practice has been exclusively with or for direct selling companies. From 1982 to 1991, I served as the Director of the Legal Division and Corporate Secretary for the Amway Corporation. Since 1992, in my private law practice, I have provided legal counsel to over 500 direct selling companies.

I serve on the Government Relations Committee and the Lawyers Council of the Direct Selling Association (DSA) and am a Board Member of the Multi-Level Marketing International Association (MLMIA). I have given over 100 lectures and presentations on various legal issues of direct selling companies, in forums sponsored by the DSA, the MLMIA, the Network Marketing Business Journal, the MLM Symposium, and my own client companies. My writings include numerous articles of in-depth analysis of direct selling, multilevel marketing, business opportunity, pyramid, and Ponzi issues. I have been an expert witness in cases involving direct sellers, including Herbalife v. McCormack, settled; Dunda v. Mary Kay, Cause No. 06-11432, District Court, Dallas County, on appeal;  FTC v. Trek Alliance, FTC Matter No. 012 3096, settled; and International Galleries Inc. v. LaRaza, USDC, Chicago, IL, settled. My resume, which contains an extensive list of publications, is Attachment A.

EXPERT REPORT OF GERALD P. NEHRA, ESQ.

1

EXHIBIT C

## DECLARATION OF GERALD P. NEHRA, ESQ.

*In re the matter of the ASD Case: 1:08-cv-01345*

I live and practice law in Muskegon, Michigan. I have practiced law for 38 years, being admitted to practice in Michigan, New York, and Colorado, and before the Federal Courts. From 1971 to 1979, I held the positions of Attorney, Staff Attorney, Senior Attorney, and Regional Counsel for International Business Machines Corporation. From 1979 through 1982, I was Vice President and General Counsel of Church & Dwight, also known as the Arm & Hammer Company. Since 1982, my law practice has been exclusively with or for direct selling companies. From 1982 to 1991, I served as the Director of the Legal Division and Corporate Secretary for the Amway Corporation. Since 1992, in my private law practice, I have provided legal counsel to over 500 direct selling companies.

I serve on the Government Relations Committee and the Lawyers Council of the Direct Selling Association (DSA) and am a Board Member of the Multi-Level Marketing International Association (MLMIA). I have given over 100 lectures and presentations on various legal issues of direct selling companies, in forums sponsored by the DSA, the MLMIA, the Network Marketing Business Journal, the MLM Symposium, and my own client companies. My writings include numerous articles of in-depth analysis of direct selling, multilevel marketing, business opportunity, pyramid, and Ponzi issues. I have been an expert witness in cases involving direct sellers, including Herbalife v. McCormack, Dunda v. Mary Kay, FTC v. Trek Alliance, and International Galleries Inc. v. LaRaza. My resume, which contains an extensive list of publications, is Attachment A.

EXPERT REPORT OF GERALD P. NEHRA, ESQ.

1

EXHIBIT C

I have been retained to provide an objective expert opinion and to prepare and submit a declaration which summarizes my professional expert opinion.  In order to make this declaration and to prepare to testify as an expert in this case, I have reviewed the following documents:

a)  ASD Terms of Service

b)  ASD Legality Statement

c)  New Member Success Video, featuring Andy Bowdoin and Robert Garner

d)  ASD Customer Service Training Manual

e)  Over 1000 e-mails from ASD members

f)  The Complaint filed in this action

I have also interviewed in person, and at length, the following persons:

a)  Andy Bowdoin, the Founder and President of ASD

b)  Juan Fernandez, the COO of ASD

c)  Don Peterson, the Compliance Officer of ASD

## MY OPINIONS IN RESPONSE TO THE ALLEGATION THAT THE ASD BUSINESS MODEL IS AN ILLEGAL PONZI SCHEME

1.     It is not. The elements of a Ponzi scheme include the promise of a "return on investment" to induce the participant to put money into the program. A second element is the lack of any underlying product or service or asset sufficient to sustain the promised payouts, and a third element is the necessity of a continuing flow of new investors/participants to fund the payouts.

2.    The first difference from a Ponzi scheme in the ASD business model is the lack of

any promised return. The company repeatedly disavowed any continuing obligation and,

moreover, stated that the rebate program could be cancelled at any time. The second difference is

the presence of a real, viable, marketable service, namely internet advertising. And third, new

participants are not needed to keep everything afloat. These three differences are examined in

more detail below.

3.    The Complaint uses investment and return on investment language, but the

Company never used such language. The Complaint repeatedly speaks of promises, but the

Ponzi-like promises were never made by the Company. The operative contractual language in the

ASD Terms of Service is devoid of any of the promises alleged in the Complaint. The Complaint

says "ASD must generate new revenues of a quarter of a billion dollars in the four months after

June 2006 to keep its promises to its membership." But this allegation begs the question, "What

promises?" The company made no such promises. Without such promises, the ASD business

model is not a Ponzi scheme.

4.    The service being sold to ASD customers is internet advertising. Although

references to Google and Yahoo may be obvious, such references are not as meaningful as the

thousands of testimonials by ASD advertisers that the advertising worked the way advertising is

supposed to work. The advertising customers purchased the ASD ad packages for their intended

purpose of increased views of their web sites, and thus increased business volume. And the

advertising worked—over and over again, it worked. The advertisers paid for and received what

they paid for. This is a feature absent from Ponzi schemes. I have been advised that ASD's law

firm has received over 3000 emails as of August 15, 2008, and that over 52% discuss the

EXPERT REPORT OF GERALD P. NEHRA, ESQ.

3

advantages of ASD internet advertising and approximately 41% discuss, in general, support for ASD. Of the over 3000 emails received, I have been provided with 1,027 to review.

5.    The third critical difference is whether new participants are needed to keep the venture afloat. They are not. The customers of the ASD business venture are the advertisers, and the income opportunity seekers of the ASD business venture are the members, who can participate at four levels. All advertisers can participate as free or paying members. All members are offered the referral program and the rebate program, but are not required to participate. The members are offered a referral program, which pays them commissions for selling ad packages to advertising customers. It is important to note that a personal ad package purchase is not required to be eligible to receive commissions, as a legally structured multilevel direct selling business model cannot require a product purchase as a condition of participation in multilevel compensation.

6.    The rebate program is for members who have purchased an ad package, but the purchase can be as low as $10. To equate this business model to an early direct selling model, as I will develop more fully later in this declaration, the advertising packages are like the vacuum cleaners, and the members receiving commissions and rebates are like the vacuum cleaner salesmen. A decision to not bring in more salesmen (income opportunity seekers) will stop or severely limit growth, but it will not kill the business. The business is about internet advertising, and even without new advertisers, the existing advertisers, by merely renewing their ad packages because they have produced results, will keep the business going. Advertising is consumable and renewable. Again, this is evidence the business model is not a Ponzi scheme.

4

7.    The ASD business model is a legitimate multilevel direct selling business model. Such a business model was "legalized," in a sense, in the case of IN THE MATTER OF AMWAY CORPORATION, INC. ET AL, 93 F.T.C. 618, (1979.) The elements of the legal direct selling business model are:

a) A product or service being sold to the consuming public;

b) A distribution channel choice of independent contractor representatives, selling away from fixed business establishments; and

c) A two-part compensation plan that rewards the representative for generating business volume and gives the representative an incentive to introduce more representatives by rewarding them, not for recruiting the second representative, but on the business volume generated by the second representative.

8.    The ASD business model begins with a service sold to the consuming public— internet advertising, called ad packages. The ASD channel of distribution choice is independent contractor representatives, called members. The first level of compensation in the referral program is a three percent up to ten percent commission on what the advertiser/customer pays for the ad package. To give the member an incentive to introduce a new member, a second level commission is offered, up to five percent. In keeping with the legal direct selling business model, there are no commissions paid on the administration fee charged to be an ASD member. To pay such a commission is known as an illegal headhunting fee. The highest level fee to enter the ASD income opportunity is $100, well below the thresholds of Federal and state business opportunity statutes. And there is no contractual requirement to remain a member for six months or any time period, as the right to cancel with written notice begins immediately. The rebate

EXPERT REPORT OF GERALD P. NEHRA, ESQ.

5

program has no multilevel elements and serves two purposes: It creates viewers of the advertised sites and allows members who are also advertisers to recoup some of their advertising costs.

9.      The government, in the complaint in this lawsuit, alleges that most of the ASD participants were not interested in actual advertising. My understanding, after viewing web pages and over a thousand e-mails from members, is that there was significant actual advertising of a very wide variety of products and services, and members were pleased with the increased traffic to their web sites and the resultant increases in business volume. The consumption and use for the intended purpose of the products and services of a direct selling company is a critical element of a legal direct selling company and also is completely inconsistent with the allegation of an illegal Ponzi.

10.     It is fair to ask, if this business model is not an illegal Ponzi scheme, what is it? It is a legally structured, direct selling business model with multilevel compensation. The product/service is internet advertising. The distribution channel choice is independent contractor representatives. And the compensation plan rewards only the persons who bring the advertising business volume to the company.

### VERIFICATION

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___8 - 1 5 - 0 8___

*Gerald P. Nehra*

Gerald P. Nehra

# VITA of GERALD P. NEHRA

**ADMITTED IN:**    Michigan, 1970; New York, 1972; and Colorado, 1992.
Federal Courts in Michigan, 1970; and New York, 1972.
Sixth Circuit Court of Appeals, 1976.

## CAREER EXPERIENCE:

- Private practice attorney, specifically focused on direct sales and multi-level marketing issues, August 1992 to date. Representative clients include Amsoil, Ardyss, Bing Han, Dove Chocolate, Eniva, Essentially Yours, Financial Destination, Gano Excel, Isagenix, Life Plus, Orovo, Pinnacle Communications, Wachters' Organic Sea Products, and ViSalus Sciences.

- Vice President - Legal and Human Resources, The Fuller Brush Company, November 1991 to August 1992 when, at my request, I became independent outside counsel for the company.

- Director - Legal Division, Amway Corporation. Began in September of 1982 as Deputy Chief Attorney and became head of the Legal Division in 1984, continuing through October 1991. Added responsibilities included Assistant Secretary in 1984, Profit Sharing Trustee in 1986, and Corporate Secretary in 1991.

- Vice President, General Counsel, Church & Dwight Co. Inc. (The Arm & Hammer Company), 1979-1982.

- Attorney, Staff Attorney, Senior Attorney, and Regional Counsel, International Business Machines (IBM) Corporation, 1971-1979, at locations in Armonk, New York, Owego, New York, and Franklin Lakes, New Jersey.

- Sales Representative and Systems Engineer, IBM, Dearborn, Michigan, assigned to the Ford Motor Company account, May 1967 to June 1971.

## EXPERT WITNESS CREDENTIALS:

Have counseled and testified on many legal issues of direct selling, including comprehensive evaluations of business plans, and whether they meet the legal standards established in the landmark FTC v. Amway case and cases which followed. Have analyzed in detail the differences and legal significance of plan design, controlled by the company, and plan implementation, where distributor conduct is often the challenge. Gave testimony on direct selling legal issues in Herbalife v. McCormack, Dunda v. Mary Kay, Florida v. P.R.S.I., FTC v. Trek Alliance, and International Galleries Inc. v. LaRaza.

## MULTI-LEVEL SPECIFICS:

- Handled the legal and personnel issues for conversion of the single-level direct sales organization to a multi-level system at Fuller Brush. Issues included



marketing plan legal review and necessary modification, sales force transition and conversion, literature review, sales training rules and ethics enforcement, advertising guidelines, product line selection and pricing, and creation of a distributor advisory board.

- Negotiated multi-level compliance issues, including Consent Orders and Assurances of Voluntary Compliance, with the Attorney General Offices in numerous states, including Arizona, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Louisiana, Maryland, Michigan, Missouri, New Mexico, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, and Wisconsin.

- Took immediate corrective action with a high ranking distributor for practices that put an entire program in jeopardy in the state of Florida.

- Meet and speak regularly with corporate officers and top distributors to evaluate progress of programs, listen to recommendations for adjustments and discuss and advise on future plans.

- Processed through to completion more than 350 trademark applications for numerous clients.

## WHILE AT AMWAY:

- Directed the corporate legal function, including counsel to senior management and subsidiaries. Hired and managed outside counsel, and advised on legal issues associated with corporate operating and corporate planning decisions.

- As Corporate Secretary, attended to all matters of corporate governance and corporate structure for the parent corporation and over 70 subsidiaries.

- Negotiated with the FTC, FDA, CPSC, and other agencies regarding Amway's products and services and Sales Plan positioning. Reviewed and modified labels and literature to comply with regulatory requirements.

- Managed the patent function and over 4000 trademark registrations in over 31 countries.

- Built an in-house litigation capability by hiring and supervising two litigators and three paralegals, significantly reducing outside counsel expenses. Actively managed counsel outside Michigan and second-chaired two distributor related litigations, a two week trial to a successful jury verdict and a three day non-jury trial to favorable disposition.

- Advised Amway's Nutrilite Products Inc. subsidiary on food supplement product positioning, claims platforms, literature, and avoidance of drug claims.

- Resolved a serious challenge with Dominican Republic Customs regarding duty valuation on imports through personal negotiation and the creation of a sales and warehousing subsidiary in-country.

- Managed the government affairs function, including monitoring legislation and lobbying pending bills at the state and federal level.

- Implemented and administered the Conciliation and Enforcement Procedures for distributor to distributor and distributor to corporation disputes.
- Resolved favorably civil and criminal charges brought against the company and a distributor by the Canadian Government for claims made in sales literature.

**TEACHING/LECTURES:**

- Presented the Legal Issues segment at each New Amway Direct Distributor Seminar.
- Frequent guest speaker on direct selling legal issues at seminars and forums, averaging over 10 per year for the last 10 years, at events hosted by clients and industry associations.

**PUBLICATIONS:**

Antitrust Law Developments, *ABA Press, 1975, (Contributor)*

Legal Issues of Side-Line Businesses, *Amway, 1985*

"Give Your M/L/M 'The Test'" *Emerald Coast News, 1992*

"Amway Case from the Price Fixing Prospective," *www.mlmatty.com website*

"Pyramid or Ponzi" *M/L/M Insider Newsletter, 1995, updated version re-published in Network Marketing Business Journal, August, 2008*

"Trademark Use Guidelines," *Mlmatty.com, Newsletter Volume 8*

"The Intrinsic Value Position Paper" *M/L/M Insider Newsletter, February, 1998*

"Don't-Even Think About It," *Mlmatty.com, Newsletter Volume 18*

"Who are the PARTICIPANTS," *www.mlmatty.com website*

"What is Direct Selling PRIMARILY About?" *Direct Selling Today, October, 1998*

"RAMBLINGS OF A TIRED LAWYER," *Mlmatty.com, Newsletter Volume 19*

"How Confidential are Names and Addresses?" *Direct Sales Journal, October, 2000*

"Prohibited Activity," *www.mlmatty.com website*

"Business Opportunity – What do the Words Mean?" *www.mlmatty.com website*

"Are Two-Tier Affiliate Programs Multi-level Marketing," *www.mlmatty.com website*

"The ABC's of M/L/M 2000," *www.mlmatty.com website*

"Looking Past the Paper," *www.mlmatty.com website*

"Paperless Signup," *www.mlmatty.com website*

"The Thinkin' Needs Fixin'" *Network Marketing Business Journal, October 2003*

"Are They Worth It?" *Network Marketing Business Journal, October 2004*

"Coupons, Vouchers, Gift Certificates, and Down Payments," *My NetBrief, October 2004*

"PONZI, THE PERSON," *Network Marketing Business Journal, December 2004, and re-published in Network Marketing Business Journal, September 2008*

"BUILD IT BIG – 101 INSIDER TIPS from TOP DIRECT SELLING EXPERTS," *Dearborn Trade Press, 2004 (Contributor)*

"THE MICHIGAN SINGLE BUSINESS TAX – M/L/Ms BEWARE," *Network Marketing Business Journal, February 2005*

"Another Look at Commissions on Sales Aids" *Network Marketing Business Journal, July 2005*

"About AGENTS" *Network Marketing Business Journal, August 2005*

"Database Confidentiality" *Network Marketing News, September 2005.*

"What is M/L/M? – My Biased View" *Network Marketing Business Journal, January 2006*

"Gifting Programs - - Stay Away!" *Network Marketing Business Journal, March 2006*

"Business Volume – Its Critical Importance" *Network Marketing Business Journal, April 2006*

"FTC – What Were You Thinking?" *Network Marketing Business Journal, August 2006,* and filed with the Federal Trade Commission

"Company Names as Trademarks" *Network Marketing Business Journal, October 2006*

"Where to Incorporate" *Network Marketing Business Journal, July 2007*

"The Michigan Business Tax 'Super-Sized'" *Network Marketing Business Journal, February 2008*

"Louisiana – It's Different Down There" *Network Marketing Business Journal, June 2008*

**EDUCATION:**

J.D. 1970, Michigan State University College of Law, (formerly Detroit College of Law) top 15 percent.

B.I.E. 1962, Kettering University, Flint Michigan (formerly General Motors Institute)

**PROFESSIONAL AFFILIATIONS:**

A.B.A., and State and Federal Bars in Michigan, New York, and Colorado.

Professional Association for Network Marketing.

Direct Selling Association (DSA-US), Supplier Member.

DSA, Lawyers Council and Government Relations Committee.

Direct Sellers Association Canada, Associate Member.

Multi-Level Marketing International Association, Board Member.

Direct Selling Women's Alliance, Support Member.

Distributor Rights Association, Support Member.

 **BETA**

**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# ASD
1 message

**Linda Vasilaki <lvasilaki@hotmail.com>**                    **Mon, Aug 11, 2008 at 9:49 AM**
To: william.cowden@usdoj.gov
Cc: gchelette@tallahassee.com

August 11, 2008

To whom it may concern,

I have been a member of Ad Surf Daily since June, 2008. I have had nothing but positive results with the company and it's staff at the office. The people who brought me into the business and the friends I have made during this venture have been nothing but honest, generously giving of their time and talent to help me get started.

I did my surfing daily and posted my own web sites. As I surfed I frequently found web sites that were selling items that was interested in and in fact, by folks from my own hometown. I learned about valuable businesses that I intend to patronize at some point. My web site was viewed several times and I was happy to have the exposure.

ASD was meeting all of my goals and I was happy to introduce the business to others who needed income and were searching for an online business. I was completely satisfied with their business conduct. I have no complaints about ASD and have been looking forward to meeting more people who are involved in the business, for the potential is great.

Thank You,

Dr. Linda Vasilaki

sent to:
william.cowden@usdoj.gov --- US Attorney General

gchelette@tallahassee.com ---Tallahassee Democrat

isupportadsurfdaily@gmail.com ---ASD Attorneys

EXHIBIT D



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# ASD has proved to be the most cost effective advertising I have ever done.

1 message

---

**Thomas Ray ~ RS Marketing <rsm@teamrsm.com>**                        Thu, Aug 7, 2008 at 11:31 PM
Reply-To: Thomas Ray ~ RS Marketing <rsm@teamrsm.com>
To: isupportadsurfdaily@gmail.com

This is Thomas Ray, RS Marketing LLC, ASD ID#11201. I joined ASD December 16, 2007, and began advertising three different businesses that very day. I did nothing but surf the full 72 sites per day that was allowed, on both the ASD and the Lafuente sites, and traded those credits for views of my own websites. I did this for two solid months, never missing a day, and received numerous enrollments in both Vooka Technologies Privacy and Security software and in MyWorldPlus, a discount savings membership program. I also have received sales to new customers, many of which have become repeat customers, of our SOLTRON® Enzyme Fuel Treatment product. In addition, we have even brought on new dealers and additional affiliates for our SOLTRON® product, which are also advertising our products on ASD as well.

It wasn't until mid-February of this year, 2008, that I even realized how the ASD rebate program worked, and up until then, I didn't care. I was getting better results from advertising to ASD members than I had received through multiple other sources, and I was doing so at no cost. The only problem was, not having enough ad credits to get the additional exposure I wanted. It was then that I began to understand the value of purchasing ad packages, which gave our company additional credits to have our pages viewed by even more potential customers. We went ahead and purchased ad packs, and began converting our daily rebates into additional ad packs, thereby receiving an even greater number of advertising credits to increase our ad exposure.

Since that time, we have been able to build a substantial and growing ad pack account, so that we can now take advantage of purchasing the PTC (pay to click) ads, and in our very first attempt, offering 6 credits each for just 6,000 clicks (obviously 15 second or more page views each), we actually signed 5 new customers in just thirty hours. Yes, the advertising works, and works very well. ASD is not only helping to provide more immediate sales for our companies, it is also helping greatly to increase our market awareness and branding of our products, at the best value available on the internet.

I only wish I could have my ads back in the rotator right this minute, and get back to work. ASD is by far the most cost effective means of internet advertising we have done, and we hope to be back up and running very soon. Just before this investigation started, we had three more businesses ready to join us and get their products and services advertised on ASD as well. Ironically, because of the results we and others have had, they are also anxious to get this behind us so they too can join us.

Thomas Ray
RS Marketing LLC
ASD #11201 - Lafuente #2661
231-972-2065

# ASD – CLEARED FOR TAKEOFF, LLC

Thursday, August 7th, 2008

To:    Jeffrey A. Taylor, USA
       Judiciary Center Building
       555 Fourth Street, NW
       Washington, DC  20530

From:  Ray K. Taylor
       ASD Affiliate #26020
       66 Deer Hill Road
       Redding, Connecticut 06896

**Re:  AdSurfDaily, Inc. and Thomas A. Bowdoin**

Dear Mr. Taylor:

Below please find the details on how online advertising with ASD has helped my businesses, as well the businesses of my family members.

I have been promoting four (4) businesses online:

1. **ISAGENIX**, a multi-level marketing online business, which is one of the largest health and wellness company in the world. Cleanse, Replenish and Revitalize is the founding principle behind our cutting-edge products. Cleansing helps keep the body healthy and is the missing link to supporting health and successful, long-term weight loss. Replenishing the body with nutrients helps to revitalize the body's systems, leading to vibrant good health.
2. **BUTLER GATES, LLC**, a privately-held company in Brattleboro, Vermont that manufactures, markets & sells the highest standards in their performance gate systems. Each is custom designed & hand built one at a time by leading master craftsmen.
3. **KANGEN4LIFE.INFO**, a multi-level marketing online business, that markets & sells the LeveLuK, the Ionized Alkaline Water Generators Water Machine, made by Enagic, the industry leader over the course of its 17 years in the business.
4. **THE TAYLOR CAMP**, a log cabin with 4 bedrooms and sleeps 10, on Tunk Lake in Sullivan, Maine. Heavily protected by conservation easements, there are only 12 cabins on the lower 2/3 of Tunk Lake making The Taylor Camp very quiet, private and secluded that we rent during the months of June, July & September.

Except for BUTLER GATES, LLC, all are strictly online businesses. These businesses are all promoted via word of mouth, as well as utilizing other methods to promote their websites online. All have experienced dramatic increased traffic to their websites since my involvement with ASD, but because it has only been a few months it is too soon to know exactly how much new business has been generated as a result. In the end, more

# ASD – CLEARED FOR TAKEOFF, LLC

traffic equates into more business, so I have been very pleased in my investment in ASD Ad Packages in an effort to promote each of these businesses online.

As the result of my daily surfing on my ASD Website, I have bookmarked many of the other advertisers on ASD for future reference and yes, I have contacted a few of these directly.

Thank you for the opportunity to help Andy Bowdoin and ASD in this investigation. I sincerely hope that this will be completed expeditiously and that ASD will be back in business very soon.

Sincerely,

Ray K. Taylor
President
ASD #26020



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# FW: My experience with ASD

1 message

**Penni Rentz <penni_rentz@yahoo.com>**      **Mon, Aug 11, 2008 at 9:27 AM**
Reply-To: penni_rentz@yahoo.com
To: isupportadsurfdaily@gmail.com

I just want to share my experience with ASD. Our business is a kitchen and bath design company with a large showroom. Our business is the type of business where we have to keep our name in front of people, so that when they decide to remodel their kitchen or bath, we are going to be the first one to come to mind to help them with their project.

Our website is hosted by a company I probably am not allowed to name. They guarantee me 240 clicks per year on my website. That is 20 clicks per month. I have been with them a year and they fulfilled their promise. That was all I got. In just my first **two weeks** with ASD, my website had been viewed over 200 times. That was in early June. It has increased since then. I can't imagine that a business would not benefit from having a targeted audience of over 100,000 and growing at 5000+ per day. I would much rather have my business online with ASD, and know that I have targeted traffic to my site from a large, diverse mature audience of other business owners who are all trying to achieve the same goal, and that is to have an interested audience that will eventually buy from them. ASD is a network of business owners truly interested in doing business with other business owners and this is the perfect medium for that.

The old way of advertising is that the advertiser aired to the audience, ie tv, radio, etc.  ASD brought the audience to advertising. ASD brought an eager audience to advertising

My husband and I have made inquiries, and ordered product from businesses regarding goods and services offered on the ASD rotation and I have saved websites in my favorites to go back and review. My husband has never been an internet person and he got completely hooked on ASD and became very interested in seeing the new and various web pages being shown on the rotation and what products were being offered.

Also, even though a person cannot order items from my website, I have heard a lot of good feedback on the forums from other business owners about how their online sales have been boosted from ASD.

I love this business model and wish to see it back up and running quickly.

*Thank You. Have a Great Day!*
*Penni M. Rentz*
*Account Manager*
*SHOWCASE*
515-233-6262 ext 2005
*515-233-6565 fax*
pennir@showcasedesign.us
www.showcasekitchendesign.com



**Support AD Surf Daily <Isupportadsurfdaily@gmail.com>**

# Ad Surf Daily
1 message

---

**thescovels@netzero.net <thescovels@netzero.net>**                        **Sat, Aug 9, 2008 at 12:16 PM**
To: william.cowden@usdoj.gov, gchelette@tallahassee.com, news@wctv.tv, isupportadsurfdaily@gmail.com

My name is Tiffany Scovel. My husband and I have a Taxidermy business. We were introduced to
ASD in May 2008 by another small business owner. We have always advertised locally with average
success. We built a website to help create external business. But to get your website viewed you
have to pay a lot of extra money to the search engines so they will push our website to the front
page. We didn't have that kind of money, so the traffic flow to our website was minimal. Since
advertising on ASD our website went from 60 visits per month to 3,000 visits for the month of July
(per our website host tracking system). Our peek season begins in the fall we were excited to see
how our business would grow this upcoming season. Name branding is everything. The more times
hunters saw our website, the better our chances are of having them call Scovel Taxidermy when they
get their trophy deer in the fall.

Tiffany Scovel
www.scoveltaxidermy.com

| Visits per Month | |
|---|---|
| Aug 2008 | 94 |
| Jul 2008 | 3,029 |
| Jun 2008 | 692 |
| May 2008 | 131 |
| Apr 2008 | 44 |
| Mar 2008 | 42 |
| Feb 2008 | 63 |
| Jan 2008 | 95 |
| Dec 2007 | 71 |
| Nov 2007 | 69 |
| Oct 2007 | 54 |
| Sep 2007 | 51 |

Live your dreams. Click here to find information on becoming a lawyer.



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

---

# Testimony
1 message

---

**Ann August <auggie23@charter.net>**                                    Fri, Aug 8, 2008 at 2:49 PM
To: isupportadsurfdaily@gmail.com

To Whom It May Concern:

ASD has been a wonderful way for me to promote my business website worldwide. My newest site which I've been promoting, www.showmegoji.com/goji2freedom , has received thousands of hits since it became live in June. (see below from my back office) I would not have had this kind of traffic to my site without an advertising program like ASD. There are still glitches with the showmegoji site which is preventing the autoresponder from sending out letter sets that convert prospects into members, but I'm confident once that gets straightened out, I will have new members in my business thanks to the exposure on ASD. ASD has allowed me to advertise in an inexpensive way, as I could not afford to advertise on Google, Overture, or any other company that charges pay-per-click. I feel fortunate that I found a way for the average person to advertise their site to the world.

Sincerely,

Ann August
Member #5681
815-623-7287

Traffic Stats:

| | |
|---|---|
| Aug 2008 | 8 |
| Jul 2008 | 1709 |
| Jun 2008 | 2598 |

**Unique
Visitors
Since
7/3/2008**

| Location | Unique Visitors | |
|---|---|---|
| Other | 80 | 5% |
| Austria | 1 | 0% |
| Australia | 15 | 1% |
| Belgium | 5 | 0% |
| Belarus | 1 | 0% |
| Canada | 84 | 5% |
| Switzerland | 1 | 0% |
| China | 1 | 0% |

| Colombia | 10 | 0% |
| Germany | 8 | 0% |
| Denmark | 1 | 0% |
| Spain | 3 | 0% |
| France | 1 | 0% |
| Guam | 2 | 0% |
| Croatia | 1 | 0% |
| Ireland | 2 | 0% |
| Israel | 1 | 0% |
| India | 6 | 0% |
| Italy | 1 | 0% |
| Jamaica | 1 | 0% |
| Japan | 3 | 0% |
| Mexico | 2 | 0% |
| Netherlands | 3 | 0% |
| New Zealand | 1 | 0% |
| Oman | 1 | 0% |
| Philippines | 2 | 0% |
| Puerto Rico | 1 | 0% |
| Romania | 1 | 0% |
| Singapore | 2 | 0% |
| Trinidad And Tobago | 1 | 0% |
| Ukraine | 1 | 0% |
| United Kingdom | 12 | 0% |
| United States | 1185 | 81% |
| South Africa | 7 | 0% |
| **Total** | **1447** | |

Ann


BETA

Support AD Surf Daily <isupportadsurfdaily@gmail.com>

## Aloha From Hawaii: Ad Surf Daily

2 messages

**Carvel Harward: Aloha! <getpaidtopromoteyourbusiness@yahoo.com>**          Sat, Aug 9, 2008 at
                                                                                                 3:21 PM
To: gchelette@tallahassee.com
Cc: isupportadsurfdaily@gmail.com

Greetings:

My name is Carvel R. Harward. I am a retired attorney.
During my career as a lawyer I prosecuted criminal
cases.

However, I do not write this as an attorney. I write it as
a concerned US citizen and member of Ad Surf Daily
Cash Generator.

Yes, I am a US citizen living in Hawaii. I joined Ad Surf
Daily Cash Generator early June, 2008.

I studied ASD the best I could before I joined. After I
joined I sent my W-9 form to the company and then
worked ASD as a business.

Before I joined, I concluded that Ad Surf Daily is a
legitimate business with a product and service with
value.

The product and service is advertising. What did I get for my money when I purchased ad packages on the ASD system?

For each dollar I spent, I received 1 ad package, which enabled me to expose a website to a loyal group.

I am not an expert in advertising, but I know enough about it to realize that people who seriously advertise products and services want to get their ads exposed to loyal groups.

When I joined ASD there were about 50,000 members. When the government caused it to stop operating, there were over 100,000 members.

I had loaded up 5 very nice websites on the ASD system. Each day, until the government took it away, my websites were being viewed by members of the loyal group.

Did everyone who viewed a site convert to a customer? Of course not. But that is the nature of advertising. Not everyone who sees an ad in a newspaper or hears a commercial on the radio makes a purchase.

For advertising to be effective, it requires exposure to

many people over time. Some advertising works, and some doesn't.

As a member of ASD I was associated with some other people promoting nice websites on the ASD system. We wanted leads and customers from our marketing efforts from our websites which were in rotation on the Ad Surf Daily system.

Were we getting leads and customers? Yes.

Several people liked our websites. Some people merely wanted to know more. Others signed up with us without first contacting us. Some signed up after they had requested more information and had contact with us.

Creating customers is a process. The process includes a compelling website, exposure for the website, and effective followup.

What did I, and what do I now, think about the the Ad Surf Daily system? I liked it when I joined. I like the concept now.

I want the government to let it live. Can it be improved? Of course.

Now about the big P word – Ponzi. As a retired person I receive a Social Security benefit. For many years I have viewed SS as a form Ponzi scheme. As I understand it, I don't get paid each month out of my own account created with my own contributions, but from money being contributed by younger people still working. I read in the AARP magazine that the Social Security system is destined to collapse.

Do I consider Ad Surf Daily to be a Ponzi scheme? No. Why?

Well, Ad Surf Daily is a business. I don't claim to know about all types of business models, but every business model I know of must have fresh sales to remain healthy.

Being an advertising business, Ad Surf Daily must sell advertising to remain healthy.

The advertising offered by Ad Surf Daily is online exposure for websites. That is a huge market. Online purchases are increasing. Studies show that not only are online purchases increasing, but that most online purchases are preceded by a search.

Even though surfing on the Ad Surf Daily system is not exactly a search for particular products or services, many people who do surf on the Ad Surf Daily system

see compelling websites and either take immediate action or save the site to work with later.

Have I made purchases from sites I saw while I was surfing on the Ad Surf Daily system? Yes.

I purchased a high quality email and contact managing system from a website someone had up on the Ad Surf Daily rotator. I use that product every day now. Also, I have saved other sites in my favorites which I will make purchases from later.

For example, while surfing on the Ad Surf Daily system, I saw a website featuring metal yard decorations. I saved that site. I have looked at it many times. Next month I am moving from Hawaii to Texas. I am buying a small home in San Antonio. I intend to buy some of the metal yard decorations from the site I picked up on the Ad Surf Daily system.

Why do I consider this to be a legitimate business and not a Ponzi scheme? I can answer my own question.

First of all The Ad Surf Daily system is real and tangible. It exists (Or at least did until the government came forward to kill it) The purpose of it was to get exposure for websites.

Yes, I could get effective exposure for websites, and I

could get paid to do it.

For many years I have liked the idea of rebates. Earlier this year I bought a Magnavox TV from Office Depot. I sent in a little voucher and Office Depot sent me a rebate.

My understanding of the rebate system is that the Ad Surf Daily company would use 50% of the company revenues today to pay rebates to qualified members tomorrow. That is financially healthy.

To be qualified a member had to have an appropriate website on the rotator and surf a minimum number of websites each day. So, there was a requirement to do something meaningful.

Also I was pleased that Andy was doing some other things to generate additional income for Ad Surf Daily. For example, he had a wonderful co-branding partnership with www.greenbackstreet.com . Green Back street is a 10 year old company with one of the largest online malls in the world, with over 1000 stores.

An Ad Surf Daily member could join Green Back Street, make purchases from such stores as Wal Mart and get cash rebates. Also it was an additional income stream for Ad Surf Daily.

Why the government did not enter the picture with an attitude to help, I will never know. The action of the government so far in this situation is destructive. The government is being a detriment.

The so called regulators, including the government attorneys do not understand the Ad Surf Daily business model. I guess it is something like the concept of franchising many years ago. There was a day when franchising was not perceived as being a legitimate business model.

In my opinion, through negotiation, the real and perceived weaknesses in the contemporary Ad Surf Daily system could be corrected.

Everyday Andy is not allowed to open the doors, thousands of people are being deprived. The government owes it to it's citizens to enable Ad Surf Daily to operate.

Ad Surf is a lawful business, built on a sound, but perhaps novel, business model. It does provide a forum to effectively expose websites before a loyal group, and for the qualified members to get lawful rebates.

Thousands of people view Ad Surf Daily as a desirable

and doable home based business. They need it. They want it.

Now in conclusion, I want to mentions the word Justice. Yes, Justice.

I was taught as a young prosecutor that the duty of a prosecutor is to seek Justice. Justice in this case is to enable Andy Bowdoin to open up Ad Surf Daily, allowing thousands of members to go back to work on the system, promoting their websites, and getting paid.

Sincerely,

Carvel R. Harward

getpaidtopromoteyourbusiness@yahoo.com

1 (808) 636-6333

---

Carvel Harward: Aloha! <getpaidtopromoteyourbusiness@yahoo.com>          Sat, Aug 9, 2008 at 3:23 PM
To: news@wctv.tv
Cc: isupportadsurfdaily@gmail.com

[Quoted text hidden]

---



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

---

# letter of support for ASD
1 message

---

**Rev Dr Michael Milner <bpmilner@yahoo.com>**                          **Fri, Aug 8, 2008 at 12:57 PM**
To: isupportadsurfdaily@gmail.com

August, 8, 2008

    From: Rev. Dr. Maclin R. Milner, Jr., PhD
           Bishop, Diocese of St. Paul the Apostle, Inc.
           ASD Affiliate# 39193
           1470 Laura Street
           Clearwater, FL 33755

    Re:   AdSurfDaily, Inc. and Thomas A. Bowdoin

To Whom It May Concern:

Below please find detail on how online advertising with ASD has helped my business.

We are a 501(c)3 Church corporation, incorporated in 1981 to establish and oversee churches and various church related ministries. We use our website to advertise ongoing services and special events sponsored by the Church. We also advertise in local magazines, newspapers and media.

In April 2008, we began to purchase advertising from ASD. Since then, traffic to our website has increased dramatically, by many thousands each month (reflected in our website hit-counter), and this has resulted in increased attendance at our church sponsored events. For anyone with a website representing their business, the issue is to generate traffic to the website and get people to look at it. For years we have purchased "click throughs" from various internet companies.

In addition, we have purchased products from a number of other ASD advertisers and have taken a great interest in learning about their products and services, which include a number of churches and charitable organizations.

We are very concerned that the govt. has seized our advertising dollars, inasmuch as this is a non-profit church corp. and our funds for advertising are both limited and precious.

Thank you for the opportunity to help Andy Bowdoin and ASD in this investigation. I sincerely hope that this will be completed expeditiously and that ASD will be back in business very soon.

Sincerely,

Rev Dr Maclin R Milner, PhD
Bishop, Diocese of St Paul the Apostle, ASD #39193



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

---

# My results in advertising with ASD

1 message

---

**George Shears <gshears@arrowheadtel.net>**                          Fri, Aug 8, 2008 at 10:19 AM
To: isupportadsurfdaily@gmail.com

To Whom it May Concern:

I became a free member in ASD on 6/17/08 and started advertising my website there on June 29th, when
I became verified at the VIP Executive Leadership level.

I chose to advertise one of my affiliate websites, which is a sales page for a weight loss product I'm selling—
EasySlimRX.  This was the ONLY place where I advertised this sales page.

I was delightfully surprised to get a sale in less than two weeks after placing my website in the ASD rotation.
Given my understanding that my website is being presented for others to view between 40 and 60
times a day, the click through rate that I've gotten thus far (prior to the ASD website becoming non-
functional a couple of weeks ago) compares very favorably with other methods of online advertising
I have used.  This means of advertising is obviously far more cost-effective than any
other online advertising that's available.  Where else can you earn rebates on your advertising costs?!

I was notified yesterday that the person who became my customer through ASD has also reordered
the weight loss product I'm selling.  That strongly reinforced my initial satisfaction.

Anyone familiar with online marketing will recognize the tremendous attractiveness of being able to acquire
repeat customers in such a simple, easy way—and, moreover, to generate an additional stream of income
in the process.  As ASD continues to grow, it's obvious that an increasing number of savvy online marketers
will choose it as an advertising venue over other, very costly available methods.

In summary, then, based on my initial and very limited experience in advertising with ASD, it promises
to become a highly effective way of increasing my online marketing income.

With best regards,
George Shears

**George Shears**
**Retired Psychologist & Wellness Consultant**
**Health and Wealth Mentors, LLC**
**651-204-0523**
**gshears@arrowheadtel.net**
**http://masstrafficnetwork.com**

---

## *Working for a World of Wellness, Happiness, & Prosperity*

**"Every wind is a good wind for the sailor who knows how to set his sails."**

- Anonymous

Dear Andy Bowdoin,                                                     08/06/08

This testimonial letter is to explain to you my positive experience with advertising my
website on Ad Surf Daily (ASD) and La Fuente Di Dinero (LFDD).

My company is Terra Green Ceramics, Inc.. We make a "certified green" ceramic tile
with recycled glass. We manufacture, market and distribute our tile in the United States
to retail tile establishments.
My immediate goal in advertising the Terra Green Ceramics, Inc's. website with Ad Surf
Daily and La Fuente Di Dinero was not to have a "sale" and expect the masses to respond
to a ceramic tile website. My customer base to "sell" my ceramic tile to is very narrow.
However, my customer's customer base is much wider.
Therefore, my ultimate goal in advertising with ASD and LFDD is to achieve
institutional advertising. I want more people who may not be aware that a "certified
green" ceramic tile exists to become aware of it and to associate "green" ceramic tile with
Terra Green Ceramics, Inc.. At some point a homeowner will make a decision to replace
flooring or redecorate a portion of their homes, businesses, cabins, etc.. I want to
influence this decision by making them aware now of the existence of Terra Green
Ceramic Tile.

Due to the extremely high cost of most advertising mediums I have not been able to reach
out to the public with my institutional advertising message until now. I have found ASD
and LFDD to be my most cost effective advertising medium in achieving this institutional
advertising goal.
It is impossible to make Terra Green a household name. I could never afford to advertise
to a potential audience of upwards of 100,000+ adults on a regular basis let alone be
guaranteed that I could have their attention for the coveted 15 seconds of their daily
media exposure until ASD and LFDD came along. The reach and frequency that I can
achieve in my effort to establish my company name and product branding is wonderful
with ASD and LFDD.

Thank you Mr. Bowdoin for taking internet advertising to a new level. I have many
business associates that created web sites to promote their businesses over the last 10
years and these websites just sit out in cyberspace with little to no attention. Now these
websites can actually find an audience of 18+ adults who may or may not be in the
market for the products or services advertised at the time they see the websites. That
however, is no indication that the need or desire will not arise in their futures for the
products and services that they are aware of through ASD and LFDD. That is the way all
of the advertising world works.

It is an honor to be associated with ASD and LFDD as a participating member and an
advertiser.

Kindest Regards,
John Cokley
941-525-8408



Support AD Surf Daily <isupportadsurfdaily@gmail.com>

# Support document for my on-line advertising
1 message

**Jack and Deb Douglas <jd71898@ameritech.net>**                     **Sun, Aug 10, 2008 at 11:34 PM**
To: William.Cowden@usdoj.gov, GCHELETTE@tallahassee.com, news@wctv.tv,
ag.mccollum@myfloridalegal.com
Cc: isupportadsurfdaily@gmail.com

To Whom It May Concern:

I can only take credit for writing part of this letter that references my small business. The rest of the
letter was written by another ASD member, but it conveys my thoughts and feelings EXACTLY.

I am shocked and saddened by the actions taken by the US Attorney and the Florida Attorney
General against ASD Ad Cash Daily and its advertisers.

As an American citizen, tax payer and small business owner, I can barely find the words to
adequately express how disturbed I am over the actions of the US Attorney and the Florida Attorney
General.

I feel that this invasion by the AG has severely damaged my confidence and faith in the
entrepreneurial freedom I as an American hold so dear. Suddenly and for the first time in my life I
am seriously asking the question: What on earth has happened to our government?

I strongly believe in the business principles, platform, business model and owners of ASD and I
intend to work to protect the viability of this business model.
As a small business owner and satisfied advertiser I feel a responsibility to make every attempt to
see ASD cleared of these ridiculous misrepresentations brought by the AG and the media. We are
**NOT** investors - **We are Advertisers**.

The small business owners involved with ASD need this marketing vehicle in order to effectively
compete in today's marketplace. ASD levels the playing field and creates an environment for success
for the small business owner.

The most important questions of the day: Who is truly being threatened or harmed by the ASD
business model? Certainly not the 100,000 satisfied advertisers seeking to brand their companies and
realize immediate results from their advertising expenditures.
The ASD advertising vehicle is extremely viable for any advertiser. As a small business owner who
purchased advertising for my web businesses, I find ASD to be a legitimate and highly cost effective
marketing tool.

I have spent thousands of dollars on conventional advertising, radio, newspapers and magazines to
only see less than a 1% return. I have a business which requires multiple exposures (at least 4-5
times) before a person is ready to admit they have a problem and need my product. ASD has
afforded me that opportunity to have people view my site in the rotation. This value is GREAT and
it is REAL. Having only been in ASD 2 months, I was just beginning to get calls and purchases
before the AG closed and confiscated my advertising dollars.

How can anyone not recognize the value in the business model? This is a genuinely cost effective advertising solution for any business but most assuredly for the small business owner. Thousands of advertisers receive extremely positive results from advertising on ASD.

For the first time EVER I know that I can purchase effective and affordable advertising utilizing the ASD advertising web portal and that this vehicle is going to cause my business to grow and profit. The principles and management team representing ASD have been extremely transparent and forthright in keeping the advertisers abreast of their daily progress. They did an admirable job of communicating. ASD made every reasonable effort to keep all of us informed and involved in the progress the company was making. More so than any other company, both MLM and corporate America, I have ever worked with.

ASD has been very clear about their business agenda and business investments example: real estate purchases, additional advertising expenditures and marketing plans designed to brand and build awareness for ASD and its advertisers.

The news of server and web upgrades for the site are greatly appreciated. I know that once these improvements are completed the ASD site will be much faster, will handle the massive strain from millions of viewers and I look forward as an advertiser to seeing my product sales increase enough for my company to actually make a profit from my advertising expenditure on ASD. The opportunity to brand my company to thousands of ASD viewers is remarkable and greatly needed.

All of the costly expenditures made by ASD were made in good faith and for the benefit of its clients and every thing ASD did was in the best interest of its advertisers.

The improvements being made to the ASD business model are legitimate, necessary, time consuming and expensive. The thousands of forward thinking and informed advertiser's patiently waiting to get involved with ASD's remarkable and improved business platform have been denied the opportunity to benefit from their advertising expenditure.

The Co-op advertising opportunities made available to all of us by ASD also had massive value. For the first time small business owners were able to cooperatively participate in major advertising vehicles which not one of us could afford independently, along with the planned infomercial.

This over reaction and drastic invasion by the US Attorney has frozen thousands of my advertising capital dollars. I have been denied the ability to utilize a viable marketing vehicle and now face financial failure because the US Attorney has blocked my ability to effectively and efficiently market my businesses utilizing the advertising vehicle of choice and now have little recourse for recovery because our advertising capital is no longer available to us. Because of the success I was having with ASD, I pulled all of my advertising dollars for the rest of the year and was in the process of purchasing advertising I knew had a proven record. I now have **NO** money left for advertising, which in turn could mean financial ruins for my family; since both my husband & I are retired and were trying to make extra income from selling our products to subsidize social security and pension. **IF NO ONE SEES YOUR PRODUCTS, YOU CAN'T SELL YOUR PRODUCTS, YOU MAKE NO MONEY.**

It is incredibly expensive and cost prohibitive for most small business owners to effectively compete on the Internet in today's market. The ASD business model allows any small business owner the ability to present their advertising message in an affordable format whereby each viewing is a

Gmail - Support document for my on-line advertising.                    Page 3 of 4

Case 1:08-cv-01345-RMC    Document 7-6    Filed 08/18/2008    Page 23 of 57

minimum of 15 seconds each.

This 15 second opportunity has tremendous value – considerably greater value than:
Driving by billboards at 60 mph
Channel surfing past television commercials in the first half second of airing
Button pushing past radio commercials in the 1st two seconds of the commercial break
Scanning over newspaper ads which have no chance of capturing a prospects attention unless the
prospect is specifically in the market for that particular item
Enduring ridiculously high pay per click internet advertising charges which offer no realistic way of
ever breaking even.

As a small business owner I am appalled that in a "free market society" our government would take
such reckless, massive and immediate action to move in and disrupt this thriving and burgeoning
business model with out allowing ASD or its advertisers the opportunity to offer legitimate and
thoughtful explanation.

This action by the US Attorneys office and the Florida Attorney General was implemented without
the benefit of legitimate and thoughtful consideration or exploration on the part of the US Attorney.
You have no idea the harm you have caused to thousands of hard working American citizens.

Alleged complaints to the US Attorney's office from impatient and misinformed individuals were
microscopic compared to the huge numbers of satisfied and informed advertisers.  I wish to
aggressively express my extremely positive experiences with ASD. My small business was starting
to receive strong results from the advertising placed in the ASD rotation and without this opportunity
I will surely be out of business within the next 30 to 60 days. My professional credibility is now
damaged because I referred this remarkable advertising vehicle to other business owners only to
have the AG come in, seize our advertising dollars and make slanderous and over blown accusations
about this company through the manipulation of the media.

ASD is a remarkably innovative and effective advertising agency. The online and off line marketing
opportunities offered to its clients, incentives, referral commissions and rebates are business
practices offered by a multitude of companies around the world.

Incentives, bonuses and rebates are offered by thousands of companies in today's business
environment. Advertising agencies pay commissions, referral commissions, perks, dinners, trips,
bounce backs, bonuses and rebates, no charge added value commercials and added value programs at
all levels of the industry.

Buy 2 get 1 free offers and matching bonus programs are rampant throughout every industry.
Advertising agencies, television stations and radio stations offer incentives, pay multiple levels of
commissions, referral commissions, free inventory matching incentives, added value, perks, trips,
cruises, etc as a course of normal business every day.

All innovative retailers and marketing companies offer rebates, referral commissions and free bonus
incentive to customers. Drug Companies, Wal-Mart, Best buy, the lottery, cell phone companies, and
computer manufactures, automobile companies, cable companies, affiliate programs, real estate
companies, insurance companies and hundreds of other business categories offer rebates, pay referral
commissions and incentives to their prospects, customers and clients in order to win their business
and loyalty.

All businesses, advertising and marketing agencies pay 100% of their operating expenses and referral commissions based on the revenue received from advertisers, customers or clients. When any advertising agency loses its customers or clients or is unable to secure new clients the advertising agency is no longer viable. ASD is no different from any other advertising agency or business.

The actions of the US Attorney and the Florida Attorney General are inflicting tremendous and unnecessary financial damage to 100,000 plus small business owners. The damage to our businesses and our professional reputations is being felt very quickly and many of us will not recover unless you stop this right now.

We are not naive, unsuspecting sheep who were being lead down the garden path of dreams. We are hard working, perceptive business owners who have done ample due diligence. We made the informed determination that the ASD business model is sound.

We chose to participate in the most viable and cost effective marketing tool we have ever found for our businesses and we are begging you to resolve this in ASD's favor immediately.

The reckless dismissal and lack of consideration by the AG and the media regarding the positive contributions made by ASD on all levels is astonishing. The citizens of our country are suffering terribly and very rapidly failing financially on every level. I can not believe that our governmental agents and the members of the media could take it upon themselves to slander and destroy such a positive, effective and phenomenal endeavor.

A CONCERNED ASD MEMBER LOOKING FOR A QUICK POSITIVE SOLUTION,
Deb Douglas
Member # 33133
Sharing from a member...



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

---

# My Testimonial
1 message

---

**Lorene Haggard <lorenehaggard@msn.com>**                    Thu, Aug 7, 2008 at 9:57 PM
To: isupportadsurfdaily@gmail.com

*To Whom It May Concern:*

*I am a owner/broker of a real estate office and due to the current market conditions and the need for additional streams of income, I started in my travel business in early November, 2008 and in December, 2008 I signed up for a contact manager and lead generator called Earn Vacations offered in my back office of my World Ventures business. I am a computer technician and am very familiar with computers and had no problem learning the simple system and went to work marketing through that system. I put my link to my Earn Vacations landing page all over the internet in untold numbers of free and paid marketing places with very little success. I could count the number of real leads on both my hands.*

*On June 4, 2008 I signed up for ASD and believed the program would work and was willing to buy $1000 ad packs to test it out. I started by listing my travel website five times in the rotator and I started to get leads. Then I also learned how to set up my PTC (pay to click ad) and it started to happen. I had five people that I tracked through ASD when I started paying attentions which was not till about the third week. I was traveling the two weeks before that. Then the next week I had 26 leads and I saw that this was going to be difficult for me to keep up with so I enlisted my son who works on phones in his job. I had to teach him the contact manager system and we were then on a roll calling all the leads around the country. The next week ASD started having computer overload issues and at the same time our contact manager system, Earn Vacations, went down for a totally new version. We are up and running again, waiting for ASD and La Fuente to get back on line so we can begin again.*

*Although short lived, the success I found with ASD and La Fuente was phenomenal and just the beginning. We signed up two people in 26 and have five of those very interested and studying our site, a trucking company owner in Florida, a teacher in Las Vegas, a janitor in South Dakota, a fulltime network marketer in Virginia and several people in California. We still have leads coming in slowly. With all the problems, we totaled nearly 40 leads and that was more than I have had in all the last 8 months I have been in my travel business. I am very, very happy to have found ASD and La Fuente and felt a lot of excitement (more than I already have) about my World Ventures business and how the advertising was going so well. It is well worth it to me to continue this company.*

*I have chosen to advertise my other company, Global Domains International on Golden Panda Ad Builder. I signed up right away because of my success with my travel business advertising on ASD and La Fuente and heard that they were going to open the Golden Panda site in English and Chinese. My GDI business is translated into Chinese so I was excited to advertise this site with Golden Panda. I listed my GDI site three times in English and 2 times in Chinese (I knew the marketing of Golden Panda had not started real big yet in China). I do have an ad for Golden Panda on craigslist in Hong Kong and have an email inquiring about Golden Panda from that craigslist listing already and I haven't*

*addressed it yet because I don't know what to say.*

*After my sites were approved it didn't take long before my success began. I have signed up three new people in my business in two days. I have even spoken to my new signups and they are happy about my GDI business and hope that Golden Panda will continue because these two put together will grow our GDI business and create our future as we had dreamed of. If anyone needs more information I will be happy to talk to anyone on the phone at 520-975-8207.*

*As an additional note to all of the above, I received a call from my company that provides my contact manager, autoresponder, lead generator, software. The statement from them was in astonishment for the traffic I have had to this system calling me "phenomenal". They wanted to know what I was doing to drive so much traffic to my EarnVacations landing page that manages my leads to my WorldVentures travel business. They said they have not seen such a good conversion rate in any of their other users. I told them to email me and I would give information regarding that and then of course I haven't because of the turn of events regarding the current situation with the advertising companies.*

*The bottom line here is that I am so happy about the traffic that Ad Surf Daily Cash Generator, La Fuente de Dinero and Golden Panda Ad Builder was giving to me that I felt sure my two businesses, WorldVentures and Global Domains, were going to be extremely successful this year. I have signed up one person in travel and three people in GDI and this was in a very short time. I have others still very interested. I can only imagine the success as I continue using these three companies as my form of marketing my businesses. I have spent a lot of money with other companies over the past year and have and am still using many other forms of marketing my two businesses with no results so far.*

*As far as my surfing goes, I have saved 98 websites in my favorites from my surfing to refer back to because of my interest in their services or products. I have purchased from a few and am considering some things such as a health product phyto planktin to help my fibromyalgia, other social networks I was unaware existed to share my businesses, personal growth and spiritual sites and locations. I spent $650 in two weeks on Google Adwords and Yahoo Marketing and have not had one lead I called back say they were from this marketing. They were from ASD and Golden Panda and two from La Fuente.*

*I feel my world has opened up tremendously to all possibilities and am very happy that I do not have to be a casualty of our current economic conditions of foreclosures and lost income and extremely high living costs and transportation expenses. I am very anxious to get back to business with my advertising campaigns with Ad Surf Daily, La Fuente de Dinero and Golden Panda Ad Builder so my main two businesses, WorldVentures and Global Domains International can grow and flourish. The longer these systems of advertising are not available to me the more I face economic doom as a huge portion of people in our country are going through right now.*

**Blessings,**

**Lorene Haggard**



**Tech Dimensions Travel**

**http://techdimensions.worldventures.biz**



Green Go'Fer Health
2211 Riddle Avenue
Wilmington, DE 19806
Phone: 302-656-8567
sales@greengoferhealth.com
www.greengoferhealth.com



**Green Go'Fer Health**

8/14/2008

RE: Legal Action Against Ad Surf Daily, Inc.  Quincy, FL

To whom it may concern;

My name is Robert Grayson and I have been a member of Ad Surf Daily since the early part of 2008. My member ID number is #13492. I recently returned from business in the UK to find that the state and federal authorities had taken action against ASD and I can only say that I am shocked and appalled at such unwarranted behavior. ASD is a well thought out, viable business model that allows businesspeople like myself to not only benefit from advertising online, but also to profit from it. But I am getting ahead of myself. As I understand it, the government agencies are alleging that the ASD business model is some type of securities fraud or Ponzi scheme and further that the so called advertising product has no intrinsic value to the business consumer. The agencies are mistaken on both points.

Let me address these issues from my own personal and professional points of view. I was introduced to ASD by a good friend and fellow entrepreneur with whom I engage in several small business ventures selling either product or services online. Part of the ASD business model is the use of an independent sales force to promote the "sale of online advertising". That sales force is paid a 10% cash commission for direct referrals and a 5% override commission for 2nd generation sales. I would point out here that this type of compensation is considered a standard for sales and sales management in virtually all industry segments.

I am 58 years old. You might call me semi-retired. I spent the best part of my professional career in the high tech world on both West and Easy coasts. I was either is sales or marketing management throughout that career. For roughly the past 10 years, I have been involved with various types of online sales and marketing of products and services. I build my own websites, choose the products, and hopefully maintain a profitable business- things are quite tough these days.

My initial reaction to the ASD business was expectedly skeptical. It sounded too good to be true and I could not imagine that it was on the level. I refused to participate for three weeks despite the urgings of my business associate. Then he presented a piece of the ASD business model that goes largely overlooked in the shadow of the Ad Package purchases and rebates and commissions. To participate with ASD as an online advertising vehicle is absolutely FREE. There is no charge to become an ASD member, and you can earn advertising credits in the form of "page views" simply by viewing the web pages (surfing) of other members up to 72 pages per day at 15 seconds per page.. Now we know there are 3 different sites in question - ASD, La Fuente de Dinero, and Golden Panda Ad builder. Three times 72 is 216 page views of MY website per day at no cost to me beyond my time. Let's put a dollar value on those views. I have, before ASD, had to rely on Google, Yahoo, and Microsoft with their sponsored links (Pay per Click) programs to drive traffic to my site. It would cost me between $200 and $300 per day for 216 visits all without any guarantee of conversion to a sale. That's a monthly value of $6,000 to $9,000 in online advertising for Free. For anyone running a business online, the starting point on value received is several thousand dollars per month before any ad packages are purchased.

So as far as I am concerned as one who has over the past 8 years paid more than his pair share of money to the search engine companies with no guarantee of any return, I received more than fair value from ASD before I spent one dollar on advertising and was able to improve profit by NOT spending with Google or Yahoo. Plus the conversion rate of sales from the affinity group of ASD members is an added plus.

However what really sets ASD apart as an advertising vehicle is the business plan that revolves around the purchase of Ad Packages and the referral of other members. This allows a member like myself to purchase advertising for my website in the form of page views very much analogous to Pay per Click sponsored links with the search engines. I pay roughly the same amount for the advertising- $1.00

per view of my page. ASD has chosen to utilize a combination of compensation components to reward it's members and allow them to a) recover their out of pocket advertising costs, b) earn a 25% premium above and beyond those costs, c) compound the recovery of those expenses, and d) earn commission on 2 generations of the referral of new members who also make advertising purchases. None of these components are unusual, illegal, or uncommon in their practice.

I have been in sales and marketing for more than 30 years, the following are all common practice:

1) <u>Use of an Independent Sales Force and Referral Commission</u> - In these days of corporate outsourcing of many services and functions, use of an Independent Sales Organization (ISO) is an everyday practice. Payment of commission in the neighborhood of 10% for direct sales and 5% on 2nd generation sales (override) would also be considered common practice.

2) <u>Revenue Sharing Bonuses & Rebates</u> - It is not uncommon for any corporation to share profits or revenue with employees or contractors on a quarterly basis. This gives those employees and contractors a bit of a vested interest in the success of the company. What makes the ASD model unconventional is the timeframe and the generosity of the revenue sharing. ASD has chosen to take 50% of the revenue on a DAILY basis and distribute that revenue pro-rata in the form of a "rebate" among all those members who purchased Ad Packages which were active and qualified for that day. Active meaning that they had not expired. Qualified meaning that the member had fulfilled his or her requirement to view the websites of other members for that particular day. Rebates continue to accrue on any Ad Package to a maximum of 125% of the purchase price - no guarantee that it will ever happen or happen within any given timeframe (could be 3 months - could be 3 years...)

A Note here: This is why ASD is NOT an illegal money pyramid nor is it a Ponzi scheme. In an illegal pyramid or Ponzi - today's "new money" from new members is used to pay members who had "invested" earlier. (much like the Social Security system that we've been paying into our entire working career - oh never mind that one...) ASD takes 50% of today's revenue and divides it among all members based solely on the number of active ad packages they have purchased. I joined in February and let's say I have spent $10,000 and purchased a total of 10,000 Ad Packs. John joined a week ago and purchased $50,000 in Ad Packages. Susan joined a year ago and only purchased $500 in Ad Packs. If today's revenue sharing amounted to a 1% rebate - Susan would receive $5.00; I would receive $100.00, and John would receive $500.00 assuming that we all completed our surfing for the previous day. When today is over it's over - the same process is repeated the following day. This is just an extremely generous and totally equivocal sharing by the company. And as for the "extra" 25%; If I own a dividend bearing security and I hold it for a very long time - it is more than likely that at some point the accrued dividends will total 125% of the purchase price of the share regardless of the share price - just look at today's stock market in the financial sector.

3) <u>Compounding the Rebates</u> - In much the same way as a securities investor can reinvest his or her dividend in order to purchase additional shares of stock and increase the size of the next dividend or for the holder of a high yield savings account, Certificate of Deposit, to roll over the earned interest and compound the yield; ASD offers members who have purchased Ad Packages to use their rebates to purchase additional Advertising packages. This increases the Ad Package balance used to calculate the ~~next day's rebate - increases the pro-rata share of the revenue sharing.~~ Again this is not an unusual practice, most of our financial institutions are sweeping their deposits (the money of their customers) through international markets to increase the institution's earnings on a daily basis. What we don't see is a company like ASD allowing it's members to take advantage of similar practices by sharing it. We are never dealing with more than 50% of any one day's revenue and the prorate distribution based on the number of outstanding Ad Packages insures that nothing is paid out on paper or in cash that isn't already there. A truly generous and magnificent business model.

4) Last but not least, let's not forget that this is an advertising program and the purpose of advertising is to generate profitable sales of a product or service or to increase the awareness of a brand or to acquire new customers (perhaps at an initial loss). The ASD program allows a small business owner to take maximum advantage of his or her advertisingdollar. In the online arena traffic is the king. The more page visits, the more conversions. ASD requires that all page visits be a minimum of 15 seconds and it has been well documented that if a consumer remains on a web page for 15 seconds or more, the likelihood of that visit converting into business increases by 50%. And there's a big difference between a

sale and a profitable sale. Knowing that my cost for page views with ASD is FREE- any sale I make is by definition profitable especially when compared to the enormous costs of search engines and the software manipulation they go through to take my money. Could Google or Yahoo offer me a rebate of course they could, BUT THEY DON'T!! When I purchase Ad Packages with ASD or whether I just surf and earn credits for free or both - I am improving the dynamics of my business and when I share that with other folks who are in a similar position to me - I can make a substantial incremental profit

There were no victims with ASD. No money was being lost at the "bottom" to be paid at the "top" because there is no bottom or top with ASD. When the agencies stepped in and seized the money of the members - it was not ASD's money; it was ours- you made victims out of all of us. Further, by shutting down the operation, you also took away from us the advertising that we paid for or were earning every day. I will grant you that ASD was experiencing a myriad of administrative and technical infrastructure problems. I working in that industry for almost 20 years. I also am an excellent judge of people and character. The issues with administration and with hardware/software infrastructure were being addressed. The company clearly had the resources to address them. By the end of the third calendar quarter, things would have been running smoothly.

Perhaps you do not understand the impact of your actions. You may have managed to achieve the very result you were trying to prevent. People who joined ASD looked at it to keep their heads above water in what is admittedly the worst economic environment we've seen in decades. ASD was preventing foreclosures and bankruptcies among people all over the country. Sure there were people throwing larger amounts of money into the advertising, but those were the exception not the rule. My brother is on the verge of losing his home- you cut off his income from ASD. I have friends in Chicago struggling to recover from a series of poor real estate investments- you cut them off and they are foundering. You are guilty only of an error in judgment which due diligence and some more in depth analysis would have avoided. ASD is completely above board. The business model is one of the most generous and well constructed I have ever seen and I did 4 weeks of numerical modeling before I was convinced that it was legitimate. Andy Bowdoin, his wife Faye, and all of the people I have met that are associated with this company are truly well meaning and generous people. I realize that it is hard to believe that someone is actually making a positive and tangible difference on the lives of so many in this hard economic times, but ASD is that company and Andy Bowdoin is that person.

I urge you strongly to reconsider your actions- do a thorough and in depth analysis of the business model. We all questioned it at first, but analysis has shown it to be anything but a Ponzi scheme. I urge you to release the funds so people can receive their money- they need this. I urge you to allow the company to resume operations during your investigation sowe can use the advertising that we paid for and withdraw the rebates that we have earned.

Finally I urge you to take this letter seriously and to exercise your humanity as it relates to the members of ASD who may have put whatever they had left on the linethat this business would work for them. Thank you for your time and attention to resolving this error as quickly as possible.

Sincerely,

Robert L. Grayson
Owner - Green Go'Fer Health
2211 Riddle Avenue
Wilmington, DE 19806
ASD Member #13492



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

---

# Letter of Appeal from an ASD Member
1 message

---

**usha prabhakar <usha.prabhakar@gmail.com>**                    Sat, Aug 9, 2008 at 1:26 PM
To: isupportadsurfdaily@gmail.com

### <u>To Whom It May Concern</u>

This is in regards to the current legal action against ASD. I have been a member of ASD since April of 2008 and I was hopeful of seeing better economic times in my life and had the confidence that I would be able to deal with all the challenges in my life like taking care of my mother who is over 80 years and since I am diabetic taking charge of my medical bills without depending on anybody. However, since the recent legal allegations against ASD being a Ponzi scheme, I am not sure what my future will be like. Therefore, I wanted to plead the case by voicing my opinion of the whole situation.

I stayed home to be a good mother to my daughter, to whom I gave my all so she could have the best in the present as well as in the future. I chose to sacrifice my career so I could be available to her a 100%. Today she has gone off to college and I am very proud to say pursuing to become a good doctor.

I was left with an empty nest and loneliness. Being in a small town my opportunities to re –enter the workforce were limited. So I began to explore in the internet for employment opportunities and realized there was an option to stay at home and work. I found this very appealing in many ways.

I have been trying to find a way to work from home through Internet Marketing. I have tried various businesses for the past one year and all of them had equally good products. However, many of them involved building a huge down line before realizing any success.

Last December business became very slow and I was forced to take up a job for a measly $8 an hour. I got introduced to ASD in the late month of April and found an easy model of advertising when compared to other forms of advertising like traffic engines on the internet. I studied its business model and found that it was

a win-win situation for both the company and its members.

I researched into the philosophy of the company by looking into the presentations made by Andy Bowdoin both in his introductory videos as well as in his weekly webinars. He impressed me as a simple and honest man with impeccable integrity. He has a great vision for the company with the best intentions for the good of the average American.

My experience in doing business with ASD has been very profitable and positive. It gave me hope for a brighter future with all possibilities of realizing my dreams as well as facing the challenges in my life.

I found as promised by Andy Bowdoin that in this short period of time I was able to make sales in the business I advertised, earned my daily rebates without missing even one day – even when the system was pulled down for upgrades for two weeks at a time – and I also referred people successfully to this business. I have people who are free members as well as members who have purchased advertisement packages for their own businesses.

In light of my personal experience it saddens me to see that ASD is being portrayed as a Ponzi scheme. My experience in doing business with ASD shows me beyond theory that it is a reliable company that keeps its promises and is definitely not a Ponzi scheme. I do not know of a single member who said they were not paid! Nobody has been cheated. IT IS DEFINITELY NOT A PONZI SCHEME! On the contrary, it is a very simple, revolutionary and robust business model unlike any other business out there.

America is the greatest nation leading the world today. It is unfortunate and sad to see a nation with a philosophy of true liberty and free enterprise kill such a robust model led by a man of excellent integrity who is showing us the way to a better economic future.

I implore you to consider this issue with great deliberation and act favorably to our appeal. Please do not take away our opportunity to realize the "American dream."!

Thank you,

Sincerely,

Usha Prabhakar
ASD Member Id# 20019



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# ASD

1 message

**Nancy Hay <nrhay@cox.net>**                                      **Sat, Aug 9, 2008 at 12:00 PM**
To: isupportadsurfdaily@gmail.com

I have sent the following letter to US Attorney General - william.cowden@usdoj.gov ,Tallahassee
Democrat - gchelette@tallahassee.com &
WCTV- news@wctv.tv. Let me know if I can help in any way.


Dear Sir,

I am very new to ASD (June 08) and want to let you know why I decided to become involved with the
business. I have one e-book completed and several other e-book/video products in the works which I want to
market on the internet. Last December, I began studying internet marketing so that I can promote my
products and therefore make money online. What I have learned ( and I have spend several thousand dollars
on this education so far) is that with Web 2.0, marketing is done through social networks. You have to get
very good at blogging, building a following and building a list for people to even see your products. Without
that, it's like having a billboard in the middle of the desert....almost no one sees it.

Another way to sell products and make money is to buy adwords or pay per click advertising
for my product. That means that I would pay google for people to open my web page... no guarantees for
conversion or sales. I don't know the amount, but I'm sure Google makes millions of dollars on this.

When I was introduced to ASD, I saw an opportunity for my ebook <u>Conflict Resolution Skills: The Art of
Fair Fighting</u> found at <u>www.maximizerelationships.com</u> to reach a market within an already established
social network of over 100,000 people. My site went "live" during the revamping of the website when things
were not working well, but I still had 13 views in a 2 day period. I was thrilled! I did not get a chance to see
any conversion into sales because the website was shut down by the government. I was expecting to make a
nice income from the sale of my products within the ASD network. People within networks tend to buy from
each other rather than from an unknown source.

As I understand it, the rebate system to view other members' sites is a way to continue to build the large
social network. Larger advertisers pay for ad space when they know they will reach a certain amount of
people. This is being done on the internet everyday. I believe that ASD has already secured larger advertising
as an additional revenue stream because the last few days that I surfed, I saw one ad for a Marriot and one
ad for Macy's.

The person who introduced me to ASD and everyone with whom I have come into contact, is of the
highest ethical character. In my own profession, the first standard is to "do no harm". I have introduced about
nine people to ASD which I **never** would have done if I did not believe in the program 100%. I understand that
Mr. Bowdoin has been a follower and teacher of the principles of Napolean Hill and Andrew
Carnegie. Because of that, I believe that he is sincerely trying to help others achieve their dreams.

I would be glad to talk with you in person about my experience if that would be helpful

Respectfully,

Nancy Hay, MA, LPC
ASD Member # 41948



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# REGARDING AD SURF DAILY INVESTIGATION

1 message

---

**Tom Blake <bfsolutions@cableone.net>**                    Tue, Aug 12, 2008 at 10:57 AM
Reply-To: bfsolutions@cableone.net
To: william.cowden@usdoj.gov, ag.mccollum@myfloridalegal.com
Cc: gchelette@tallahassee.com, news@wctv.tv, rrbzn@infowest.com, thefavagroup@gmail.com,
isupportadsurfdaily@gmail.com

To: William Cowden, U.S. Attorney General of the District of Columbia
    Bill McCollum, Florida U.S. Attorney

CC:  Friedman and Feiger, Attorneys at Law
     Tallahassee Democrat Newspaper
     WCTV, Tulsa News Station
     The ASD Legal Team
     Rayda, ASD Trainer
     Robert Fava, ASD member

Gentlemen:

I have been an advertising member of ASD since May, 2008.

The facts that I personally have experienced with ASD:

1)  I began with ASD by utilizing there free service to help promote a
website just started up by my brother and sister-in-law.  I soon discovered
however that I could be paid a rebate to surf additional sites with ASD.
Since I was already surfing my daily required sites anyway to earn credits I
decided to purchase some advertising credits.  Just figured if I was going
to be surfing I might as well get paid for it.  The results have been a
tremendous increase in traffic for the site I am promoting and I was getting
credited just as promised by ASD and earning rebate checks.

2) I was told emphatically that I must attach my website to the ASD rotator
as quickly as possible, and would be allowed only a few days' grace period.
I also strongly encouraged my downline to prepare and attach their websites
as quickly as possible after joining, to remain in compliance with the terms
and conditions that are clearly stated.

4) I was required to become familiar and educated in all aspects of ASD by
reading ALL terms and conditions of the sales contract, and encouraged to
attend training seminars frequently provided by ASD.

5) I was never coerced or encouraged, by my sponsor, my upline or anyone
associated with ASD, to purchase more advertising than what I was
comfortable with, considering my budget restraints.

6) Whenever I purchased advertising on ASD the purchase was applied to my
account as soon as it was humanly possible to do so, and always within the

..ated time frame.

7) Within seconds of attaching my website to the ASD rotator, it was placed
and viewed immediately and frequently, at least 35-40 times per day.

8) The rebates were paid just as was promised, and exactly as I was
entitled.

9) When there was human error, which was extremely infrequent, it was
corrected in a timely and professional manner, and to my satisfaction.

10) Whenever I requested a cash out (5 times total), I received it for the
exact amount I had requested, within an acceptable time frame.

11) All experiences with ASD met or exceeded my expectations, comparable or
exceeding the service and results of any other traditional (print)
advertising service with which I have dealt.

12) Yes, I was frustrated with the fact that the company server had been
down for a while due to upgrading, but I realized that this would only help
to further improve the service I was already receiving.  My experience had
been in the pass that whenever the company took the website or its servers
down for any reason it had justly compensated me by crediting me rebates
that I was unable to earn by surfing for that day.

13)  I do not have any reservation whatsoever with Mr. Bowdoin or his
company.  I have personally met him and find him to be most genuinly
interested in helping people to be successful in promoting and building
their businesses.

Thank you for allowing me the opportunity to express my feeling about ASD
and its founder Andy Bowdoin.  My hope are that whatever issues perceived or
real be resolved as quickly as possible so that I might continue to enjoy
the success I have had with this company thus far.


Respectfully,

Thomas W. Blake
ASD Member #27776



BETA                                    Support AD Surf Daily <isupportadsurfdaily@gmail.com>

# FW: I Support Ad Surf Daily! Sent to Bill Cowden
1 message

---

**~Frank Metzger <frank@frankmetzger.com>**                    Tue, Aug 12, 2008 at 3:34 PM
To: isupportadsurfdaily@gmail.com

---

**From:** ~Frank Metzger [mailto:frank@frankmetzger.com]
**Sent:** Tuesday, August 12, 2008 2:17 PM
**To:** 'william.cowden@usdoj.gov'
**Subject:** I Support Ad Surf Daily!

**Dear Mr. Cowden,**

First let me say that I understand that you have an obligation to protect our country's citizens and our interests and I commend you for that. However, I am shocked, saddened and frustrated by your recent action against Ad Surf Daily and the advertising members of ASD. I just hope that you can find a speedy resolve to your investigation so that those of us that are very content and in fact delighted with the service and opportunity that ASD provides us, can get on with the business of doing business and trying to build our dreams.

I'm a very satisfied advertising member of Ad Surf Daily. This new ASD Social Advertising Network business model was working very well for me and many other small business owners I know. Things have been very tough for me and my family these last few years and I finally found something in ASD that was beginning to work for me after so many other things did not.

At no point have I ever felt I was being mislead by Mr. Andy Bowdoin, ASD Cash Generator, it's officers, or by anyone of its business partners. I thoroughly understand the Terms of Service and that I was purchasing advertising with the ability to earn rebates by viewing other member's websites. I paid for the advertising… rebates or no rebates.

I'm a hard working small business owner/entrepreneur and at 47 years old I've been self-employed most of my adult life in various business ventures including a decade as the owner of a successful $CO_2$ Laser Distribution business and also the owner of an aluminum travel case manufacturing business. I am very knowledgeable about advertising and building a business brand so this new approach to advertising really intrigued me.

I joined Ad Surf Daily as an Advertising Member on June 19th of 2008. This business model and innovative method of advertising was new to me but I had heard good things about Ad Surf Daily from a number of my trusted business associates. I thought I would give it a try so I signed up and purchased some advertising.

I put 3 of my business websites in rotation to be seen by other ASD members as they performed their website

Gmail - FW: I Support Ad Surf Daily! Sent to Bill Cowden    Page 2 of 5

Case 1:08-cv-01345-RMC    Document 9-6    Filed 08/18/2008    Page 38 of 57

viewings to earn rebates. I started receiving leads right away and already have a few sales pending. My products are high ticket items and generally require large numbers of prospects for a sale conversion. In this targeted environment of entrepreneurs, I find that my cost per conversion to sale will be much less than using Google, Yahoo or other on or offline venues. Google, Yahoo and other BIG recognized Internet advertising venues are incredibly expensive and cost prohibitive for most small business owners to effectively compete on the Internet in today's market…..AND advertising effectively online requires great deal of specialized training for any measurable success which is something most small business owners cannot do.

I'd also like to state that I have a Favorites folder full of websites I have bookmarked while doing my own required surfing to earn rebates. I will definitely be making purchases from a number of these websites… everything from household products and travel to business opportunities and education products. Chances are very high that I would have never been exposed to these websites, products and services had I not been surfing to earn my own advertising rebates.

I've tried all types of advertising in my entrepreneurial career at a great cost with varying degrees of success. One constant, whether it was print media or Internet Marketing is that the cost to advertise

was always very high. Whether my advertising campaigns were successful or not, I still had to pay Google, Yahoo, the magazine, the newspaper or advertising company. They had no vested interest in whether my advertising with them was a success or not.

I see the new "Social Groups" or "Membership" based Advertising Network - Ad Surfing Business Model that ASD is pioneering as something very revolutionary that will evolve into something extraordinary long term if it is not choked off by the government without truly understanding how this new advertising model works.

Businesses spend billions of dollars on advertising with the sole purpose of trying get people to go to their computers, type in their URL and view their websites with the goal to get them to purchase products. With ASD and this new advertising business model, targeted consumers (members of our Social Advertising Network) are paid rebates to view websites they may have never ever been exposed to if not for the rebate incentive to view them. To me, there is not a more effective way to incentivize a consumer group to view various products and services than by paying them rebates to do so.

I look at the billions and billions of dollars that Google, MySpace, Facebook and other Internet Corporations are earning via Social Networking sites and what I see is a very limited number of people at the top accruing billions of dollars in profits on the backs of their members or advertisers. There is no profit sharing going on with the members of those giants but rather the owners and shareholders are making those profits at the expense of their members and advertisers.

I feel very strongly that the ASD and the Website Surfing business model which shares profits with its Advertising Members is not only a much fairer way to do things but also a more effective long term strategy….especially as this advertising model evolves and the advertising audience becomes more categorized and consequently more targeted. Imagine a million or more members all being paid rebates to view websites of interest to them…That is Powerful and will attract big corporate advertisers and also creates long lasting business loyalty! The cost to advertise on Google, Yahoo and other Internet giants is way beyond the budget of most small business owners, not to mention that you need to be a marketing guru to understand how to make it work for you.

I clearly see the Social Advertising Network Incentivized Website Surfing business model paying rebates as a

force to be reckoned with in the future of Internet advertising.....And this model will help so many struggling small business owners finally achieve the success they desire and deserve in this great country of ours.

Thank you for your attention in reading my thoughts and opinion and God Bless!

**Frank Metzger**
**Small Business Owner & Entrepreneur**
**ASD Advertising Member #56777**
**Tel: 303-325-5830**

*P.S. Yesterday I received a copy of an email another ASD Member sent to you. While I am not as eloquent in*

*conveying my thoughts about ASD's revolutionary new advertising business model and the current legal situation,*
*I have copied it below as it summarizes my thoughts very closely.*

To Whom it May Concern:

My name is George Shears. I'm a retired psychologist with nearly 6 years of experience in Network and Internet Marketing. I became a member of Ad Surf Daily (ASD) on June 17, 2008.

I'm writing this in protest of ASD being shut down by the U.S. Attorney and also to show how the charge that ASD is a Ponzi scheme is an outrageous instance of mistaken identity. Although I can understand how someone with little or no understanding of internet advertising and without carefully evaluating all of the evidence could mistakenly arrive at this conclusion, it is nevertheless highly damaging and completely unwarranted.

I submit, further, that summarily shutting down ASD on the basis of this misinterpretation, without fully and objectively investigating all the facts is a blatant instance of the U.S. government unjustly interfering with free enterprise and with my participation in a completely legitimate online business. I regard it as a flagrant violation of my rights and the rights of all other ASD members and want it to be rectified immediately.

According to Wikipedia, "a Ponzi scheme is a fraudulent investment operation that involves promising or paying abnormally high returns ("profits") to investors out of the money paid in by subsequent investors, rather than from net revenues generated by any real business."

By this definition, ASD is clearly NOT a Ponzi scheme any more than a diamond is not a piece of coal—even though they are both comprised of carbon and may be confused with each other by someone with an untrained eye.

If ASD did not offer a valuable product to its members, I agree that it would fit the above definition of a Ponzi scheme. And, at this point in its early evolution, it may well be that even some of its own members do not fully recognize the enormous immediate and future value of the product that they have purchased. It's readily apparent that, in filing complaints against ASD, the U.S. Attorney and the Florida Attorney General have also not recognized this highly valuable product. If and when they do, I hope they will acknowledge that their charges are completely specious and unfounded.

So what is this product? Very simply, it's a profoundly simple and highly effective way of advertising ANY

Gmail - EW: I Support Ad Surf Daily! Sent to Bill Cowden    Filed 08/18/2008    Page 40 of 87    Page 4 of 5

Case 1:08-cv-01345-RMC    Document 9-16

business on the internet. All that is needed to comprehend its enormous potential value is to consider the vast billions of dollars in profits that Google, Yahoo, and MSN have generated—and continue to generate daily—through very similar advertising.

More specifically, the product that ASD provides to its members is a example of a "traffic exchange," which is one of the most well-established and commonly used methods of internet advertising currently available to internet marketers . All that one needs to do to become aware of its prevalence is to do a Google search for "traffic exchanges," which includes 761,000 listings.

For those who are not familiar with traffic exchanges, here's the Wikipedia definition:

"A *traffic exchange website receives website submissions from webmasters that join traffic exchange networks. The person who submitted the website then has to browse other member sites on the exchange program to earn credits, which enable their sites to be viewed by other members through the surf system. This increases the number of visitors to all the sites involved."*

The particular traffic exchange product provided by ASD to all of its members is uniquely powerful in that it not only offers them an effective immediate way to advertise their own personal business websites, but—even more importantly—it also positions them to profit from ALL OF THE ADVERTISING that is purchased from ASD by ALL OTHER business owners and/or corporations. Given the ever-increasing shift of advertising to the internet, the potential value of the ASD product in this regard, then, is truly immense. Fundamentally, it's not unlike having part ownership in, say, Google, Yahoo, or MSN.

It's very important to understand that the potential value of this ASD product is in direct proportion to the total number of participating ASD members; that is, since all ASD members are required to view at least 12 websites of other advertisers each day in order to earn rebates and credits to have their own websites viewed, they effectively become a large "captive audience" for ALL advertisers using the system. The greater their number, the greater the exposure that these advertisers have for their respective products/services.

Correspondingly, the attractiveness (as well as the cost) of this advertising is directly proportional to the number of "eyeballs" that will see it. This, for example, is why large numbers of corporate advertisers are willing to spend millions of dollars for a 30-second Super Bowl advertising spot.

In keeping with these basic advertising facts, the ASD business plan entails growing the membership base as fully and as rapidly as possible in order to attract a maximal number of large corporate advertisers. Up to this time, this has been accomplished very successfully through rallies in many large U.S. cities. While these rallies may appear on the surface to be the promotion of a so-called Ponzi scheme, they are actually an optimal means of increasing the value of the main ASD product for all members and to make ASD financially self-sustaining (and increasingly profitable) as quickly as possible.

The success of this strategy is already evident, for example, through the inclusion into ASD of the large online shopping mall, GreenBackStreet.com, which has now become a major additional source of revenue for ASD and its members.

Quite apart from the potential immense added value of large corporate advertisers using ASD to promote their products and/or services, however, ASD already offers its members a highly effective way to promote their own business products/services. It also provides a very powerful way for business owners to create and maintain brand awareness through repeated exposure of potential customers to their products/services.

Although I have been an ASD member for a very short period of time, I can personally attest to the value it has already had for me in promoting my main online business.

Immediately after becoming qualified at the VIP Executive Leadership level in ASD through the purchase of a $500 ad package on 6/29/08, I chose to advertise one of my affiliate websites, which is a sales page for a weight loss product I'm selling—EasySlimRX. Since I've just started marketing this product, ASD was the ONLY place where I advertised this sales page.

I was delightfully surprised to get a sale almost immediately after placing my website in the ASD rotation. Moreover the person who became my customer through ASD has already placed two additional orders for the

Gmail - F.W.: Support Ad Surf Daily! Senator Bill Cowden    Filed 08/18/2008    Page 41 Page 5 of 5

Case 1:08-cv-01345-RMC    Document 7-6

product. This has strongly reinforced my initial satisfaction.

Anyone familiar with online marketing will recognize the tremendous attractiveness of being able to acquire repeat customers in such a simple, easy, and highly cost-effective way—and, moreover, to generate an additional stream of income in the process.

Given my understanding that my website is being presented for others to view between 40 and 60 times a day, the click through rate that I've gotten thus far is much better than with other, very expensive methods of online advertising I have used in the past. It has become absolutely clear to me, therefore, that the advertising venue offered by ASD is dramatically more cost-effective than any other form of online advertising that's available to me. Not only do I earn profits through my main online business, but I earn rebates from ASD as well for the advertising I purchase.

As ASD continues to grow, it's obvious that an increasing number of savvy online marketers will choose it as an advertising venue over other, much more costly options. Pay per click advertising on Google, for example, commonly costs up to $5.00 (or more) each time someone clicks on a particular ad. And, unlike with ASD, there is absolutely no assurance that the ad will be viewed for at least 15 seconds. (At this time, the ASD advertising cost per view of a website is only $1.00.)

In summary, then, based on my initial experience in advertising with ASD, it seems to hold huge promise of becoming a highly effective way for increasing my online marketing income.

Due to the heavy-handed actions by the U.S Attorney and the Florida Attorney General, however, I (along with around 130,000 other ASD members) have now been deprived of my right to pursue my business freely; consequently, I (along with thousands of others) am losing valuable revenue on a daily basis. I regard this as highly unfair and in violation of my basic rights as a U.S. citizen.

I regard the action of shutting down ASD and impounding all of its funds, along with those of its member without a fair and unbiased examination of the evidence, as an unwarranted and egregious affront to American justice and the basic principle of "innocent until proven guilty." I earnestly hope that those who have perpetrated this injustice will quickly acknowledge their error and rectify it immediately.

Sincerely,

George Shears



Support AD Surf Daily <isupportadsurfdaily@gmail.com>

# ASD
1 message

christyjeske@msn.com <christyjeske@msn.com>                    Tue, Aug 12, 2008 at 2:06 PM
To: isupportadsurfdaily@gmail.com

To Whom it May Concern,

I am a member of ASD. I have been a member for a very short time. I believe in this Business or I would not have gotten involved.

I have been in Real Estate all my live, need I say anymore. My family has been devastated in this recent market with unfortunately several properties in foreclosure. That is a very degrading thing to have to go through when that has been your livelihood for as long as you can remember and your credit is the most important thing you have guarded all your life.

With that said, my husband and I have both started new small businesses. ASD was the perfect scenario for our businesses to have people look at what we are doing.

Where in our Society can I have so many people look at my product and I theirs with out buying lists (spending more money) and sending out emails to people that do not want your emails!

I cannot stand receiving so many unwanted emails as I know I am not the only one. It is very time consuming to delete, unsubscribe unwanted emails!!!

Our lives should be focusing on what I choose to do, not what I have to do because of the need of others to get their business seen and heard.

NO WHERE can you have so many people really sitting and viewing my website!! My product is not for everyone, but at least it is being viewed by people want to see it and happy to see my website not unwanted junk mail that they just erase without even viewing it as I do.

Please help us. Just because it is different does not make it wrong. Many lives are at stake here and with the devastation of our Real Estate Industry that is affecting many many more industries in our Country. Our Government cannot be so unattached from our Society that they don't get this.

Wake up!! Times change with changing times.

Christy Jeske
ASD #66456



Support AD Surf Daily <isupportadsurfdaily@gmail.com>

# ASD member Testimonial
1 message

**Catherina Parker <lifewithzerolimits@yahoo.ca>**                    Tue, Aug 12, 2008 at 3:46 PM
To: isupportadsurfdaily@gmail.com

To ASD Defense Team:

Hi

I came across ASD quite by accident early in February, of this year. I came across it at a time, when I was just about to quit trying to make a living online.  Up until that time I was a statistic, just a representative of the 97% who do not make it online.

I started by joining my first online program back in 2005.  I was newly separated, and desparately needed an income, to support two daughters.  My spouse was unable to support us at the time, so it was left up to me to do so.   Having being a stay at home mom for many years, I wanted to find a way to make an income, that would allow me to remain at home, so I looked to the internet to accomplish this.

What I found were high sign up/join up fees, empty promises, impossible odds and requirements.  The result was, instead of earning an income, I lost a substantial amount of money, money I could not afford. I also lost my self esteem and self confidence, and if it wasn't for the small inheritance left to me by my parents, my children and I would have found ourselves in dire circumstances.  Along came ASD, which I almost dismissed, as another online advertising site, which would just take your money, and like every other online advertising site, give you back nothing in return; no results and certainly no money...no income!

After checking it out and doing my homework (a hard learnt lesson), I joined, and in my first month as an ASD member, I realised how wrong my initial assumption, had been!

Not only have I made money, not only has ASD's advertising reaped results, but it has rewarded me:

- daily by paying me rebates to look at ASD member advertising

- providing me with inexpensive advertising that works for my needs

- by allowing me to help so many others find an online program that WORKS!

ASD delivers exactly what it promises!

In the past, I have joined at least 10 online programs. In order to earn an income, I was required to:

- build a substantial downline

- accumulate a substantial personal sales volume or volume points

- accumulate a substantial group sales volume or volume points

I WAS NOT ABLE TO DO EITHER.

However, with ASD, I have been able to earn a substantial income, based on my own efforts, and not on the efforts of my downline. To my total amazement, I have been able for the first time in four years, build a downline, not only in ASD, but in an additional advertising program that I have been

advertising on ASD.

EVERYONE of my downline members have made money as members of ASD, whether they bought $10.00 worth of ad packages, the WONDERFUL PRODUCT THAT ASD SELLS, or whether they bought $100.00 or more.

The Attorney General's Office has not only frozen our funds, has not only put the small businesses of 120 000 members at risk, but has put ASD's and every member's credibilty at stake!  How ethical or moral is that?

And yet the man, Andy Bowdoin, whose only goal with ASD, was to help as many people as he could achieve financial independence, allowing them to live a life that we all rightly deserve, has been labelled as unethical and immoral! This is outrageous!

As a downline member of mine so rightly commented, "How come the government can hurt over 100,000 people in order to protect the 30 who complained?"

Andy Bowdoin, did whatever was required to keep ASD legal and compliant, requesting that members file W-9 documentation, as well as, retaining lawyer/s strongly versed in compliancy.  An unetical and immoral CEO, would not have opened up a business in his home town, and employed citizens that live there.  An unethical and immoral CEO would have opened a Swiss bank account, and not an account with the local Bank of America.

Andy Bowdoin is a deeply religious and ethical gentleman with a strong desire to help others.

We are all members in a ADVERTISING company.  We advertise our businesses, and the President, Andy Bowdoin, shares the profits from the company in the form of cash rebates with each member.  All companies share their profits with their stockholders or members, paying them dividends or bonuses at the end of each year.  Andy Bowdoin, instead of waiting for the end of each year, shares the company's profits daily, with all its members, not only with the upper echelon, and not only once at the end of each year.

Andy Bowdoin should be rewarded for his efforts in helping everyone, everyday.

Please help us get our company back up and running, so that we can begin to repair the damage inflicted on our individual businesses and ASD, a legal advertising company, that chooses to reward ALL its members daily, rather than a few, once a year.

With sincere thanks for your help
Catherine Parker
ASD Member ID# 12818
905 525 8703 Ontario, Canada
011 30 9880370  currently vacationing in Greece until 29 August

**Yahoo! Canada Toolbar :** Search from anywhere on the web and bookmark your favourite sites. Download it now!



## asd

1 message

**Sandra Hinic <slhinic@gmail.com>**                                    **Mon, Aug 11, 2008 at 11:14 AM**
To: isupportadsurfdaily@gmail.com

Dear Sir,

I am writing this in regards to ASD, Ad Surf Daily and La Fuente. I am very surprised and
disappointed in the manner the government has conducted this investigation. I support ASD and
hope you will see how this business plan has helped the members of ASD.

For us specifically the program has given us a vehicle to present the web sites of our home-based
business. We have been in our business for about 1 year and have not been able to find a way to
direct traffic to these sites. Yes, if we talked to people face-to-face we could direct them to our site
but that plan did not contact a large group of people on a regular bases on the Internet. Since we are
not familiar with how to get about the Internet with regards to advertising ASD and LaFuente
fulfilled this void.  Our sites were starting to get responses. And has you must know it does take a
while for people to respond as in any advertising.  Also, once a person does purchase a product those
same people tell others who are not on ASD and LaFuente  and on it goes. Word of mouth.

Besides this ASD and LaFuente also provided us with a large a ray of advertising of other companies
we have never seen. Some of these sparked the interest for us to use for our home-based business.
Some were products that we were contemplating to purchase. Some were of interest of places to go.
The point is ASD and LaFuente opened our eyes to how much was on the Internet and options of
thing we could do for our business or the option to have more than one home based business.

Also ASD and LaFuente are about providing added streams of income, which is important in the
hard economic times.  I say about because our government shut it down with out understanding the
business plan.  The added stream of income of course would only come if members chose to look at
others web sites, that is up to the discretion of each member to make that business decision.

Also I cannot say enough good things about Andy Bowdoin, He has always been up front, honest
and caring. His concerns for the members of ASD and LaFuente and has shown this through these
rough times. He has not hidden from what is going on but is forthright and has much integrity in
dealing with all of the members. I defiantly support Andy and all the Staff of ASD and LaFuente.

ASD and LaFuente gives hope to so many people in many different ways. Please look at this
business plan again and again, and listen to the people.


Thank you,

Sandra Hinic
1248 Morris Ave
Green Bay, WI 54304

920-497-3299



Support AD Surf Daily <isupportadsurfdaily@gmail.com>

## good results letter
1 message

ellenOmeara <ellen@wishworksworld.com>                                      Fri, Aug 8, 2008 at 9:44 AM
To: isupportadsurfdaily@gmail.com


August 6, 2008


To whom it may concern,


Why do I as a businesswoman advertise?  To get views ... EYEBALLS.    If I put an ad in the
newspaper I have no idea how many people see it ... if any.  With ASD I can see exactly how many
people have viewed my advertisement.   While ASD members are required to view sites for 15
seconds to be candid, all I'm asking for is 3 seconds, and I know that an ASD member has to see my
site for at least 3 seconds even if they look away the other 12 because of the design of the system.


How many responses I get and how much product/service I sell is not ASD's responsibility anymore
than it is the responsibility of a newspaper, magazine, etc.  My sales depend on what I'm offering,
my presentation and closing skills.   IF I am getting responses it is MY responsibility to make the
sale.  If I am not getting calls and/or sales it is MY responsibility to adjust my ads to attract
attention.


The advertising challenges I have experienced prior to ASD is the newspaper, magazine, etc
wouldn't give me my money back if I didn't get any responses.  I just had to tweak and fork over
more money to try again.   With ASD's rebate program my advertising dollars aren't down the
drain.  If I don't get the response I want I know I need to tweak my ad to catch people's attention.
The good news is with ASD I don't have to fork out more advertising dollars to do that.


Do I have a product I want to sell through ASD?  You bet I do!  Currently I am introducing into the
country the most nutrient dense organic single source enzymatically alive whole food on the planet
... something people can consume on the fly and save money at the grocery store.  I have a product
for anyone that's breathing ... so every ASD member is a viable potential customer for my product.
How do I get that message across to make it stand out?  With ASD I can work on as many ad
versions as I want until I get one that pulls strong.   I don't have that liberty with any other
advertising company.

The ASD advertising system is PHENOMENAL.  Please!  Get the system back up and let us get back to work!


Respectfully Submitted,




Sue Ramson

NJJ Global Enterprises

715-354-9506

www.lifeinacan.net - Save on groceries.  Try Risk Free 30 days

www.lifeinacan.com - Reps Needed for new product expansion



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# Why I Use Ad Surf Daily

1 message

**Joan Hughes <joanhughes@rogers.com>**                                     Fri, Aug 8, 2008 at 1:35 PM
To: isupportadsurfdaily@gmail.com

I have been in business for myself for many years and have spent a lot of money on advertising. Over the years, it has become more and more difficult to find a way of promoting my business that would work. In fact, I came to the conclusion last year that I was wasting my money using traditional advertising and that the internet was the way to go.

I was in the process of learning how to use the internet for promoting my products and services, when I learned about ASD. Wow! What an amazing discovery that was for me! Let me explain why:

1. First, while there was an initial cost for purchasing ad packages, I knew that, over time, I would recover these costs. This was huge, when I thought about the thousands of dollars I had previously thrown at advertising with such poor results.
2. I was thrilled that, once my websites were posted, they would be constantly put in front of a very large audience of people, many of whom would actually look at my websites to find out more about my products.
3. I knew that I could expect that, based on percentages I had experienced in other forms of advertising, a certain number of people would decide to use my products.

You cannot imagine what a load was taken off my shoulders when I started to use ASD's advertising structure. I have a highly effective health system for people who want to restore their health. There is even a side benefit of weight loss. Because of the high level of quality of the program, I started to get interest in my products from doctors of naturopathy, who are also members of ASD – the very professional audience I had tried to reach through my traditional advertising but had not previously succeeded in reaching.

I cannot tell you what that means to me! I am completely committed to assisting people to  feel great and look great. To be able to work with other health professionals of this calibre is a dream come true.

Since ASD has had to stop its operations, there has been a definite void in my business without this ability to "show my wares" to such an open and enthusiastic audience. In ASD, we are all business people and, as such, we appreciate other people who are offering their products and services. So this isn't just about advertising to others. There simply isn't a better way for me, as well, to be exposed to what is "out there" in the  business world. I have found things that I never would have known existed, if it hadn't been for ASD.

Without the opportunity to continue showing my website and viewing others' websites on ASD, I find myself in quite a quandry. There simply is no other advertising option like it available on the net or elsewhere. I do hope that it is reinstated soon, so we can back to "business as usual"!

Thank you,

Joan Hughes
613 435-4000



Support AD Surf Daily <isupportadsurfdaily@gmail.com>

# Our website being advertised with ASD

1 message

**Paul <paul@papacc.com>**          Fri, Aug 8, 2008 at 11:39 AM
Reply-To: paul@papacc.com
To: isupportadsurfdaily@gmail.com

Dear Sirs,

Our website www.invantagemedical.com has been advertised through your company since the beginning of May 2008. **We have already had one response from a qualified biller looking for a job with our company.** And my projections are to acquire one new client through advertising with ASD by the end of 2008.

### Advertising rationale for InVantage Medical.

Our stand-alone website on the internet had very few visits. With ASD our site has been shown over 400 times a day. Even though ASD does not provide targeted advertising right now we know that health care industry physicians and workers will see our site. We know that there will be more of our type of potential clients surfing ASD in the future. Repeated exposure to our site may generate word of mouth referrals which may result in a sale. ASD has given us a way to advertise our business to the healthcare industry and it is a cost effective alternative to the traditional "pay for clicks" internet advertising.

**Watching advertising is a very important service that I provide to advertisers.**

If we also pay to advertise with ASD, then we may receive a rebate for our service - viewing advertising. With this rebate we can buy more advertising or collect it in cash. When we collect the rebate in cash we have to pay income tax and social security tax on the rebate earned from ASD. Everyday companies pay for advertising without any guarantee of results. ASD advertising provides proof of advertising viewers. In return, ASD shares a portion of the advertising revenue with their viewers in the form of rebates.

### Our type of service - Viewing Advertising - is exactly what companies expect from their dollars spent on advertising.

Exploiting our type of service is so important to the economy that we are barraged with advertising everywhere we turn. Pop up ads, email spam, TV ads, Radio ads, magazine ads, junk mail ads, bill board ads, signage ads, ads on cars and trucks, window ads, ads pulled behind airplanes, etc. It's about time we received some of that advertising revenue since we are the ones performing the service.

**Why are we not able to be reimbursed for our time to provide our valuable service to advertisers?**

ASD has given us a way to be paid for our service. Everyday we pay for the privilege of being barraged with advertisements no matter where we turn. Everyday we pay for Satellite TV and have to see and listen to advertising. We purchase a magazine and half of the content is advertising. Everyday we pay for Satellite Radio and have to listen to advertising. Everyday we pay to use the internet and have to watch advertising. With ASD we may now paid for our service that we have had to pay for the privilege of providing to the very same advertisers.

Rebates for service provided is not capital gains income. I do not consider ASD an investment company because rebates may only be paid for service provided. That is not capital gains income. Rebates are another source of personal income we pay taxes on and are reported on a 1099.

Thank you for your attention.

Paul Walling, CEO

InVantage Medical

paul@papacc.com

877-772-8296



# Personal Experience with ASD Ad Cash Generator

1 message

---

David Godfrey <david@socialcirclenetwork.com>                    Fri, Aug 8, 2008 at 3:51 PM
To: isupportadsurfdaily@gmail.com

To Whom It May Concern:


I am writing in regards to the recent suit filed against ASD Ad Cash Generator (ASD) by the US Attorney's General office in Washington, DC; Case Number 1: 08-cv-0 1 345.


As I understand, this suit alleges that the company committed wire fraud by operating what is referred to as a "*Ponzi Scheme*". Having reviewed how the Attorney's General Office defines a "*Ponzi Scheme*", I must vehemently disagree with this characterization of ASD.


I became aware of ASD in January 2008. Between January and April 2008 I conducted my own personal research on the Company and its founders. I did find that Mr. Bowdoin had been involved in other legal cases, but that those had been resolved to the satisfaction of the Court and the plaintiffs.


I also read the term and conditions of participation with ASD very carefully. It was my understanding of these terms and conditions that I would be purchasing Internet Advertising for my personal business website. In return for this purchase and viewing a defined number of advertisements from other subscribers, I would be provided with a rebate on my purchase that I could use to either buy more advertising or to use personally. Should I decide to use this rebate for personal use, I would be required to submit a completed W-9 form for tax purposes and that I would be responsible for any taxes associated with it.


Also in the Terms and Conditions, and in information provided by ASD Sponsored Training Classes, it was stressed that I was not required to recruit additional members, make regular payments to ASD, or enter into any type of paid subscription to services

provided by or suggested by ASD or its members. I was required to make an initial advertising purchase of USD $10.00. I was also instructed by ASD Staff on the procedure required to ensure my purchase was properly processed.

I was also instructed through ASD sponsored training that the rebate program could end at any time and that if I was using the services of ASD for anything other than Advertising that I was "in the wrong place". Even though the rebate program did offer a financial incentive, it was stressed that there were no guarantees that the program would continue or that the rebate percentage would remain constant.

I joined as a member in April of 2008. I submitted my USD $10.00 payment for advertising packages and began viewing the advertisements of other members as required. I also participated in the Weekly ASD training calls and was able to gain valuable instruction on marketing techniques, other areas to advertise, how to create and implement internet marketing campaigns, and how to improve my internet presence. In addition to the training, day to operation of the company was also discussed. At least once a week, Mr. Bowdoin would address the class and inform us of any problems the company was experiencing, any changes to policy that had not yet been posted to the ASD Members Website and to address any questions that a member may have regarding their account or the company.

In all of the "Question and Answer" sessions, Mr. Bowdoin was consistently conservative in his interpretation of company policies. He also stressed the requirement for the member websites to actually promote a product or service and that ASD would begin screening the member websites in the July 2008 timeframe to ensure that a site was promoting a legal product or service and that the content was not objectionable or Adult Oriented. Previous to this, the members were repeatedly instructed to report such sites for review by ASD.

In May of 2008, I submitted my business website, http://www.socialcirclenetwork.com, for inclusion on the rotator. I used the credits I had obtained from my daily viewing of other member sites and the initial $10.00 purchase to achieve this.

Between May and July of 2008, I received a total of 13,394 visits to my website from ASD advertising. From this we gained 5 paid subscriptions to our site. We gained 2 subscriptions from the combined effort of e-mail campaign, classified advertising, social networking and word of mouth.

Had I utilized a pay-per-click campaign, Google AdWords for example, to receive the same number of visits would have required an advertising budget of approximately USD $51,500.

That figure is based on Google's "Recommended" bid of $3.63 per click on the keyword "money making opportunities". As this is the central theme of my website, this would have been a very relevant search term. Although I hope at sometime to be able to afford a large advertising budget, as a small startup venture I am not able to afford $51,000 for advertising. ASD provided me with the opportunity to get my services out to the public in a very affordable vehicle. Just as was promised in the advertising and sponsored training sessions.

I had also began running a campaign on the Golden Panda site for another startup venture, http://www.shepherdsranchangusbeef.com. This campaign was started on August 1. In the short time it was allowed to run, I received 326 visits to the site with 5 requests for further product information. As I was a "free member" of Golden Panda, this exposure only "cost" me the time required to view the advertisements from other members. Using the Google Recommended pay per click bid of $2.92 for the term "grass fed beef", this exposure would have cost me approximately $952.00. Again, way above what I can presently afford in advertising and again, my product was presented as promised.

I understand that some individuals may not possess the research skills that I have, or the understanding of business practices that I have. I know that the ASD website was unavailable and being associated with computer systems in my primary profession, I also understand that significant re-design and distribution of computer and telecommunication networks requires some considerable amount of time. The time that ASD has been unavailable does not appear to be excessive given my experience with other similar projects.

During the "down" period, ASD Staff repeatedly informed the members that if they were concerned with this and felt that they needed to withdraw from the company, that all possible effort would be made to achieve the "cash out" as quickly as possible. It was suggested that the member send a registered letter or traceable over-night shipment to the ASD staff in order to expedite the process.

I do not feel as though ASD or any of its management took advantage of me, attempted

to defraud me, or presented information that was not truthful. I was very appreciative of the efforts that ASD and Mr. Bowdoin expended in explaining the company's situation and offering solutions to those who felt compelled to withdraw. I was also aware that at the present moment, most of the company funding was being provided by the membership. However, I also knew that the company was working with a Video Production company to produce a sales video that would be presented to large corporations and in the format of a TV Infomercial. This was discussed by ASD and a representative from the Production Company during a weekly call shortly after the Tampa meeting of June 2008.

As a former employee of start-up businesses and with the experience I have gained from attempting to start my own business, I understand that things may progress more slowly than anticipated. The fact that ASD grew from approximately 10,000 members in December of 2007 to the approximately 150,000 as of August 5, 2008, it is more than reasonable to expect that growing pains would occur. Mr. Bowdoin and his staff went out of their way to notify the membership of these problems and provided suggestions to ensure satisfaction with the company.

I have been provided with all the benefits promised by ASD and do not know of anyone associated with ASD that has not received payments, advertising service, or other benefits promised by the company. There have been some delays, at most 2 weeks, in processing request for a few people I know, but what was promised was delivered and the member was I kept informed of the process by ASD Staff.

I am hopeful that this situation will be resolved quickly and that I will again have access to an affordable and successful advertising program for my small business efforts.

Respectfully,

David Godfrey

Member Number 28289

6000 Jabo Hussey Road

Robbins, NC 27325

336.581.9692



**Support AD Surf Daily <isupportadsurfdaily@gmail.com>**

# Testimony
1 message

---

**dung trinh <iggyigette@yahoo.com>**                                    Fri, Aug 8, 2008 at 12:05 AM
Reply-To: iggyigette@yahoo.com
To: isupportadsurfdaily@gmail.com

To whom it may concern:

My experience with ASD has been very positive.  I participate in Medical Mission
trips through a non-profit charitable organization (www.kingdomflight.org)
and wanted to promote the Faith Base Charity through ASD.  The Founder of the
Charity has informed me that his online Charity website has had an additional
80-100 "views" a day as a result of  advertising through ASD.


Sincerely,

Dung Trinh, M.D.
Clinical Assistant Professor of Medicine
University of California at Irvine College of Medicine
Cell Phone # 714-334-8739

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530,

      Plaintiff,

vs.

8 GILCREASE LANE, QUINCY
FLORIDA 32351,

     and

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

     AND

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
OF (1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY, JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA AD BUILDER,

     Defendants._____/

Case: 1:08-cv-01345
Assigned To: Collyer, Rosemary M.
Assign. Date: 8/5/2008
Description: General Civil

## DECLARATION OF ANDREW E. SCHWARTZ

1.     My name is Andrew E. Schwartz. I am licensed to practice law in the State of

Florida. I am an associate attorney with Akerman Senterfitt, resident in the firm's Miami office.

2.      In the late afternoon of August 7, 2008, the Akerman Senterfitt law firm established an e-mail address to receive letters and memos from Ad Surf Daily members wishing to submit their comments about AdSurfDaily. Members of Ad Surf Daily were advised through Ad Surf Daily's member website that they could post comments regarding Ad Surf Daily to this e-mail address.

3.      Since the e-mail address was established through 12:00 p.m. on Friday, August 15, 2008, the e-mail address received 3,005 emails. To this date I have reviewed 1,241 of these e-mails.

4.      Of the 1,241 e-mails I have reviewed to date:

(a)      646 e-mails, or 52.05% of the e-mails reviewed, discussed how Ad Surf Daily increased the member's advertising exposure to their website for products and services;

(b)      509 e-mails, or 41.02% of the e-mails reviewed, expressed general support for Ad Surf Daily;

(c)      33 e-mails, or 2.66% of the e-mails reviewed, discussed the ability of members to earn rebates and commissions through the Ad Surf Daily program;

(d)      30 e-mails, or 2.42% of the e-mails reviewed, discussed how the member found useful products to purchase through the web-pages they visited on the Ad Surf Daily generator;

(e)      18 e-mails, or 1.45% of the e-mails reviewed, expressed concern for the future of Ad Surf Daily and/or Thomas Anderson Bowdoin, Jr. (known as Andy Bowdoin to the employees and members); and

(f)      5 e-mails, or 0.40% of the e-mails reviewed, were negative or hostile to Ad Surf Daily or Andy Bowdoin, Jr.

I HEREBY DECLARE, under penalty of perjury, that the foregoing is true and correct.

Executed on this 15th day of August, 2008.

ANDREW E. SCHWARTZ

August 10, 2008

Dear Andy,

I want you to know how much Ad Surf Daily has meant to me and Self Talk Partners. Of course you know that I am the author of the book entitled The Power of Self Talk. This has been my passion for the past 30 years -- to share the tools and techniques with people in order to enhance their personal and professional lives. I have spent thousands and thousands of dollars trying to get my message out to the masses. Nothing, I Say Nothing has worked as effectively as your company Ad Surf Daily.

Thanks to you and Faye and all of the members and staff at ASD I truly am very, very appreciative. I have received hundreds and hundreds of hits on my web site and have made numerous sales for my Power of Self Talk Toolkit. Even though we have only been members for a short few months we are already seeing tremendous positive feedback and name recognition/brand recognition.

Also, I want to thank you for inviting me to do the Web seminar on Thursday, July 31, 2008. Your suggestion of me speaking to the members in regards to "How They Can Become a Great Sponsor" was a tremendous hit. I am enclosing a copy of all the e-mails I received the next several days following the webinar. As you can see, our members were very appreciative and very eager to learn what it takes to be an excellent sponsor.

Andy, I know you, Faye and the rest of the staff and members have gone through a lot of challenges the last several days. I for one want you, Faye, the staff, our members, your legal team, the U.S. Attorney General's and the media to know how much I appreciate all that you and Ad Surf Daily has done for me, my family and associates.

At a time in which we truly believed that there was light at the end of the tunnel -- that we had finally found the vehicle to get our name, product and web site recognized not only here in the United States but worldwide we have found the government that we so dearly believe and hope in has unfortunately been misinformed and uneducated in what ASD is all about. We sincerely pray and expect the U.S. Attorney General's office to thoroughly understand and give ASD their blessings to continue forward; not only for our goals, dreams and aspirations, but for the thousands and thousands of other members and people who you have positively touched and will continue to enhance their lives as well.

Your desire to help people has been manifested day in and day out and I hope the public at large will soon know the truth about Andy and Faye Bowdoin and Ad Surf Daily. You are truly a very generous person and may God continue to bless you, Faye and all those surrounding and associated with ASD. This will only make us all stronger in the long run.

With sincere appreciation and respect,

*Jim Will, Ph.D.*

Jim Will, Ph.D.
Self Talk Partners Ltd.

Enclosures

# Dr. Jim Will

2929 Buffalo Speedway, Suite 801 • Houston, TX 77098, USA • 713-622-4604, 832-203-5862 • Cellular: 281-236-6086
E-mail: jwill@jimwillphd.com • Web Site: www.jimwillphd.com

EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530,

       Plaintiff,

vs.

8 GILCREASE LANE, QUINCY
FLORIDA 32351,

     and

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

     AND

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
OF (1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY, JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA AD BUILDER,

      Defendants. _____ /

Case: 1:08-cv-01345
Assigned To:  Collyer, Rosemary M.
Assign. Date:  8/5/2008
Description:  General Civil

## DECLARATION OF CHARLES JOHN OSMIN

1.     My name is Charles John Osmin.

2.     I am the team leader of AdSurfDaily, Inc.'s special Customer Service Department,

known as Customer Service Investigators ("CSI").

3.    I was in the United States Navy (active duty) from July 1976 to December 1987.

4.    I worked for the United States Postal Service from approximately December 2003 until April 2008.

5.    I left the United Sates Postal Service because it was cutting back on hours.

6.    I am married and have two sons, one of whom is serving in Iraq, and two daughters at home.

7.    I am team leader Adsurf's CSI group, which serves as the bridge between Customer Service and Accounting.  One of our primary jobs was to locate ad packages for members.

8.    The Customer Service Department has approximately 25 to 30 employees, working three shifts.  The Department is open (or was open, until AdSurf was effectively shut down by the seizure of its bank accounts and computers) from 7 a.m. to 11:30 p.m.  The CSI group has (or had) three active employees, working from 8:30 a.m. to 5:30 p.m.

9.    When I was first hired by ASD, I was assigned to the Customer Service Department, answering telephones.

10.    Because AdSurfDaily recognized in late May or early June 2008 that the communications between the Accounting and Customer Service Departments was inefficient, a Special Customer Service Department, called CSI, was created.  I am (or was) was the team leader of this CSI department, which had access to accounting and software materials not routinely available to Customer Service representatives.

11.    CSI's goal was to develop better, more-efficient communications, both internally and externally, and to find the "lost" ad packages for members.

12.     In my position as team leader of AdSurfDaily's CSI Department, I usually worked approximately 60 hours per week or more.  A good portion of my daily work was devoted to reviewing and responding to e-mails from Adsurfdaily members.

13.     Despite the employees in the Customer Service Department and the CSI Department,   AdSurfDaily experienced several log jams as a result of its growth.

14.     I am aware that the Government contends that AdSurfDaily's Customer Service was "illusory" because it says that Task Force operators unsuccessfully attempted to contact the company's Customer Service telephone number.  AdSurfDaily did have a Customer Service Department and it had more than 30 employees devoted to answering phone calls and responding to emails to and from members.   In fact, I personally communicated by email each day with dozens and dozens of AdSurfDaily members in my capacity as manager of the CSI division.

15.     AdSurfDaily is an advertising company and the advertising works.  I know this from personal experience.  In fact, I have three businesses which advertised on the AdSurfDaily rotator:  a water supplement company, a vegan whole food business and a party/entertainment business.  All of these businesses received increased traffic through the advertisements on the AdSurfDaily rotator.

16.     My job at AdSurfDaily is the best job I have had in 30 years, and I am devastated that the Government has effectively shut down the business.

**I HEREBY DECLARE, under penalty of perjury, that the foregoing is true and correct.**

Executed on this $14_{TH}$ day of August, 2008.

By: _Charles John Osmin_
**CHARLES JOHN OSMIN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530,

      Plaintiff,

vs.

8 GILCREASE LANE, QUINCY
FLORIDA 32351,

     and

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

     AND

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
OF (1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY, JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA AD BUILDER,

     Defendants.            /

Case: 1:08-cv-01345
Assigned To:  Collyer, Rosemary M.
Assign. Date: 8/5/2008
Description:  General Civil

## DECLARATION OF GARY TALBERT

1.      My name is Gary Talbert.

2.      I am the Human Resource Manager, Assistant CFO and Website Editor of

Adsurfdaily, Inc.

{M2716388;2}

3.    I was present at the Adsurfdaily office in Quincy, Florida on the day that Secret Service agents executed a search warrant.

4.    The Secret Service agents did not ask me to help them locate what they wanted to find, and I did not hear them ask any other Adsurfdaily employee for help, either.  Instead, they instructed us to leave and to go home early.

5.    In the days after the Secret Service completed its search (removing all of the company computers and most of its business records), I found more than 550 additional checks, totaling more than $1.2 million, which the Secret Service left behind.  I delivered those checks to the Secret Service, along with the Adsurfdaily stamp which the Secret Service and/or the bank could use to assist in the negotiation of the seized checks, including the additional checks I delivered to the Secret Service.

6.    Although the Secret Service agents initially accepted the additional checks I found and voluntarily delivered, they ultimately told me to keep the checks and they returned them to me.

7.    Specifically, on Monday, August 11, 2008, I went to the Secret Service once again and attempted to drop off approximately 16 checks, totaling approximately $40,000. These checks were also made payable to Adsurfdaily.  The Secret Service agent specifically told me to not bring any more checks to the Secret Service.  I was instructed to not drop off any further checks, to keep the checks I was attempting to deliver and to send the checks to the members who sent them to the Adsurfdaily office.

8.    The Secret Service agents (or Task Force agents) also returned approximately $15,000 in checks which I had dropped off the previous Friday (August 8, 2008).

9.     Since the seizure of the Adsurfdaily bank accounts and the execution of the search warrants, Adsurfdaily and its executives have been swamped with telephone calls and emails from Adsurfdaily members who say they are upset over these developments and who want the business up and running as quickly as possible.  They have praised the Adsurfdaily program for generating additional traffic to their websites.

10.     The seizure of the accounts and the removal of  computers and files have caused the company to effectively be placed out of business. The seizure of the bank account balances have crippled the company, as it  cannot pay employees, vendors and creditors.

11.     Unless all or most of the seized funds and the computer equipment are returned quickly, and unless Adsurfdaily, Inc. is provided access to its business files, it is exceedingly unlikely that the business will be able to resume.

12.     Adsurfdaily's employees and their families depend on Adsurfdaily for their salaries, which provides critical support to their families.  Many of the employees have already contacted me to say that they are extremely worried about their ability to financially support their families without working for Adsurfdaily and without receiving salaries.

## <u>VERIFICATION</u>

**I HEREBY DECLARE, under penalty of perjury, that the foregoing is true and correct.**

**Executed on this 14th day of August, 2008.**

By: _____

**GARY TALBERT**