UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES OF AMERICA

    Plaintiff,

8 GILCREASE LANE, QUINCY,
FLORIDA 32351,

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA

    and

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
OF (1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY, JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA AD BUILDER,

    Defendants, and

ADSURFDAILY, INC., THOMAS A.
BOWDOIN, JR., AND BOWDOIN HARRIS
ENTERPRISES, INC.,

    Claimants.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case: 1:08-cv-01345

Hon. Rosemary M. Collyer

**CLAIMANT'S REPLY TO PLAINTIFF'S
OPPOSITION TO EMERGENCY
MOTION FOR RETURN OF SEIZED
FUNDS, AND TO PLAINTIFF'S
OPPOSITION TO CLAIMANT'S
MOTION TO DISMISS
AND REQUEST FOR EVIDENTIARY
HEARING
(WITH INCORPORATED
MEMORANDUM OF LAW)**

Claimant, AdSurfDaily, Inc. ("ASD") hereby submits its reply to the two responses filed by the United States (the "Government"). [DE #13 & #14] On August 18, 2008, ASD filed Claimant's Emergency Motion for Return of Seized Funds to Save Business and Jobs With Oversight and Monitoring and/or Evidentiary Hearing, and Motion to Dismiss and Supporting Points of Law and Authorities (hereinafter "Emergency Motion"). [DE #7] On August 25, 2008, the Government filed two separate responses in opposition to ASD's consolidated pleading.[1] [DE #13 & 14] In reply, ASD files this one reply that addresses both responses filed by the Government, and states:

## INTRODUCTION

*First*, in its Opposition to Claimants' Emergency Motion for Return of Seized Property [DE #14], the Government complains that ASD has not complied with certain particular procedures established in 18 U.S.C. § 983(f)(2), which requires that the claimant first seek release of the seized property from the appropriate official. [*Id*. at 2] The Government implies that counsel for ASD never contacted counsel for the Government, prior to the filing of ASD's Emergency Motion. That is not correct. ASD's counsel did have a forthright and comprehensive conversation with Government's counsel regarding the status of the seized property. In fact, the Emergency Motion itself references this discussion, as it mentions the Government's position concerning the return of computer equipment. [*See, e.g.,* DE #7, at 1, n.2]

Moreover, as explained in ASD's motion, the corporation needs <u>emergency</u> relief if it is to survive as a business. ASD also distinguished the relief it seeks here from the relief available under § 983. Specifically, ASD explained in its Emergency Motion that it does not seek an

---

[1] ASD's Emergency Motion was filed solely by Claimant ASD. [DE #7, at 1] However, the Government incorrectly asserts that the Emergency Motion was filed by "several of the current 'claimants'" [DE #14 at 1], and refers specifically to Claimant Bowdoin throughout its Response.

unfettered release of seized property.  ASD seeks a reasonable, court-approved, monitored compromise that would allow ASD to continue doing business while this litigation proceeds. ASD is prepared to thoroughly explain its detailed proposals for oversight and monitoring, as well as its modified business plan, at an evidentiary hearing, if permitted by this Court.  In addition, ASD is prepared to propose an experienced, independent monitor, who would be available for appointment by the Court.  In fact, counsel for ASD has had preliminary discussions with an attorney who has extensive background in compliance with the anti-pyramid requirements established by the Federal Trade Commission and with consumer protection law, and who indicated a willingness to act as a independent monitor .

While ASD acknowledges that § 983 provides a procedure for releasing funds in specific conditions, the relief requested here is consistent with § 983 procedures and the Due Process Clause of the United States Constitution.  ASD proposes such a compromise not for self-serving reasons, as suggested by the Government, but because it is the only solution that will avoid penalizing ASD (and its members and employees) prior to, and in the absence of, any judicial finding of wrong-doing.

***Second***, in its Opposition to Claimants' Motion to Dismiss [DE #13], the Government responds to ASD's contentions that the Affidavit and the Verified Complaint contain material defects, misstatements and omissions.  The Government asserts that no funds can be released and no allegations can be challenged until this case is tried before this Court, which is likely to be held numerous months from now.  The Government also claims that no hearing should be held to examine the reliability of the affidavit and verification.  If ASD must wait until the appropriate moment for the Government to carry its burden of proof at a trial, then ASD's once-thriving business will be completely destroyed – based solely on vague, conclusory and deficient

allegations contained in the Government's pleadings. This result would deprive ASD of fundamental due process rights and would be grossly inequitable.

## MEMORANDUM OF LAW

In its Opposition filings, the Government has failed to address many of the points raised in ASD's Emergency Motion. For example, the Government did not rebut legal arguments asserted in Section III.B. of ASD's Motion, explaining why ASD is a legitimate multi-level marketing program, and not an illegal Ponzi scheme. Nor did the Government attempt to rebut the substance of the declaration of Gerald Nehra (Exhibit C to ASD's Emergency Motion), in which Mr. Nehra concluded that the ASD business plan is not a Ponzi scheme. Rather, the government merely denigrates Mr. Nehra.

In addition, the government provides no additional details to support inherently vague assertions made in the Verified Complaint that an unnamed economist, employed by the Federal Trade Commission ("FTC"), purportedly concluded that ASD's business activities were consistent with a Ponzi scheme. The Government provided no information regarding the extent of the involvement of this FTC "expert" in the ASD investigation, what he or she was told by the Task Force Agent, and/or what he or she reviewed (if anything) that was specifically related to ASD's business practices. The Government simply provides no additional information to answer ASD's challenges to reliance on the opinion of this mysterious "expert." Similarly, although ASD's Emergency Motion clearly expressed its objection to the Government's nebulous allegation that "most" ASD members are not interested in the advertising aspects of ASD's business, the Government's Response provides no detail – and certainly no explicit numbers – to give support to its prior vague statements. The Government's silence on such critical issues is significant.

Further, instead of candidly conceding that it has received many emails, phone calls and letters in support of ASD's advertising business, the Government attempts to belittle those contacts by suggesting that ASD solicited those contacts from its members.  Even if it could be assumed that the Government had proof to support its criticism, and even if all of those comments were indeed sent at the behest of ASD, the Government cannot possibly suggest that the persons writing and calling were dishonest or disingenuous in expressing their support of ASD.  The Government continues to loosely advance its cause with fact-free, sweeping rhetoric, unsupported by competent evidence.

### I.  ASD Seeks A Release of Funds In Accordance with a Court-Approved Plan

In an attempt to restore its business, ASD needs funds and the return of its computers. Because ASD is an internet advertising company, its computers are critical to its business operations.  Additionally, ASD has numerous bills and debts that need to be paid, including employees' salaries and employment taxes that have not been fully paid for work completed prior to the Government's seizures.  If ASD is permitted to remain in business, these bills will have to be paid.[2]  ASD is willing to submit any and all invoices for payment to a court-appointed monitor, who could evaluate the necessity for and propriety of any such payments.

The Government also suggests that ASD should have to repatriate ASD funds in Antigua before funds seized by the Government should be released.  With the Court's authority and with the Government's assurance that repatriated funds will not be similarly seized, ASD is willing to

---

[2] Contrary to the Government's **conjecture** that the Claimants own all ASD offices [DE #14, at 7], ASD did indeed rent office space located at 215-B Jefferson Ave, in Quincy, Florida. The Government searched that rented space on August 5, 2008.  However, because of its inability to pay the rent owed for September under the lease of that location, ASD has been forced to move out of that location and has informed the Government of that move.  Counsel for ASD contacted counsel for the Government and discussed this situation.  However, at the time of the forced move, counsel for the Government was unwilling to offer any solution or release any funds to pay the rent that was due.

bring those funds to the United States and to use those funds to resume its business under a court-approved oversight plan.

Curiously, though invited to propose additional conditions for a monitored return to business, the Government proposed nothing and insists only that no funds be released. No computers have been returned as of the date of this filing. Nevertheless, the Government insists that ASD's business has not been "seized." The Government does not dispute that ASD's business has, for all intents and purposes, been effectively shut down by the Government's actions. The Government's Response proposes no reasonable solution and expects that ASD, its members and its employees must simply endure all of the consequences of the Government's actions: loss of advertising opportunities, loss of jobs and income in an already difficult economy and loss of a vital family-owned business in a small community.

## II.  The Complete Destruction of ASD Constitutes Substantial Hardship

To date, ASD has received more than 3,500 supportive e-mails from its members. By way of example, ASD attaches to this Reply a letter written by an ASD member, Will York (who describes himself as holding two masters degrees), sent to the Attorney General of Florida. [*See Exhibit A, attached*]  While ASD has every reason to believe that its members would indeed return and pay for the opportunity to advertise on the ASD website, as the Government suggests in its Opposition [DE #14, at 6], it has been impossible to return to business without funds to pay its outstanding bills and without access to its computers. Indeed, ASD's mail is no longer being delivered by the U.S. Postal Service in the wake of the Government's actions. The Government's suggestion that ASD should simply open its doors again and re-open its business is specious, in light of the consequences of the Government's raid.

In its Opposition to Claimants' Emergency Motion, the Government does not rebut ASD's arguments that it is a legitimate multi-level marketing program. In fact, the Government appears to hold out the possibility that the business might indeed be legitimate when it notes that "Claimants' business (legitimate or otherwise) has not been seized." [DE #14, at 5] Unless ASD is allowed to operate pursuant to monitoring, as requested in ASD's motion, it will be severely punished before any case is proven against it. This family-owned business will be decimated by the government's pre-trial actions against it.

ASD cannot politely wait several years to litigate this lawsuit with its assets frozen and its business shuttered. ASD is not unmindful of the Government's concerns – which is why we are proposing that ASD's funds be returned **as a component of compliance and monitoring procedures with all safeguards, as ordered by this Court**.

The Government proposes as "truth" that "*ASD was insolvent before the funds at issue here were seized.*" [DE #14, at 7]. The Government simply tosses out this provocative allegation, apparently believing that the mere description of it as "truth" will make it so. The Government does not include a financial report, an accountant's analysis or other competent evidence. Instead, it simply uses strident rhetoric as a substitute. ASD intends to consult with and seek appropriate financial statements from an independent accounting firm in the very near future. In that regard, the firm of Rachlin, Cohen and Holtz, a large regional accounting firm based in Miami, Florida, is ready to work with ASD in the event that ASD is permitted to move forward in the manner set forth in its Emergency Motion and this Reply. The procedures and safeguards proposed by ASD will provide reasonable assurances to the Court that ASD is being operated in a fiscally sound, legal manner.

### III.  **The Relief Requested Is Not Precluded by Section 983**

The Government suggests that there is no legal basis to support the return of any seized funds, and ignores the reasonable procedures suggested by ASD.  The relief sought by ASD is not precluded by law.  In fact, the relief is entirely consistent with law, reason, and due process, as already set forth in ASD's Emergency Motion.  [DE #7, at 16-18]  Though the Government claims that ASD's business was not seized pursuant to a seizure warrant, ASD's business has in fact been seized as a consequence of the Government's actions.

In its Response, the Government did not argue that §983(f) does not authorize an "immediate release" of property on the grounds that ASD was not a "legitimate business."  [DE #7, at 17]  Instead, the Government [DE #14, at 5] argues that ASD's business – whether legitimate or not – has <u>not</u> been "seized."  The Government relies on this Court's decision in *United States v. All Funds Seized from Suntrust Account xxx8359, et al.*, No. 05-2497 (D.D.C. Mar. 17, 2006).  It does not appear from the Court's Order that the property owner in that case, GSR, proposed any monitoring or supervision, as proposed by ASD, to prevent the dissipation of funds that would be potentially available *should the government prove its case at trial.*  The reasonable safeguards proposed by ASD distinguish this Emergency Motion and the relief requested by ASD from the cases cited by the Government, and should reasonably provide grounds for this Court to reach a different result.  Such a result would be consistent with the terms of § 983 and the Due Process Clause of the United States Constitution.

### IV.  **A *Franks* Hearing Is Appropriate in a Civil Forfeiture Case**

ASD's Emergency Motion requested a *Franks* hearing and made the requisite showing necessary to warrant such a hearing.  [DE #7, at 22-24]  *See Franks v. Delaware*, 438 U.S. 154, 171-172, 98 S. Ct. 2674, 2684-85 (1978).  In its Response, the Government implies that, because

this is a civil forfeiture case, there is no right to, or purpose for, a *Franks* hearing, even if the seizure was based on a faulty affidavit or deficient verification.  [DE #14, at 4 (citing *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984) and *U.S. v. Parcel of Property*, 337 F.3d 225, 234 (2d Cir. 2003))]

The Government's Response, however, ignores the all-important point that the purpose of a *Franks* hearing is explicitly intended to challenge the sufficiency of the affidavit and verification used to support the seizure.  *Franks* hearings are routinely and properly sought in civil forfeiture cases to attack the veracity of the statements used to establish probable cause for the seizure and *in rem* arrest warrants.  *See, e.g., U.S. v. Parcel of Land and Residence Located thereon at 5 Bell Rock Road, Freetown, Mass.*, 896 F.2d 605, 607-608 (1st Cir. 1990); *U.S. v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Conn.*, 897 F.2d 97, 100-101 (2d Cir. 1990); *U.S. v. U.S. Currency Deposited in Account No. 1115000763247 for Active Trade Co., Located at First Nat. Bank, Chicago, Ill.*, 176 F.3d 941, 944-45 (7th Cir. 1999); *U.S. v. One 1995 Chevrolet Tahoe, VIN # 1GNEC13K3SJ398583*, 108 F. Supp. 2d 954, 956-57 (W.D. Tenn. 1999); *U.S. v. 1999 Ford Expedition*, 2001 WL 777471 (N.D. Cal. 2001).

In its Opposition to Claimants' Motion to Dismiss, the Government draws an analogy to criminal procedure applicable to a criminal complaint and an affidavit to support a finding of probable cause.  [DE #13, at 8, n.5]   ASD agrees that the procedure for determining probable cause in civil forfeiture actions is similar to that for determining probable cause in a criminal setting.  As a result, the court should look at the totality of the circumstances in making its decision. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

Hearsay and other inadmissible evidence may be used in establishing probable cause, *so long as* the evidence bears strong indicia of reliability.  *U.S. Currency Deposited in Account No.*

*1115000763247 for Active Trade Co.*, 176 F.3d at 944.  Only legally obtained evidence may be used to establish probable cause in a civil forfeiture proceeding.  *U.S. v. $53,082.00 in U.S. Currency*, 985 F.2d 245, 250 (6th Cir. 1993).  Further, if unreliable information, such as a false or misleading statement in an affidavit, is used to establish probable cause and there is not enough other reliable evidence to support a finding of probable cause, then the initial finding of probable cause should be vacated. *U.S. Currency Deposited in Account No. 1115000763247 for Active Trade Co.*, 176 F.3d at 944-45 (citing *Franks*, 438 U.S. 154 (1978) (search warrant must be set aside if, without the use of false statements, there is not enough evidence to establish probable cause)); also citing *United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28DXHF373152*, 1992 WL 198441 (N.D. Ill. 1992) (after finding "factual statements made in the affidavit supporting the seizure warrant consisted of a reckless disregard for the truth," the court deemed the warrant void *ab initio*, found that the seizure and forfeiture were unlawful, and ordered the return of the car to the claimant and the dismissal of the forfeiture complaint).

       As explained in ASD's Emergency Motion, the Affidavit and Verified Complaint filed by the Government in this case is replete with misstatements, omissions, nebulous and conclusory allegations and baseless hyperbole.  [DE #7, at 22-24]  Such statements cannot provide a solid basis for a finding of probable cause.  In a criminal case, a defendant would be entitled to an immediate hearing challenging the probable cause for his or her arrest.  Here, where tens of millions of dollars and real and personal property have been seized in a civil forfeiture action, a claimant has a due process right to a similar hearing.  *See United States v. E-Gold*, 521 F.3d 411, 421 (D.C. Cir. 2008).  Therefore, in addition to the evidentiary hearing requested by ASD to challenge the pre-trial seizure and propose reasonable safeguards for release, ASD also requests

a *Franks* hearing to challenge the veracity of statements included in the Affidavit and Verified Complaint. The *Franks* hearing need not be a separate proceeding: it can be part of the evidentiary hearing.

## V. Dismissal Of Complaint Is Appropriate Due to Deficient Verification

In its Opposition to Claimants' Motion to Dismiss, the Government contends, in large part, that regardless of what else Agent Dotson says in his verification in support of the Complaint or how he says it, his verification should be found to be substantially in the same form of the exemplary clause provided in § 1746 as long it includes the buzz phrases "under penalty of perjury" and "true and correct." That is not the law. *See Huff v. UGI Corporation*, 2006 WL 2385286 at *1 n.2 (N.D. Ind. 2006) (Plaintiff's "[c]omplaint does not comply with the requirements of an unsworn declaration under 28 U.S.C. § 1746, because the 'to the best of my knowledge' formulation is insufficient"). Agent Dotson failed to comply with the statute – not by *omission*, as was the case in the authority cited by the Government in its Opposition[3] – but rather, by *addition*. Adding the equivocal and conditional language "to the best of my knowledge and belief" defeats the intent of the statute and renders his verification meaningless.

In 1976, Congress passed 28 U.S.C. § 1746 for the purpose of allowing the use of unsworn declarations given under the penalties of perjury in lieu of affidavits in all federal proceedings. *Muscatell v. Muscatell*, 106 B.R. 307, 308 (Bankr. M.D. Fla. 1989). Therefore, two different documents can be used, the only difference being one document (affidavit) is subscribed and sworn to before some other person having the authority to administer an oath or

---

[3] The Government in its Opposition relies in large part on equally dated cases that involved verifications where either a buzz phrase was omitted or where synonyms or paraphrases were used rather than the exact exemplary language of the statute. The Government also criticizes ASD for relying on cases addressing affidavits and then turns around and relies heavily on *Schroeder v. McDonald*, 55 F.3d 454 (9th Cir. 1995), which involved a verified complaint functioning as an affidavit for summary judgment purposes.

affirmation, and the other document (verification) subscribed to by the person himself and need not be notarized nor sworn to by another. *Id.* As a result, great caution should be shown when an affiant is left to tinker[4] with the exemplary language to create wiggle room, especially when the complaint being verified is replete with misrepresentations, omissions and exaggerations. *See Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("…it allows the affiant to circumvent the penalties of perjury in signing onto intentional falsehoods").

In *United States v. That Certain Real Property Located At 632-636 Ninth Avenue, Calera Alabama*, 798 F. Supp. 1540 (N.D. Ala. 1992), the government seized real property and sought its forfeiture based on alleged cocaine activity on the property. The claimant complained that the interrogatory answers provided by the government were signed only by an Assistant U.S. Attorney, not based on personal knowledge. *Id.* at 1546. Specifically, claimant complained that the government's answers to his second interrogatories contained only the following verification language:

> I declare under penalty of perjury that the foregoing, based *in part on information supplied by others*, is true and correct.

*Id.* at 1547 (emphasis in original). Notwithstanding the AUSA's inclusion of the buzz phrases "under penalty of perjury" and "true and correct," the court found that the verification did not comply with 28 U.S.C. § 1746 because virtually all of plaintiff's purported "answers" were second hand and the court was unable to determine what answers were supplied by others. *Id.* Agent Dotson's verification likewise fails to comply. As a result, the improperly verified Complaint should be dismissed.

---

[4] Pragmatically, the continued inquiry could be eliminated if only the exemplary language in the statute was used verbatim. *Muscatell*, 106 B.R. at 309.

**VI.  Motion to Strike Improper Statements in Government's Response**

For similar reasons, ASD moves to strike unreliable and unsupported statements that are presented as "facts" in the Government's Opposition to Claimants' Emergency Motion. Specifically, the Government's counsel describes in his Response certain statements that Claimant Thomas Bowdein allegedly made "to the Secret Service."  [DE 14 at 3 & n. 2].  In addition, the Government makes the sweeping assertion:  "As many of ASD's followers know, including those individuals with special side agreements, Bowdoin actually promised to return even greater percentages [than 125%] to many of those who agreed to join his flock and promote his get-rich-quick scheme."  [*Id.* at 8]

How does the government know what "**many** of ASD's followers know"?  How many is "many"?  Who heard Mr. Bowdoin "promise" anything?  In addition, the Government claims that it has "received *numerous* calls, letters and emails from ASD followers. . . ."  [*Id.* at 8, n. 5 (emphasis added)]   Again, what is "numerous"?  These statements are nothing more than hyperbole and rhetoric.  They are not supported by any affidavit or verification.  They do not constitute proof of anything and should be stricken as irrelevant to the determination of matters before this Court.

**CONCLUSION**

As argued in its Emergency Motion, unless its Motion is granted by this Court, ASD will be severely penalized before the Government ever presents any solid evidence of wrong-doing. If, at the end of the trial, the Government ultimately fails to prove its case, and ASD is found to be a legitimate multi-level marketing business, ASD will remain the victim of the Government's actions.  It will never be able to re-establish its business.  Indeed, with each day that passes, ASD's ability to resume business is diminished.

As a result, ASD respectfully requests that this Court enter an order:

1. requiring the seized funds to be returned within two days of entry of an order, subject to the previously-outlined seven-oversight measures (acceptable to the Court) governing ASD's resumption of business; or alternatively

2. schedule an evidentiary hearing *as quickly as possible*, at which the disputed issues may be argued and considered and at which reasonable safeguards and monitoring parameters may be presented.

**WHEREFORE**, for the foregoing reasons, on behalf of Claimants, Counsel respectfully requests that the Court grant the relief described herein.

Dated:  August 29, 2008

Respectfully submitted,

**AKERMAN SENTERFITT**

By: /s/ Michael L. Fayad
    Michael L. Fayad, Esq.
    D.C. Bar No. 91694
    8100 Boone Boulevard, Suite 700
    Vienna, VA  22182
    Telephone:  703-790-8750
    Fax:  703-448-1801

    -and-

    Jonathan Goodman, Esq.
    (Admitted to Appear *Pro Hac Vice*)
    Florida Bar Number:  371912
    One Southeast Third Avenue
    25th Floor
    Miami, FL  33131-1714
    Phone:  (305) 374-5600
    Fax:  (305) 374-5095
    Email:  jonathan.goodman@akerman.com

    ATTORNEYS FOR CLAIMANTS

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Reply was served this 29th day of August, 2008 via the Court's electronic filing system upon the following counsel:

William Rakestraw Cowden, Esq.
U.S. Attorney's Office
555 Fourth Street, NW
Washington, DC  20530

/s/ Michael L. Fayad
Michael L. Fayad, Esq.



This is an open letter/e-mail to Bill McCollum, the Attorney General of Florida:

It is in response to his remarks on television about ASD. I plan to share this response with the entire membership of ASD and Golden Panda. I sure hope that I am not violating any contractual agreement with ASD and Golden Panda, because I am simply trying to explain how their businesses work, and I can't access their membership contract pages with their websites down. I'm going to take the risk for the benefit of all my fellow members, in hopes of getting ASD and Golden Panda back up and running ASAP. I also do not want to write anonymously, as I am not afraid to be corrected publicly if I am incorrect, and I will happily write an acknowledgement and apology if I am found to be so.

Also, you, Bill McCollum, spoke publicly on television, and I am writing to you in response to your public statements. We can think of this as a sort of op-ed letter, and I am making a public reply to your television statements.

Hello Bill McCollum,

My name is Will York, and I live in Los Angeles, California. I am an online marketer, and I just watched a news clip in which you spoke about ASD. I was sad to see you speak incorrectly about ASD, and I would like to correct you and explain your mistakes.

Please do not think I am a nut-case. I have two masters degrees and I taught high school biology and chemistry in the nineties. My background does not mean that I'm correct in my following explanations, but is merely introduced as evidence that my explanation will probably be clear enough for you to justify spending the time to read this e-mail. I am a good teacher and want to politely teach you how you are mistaken about ASD and Golden Panda (GP). Please take the time to read this correction and explanation.

Before I begin, I will say that I am thankful the government does not allow pyramid schemes, because they are horrible schemes that prey upon people's hopes and dreams and then shatter them. When I first saw ASD, I too thought it must be a Ponzi scheme, but I read everything on their website and drew diagrams and cash flow charts according to their business plan and I finally figured out what these advertising companies are doing.

I will now address your mistakes and explain the ASD and Golden Panda business structure.

First, the news caster said that you say, "[you] wouldn't feel comfortable with the company operating again, even with court oversight. [You say] the company used advertising as a front for its money making scheme."

If you did say such a thing, you have implied by your statement that ASD is guilty before the allegation has been proven. With all due respect, the fact that you and Federal agents do not understand a business does not make it an illegal "scheme." The allegation has not been proven, and if you are willing to read this e-mail, you will see that it cannot be proven, because it is false. Also, the company is asking for oversight so that whoever does the oversight can actually comprehend the business plan and observe its legality. I realize that you are trying to protect the public by saying that you do not want ASD to continue its "pyramid scheme." But in reality, you are harming the public, because ASD and Golden Panda (GP) are not pyramid schemes; they are very affective advertising companies that can guarantee fifteen-second website-views to those who purchase their advertising. Seriously, I read every single sentence on the ASD and Golden Panda websites before I bought any advertising from them. It took me three weeks to understand their business plan, and when I did, I realized they had designed a breakthrough business plan that will literally revolutionize the advertising industry as we know it. I will explain it after addressing your second mistake.

Second, you said, "at the end of the day, that's the only way that they can sustain themselves, uh, is by getting new members, and that's an illegal pyramid scheme, and, and it's not right for them to go back and do it again. It just doesn't work that way."

Okay, if ASD and GP were indeed running a pyramid scheme, I would wholeheartedly agree with you that they should not be allowed to continue fleecing the innocent of their hard earned money. But, none of your statement is true. First and foremost, membership in ASD and Golden Panda is 100% FREE! There is no cost whatsoever to becoming a member. The only cost is if a member wants to buy advertising. Please realize that Google, Yahoo, myspace, Facebook, MSN, and other high-traffic websites are all multi-billion dollar companies because of one thing -- SELLING ADVERTISING. And, "the only way they can sustain themselves" is by continuing to sell advertising.

You may not know this, but buying advertising from the above-listed companies is extremely expensive. I will provide a Google example.

I have a business acquaintance who buys $300 to $500 of advertising per day from Google. The amount my friend buys varies because each day he uses exactly half of his income to buy more advertising from Google. This means that Google is actually earning half of my friend's income from his selling nutritional supplements and using Google as his main advertiser. (There are some individual marketers who buy $100,000 worth of advertising from Google daily!) When we sales-people buy from Google, our money is permanently gone into the Google bank accounts. It is a scary feeling to know that the only hope we have of earning that money back is by selling our product to the viewers of the Google search engine results. And Google offers no guarantee that anyone will look at our website long enough to know what we are selling. But we marketers have to buy advertising, and Google, blogs, search engines, and high traffic websites keep our money permanently. Now, if Google or any other advertising medium, including TV, magazines, newspapers, radio, and billboards, stopped selling new advertising, they could not "sustain themselves."

ASD and Golden Panda are no different. If they stop selling new advertising, they will not be able to "sustain themselves." When I purchased advertising from both companies, I was aware of the fact that I was buying 15 second advertisements with my money (each ad is called an "ad package"). I knew from reading the terms and agreements and other parts of the website that I was buying advertising from these companies in the exact same way that I buy from Google, MSN, Yahoo, and blog pages, and that the money was gone; it was spent permanently on advertising.

I was also aware of the fact that similar to being involved in any other multi level marketing company (MLM) I could sell the ASD and GP product – ADVERTISING – to other business people, and receive a 10% commission on all my sales. My sponsor would also receive a commission on all advertising I sell, 5%. Most MLM companies in the USA pay commissions to sponsors from many more levels below the sponsor than just two levels. And in all direct sales of any product, the sales-person is motivated by the anticipation of earning the promised commission. This is a well known fact in the sales world.

The rebate process is simply a shared sale's commission given to the entire sales-force if they meet one requirement: view a certain number of advertisements for 15 seconds each on any day they want to receive a rebate. But, there are two situations in which a rebate would not be paid to advertisers: 1) If the company and all of its independent sales associates do not sell any advertising products, website products, consulting products, or website development products on the day people have viewed websites in hopes of receiving a rebate. In other words, if no products are sold, no rebate will be given, plain and simple. I was fully and completely aware of this fact before I bought advertising from these companies. 2) If an individual advertiser does not view the required number of website advertisements on the day he/she hopes to receive a rebate, he/she will not qualify to receive the rebate. In other words, no work, no rebate.

How do the rebates get paid? This is simple math.. Imagine that ASD has 60 million advertising packages that people like me have bought. If ASD sells only $2 million worth of advertising products in one day, here is how that $2 million is divided up:

50%, or $1 million dollars, is divided among the qualifying advertising packages. (Ad packs are "qualified" when their purchaser surfs the required number of his fellow advertiser's websites.) In this case, we will assume that all 60 million ad packs were qualified. Therefore, when dividing $1 million dollars equally among 60 million ad packs, each ad pack would earn a rebate of 1.666666 cents. If you multiply 1.666666 by 60 million and then divide by 100 to convert the result to cents, you get 1 million. If we value each ad pack at $1, then in this example of a rebate, 1.666% of the advertiser's advertising cost has been rebated back to the company or advertising individual for that day. (This is not a return on investment! No one "invests" in anything in these two companies. Advertising was sold and commissions are being given back to the sales/advertising team as a "thank you" for helping the company satisfy its guarantee that every ad pack is a guaranteed 15-second-view of the purchaser's website. It is a win/win situation for everyone, even for people who don't sell advertising that day. Non-sellers still helped view websites for 15 seconds each and are therefore qualified to be rewarded by the rebate.)

For the sales people who did sell advertising that day, they get a sweeter reward. Their 10% commission, and their sponsor's 5% commission is taken out of the other 50% of sales that day. So, 15% from the left over $1 million in sales equals $150,000 in commissions that will be paid out that day.

Now, ASD would be left with an income that day of $350,000. They have to pay their employees, their lawyers, their computer hosting companies, their electric bills, their taxes, etc. out of that income. And of course, their lawyer fees are now much higher because someone didn't understand where all the money is coming from or how online marketing works. Well, the money is coming strictly from the SALE of ADVERTISING and other web service products such as hosting and domain registrations, and if the sale of advertising stops at any time in the future, the business stops too, and no one is guaranteed their rebates or money back.

So, each day of the year, the total sales income is split 50/50. 50% is rebated to the qualifying ad pack purchasers. 15% is paid in commissions to each salesperson and his/her sponsor. 35% is ASD's to keep and pay bills and salaries with.

In the example above, the ASD sales-force sold $2 million worth of sales, and ASD only kept $350,000 of it. ASD gave 65% of their sales income to their sales force. They're generous!

If on any given day there are no products sold at all, then NO ONE GETS REBATED AT ALL. This was clear to me after reading ASD's and GP's websites. If people do not read the websites or somehow get the idea that the company is guaranteeing them their money back, those people have misread the company's terms and conditions and are believing a lie. They may be able to earn their advertising money back through rebates, but advertising has to be sold daily for anyone to get any rebates. Now, if people agree to a contract they do not understand, the company with whom they formed the contract is not to be blamed. The phrase, "always read the fine print" is evidence that people often do not understand what they are signing, and often do not "read the fine print." But the company who wrote and agreed to the contract cannot be blamed for the non-reading and misunderstanding people who enter into contract with them.

Now, financially, when would these companies be unable to "sustain themselves"? Only when there are no companies or individuals who want to advertise their goods and services to a captive audience. If such an event were to happen, we would not have free television, radio, newspapers, magazines, blogs, search engines, e-mail accounts, vlogs, dating websites, etc, etc. It is highly unlikely that there will ever be such a time. So, when Nike, Coke, Nestle, Micky D's, Ford, GE, Victoria's Secret (sad day), and politicians stop advertising, we can expect ASD and Golden Panda to run out of customers soon thereafter.

Next, let me explain the "matching bonuses" that are given out at the "rallies." Please realize that in marketing we want to evoke a purchase from as many potential customers as possible. Any business that sells a product has a time-tested and proven way of increasing the number of products sold: they can have a "sale." We are all familiar with the fact that people are much more likely to buy when there is a "sale" than when the products are being sold at their regular "retail" price. Therefore, sales are used to increase a company's cash flow.

(Another way to get people very excited about buying a product is to tell them they can earn a rebate on it, which I've already explained above.)

The rallies are nothing more than "sales," but the wording they use is extremely effective. Instead of telling potential customers that they can buy ad packages "at a discount," ASD and GP are saying that they will "give" matching-bonus-ad-packages of 25%, 50% or 100% of the original purchase. Let's look at the most outrageous offer, 100%.

If ASD is offering a 100% matching bonus, someone buying $50,000 in advertising will actually receive 100,000 ad packages for their money. That purchaser just paid fifty cents for each 15

second ad rather than one dollar.. They bought during a "half-off-sale." And, as expected at such huge "savings" people are buying a lot of ad packs at the rallies. The customer is being told that the company is "giving" them something, but in reality the customer is simply being "sold" something at a discount. The wording works and people "buy" at the discount price. Even knowing this wordplay, I am happy to buy at the sale price.

Also, the sponsor of someone buying $50,000 in advertising during a 100%-matching-bonus-rally would also get 50,000 fifteen second ads. Thus, ASD or GP was actually running a "66% off sale" or a "three-for-the-price-of-one sale." Sponsors are understandably very motivated to make sales. And the customer is seriously motivated to buy advertising. And ASD or GP has increased its cash flow dramatically.

The confusing part of these sales is that the amount of money ASD or GP is going to divide 50/15/35 in order to pay rebates and commissions is only the original $50,000 received by the company. ASD and GP are not matching people's money with more money, they are simply selling their advertising at huge discounts. If an advertiser wanted a refund on their purchase and the company agreed to refund purchases in the contract, which they don't, the only money the company would refund would be the $50,000, no more.

Quite simply, 150,000 ad packages were sold for $50,000; therefore, $25,000 would be "rebated" to qualifying ad packs. $7,500 would be paid in commissions to the salesperson and his/her sponsor. And $17,500 would be the amount ASD or GP keeps.

If no sales are made, no salespeople get paid. To increase sales of advertisements, ASD and GP discount the retail price of their product, which costs them less than a penny to provide for the customer.

So, what these companies are doing is sharing the huge profits from online advertising with their customers, who are also their sales force, which is legal under the MLM laws of this great nation.

Who wouldn't want to be a part of such a business? What advertiser in their right mind would not want to look at other advertisements and sell advertising for the company they buy advertising from in order to earn their advertising money back over time? With ASD and GP an advertiser can earn 125% of the value of their advertising packages back in the form of rebates -- if sales continue and are enough, just as in any other advertising business. No sales, no rebates. But, most existing advertisers are going to continue buying advertising from ASD and GP on a regular basis, so it is unlikely that there will ever be a day that there are zero sales.

Lastly, let's look at the profits. Google sells click ads from a penny to $500 and higher per click. Google's cost for each click is probably less than a penny. Is a $500 retail price on an item that cost $0.01 a great profit? You bet!! That's why Google's owners are billionaires.

Thomas A Bowdoin, Jr., Clarence Busby, Jr., and Dawn Stowers, DBA Ad Surf Daily and Golden Panda, are sharing the massive profits to be made in online advertising with their customers who 1) advertise with them, 2) sell advertising for them, and 3) view advertising for them. They are charging $1 for a product that costs less than a penny to provide, but sometimes they only charge $0.33. Either way, they are then dividing up the total income into the following categories: 50% in rebates, 15% in commissions, and %35 for themselves. And, they are not only being generous by sharing the daily income, they are also charging us online-marketers much less money than Google, or any other advertising site on the net, which means they will

probably out-sell some of those sites at some time in the future. These ad companies should be allowed to grow to any size that their computer systems can handle. I believe they will grow to twenty or thirty million members if they are given the chance. And if their members read the contracts they are agreeing to when they become members for free, they will know that none of their advertising money is guaranteed to be returned to them, not in rebates or in commissions. Sales must always be made for a sales force to be paid and for a business to sustain itself.

In conclusion, Mr. McCollum, ASD and Golden Panda were providing valuable products and services to their rapidly growing membership. I believe that federal agents did not do their due diligence before freezing these company's assets, and if I'm right, every day that ASD and GP are closed, there are thousands of innocent citizens who are being financially and emotionally harmed by not allowing ASD and GP to continue operating their advertising-sales-business with oversight. I'm certain that I can speak for all of the members when writing that we would welcome the oversight of each company. We do not want the managers of these companies to mingle funds, mismanage, or commit any kind of fraud, because we want to purchase and benefit from their advertising for many years into the future.

Many of our websites were receiving higher click rates from ASD and GP advertising than from any other form of advertising. One of my friend's websites received 200 website-views a month before joining ASD, and within two months after purchasing advertising with ASD her website was receiving 8,000 views a month. That friend's sales of financial advising services grew so quickly she had to hire help. That's the consequence of great advertising! Her website also moved to the number-one-position in the free Google search results. This kind of advertising effectiveness is every business person's dream.

Over 100,000 Americans were using these companies to advertise their products until the Federal agents shut them down. Sadly, it seems that the crime in this situation has not been committed by ASD or GP but by the agents, and thousands of small business owners such as myself are suffering every day that ASD and GP are not operating.

Please feel free to call me at ###-###-####, which I will remove from the public letter. I would be very happy to speak with you and answer any questions you have.

If you would like to learn how you can become an online affiliate marketer for numerous businesses such as Blockbuster, Netflix, The Dish Network, and more, for free, and start earning the great commissions that such companies pay us marketers, I'll be happy to teach you how the affiliate business works as well.

And, of course, if you'd like to become a free member of ASD and/or Golden Panda, then please visit my website at http://www.nojokesjustbrilliance.com/ and provide your name and e-mail for more information. It is free to join and you can even earn advertising credits for free. I know that your AG job pays a decent salary, but if you're willing to spend just fifteen to twenty minutes a day, you could probably double your salary in less than a year, and I can teach you how to do that. (I'm a sales guy!) But, of course, there are no guarantees, and you would sign a contract in agreement to those terms. You would also need to provide ASD and Golden Panda with a W-2 form so they can properly send you a 1099 for tax purposes at the end of the year.

Thank you for taking the time to read this. I wish you the best.

Sincerely, Will York

If you now understand that ASD and Golden Panda are not pyramid schemes, I hope that you will share this letter with the honorable Rosemary M. Collyer, who has the authority and power to demand that these two businesses be allowed to operate with any necessary oversight she may want to place over them, so that those of us who earn our livelihood by selling goods and services on the Internet can get back to business and stop stressing out.

If you still disagree with me, it is possible that I have believed a lie, and I would ask that you please call and explain where you think I am mistaken about these businesses. If you convince me that these businesses are pyramid schemes, I will humbly write another open letter to tell everyone and notify them that we've all been suckered. Then I'll start an advertising company with the above business plan and be a hero for doing so. But in this case, I don't think I'll have to do that.

Again, I wish you the best.

---

 **Yahoo! Canada Toolbar :** Search from anywhere on the web and bookmark your favourite sites. Download it now!