# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

                Plaintiff,

       v.

8 GILCREASE LANE, QUINCY
FLORIDA  32351,

            and,

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

            and,

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

           Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

           Claimants.

**CLAIMANTS' MOTION FOR
SEVERANCE AND TRANSFER**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

## CLAIMAINTS' MOTION FOR SEVERANCE AND TRANSFER

Claimant Clarence Busby Jr. d/b/a Golden Panda Ad Builder ("Golden Panda"), by counsel and pursuant to Fed. R. Civ. Pro Rule 20, 42, and 28 U.S.C. § 1404, respectfully requests that this Honorable Court sever these forfeiture proceedings in two and a simultaneous transfer forfeiture proceedings concerning Golden Panda's assets to the United States District Court for the Northern District of Georgia. The Government has named the property of two independently owned, operated, and controlled companies, Golden Panda Ad Builder ("Golden Panda") and Ad Surf Daily Cash Generator ("ASD"), as defendants. In its 44 page complaint, the Government devotes just two pages of text to discussion of Golden Panda. The Government has predicated its allegations against Golden Panda on the false assumption that Golden Panda was and is controlled by ASD and its owner Andy Bowdoin. To the contrary, neither ASD nor Bowdoin is affiliated with Golden Panda. Neither has control of Golden Panda accounts, supplied funding for Golden Panda, or has received any compensation from Golden Panda. In addition, neither Golden Panda nor its principals have any connection with the District of Columbia.

Golden Panda thus stands in a different position from ASD, and it would suffer prejudice if forced to defend alongside ASD in these proceedings. Therefore, Golden Panda requests severance of the case into two proceedings, and it requests simultaneous transfer of the cause of action against it to the District Court for the Northern District of Georgia, a venue appropriate and that does not impose undue burden and prejudice to Golden Panda.

In support of this motion, Golden Panda submits the attached Memorandum of Law and Authorities.

Respectfully submitted,

CLARENCE BUSBY JR. AND GOLDEN
PANDA AD BUILDER

By: _____/s/_____

D. Jack Smith
Law Offices of D. Jack Smith
4620 Shady Grove Rd.,
Memphis, TN  39117
*Co-Counsel*

Jonathan W. Emord*
Andrea G. Ferrenz
Peter A. Arhangelsky
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com
*Its Counsel*

* Counsel of Record

Date submitted:  August 29, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

     Plaintiff,

   v.

8 GILCREASE LANE, QUINCY
FLORIDA  32351,

     and,

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

     and,

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

     Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

     Claimants.

**MEMORANDUM IN SUPPORT OF**
**CLAIMANTS' MOTION FOR**
**SEVERANCE AND TRANSFER**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

<u>**MEMORANDUM IN SUPPORT OF CLAIMANTS' MOTION FOR SEVERANCE**</u>
<u>**AND TRANSFER**</u>

# SUMMARY

On August 5, 2008, the Government filed its complaint seeking civil forfeiture of property belonging to two companies, Ad Surf Daily Cash Generator ("ASD") and Golden Panda Ad Builder ("Golden Panda"). The Government subsequently seized fifteen bank accounts with Bank of America, five of which are independently owned by Golden Panda. As support for this seizure, the Government presents this Court with a 44-page complaint alleging that ASD had made misrepresentations to customers and that ASD might abscond with the funds. The Government limits its discussion of Golden Panda, however, to just over two pages of text. But contrary to the Government's assumption, Golden Panda is not affiliated with ASD, has not received any funding from ASD or its principals, and is independently owned, operated, and controlled.

Because ASD and Golden Panda are not affiliated but are separately owned, operated, and controlled, it is unjust to prosecute them as co-defendants. The union of the two yields an inevitable tendency, evinced by the complaint itself, to ascribe wrong-doing alleged against ASD to Golden Panda, thereby unjustly prejudicing Golden Panda. Accordingly, Golden Panda requests that this Court sever the forfeiture proceedings into two. The Government's allegations against Golden Panda's assets do not stem from the same transaction of facts giving rise to the Government's allegations against ASD. Because Golden Panda is unrelated to ASD; severance will preserve a clean record before this court and prevent false associations and prejudice otherwise inevitable and will avoid unnecessary conflict between the litigating parties.

Golden Panda further requests that this Court simultaneous with its severance order transfer forfeiture proceedings against Golden Panda's property to a more appropriate venue, thereby alleviating prejudice to Golden Panda's defense. Golden Panda seeks transfer to the

United States District Court for the Northern District of Georgia where Golden Panda, its

principals, and its assets are resident and where venue is proper.

## I.  FACTS

Clarence Busby Jr. is the President and CEO of Golden Panda Ad Builder Inc.  *See* Exhibit 1

at ¶ 1 (Affidavit of Clarence Busby).  He oversees the daily operation of the company.  His

daughter, Dawn Stowers, is the Chief Operating Officer.  *Id*.  The company has eleven

employees.  *Id*. at ¶ 3.

Golden Panda Ad Builder Inc. was incorporated in Georgia on May 15, 2008.  *Id.* at ¶ 3.

It is a company in good standing.  *Id.*

Golden Panda commenced operations on July 24, 2008.  *Id.* at ¶ 16.  From that date until

the present suit was filed on August 1, 2008, is a period of 8 days.  On August 1, 2008, the

following Golden Panda bank accounts were seized by the Department of Justice:  Bank of

America Account #'s 334011130192; 33401130200; 334015765704; 91000113401039; and

91000113404188.

The other defendant in this action, Ad Surf Daily Cash Generator ("ASD") is not

affiliated with Golden Panda.  *Id.* at ¶¶ 6-8, 18-20, 23-24.  Contrary to an allegation in the

government's complaint, none of the accounts owned by Golden Panda contains any money from

ASD, Andy Bowdoin, or any of ASD's officers, directors, or shareholders.  *See id.* at ¶¶ 20, 24;

Exhibit 1, Attachment 3 (Affidavit of Robert J. Skinner, CPA, and attachments).  Neither ASD

nor any of its officers, directors, or shareholders is an officer, director, or shareholder in Golden

Panda.  *Id.* at ¶ 24.  None has ever exercised any influence or control over Golden Panda's

operations.  *Id.* at ¶ 20-24.  Golden Panda has never received any funding for its operation from

ASD.  *Id.*

Busby was never involved in ASD ownership, operation, or control.  He has never been an ASD officer, director, or shareholder.  He is not privy to how Bowdoin runs ASD's business and was not privy to any decision Bowdoin made concerning how to allocate funds raised by ASD.  *See* Exhibit 1 at ¶ 12.  He has had no involvement in any sales presentations Bowdoin has made and never knew, prior to his receipt of the complaint in this proceeding, that Bowdoin had prior run ins with the law.  *Id.* at ¶ 9.

On the recommendation of an ASD member, Busby bought an ASD ad package in November of 2007.  *Id.* at ¶ 11.  Before buying the package, he asked that member if he could meet the person she identified as the head of ASD, Andy Bowdoin.  He met Bowdoin, heard about Bowdoin's ASD program, talked it over with his wife, and then bought an ad package.  *Id.* at ¶ 10-11.  He knew little about the business other than what Bowdoin told him and has little knowledge of computers and the web.  *Id.* at ¶ 15.

As a social courtesy to Bowdoin, he asked a pastor friend of his, Rev. Charles Green, if Green might bring his boat and join Busby in inviting Bowdoin on a relaxing fishing trip.  *Id.* at ¶ 13.  Bowdoin accepted the invitation and on April 11, 2008, he spent the day fishing with Busby and Green.  During that fishing trip, Bowdoin recommended that Busby start a Chinese version of ASD.  *Id.* at ¶ 14.  He told Busby to organize the business without him.  He said, "I can't handle the business I already have," stating that Busby should be the one to create, own, and operate this Chinese version of ASD.  *Id.*

Busby did not believe he knew enough about computers and the web to run the business and, so, told Bowdoin that Bowdoin should run it.  Bowdoin explained that he did not want to run it.  *Id.* at ¶ 14-15.  Busby then proceeded solo in choosing the name for the company and incorporating it on May 15, 2008.  At the time of incorporation, Busby still thought Bowdoin

would need to run the business, so he placed Bowdoin's name as President of the company, although Bowdon never actually filled that office and never actually took any step to run the company. *Id.* at ¶ 15-16.

Two and one-half weeks before Golden Panda commenced operations (July 24, 2008), Bowdoin called Busby and reiterated that he did not have time for Golden Panda, had done nothing to help create it, and thought Busby should be the one to own, operate, and control the business. *Id.* at ¶ 16. Busby decided with the help of his kids that he really could run a web based advertising business on his own. *Id.* at ¶ 17. On July 2, 2008, he amended the Golden Panda papers with the state, naming himself the President and removing Bowdoin's name. *Id.*

On July 12, 2008, in an ASD rally in Miami, Florida, Bowdoin announced that he had no affiliation with Golden Panda. He reiterated that he had no affiliation with Golden Panda at an ASD rally in Chicago on July 19, 2008. *Id.* at ¶ 18. He also posted a notice on his web site stating that he withdrew himself from Golden Panda. *See id.* at ¶ 19; Exhibit 1 at Attachment 1 (Bowdoin Letter Regarding Disassociation); Exhibit 1 at Attachment 2 (Bowdoin Resignation from Golden Panda). Those notices were posted approximately one week before the July 24 date when Golden Panda became operational. *See* Exhibit 1 at ¶ 19.

Bowdoin never performed any function for Golden Panda while his name was on the state papers as President of the company. He was President in name only for the period of May 15 to July 2, 2008. *Id.* at ¶ 20. On July 2, Busby amended the papers, removing Bowdoin's name and naming himself as President. *See id.* at ¶ 17.

Busby created a web based advertising business that aims to provide advertising value to businesses. The focus of the business is advertising, not cash distribution. The names of the two

defendants are telling in that regard.  The name of ASD is Ad Surf Daily *Cash Generator*.  The name of Golden Panda is Golden Panda *Ad Builder*.  *Id.* at ¶ 21.

At the very start of Golden Panda's business (which lasted only 8 days before it was shut down through the government's fund seizure), Busby wanted to secure the legal representation of an expert in direct selling and network marketing law to ensure lawful operation.  He found D. Jack Smith of Memphis, Tennessee, an internationally known marketing attorney.  *Id.* at ¶ 22.  He first contacted Smith on or about the week of July 22, 2008.  He retained Smith on July 29, 2008.  He invited Smith to the Golden Panda offices in Atlanta, Georgia and hired Smith to evaluate the company's records and business model and advise the company on all steps necessary to ensure that the company was lawful.  *Id.*  Smith traveled to Atlanta and met with Golden Panda on July 31, 2008.  On August 1, 2008, the day <u>after</u> Smith had met with the company, Golden Panda received word from its bank that all of the Golden Panda accounts had been frozen.  It was not until one week later that Golden Panda received the government's complaint that its principals became aware of the government's reason for freezing the funds.  *Id.*

The allegations in the complaint associating Golden Panda and Busby with ASD and Bowdoin are false.  *Id.* at ¶ 23.  Neither Bowdoin nor ASD provided any capital or expended any effort in establishing or operating Golden Panda.  *Id.* at ¶¶ 23-24.  Golden Panda received no funding, direction, or control from ASD and is a business completely independent from and not in any way beholden to ASD.  *Id.* at ¶¶ 6, 23-24.

Golden Panda's funding came from Busby who, in turn, retrieved it from proceeds stemming from his successful real estate practice and from 34 founders named in the Busby affidavit.  *Id.* at ¶ 23.  None of those founders is an officer, director, or shareholder in ASD.  *Id.* at ¶ 24.

Busby created Golden Panda to sell advertising.  *Id.* at ¶ 26.  The company screens each ad to ensure that it is "clean" (free of content that would offend, particularly content that is pornographic).  Approved ads are placed on a web rotator and each advertiser is asked to view 12 other randomly selected ads for 15 seconds each every day ("ad views").  *Id.* at ¶ 28.  That builds an immediate audience for the ads, something hard to come by in typical web advertising.  *See id.* at ¶¶ 26-29.  Since its inception, the company has been developing a system that will allow its advertisers to geographically target ads to reach specific audiences, to post classified ads, and to take steps to increase the visibility of company ads on search engines.  Those services come at an additional fee beyond the cost of the rotator ads.  *See id.* at ¶ 26-30.

From every rotator advertising dollar paid to the company, 50 cents is retained as profit and 50 cents is contributed to a cash out fund.  The cash out fund is designed to create an incentive for ad views.  *Id.* at ¶ 28.  Those who daily perform ad views are eligible to receive a pro rata share of the ad sales proceeds contributed to the cash out fund.  *Id.* at ¶¶ 28-29.

Advertisers can request that their pro rata share be paid out to them or can apply it to future advertising.  When they ask for the pro rata share in cash or apply it, their request is honored but Golden Panda reduces the amount of their prior ad package purchase by the amount taken out until that amount reaches zero, whereupon in order to keep their advertisement in the rotator, they must buy additional advertising.  *Id.* at ¶ 30.

Golden Panda explains the program to its advertisers honesty and does not make any claims, like those alleged to have been made by ASD, that advertisers will be guaranteed a 125% return on an ad purchase.  *Id.* at ¶ 31-32.  They are told, instead, that if money is present in the cash out fund, it will be distributed pro rata.  If not, there will be no distribution.  *Id.* at ¶ 31.

Golden Panda is not responsible for, had no foreknowledge of, and never was involved in the making of the claims alleged in the complaint that give rise to wire fraud.  *See id.* at ¶ 9.

Golden Panda is not presently in operation as a direct result of the seizure order.  Golden Panda is losing customers, has been forced to terminate employees, is paying the remainder reduced salaries for a time out of Busby's pocket, and cannot remain a viable company unless it promptly has access to its funds and resumes business.  *Id.* at ¶ 35-36.

Golden Panda has no connections with the District of Columbia.  *See* Exhibit 2 at ¶¶ 8-15 (Busby Affidavit in Support of Motion to Sever); Exhibit 3 at ¶¶ 6-12 (Stowers Affidavit in Support of Motion to Sever).  All five of the Golden Panda accounts seized by the Government were opened locally in Georgia.  *See* Exhibit 2 at ¶ 10.  The address attributed to each account was 4900 Ivey Rd., N.W., Suite 820, Acworth, GA 30101-4001.  *Id.* at ¶ 11.  Of Golden Panda's 34 founders, none live or has lived in the District of Columbia.  *Id.* at ¶ 8.  Golden Panda has received no funds of any kind from the District of Columbia.  *Id.* at ¶¶ 12-15.  It has paid no cashout payments into the District of Columbia.  *Id.* at ¶ 12.  No Golden Panda officer, director, or shareholder has entered the District of Columbia for the purpose of conducting business or otherwise.  *Id.* at ¶ 14; Exhibit 3 at ¶ 8.  Golden Panda had 19,804 customers at the time the Government seized its business on August 1, 2008.  *See* Exhibit 2 at ¶ 12.  None of those customers resided in the District of Columbia.  *Id.*

Meanwhile, Golden Panda has a strong connection to the general Acworth, Georgia area. In fact, four generations of Busby's have resided in Acworth, Georgia.  *Id.* at ¶ 6.  Clarence Busby Jr. has lived in Georgia all but two years of his life.  *Id.* at ¶ 2.  He has spent 7 of the past 12 years in Acworth, Georgia, and he has resided within a 20 mile radius of Acworth for the past 20 years.  *Id.*  Busby has cultivated several successful local businesses.  He has a combined 31

years of business experience in the local economy.  *See* Exhibit 2 at ¶ 4.  He continues to own

numerous properties in the area.  *Id.* at ¶ 3.  Golden Panda Chief Operating Officer Dawn

Stowers has lived her entire life in Georgia.  *See* Exhibit 3 at ¶ 2.  She owns several properties in

the Acworth area.  *Id.*  All of Golden Panda's employees reside in Cobb County (in which

Acworth is located) or the immediate surrounding counties.  *Id.* at ¶ 7.

    Therefore, the events giving rise to the Government's allegations against Golden Panda's

assets all arose in the Northern District of Georgia.

## II.  SEVERANCE IS APPROPRIATE IN THIS CASE BECAUSE THE ALLEGATIONS AGAINST GOLDEN PANDA DO NOT ARISE OUT OF THE SAME TRANSACTION, OCCURRENCE, OR SERIES OF TRANSACTIONS

    The Government seized two sets of properties unrelated to one another, but seeks to

proceed under one forfeiture proceeding.  Under Federal Rule of Civil Procedure 20, parties may

be joined in one action if "they assert any right to relief jointly, severally, or in the alternative in

respect of or arising out of the same transaction, occurrence or series of transactions or

occurrences. . ."  *See M.K. v. Tenet*, 216 F.R.D. 133, 137-38 (D.D.C. 2002); Fed. R. Civ. Pro

20(a).  This Court has stated that "[i]n ascertaining whether a particular factual situation

constitutes a single transaction or occurrence for purposes of Rule 20, a case by case approach is

generally pursued."  *Id.* at 138.  In addition, even if the claims do arise under the same

transaction or occurrence, this Court may separate the proceedings "to avoid prejudice."  *See*

Fed. R. Civ. Pro 42(b); *M.K. v. Tenet*, 216 F.R.D. at 138 (same); *see also In re Vitamins Antitrust*

*Litig.*, 2000 U.S. Dist. LEXIS 7397 (D.D.C. May 9, 2000) (court may sever "if the Court

determines in its discretion that the interests of justice would be served by doing so").

    Whether facts derive from the same transaction or occurrence is a flexible analysis

tending to encompass a broad scope of action.  *See Montgomery v. STG Intern., Inc.* 532 F.Supp.

2d 29, 35 (D.D.C. 2008). But the relationship between events depends "not so much upon the immediateness of [the] connection as upon [the] logical relationship." *Id.* (citing *Mosely v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974).

The Government presumes that ASD controls Golden Panda and that ASD funds entered Golden Panda bank accounts. Both presumptions are false, unsupported by facts in the Government's complaint and disproven by Golden Panda. *See* Exhibit 1 at ¶¶ 6-7, 23-24 (affidavit of Clarence Busby); Exhibit 1, Attachment 3 (affidavit of Robert J. Skinner, CPA). No ASD funds transferred into Golden Panda accounts. Golden Panda obtained its seed money from Busby and thirty-four individual founders, none of whom is an officer, director, or shareholder in ASD.

ASD's Any Bowdoin contributed no money to Golden Panda. Bowdoin has never exercised ownership, operation, or control of Golden Panda. Neither ASD nor Bowdoin ever opened, placed funds into, or controlled any Golden Panda bank accounts or any of Golden Panda's officers, directors, or shareholders' bank accounts.

The Government is not empowered to join claims based only on similar accusations. *See Lucas v. Barreto*, 2005 U.S. Dist. LEXIS 4248, *5 (D.D.C. 2005) (shared experiences of employees were insufficient to permit joinder because allowance would enable joinder in an overly broad range of cases); *see also Cohen v. District of Columba Nat'l Bank*, 59 F.R.D. 84, 88 (D.D.C. 1972) (citing complications that exist when parties are lumped together).

This Court should sever this matter to avoid undue prejudice to Golden Panda. Federal Rule of Civil Procedure 42(b) provides for severance as a mechanism to prevent prejudice to any party. Civil forfeitures generally assume elements of criminal law because of their punitive nature. The Fourth Amendment's protections against unreasonable government behavior apply,

as well as the Eighth Amendment's guard against excessive forfeitures.[1]  In the criminal context,

the Court of Appeals for the D.C. Circuit recognizes two instances when severance is

appropriate:  (1) when the evidence is "far more damaging" against one defendant; and (2) when

the parties present conflicting defense theories.  *See U.S. v. Tarantino*, 846 F.2d 1384, 1398-

1399 (D.C. Cir. 1988).

While criminal joinder rules are not directly binding, they are persuasive authority.  The

Government does not allege facts to support what would be a false charge that Golden Panda's

principals committed wire fraud or otherwise committed illegalities.  *See* Govt Complaint at 28-

30 (discussing Golden Panda in context of ASD "Additional Misrepresentations to Promote

Expansion").  The evidence while damaging against ASD, is not so against Golden Panda.

Because Golden Panda's defense hinges upon its innocence and lack of affiliation, its defense

theory differs markedly from ASD, which will endeavor to define the representations made by

Bowdoin not to constitute wire fraud and will endeavor to define its different marketing system

which depended upon membership fees (not ad revenues) and guaranteed a 125% return on

investment (not a pro-rata share of an advertising sale funded account).  The risk is too great that

Golden Panda's defense will be consumed by the enormity of litigation between ASD and the

Government.  In *Cohen*, the Court confronted multiple claims against several banks.  The Court

explained the need to differentiate matters when plaintiffs seek to consolidate parties without

specific need.  This Court explained in *Cohen* that:

> It has already been shown that there are significant differences in the practices
> and policies of the defendant banks in making the loans here in issue.  Each bank
> is entitled to defend against the complaints of its own borrowers and to have its
> defense determined on the facts that are specifically relevant to its won activities.

---

[1] Indeed, in a separate motion before this Court in these proceedings, the Government invoked
elements of the criminal law in support of its argument.  *See* Govt Opposition to Claimants'
Motion to Dismiss, Dkt. #13, at 8 n.5.

.  .   This Court seeks to avoid the difficulties and complications that would inevitably arise in an omnibus trial in which several counsel representing numerous parties would attempt to define and preserve the distinctions between evidence and issues relating to some defendant banks and not to others.  A separate trial for each bank, for wholly pragmatic reasons, will be a more orderly and efficient way of handling this litigation.

*Cohen*, 59 F.R.D. at 88; *see also Manufacturers Bank & Trust Co. v. Transamerica Ins. Co.*, 568 F.Supp. 790 (E.D. Mo. 1983) (considerations of clarity and avoidance of confusion may favor separate trials of claims and outweigh economies which might be achieved by single trial).

As in *Cohen*, Golden Panda will constantly be forced to distinguish itself from ASD, taxing time better spent presenting its central arguments against the Government's allegations specifically germane to Golden Panda.  So while the Government bears the burden of persuasion against Golden Panda, the Government's success against ASD could shift the burden to Golden Panda to distinguish itself from ASD as opposed to defending itself on the merits.  This Court has held that "where any party will be prejudiced by a joint trial, consolidation rather than separate trials, is improper."  *In re Ampicillin Antitrust Litigation*, 88 F.R.D. 174, 177 (D.D.C. 1980).

### III.  GOLDEN PANDA REQUESTS TRANSFER OF THIS ACTION TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA BECAUSE LITIGATION IN THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CAUSES UNDUE PREJUDICE

The Government argues venue is proper in the District of Columbia under 28 U.S.C. § 1395(b) because the property will be "found" in this jurisdiction pending forfeiture.  *See* Govt Complaint at 2.  While venue may be proper by statute, Golden Panda's lack of contacts with the District of Columbia makes venue here inequitable, burdensome, and prejudicial.  Venue is also proper in the Northern District of Georgia, because Golden Panda maintains its principal place of business in Acworth, Georgia.

Golden Panda is a family run business.  After the Government's seizure, Golden Panda has been unable to conduct business, but maintains a skeletal staff of seven employees paid in part from Clarence Busby Jr.'s part-time real estate company.  *See* Exhibit 1 at ¶ 35 (affidavit of Busby).  Battling the Government on its home turf in Washington, D.C. is immensely burdensome and costly for Busby.  Litigation in the District of Columbia will force Golden Panda's small team to expend fees on travel and lodging while subject to regular cost of civil litigation.  In addition, Golden Panda will have to finance the travel and lodging of witnesses brought to the District of Columbia, while all are resident in Georgia.  Were the case in the Northern District of Georgia, all witnesses would be within driving distance of the court.

The Government seeks to inflict this hardship under the wording of 28 U.S.C. § 1395(b).  In reality, the Government essentially traveled to Georgia, retrieved Golden Panda's assets, and returned them to the District of Columbia where litigation is more costly and challenging for Golden Panda.  In addressing the broad use of 28 U.S.C. § 1395(b), one district court has already identified the injustice in this practice:

> It is unreasonable to assume that there was any intent on the part of Congress to confer upon the Attorney General the ability to bring his action for forfeiture in the district of his choice merely by transferring the property to that district.  It follows that, where the Attorney General may take whatever necessary steps to insure the security of the property involved, he may not create or defeat jurisdiction of the district court by his actions.

*United States v. One 1974 Cessna Model 310R Aircraft*, 432 F.Supp. 364 (D. S.C. 1977).

In addition, the Government alleges no significant contacts by Golden Panda or its officers, directors, or shareholders with the District of Columbia.  In its complaint and underlying affidavit, the Government presents no evidence that Golden Panda had minimum contacts with the District of Columbia.  Federal agents located within the District of Columbia contracted with ASD for services.  But unlike ASD, no federal agent contracted with Golden

Panda from the District of Columbia. Given the Government's lack of proof that either Golden Panda or its principals have had any meaningful contact with the District of Columbia, it is especially inequitable to force the company to litigate far from home.

Golden Panda has no connection to the District of Columbia. No Golden Panda employee, director, or shareholder, has traveled to the District of Columbia for business or otherwise. *See* Exhibit 2 at ¶¶ 14-15 (affidavit of Busby in Support of Motion for Severance); Exhibit 3 at ¶¶ 8-12 (affidavit of Dawn Stowers in Support of Motion for Severance). Golden Panda has received no funding from sources within the District of Columbia. *See* Exhibit 2 at ¶¶ 8-15; Exhibit 3 at ¶¶ 6-12. The company has not transacted business with any individual or business from the District of Columbia. Exhibit 2 at ¶¶ 12-15. When the Government seized Golden Panda's business, the company had 19,804 customers, and none of those customers were from the District of Columbia. *Id.* at ¶ 12.

By contrast, Golden Panda and its officers, directors, and shareholders all have substantial connections to northern Georgia. Golden Panda is a family-run business that originated in Acworth, Georgia. All of its employees are residents of northern Georgia. *See* Exhibit 2 at ¶ 7. Golden Panda is a Georgia corporation with 2 directors: Clarence Busby Jr. and his daughter, Dawn Stowers. Four Busby generations have resided in the Acworth area. *See* Exhibit 2 at ¶ 1. Clarence Busby has lived within a 20 mile radius of Acworth for the past 20 years. *Id* at ¶ 2. Dawn Stowers has resided in the State of Georgia her entire life. *See* Exhibit 3 at ¶¶ 2-3. All of Golden Panda's seized bank accounts were opened in local institutions, all within the State of Georgia. *See* Exhibit 2 at ¶ 10. The listed address on Golden Panda's accounts is Acworth, Georgia. *Id.* at ¶ 11.

This Court may transfer "any civil action to any other division where it might have been brought." 28 U.S.C. § 1404(a). Courts should allow a transfer "[f]or the convenience of the parties and witnesses, in the interest of justice." *Id.* Venue is proper in the Northern District of Georgia. 28 U.S.C. § 1355(b) provides for jurisdiction in forfeiture cases in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred . . ." *Id.* Jurisdiction is thus proper in the Northern District of Georgia because Golden Panda maintains its principal place of business in Acworth, Georgia. Part of Cobb county, Acworth is within the jurisdiction of the United States District Court for the Northern District of Georgia.

The decision whether to transfer requires a "factually analytical, case-by-case determination of convenience and fairness." *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149 (D.C. Cir. 1978). Golden Panda must demonstrate that the "balance of convenience of the parties and witnesses and the interest of justice are in its favor." *Consol. Metal Products v. Am. Petroleum Inst.*, 569 F.Supp. 773, 774 (D.D.C. 1983). And while the plaintiff's choice of venue is given deference, that deference is "lessened when the plaintiff's forum choice 'lacks meaningful ties to the controversy and [has] no particular interest in the parties or subject matter.'" *Wada v. United States Secret Serv.*, 525 F.Supp. 2d 1, 10 (D.D.C. 2007) (citing *S. Utah Wilderness Alliance v. Norton*, 315 F.Supp. 2d 82, 86 (D.D.C. 2004). Because the Government has failed to allege any contact between Golden Panda and the District of Columbia, other than an illusory relationship with ASD, the balance of convenience of the parties weighs in favor of transfer to the Northern District of Georgia.

## CONCLUSION

For the foregoing reasons, Golden Panda respectfully requests that this Honorable Court sever the Government's action against Golden Panda's accounts and simultaneously transfer the

cause of action against Golden Panda's assets to the United States District Court for the District

of Georgia.

Respectfully submitted,

CLARENCE BUSBY JR. AND GOLDEN
PANDA AD BUILDER

By:  _____/s/_____
          Jonathan W. Emord*
D. Jack Smith                               Andrea G. Ferrenz
Law Offices of D. Jack Smith             Peter A. Arhangelsky
4620 Shady Grove Rd.,                   Emord & Associates, P.C.
Memphis, TN  39117                      11808 Wolf Run Lane
*Co-Counsel*                               Clifton, VA  20124
                                                Ph:  (202) 466-6937
                                                Fx:  (202) 466-6938
                                                jemord@emord.com
                                                *Its Counsel*


                                                * Counsel of Record

Date submitted:  August 29, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, c/o United States Attorney's Office 555 Fourth St., N.W., Washington, D.C.  20530,  Plaintiff,  v. | |
| ALL FUNDS, INCLUDING APPROXIMATELY $53 MILLION, HELD ON DEPOSIT AT BANK OF AMERICA ACCOUNTS IN THE NAMES (1) THOMAS A. BOWDOIN, JR., SOLE PROPRIETOR, DBA ADSURFDAILY, (2) CLARENCE BUSBY JR. AND DAWN STOWERS, DBA GOLDEN PANDA AD BUILDER, AND (3) GOLDEN PANDA AD BUILDER,  Defendants, and  GOLDEN PANDA AD BUILDER, AND CLARENCE BUSBY, JR.  Claimants. | **AFFIDAVIT OF WALTER CLARENCE BUSBY JR.**  Civil Action No:  1:08-cv-01345 Hon. Rosemary M. Collyer |

**AFFIDAVIT OF WALTER CLARENCE BUSBY JR.**

I, Walter Clarence Busby Jr. ("Clarence Busby"), declare under penalty of perjury that

the following is true and correct to the best of my knowledge, information, and belief:

**EXHIBIT 1**

1. I am President and Chief Executive Officer of Golden Panda Ad Builder Inc. ("Golden Panda") (www.goldpandaadbuilder.com).  As President and CEO, I oversee the daily operation of Golden Panda.  My daughter, Dawn Stowers, is the Chief Operating Officer.  Golden Panda has 2 directors: Clarence Busby Jr. and Dawn Stowers.

2. I currently reside in Acworth, Georgia, and I have lived in the Acworth area for over 20 years.  My son and daughter also reside in the Acworth area.  I have successfully run a real estate business in Acworth, Georgia for the past 12 years.

3. Golden Panda is a Georgia corporation, registered on May 15. It is a company in good standing with the state.

4. Golden Panda has 11 employees, and three additional hires that we were forced to let go.  The eleven original employees are Clarence Busby Jr.; Dawn Stowers; Bryan Busby (my son); Cheryl Pasley; Katie Bates; Lynsey Myers; Moneita Lewis; Rhonda Broadnax; Samantha Geizer; Katirna Motes; and Steven Haynes.

5. Golden Panda commenced operations on July 24, 2008.  From the time it commenced operations until the date suit was filed against Golden Panda, August 1, 2008, is 8 days.

6. Neither Ad Surf Daily ("ASD") nor any of its officers, directors, or shareholders is an officer, director, or shareholder in Golden Panda.  None has ever exercised any influence or control over the company's operations.  Neither ASD nor Bowdoin ever opened, placed funds into, or controlled any Golden Panda bank accounts or any of Golden Panda's officers, directors, or shareholders' bank accounts.  *See* Attachment 3 (affidavit of Robert J. Skinner, CPA).

**EXHIBIT 1**

7.  Golden Panda has never received any funding for its operation from ASD.

8.  The following bank accounts of Golden Panda were seized on August 1, 2008 pursuant to the Government's pending civil forfeiture proceeding in the United States District Court for the District of Columbia: Bank of America Account #334011130192; #33401130200; #334015765704; #91000113401039; and #91000113404188.  Those accounts include no money from ASD, Andy Bowdoin, or any of ASD's officers, directors, or shareholders.  Those accounts include all funds necessary to operate Golden Panda's business and, so, their seizure has forced Golden Panda to cease operations.

9.  I have no knowledge of how ASD allocates its funds or operates its business beyond the rudimentary and had no knowledge that Andy Bowdoin had prior run-ins with the law or had been accused of wire fraud until I read the complaint served upon me.

10. I was first informed of ASD from Robyn Lynn from Sarasota, Florida, an ASD member who I met at a new business opportunity seminar.  She told me that she was an ASD member and asked me if I would be interested in buying an ASD ad package and becoming an ASD member also.  I initially said no.  Because I regarded her as intelligent and honest, I told her I would consider the proposal further but would have to meet the person who headed ASD to know whether to buy the package.  She gave me Bowdoin's name and phone number. As it happens, in November of 2007, I needed to attend a funeral for my wife's uncle.  The funeral would take place near the area where Lynn told me Bowdoin was located.  I called Bowdoin and left him a message telling him I would be in the area and would like to

**EXHIBIT 1**

meet him.  He called me back and confirmed a lunch appointment.  I then first met him at the Charter House restaurant in Bainbridge, Georgia.

11.    He explained his ASD program to me over lunch.  I had (and still have) little understanding of computers and the web.  I told him I would have to talk over the idea of buying an ASD ad package with my wife before I decided whether to buy the package and thereby become an ASD member.  I spoke with my wife and she thought it worth a try, so we bought an ad package.

12.    At no time was I ever involved in ASD ownership, operation, or control.  I have never been an ASD officer, director, or shareholder.  I am not privy to how Bowdoin runs ASD's business and was not privy to any decision Bowdoin made concerning how to allocate funds raised by ASD.  I had no involvement in any sales presentations he has made and never knew, prior to my receipt of the complaint in this proceeding, that he had prior run ins with the law.

13.    As a social courtesy to Bowdoin, I asked a pastor friend of mine, Rev. Charles Green, if he might bring his boat and join me in inviting Bowdoin on a relaxing fishing trip.  I imagined that operating ASD involved a lot of stress, and I had heard Bowdoin liked to fish.  I also wanted a respite from work.  The invitation was extended and Bowdoin agreed to join us.

14.    On April 11, 2008, we fished at a lake in Brunswick, Georgia for a day.  On that Day Bowdoin surprised me by recommending that I start a Chinese version of ASD.  Bowdoin suggested that I organize the business without him.  He said, "I can't handle the business I already have," stating that I should be the one to create, own, and operate this Chinese version of ASD.

**EXHIBIT 1**

15. I was interested in the idea, but did not have knowledge of computers and the web, so I thought Bowdoin should run it, but Bowdoin did not want to run it. I chose the name of Golden Panda Ad Builder Inc. and I had the company incorporated on May 15, 2008. At that time, I still thought that Bowdoin would end up running the business, so I placed his name as President of the company, although Bowdoin never actually took any step to run the company.

16. Two and one half weeks before Golden Panda commenced operations on July 24, 2008, Bowdoin called me and reiterated that he did not have time for Golden Panda, had done nothing to help create it, and therefore thought I should be the one to own, operate, and control the business.

17. I then decided that with the help of my kids that I really could run a web based advertising business on my own. On July 2, 2008, I amended the Golden Panda papers with the state, naming myself as the President and removing Bowdoin's name.

18. On July 12, 2008, in an ASD rally in Miami, Florida, Bowdoin announced that he had no affiliation with Golden Panda. He reiterated that he had no affiliation with Golden Panda at an ASD rally in Chicago on July 19, 2008. I know those statements to be true.

19. Bowdoin also posted a notice on his web site stating that he withdrew himself from Golden Panda. *See* Letter from Bowdoin Regarding Disassociation (Attachment 1); Bowdoin Resignation from Golden Panda (Attachment 2). Those notices were posted approximately one week before the July 24 date when Golden Panda became operational.

**EXHIBIT 1**

20.  In fact, Bowdoin never performed any function when I put his name down as President of Golden Panda in the corporate papers.  He was President in name only for the period of May 15 to July 2, 2008.  He not only did not perform any function for Golden Panda or direct Golden Panda's operations in any way, he also never contributed any funding either from ASD or personally to Golden Panda.  He had no involvement in forming Golden Panda beyond planting the idea of a web based advertising business in my mind.

21.  Bowdoin's business is named Ad Surf Daily Income Generator.  I named my business Golden Panda Ad Builder.  I chose that name.  I now have come to realize that the last two words of each name are telling.  While the focus of ASD may be income generation based on my read of the complaint, the focus of my business was advertising (building greater audiences for web based advertising).

22.  Because I wanted to ensure that Golden Panda operated lawfully, I searched for and found a recognized expert on legal compliance in direct selling and network marketing law who resided in Memphis, Tennessee.  D. Jack Smith is that expert attorney.  My daughter and I first contacted Jack on or about the week of July 22, 2008.  We retained Jack on July 29, 2008.  We invited Jack to visit our offices and go through all of our records and discuss with us Golden Panda's business model.  We asked him to help us ensure that it was lawful in every respect.  Jack came to our offices in Atlanta, Georgia, for his review and conferences on July 31, 2008.  The following day, after Smith had returned to Memphis, we received word from our bank that the Department of Justice had frozen our accounts.  It was not until one

**EXHIBIT 1**

week later that we received the government's complaint and first learned of the

government's reason for freezing the funds.

23.   The charges in the complaint associating us with ASD and stating that a majority of

Golden Panda's funds came from ASD are false, as explained above.  Neither

Bowdoin nor ASD provided any capital or expended any effort in establishing or

operating Golden Panda.  I chose the name for the business, and I provided seed

capital from my real estate business revenues.  Golden Panda obtained all other start

up money from 34 founders:  Lucille Allen and her spouse; Dr. Kevin Campbell and

his spouse; Donald L. Chrestensen and his spouse; Robert Cobb and his spouse;

Kent Davis and his spouse; Ray Dawson and his spouse; Judy Dishman and her

spouse; Jenny Elliott and her spouse; Alan Ferguson and his spouse; Anthony Gantz

and his spouse; Toby Gantz and his spouse; Rev. Charles D. Green and his spouse;

Billy Jo Haas and her spouse; Joyce Haws and her spouse; Boyd Wayne Hughes and

his spouse; and Shannon Hutto and her spouse.

24.   None of those founders is an officer, director, or shareholder in ASD.  None of

Golden Panda's funds are from Bowdoin, ASD, or any bank account affiliated with

Bowdoin or ASD.  *See* Attachment 3 (affidavit from Robert J. Skinner, CPA).  The

money I invested in Golden Panda came from my local real estate business.

25.   Golden Panda has never transferred funds from its Bank of America accounts into a

Solid Trust Pay account, and it has no plans to do so in the future.

26.   I created Golden Panda to sell advertising.  I did not sell memberships and do not

have a "member" based business.  I designed Golden Panda to provide a valuable

web base where one advertiser could present its ad to others and would have an

**EXHIBIT 1**

incentive to do so in the form of a return of portion of ad dollars spent.  I also wanted Golden Panda to maximize ad value for customers, so we have developed a geographically-targeted web advertising tool and are developing classified ad options for our customers.  We are also working on ways to improve the positioning of our advertisers on search engines.

27.    Advertisers join *free* and receive 50 ad views to show their business in the Golden Panda rotator.  They are also allowed to surf (look at ads on the rotator) up to 72 sites each day.  For each ad they look at in the rotator they are given additional credit views that they can use to show there business ad.  Customers use this opportunity to test the effectiveness of their advertising before purchasing ad packages.

28.    Golden Panda profits from the sale of advertising.  For every advertising dollar spent with the company, we retain 50 cents as payment for the ad (our profit) and place the other 50 cents in our "cash out" fund, which is a separate account exclusively for pay-outs.  The cash out fund is paid out to all advertisers who examine 12 ads that we randomly select every single day for a period of at least 15 seconds for each ad. Those who perform that function, and thus ad value by giving assured views to ads, are rewarded by receiving daily a pro rata share of the ad sales proceeds that we contribute to the "cash out" fund for that day (i.e., the 50% of ad sales revenues that we place in the fund).  Those who do not are not entitled to any pro rata share.

29.    Those who surf consistently over time (examine every day for 15 seconds each ad every one of the 12 ads randomly selected) also receive credits, which are cash equivalents toward future advertising.  By adding value through consistent viewing

**EXHIBIT 1**

of ads, those advertisers not only receive a pro rata share of the daily sales but also credits good towards future advertising.

30.    Advertisers can request that their pro rata share be paid out to them or can apply it to future advertising.  When they ask for the pro rata share in cash or apply it, their request is honored but we reduce the amount of their prior ad package purchase by the amount taken out until that amount reaches zero, whereupon in order to keep their advertisement on our rotator, they must buy additional advertising.

31.    We do explain the benefits of attracting viewers through a system that encourages viewership of ads, but, unlike ASD, we do not guarantee any advertisers that he or she will receive any amount of money from the cash out fund.  If the money is there, and the advertiser views the 12 ads for 15 seconds each ad, then the advertiser will be entitled to a pro rata share.  No money is promised that does not exist in the cash out fund.

32.    Golden Panda calculates the amount to distribute from the cash out fund to the advertisers who are ad viewers by dividing total ad revenue received by one-half.  It then divides that half by the number of customers who viewed the advertisement as required.  It then pays out that percentage (from 0 to 5%).  Never does Golden Panda commit to pay out more than it actually has in the daily cash out fund.  Never does Golden Panda commit to pay out a fixed sum or percentage of total ad dollars.  It varies entirely based on daily ad sales, so a statement of that kind is not possible.

33.    When the government seized Golden Panda's accounts, I ordered that Golden Panda suspend its operations.  I never received a cease and desist order.  I suspended the business because I am not about to continue it unless I am assured that it is lawful.  I

**EXHIBIT 1**

have done all I can to make sure that it is lawful, even hiring at considerable expense an expert attorney to guide me in ensuring that result, hired before the freeze order at the earliest days of the business.

34.    It is my intention to operate a lawful advertising business that provides a service that affords web advertisers greater value than they ordinarily experience in buying ads from companies like Google.

35.    Golden Panda cannot operate under the current asset freeze.  Golden Panda, its Employees, and its customers suffer significant hardship while the government retains control over Golden Panda's accounts.  On August 1, 2008, the company employed 14 people.  We now employ 7.  The rest I was forced to fire.  We will have to fire the rest unless the funds now frozen are released.  The employees still on board have taken significant salary cuts to help us keep paying payroll for as long as I can personally afford it.  In addition, my daughter Dawn and I have not been taking any salary.  I am pulling funds from my part-time real estate business to compensate those employees.  Golden Panda must resume business quickly or it will go out of business.

36.    Word of the freeze order is out, of course, because we have had to explain why ads are not being placed on the web.  The longer we are not in operation, the more difficult it will be to keep advertisers.  When they leave, they are entitled to a refund of their purchase.  When they leave, they will have little difficulty finding competitors that sell web advertising.  I believe it unlikely that customers that leave us under the present circumstances will return.

**EXHIBIT 1**

Clarence Busby Jr.
CEO/President, Golden Panda Ad Builder Inc.

Executed on: 8/25/08

**EXHIBIT 1**

**POSTED ON WWW.GOLDENPANDAADBUILDER.COM ON JULY 19, 2008**

Andy Bowdoin, is a man with a huge heart to help others. He continues to give in all that he does and we would like to publically thank him for giving us the opportunity to open the Chinese site, Golden Panda Ad Builder. Although, he is unable to take on this new venture with us, we want our members to know that we intend to run this company with integrity and efficiency, and again we want to thank Mr. Bowdoin for his gift of Golden Panda Ad Builder.

Below is the letter that he approved to send out to our members. We hope this helps to explain the separation between ASD and Golden Panda Ad Builder, in the light that Mr. Bowdoin expressed it to us.

**To the Members of Golden Panda Ad Builder,**

The Golden Panda Ad Builder Site will be opening its doors in the next few days. In all of the preparation and excitement surrounding the Chinese Site's opening, there have been many conflicting reports brought forth concerning ASD's affiliation with Golden Panda Ad Builder. I would like to caution those of you reading this letter, to consider much of the negative things you hear about ASD, La Fuente Dinero and Golden Panda Ad Builder, as what they are, inaccurate truths, especially those concerning any conflict between ASD and Golden Panda Ad Builder's affiliation.

All three sites, ASD, La Fuente Dinero and Golden Panda Ad Builder are separate companies. The intent in starting Golden Panda Ad Builder has always been that it would operate as a separate company. ASD and La Fuente Dinero are operated out of Quincy, Florida. Golden Panda Ad Builder is operated out of Acworth, Georgia. Both the ASD and La Fuente Dinero Sites are operated, by myself, Andy Bowdoin, as President. Golden Panda Ad Builder is operating under the leadership of Clarence Busby, Jr. He was chosen by me, to start and run the Golden Panda Ad Builder Site.

There are many transitions and enhancements taking place at ASD and La Fuente Dinero, at this time. Because of the large efforts and time constraints placed on running two companies, I am unable to take on the additional challenges that are involved with opening another company/site. Due to these large time constraints and the daily issues that arise in operating two large companies, I have chosen to resign from my position as President of Golden Panda Ad Builder. I have chosen to place control of ownership, operation and management with Mr. Busby and his capable staff. I have full confidence that Mr. Busby and his team will operate a professional and efficient company and I give him, his staff and Golden Panda Ad Builder my approval on this new, exciting adventure.

Thank You,

Andy Bowdoin

**The staff at Golden Panda Ad Builder is excited about this new venture that we are about to enter. We would like to thank all of you your support.**

**POSTED ON ASD WEBSITE ON JULY 17, 2008**

# Message from Andy Bowdoin, ASD President

Posted July 17, 2008

To All Members of ASD and La Fuente Dinero from President, Andy Bowdoin:

Due to the amount of time I must dedicate to manage ASD and La Fuente Dinero, I have resigned my position as President of Golden Panda and have relinquished my ownership and affiliation with the Golden Panda Ad Builder Company.

I have much respect for Clarence Busby and wish him great success in his endeavor.


Sincerely,

Andy Bowdoin

## Robert J. Skinner, CPA, P.C.
### Certified Public Accountant

To The Board of Directors
Golden Panda Ad Builder Inc.
Acworth, Georgia 30101

I have been engaged to report on the deposits made into Golden Panda Ad Builder's bank
accounts. I have tested the information provided by management, and their financial reporting
systems to the appropriate company bank accounts. The company's bank account activity started
in July 2008. The tests were completed using the July 2008 bank statements from Bank of
America. The August 2008 bank statements were not available at the time of this engagement
and thus were not tested, although internal documents were verified to the company's financial
reporting systems up through August 25, 2008.

The internal documentation provided by management, their financial reporting systems, and the
company's July bank accounts do not reveal the presence of any funds coming from Andy
Bowdoin or ASD Cash Generator. I have attached copies of all documents relied upon for this
review.

The above statements are made under the penalty of perjury.

August 26, 2008

**BUSBY AFFIDAVIT**
**ATTACHMENT 3**

**EXHIBIT 1**

5150 Stilesboro Road, Suite 340 • Kennesaw, GA 30152 • (770) 794-9677 • (770) 794-9667 Fax

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

                Plaintiff,

     v.

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

                Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

                Claimants.

**AFFIDAVIT OF
WALTER CLARENCE BUSBY JR.
IN SUPPORT OF GOLDEN
PANDA'S MOTION FOR
SEVERANCE AND TRANSFER**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

### AFFIDAVIT OF WALTER CLARENCE BUSBY JR. IN SUPPORT OF GOLDEN PANDA'S MOTION FOR SEVERANCE AND TRANSFER

      I, Walter Clarence Busby Jr. ("Clarence Busby"), declare under penalty of perjury that

the following is true and correct to the best of my knowledge, information, and belief:

    1.     I am President and Chief Executive Officer of Golden Panda Ad Builder Inc. ("Golden

        Panda") (www.goldpandaadbuilder.com).  As President and CEO, I oversee the daily

**EXHIBIT 2**

operation of Golden Panda. My daughter, Dawn Stowers, is the Chief Operating

Officer. Golden Panda has 2 directors: Clarence Busby Jr. and Dawn Stowers.

2.    I lived in Georgia all but two years of my life. I have resided in Acworth, Georgia for 7

of the past 12 years. I have lived within a 20 mile radius of Acworth for the past 20

years.

3.    In my lifetime I have owned and resided in about 15 homes all located in Georgia. I

have held an ownership interest in at least 150 homes located within Georgia.

4.    I have run several successful businesses, all of which were located within Georgia.

Those businesses include: Rockdale Bolt and Screw (operated in Georgia for 2 years);

LADS Fasteners (operated in Georgia for 5 years); Classic Express Custom Vans

(operated within Georgia for 4 years); Oceanview Enterprises (operated in Georgia for

4 years); Beach Management (operated in Georgia for 4 years); and Legacy Premier

Properties, Inc. (operated in Georgia for 12 years).

5.    Aside from Golden Panda, I have never transacted business outside of the State of

Georgia.

6.    Georgia is home to four Busby Generations. I am the second generation to reside in

Georgia, and my grandchildren are now raised in Georgia. I currently have no intention

of leaving the state for business or to establish a new residence.

7.    When the Government seized Golden Panda's accounts, the company employed 14

individuals who all resided within Georgia. All of Golden Panda's employees resided

within Cobb County or the surrounding counties.

8.    Golden Panda received its startup funding from 34 founders. None of those founders

were from the District of Columbia. Those founders resided in: Maryland, Iowa,

Alabama, Arizona, Michigan, New York, Florida, and Georgia.

**EXHIBIT 2**

9.  All money received from these founders arrived from those states, and no seed capital transferred from the District of Columbia.

10. The Government seized five Golden Panda bank accounts from Bank of America. Those accounts are:  Bank of America Account #'s 334011130192; 33401130200; 334015765704; 91000113401039; and 91000113404188.  Golden Panda opened all of those accounts in Georgia, through Bank of America institutions located within Georgia.

11. The listed address on each of those seized accounts is 4900 Ivey Rd., N.W., Suite 820, Acworth, GA,  30101-4001.

12. When the Government seized Golden Panda's business, the company had 19,804 customers.  To the best of my knowledge, none of those customers resided in the District of Columbia.  Golden Panda has made no rebate payments to individuals in the District of Columbia.  It has never made cashout payments to individuals in the District of Columbia.

13. Aside from the present litigation, neither Golden Panda nor any of its representatives has discussed Golden Panda's business operations with an individual from the District of Columbia.  Golden Panda has never specifically solicited business within the District of Columbia.

14. No Golden Panda representative, officer, or owner has ever traveled into the District of Columbia for business.

15. Other than the present litigation, Golden Panda'a business and its assets have had no connection with the District of Columbia.

**EXHIBIT 2**

Clarence Busby Jr.
CEO/President, Golden Panda Ad Builder Inc.

Executed on:   5/25/08

**EXHIBIT 2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o United States Attorney's Office<br>555 Fourth St., N.W.,<br>Washington, D.C.  20530,<br><br>               Plaintiff,<br><br>     v.<br><br>ALL FUNDS, INCLUDING<br>APPROXIMATELY $53 MILLION,<br>HELD ON DEPOSIT AT BANK OF<br>AMERICA ACCOUNTS IN THE NAMES<br>(1) THOMAS A. BOWDOIN, JR.,<br>SOLE PROPRIETOR, DBA<br>ADSURFDAILY, (2) CLARENCE<br>BUSBY JR. AND DAWN STOWERS,<br>DBA GOLDEN PANDA AD BUILDER,<br>AND (3) GOLDEN PANDA<br>AD BUILDER,<br><br>               Defendants, and<br><br>GOLDEN PANDA AD BUILDER, AND<br>CLARENCE BUSBY, JR.<br><br>               Claimants. | **AFFIDAVIT OF<br>DAWN STOWERS<br>IN SUPPORT OF GOLDEN<br>PANDA'S MOTION FOR<br>SEVERANCE AND TRANSFER**<br><br><br>Civil Action No:  1:08-cv-01345<br>Hon. Rosemary M. Collyer |

<u>**AFFIDAVIT OF DAWN STOWERS IN SUPPORT OF GOLDEN PANDA'S MOTION
FOR SEVERANCE AND TRANSFER**</u>

       I, Dawn Stowers, declare under penalty of perjury that the following is true and

correct to the best of my knowledge, information, and belief:

**EXHIBIT 3**

1.   I am the Chief Operating Officer of Golden Panda Ad Builder Inc. ("Golden Panda") (www.goldpandaadbuilder.com).  As Chief Operating Officer, I assist in the daily operation of Golden Panda.  Golden Panda has 2 directors: Clarence Busby Jr. and Dawn Stowers.

2.   I have resided in Georgia my entire life.  I have lived in various locations within Georgia, including:  Norcross, Dahlonega, Macon, Hartwell, Powder Springs, Marietta, Kennesaw, and Acworth.  I have owned four properties in the State of Georgia.  Those properties are located in:  Kennesaw (owned for 1 year); Kennesaw (owned for 2 years); Acworth (owned for 8 years); and Acworth (owned for 2 years).

3.   I have never held a job outside the State of Georgia, nor have I transacted business outside Georgia.

4.   I am among the third Busby generation to reside in Georgia.  My extended family also lives in Georgia, including my children, brother, and parents.

5.   I am aware that Golden Panda does not employ any individual residing outside the State of Georgia.

6.   Golden Panda has never received funding from the District of Columbia.  It received its initial startup money from 34 founders, none of whom reside or resided in the District of Columbia.

7.   I am named on Golden Panda's Bank of America accounts.  Golden Panda opened each of those accounts at local institutions in Georgia.  The address attributed to those accounts is 4900 Ivey Rd., N.W., Suite 820, Acworth, GA  30101-4001.  That was the only address ever listed on those accounts.

**EXHIBIT 3**

8.  I have never traveled to the District of Columbia for business.  I have never discussed Golden Panda's business or conducted business with a Golden Panda customer from the District of Columbia.  No Golden Panda employee has transacted business with an individual from the District of Columbia.

9.  The Government seized Golden Panda's business accounts on August 1, 2008.  At that time, Golden Panda had 19,804 customers.  To best of my knowledge, information, and belief, none of those customers resided in the District of Columbia.

10.  Golden Panda has never advertised in the District of Columbia, or otherwise specifically marketed its program in the District of Columbia.

11.  Golden Panda has never issued a cashout payment to an individual or business located within the District of Columbia.

12.  Other than the present litigation, Golden Panda's business and its assets have had no connection with the District of Columbia.


Dawn Stowers
Chief Operating Officer, Golden Panda Ad Builder Inc.

Executed on: _8-29-08_

**EXHIBIT 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

                    Plaintiff,

        v.

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

                  Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

                  Claimants.

**DRAFT ORDER**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

<u>**ORDER**</u>

       Upon consideration of the claimant's Motion for Severance and Transfer and the

Government's response thereto, it is on this _____ day of _____, 2008,

HEREBY:

       ORDERED that the Motion for Severance be GRANTED.  Forfeiture proceedings

against the following accounts shall be separate from these proceedings:

1.  All funds held in account # 334011130192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

2.  All funds held in account # 334011130200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account;

3.  All funds held in account # 334015765704 at Bank of America, the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account;

4.  All funds held in account # 91000113401039 at Bank of America, in the name of Golden Panda Ad Builder; and

5.  All funds held in account # 91000113404188 at Bank of America, in the name of Golden Panda Ad Builder;

ORDERED that the Motion for Transfer be GRANTED.  Forfeiture proceedings against the above accounts is hereby transferred to the United States District Court for the Northern District of Georgia.


_____
ROSEMARY M. COLLYER
United States District Judge