## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o United States Attorney's Office<br>555 Fourth St., N.W.,<br>Washington, D.C.  20530,<br><br>    Plaintiff,<br><br>  v.<br><br>8 GILCREASE LANE, QUINCY<br>FLORIDA  32351,<br><br>    and,<br><br>ONE CONDO LOCATED ON<br>NORTH OCEAN BOULEVARD IN<br>MYRTLE BEACH, SOUTH<br>CAROLINA,<br><br>    and,<br><br>ALL FUNDS, INCLUDING<br>APPROXIMATELY $53 MILLION,<br>HELD ON DEPOSIT AT BANK OF<br>AMERICA ACCOUNTS IN THE NAMES<br>(1) THOMAS A. BOWDOIN, JR.,<br>SOLE PROPRIETOR, DBA<br>ADSURFDAILY, (2) CLARENCE<br>BUSBY JR. AND DAWN STOWERS,<br>DBA GOLDEN PANDA AD BUILDER,<br>AND (3) GOLDEN PANDA<br>AD BUILDER,<br><br>    Defendants, and<br><br>GOLDEN PANDA AD BUILDER, AND<br>CLARENCE BUSBY, JR.<br><br>    Claimants. | **EMERGENCY MOTION FOR<br>RELEASE OF PROPERTY<br>PENDING FORFEITURE, AND FOR<br>EVIDENTIARY HEARING**<br><br><br>Civil Action No:  1:08-cv-01345<br>Hon. Rosemary M. Collyer |

## EMERGENCY MOTION FOR RELEASE OF PROPERTY PENDING FORFEITURE, AND FOR EVIDENTIARY HEARING

Claimant Clarence Busby Jr. d/b/a Golden Panda Ad Builder, by counsel and pursuant to 18 U.S.C. § 983(f) and Fed. R. Civ. Pro Rule G(8)(d), hereby petitions this Court for release of seized property pending civil forfeiture proceedings.  On August 1, 2008, the Government seized five Bank of America accounts under Golden Panda's exclusive ownership.  That seizure prevents Golden Panda from conducting business.  Golden Panda suffers a substantial hardship as it is unable to pay employees, has been forced to terminate half of its staff, and will be forced to close if its property is not soon returned.  The balance of factors under 18 U.S.C. § 983(f) weighs in favor of release.  Accordingly, Golden Panda respectfully requests that this Court order the immediate release and restoration of the following five bank accounts owned by Golden Panda Ad Builder:

1. All funds held in account # 334011130192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

2. All funds held in account # 334011130200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account;

3. All funds held in account # 334015765704 at Bank of America, the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account;

4. All funds held in account # 91000113401039 at Bank of America, in the name of Golden Panda Ad Builder; and

5. All funds held in account # 91000113404188 at Bank of America, in the name of Golden Panda Ad Builder.

Golden Panda requests an evidentiary hearing on the merits of this Petition for Release.  The Government intends to oppose this motion.  In support of its Motion for Release, Claimant Golden Panda provides the attached Memorandum of Points of Law and Authorities.[1]

Respectfully submitted,

CLARENCE BUSBY JR. AND GOLDEN PANDA AD BUILDER

By:  _____/s/_____

D. Jack Smith
Law Offices of D. Jack Smith
4620 Shady Grove Rd.,
Memphis, TN  39117
*Co-Counsel*

Jonathan W. Emord*
Andrea G. Ferrenz
Peter A. Arhangelsky
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
*Its Counsel*

* Counsel of Record

Date submitted:  August 29, 2008

---

[1]    Today, on August 29, 2008, Golden Panda filed a Motion to Sever and Transfer this cause of action to the United States District Court for the Northern District of Georgia.  Golden Panda's Motion to Sever and Transfer did not waive any objections or rights in this Court. Under Fed. R. Civ. Pro 20 and 42, Golden Panda can request a severance or transfer through the completion of discovery.

Because of the exigent circumstances attending the instant motion, Golden Panda submits this Motion for Release to preserve its call for prompt relief.  The motion is filed immediately after word was received from opposing counsel that the Government had not completed its review of evidence supplied by Golden Panda and, thus, could not consent to release of the funds at this time.  If this Court rules expeditiously on Golden Panda's Motion for Severance and Transfer, Golden Panda will raise this instant motion in the District Court for the Northern District of Georgia.  However, if this Court anticipates a lengthy period of response, Golden Panda requests that its instant Motion for Release be adjudicated by this Court forthwith to prevent destruction of Golden Panda's business.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

               Plaintiff,

       v.

8 GILCREASE LANE, QUINCY
FLORIDA  32351,

               and,

ONE CONDO LOCATED ON
NORTH OCEAN BOULEVARD IN
MYRTLE BEACH, SOUTH
CAROLINA,

               and,

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

             Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

               Claimants.

**MEMORANDUM IN SUPPORT OF CLAIMANTS' EMERGENCY MOTION FOR RELEASE OF PROPERTY PENDING FORFEITURE, AND FOR EVIDENTIARY HEARING**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

<u>**MEMORANDUM IN SUPPORT OF CLAIMAINTS' MOTION FOR RELEASE OF PROPERTY PENDING FORFEITURE, AND FOR AN EVIDENTIARY HEARING**</u>

# <u>TABLE OF CONTENTS</u>

Table of Contents ............................................................................................................ ii

Table of Authorities ....................................................................................................... iii

Introduction ..................................................................................................................... 1

Facts ................................................................................................................................. 4

Argument .......................................................................................................................... 9

  I.  Golden Panda is Statutorily Entitled to Release of Seized Bank Accounts and
      Restoration of its Business Pending Forfeiture Proceedings ...................................... 9

        A.  Golden Panda has a Possessory Interest in the Seized Property ................ 10

        B.  Golden Panda's Officers have Sufficient Ties to the Community to
            Provide Assurance that the Property will be Available at the Time of
            Trial ................................................................................................................ 10

        C.  The Government's Continued Possession of Golden Panda's Property
            Pending the Final Disposition of the Forfeiture Proceedings Causes
            Substantial Hardship to Golden Panda and Its Employees ........................ 12

        D.  Golden Panda's Hardship Outweighs the Risk that Property will be
            Destroyed, Damaged, Lost, Concealed, or Transferred if it is
            Returned to Golden Panda During the Pendency of the Proceeding ......... 13

        E.  Golden Panda is a Legitimate Business, Not a Ponzi Scheme ................. 14

  II.  Golden Panda Requests an Evidentiary Hearing on the Merits of Its Petition for
      Release ...................................................................................................................... 16

Conclusion ...................................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Degan v. U.S.*, 517 U.S. 820 (1996) ................................................................. 17

*Floyd v. Dunson*, 209 B.R. 424 (Bankr. S.D. Tex. 1997) .................................. 15

*Kaloti Wholesale, Inc. v. United States*, 525 F.2d 1067 (E.D. Wis. 2007) ...... 12

*Matter of Sinclair*, 870 F.2d 1340 (7th Cir. 1989) ........................................... 12

*Terry v. Dowdell*, 2006 U.S. Dist. LEXIS 60114 (W.D. Va. Aug. 11, 2006) ................. 15

*U.S. v. E-Gold, Ltd.*, 521 F.3d 411 (D.C. Cir. 2008) ........................................ 17

*U.S. v. James Daniel Real Property*, 510 U.S. 43 (1993) .................................. 16

*United States v. $1,231,349.68 in Funds*, 227 F.Supp. 2d 125 (D.D.C. 2002) ................. 11

*United States v. One Lincoln Navigator 1998*, 328 F.3d 1011 (8th Cir. Ark. 2003) .... 9, 17

*United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260 (4th Cir. N.C. 2004) ................................................................................................. 14

**Statutes**

18 U.S.C. § 1343 ................................................................................................. 11

18 U.S.C. § 1956 ................................................................................................. 11

18 U.S.C. § 1957 ................................................................................................. 11

18 U.S.C. § 983 ........................................................... 1, 3, 9, 12, 14, 16, 18, 19

Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, § 2, 114 Stat. 202 ....... 9

**Other Authorities**

11A Wright, Miller & Cooper, Federal Practice and Procedure § 2949 .......................... 18

**Rules**

Fed. R. Civ. P. Supp. Rule G ............................................................................. 9

Fed. R. Civ. Pro. 65 ........................................................................................... 18

**<u>INTRODUCTION</u>**

A claimant is entitled to a release of property pending forfeiture proceedings where the Government's retention of such property causes a substantial hardship to the claimant, and that hardship outweighs the likelihood that property will be lost, depleted, or transferred during the proceedings. *See* 18 U.S.C. § 983(f). The Government seized all of Golden Panda's bank accounts on August 5, 2008, and Golden Panda is prevented from transacting business. The freeze on its business has forced Golden Panda to terminate five employees, and reduce its staff from 14 down to a skeletal crew of 7 employees. Continued seizure of Golden Panda's assets will soon result in total destruction for the company. Golden Panda CEO and President Clarence Busby Jr. has demonstrated no intention of transferring funds or depleting company assets. Golden Panda is a legitimate advertising company seeking only to continue business in the normal course. The balance of factors in 18 U.S.C. § 983(f) thus favors release of Golden Panda's property.

Golden Panda is not affiliated with Ad Surf Daily ("ASD"). The two companies are independently owned, operated, and controlled. No ASD or Bowdoin funds were ever deposited into Golden Panda accounts or relied upon to run Golden Panda. ASD owner Andy Bowdoin publicly declared his non-affiliation with Golden Panda weeks before Golden Panda became operational. Yet the Government now proceeds against Golden Panda on the false premise that it is affiliated with ASD.

In the Government's 44 page complaint, just over two pages of text pertain to Golden Panda. Operating on the faulty assumption that Golden Panda is linked with ASD, the Government provides no evidence that Golden Panda violated federal law, operated an unlawful business, or manifested an intent to conceal funds. The Government conducted no independent

1

investigation of Golden Panda, while falsely alleging that a majority of funds deposited into

Golden Panda accounts originated from ASD accounts at BOA.  *See* Govt Complaint at 39.  That

allegation is patently false.  *See* Exhibit 1 at ¶ 6 (Affidavit of Clarence Busby Jr.); Exhibit 1,

Attachment 3 (Affidavit of CPA).  Indeed, the Government has not established the requisite

probable cause to seize Golden Panda's assets.

Full refutation of the Government's central allegation, that Golden Panda is linked with

ASD can best be exposed in an evidentiary hearing.  While the Government holds Golden

Panda's assets, the company remains unable to conduct business of any kind.  The freeze on its

accounts is causing Golden Panda substantial hardship.  Golden Panda has been forced to fire

half of its employees, reducing its operating staff from 14 to 7.  All of the terminated employees

depended on Golden Panda for their living income.  Remaining employees work for reduced

salaries, and the company is running dangerously low on cash.

Golden Panda CEO and President Clarence Busby Jr. commenced Golden Panda's

operations on July 24, 2008.  All funds used for the operation of the business came from

Clarence Busby Jr. (which, in turn, came from his real estate business) and from 34 founders,

none of whom is Andy Bowdoin or ASD.  Mr. Busby is paying for his staff of 7 out of funds

from his real estate business, which funds cannot continue to pay payroll longer than several

weeks.  Without expeditious relief, Golden Panda will be forced to terminate its remaining

employees.

Golden Panda seeks to resume its legitimate advertising business.  Contrary to the

Government's allegations, Golden Panda does not operate an unlawful Ponzi scheme.  In fact,

Golden Panda's business model reflects none of the characteristic elements commonly associated

with a Ponzi.  It provides customers with a valuable service:  advertising.  Golden Panda makes

money only from the sale of advertising.  It does not enroll members or charge membership fees.

It does not fund pay-outs to advertisers from new "member" payments but instead devotes 50%

of all ad purchase revenue to a cash out account from which distributions are made pro rata to

those who daily view 12 randomly selected Golden Panda ads for 15 seconds per ad.  *See* Exhibit

1 at ¶¶ 28-30 (Affidavit of Clarence Busby Jr.).

The Government has thus seized the assets of a legitimate business.  And under 18 U.S.C.

§ 983(f), Golden Panda petitions this Court to restore its property pending the resolution of these

forfeiture proceedings.  The Government provided no evidence that Golden Panda's funds were

unlikely to remain available during the course of these proceedings.  Indeed, Clarence Busby Jr.

and Golden Panda have displayed no intention of transferring or depleting Golden Panda

accounts.  Accordingly, the likelihood of substantial hardship to Golden Panda far outweighs the

possibility that such funds will be unavailable at trial.

This Court can release Golden Panda's accounts subject to conditions, and Golden Panda

will abide by any conditions this Court deems necessary to protect the assets in question.

Pending the ongoing forfeiture proceedings, Golden Panda can provide complete transparency in

its operation or this Court may require the posting of a bond.

The Government has erred by presuming Golden Panda an ASD clone when its business

model differs materially and its principals have engaged in no wire fraud or acts of deception

whatsoever.  For the following reasons, Golden Panda requests an evidentiary hearing within the

30-day statutory period for decision on its motion for release.  *See* 18 U.S.C. § 983(f)(5).

## FACTS

Clarence Busby Jr. is the President and CEO of Golden Panda Ad Builder Inc. *See* Exhibit 1 at ¶ 1 (Affidavit of Clarence Busby). He oversees the daily operation of the company. His daughter, Dawn Stowers, is the Chief Operating Officer. *Id*. The company has eleven employees. *Id*. at ¶ 3.

Golden Panda Ad Builder Inc. was incorporated in Georgia on May 15, 2008. *Id.* at ¶ 3. It is a company in good standing. *Id.*

Golden Panda commenced operations on July 24, 2008. *Id.* at ¶ 16. From that date until the present suit was filed on August 1, 2008, is a period of 8 days. On August 1, 2008, the following Golden Panda bank accounts were seized by the Department of Justice: Bank of America Account #'s 334011130192; 33401130200; 334015765704; 91000113401039; and 91000113404188.

The other defendant in this action, Ad Surf Daily Cash Generator ("ASD") is not affiliated with Golden Panda. *Id.* at ¶¶ 6-8, 18-20, 23-24. Contrary to an allegation in the government's complaint, none of the accounts owned by Golden Panda contains any money from ASD, Andy Bowdoin, or any of ASD's officers, directors, or shareholders. *See id.* at ¶¶ 20, 24; Exhibit 1, Attachment 3 (Affidavit of Robert J. Skinner, CPA). Neither ASD nor any of its officers, directors, or shareholders is an officer, director, or shareholder in Golden Panda. *Id.* at ¶ 24. None has ever exercised any influence or control over Golden Panda's operations. *Id.* at ¶ 20-24. Golden Panda has never received any funding for its operation from ASD. *Id.*

Busby was never involved in ASD ownership, operation, or control. He has never been an ASD officer, director, or shareholder. He is not privy to how Bowdoin runs ASD's business and was not privy to any decision Bowdoin made concerning how to allocate funds raised by

4

ASD.  *See* Exhibit 1 at ¶ 12.  He has had no involvement in any sales presentations Bowdoin has made and never knew, prior to his receipt of the complaint in this proceeding, that Bowdoin had prior run ins with the law.  *Id.* at ¶ 9.

On the recommendation of an ASD member, Busby bought an ASD ad package in November of 2007.  *Id.* at ¶ 11.  Before buying the package, he asked that member if he could meet the person she identified as the head of ASD, Andy Bowdoin.  He met Bowdoin, heard about Bowdoin's ASD program, talked it over with his wife, and then bought an ad package.  *Id.* at ¶ 10-11.  He knew little about the business other than what Bowdoin told him and has little knowledge of computers and the web.  *Id.* at ¶ 15.

As a social courtesy to Bowdoin, he asked a pastor friend of his, Rev. Charles Green, if Green might bring his boat and join Busby in inviting Bowdoin on a relaxing fishing trip.  *Id.* at ¶ 13.  Bowdoin accepted the invitation and on April 11, 2008, he spent the day fishing with Busby and Green.  During that fishing trip, Bowdoin recommended that Busby start a Chinese version of ASD.  *Id.* at ¶ 14.  He told Busby to organize the business without him.  He said, "I can't handle the business I already have," stating that Busby should be the one to create, own, and operate this Chinese version of ASD.  *Id.*

Busby did not believe he knew enough about computers and the web to run the business and, so, told Bowdoin that Bowdoin should run it.  Bowdoin explained that he did not want to run it.  *Id.* at ¶ 14-15.  Busby then proceeded solo in choosing the name for the company and incorporating it on May 15, 2008.  At the time of incorporation, Busby still thought Bowdoin would need to run the business, so he placed Bowdoin's name as President of the company, although Bowdon never actually filled that office and never actually took any step to run the company.  *Id.* at ¶ 15-16.

Two and one-half weeks before Golden Panda commenced operations (July 24, 2008), Bowdoin called Busby and reiterated that he did not have time for Golden Panda, had done nothing to help create it, and thought Busby should be the one to own, operate, and control the business. *Id.* at ¶ 16. Busby decided with the help of his kids that he really could run a web based advertising business on his own. *Id.* at ¶ 17. On July 2, 2008, he amended the Golden Panda papers with the state, naming himself the President and removing Bowdoin's name. *Id.*

On July 12, 2008, in an ASD rally in Miami, Florida, Bowdoin announced that he had no affiliation with Golden Panda. He reiterated that he had no affiliation with Golden Panda at an ASD rally in Chicago on July 19, 2008. *Id.* at ¶ 18. He also posted a notice on his web site stating that he withdrew himself from Golden Panda. *See id.* at ¶ 19; Exhibit 1 at Attachment 1 (Bowdoin Letter Regarding Disassociation); Exhibit 1 at Attachment 2 (Bowdoin Resignation from Golden Panda). Those notices were posted approximately one week before the July 24 date when Golden Panda became operational. *See* Exhibit 1 at ¶ 19.

Bowdoin never performed any function for Golden Panda while his name was on the state papers as President of the company. He was President in name only for the period of May 15 to July 2, 2008. *Id.* at ¶ 20. On July 2, Busby amended the papers, removing Bowdoin's name and naming himself as President. *See id.* at ¶ 17.

Busby created a web based advertising business that aims to provide advertising value to businesses. The focus of the business is advertising, not cash distribution. The names of the two defendants are telling in that regard. The name of ASD is Ad Surf Daily *Cash Generator*. The name of Golden Panda is Golden Panda *Ad Builder*. *Id.* at ¶ 21.

At the very start of Golden Panda's business (which lasted only 8 days before it was shut down through the government's fund seizure), Busby wanted to secure the legal representation of

an expert in direct selling and network marketing law to ensure lawful operation.  He found D.
Jack Smith of Memphis, Tennessee, an internationally known marketing attorney.  *Id.* at ¶ 22.
He first contacted Smith on or about the week of July 22, 2008.  He retained Smith on July 29,
2008.  He invited Smith to the Golden Panda offices in Atlanta, Georgia and hired Smith to
evaluate the company's records and business model and advise the company on all steps
necessary to ensure that the company was lawful.  *Id.*  Smith traveled to Atlanta and met with
Golden Panda on July 31, 2008.  On August 1, 2008, the day <u>after</u> Smith had met with the
company, Golden Panda received word from its bank that all of the Golden Panda accounts had
been frozen.  It was not until one week later that Golden Panda received the government's
complaint that its principals became aware of the government's reason for freezing the funds.  *Id.*

The allegations in the complaint associating Golden Panda and Busby with ASD and
Bowdoin are false.  *Id.* at ¶ 23.  Neither Bowdoin nor ASD provided any capital or expended any
effort in establishing or operating Golden Panda.  *Id.* at ¶¶ 23-24.  Golden Panda received no
funding, direction, or control from ASD and is a business completely independent from and not
in any way beholden to ASD.  *Id.* at ¶¶ 6, 23-24.

Golden Panda's funding came from Busby who, in turn, retrieved it from proceeds
stemming from his successful real estate practice and from 34 founders named in the Busby
affidavit.  *Id.* at ¶ 23.  None of those founders is an officer, director, or shareholder in ASD.  *Id.*
at ¶ 24.

Busby created Golden Panda to sell advertising.  *Id.* at ¶ 26.  The company screens each
ad to ensure that it is "clean" (free of content that would offend, particularly content that is
pornographic).  Approved ads are placed on a web rotator and each advertiser is asked to view 12
other randomly selected ads for 15 seconds each every day ("ad views").  *Id.* at ¶ 28.  That builds

an immediate audience for the ads, something hard to come by in typical web advertising.  *See id.* at ¶¶ 26-29.  Since its inception, the company has been developing a system that will allow its advertisers to geographically target ads to reach specific audiences, to post classified ads, and to take steps to increase the visibility of company ads on search engines.  Those services come at an additional fee beyond the cost of the rotator ads.  *See id.* at ¶ 26-30.

From every rotator advertising dollar paid to the company, 50 cents is retained as profit and 50 cents is contributed to a cash out fund.  The cash out fund is designed to create an incentive for ad views.  *Id.* at ¶ 28.  Those who daily perform ad views are eligible to receive a pro rata share of the ad sales proceeds contributed to the cash out fund.  *Id.* at ¶¶ 28-29.

Advertisers can request that their pro rata share be paid out to them or can apply it to future advertising.  When they ask for the pro rata share in cash or apply it, their request is honored but Golden Panda reduces the amount of their prior ad package purchase by the amount taken out until that amount reaches zero, whereupon in order to keep their advertisement in the rotator, they must buy additional advertising.  *Id.* at ¶ 30.

Golden Panda explains the program to its advertisers honesty and does not make any claims, like those alleged to have been made by ASD, that advertisers will be guaranteed a 125% return on an ad purchase.  *Id.* at ¶ 31-32.  They are told, instead, that if money is present in the cash out fund, it will be distributed pro rata.  If not, there will be no distribution.  *Id.* at ¶ 31.

Golden Panda is not responsible for, had no foreknowledge of, and never was involved in the making of the claims alleged in the complaint that give rise to wire fraud.  *See id.* at ¶ 9.

Golden Panda is not presently in operation as a direct result of the seizure order.  Golden Panda is losing customers, has been forced to terminate employees, is paying the remainder

reduced salaries for a time out of Busby's pocket, and cannot remain a viable company unless it

promptly has access to its funds and resumes business.  *Id.* at ¶ 35-36.

## **ARGUMENT**

### I.  **GOLDEN PANDA IS STATUTORILY ENTITLED TO RELEASE OF SEIZED BANK ACCOUNTS AND RESTORATION OF ITS BUSINESS PENDING FORFEITURE PROCEEDINGS**

As a claimant to seized property, Golden Panda petitions this Court for release of that

property.  *See* Fed. R. Civ. P. Supp. Rule G(5).  By statute, Golden Panda is entitled to that

release if it satisfies the enumerated statutory factors.  *See* 18 U.S.C. § 983(f).  Congress created

this remedy in the Civil Asset Forfeiture Reform Act of 2000 to prevent the Government, as it

does here, from making overly broad use of the civil forfeiture statute.  *See* Pub. L. No. 106-185,

§ 2, 114 Stat. 202.  Available relief under Section 983(f) is necessary "to make federal civil

forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the

means to recover their property and make themselves whole after wrongful government

seizures."  *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1012 (8th Cir. Ark.

2003).

The remedial protections in Section 983(f) prevent the Government from circumventing

the Due Process Clause by effecting a pre-hearing seizure without just cause.  Under 18 U.S.C. §

983(f), a claimant must demonstrate:  (1) a possessory interest in the property; (2) sufficient ties

to the community to provide assurance that the property will be available at trial; (3) continued

possession by the Government pending the final disposition of forfeiture proceedings will cause

substantial hardship; (4) the hardship to the claimant outweighs the risk that the property will not

be available at the time of trial; (5) and that none of the statutory exceptions in 18 U.S.C. § 983(f)(8) apply. *See* 18 U.S.C. § 983(f)(1).

### A. Golden Panda has a Possessory Interest in the Seized Property

Golden Panda has exclusive ownership in the currency found in the seized accounts. The following bank accounts of Golden Panda were seized on August 1, 2008 pursuant to the Government's pending civil forfeiture proceeding in the United States District Court for the District of Columbia: Bank of America Account numbers # 334011130192; # 33401130200; # 334015765704; # 91000113401039; and # 91000113404188. *See* Exhibit 1 at ¶ 8 (Affidavit of Clarence Busby); Exhibit 1, Attachment 3 (Affidavit of Robert J. Skinner, CPA).

Golden Panda CEO and President, Clarence Busby Jr. opened each of those accounts. Golden Panda's officers remain the only individuals authorized by Bank of America to deduct funds from those accounts. Clarence Busby Jr. and his daughter, Dawn Stowers, are each named accountholders on Golden Panda's accounts. *See* Exhibit 1 at ¶ 8.

### B. Golden Panda's Officers have Sufficient Ties to the Community to Provide Assurance that the Property will be Available at the Time of Trial

Clarence Busby Jr. has resided in or around Acworth, Georgia for over 20 years. He is a minister in the community and has a real estate business there that he has owned and operated for the past 12 years. His wife, son, and daughter all reside there. He has no intention of leaving. *See* Exhibit 1 at ¶ 2. Busby owns real property in Acworth, Georgia. The Government provided no evidence that Busby plans to purchase real property outside the state. No evidence suggests Busby has plans to move funds from Golden Panda's Bank of America accounts. In short, nothing suggests Busby will use the funds for anything other than legitimate operation of Golden Panda Ad Builder. *See United States v. $1,231,349.68 in Funds*, 227 F.Supp. 2d 125, 128

(D.D.C. 2002) (finding no risk from claimant who had maintained a residence in Maryland for 22 years, even though currently unemployed).

Busby has no incentive to deplete the seized property. Golden Panda is a legitimate advertising company taking hold of the internet advertising market share. Busby desires only to restore operation of Golden Panda. Furthermore, Busby operates without significant threat of criminal prosecution. The Government's complaint against ASD was predicated on several violations of federal criminal law. Bowdoin's alleged misrepresentation of facts concerning his past business history could expose him to criminal liability under the wire fraud statute. *See* 18 U.S.C. § 1343. The Government also bases its action on the money laundering statutes. *See* 18 U.S.C. §§ 1956, 1957. But Busby had no knowledge of Bowdoin's past alleged illegalities and had nothing to do with his representations about ASD and, therefore, Busby's operation of Golden Panda could not have knowingly or intentionally perpetuated false statements made by Bowdoin. Both wire fraud and money laundering require proof of knowledge and intent, *mens rea* elements that Busby lacked.

The Government in its complaint argued that ASD had plans to move funds into a Solid Trust Pay account, thereby removing funds to a Canadian-based company. Golden Panda has never used Solid Trust Pay to receive money from foreign customers. Golden Panda has never transferred funds from its Bank of America accounts into Solid Trust Pay accounts and has no intention of doing so. *See* Exhibit 1 at ¶ 25. Golden Panda originally intended to use that service but never followed through. Golden Panda's website and terms of use encourage customers to deposit funds into its Bank of America accounts. The Government provided no evidence that Busby intends to make any other use of the Solid Trust Pay account. The Government produced

no evidence showing that the funds in Golden Panda's Bank of America accounts were likely to move during the pending forfeiture proceedings.

In sum, Golden Panda's strong ties to the community minimize risk that funds could be depleted before trial. Therefore, this factor militates in favor of releasing Golden Panda's seized property.

### C. The Government's Continued Possession of Golden Panda's Property Pending the Final Disposition of the Forfeiture Proceedings Causes Substantial Hardship to Golden Panda and Its Employees

In 18 U.S.C. § 983(f)(1)(C), Congress provided examples of substantial hardship warranting the release of property pending forfeiture. A claimant suffers substantial hardship if the Government's forfeiture prevents the functioning of a business or prevents an individual from working. 18 U.S.C. § 983(f)(1)(C). Where the language of a statue is plain and does not lead to an absurd result, the language itself "is the sole evidence of the ultimate legislative intent." *Matter of Sinclair*, 870 F.2d 1340, 1343 (7th Cir. 1989). "Congress indicated in the text of the statute that the kind of hardship it envisioned was hardship that would prevent a business from 'functioning' or an individual from 'working,' or cause a person to become 'homeless.'" *Kaloti Wholesale, Inc. v. United States*, 525 F.2d 1067, 1070 (E.D. Wis. 2007).

The Government's seizure of Golden Panda's assets prevents Golden Panda from functioning and deprives Golden Panda employees of a living wage. At present, the Government has seized all of Golden Panda's operating accounts, effectively shutting down its business and preventing Golden Panda from abiding by its terms of agreement with customers. With its assets frozen, Golden Panda remains idle during the Government's forfeiture proceedings. Golden Panda cannot afford to cease business for the prolonged period of anticipated litigation. It needs relief immediately. *See* Exhibit 1 at ¶ 35-36.

When the Government filed its complaint on August 5, 2008, Golden Panda employed 14 persons. In just over two weeks since, Golden Panda has been forced to terminate 7 employees. For those employees terminated, Golden Panda was their sole source of income. Golden Panda retains a skeletal staff of just 7 employees, 4 have experienced a reduction in pay. Mr. Busby has been forced to contribute funds from his part-time real estate business to compensate the remaining employees. If Golden Panda cannot resume business quickly, Busby will be unable to keep paying the employees, and the company will cease to exist.

The Government's *ex parte* seizure thus prevents the functioning of a legitimate business and deprives individuals from work. Accordingly, this factor militates in favor of releasing Golden Panda's property pending the forfeiture proceedings.

### D. Golden Panda's Hardship Outweighs the Risk that Property will be Destroyed, Damaged, Lost, Concealed, or Transferred if it is Returned to Golden Panda During the Pendency of the Proceeding

Observe that the Government provided no evidence that funds in Golden Panda's accounts are at risk of depletion or transfer. In its complaint, the Government alleges only that Bowdoin might transfer property to foreign sources. The Government presumes that Golden Panda's accounts are directly linked to Andy Bowdoin. That is false. *See* Exhibit 1 at ¶¶ 7, 23-24; Exhibit 1 at Attachment 3 (Affidavit of Robert J. Skinner, CPA). Indeed, the Government's allegations against Golden Panda only proceed if Bowdoin has control of the funds in Golden Panda's Bank of America accounts. But Bowdon has no such control. *See* Exhibit 1 at ¶¶ 6, 20, 24. Bowdoin has no financial relationship with Golden Panda. He has no authority to access Golden Panda's accounts. Golden Panda's funds are under the exclusive control of Clarence Busby Jr., and Busby demonstrates no intent to move funds from the Golden Panda Bank of America Accounts. In fact, Golden Panda had moved most of the funds into two CDs.

While the Government may argue currency is too transient, the value of a legitimate business's operating accounts do not present an undue risk of loss. *See United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260, 265 n.4 (4th Cir. N.C. 2004). Because a legitimate business uses the currency to continue operating as a going concern, the Court can depend on business assets being available to assure the return to the government of an equal amount to the previously seized currency. *Id.* The flexibility in 18 U.S.C. § 983(f)(7) requires only that equal money or assets are available. The Government need not preserve the exact same currency now under seizure.

Even if this Court determines that release of Golden Panda's property presents a risk, Golden Panda would accept conditions to reassure the Court that the subject property will remain available during the forfeiture proceedings. This Court is statutorily empowered to impose conditions upon the release of property to ensure that the value of the property is maintained while the forfeiture action is pending. *See* 18 U.S.C. § 983(f)(7). Such conditions may include the inspection of bank accounts, posting a bond, requiring the claimant to obtain or maintain insurance, or placing a lien against the subject property to ensure that the property is not transferred to another persons. *Id.* Golden Panda would accept any such protections to guarantee its funds remain available.

### E.  Golden Panda is a Legitimate Business, Not a Ponzi Scheme

Under the provisions for relief in 18 U.S.C. § 983(f), Congress precluded release of electronic funds "unless such currency or other monetary instrument or electronic funds constitutes the assets of a legitimate business which has been seized." 18 U.S.C. § 983(f)(8)(A). The Government has accused ASD of operating an unlawful Ponzi scheme and, without any investigation of Golden Panda's business, incorrectly considers Golden Panda an extension of

ASD, a false supposition.  *See* Exhibit 1 at ¶¶ 6, 20, 23-24.  Golden Panda's business model is not unlawful and, therefore, the statutory exemption in 18 U.S.C. § 983(f)(8)(A) is inapplicable.

The Government applies the term "Ponzi" to Golden Panda by association without fully vetting the characteristics of Golden Panda's business.  Courts generally define a Ponzi scheme as "a fraudulent investment arrangement whereby an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture."  *Floyd v. Dunson*, 209 B.R. 424, 430-431 (Bankr. S.D. Tex. 1997).  Golden Panda does no such thing.  It does not pay ad purchases from funds received from later ad purchasers.  It devotes 50% of all ad buys to a cash out fund that is distributed pro rata to existing advertisers who perform the ad view duration discussed in the Fact section above.  A business is a Ponzi scheme if it:  "(i) received deposits from investors; (ii) conducted no legitimate business as represented to investors; (iii) produced no profits or earnings through legitimate investments or business, but rather raised funds by securing new investments from investors; and (iv) made payments to investors from other investors' invested funds."  *Terry v. Dowdell*, 2006 U.S. Dist. LEXIS 60114 (W.D. Va. Aug. 11, 2006).

Golden Panda is an advertising business that displays none of the characteristics of an unlawful Ponzi scheme.  Its customers purchase ad packages with the knowledge that their money is for advertising space.  Golden Panda produces profits from the sale of that advertising. It does not charge membership fees for new participants.  It does not enroll members.  Although it takes 50% of ad revenue and puts it in a cash-out account used to encourage ad views, those are not "invested funds," those are direct purchase funds.

Golden Panda is not unlike any other business selling services as opposed to goods. Golden Panda sells advertising.  Just like an advertiser that purchases newspaper ad space,

Golden Panda's customers understand that payment is for advertising time, and not an investment with a guaranteed rate of return. Golden Panda's unique system promotes "audience creation" for its advertisers. Golden Panda genuinely intends to maximize exposure to ever-increasing audiences for its advertisements.

The Government applies the opinion of an anonymous FTC Economist who opines that unlawful schemes generally include: "(1) the promise of abnormally high short term returns on investments; (2) all income is derived from within the investment scheme; (3) the absence of any legitimate or reasonable business investment; and (4) only a small minority of individuals can profit from the operation of the business." *See* Govt Complaint at 34. Golden Panda makes no promise of returns at all. Because Golden Panda's pro-rata cash out payments are dependent on existing business, Golden Panda makes no promise of any amount of return coming to customers.

The business of Golden Panda is lawful and legitimate advertising sales. The Government has thus seized the assets of a legitimate business. Under 18 U.S.C. § 983(f), Golden Panda is entitled to restoration of its property pending further proceedings.

## II.  GOLDEN PANDA REQUESTS AN EVIDENTIARY HEARING ON THE MERITS OF ITS PETITION FOR RELEASE

This Court should hold an evidentiary hearing to determine whether Golden Panda is entitled to release of its property, and whether the Government has met its burden to seize Golden Panda's assets at the outset of litigation. The Supreme Court extended the protections of the Due Process Clause to civil forfeiture proceedings where the Government seizes property upfront. *See U.S. v. James Daniel Real Property*, 510 U.S. 43, 48-49 (1993) (requiring meaningful opportunity to be heard when real property is the subject of seizure); *see also Degan*

*v. U.S.*, 517 U.S. 820, 822 (1996) (citizen has a right to a hearing to contest the forfeiture of his property, a right secured by the Due Process Clause").

In April of 2008, the Court of Appeals for the D.C. Circuit extended the right to a post-deprivation pretrial hearing where the funds seized by the Government were required to facilitate representation of counsel under the Sixth Amendment. *See U.S. v. E-Gold, Ltd.*, 521 F.3d 411, 418 (D.C. Cir. 2008). The Court in *E-Gold* determined that the opportunity to be heard at a "meaningful time and in a meaningful manner" must provide for an adversary hearing after the Government effects a seizure, but before the trial stage in civil forfeiture proceedings. *Id.* ("There is considerable worth in a post-indictment, pre-trial adversarial hearing on the issue of the restraint of the seized property. It is the right to adduce such evidence that underlies the Supreme Court's longstanding determination that a fundamental requirement of due process is the opportunity to be heard"). However, the *E-Gold* Court stopped short of extending this right in all civil forfeiture proceedings, choosing instead to limit its opinion to instances where the Sixth Amendment is impaired. *Id.* at 420 ("the constitutional right of due process of law entitles defendants to an opportunity to be heard at least where access to the assets is necessary for an effective exercise of the Sixth Amendment right to counsel"). While the Court's language implies that pre-trial hearings are appropriate in still more circumstances, the law remains silent in this Circuit as to whether such hearings are guaranteed.

Reference to civil forfeitures in other circuits and procedures in similar legal scenarios demonstrates the availability and need for an evidentiary hearing in this case. The Eighth Circuit has used evidentiary pretrial hearings concerning seized property. *See U.S. v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1024 (8th Cir. 2003). In *One Lincoln Navigator*, the court found that "[t]he district court proceeded in this manner, quite properly using the evidentiary

hearing on the hardship issue to help resolve what the government presented as a threshold issue of standing." *Id.*

A petition for release of seized property is similar to a motion for preliminary injunction following a temporary restraining order. Both the petition for release and the preliminary injunction seek to remedy unjust harm that could accrue over the course of litigation. Observe that in motions for preliminary injunctions before this Court, a movant is entitled to a hearing under Federal Rule of Civil Procedure 65(b)(3). *See* Fed. R. Civ. Pro. 65(b)(3) (requiring a hearing at the earliest possible time to prevent irreparable harm"). An evidentiary hearing is essential to adjudge credibility when factual controversies are present. *See* 11A Wright, Miller & Cooper, Federal Practice and Procedure § 2949 (discussing preliminary injunctions). "If there is a factual controversy, oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses." *Id.* Similarly, the right to confront witnesses grows increasingly paramount when allegations of fact are contradictory.

The Government alleged that ASD currency funded Golden Panda's operation. Golden Panda can prove this false. The Government alleged that Bowdoin played a substantial role in Golden Panda's creation. Again, Golden Panda can prove otherwise. The Government alleges that Golden Panda's business model is an illegal Ponzi scheme, yet Golden Panda can prove the Government's understanding of its business is incorrect. These material discrepancies of fact mandate an evidentiary hearing to afford Golden Panda an opportunity to confront its accusers.

Recognizing the need for prompt action, Congress provides this Court with just 30 days to rule on Golden Panda's Petition for Release. *See* 18 U.S.C. § 983(f)(5) ("[t]he Court shall render

a decision on a petition filed under paragraph (3) not later than 30 days after the date of filing").[1] Given the aggressive timeline for decision, Golden Panda requests an expedited hearing on the merits at the earliest possible date. Should this Court schedule a hearing on ASD's Emergency Motion for Return of Seized Funds, Golden Panda hereby requests to participate as a claimant to the property at issue.

## CONCLUSION

For the foregoing reasons, Golden Panda respectfully requests this Court order the return of seized property pending the outcome of litigation or, in the alternative, set a short date for hearing on the issues presented herein.

Respectfully submitted,

CLARENCE BUSBY JR. AND GOLDEN PANDA AD BUILDER

By:  _____/s/_____
     Jonathan W. Emord*
     Andrea G. Ferrenz
     Peter A. Arhangelsky
     Emord & Associates, P.C.
     11808 Wolf Run Lane
     Clifton, VA  20124
     Ph:  (202) 466-6937
     Fx:  (202) 466-6938
     *Its Counsel*

D. Jack Smith
Law Offices of D. Jack Smith
4620 Shady Grove Rd.,
Memphis, TN  39117
*Co-Counsel*

     * Counsel of Record

---

[1] Under 18 U.S.C. § 983(f)(3)(B)(ii), Golden Panda is required to set forth the steps it has taken to secure release of its property from the Government. Golden Panda has conferred with Government counsel on Monday, August 25, 2008, to seek a volitional release of the funds. The parties have agreed to extend the time for filing a response to the Government's complaint on the condition that Golden Panda exchange requested evidence. Golden Panda files this motion seeking emergency relief to expedite its recovery, and to preserve its need for prompt relief. Although Golden Panda will continue to seek cooperation from the Department of Justice, it cannot afford to delay in seeking the relief requested herein.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

                Plaintiff,

      v.

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

                Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

                Claimants.

**AFFIDAVIT OF
WALTER CLARENCE BUSBY JR.**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

## AFFIDAVIT OF WALTER CLARENCE BUSBY JR.

        I, Walter Clarence Busby Jr. ("Clarence Busby"), declare under penalty of perjury that

the following is true and correct to the best of my knowledge, information, and belief:

**EXHIBIT 1**

1.  I am President and Chief Executive Officer of Golden Panda Ad Builder Inc. ("Golden Panda") (www.goldpandaadbuilder.com). As President and CEO, I oversee the daily operation of Golden Panda. My daughter, Dawn Stowers, is the Chief Operating Officer. Golden Panda has 2 directors: Clarence Busby Jr. and Dawn Stowers.

2.  I currently reside in Acworth, Georgia, and I have lived in the Acworth area for over 20 years. My son and daughter also reside in the Acworth area. I have successfully run a real estate business in Acworth, Georgia for the past 12 years.

3.  Golden Panda is a Georgia corporation, registered on May 15. It is a company in good standing with the state.

4.  Golden Panda has 11 employees, and three additional hires that we were forced to let go. The eleven original employees are Clarence Busby Jr.; Dawn Stowers; Bryan Busby (my son); Cheryl Pasley; Katie Bates; Lynsey Myers; Moneita Lewis; Rhonda Broadnax; Samantha Geizer; Katirna Motes; and Steven Haynes.

5.  Golden Panda commenced operations on July 24, 2008. From the time it commenced operations until the date suit was filed against Golden Panda, August 1, 2008, is 8 days.

6.  Neither Ad Surf Daily ("ASD") nor any of its officers, directors, or shareholders is an officer, director, or shareholder in Golden Panda. None has ever exercised any influence or control over the company's operations. Neither ASD nor Bowdoin ever opened, placed funds into, or controlled any Golden Panda bank accounts or any of Golden Panda's officers, directors, or shareholders' bank accounts. *See* Attachment 3 (affidavit of Robert J. Skinner, CPA).

**EXHIBIT 1**

7.  Golden Panda has never received any funding for its operation from ASD.

8.  The following bank accounts of Golden Panda were seized on August 1, 2008 pursuant to the Government's pending civil forfeiture proceeding in the United States District Court for the District of Columbia: Bank of America Account #334011130192; #33401130200; #334015765704; #91000113401039; and #91000113404188.  Those accounts include no money from ASD, Andy Bowdoin, or any of ASD's officers, directors, or shareholders.  Those accounts include all funds necessary to operate Golden Panda's business and, so, their seizure has forced Golden Panda to cease operations.

9.  I have no knowledge of how ASD allocates its funds or operates its business beyond the rudimentary and had no knowledge that Andy Bowdoin had prior run-ins with the law or had been accused of wire fraud until I read the complaint served upon me.

10. I was first informed of ASD from Robyn Lynn from Sarasota, Florida, an ASD member who I met at a new business opportunity seminar.  She told me that she was an ASD member and asked me if I would be interested in buying an ASD ad package and becoming an ASD member also.  I initially said no.  Because I regarded her as intelligent and honest, I told her I would consider the proposal further but would have to meet the person who headed ASD to know whether to buy the package.  She gave me Bowdoin's name and phone number. As it happens, in November of 2007, I needed to attend a funeral for my wife's uncle.  The funeral would take place near the area where Lynn told me Bowdoin was located.  I called Bowdoin and left him a message telling him I would be in the area and would like to

**EXHIBIT 1**

meet him.  He called me back and confirmed a lunch appointment.  I then first met him at the Charter House restaurant in Bainbridge, Georgia.

11.    He explained his ASD program to me over lunch.  I had (and still have) little understanding of computers and the web.  I told him I would have to talk over the idea of buying an ASD ad package with my wife before I decided whether to buy the package and thereby become an ASD member.  I spoke with my wife and she thought it worth a try, so we bought an ad package.

12.    At no time was I ever involved in ASD ownership, operation, or control.  I have never been an ASD officer, director, or shareholder.  I am not privy to how Bowdoin runs ASD's business and was not privy to any decision Bowdoin made concerning how to allocate funds raised by ASD.  I had no involvement in any sales presentations he has made and never knew, prior to my receipt of the complaint in this proceeding, that he had prior run ins with the law.

13.    As a social courtesy to Bowdoin, I asked a pastor friend of mine, Rev. Charles Green, if he might bring his boat and join me in inviting Bowdoin on a relaxing fishing trip.  I imagined that operating ASD involved a lot of stress, and I had heard Bowdoin liked to fish.  I also wanted a respite from work.  The invitation was extended and Bowdoin agreed to join us.

14.    On April 11, 2008, we fished at a lake in Brunswick, Georgia for a day.  On that Day Bowdoin surprised me by recommending that I start a Chinese version of ASD.  Bowdoin suggested that I organize the business without him.  He said, "I can't handle the business I already have," stating that I should be the one to create, own, and operate this Chinese version of ASD.

**EXHIBIT 1**

15.  I was interested in the idea, but did not have knowledge of computers and the web, so I thought Bowdoin should run it, but Bowdoin did not want to run it.  I chose the name of Golden Panda Ad Builder Inc. and I had the company incorporated on May 15, 2008.  At that time, I still thought that Bowdoin would end up running the business, so I placed his name as President of the company, although Bowdoin never actually took any step to run the company.

16.  Two and one half weeks before Golden Panda commenced operations on July 24, 2008, Bowdoin called me and reiterated that he did not have time for Golden Panda, had done nothing to help create it, and therefore thought I should be the one to own, operate, and control the business.

17.  I then decided that with the help of my kids that I really could run a web based advertising business on my own.  On July 2, 2008, I amended the Golden Panda papers with the state, naming myself as the President and removing Bowdoin's name.

18.  On July 12, 2008, in an ASD rally in Miami, Florida, Bowdoin announced that he had no affiliation with Golden Panda.  He reiterated that he had no affiliation with Golden Panda at an ASD rally in Chicago on July 19, 2008.  I know those statements to be true.

19.  Bowdoin also posted a notice on his web site stating that he withdrew himself from Golden Panda.  *See* Letter from Bowdoin Regarding Disassociation (Attachment 1); Bowdoin Resignation from Golden Panda (Attachment 2).  Those notices were posted approximately one week before the July 24 date when Golden Panda became operational.

**EXHIBIT 1**

20.   In fact, Bowdoin never performed any function when I put his name down as President of Golden Panda in the corporate papers.  He was President in name only for the period of May 15 to July 2, 2008.  He not only did not perform any function for Golden Panda or direct Golden Panda's operations in any way, he also never contributed any funding either from ASD or personally to Golden Panda.  He had no involvement in forming Golden Panda beyond planting the idea of a web based advertising business in my mind.

21.   Bowdoin's business is named Ad Surf Daily Income Generator.  I named my business Golden Panda Ad Builder.  I chose that name.  I now have come to realize that the last two words of each name are telling.  While the focus of ASD may be income generation based on my read of the complaint, the focus of my business was advertising (building greater audiences for web based advertising).

22.   Because I wanted to ensure that Golden Panda operated lawfully, I searched for and found a recognized expert on legal compliance in direct selling and network marketing law who resided in Memphis, Tennessee.  D. Jack Smith is that expert attorney.  My daughter and I first contacted Jack on or about the week of July 22, 2008.  We retained Jack on July 29, 2008.  We invited Jack to visit our offices and go through all of our records and discuss with us Golden Panda's business model.  We asked him to help us ensure that it was lawful in every respect.  Jack came to our offices in Atlanta, Georgia, for his review and conferences on July 31, 2008.  The following day, after Smith had returned to Memphis, we received word from our bank that the Department of Justice had frozen our accounts.  It was not until one

**EXHIBIT 1**

week later that we received the government's complaint and first learned of the government's reason for freezing the funds.

23. The charges in the complaint associating us with ASD and stating that a majority of Golden Panda's funds came from ASD are false, as explained above. Neither Bowdoin nor ASD provided any capital or expended any effort in establishing or operating Golden Panda. I chose the name for the business, and I provided seed capital from my real estate business revenues. Golden Panda obtained all other start up money from 34 founders: Lucille Allen and her spouse; Dr. Kevin Campbell and his spouse; Donald L. Chrestensen and his spouse; Robert Cobb and his spouse; Kent Davis and his spouse; Ray Dawson and his spouse; Judy Dishman and her spouse; Jenny Elliott and her spouse; Alan Ferguson and his spouse; Anthony Gantz and his spouse; Toby Gantz and his spouse; Rev. Charles D. Green and his spouse; Billy Jo Haas and her spouse; Joyce Haws and her spouse; Boyd Wayne Hughes and his spouse; and Shannon Hutto and her spouse.

24. None of those founders is an officer, director, or shareholder in ASD. None of Golden Panda's funds are from Bowdoin, ASD, or any bank account affiliated with Bowdoin or ASD. *See* Attachment 3 (affidavit from Robert J. Skinner, CPA). The money I invested in Golden Panda came from my local real estate business.

25. Golden Panda has never transferred funds from its Bank of America accounts into a Solid Trust Pay account, and it has no plans to do so in the future.

26. I created Golden Panda to sell advertising. I did not sell memberships and do not have a "member" based business. I designed Golden Panda to provide a valuable web base where one advertiser could present its ad to others and would have an

**EXHIBIT 1**

incentive to do so in the form of a return of portion of ad dollars spent.  I also wanted Golden Panda to maximize ad value for customers, so we have developed a geographically-targeted web advertising tool and are developing classified ad options for our customers.  We are also working on ways to improve the positioning of our advertisers on search engines.

27.  Advertisers join *free* and receive 50 ad views to show their business in the Golden Panda rotator.  They are also allowed to surf (look at ads on the rotator) up to 72 sites each day.  For each ad they look at in the rotator they are given additional credit views that they can use to show there business ad.  Customers use this opportunity to test the effectiveness of their advertising before purchasing ad packages.

28.  Golden Panda profits from the sale of advertising.  For every advertising dollar spent with the company, we retain 50 cents as payment for the ad (our profit) and place the other 50 cents in our "cash out" fund, which is a separate account exclusively for pay-outs.  The cash out fund is paid out to all advertisers who examine 12 ads that we randomly select every single day for a period of at least 15 seconds for each ad.  Those who perform that function, and thus ad value by giving assured views to ads, are rewarded by receiving daily a pro rata share of the ad sales proceeds that we contribute to the "cash out" fund for that day (i.e., the 50% of ad sales revenues that we place in the fund).  Those who do not are not entitled to any pro rata share.

29.  Those who surf consistently over time (examine every day for 15 seconds each ad every one of the 12 ads randomly selected) also receive credits, which are cash equivalents toward future advertising.  By adding value through consistent viewing

**EXHIBIT 1**

of ads, those advertisers not only receive a pro rata share of the daily sales but also credits good towards future advertising.

30. Advertisers can request that their pro rata share be paid out to them or can apply it to future advertising. When they ask for the pro rata share in cash or apply it, their request is honored but we reduce the amount of their prior ad package purchase by the amount taken out until that amount reaches zero, whereupon in order to keep their advertisement on our rotator, they must buy additional advertising.

31. We do explain the benefits of attracting viewers through a system that encourages viewership of ads, but, unlike ASD, we do not guarantee any advertisers that he or she will receive any amount of money from the cash out fund. If the money is there, and the advertiser views the 12 ads for 15 seconds each ad, then the advertiser will be entitled to a pro rata share. No money is promised that does not exist in the cash out fund.

32. Golden Panda calculates the amount to distribute from the cash out fund to the advertisers who are ad viewers by dividing total ad revenue received by one-half. It then divides that half by the number of customers who viewed the advertisement as required. It then pays out that percentage (from 0 to 5%). Never does Golden Panda commit to pay out more than it actually has in the daily cash out fund. Never does Golden Panda commit to pay out a fixed sum or percentage of total ad dollars. It varies entirely based on daily ad sales, so a statement of that kind is not possible.

33. When the government seized Golden Panda's accounts, I ordered that Golden Panda suspend its operations. I never received a cease and desist order. I suspended the business because I am not about to continue it unless I am assured that it is lawful. I

**EXHIBIT 1**

have done all I can to make sure that it is lawful, even hiring at considerable expense an expert attorney to guide me in ensuring that result, hired before the freeze order at the earliest days of the business.

34.   It is my intention to operate a lawful advertising business that provides a service that affords web advertisers greater value than they ordinarily experience in buying ads from companies like Google.

35.   Golden Panda cannot operate under the current asset freeze.  Golden Panda, its Employees, and its customers suffer significant hardship while the government retains control over Golden Panda's accounts.  On August 1, 2008, the company employed 14 people.  We now employ 7.  The rest I was forced to fire.  We will have to fire the rest unless the funds now frozen are released.  The employees still on board have taken significant salary cuts to help us keep paying payroll for as long as I can personally afford it.  In addition, my daughter Dawn and I have not been taking any salary.  I am pulling funds from my part-time real estate business to compensate those employees.  Golden Panda must resume business quickly or it will go out of business.

36.   Word of the freeze order is out, of course, because we have had to explain why ads are not being placed on the web.  The longer we are not in operation, the more difficult it will be to keep advertisers.  When they leave, they are entitled to a refund of their purchase.  When they leave, they will have little difficulty finding competitors that sell web advertising.  I believe it unlikely that customers that leave us under the present circumstances will return.

**EXHIBIT 1**

Clarence Busby Jr.
CEO/President, Golden Panda Ad Builder Inc.

Executed on: 8/25/08

**EXHIBIT 1**

**POSTED ON WWW.GOLDENPANDAADBUILDER.COM ON JULY 19, 2008**

Andy Bowdoin, is a man with a huge heart to help others. He continues to give in all that he does and we would like to publically thank him for giving us the opportunity to open the Chinese site, Golden Panda Ad Builder. Although, he is unable to take on this new venture with us, we want our members to know that we intend to run this company with integrity and efficiency, and again we want to thank Mr. Bowdoin for his gift of Golden Panda Ad Builder.

Below is the letter that he approved to send out to our members. We hope this helps to explain the separation between ASD and Golden Panda Ad Builder, in the light that Mr. Bowdoin expressed it to us.

**To the Members of Golden Panda Ad Builder,**

The Golden Panda Ad Builder Site will be opening its doors in the next few days. In all of the preparation and excitement surrounding the Chinese Site's opening, there have been many conflicting reports brought forth concerning ASD's affiliation with Golden Panda Ad Builder. I would like to caution those of you reading this letter, to consider much of the negative things you hear about ASD, La Fuente Dinero and Golden Panda Ad Builder, as what they are, inaccurate truths, especially those concerning any conflict between ASD and Golden Panda Ad Builder's affiliation.

All three sites, ASD, La Fuente Dinero and Golden Panda Ad Builder are separate companies. The intent in starting Golden Panda Ad Builder has always been that it would operate as a separate company. ASD and La Fuente Dinero are operated out of Quincy, Florida. Golden Panda Ad Builder is operated out of Acworth, Georgia. Both the ASD and La Fuente Dinero Sites are operated, by myself, Andy Bowdoin, as President. Golden Panda Ad Builder is operating under the leadership of Clarence Busby, Jr. He was chosen by me, to start and run the Golden Panda Ad Builder Site.

There are many transitions and enhancements taking place at ASD and La Fuente Dinero, at this time. Because of the large efforts and time constraints placed on running two companies, I am unable to take on the additional challenges that are involved with opening another company/site. Due to these large time constraints and the daily issues that arise in operating two large companies, I have chosen to resign from my position as President of Golden Panda Ad Builder. I have chosen to place control of ownership, operation and management with Mr. Busby and his capable staff. I have full confidence that Mr. Busby and his team will operate a professional and efficient company and I give him, his staff and Golden Panda Ad Builder my approval on this new, exciting adventure.

Thank You,

Andy Bowdoin

**The staff at Golden Panda Ad Builder is excited about this new venture that we are about to enter. We would like to thank all of you your support.**

**POSTED ON ASD WEBSITE ON JULY 17, 2008**

# Message from Andy Bowdoin, ASD President

Posted July 17, 2008

To All Members of ASD and La Fuente Dinero from President, Andy Bowdoin:

Due to the amount of time I must dedicate to manage ASD and La Fuente Dinero, I have resigned my position as President of Golden Panda and have relinquished my ownership and affiliation with the Golden Panda Ad Builder Company.

I have much respect for Clarence Busby and wish him great success in his endeavor.


Sincerely,

Andy Bowdoin


**BUSBY AFFIDAVIT**
**ATTACHMENT 2**

**EXHIBIT 1**

# Robert J. Skinner, CPA, P.C.
## Certified Public Accountant

To The Board of Directors
Golden Panda Ad Builder Inc.
Acworth, Georgia 30101

I have been engaged to report on the deposits made into Golden Panda Ad Builder's bank
accounts. I have tested the information provided by management, and their financial reporting
systems to the appropriate company bank accounts. The company's bank account activity started
in July 2008. The tests were completed using the July 2008 bank statements from Bank of
America. The August 2008 bank statements were not available at the time of this engagement
and thus were not tested, although internal documents were verified to the company's financial
reporting systems up through August 25, 2008.

The internal documentation provided by management, their financial reporting systems, and the
company's July bank accounts do not reveal the presence of any funds coming from Andy
Bowdoin or ASD Cash Generator. I have attached copies of all documents relied upon for this
review.

The above statements are made under the penalty of perjury.

August 26, 2008

**BUSBY AFFIDAVIT**
**ATTACHMENT 3**

**EXHIBIT 1**

5150 Stilesboro Road, Suite 340 • Kennesaw, GA 30152 • (770) 794-9677 • (770) 794-9667 Fax

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
c/o United States Attorney's Office
555 Fourth St., N.W.,
Washington, D.C.  20530,

                              Plaintiff,

          v.

ALL FUNDS, INCLUDING
APPROXIMATELY $53 MILLION,
HELD ON DEPOSIT AT BANK OF
AMERICA ACCOUNTS IN THE NAMES
(1) THOMAS A. BOWDOIN, JR.,
SOLE PROPRIETOR, DBA
ADSURFDAILY, (2) CLARENCE
BUSBY JR. AND DAWN STOWERS,
DBA GOLDEN PANDA AD BUILDER,
AND (3) GOLDEN PANDA
AD BUILDER,

                              Defendants, and

GOLDEN PANDA AD BUILDER, AND
CLARENCE BUSBY, JR.

                              Claimants.

**DRAFT ORDER**

Civil Action No:  1:08-cv-01345
Hon. Rosemary M. Collyer

## <u>ORDER</u>

        Upon consideration of the claimant's Emergency Motion for Release of property and

the Government's response thereto, it is on this _____ day of _____, 2008,

HEREBY:

ORDERED that the Motion for Release be GRANTED.  The Government shall hereby restore possession and control of the following Bank Accounts to claimant Golden Panda Ad Builder during the pendency of forfeiture proceedings:

1. All funds held in account # 334011130192 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Deposit Account;

2. All funds held in account # 334011130200 at Bank of America, in the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Operating Account;

3. All funds held in account # 334015765704 at Bank of America, the name of Clarence Busby Jr. and Dawn Stowers, DBA Golden Panda Ad Builder Cashout Account;

4. All funds held in account # 91000113401039 at Bank of America, in the name of Golden Panda Ad Builder; and

5. All funds held in account # 91000113404188 at Bank of America, in the name of Golden Panda Ad Builder;

_____
ROSEMARY M. COLLYER
United States District Judge