## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 08-1345 (RMC)** |
| | ) | **ECF** |
| **v.** | ) | |
| | ) | **Plaintiff's Proposed Findings of Fact** |
| **8 GILCREASE LANE, QUINCY** | ) | **And Conclusions of Law** |
| **FLORIDA 32351, *ET AL.*,** | ) | **Following Evidentiary Hearing** |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| **Thomas A. Bowdoin, Jr.** | ) | |
| **Bowdoin/Harris Enterprises, Inc. &** | ) | |
| **Adsurfdaily, Inc.,** | ) | |
| **Claimants.** | ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN OPPOSITION TO CLAIMANTS' MOTION FOR RETURN OF SEIZED FUNDS

Plaintiff, the United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the attached following as its Proposed "Findings of Fact and Conclusions of Law" in Opposition to Claimants' Motion for Return of Seized Funds.

Respectfully submitted,

_/s/_____

JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

_/s/_____

WILLIAM R. COWDEN, DC Bar # 426301
VASU B. MUTHYALA, CA Bar # 210462
Assistant United States Attorneys
U.S. Attorney's Office, Criminal Division
555 Fourth Street, N.W.,
Washington, D.C. 20530
(202) 307-0258
william.cowden@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the attached Proposed Findings of Fact and Conclusions of Law to be served by means of the Court's ECF system on this 9th day of October 2008 upon claimants' counsel of record.

_/s/_____
William R. Cowden

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>          Plaintiff,<br><br>          v.<br><br>8 GILCREASE LANE, QUINCY<br>FLORIDA 32351, *ET AL.*,<br>          Defendants.<br>_____<br><br>Thomas A. Bowdoin, Jr.<br>Bowdoin/Harris Enterprises, Inc. &<br>Adsurfdaily, Inc.,<br>          Claimants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 08-1345 (RMC)**<br>   **ECF** |

## PROCEDURAL HISTORY

The government brought this civil forfeiture Complaint on August 5, 2008.  On August 15, 2008, the Court docketed a pleading styling itself as containing verified claims by:  (1) Bowdoin/Harris Enterprises, Inc.; (2) Adsurf Daily, Inc.; and (3) Mr. Thomas A. Bowdoin, Jr. The same counsel filed the pleading attaching all three claims.

On August 18, 2008, Bowdoin/Harris Enterprises, Inc.; Adsurf Daily, Inc.; and Mr. Thomas A. Bowdoin, Jr., as claimants, filed an "Emergency Motion For Return Of Seized Funds . . . And Motion To Dismiss" by which claimants have asked the Court to release some of the funds agents seized from Thomas Bowdoin's bank accounts because, his attorneys allege, without "emergency relief[,] the company will soon collapse completely.  Its member base, its most important asset, will disappear, and its employees will be out of work."  Emergency Motion at 1. Furthermore, says ASD, an emergency exists because "[ASD] has been unable to pay . . . its landlord and is hurtling down into a steep financial tailspin."  Id.  The government opposed the

return of the seized funds.  In its opposition, the government noted that the statutory basis for pretrial release of property sued for forfeiture specifically excepted currency and similar monetary instruments, the very property that is sued here.  Nevertheless, the government did not oppose the request for an evidentiary hearing that claimants had requested as part of their emergency motion.

The Court accommodated claimants' request for two days of testimony.  The hearing commenced on September 30, and ended on October 1, 2008.  But, prior to the hearing, claimants' counsel indicated that neither claimant Bowdoin, nor ASD's Chief Executive Officer Juan Hernandez, would testify at the hearing.  Instead, both men, through their counsel, invoked their right under the Constitution's fifth amendment not to incriminate themselves.

At the evidentiary hearing, claimants offered testimony from (1) Robert Grayson, an ASD member, (2) Gerald P. Nehra, an attorney hired by claimants' counsel to challenge some of the government's allegations, (3) Chuck Osmin, a customer service representative employed by ASD, and (4) Philip Schwartz, an attorney employed with the law firm representing claimants at the hearing.  Additionally, both parties submitted several exhibits.

## FINDINGS OF FACT

1.  Ad Surf Daily Inc. ("ASD") operates over the Internet (thereby engaging in transmissions by wire) at www.asdcashgenerator.com, that related persons operate La Fuente Dinero over the Internet at www.lafuentedinero.com.  These sites claim that members can earn large profits simply (1) by paying fees to advertise webpages, (2) by surfing other members' webpages, and (3) by recruiting more members to do the same.  Complaint ¶ 15.

2.  Although ASD appears to be careful to avoid calling its members "investors," ASD

2

promotes paid membership by offering its members a 125% return on the fees they paid to ASD. In addition, ASD encourages members to recruit new members by paying commissions for referrals. ASD pays the source of a referral a percentage of each newly referred member's fees. ASD's webpage proclaims that each weekday in May and June it "rebated" to its members at least 1% of the money they had paid to ASD, and each weekend day it "rebated" at least .50%. Complaint ¶ 16.

3. In July 2008, while it was still operating over the Internet, on the first page of its website ASD informed prospective ad purchasers that their "advertising becomes FREE with rebates and you can Earn 25% on your purchase." Gov. Hearing Exhibit.

4. In July 2008, while it was still operating over the Internet, on the first page of its website ASD informed prospective ad purchasers that they could "Generate Money Placing Free Ads On The Internet!" Gov. Hearing Exhibit.

5. In July 2008, while it was still operating over the Internet, on the first page of its website ASD informed prospective ad purchasers that "ASD pays its advertisers a rebate to view a minimum number of sites each day, therefore, insuring that prospects will be viewing each site." Complaint ¶ 24.

6. In July 2008, while it was still operating over the Internet, ASD claimed to have a business model with an "innovative rebate structure that will enable [it] to continue indefinitely." On the first page of its website ASD informed prospective ad purchasers that "[t]he **rebates are paid from ad purchase sales of the Cash Generator**, the sale of banner ads on the Cash Generator, commissions from the sale of the Ad Placement Service at our sister site 'Attract Marketing System' by cash Generator members, sale of ebooks and any other products that ASD

decides to market." Complaint ¶ 27 (emphasis added).

7.  In July 2008, while it was still operating over the Internet, on the first page of its website ASD informed prospective ad purchasers that "[a]d purchasers **will continue to be paid rebates until they receive 100% of their ad purchases**. To earn an additional 25% rebate on their ad purchase, an ad purchaser must have a minimum group sales volume of $15 per month or their sales volume must average $15 per month while the ad package is still active. **This helps us maintain a constant growth so everyone can reap their profits**." Gov. Hearing Exhibit (emphasis added).

8.  In its Complaint, the government alleges that ASD does not sell any products or services sufficient to generate an income stream needed to support the rebates and commissions that it promises to pay its members from its "sales." The rebate and commission payments come from the funds the members pay to ASD. Complaint ¶ 17.

9.  ASD produced no evidence that it sells any products or services except "ad packages" that would be sufficient to generate an income stream needed to support the rebates and commissions that it promises to pay its members from its "sales," and no evidence that the ad packages are not, for most so-called "purchasers," in effect free.

10.  ASD produced no evidence that most ad package purchasers are not also seeking to qualify for rebates. Members are paying ASD with the expectation that ASD will provide a full rebate and additional revenue. Thus, absent continuous membership growth, ASD has no means to generate the returns that it represents it will pay to those who pay to join its program. Complaint ¶ 17.

11.  ASD agrees that "[t]he elements of a Ponzi scheme include the promise of a 'return

4

on investment' to induce the participant to put money into the program. A second element is the

lack of any underlying product or service or asset sufficient to sustain the promised payouts, and

a third element is the necessity of a continuing flow of new investors/participants to fund the

payouts." Nehra Declaration ¶ 1.

12. A Ponzi scheme needs new investors to succeed. To attract new money, Ponzi

operators must promote the scheme's wealth building opportunity while at the same time

disguising to new members the fact that the program's survival depends on new members' money.

At rallies and on ASD's website numerous misrepresentations were made in order to promote the

operators alleged business acumen and to disguise the source of the purported profits. Complaint

¶ 50.

13. On or about July 12, 2008, during an ASD rally in Miami, Florida, a representative of

ASD took the stage to addresses concerns that prospective members might have about whether

ASD was a legitimate business. The representative stated that ASD's founder had received the

Medal of Distinction from the President of the United States for his contribution to business and

that the only blemish in the founder's past was a speeding ticket. Those representations were

false. Complaint ¶ 52.

14. On or about July 12, 2008, during an ASD rally in Miami, Florida, ASD's founder

and President, Thomas A. ("Andy") Bowdoin, Jr., explained that "we don't have to be a network

marketing company with seven levels or ten levels. Our people are making tremendous profits

with two levels – which takes us out of being a network marketing company." Complaint ¶ 53.

15. Contrary to ASD's President's representation to prospective members at the Miami

rally, ASD's retained "expert" opined that the ASD "business model is a legally structured, direct

selling business model with multilevel compensation."  Nehra Declaration ¶ 7.

16.   After ASD operated for at least 20 months over the internet, from October 2006 to July, 2008, Mr. Bowdoin at the behest of Bob Levine, contacted Mr. Nehra.

17.   On July 30, 2008, Mr. Bowdoin signed Mr. Nehra's "Retainer Agreement for Specialized Legal Services for a United States Direct Selling Company."  In the Retainer Agreement, Mr. Nehra agreed that "[t]he DESIGN of [ASD's multi-level marking plan] and the proposed IMPLEMENTATION of the plan will be legally reviewed by me to eliminate or reduce to an absolute minimum any possibility of violation of . . . Securities Laws (Sale of unregistered securities)[.]"  For his expertise, Mr. Nehra demanded and received a $24,000 retainer, his largest retainer ever.

18.   On August 15, 2008, two weeks after Mr. Nehra accepted his largest retainer ever to perform the work needed to ensure that ASD did not violate a host of laws, including pyramid, consumer fraud, lottery, securities, franchise, business opportunity and chain referral laws, Mr. Nehra opined that "[t]he ASD business model is a legitimate multilevel direct selling business model."

19.   In his declaration, Mr. Nehra explained that "[the customers of the ASD business venture are the advertisers, and the income opportunity seekers of the ASD business venture are the members[.]"  Nehra Declaration ¶ 5.  But, at the hearing, Mr. Nehra confirmed that in an article he wrote titled "*Do the Products Have 'Intrinsic Value'*", which he posted on his website, Mr. Nehra highlighted the need, when reviewing the legitimacy of any multilevel marketing company, to distinguish between (1) a product's customers – true consumers – and (2) the income opportunity seeking members of a multilevel marketing company.  Mr. Nehra testified that in his

article he explained: "Companies whose products (unless clearly indicated otherwise, 'products' includes services) are sold to its representatives exclusively, with no true customers, pose a pyramid law challenge most everywhere. . . . The two most common actual numbers [of needed true customers] are 'more than 50 percent' or '70 percent.' . . . Why is this issue so important? Well, pyramids and endless chains are illegal in the United States and in most of the rest of the world. You cannot 'pay to play.'"

20. Despite the advice he posted on his website that multilevel marketing companies must ensure they have a significant amount of customers who are not also company representatives, before he testified under oath that ASD was a standard multilevel marketing company, Mr. Nehra did not investigate whether most of ASD's "advertisers" were, at the same time, its "income opportunity seekers." In other words, before opining as to ASD's legality, Mr. Nehra did not know whether ASD had a significant amount of customers who were not also seeking, through its rebates, to have all of the money they paid to ASD returned.

21. Contrary to his own article, Mr. Nehra opined at the hearing that even if ASD had 100,000 members but only 5 customers, ASD may still not face any legal challenges.

22. Furthermore, although opining that ASD was a traditional multilevel marketing company, Mr. Nehra acknowledged that in his over twenty years of experience with multilevel marking companies, he had never seen one with both a traditional commission structure, and a non-traditional so-called "rebate" program that permitted customers to get back not just all of the money they paid into the program, but more.

23. Mr. Nehra had inconsistent explanations for how ASD could both sell advertising and pay all that money back each day. He admitted that even if the company had no expenses, it

would be necessary for at least 50% of the ad package purchasers not to request rebates for the company just to break even, and he admitted that he did not know whether this was the case before he testified, under oath, that ASD was a legal operation because it was selling ads, not income opportunities.

24. In forming his opinion, Mr. Nehra indicated that he relied on testimonial emails that ASD solicited. But, these emails were less than 1% of the membership, and even a smaller subset was attached as an ASD exhibit. Most of those emails indicated that ASD members were purchasing advertising in order to qualify for its profitable returns.

25. Mr. Nehra agreed that to be legal in this country, multilevel marketing companies must sell true products or services, not income opportunities. Yet, he testified that before he opined that ASD was legal, he watched an Andy Bowdoin video in which Mr. Bowdoin invites prospects to "start earning money now with this income earning opportunity."

26. Mr. Nehra said he believed that ASD was not a Ponzi because it only committed to paying 65% of its revenue from any given day to its paying members. But, in reality, ASD committed itself to using 65% of its revenues to ensure that "advertising becomes FREE" for members, who also could "Earn 25% on [their] purchases."

27. Despite being shown a letter from Pinnacle Communications International, Inc., which stated that Pinnacle was recommending that ASD employ Nehra because they "have identified a number of potential land mines and we believe that working with Gerry [Nehra] and our company can provide [ASD with] an extremely positive proactive approach to defusing problems before they manifest themselves[,]" Mr. Nehra testified that he had not in fact seen any significant legal problems with ASD's operation before he accepted his retainer. According to

Mr. Nehra, he saw no significant legal issues even after he was paid.

28.   In the declaration that the Mr. Nehra provided to the Court, he said his opinion as to the legality of ASD was based on his conclusion that ASD's "compensation plan rewards only the persons who bring the advertising business volume to the company," which Mr. Nehra testified was standard operating procedure for multilevel marketing companies he has advised.  ASD's two level (10% and 5%) commission structure was its prescribed method for compensating persons who brought advertising business to the company.  ASD's so-called rebate program was supposedly intended to compensate customers for surfing.  Although Mr. Nehra acknowledged that he had never seen a rebate program like ASD's, and although in Mr. Nehra's declaration he misrepresented ASD's 125% rebate program when he reported that it "allows members who are also advertisers to **recoup some** of their advertising costs", Mr. Nehra refused to reassess his opinion.

29.   Mr. Nehra's testimony was not credible.

30.   In July 2008, while it was still operating over the Internet, ASD displayed to prospective members a video of Andy Bowdoin, along with an ASD attorney, Robert Garner. Mr. Bowdoin introduced Mr. Garner as the company's outside legal counsel.  In the video, which ASD streamed over the Internet, Mr. Bowdoin invited viewers to "start earning money now with this income earning opportunity."  Mr. Bowdoin said he was a "professional and successful businessman" and that although ASD might "sound too good to be true . . . like an illegal money making scheme that won't last very long. . . . Ad Cash Generator is good and it's all true and it's definitely legal, ethical, and not a scam."  Mr. Bowdoin further explained that he asked his attorney to confirm that ASD was not a Ponzi scheme.  Thereafter, Mr. Garner proceeded to

explain that Bowdoin hired Garner to insure that ASD's operations were legal in all aspects.

Garner assured viewers that he and "other attorneys in our offices . . . are dedicated to this work

with Andy and his company." According to Garner, "ASD . . . complies with all laws and

regulations that apply to it." In explaining that ASD was not a Ponzi scheme, Garner noted that a

Ponzi scheme is "illegal, because [it] use[s] money from new investors to pay the first investors

in the scheme their promised returns." (Emphasis added.) On behalf of ASD, on its website,

Garner advises prospective members that ASD was not a Ponzi because, among other things,

"ASD's business models have multiple components, as Andy mentioned earlier, and multiple

sources of revenue."

31. Except for Mr. Garner's description of a Ponzi, none of this was true. Mr. Garner did

not work with "other attorneys in our offices", ASD did no comply with all laws applicable to it,

Mr. Bowdoin was not a successful businessman, and ASD did not have multiple sources of

revenue to support the rebates it said it would pay members to surf. Complaint ¶¶ 16, 17, 19, 20,

52, 53, 55.

32. Prior to the government's intervention, ASD used money it received from new

members to pay earlier members the rebates it promised to pay them for surfing and the global

credits it paid to them when surfing was unavailable. Complaint ¶¶ 16, 17, 66.

33. On the video, Bowdoin explained: "It's actually very simple how our company can

pay out so much money to our members and still have plenty of money to operate and keep

expanding. We sell advertising and we pay fifty percent of our sales to our members as rebates.

So, by paying fifty percent of our sales we can pay out indefinitely." In truth, Bowdoin and ASD

promised to pay out 125% of what he terms "sales," but to use only 50% of each day's revenue to

10

support these repayments.  In fact, as its two non-attorney witnesses confirmed at the hearing, it was paying them 125%.  All this "50% of each day's revenue" did was prolong the time it took to pay the returns – but it does not change the fact that the returns were being funded by new members' money.  Historically, while the membership base was expanding, it was taking members about four months to earn their 125% return.

34.  Robert Grayson testified that he was a member of ASD.  He explained that he had put about $35,000 of his own money into ASD, that he had received about $25,000 back so far, as well as a check for another $8,000 that he was unable to cash before the government seized ASD funds.  In other words, he was almost at the point where all of his out of pocket expenditure (initial investment) had been returned.

35.  Grayson further testified that, based on his having reinvested in ad packages, he had an ad package balance worth approximately $200,000 from which he was expecting to receive about $2,000 per day (provided he merely surfed several websites for fifteen seconds each day).  Compounding the returns ASD provided allowed members to earn much, much more than their 125%.

36.  Mr. Grayson was not sure whether ASD would be cost effective without its rebate program.  He acknowledged that his advertisements were not shown when ASD's website was down and he confirmed that ASD's website was down for a prolonged period of time.  However, during this time he was still earning his returns.

37.  Mr. Grayson testified that he did not believe ASD was promoted as an investment of security, but in an email he wrote to ASD's attorneys, which they provided to the Court as part of an exhibit to the Emergency Motion they filed, Mr. Grayson explained ASD's operation as

follows: "ASD has chosen to utilize a combination of compensation components to reward it's [sic] members and allow them to a) recover their out of pocket advertising costs, b) earn a 25% premium above and beyond these costs, c) compound the recovery of those expenses, and d) earn commissions on 2 generations of the referral of new members who also make advertising purchases." Docket Document 7-6, page 29 of 57. Mr. Grayson likened ASD's compounding of rebates to how "a securities investor can reinvest his or her dividend in order to purchase additional shares of stock and increase the size of the next dividend[.]" Id. "Last but not least" Mr. Grayson offered, "let's not forget this is an advertising program and the purpose of advertising is to generate profitable sales of a product or service[.]" Id. According to Mr. Grayson, "[k]nowing that my cost for page views with ASD is FREE - any sale I make is by definition profitable[,] especially when compared to the enormous costs of search engines and the software manipulation they go through to take my money." Id. at 30.

38. In paying money to ASD, Mr. Grayson relied on ASD's representation that its operation was legal.

39. Chuck Osmin, who had been employed with ASD as a customer service representative for about three months (before funds were seized), testified that he was aware that ASD had paid many people the 125% returns it offered.

40. Mr. Osmin, the only ASD representative presented, did not know whether ASD had any revenue sources other than what it received from its members to pay the returns.

41. Mr. Osmin also testified that ASD used ad packages to compensate employees and rally/convention workers.

42. Mr. Osmin was aware that some ASD "advertisers" had no businesses to advertise.

He acknowledged that ASD suggested two websites for such individuals to use in order to permit them to "take advantage of our opportunity."

43. Mr. Osmin acknowledged that ASD continued to pay returns even when it could not display any advertising and thus was not paying members for having surfed any ads. He explained however that such "global credits" were paid as an accommodation to those who were not receiving advertising.

44. Mr. Osmin described ASD's different membership levels and explained that members could pay ASD monthly fees to view fewer web pages.

45. Based on Mr. Osmin's own money with ASD he had already netted a return of about 700%.

46. Mr. Osmin did not provide any information about the amount of funds needed for ASD to continue to operate, nor did he provide any information about ASD's finances including its balance sheet or statement of earnings.

47. Mr. Osmin did not know of any ASD board of directors.

48. Although no officer or director of ASD appeared at the hearing, Philip Schwartz, an attorney with the Akerman Senterfitt law firm who expressed expertise with federal securities laws, testified. According to Mr. Schwartz, Mr. Bowdoin contacted him after ASD had been operating for at least 20 months over the Internet, from October 2006 to July, 2008.

49. Mr. Schwartz testified that after his initial contact with ASD, he was waiting for ASD to send him documents to review. Mr. Schwartz said that ASD did not send documents to him before the government intervened.

50. Mr. Schwartz urged the Court to release several million dollars of funds to his law

firm so that the firm could create a compliance program that would, he surmised, ensure ASD's legal operation on a going-forward basis. But Mr. Schwartz could not determine whether expending several million dollars was necessary.

51. According to Mr. Schwartz, he had never looked at whether ASD's prior operation was lawful, so he did not know whether its future operation would need adjustment. Nor could Mr. Schwartz – according to his testimony – even explain how giving him $2 million dollars would ensure that ASD could continue paying 125% rebates without violating applicable securities laws.

52. Like Mr. Nehra, Mr. Schwartz called himself an expert on securities laws outside the courtroom, but professed ignorance as to securities issues on the witness stand. In other words, Mr. Schwartz was asking the Court to release funds that would permit him to figure out how to run a legal advertising company without knowing whether the manner in which ASD had previously operated was just fine.

53. At the hearing, Mr. Schwartz offered an unaudited "Balance Statement" prepared by ASD indicating that, as of July 31, 2008, ASD had received $100,888,592.23 as income from the sale of worth of ad packages, but total assets of only $41,879,631.31.

54. Although ASD's attorneys suggested that the Court should release several million dollars, apparently to the attorneys, so that they might construct a compliance program that would permit ASD's legal operation, no officer or director of ASD appeared at the hearing to explain or defend ASD's operation, to discuss its finances, or to explain how the funds it was seeking to have released would be used in its future operations.

55. In its emergency motion, ASD wrote that its customers would evaporate unless ASD

was permitted to pay them with the funds they supposedly paid to ASD for advertising. Thus, the rebate program that Mr. Schwartz swears he has not evaluated is, according to his law firm (which submitted ASD's Emergency Motion), key to ASD's ability to "sell" advertising.

## CONCLUSIONS OF LAW

As part of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") Congress enacted 18 U.S.C. § 983(f), the statute that governs all requests for the pre-trial release of property that has been seized for civil forfeiture. See e.g., United States v. Douleh, 220 F.R.D. 391, 396 (W.D.N.Y. 2003) (section 983(f) is the exclusive remedy for seeking pre-trial release of property to avoid a hardship; Rule 41(g) motion dismissed).[1]

Section 983(f) motions are, by the terms of the statute, limited to cases where pretrial release of seized property subject to civil forfeiture is necessary to prevent substantial hardship. Even then, a court may return property pending its forfeiture only where a claimant seeking release establishes that the substantial hardship outweighs the risk that the property will not be available for forfeiture should the government prevail at the summary judgment stage, or at trial. See e.g., United States v. Undetermined Amount of U.S. Currency, 376 F.3d 260 (4th Cir. 2004) (under section 983(f)(1)(D), court must make three findings: (1) the risk that the property will not be available; (2) the hardship to the claimant; and (3) whether the hardship outweighs the

---

[1] As the Eight Circuit noted in United States v. One Lincoln Navigator, 328 F.3d 1011, 1012 n.1 (8th Cir. 2003), "[t]he substantial hardship provision was one of eight 'core reforms' enacted by Congress in § 2 of the Civil Asset Forfeiture Reform Act of 2000 ["CAFRA"] 'to make federal civil forfeiture procedures fair to property owners and to give owners innocent of any wrongdoing the means to recover their property and make themselves whole after wrongful government seizures.'" (quoting H.R. Rep. No. 106-192, at 11 (1999)). See also Malladi Drugs & Pharmaceuticals, Ltd. v. Tandy, 538 F. Supp.2d 162 (D.D.C. 2008) (CAFRA reforms included section 983(f)).

risk)).  The arguments and testimony claimants offered in their effort to qualify for section 983(f) relief fall far short of meeting their threshold showing.  Moreover, under section 983(f)(8), the balancing test does not come into play because, by statute, no pretrial release of currency, other monetary instruments or electronic funds is available "unless such currency, or other monetary instrument, or electronic funds constitutes the assets of a legitimate business which has been seized."  Claimants' business (legitimate or otherwise) has not been seized.

## 1. Property That Will Not Be Available For Forfeiture Should Not Be Released.

In drafting section 983(f), Congress recognized that cash was almost never likely to be available for trial if released pretrial and, therefore, it precluded the release of cash in almost all civil forfeiture cases.  See 18 U.S.C. § 983(f)(8); see also United States v. $1,231,349.68 in Funds, 227 F. Supp.2d 125, 129 (D.D.C. 2002) (denying pretrial release of seized cash because the likelihood that it would be unavailable for trial is "almost assured").  In this case, as further discussed herein, a statutory prohibition bars the requested relief.

But, even were a blanket prohibition inapplicable, ASD's 983(f) motion must be rejected because ASD concedes that the seized funds will not be available for forfeiture should they be released now.  According to ASD, it either needs this Court to order the seized funds returned so that ASD can sustain its membership base by paying 125% (and better) "rebates" or it needs the money so that lawyers can be paid to construct a compliance program.  In its emergency motion, ASD acknowledges that the rebates were what induced individuals to purchase so-called ad packages in the first place.  In other words, ASD wants the funds so it can pay them out.  Emergency Motion at 5 ("seizure . . . prevents ASD from paying all of its general creditors, including the members who wanted to cash out their ASD memberships.").

Of course, a representation that the funds will be transmitted to third parties, ASD's general creditors and so-called customers, flouts ASD's duty under section 983(f)(1)(B) to show that the funds will be available for forfeiture at the time of trial (show to this Court and, even before that, to the government in the request it was obligated by section 983(f)(2) to have submitted to it before charging into a court). Given that ASD intends to dissipate the funds upon their return, the property's unavailability is assured. No alleged hardship outweighs certain dissipation of the defendant *res*. See Kaloti Wholesale, Inc. v. United States, 525 F. Supp.2d 1067, 1070 (E.D. Wis. 2007) (claimant's admission that it would sell seized merchandise upon release pending trial made release under section 983(f) impossible); United States v. One 2003 Mercedes Benz, *et al.*, __ F. Supp.2d __, 2008 WL 2966263 (E.D. Mich. July 24, 2008) (release of seized currency not permitted under section 983(f) because "it certainly would not be available, it its entirety, for trial.").

It bears noting that by the time of the hearing, ASD had revised its request, suggesting that the Court need order only the release of several million dollars at this time so that Mr. Schwartz could construct a compliance program that might permit ASD to operate lawfully in the future. This, itself, is a remarkable request for the Court to be asked to entertain. Attorneys Mr. Bowdoin employs are asking the Court for permission to use money Mr. Bowdoin may have promised to "rebate" to individuals to invest in a plan to find a legal business for Mr. Bowdoin. Had Mr. Bowdoin, though his attorneys, not invoked his right to remain silent before the hearing he requested, Mr. Bowdoin, presumably, would have agreed with his attorneys' effort to have his customers not treated as investors. As the Court pointed out at the hearing, claimants' effort to have the defendant funds released to construct a new business model is hardly a proper argument

for the Court to entertain.

In any event, Mr. Schwartz could not even determine whether expending several million dollars was necessary because, he said, he never considered whether ASD's prior operation , its "innovative" business model, needed adjusting. After Mr. Nehra accepted what he agreed was his largest retainer ever to review the company's operation, however, he opined, in effect, that ASD told the truth when it represented that its innovative model was neither too good to be true, nor unlawful. If the one lawyer was not overpaid for his advice, the other most certainly would be.

Mr. Nehra and the rest of ASD's witnesses appear to have given little thought to whether it is mathematically possible for ASD to use half of everyone's money to pay them 125% of their money back. Regardless, according to Mr. Nehra, any funds ASD proposes to spend now, to construct a compliance program or a new business model, are unnecessary. The government disagrees with ASD's proposal to dissipate these funds while crafting a new business model, and Congress created no such pre-trial release provision.

## 2. ASD Has Not Demonstrated That A Substantial Hardship Exists.

ASD asserts that a hardship now exists because, he says, "[i]t is the Government's seizure of ASD's bank accounts which prevents the ASD members from continuing to advertise." Id. at 5. But, ASD never explained why a seizure of ASD's prior sales proceeds (its characterization) would preclude ASD's members from continuing to buy ASD's advertising, or preclude ASD from continuing to display websites of those who previously paid ASD for advertising. One would expect customers to flock to any business that sold a needed and legal service in a

cost-effective manner, and the computers that ASD says it needed to operate have been returned.[2]

Of course, the government asserts that free (and here, better than free) advertising is no "sale" at all – that ASD was selling a promise of profitable rebates. In evaluating the cost-effectiveness of ASD's advertising, Mr. Grayson's email confirms that he believed, consistent with his experience, that advertising he secured from ASD was to be free. ASD's dilemma is that it either wants to use funds pending forfeiture to pay the returns that have, apparently, fostered its ability to expand the base of contributing members, or to pay attorneys to figure out how it might operate legally without paying returns. But, as the government points out, there is scant evidence that the individuals who were promised payments of returns for surfing (on page 5 of its Emergency Motion, ASD calls this "cash[ing] out their ASD memberships") would have sent their money to ASD without the returns, and will continue to send money to ASD if promises of free advertising, or returns of 125%, evaporate. When ASD urges that unless it is permitted to pay its so-called customers the promised returns, they will go away, ASD also admits that the business model may not involve "real sales." The government asserts that the advertising was largely a pretext for selling investment opportunities, while seeking to avoid the scrutiny of regulators. Nothing the Court has seen thus far suggests the government should reassess that position.

ASD previously insisted that it needed funds to pay rent. But ASD did not, in its motion, or at its hearing, explain how much rent was due, or to whom rent was due. Nor did ASD address the fact that Bowdoin, or one of the other claimants that he owns or controls, appears to

_____

[2] On September 17, 2008, the government returned the ASD computers it seized when it executed search warrants. Thus, that property is no longer at issue here.

own several properties in Quincy Florida, from where ASD might operate rent free.  Complaint ¶¶ 45, 69.

ASD submitted a Balance Statement in an apparent effort to show that ASD was not a Ponzi, because the seized funds were more than adequate to cover the cash-out balances of all the members, with millions to spare.  (Yet, it says, litigation lasting even three months will bankrupt ASD despite its supposed cash surplus.  Emergency Motion at 2.)  But, the Balance Statement may be incomplete, too.  ASD promises ad purchasers that their ads (websites) will be viewed by ASD's members.  To deliver on that promise, ASD also promises members that they will be paid returns of up to 125% if they watch ads.  Thus, unless most ads are sold to non-members, the government may be correct to have noted that ASD appears to have been upside down when the funds at issue here were seized.  According to its own records, as of July 31, 2008, ASD had on its books income from the sale of $100,888,592.23 worth of ad packages, but total assets of only $41,879,631.31.  Even if only half of the so-called ads purchases came from individuals who participated in the surfing rebate program, ASD still needed over $62,500,000 to fund the rebates it would owe those members for surfing.  In this case, ASD offered no evidence that less than half of its so-called sales qualified for rebates.  Rather, it offered Mr. Nehra, who indicated, begrudgingly, that "Companies whose products (unless clearly indicated otherwise, 'products' includes services) are sold to its representatives exclusively, with no true customers, pose a pyramid law challenge most everywhere[.]"

ASD tells this Court that it is out of money.  But its attorneys have confirmed that it sent some money overseas and some to an attorney's trust fund.  Its attorneys now express concern about whether ASD can spend that money without violating applicable laws, even while they tell

this Court that no laws were broken when ASD obtained those funds.  Whether ASD can spend

that money – or any other money to which it has access  – without violating applicable laws, may

be a concern for ASD and its attorneys now, and eventually prosecutors.  But, whether other

money ASD presently controls is also tainted is not presently a concern for this Court.  ASD

cannot not, however, be permitted to elect not to use funds it does control in order to qualify for a

hardship release of funds the Court arrested and now controls.

### 3. Even If A Balancing Of Equities Were To Cut In ASD's Favor, Section 983(f)(8) Precludes The Relief It Requests.

Under applicable law, ASD has no basis for requesting that the seized funds be returned

to it prior to adjudication of their forfeitability.  Congress, recognizing that currency, other

monetary instruments, and electronic funds were the type of property most likely to be dissipated

upon return, prohibited the pretrial release of such property – except in cases where a legitimate

business was seized (and even then, only after the legitimate business establishes that its hardship

outweighs the risk of dissipation or loss).  See 18 U.S.C. § 983(f)(8)(A); see also United States v.

All Funds Seized from Suntrust Account xxx8359, et al., No. 05-2497 (RMC) (D.D.C. Mar. 17,

2006) (denying section 983(f) motion seeking funds of a business that has not, itself, been

seized); United States v. Contents of Account 4000393242, No. C-1-01-729 (S.D. Ohio Mar. 13,

2002) (under section 983(f)(8), claimant may not seek release of funds seized from bank account

unless he establishes that they were funds from a legitimate business that was seized; the

reference is to *the seizure of the business*, not to the seizure of the funds); $1,231,349.68 in

Funds, supra, 227 F. Supp.2d at 129 (recognizing that claimants must prove legitimacy of

business and denying pretrial release of seized cash).

In this case, the government seized cash from the bank accounts of an individual. But even if the funds belonged to a business, the government did not seize the business, itself. Because the business was not seized, any effort on ASD's part to establish that the seized funds constitute assets of a *legitimate* business is, at this stage, irrelevant.

In any event, ASD failed to establish here that its business was legitimate. The government sought to elicit, during its cross examination of two lawyers who represented ASD and who fashioned themselves as familiar with federal securities laws, testimony as to whether ASD's operation violated federal securities laws. Each attorney said he did not know. "I don't know" provides no evidence that ASD's operation was legitimate. Perhaps the best person to know about the securities laws would be Mr. Bowdoin, who in 1997, in Alabama, entered into pre-trial diversion for his involvement in the unregistered and fraudulent offer and sale of securities there.

Alongside ASD's admission that it needs the seized funds to keep the membership base from evaporating, ASD's failure to refute the government's allegation that ASD had almost no revenue independent of what its members pay, and ASD's founder's acknowledgment, in his video, that ASD was selling income opportunities, no basis exists for the pre-trial relief that ASD has requested.

**4.      Claimants Should Answer the Complaint if They Intend to Challenge the Forfeiture.**

ASD concluded its Emergency Motion by arguing, for several pages, that this Court should provide it with a <u>Franks</u>[3] hearing which, as this Court knows, explores whether one's

---

[3] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

22

Fourth Amendment rights might have been violated. But this is a civil forfeiture case, not a criminal prosecution. See Rule G(8)(a); INS v. Lopez-Mendoza, 468 U.S. 1032, 1039-40 (1984) (noting, in *dicta*, that forfeiture proceedings against forfeitable property are not precluded by an unlawful seizure); United States v. Property, Parcel of Aguilar, 337 F.3d 225, 234 (2d Cir. 2003) (an illegal seizure, standing alone, does not immunize property from forfeiture; it only precludes the Government from introducing evidence gained by the seizure in the forfeiture case); 18 U.S.C. § 983(a)(3)(D) ("No complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."). In any case, ASD introduced no evidence tending to indicate that the government agent's affidavit was materially deficient. Rather, the witnesses ASD offered at its hearing confirmed many of the salient points the government's agent asserted. Rebates of 125% were being paid to some members, necessarily from funds that other members had paid to ASD, while advertising for some members was already, or was soon to become, free. In this case, the Complaint alleges that the seized funds are forfeitable as proceeds of a wire fraud and, as the government points out, ASD operated over the Internet while making several representations concerning its lawful operation that are highly questionable and which remain to be explored further, through discovery. At the hearing it requested, ASD's witnesses proved, at best, that they did not know whether ASD operated lawfully before it closed. The government's Complaint describes an unlawful wire fraud scheme, and there is no good cause at this stage to release any funds to claimants in order to allow them to explore how they might use these funds to invest in a lawful business venture even while they maintain that the funds they now want to use never came from investors.

## CONCLUSION

For the foregoing reasons, ASD's Emergency Motion for the Return of Seized Funds is

DENIED.


_____
ROSEMARY M. COLLYER
United States District Judge