UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case: 1:08-cv-01345 |
| ) | |
| 8 GILCREASE LANE, QUINCY ) | Hon. Rosemary M. Collyer |
| FLORIDA 32351, ) | |
| ) | |
| and ) | |
| ONE CONDO LOCATED ON ) | |
| NORTH OCEAN BOULEVARD IN ) | |
| MYRTLE BEACH, SOUTH ) | |
| CAROLINA, ) | |
| ) | |
| and ) | |
| ) | |
| ALL FUNDS, INCLUDING ) | **PROPOSED FINDINGS OF FACT** |
| APPROXIMATELY $53 MILLION, ) | **AND CONCLUSIONS OF LAW** |
| HELD ON DEPOSIT AT BANK OF ) | **(BY CLAIMANT, ASD)** |
| AMERICA ACCOUNTS IN THE NAMES ) | |
| OF (1) THOMAS A. BOWDOIN, JR., ) | |
| SOLE PROPRIETOR, DBA ) | |
| ADSURFDAILY, (2) CLARENCE ) | |
| BUSBY, JR. AND DAWN STOWERS, ) | |
| DBA GOLDEN PANDA AD BUILDER, ) | |
| AND (3) GOLDEN PANDA AD BUILDER, ) | |
| ) | |
| Defendants, and ) | |
| ) | |
| ADSURFDAILY, INC., THOMAS A. ) | |
| BOWDOIN, JR., AND BOWDOIN HARRIS ) | |
| ENTERPRISES, INC., ) | |
| ) | |
| Claimants. ) | |

THIS CAUSE came before this Court upon Claimant's Emergency Motion For Return Of Seized Funds To Save Business And Jobs With Oversight And Monitoring. The Court has reviewed the Emergency Motion (filed by Claimant, AdSurfDaily, Inc., otherwise known as "ASD"), the Government's Opposition, ASD's Reply and its Proposed Compliance and Oversight Plan. In addition, this Court held an Evidentiary Hearing on September 30 and October 1, 2008 and heard the testimony of ASD witnesses Robert Grayson, Gerald Nehra, Charles Osmin and Philip Schwartz. The Court has also reviewed the exhibits introduced into evidence at the Evidentiary Hearing and also reviewed ASD's Petition to Determine Proportionality, the Government's Response, and ASD's Reply.

The Emergency Motion is now ripe for adjudication, and the Court's decision is set forth in these Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

**Pre-Hearing Developments**

1.      ASD is a Nevada corporation. ASD is headquartered in Quincy, Florida, a small town of approximately 8,500 residents approximately 15 miles outside of Tallahassee, Florida. [See. Tr. vol. 1, 6:1-3[*]].

2.      ASD is a multi-level marketing company offering online internet advertising. [See Tr. vol. 2, 28:7-11].

3.      ASD experienced phenomenal growth in employees, advertisers and membership in 2008. [See Tr. vol. 2, 86:7-11]. It went from approximately 25 employees in April 2008 to 80 employees by late July 2008. During this same period, its advertisers and members expanded from approximately 23,000 to more than 100,000. [See Tr. vol. 2, 86:19-20].

---

[*] References to "Tr" are to the transcript of the hearing, as follows: volume 1 – September 30, volume 2 – October 1, morning session, volume 3 – October 1, afternoon session; then page and line number. Due to time limitations, some but not all transcript and exhibit references have been included.

4.    ASD maintained its bank accounts at the Bank of America. [See Claimant's Exhibit 5, Complaint For Forfeiture.]

5.    Beginning by at least approximately early July 2008, ASD's senior management, with the assistance of outside experts and upgraded information technology equipment, initiated steps to review the design of ASD's business plan and to develop and implement changes. ASD's goal was to strengthen its infrastructure and to increase the quality of ASD's compliance with all applicable federal and state laws and regulations. [See Tr. vol. 1 95:13-18].

6.    During at least the month of July 2008, ASD employees checked ASD advertisers to verify, as much as possible, that the advertisers were offering legitimate products, services or programs on the ASD network.  [See Tr. vol. 3, 13:16-21].

7.    During mid-July, 2008, ASD deployed a software tool to notify ASD advertisers if the web site the advertiser  identified  in the Terms of Service was not operational.

8.    On about July 23, 2008 or before, Mr. Bowdoin sought to engage  an attorney with expertise in counseling companies about direct sales and multi-level marketing issues. On July 30, 2008, Mr. Boudoin and ASD engaged Gerald Nehra, Esq., an attorney and expert in counseling clients regarding direct sales, multi level marketing, and Ponzi and Pyramid schemes, and state consumer fraud laws.  [See Tr. vol. 1, 104: 11-16, Claimant's Exhibits 2, Claimant's Exhibit 5: Nehra Declaration].   Mr. Nehra's Vita, which includes his employment history, a list of his publications, and a list of cases in which he appeared as an expert in his field, is attached to his Declaration, which was introduced into evidence at the hearing. [See Tr. vol. 1, 99:17-24; Tr. vol. 1, 122:19-22; Claimant's Exhibit 5: Nehra Declaration].

9.    During the hearing Mr. Nehra testified about his employment history, his prior experience as an expert and his publications. [See Tr. vol. 1, 95:25 – 96:24]. The Court accepted Mr. Nehra as an expert in multi level marketing and Ponzi and Pyramid schemes.

10.    Mr. Nehra used to be the director of the legal division for the Amway Corporation and has provided legal counsel to more than 500 direct selling companies. Amway Corporation is a multi-level marketing company. Its business plan was extensively litigated, and ultimately approved, by the Federal Trade Commission. In his role as Amway's legal division director, Mr. Nehra was responsible for Amway's ongoing regulatory communications with the Federal Trade Commission. [See Tr. vol 1, 97:1-11; Claimant's Exhibit 5, Nehra Declaration].

11.    Mr. Nehra traveled from his home in Michigan to Quincy, Florida to meet with Mr. Bowdoin and other ASD executives and employees. [See Tr. vol. 1, 105:12-15]. Mr. Nehra was retained on July 30, 2008, the first day he visited the ASD's offices in Quincy, Florida. [See Tr. vol. 1, 105:19-23].

12.    Mr. Nehra's tasks, as outlined in his Engagement Agreement, were to make sure that ASD was complying with federal and state statutes and regulations governing direct selling companies, multi-level marketing businesses and prohibitions against Ponzi schemes. [See. Tr. vol. 1, 105:24 - 108:5]. Mr. Nehra reviewed certain ASD's business documents, including the terms of service, and intended to make recommendations about how ASD could improve its business plan and operations and clarify any ambiguities or confusing statements among the terms of service, other business documents, and business operations. [See Tr. vol. 1, 107:15-108:1]. Between July 30 and August 1, Mr. Nehra had preliminary discussions with ASD representatives about the recommendations [See Tr. vol. 1, 105:3-11].

13.	On July 14, 2008, ASD's President, Andy Bowdoin, met in Miami with Philip Schwartz, a corporate attorney with the Akerman Senterfitt law firm, and one of Mr. Schwartz's corporate partners with substantial experience representing technology companies. Mr. Bowdoin's purpose in meeting with these two Akerman Senterfitt lawyers was to seek legal advice on how to ensure that ASD was operating legally, and particularly regarding ASD's compliance with applicable securities laws.  [See Tr. vol. 3, 80:20 – 81:3].

14.	Before Mr. Schwartz and Mr. Nehra had the opportunity to provide their guidance and recommendations, ASD was effectively shut down by the Government's seizure of its bank accounts at the Bank of America ("BOA").  [See Tr. vol. 1, 109:15-110:1].  The Government stipulated, during the hearing, that its seizure of the ASD accounts at BOA resulted in the seizure of ASD's assets and that ASD's business is no longer operating. [See Tr. vol. 1, 102:18-22].

15.	The Government seized ASD's accounts at BOA pursuant to multiple seizure warrants which were issued after Secret Service Special Agent Roy Dotson submitted an affidavit seeking the seizure and forfeiture of ASD's bank accounts, as well as other miscellaneous property (i.e., residential property in Quincy, Florida and a condominium in South Carolina).

16.	Special Agent Dotson is assigned to the Orlando, Florida field office.

17.	Before becoming a Secret Service agent, Mr. Dotson was employed by the Brevard County (Florida) Sheriff's Office for  nine years.  His last assignment was that of a task force agent with the Drug Enforcement Administration.  Special Agent Dotson, who did not testify at the evidentiary hearing, did not explain in his affidavit whether he had ever investigated an alleged Ponzi scheme before he began investigating ASD on July 3, 2008.

18.     Although Special Agent Dotson is based in Florida and although ASD is based in Florida, the Dotson affidavit was presented to a United States Magistrate Judge in the District of Columbia.  The Government's venue selection appears to be based solely on the fortuitous fact that a few phone calls made by agents working in this investigation were made in the District of Columbia.

19.     In paragraph 3 of the affidavit, Special Agent Dotson contends that the BOA accounts contain property involved in "nothing but a wide-spread Ponzi fraud, over the internet." Likewise, Special Agent Dotson also alleged, in the same paragraph, that he thinks "there is probable cause to believe that all of the property contained in the above-identified BOA accounts constitutes "proceeds of an Internet-based Ponzi scheme."

20.     According to Special Agent Dotson's affidavit (numbered paragraph 7), "Ponzi schemes promote allegedly lucrative business opportunities, often involving foreign currency exchange, precious metals trading, or other high-return investments.  But, in a Ponzi scheme, there is in fact no underlying profitable business to support the payments promoters promise they will make to the investors.  Instead, the promoters simply use the money obtained from a growing base of later investors to pay so-called "profits" to earlier investors."

21.     Likewise, Special Agent Dotson's affidavit also says (numbered paragraph 8) that the basic premise of a Ponzi scheme is that "later investors' funds are used to pay the earlier investors."

22.     Special Agent Dotson's affidavit includes a section entitled "FTC Opinion."  In this section (numbered paragraphs 55-57), Special Agent Dotson represents that he "consulted" with an economist at the Federal Trade Commission ("FTC").  Special Agent Dotson did not name the economist or provide any information about his or her background or experience.

Similarly, Special Agent Dotson did not explain whether his consultation with the unidentified economist was in person, over the telephone or through other means, such as exchange of emails. Similarly, Special Agent Dotson did not explain for how long he consulted with the anonymous economist.

23.     Special Agent Dotson's affidavit represents (paragraph 57) that the unnamed FTC economist "*indicated*," after hearing Special Agent Dotson "describe the details of ASD," that "ASD *bore all  the characteristics* of a Ponzi operation."  (emphasis added).

24.     Special Agent Dotson began his investigation of ASD on July 3, 2008 (paragraph 12, affidavit) and he submitted his affidavit in support of the seizure of all of ASD's accounts at BOA less than four weeks later, on August 1, 2008.

25.     ASD's bank accounts were frozen and seized on August 1, 2008.

26.     Shortly after seizing all of ASD's bank account balances at BOA (in excess of $53 million), the Government then executed a search warrant at ASD's home office in Quincy, Florida.  The Government removed all of ASD's computers and servers.

27.     On August 5, 2008, the Government filed its *in rem* Civil Forfeiture Complaint against ASD's bank accounts at BOA and other properties not at issue in ASD's Emergency Motion.  Special Agent Dotson signed the "Verification," representing that all the allegations are true and correct "to the best of his knowledge and belief."

28.     Similar to the seizure warrant affidavit used to obtain the warrants which caused the seizure of  ASD's accounts at BOA, the civil forfeiture lawsuit also travels on a Ponzi scheme theory.  In a section entitled "Bases for Forfeiture," (numbered paragraph 8), the Government alleges that the funds in ASD's accounts at BOA are subject to forfeiture because they are proceeds or derived from proceeds through violations of 18 USC §1343 (wire fraud) and/or

constitute property "involved in money laundering, in violation of 18 USC §1956" and/or "constitute proceeds or property involved in conspiracies to commit these offences," in violation of 18 USC §§371 and 1956(h). The alleged fraudulent or unlawful activity upon which the wire fraud, money laundering or conspiracy theories are based on is that the funds in ASD's BOA accounts "constitute proceeds of a wide-spread Internet-based Ponzi scheme that operated in violation of Title 18, USC, §1343 (wire fraud)."

29.     In its Complaint, the Government alleges (paragraphs 16, 17 and 23) that ASD "promises" to rebate to members 125% of their "membership fees."

30.     The Government conducted its investigation in July 2008, a period in which ASD's website was non-operational for approximately two weeks because of upgrades being made to accommodate the increased growth of ASD's business.

31.     The Government's Complaint (paragraphs 57 – 59) also contains the allegations about the unnamed FTC economist. Instead of titling the section "FTC Opinion," as it did in Special Agent Dotson's affidavit, the Government placed these identical allegations under the title of "Economist Opinion." No additional substantive details were provided, however.

32.     After the seizure of ASD's ten (10) bank accounts at BOA, ASD's website was shut down and it ceased to conduct operations. Several employees continue to work for the company without receiving a salary. ASD has represented that its business will completely collapse unless it receives relief from this Court.

33.     In the week after the seizure, an email account established by ASD's law firm received more than 1,200 emails from advertisers and members. Significantly, almost all of these emails supported ASD and described the advertising benefits received by such advertisers

and members from their relationship with ASD. As of the time of the evidentiary hearing, more than 4,000 emails, most of them supportive, had been received.

**The Evidentiary Hearing**

34.     The Government called no witnesses at the evidentiary hearing and rejected ASD's request that it arrange for Special Agent Dotson to appear at the hearing as a witness.

35.     ASD presented testimony from Robert Grayson (an ASD member and advertiser), Gerald Nehra, Esq., Charles Osmin (ASD's corporate representative) and Philip Schwartz, the corporate/business lawyer who met with ASD's president before the seizure to discuss ASD's efforts to make sure that ASD's business was being operated in compliance with applicable statutes and regulations.

36.     ASD is not currently seeking the right to use all seized funds.  Instead, it is seeking the immediate return of $2 million, pursuant to a Court-approved Compliance Plan with safeguards and a Court-appointed monitor.  Under the Compliance Plan submitted by ASD, the balance of the seized funds will be placed in escrow in interest bearing accounts so that they will be available for use while the case is pending or when the case is resolved, in the manner provided for the Compliance Plan.

37.     In ASD's motion and during the hearing, ASD explained that its need for emergency relief is based on practical economic realities: ASD represents that it cannot wait an extended period for a trial or summary judgment hearing for a determination of the legality of its business because the company will be defunct by then.  In effect, ASD contends that the Government has imposed the corporate death penalty (seizure of all its BOA accounts) before the trial, based solely on a seizure warrant issued in response to an *ex parte*, unilateral, one-sided affidavit.  ASD's motion, and the Compliance Plan it has filed, provide a roadmap for an accelerated resolution of this case.

38.     ASD's operation and its relationship with its advertisers and members are governed by a written agreement entitled  "Terms of  Service (sometimes referred to as "Terms and Conditions")."  The "Terms of Service " explain that advertisers "must read these terms of service carefully and be sure that he or she  understands these terms of service."  They also provide:  "If the advertiser does not agree to these terms of service, the advertiser should not access or use the services of ASD." [See Claimant's Exhibit 5: Complaint Exhibit 3, pages 1, 4].

39.     The "Terms of Service " explain  that ASD "value[s] our Advertisers and wish to provide them with a results-oriented advertising program.   To offer you the best service, all advertisers need to follow the same Terms of Service.   These Terms of Service are intended to make  ASD  the  most  efficient  and  profitable  advertising  program  in  the  industry."  [See Claimant's Exhibit 5: Complaint Exhibit 3, page 1, paragraph 3].

40.     The "Terms of Service " provide for free membership and three levels of paid membership.   [See Tr. vol. 1, 114:23-115:11].   Free members may post their websites for viewing on the ASD "rotator."

41.     The Terms and Conditions provide for "rebates" and "referral commissions." Free members cannot earn commissions or rebates.  [See Tr. vol. 1, 114:20-115:11].

42.     The  amount  of  the  commissions  vary,  depending  on  the  amount  of  the membership fee.  ASD offers monthly membership fees of $10, $25 and $100.  The commission structure is a percentage on personal, first-tier sales and a lesser commission percentage for second level sales.

43.     At the evidentiary hearing, the Government conceded that it did not consider the commission  component  of  ASD's  business  plan  to  be  illegal  or  unlawful.  Instead,  the

Government agreed that the commission payments are part of a legitimate multi-level marketing program, similar to other programs such as Amway or Mary Kay Cosmetics.

44.     The Government's primary challenge to ASD, and its apparent rationale for asserting that ASD is a Ponzi scheme, is the rebate program.

**The Rebate Program**

45.     Only ASD advertisers who purchase and maintain active "advertising packages" ("ad package") are eligible to earn rebates.  [See Tr. vol. 2, 9:21 – 10:2; Claimant's Exhibit 5, Complaint Exhibit 3, pages 2-3].

46.     Pursuant to the Terms of Service , "all payments made to ASD are considered advertising purchases." Each ad package  costs $1.00 and consists of 1 credit.  Each advertiser receives 1 showing of its website for each credit.  [Claimant's Exhibit 5, Complaint Exhibit 3, page 2-3].

47.     The Terms of Service  contain an express requirement, under "Member Responsibilities":  "In order to be an advertiser of ASD, you must have your own product, program or opportunity to advertise or have access to a website for which you are an authorized reseller with the right to advertise." [Claimant's Exhibit 5, Complaint Exhibit 3, page 5].

48.     The Terms of Service  impose additional restrictions on the types of sites which can be promoted on ASD's website.  For example, advertisers' websites may not contain pornography, matchmaking, mail-order brides, religion, politics war games and Satanism.  ASD reserves for itself the right to determine unacceptable themes.

49.     ASD also offers prospective advertisers the opportunity to become "affiliates" of established companies if they do not have their own websites.  As "affiliated" members of established companies, they earn compensation from sales made by the established company if a customer buys products through their website on ASD's portal.  [See Tr. vol. 1, 65:5-10].

50.     If an advertiser is eligible  for a rebate and if a rebate is paid, then the rebates are paid to advertisers "for the service of viewing other advertiser's websites." [See Claimant's Exhibit 5, Complaint Exhibit 3, page 2-3].

51.     Advertisers receive 1 credit (1 showing of their website) for each site they view. Depending on the advertiser's membership level, the advertiser must view up to 24 websites each day for 15 seconds each to qualify for a rebate.  [See Tr. vol. 1, 71:13-18].

52.     The Terms of Service, under the "Ad Packages and Credits", , ASD explains that "ASD does **not** guarantee any earnings and/or rebates." (emphasis added) [Claimant's Exhibit 5, Complaint Exhibit 3, page 3].

53.     On page 4 of the Terms of Service , ASD states  that "**ASD is NOT an investment company.  ASD** does **NOT** sell investments. You do **NOT** invest in **ASD**.  You do **NOT** re-invest in **ASD**.  As an **OPTION** you can purchase advertising packages and earn cash rebates by viewing our advertiser's websites.  You do not get paid back … you earn cash rebates. **ASD** does not make any guarantees as to the amount of daily rebates.  Even though sponsoring is not required to earn cash rebates, **ASD** is not a "passive" program. You are required to purchase advertising packages and view advertiser's websites to earn cash rebates.  You can only earn cash rebates on the days you view a required number of websites." (emphasis retained from original).[See Claimant's Exhibit 5, Complaint Exhibit 3, page 4, paragraph 3; Tr. vol. 1, 116:14-119:8].

54.     The rebate program which the Government focuses upon is explained under the "Advertising Rebates" section, which is on page 2 of the Terms of  Service .  ASD advises its advertisers that they "can" receive up to 125% of their advertising cost in rebates by viewing 24

websites of other advertisers on a daily basis for 15 seconds each." This sections also notes that "an advertiser must have an active ad package to earn rebates."

55.     The "Advertising Rebates" section also states  that "Advertisers will be paid rebates until they receive 125% of their ad packages."  The testimony established that this language means rebates are "capped" at 125%, and does  not require or guarantee payment of rebates or the payment of any particular amount in any given time. [See Tr. vol. 1, 45:22-46:5;125:14-129:15.]  Although this sentence might, if not read in conjunction with the other terms, imply that a rebate will be paid, the Terms and Conditions contain many other provisions which clearly explain that rebates are not guaranteed and which specify the method of calculating  any rebate which is to be paid. [See Tr. vol. 1, 45:22-46:5;125:14-129:15.]

56.     Specifically, ASD sets aside 50% of all ad package sales from the previous day and divides the total by the number of outstanding ad packages.  If there are no ad package sales the previous day, then there is no rebate and no calculation is needed.  If there are ad package sales, the calculation yields the amount of rebate to be paid per ad package.  This amount is multiplied by the number of ad packages in each member's account.  The total rebate is credit towards the advertiser's account on a daily basis. [See Tr. vol. 1, 45:22-46:5;125:14-129:15.]

57.     The Terms of Service  also note that an advertiser is not eligible to earn any rebates for days where they do not view the required number of websites.

58.     Because the ASD website was down for approximately two weeks in July 2008 because of upgrades to its software, ASD decided, as a matter of discretion and customer relations, to pay rebates for a limited period of time even though ASD's advertisers could not

view other websites on the days when ASD's Rotator was inoperable and no one would be viewing their websites.

59.     ASD's corporate representative, Charles Osmin, explained that ASD believed it was unfair to prevent advertisers from obtaining eligibility for rebates  on days when ASD was at fault for the website's unavailability.  [See Tr. vol. 3, 4:19-5:1].

60.     Mr. Osmin, who was the head of ASD's Customer Service Investigators division, believed that the funds to pay rebates for the dates in July 2008 when the website was down came from the reserve account.  The reserve account is described in the Terms and Conditions and provides that a small amount (5%) of adpack sales will be placed in a special account to be used at ASD's discretion to pay rebates.    [See. Tr. vol. 3, 37:12 – 38:3].

61.     Bob Grayson, who owns Green Go'Fer Health [See Tr. vol. 1, 19:11-14], testified at the hearing about the advertising and sales success his company enjoyed from ASD.  [See Tr. vol.  1, 27:25 – 28:16].   Mr. Grayson, who holds a Masters Degree in chemistry [See Tr. vol. 1, 18:2-3], explained that he initially questioned ASD's business model but concluded that it is not a Ponzi scheme after he conducted his own extensive due diligence. [See Tr. vol. 1, 27:8 – 28:7].

62.     Mr. Grayson prepared charts and graphs to illustrate the increased number of "hits" his internet website received while being shown on the ASD Rotator and the increased revenue.  For example, in 2007, before Mr. Grayson was using ASD, his website received 28,945 page views and 16,873 unique visitors  But in the first 9 months of 2008, when his website was being promoted on the ASD Rotator, he had 62,015 page views and 42,322 unique visitors. Mr. Grayson also submitted sales data and internet traffic data to back up these totals.  The Court admitted Mr. Grayson's charts and data into evidence as Claimant's Exhibit 1.

63.     Mr. Grayson conceded that ASD's customer service department sometimes was overloaded because of the dramatic growth the company experienced during the Spring and Summer of 2008.  Nevertheless, he testified that he was always able to contact customer service if he was persistent and made more than one phone call. [See Tr. vol. 1, 46:6-25].

64.     Mr. Grayson also acknowledged that he understood that he might never obtain rebates at all on any given day and that his total rebates over time might never reach 125% of this ad package purchases. [See Tr. vol. 1, 32:10-19].

65.     Mr. Grayson does not consider himself to be a victim of ASD's alleged fraud.  He also said it is the Government, not ASD, which is responsible for damages to his business. [See Tr. vol. 1, 90:4-6].

66.     Mr. Nehra testified as ASD's expert on multi-level marketing.  [See Tr. vol. 1, 99:25 – 103:12].   Mr. Nehra has helped approximately 400 companies launch multi-level marketing companies.   [See Tr. vol. 1, 98:4-5].  He testified that no company which hired him before launch was ever shut down by government regulators. [See Tr. vol. 1, 98:5-6].

67.     Mr. Nehra explained that his role as an ASD consultant lasted only a few days because it soon evolved into an independent expert after the Government seized ASD's funds. [See Tr. vol. 1, 103:15-21].   Mr. Nehra testified that the ASD business plan is not a Ponzi scheme.   [See Tr. vol. 1, 116:3 – 117:7].   He repeatedly and forcefully challenged the Government's theory that ASD guaranteed to pay rebates.  [See Tr. vol. 1, 142:11 – 143-21; Tr. vol. 1, 145:24 - 146:16].   He also explained that the "125% feature" which troubled the Government about the rebate program is not problematic because the rebates, if paid at all, would be derived only from 50% of the revenues from the previous day. [See Tr. vol. 1, 116:3 – 117:7].

68.     Mr. Nehra conceded that ASD, like virtually all of his clients, was not perfect and that he had planned to assist the Company by improving, clarifying and harmonizing the Terms and Conditions.  However, he also testified that ASD's business, as it was operated prior to the Government's seizure, was not an illegal Ponzi Scheme.  [See Tr. vol. 1, 116:3 – 117:7].

69.     According to Mr. Nehra's testimony, the core of ASD's business is selling internet-based advertising and that it is being used for its intended purposes. [See Tr. vol. 1, 117:8-16; Tr. vol. 1, 123:18-24].

70.     Significantly, Mr. Nehra explained that ASD's success is not dependent on an ever-growing pool of new members.  If no new advertisers join, the ASD program would not die. Instead, the existing advertisers could sustain ASD by using their credits for additional advertising. [See Tr. vol. 1, 119:12-24].

71.     Moreover, Mr. Nehra explained that the existence of a rebate program does not negate the fact that ASD was selling internet advertising.  [See Tr. vol. 1, 150:22-151:12].

72.     Mr. Nehra's analysis is that the rebate program is financially feasible because it is a daily event and is limited to 50% of the daily revenues.  [See Tr. vol. 2, 41:4-13].

73.     ASD's "New Member Success Video" contains a short introduction by Mr. Bowdoin and then a far-lengthier presentation by Robert Garner, an attorney based in Greensboro, North Carolina.  In this video presentation, Mr. Garner explains that "the program provides businesses a way to advertise on the internet."  He also explains that "not everyone qualifies for the rebates, but for those who do participate, it is a great opportunity for them to expose their websites to the public, to advertise their businesses and in addition to earn back some of the cost of that advertising."

74.     In the video, Mr. Garner also emphasizes the non-guaranteed nature of the rebates: "While ASD commits a portion of its future revenues to pay rebates, it does **not** guarantee a return per se.  And the time it takes to earn rebates is affected by the revenue stream in the future.  Not everyone elects to participate in the rebate program and not everyone earns rebates."[†] (emphasis added).

**Customer Service**

75.     Charles Osmin began working for ASD in April 2008.  A former United States Postal Service employee who received four honorable discharges from the armed services (three from the Navy and one from the Army), Mr. Osmin was in the accounting/customer service division of ASD.  There were (before the seizure of  ASD's bank accounts) approximately 30 employees working in customer service.  [See Tr. vol. 2, 83:19-84:13].

76.     Mr. Osmin placed three websites on the ASD Rotator:  a whole food pharmacy business, his family clown/entertainment business in Quincy and Xooma, which created a proprietary website for him as an "affiliate" distributor.  He developed three customers for Xooma in the three months his website was posted (before the bank account seizures). [See Tr. vol. 2, 83:19-84:13].

77.     Mr. Osmin, who continues to work at ASD since the bank account seizures without a salary because he believes in the company [See Tr. vol. 2, 85:12–86:6], explained that ASD required all members who wanted to earn rebates have a website.  He further explained ASD recently (i.e., a few weeks before the seizures of ASD's bank accounts) implemented new software designed to ensure compliance with the requirement that a bona fide website is necessary.  [See Tr. vol. 2, 88:14 - 89:8].

---

[†]     The Government introduced into evidence a transcript of the video.

78.     Mr. Osmin further explained that ASD employees took a test which probed their familiarity with the ASD business model and its operations.  [See Tr. vol. 3, 15:3-20].

79.     As outlined by Mr. Osmin, ASD maintained three separate balances for its advertisers:  the active advertising package balance, the credits balance and the cash balance (reflecting the rebates and commissions which were earned and paid).

80.     Mr. Osmin explained that the rebates and commissions could be cashed out and ASD was regularly issuing checks in response to cash-out requests from its advertisers.  [See Tr. vol. 3, 29:10-17].

81.     Mr. Osmin also testified that some members joined initially for only the advertising benefits and do not until later learn about the rebate and commission opportunities. [See Tr. vol. 3, 41:10-18].

82.     Mr. Osmin also explained the benefits of being a paid member, instead of advertising for free:  ASD paid a higher rate of commissions for the first-level and second-level sales, the amount of the processing fee for cash-outs decreased (or was eliminated) and the schedule for when cash-outs were available were broadened. [See Tr. vol. 3, 54:25 – 56:21]

**The Compliance Plan**

83.     Before the hearing, ASD submitted a written, proposed Compliance and Oversight Plan ("Plan").  Mr. Schwartz, who drafted the Plan, provided further details of  the proposed Plan in his testimony.  Mr. Schwartz, who has had extensive experience in creating and working with compliance plans with other regulatory agencies [See Tr. vol. 3, 59:21 – 60:1]., testified that the Plan is necessary in order to provide a meaningful framework for any relief which the Court may provide to ASD.  [See Tr. vol. 3, 61:10 -62:22].

84.     Mr. Schwartz explained that the Plan is a roadmap for getting ASD back on its feet, under a system of checks and balances and safeguards, overseen by a Court-approved

Monitor. [See Tr. vol. 3, 62:13-19]. He stated that the Monitor would eliminate the need for the Court to be involved in the daily business decisions. [See Tr. vol. 3, 63:24 - 64:6].

85. Mr. Schwartz testified that the two primary purposes of the Plan are, first, to govern operations of the Company's business during an interim period during which the company, with the assistance of outside experts and the Monitor, will develop a Future Business Operations Plan ("Operations Plan"); and second, during this interim period, to build and implement the Operations Plan as described in the Plan.

86. During the interim period, the Plan basically protects the interests of the business, including its valuable advertiser and member base, from being lost as the litigation progresses. [See Tr. vol. 3, 62:5-12]. Only a small percentage of the assets ($2 million) would be available initially for use until the "roll-out" of the Operations Plan. [See Tr. vol. 3, 63:8-16].

87. The Operations Plan includes, but is not limited to, the following components and steps:

(a) An independent accounting firm;

(b) Members Steering Committee;

(c) A robust Code of Conduct and policies and procedures to ensure compliance above best practices;

(d) Board of Directors;

(e) Revisions, additions or modifications to the Terms of Service or creation of multiple Terms of Service.

88. During the interim period, ASD will provide to the Monitor and the Court financial statements showing its receipts and disbursements on a monthly basis or such other timetable as the Monitor or Court may require.

89.     As outlined by Mr. Schwartz, the Government's action has created a cloud over ASD and the Plan is necessary so that the Court can be assured that ASD will be operated going forward in a legal manner.  [See Tr. vol. 3, 68:17–69:5].

90.     Because the members are a critical part of ASD's business, as noted above, the Operations Plan explained by Mr. Schwartz during his testimony contemplates the input of the members through the establishment of a member steering committee represented by counsel. [See Tr. vol. 3, 73:10-18].

91.     Although Mr. Schwartz had received a balance statement and income statement (as of July 31, 2008) from ASD, he explained that an independent firm of certified public accountants would need to vet ASD's internal financial statements.  [See Tr. vol. 3, 70:19-25]. Mr. Schwartz further noted, in his testimony, that the Plan contemplates the retention of an accounting firm for this purpose. [See Claimant's Exhibit 8.]

92.     The ASD Income Statement (which was introduced into evidence) demonstrates that ASD had approximately $100 million in revenue during the first 7 months of 2008, almost $20 million of pre-tax income and a net worth of almost $10 million.  It also demonstrates that ASD has other sources of income besides its advertising package sales, such as revenue from Green Back Street, the Millionaire Advertising Co-Op, office lease income and interest income.

93.     Under cross-examination, Mr. Schwartz testified that, in his view, the Government does not understand the rebate concept.   According to Mr. Schwartz, the Government does not understand that ASD can continue in business without becoming insolvent because it only pays out 50% of its future revenues as rebates to advertisers who qualify for them.  [See Tr. vol. 3, 79:5-15].

94.     Mr. Schwartz explained that the decision on whether to retain, modify  or eliminate the rebate program under a future business operating plan is an issue which would be considered.  [See Tr. vol. 3, 84:8-23].

95.     Recognizing that the company grew rapidly in 2008 and experienced the problems often associated with fast-growing businesses, Mr. Schwartz explained that the compliance plan calls for improvement to ASD's infrastructure, which was placed under significant strain.  [See Tr. vol. 3, 69:13-21].

96.     Mr. Schwartz explained that the social network of small advertisers who comprise the ASD members should be of more than sufficient critical mass to attract other forms of advertising and revenues often received by other internet advertising businesses.  [See Tr. vol. 3, 67:1-12].

## CONCLUSIONS OF LAW

1.     ASD seeks the return of seized funds pursuant to a proposed compliance plan involving Court-approved oversight and monitoring.

2.     18 USC §983(f) authorizes this Court to order the "immediate release" of seized property under certain conditions.

3.     In fact, the statute does more than authorize the immediate release of seized property.  It *requires* the immediate return of seized property under certain conditions and provides claimants with a substantive right.  Specifically, it provides that a claimant[‡] "is **entitled** to immediate release of seized property" under the conditions outlined in the statute. (emphasis added).

---

[‡]     ASD is a claimant under section (a) of 18 U.S.C. § 983.  ASD has filed a verified claim to the seized funds in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.  Section (f)(1)(A) of the stature requires the claimant to have a "possessory interest" in the property. Given that the funds at issue were seized from ASD's bank accounts at BOA and were derived from revenue received by ASD, this requirement is met.

5.  Section (f)(1)(B) requires the claimant to "have sufficient ties to the community to provide assurance that the property will be available at the time of trial." ASD has met this requirement. Opened in 2006, ASD is based in Quincy, Florida and most of its employees live in the Quincy area. Moreover, ASD's motion is expressly premised on a partial return of funds pursuant to a compliance plan with oversight, including a monitor. ASD is not simply asking for a wholesale return of all seized funds, nor is it asking for a wholesale, unrestricted return of any funds. Instead, its emergency motion seeks an orderly and comparatively modest use of certain funds under a court-sanctioned compliance plan operated under the supervision of a court-approved monitor. These protections provide the Court with the necessary assurances that the returned funds will be administered properly and professionally, with oversight and subject to this Court's ultimate authority.

6.  Section (f)(1)(C ) requires ASD to demonstrate that "the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving the individual homeless." ASD has easily met this requirement. ASD and its employees have endured significant and substantial hardship. The seizure of ASD's bank accounts at BOA has directly caused the cessation of business and has prevented ASD from resuming its operations.

7.  Section (f)1(D) provides that "claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be

destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the proceeding." ASD has met this requirement. There is little doubt that ASD is teetering on its last business legs and that the company will collapse completely if some of the seized funds are not returned. Without return of part of the seized funds under a compliance plan with oversight, ASD will not have sufficient revenues to develop its future business operating plan while the legal issues in this case are sorted out. A trial victory one or two years from now or a favorable summary judgment ruling 6 months from now will be hollow and illusory. There will be no company left to enjoy the favorable result and no company existing to resume operations.

8.       Section (f)(1)(E) conditions an order of immediate release of property on the non-application of the conditions set forth in paragraph (f)(8).

9.       Section (8)(A) of the statute provides that the release of property benefit is inapplicable if the seized property "is contraband, currency, or other monetary instrument, or electronic funds, unless such currency or other monetary instrument or electronic funds constitute the assets of a legitimate business which has been seized."

10.      For all practical purposes, the Government has seized ASD's business. It has seized *all* of ASD's accounts at BOA. Unlike many civil forfeiture actions involving a specific amount of money, a particular wire transfer or a partial balance in one bank account, the Government's seizure here is no different than the outright seizure of a business. The Government argues that it seized *only* bank accounts, not an actual business. But this is a hyper-technical argument which elevates form over substance. There is no functioning business without these bank accounts, and no one will do business with ASD for fear of another government seizure. The Government has not demonstrated that ASD can continue to operate its

business in any way while its BOA accounts remain under seizure. Therefore, the only issue remaining open under this subsection is whether ASD's business is "legitimate."

11.     Determining whether ASD's business is legitimate is the ultimate issue in this lawsuit. If ASD was not running a Ponzi scheme, then the Government's forfeiture theory here fails. If ASD was running a Ponzi scheme, then the funds are proceeds subject to forfeiture. This issue needs to be decided quickly so that if it is determined by the Court that ASD's business was legitimate at the time of the seizure, ASD can quickly get back into business in an orderly and proper fashion.

12.     The Government's Complaint asserts only one theory of unlawful activity: a Ponzi scheme. The specific violations, such as wire fraud and mail fraud, require underlying unlawful or fraudulent activity – and the only theory asserted in the Complaint is the Ponzi scheme theory.

13.     The Government has implied that ASD was *also* involved in the unlawful sale of unregistered securities. While ASD would dispute that assertion, that theory is nowhere in the Complaint and the Court will not consider it.

14.     The record indicates that if there is a factual basis for the Government's new theory (i.e., that ASD was allegedly involved in the unlawful sale of unregistered securities), then that knowledge existed at the time the Complaint was filed, based on Agent Dotson's seizure warrant affidavit. The Government, however, seized ASD's bank accounts based on an entirely different theory (Ponzi scheme), which the Court has now determined is untenable.

15.     Not surprisingly, ASD objects vigorously to the Government alleging **for the first time** this new theory for forfeiture, arguing that the Government knew of the facts relating to this new theory when it began these proceedings and cannot now change its theory in order to justify

this *in rem* civil forfeiture lawsuit. ASD objected to the Government's questions and comments, at the evidentiary hearing, about any purported securities violations.

16.     There is ample authority to prevent the Government from now pursuing a new theory which has not been raised in its Complaint. *See United States v. All Monies ($637,944.57) in Account No.*, 74 F.Supp. 1432, 1439 (D.Hawaii 1990) ("The court is concerned…about the government's **change of theories midstream** in this litigation based on its developing theory of probable cause); *see also*, *Carswell v. Air Line Pilots Associations*, 248 F.R.D. 325, 330 (D.D.C. 2008) (citing *Barlow v. McLeod*, 666 F.Supp. 222, 229 (D.D.C. 1986) ("But where, as here, a plaintiff makes sensational allegations with respect to a defendant without any factual basis whatsoever, and then tries to rescue his claims against that defendant from dismissal by introducing an **entirely different theory** of liability in his legal memoranda, the failure of the plaintiff and his counsel 'to make sure the original complaint was well grounded in fact is clearly a violation of Rule 11'") (emphasis added); *Rent Information, Inc. v. Home Depot U.S.A., Inc.*, 268 Fed.Appx. 555, 558 (9th Cir. 2008) (Provider of software development services, which abandoned theories of fraud contained in its complaint against customer and advanced a **new theory** of promissory estoppel by fraud, **could not bootstrap** its new promissory estoppel argument onto its fraudulent misrepresentation claim, where it failed to allege in the complaint particular facts supporting the new theory as required by rule requiring that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity) (emphasis added); *Okland Oil Company v. Knight*, 92 Fed.Appx. 589 (10th Cir. 2003) ("Although the pretrial order supersedes the pleadings, this court has stated that it does not normally expect to see claims or defenses not contained in the pleadings appearing for the first time in the pretrial order…[s]uch a practice deprives one's adversary of fair notice, possibly

discovery, and the opportunity for motion practice, and **is subject to abuse by those who employ a sporting theory of justice**. The laudable purpose of Fed.R.Civ.P. 16 is to avoid surprise, not foment it.") (internal quotations and citations omitted) (emphasis added); *Southerland v. City of New York*, 521 F.Supp.2d 218, 236 (E.D.N.Y. 2007) (citing *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093 at *6-7 (S.D.N.Y. 2004) ("A complaint cannot be amended merely by raising **new facts and theories** in plaintiffs' opposition papers, an hence new allegations and claims should not be considered") (emphasis added).

17.    In light of the information the Government had available to it from the outset, and in view of the Government's complete failure to allege a securities violation anywhere in its forty-four (44) page forfeiture Complaint, this Court will not consider this entirely new theory for the immediate purposes.

18.    Given the Government's concession that the commission portion of ASD's business plan is not unlawful and its emphasis on the rebate component, the Court's analysis here will focus on the rebate program.

19.    The Government's challenge to the rebate program is based on the theory articulated by Special Agent Dotson, who outlined it in the seizure warrant affidavit and the Verified Complaint.  Special Agent Dotson purports to rely on a "consultation" he had with an unnamed FTC economist, but this reference is too vague and nebulous to be helpful.  Thus, the Court will turn instead to the testimony of Mr. Nehra (an expert in multi-level marketing issues), Mr. Schwartz (a business lawyer with experience dealing with compliance plans and regulatory issues, including government investigations of alleged Ponzi schemes), Mr. Grayson and Mr. Osmin.

20.     The Court agrees, at least for purposes of this initial motion, with Mr. Schwartz's conclusion that the Government appears to misunderstand the rebate program. The critical facts underlying the rebate program are: (1) the rebate is not guaranteed, (2) the rebate (if there is to be one) is a new event each day, (3) the calculation is made on the prior day's revenues, (4) the rebate is funded from a set aside of 50% of the prior day's receipts, (5) there is no deadline under which an advertiser can expect to recoup 125% of his ad package purchases, and (6) advertisers may never recover any specific portion of their ad package purchases, let alone approaching the 125% cap.[§] If the revenues on any given day are weak, then the next day's rebate calculation will reflect the poor performance. If there are absolutely no revenues, then there is no rebate because 50% of zero is zero, thus rebates would not be paid. It's that simple.

21.     The Government's Ponzi scheme theory is also premised on its belief that ASD must continue to attract new money from new advertisers in order to sustain itself. This is an incorrect hypothesis. As unequivocally established by the witness testimony, ASD can continue to operate with its existing advertising base. While it is certainly true that ASD's advertisers would obtain a *greater* benefit if ASD continued to attract more advertisers, it is not true that the company would fail if new advertisers did not participate. To the contrary, ASD could continue to operate through its existing advertisers. If the revenue from the existing advertisers decreased, then the rebates would likewise decrease. But the ASD business model is not dependent on paying older members with revenues from newer advertisers (the classic hallmark of a Ponzi scheme).

---

[§]     The Government contends that the 125% "promised" rebate is a rebate of "membership fees." *See, e.g.,* Complaint, parag. 16. The Government is incorrect. The Terms of Service expressly state that the daily rebate calculation, if there is to be one, is derived from ad package sales and commissions from other income sources. They do not, by any means, purport to use a daily calculation of a rebate based on "membership fees."

22.    ASD is offering an actual, tangible product – internet advertising.  It also had other sources of income, albeit limited sources (as identified in the July 31, 2008 income statement).  It was also exploring additional sources of revenue at the time of the seizure.  In fact, Mr. Nehra was initially contacted about helping ASD assure  compliance with laws and regulations related to MLM in its business operations at the request of a potential ASD partner who was considering an arrangement between ASD and his internet shopping portal.

23.    Subsection (f)(8)(B) (the seized property "is to be used as evidence of a violation of the law") is inapplicable.  The property at issue here is funds in bank accounts, not specific cash dollars, and the Government has not argued that these account balances are needed as "evidence" in a civil forfeiture trial.

24.    Subsection (f)8(C) provides that relief to a claimant is unavailable if the seized property "by reason of design or other characteristic, is particularly suited for use in illegal activities."  This is inapplicable to the bank account balances at issue here.

25.    Subsection (f)8(D) excludes seized property from the immediate release type of relief if it "is likely to be used to commit additional criminal acts if returned to the claimant." Because ASD's motion is conditioned on a court-approved compliance plan and ultimately Court approval of ASD's future business operating plan, Claimant is not excluded from relief under this subsection.  A court-approved monitor and the Court are not "likely" to permit ASD to operate criminally.

26.    In determining whether to grant ASD's emergency motion, the Court believes it is appropriate to also consider the proportionality analysis at issue in ASD's Petition to Determine Proportionality.[**]  The petition relates to Subsection (g) of 18 U.S.C. § 983, which provides that

---

[**]    The Clerk's Office designated this as a motion.

a claimant may petition the Court to "determine whether the forfeiture was constitutionally excessive." In making this determination, the Court is required to "compare the forfeiture to the **gravity of the offense** giving rise to the forfeiture." (emphasis added).

27. The Court recognizes that the proportionality petition is typically filed *after* a forfeiture adjudication has already occurred. In the instant case, the Government has seized ASD's ten (10) bank accounts at BOA but has not obtained a final forfeiture judgment. Nevertheless, Congress was concerned about proportionality issues and it is not inappropriate for the Court to at least factor-in the proportionality analysis when evaluating an emergency motion for immediate release of seized property.

28. The gravity of the offense is not great. Indeed, there is significant doubt as to whether *any* offense even occurred here in the first place. The Government's only theory -- that ASD was operating a Ponzi scheme -- appears to be fundamentally incorrect. Moreover, the Court is not unmindful of the substantial support, such as more than 4,000 emails in less than two months, ASD has received from its advertisers and members. The Court also acknowledges the support shown by ASD advertiser and members who appeared in Court to observe the two-day evidentiary hearing.

29. ASD has established the grounds for immediate release of property provided in 18 U.S.C. § 983.

It is this___day of _____, 2008;

HEREBY ORDERED THAT

30. The Government is hereby ordered to transfer $2 million of the seized funds to an ASD bank account, to work out with ASD's counsel within _____ days of this Order reasonable procedures to place the seized funds in escrow at banks reasonably acceptable to the government

and to allow ASD to use up to $2 million of the funds in accordance with the Compliance Plan and paragraph 31 below and subject to the oversight of the Monitor.  In addition, BOA is ordered to allow the deposit of the funds and to not re-seize or re-freeze those funds.  Moreover, BOA shall not, absent further Order of this Court, seize any additional funds from any of the 10 accounts at issue in this emergency motion (i.e., the 10 accounts listed in paragraphs 5(a) – (j) of the Complaint For Forfeiture *In Rem.*

       31.     ASD shall, within _____ days of this Order, submit to the Court a resume of a proposed Monitor.  ASD will be permitted to use funds from the $2 million to pay attorney's fees and costs, including those incurred in connection with the emergency motion and the two-day evidentiary hearing, and to pay retainers to the independent accounting firm which will be retained to prepare financial statements and to the Monitor (once he or she is approved by the Court).

       32.     ASD shall develop its Future Business Compliance Plan within _____ days and present same to the Court for approval.  The parties will, within _____ days of this Order, also work out a schedule in which the issues of legality of ASD's business at the time of the seizure can be fully briefed and determined within a _____ day period.

       33.     If the Government has any specific objections to any particular component of the more-specific Compliance Plan, then it shall file and serve them within ____ days of receipt.


       in Washington, DC this _____ day of October, 2008.


                     _____
                     U.S. DISTRICT JUDGE ROSEMARY M. COLLYER

copies furnished counsel of record