```
              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA    :
                            :
          Plaintiff,        :        Docket No. CA 08-1345
                            :
     vs.                    :
                            :         Washington, D.C.
8 GILCREASE LANE,           :      Wednesday, October 1, 2008
QUINCY, FLORIDA 32351       :            9:35 a.m.
ET AL,                      :
                            :
          Defendants.       :
---------------------------x



              TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE ROSEMARY M. COLLYER
              UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Government:        WILLIAM COWDEN, Esquire
                           VASU MUTHYALA, Esquire
                           Assistant United States Attorneys
                           555 4TH Street, NW
                           Washington, DC  20530


For Defendants:            MICHAEL L. FAYAD, Esquire
                           Akerman Senterfitt
                           8100 Boone Boulevard
                           Suite 700
                           Vienna, Virginia  22182-2683


                           JONATHAN GOODMAN, Esquire
                           Akerman Senterfitt
                           One Southeast Third Avenue
                           25th Floor
                           Miami, Florida  33131-1714
```

Appearances continued:

Court Reporter:          Crystal M. Pilgrim, RPR
                         United States District Court
                         District of Columbia
                         333 Constitution Avenue, NW
                         Room 4704
                         Washington, DC  20001

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

THE DEPUTY CLERK:  Civil action 08-1345, United States of America versus 8 Gilcrease Lane, Quincy, Florida 32351, et al.

For the plaintiff William Cowden and Vasu Muthyala.

For the defense Michael Fayad and Jonathan Goodman.

THE COURT:  Good morning everyone.

MR. COWDEN:  Good morning, Your Honor.

MR. FAYAD:  Good morning, Your Honor.

MR. GOODMAN:  Good morning, Your Honor.

THE COURT:  We had our expert witness on the stand, perhaps you could come back, sir.

MR. GOODMAN:  Your Honor, I just have one or two administrative matters.

THE COURT:  Yes.

MR. GOODMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GOODMAN:  Your Honor, when we were here yesterday, some of the exhibits that we were going through in the binders were the member e-mails and --

THE COURT:  Yes.

MR. GOODMAN:  -- you may recall that they weren't numbered.  Some of us were able to keep up, others were not.

But for the benefit of all of us we have made a duplicate set which is numbered and with the Court's permission

1  I'll give an extra copy to your court deputy and to the Court.

2  I've already given a copy to the government and I'll put a copy

3  on the witness stand for use by the witness.

4        THE COURT:  That would be great.

5        Thank you very much.

6        MR. GOODMAN:  The other administrative matter, Your

7  Honor, is that when we had filed our emergency motion we

8  mentioned that we were going to be seeking return of some of

9  the money pursuant to a compliance plan.

10       And that we would explain that compliance plan at a

11  hearing if the Court gave us a hearing and you have given us a

12  hearing.

13       We then filed a proposed written compliance plan.  And

14  the architect of that compliance plan is Phillip Schwartz.

15  Mr. Schwartz is here in the courtroom this morning.

16       Mr. Schwartz, would you just stand up?

17       Your Honor, Mr. Schwartz is one of my partners from the

18  Ackerman Senterfitt law firm.  He's not a trial lawyer or a

19  litigation lawyer.  I don't think that he needs to be admitted

20  pro hac vice.

21       I had planned on having Mr. Schwartz explain to the

22  court at the appropriate time the compliance plan and how it

23  would work and I just wanted to introduce him to the Court and

24  explain what he intends to do.  Sort of as a member of the

25  legal team although we would acknowledge that he is not a trial

1  lawyer and won't be questioning any witnesses, so if that's

2  acceptable to the Court.

3          THE COURT:  All right.  Well, I think that what we

4  should do for purposes of his presentation if I could put it

5  that way, is have him as a witness because then if the

6  government has questions of him, it would be able to ask him,

7  and that would allow us to conduct his opportunity to make his

8  presentation and respond to questions in the most organized

9  fashion.

10          MR. GOODMAN:  Understood, Your Honor.  Given that he

11  is in effect a lawyer from our firm.

12          MR. COWDEN:  No objection to him staying in the

13  courtroom, Judge.

14          MR. GOODMAN:  Thank you, we appreciate that,

15  Mr. Cowden.

16          THE COURT:  You can give it to the deputy.  Thank

17  you.

18          MR. GOODMAN:  And the final administrative matter,

19  Your Honor, it's a little self-centered and selfish, but I'm

20  trying to find a folder that I believe I left in the court

21  yesterday.  It was the affidavit for the search warrant.

22          I can't say for sure that I left it here on counsel

23  table, but I'm going to issue an informal bow low, be on the

24  look out for the Jonathan Goodman marked up search warrant.  If

25  anybody finds the affidavit, please pass it on to me.

1    Thanks so much.

2            THE COURT:  All right.  I don't have it.  I'll just

3    tell you now, I have more than enough of my share of paper and

4    I don't have it.

5            MR. COWDEN:  Judge, we didn't find it either, but it

6    is submitted to an attachment to one of the motions or

7    memorandums or something.  It might be possible for your clerk

8    to print it out if they need another copy.  That might be the

9    most expeditious way than vying to have us run back to the

10   office and get it.

11           THE COURT:  Yes, sir, you can come forward now.

12                CLAIMANT WITNESS GERALD NEHRA SWORN

13                     CROSS EXAMINATION (Cont'd)

14   BY MR. COWDEN:

15   Q.   Good morning, Mr. Nehra?

16   A.   Good morning, counsel.

17   Q.   When we left yesterday you had talked about being hired as

18   an expert witness by ASD to opine on the legality of its

19   operation, correct?

20   A.   I was hired by the Ackerman law firm to be an expert

21   witness on behalf of ASD, yes.

22   Q.   Prior to that you were hired by ASD, is that right?

23   A.   Prior to that I was hired by ASD to be a counselor in my

24   area of specialty, yes.

25   Q.   Yesterday you or Ackerman Senterfitt gave us a copy of the

1 letter which is in front of you on the screen?

2 A.   Yes, that is correct.

3 Q.   I asked you yesterday about securities law.  You said you

4 were not an expert in securities law?

5 A.   I did make that statement, yes.

6 Q.   In the letter you said here the design of such plan and

7 the proposed implementation will be legally reviewed by me to

8 eliminate or reduce to an absolute minimum any possibility of a

9 violation of securities laws, right?

10 A.   It does say that.

11 Q.   When I asked you about securities laws yesterday you said

12 you were going to farm out the securities law issue to somebody

13 else not to you, right?

14 A.   I did say that when a securities issue shows up in my

15 review of my client materials, I send them to securities laws

16 experts or to that effect.  Yes, I did say that.

17 Q.   Yesterday I asked you if there was a securities law issue

18 and you said you didn't know, right?

19 A.   I don't recall saying I do.

20 Q.   If Ad Surf Daily is taking money from people and paying a

21 rebate of up to a hundred and twenty-five percent and that

22 rebate payment is based on how much they paid in, and that's

23 how you understand the rebate to work, right?

24 A.   I do understand it that way.

25 Q.   So if you're getting a profit based off how much you put

1  in, is there a securities law issue there?

2  A.   No.  I got a thousand dollar rebate when I bought a car.

3  It was based on what I paid for the car.  You haven't shut down

4  General Motors by seizing their bank accounts.

5     Rebate programs are legal in my estimation generally and

6  rebate programs specifically in this program in my opinion and

7  testimony doesn't violate any law.

8  Q.   Have you ever seen a company with a rebate program besides

9  ASD where the rebate actually gives you more money than you pay

10  to the company?

11  A.   You are assuming that this rebate gives you more money

12  than you paid in.  That is a cap that would be attained by some

13  of the people.  But the rebate program is specifically defined

14  as fifty cents on a dollar --

15  Q.   Let me ask you -- mine was a yes or no question.

16     Have you ever seen --

17  A.   The answer is no, I have not.

18  Q.   No.

19     Now, have you ever seen in the ASD rebate program the

20  representation that it makes that rebates will be paid up to a

21  hundred and twenty-five percent, correct?

22  A.   We have discussed that in the --

23  Q.   Is that correct?

24  A.   Yes, I have seen that.

25  Q.   Mr. Nehra, yes or no answer, that's what it says, rebates

1  will be paid up to a hundred and twenty five percent?

2  A.   It does say that, counselor.

3  Q.   One hundred twenty-five percent is more money than you put

4  in, right?

5  A.   Yes.

6  Q.   Mr. Nehra, in your affidavit that you submitted to the

7  Court, paragraph ten, you said under oath it is fair to ask if

8  this business model is not an illegal Ponzi scheme what is it?

9  It is a legally structured direct selling business model with

10 multilevel compensation.

11     The product service is internet advertising, the

12 distribution channel choice is independent contractor

13 representatives.  And the compensation plan rewards only the

14 persons who bring the advertising business volume to the

15 company.

16     Those were the last words in your affidavit; is that right?

17 A.   Yes, sir, I did say that and those are my words.

18 Q.   Now after we have shown you all of these documents you

19 don't agree with that statement anymore, do you?

20 A.   Of course, I still agree with that statement.

21 Q.   Well, how are rebates paid?  Are rebates a compensation

22 plan rewarding only the persons who bring the advertising

23 business volume to the company?

24 A.   Yes, they are because the rebate program is only, the only

25 eligible people for the rebate program are the advertisers who

1 have brought their advertising business to the company. The

2 people who --

3 Q.   Wait a minute.  Those are the customers, those aren't the

4 sellers, those are the customers, isn't that your testimony?

5 A.   The advertisers are the customers, that was my testimony.

6 Q.   So is it your testimony here in front of the Judge that

7 the customers are also the sellers?

8 A.   The customers, some of them may choose to participate as a

9 member in the rebate program.

10 Q.   Let me ask you a yes or no question.

11    Are the customers the sellers in the ASD model?

12 A.   No.

13 Q.   Before you gave that opinion to the Court, you reviewed

14 the ASD website, right?

15 A.   I've so testified, yes.

16 Q.   In fact, you reviewed the ASD website before you even

17 showed up down at ASD to be hired to work for the company,

18 right?

19 A.   I went to the ASD website and I used it to download

20 Garner's opinion letter as I have so testified yesterday.

21    Your question implies that I reviewed the entire website by

22 which I did not.  I already told you I looked at a few pages

23 and I downloaded Garner's opinion.

24 Q.   When you looked at a few pages of the ASD website, this

25 was before you went down to Quincy, Florida, correct?

1  A.    Yes.

2  Q.    When you reviewed a few pages of the ASD website, you saw

3  some concerns, didn't you, sir?

4  A.    Concerns?

5  Q.    Concerns?

6  A.    No, not at that time.  I needed to go and find out what

7  the program was about and hear an explanation by the owner.

8  Q.    Remind Judge Collyer how you believe you got referred to

9  ASD?

10  A.    I believe I was referred to ASD by a mutual acquaintance

11  named Bill Levine who recommended that Andy Bowdoin interview

12  me and retain me.  I've so testified, yesterday.

13  Q.    Who does Bill Levine work for?

14  A.    Bill Levine owns a company called Pinnacle Communication.

15  That is the parent company of Greenback Street.

16  Q.    Did Bill Levine tell you that he was interested in doing

17  business with ASD before you met Andy Bowdoin?

18  A.    Bill Levine did tell me that, yes.

19  Q.    And did Bill Levine ask you to look over ASD's website

20  before you met Andy Bowdoin?

21  A.    He recommended that I look at the Garner opinion letter

22  and download a copy of it?

23     Yes.

24  Q.    Did you tell Bill Levine that you were concerned about ASD

25  before you met with Andy Bowdoin?

1  A.   I did not, no.

2  Q.   Is that a letter on Pinnacle letterhead?  Have you seen

3  that before?

4  A.   I've seen Pinnacle letterhead before, but I've only seen

5  the --

6  Q.   And is that the Pinnacle letterhead that you have seen

7  before?

8  A.   Yes, I have seen that letterhead.

9           MR. FAYAD:  Your Honor, excuse me.  May we look at

10  the exhibit?

11           THE COURT:  Well, we don't have the exhibit

12  presented.

13           MR. FAYAD:  I'm sorry, what's being shown to the

14  witness?

15           MR. COWDEN:  It's on the screen.

16           THE COURT:  Wait.

17      It's not being introduced into evidence at the moment.

18  So when the government intends to introduce it into evidence,

19  then you have to see a copy of it before they do.

20           MR. FAYAD:  Your Honor, I can't even understand the

21  questions if I don't know the document that the government is

22  using.

23           THE COURT:  Well, no --

24           MR. GOODMAN:  It's courtesy.

25           THE COURT:  I think that for whatever reasons,

1  Mr. Cowden is proceeding as he is and it's not improper to.  I

2  can't stop him.  He just wants to know so far does that look

3  like Pinnacle letterhead that you have seen in the past.

4          THE WITNESS:  I said yes, Your Honor.

5          MR. FAYAD:  Thank you.

6          THE COURT:  You're most welcome.

7      Now, Mr. Cowden, if you're going further then if you

8  want to use this document you must show the defense a copy of

9  it, Pinnacle --

10         MR. FAYAD:  Your Honor, may I just state an

11  objection?

12      We've not had a chance to review the letter thoroughly,

13  it's about four pages.  The letter is not to Mr. Nehra or from

14  Mr. Nehra, so with that, we object to using it.

15         THE COURT:  Is this Mr. Bowdoin the signatory?

16         MR. COWDEN:  No, Your Honor.

17         THE COURT:  Who is the signatory, who is the letter

18  from?

19         MR. COWDEN:  The letter is from Mr. Levine to

20  Mr. Bowdoin, to Mr. Bowdoin.  And it references Mr. Nehra and

21  it references conversations with Mr. Nehra and it's pertinent

22  to his testimony here in which he's indicated that he didn't

23  have these conversations.

24         THE COURT:  Right, right, I understand the

25  pertinence.

1    Is it hearsay?

2    MR. COWDEN:  I'm not seeking to introduce the

3  document, Judge.  I'm seeking to use it in cross examination to

4  see if it affects Mr. Nehra's testimony, not really any

5  different than if I might be introducing a kitchen sink to see

6  if it helps him recall what he's testifying about.

7    THE COURT:  All right.  Then I think he can use it as

8  a matter of questioning for cross examination or if he chooses

9  to show it to the witness to refresh his recollection.

10    MR. FAYAD:  As I understand it, it's not being used

11  as substantive evidence.  It's being used to test the witness'

12  recollection.

13    THE COURT:  Test the witness' recollection.

14    MR. FAYAD:  Thank you, Your Honor.

15    THE COURT:  Go ahead.

16    Go ahead, sir.

17  BY MR. COWDEN:

18  Q.   Mr. Nehra, I'm showing you this document.  This is a

19  letter on Pinnacle letterhead; is that right?

20  A.   I did testify that I recognized the Pinnacle letterhead,

21  yes, sir.

22  Q.   In the letter it indicates that Jerry Nehra, our network

23  marketing and LL counsel has been on for the past five years.

24    In fact, you have worked for Pinnacle five years?

25  A.   Five or more, yes, counsel.

1  Q.   Pinnacle asked you in fact to take a look at ASD prior to

2  the time that you went down and spoke with Mr. Bowdoin; isn't

3  that right?

4  A.   Pinnacle introduced me to Bowdoin and gave me some

5  information about ASD and gave me a link to the website so that

6  I could download Garner's opinion letter.

7  Q.   And you did prior?

8  A.   I did those things.

9  Q.   So prior to going down to ASD you had a chance to look at

10  its website, right?

11  A.   Yes.

12  Q.   The letter says we have identified a number of potential

13  land mines and working with Gary and our company can provide

14  you an extremely positive proactive approach to diffusing

15  problems before they manifest themselves.

16     The letter says that, right?

17     MR. FAYAD:  Your Honor, we object because this is

18  being offered not to test recollection but it's being offered

19  as a substantive statement.

20     This witness --

21     THE COURT:  It's being offered to challenge the

22  witness' testimony.

23     So I'm going to allow him to proceed.

24     MR. FAYAD:  Yes, Your Honor.

25     THE WITNESS:  I understand, and I can read what the

1  paragraph says, counselor.

2      Is there a question for me?

3  BY MR. COWDEN:

4  Q.   Before you went down to ASD, had you identified a number

5  of potential land mines?

6  A.   No.  The word land mine had never been used, and I have

7  never seen this letter before.

8  Q.   Before you went down to speak to Mr. Bowdoin at ASD --

9  A.   Yes.

10  Q.   -- did you identify your concerns about the ASD operation

11  in your mind?

12  A.   No.

13  Q.   Well, if you didn't identify concerns, why did you go down

14  to ASD and get the highest retainer that you've ever gotten in

15  your life?

16  A.   Because that's what I do for a living, counselor.

17     And when I got there I was going to be able to analyze the

18  programs and find out where I could be of service.  That's what

19  I do on a regular basis.

20  Q.   So let me --

21  A.   And I did it because Mr. Levine asked me to make myself

22  available to Mr. Bowdoin.  If Mr. Bowdoin chose to hire me --

23  Q.   So let me understand that.

24     Is it your testimony today that you went down to ASD and

25  you got a $24,000 retainer, right?

A.    I did.

Q.    And yesterday you told me that the $24,000 retainer was the most you ever received from a client for a retainer, right?

A.    That is the highest one year retainer, I did say that.

Q.    Now your testimony is that, do I understand it correctly that you got that retainer even though ASD had no legal issues?

A.    Of course I did not say that.  They probably had numerous legal issues.

    I had to go down there to be retained and then start examining the materials that are normally provided to me to determine what legal issues are present and how can I be of help.

Q.    And after you did that, you did that, right, you identified and you looked at a few documents, you looked at some documents, you looked at the website, you spoke to Andy Bowdoin for six hours and other company officials, you -- well, let's go through the list here.

A.    I --

Q.    You looked at the new member, the ASD Legality Statement, the ASD terms of service, the Customer Service Training Manual, over 1,000 e-mails, the complaint and spoke to Andy Bowdoin, Chris Peterson and after you did that, you determined that ASD has no legal issues, right?

A.    I didn't look at 1,027 e-mails until I was later retained as a potential expert witness.

1    What I looked at when I was retained as consultant to this

2  company was the, the terms of service primarily Garner's

3  opinion letter, and they showed me a video at the meeting.

4    I did identify as I have previously testified that I

5  thought a further separation of the terms of service agreement

6  between advertisers and members would be appropriate and I

7  started down that road which as I said yesterday.

8    The other documents you referred to, the 1,000 plus e-mails

9  and your complaint, of course, came later when my role

10  significantly changed.

11  Q.   Yesterday when we broke off we were talking about this

12  e-mail on page 29 of 57 of Claimant's Exhibit document 76

13  attached to their motion for hearing, for the motion for return

14  of property, right?  This is where we were yesterday?

15  A.   I recall this being on the screen yesterday, yes,

16  counselor.

17  Q.   And we discussed before that the first page of this e-mail

18  indicates that it starts on page 28 of 57, right, of this

19  exhibit?

20  A.   Yes.

21  Q.   And that at the end of the e-mail it's signed by

22  Mr. Robert L. Grayson, correct?

23  A.   Yes.

24  Q.   Yesterday when we parted company, I asked you to look at

25  the highlighted portion of this e-mail at the top of page 2

1  which says ASD has chosen to utilize a combination of

2  compensation components to award it's members and allow them to

3  A, recover out-of-pocket advertising costs.

4      B, earn a 25 percent premium above and beyond those costs.

5      C, compound the recovery of those expenses.

6      And D, earn commission on two generations of the referral

7  of new members who also make advertising purchases, period.

8      None of these components are unusual, illegal or uncommon

9  in their practice, period.

10     I asked you yesterday if you agree with that statement and

11 you said no.  Correct?

12 A.   You gave me two choices agree or disagree, so I said that

13 I disagreed.

14     The reason I disagreed is that I have no understanding of

15 C, compound the recovery of those expenses.  I do not

16 understand what he meant and since I was only given two choices

17 agree or disagree, I chose to disagree.

18 Q.   This e-mail was presented to you when you reviewed the

19 thousand e-mails from the claimant's law firm before you gave

20 your opinion that ASD is a legal multilevel marketing company,

21 correct?

22 A.   I do believe this is one of a thousand that was in the

23 package, yes, counselor.

24 Q.   When you didn't understand that, did you e-mail

25 Mr. Grayson to ask him to explain to you what compound the

1  recovery meant?

2  A.   I did not.

3  Q.   Did you ask anybody to try to explain to you, identify to

4  you what this part of the e-mail that you didn't understand

5  means?

6  A.   I did not ask anybody; that is correct.

7  Q.   Mr. Grayson appears to believe from this e-mail, doesn't

8  he, that his advertising is free?  Is that right?

9  A.   You are representing what you believe Mr. Grayson thinks

10 and when he wrote this and you're asking me to agree with you.

11     I suppose that's -- I don't have a response for that, I'm

12 sorry.

13 Q.   Well, you don't have a response.  Let me try to reframe

14 the question.

15     If you are able to recover your out-of-pocket advertising

16 costs from the company that you paid the advertising expenses

17 to, has the advertising become free?

18 A.   We discussed that yesterday.

19          THE COURT:  Just answer the question.  Just say yes

20 or no, please, please.

21          THE WITNESS:  Yes, yes.

22 BY MR. COWDEN:

23 Q.   Now you understand that rebates, the company says rebates

24 are paid for viewing advertising, right?

25 A.   That is my understanding, yes.

1  Q.   But you also understand that rebates were being paid even

2  when the website was down, correct?

3  A.   Mr. Bowdoin told me that he was paying some rebates during

4  the down time.

5      Is that correct?  Yes.

6  Q.   Did you ask Mr. Bowdoin how people are being paid to view

7  ads if they're actually being paid when they're not viewing

8  ads?

9  A.   I did not ask Mr. Bowdoin that question, no.

10  Q.   Knowing that now rebates were being paid even though

11  people weren't looking at ads, does that cause you to

12  re-evaluate your position that the company was selling

13  advertising?

14  A.   My position that the company was selling advertising has

15  not changed and does not change based on this statement you

16  just made in your question.

17  Q.   Does it cause you some concern as an attorney that the

18  company is representing that rebates are being paid for viewing

19  ads, but it's paying rebates when nobody is looking at ads?

20  A.   It doesn't, it does not cause me to a concern because of

21  the underlying reason that he was fixing the infrastructure

22  failure and it was a very short term situation.

23  Q.   You saw this e-mail in your review of the e-mails didn't

24  you, sir?

25          THE COURT:  What page are you on, sir?

1    MR. COWDEN:  I'm sorry, page 34, Your Honor.

2    THE COURT:  Thank you.

3    THE WITNESS:  If that was in the package of e-mails

4 sent to me, I either read it or skimmed it, yes, counselor.

5 BY MR. COWDEN:

6 Q.   Did you see that this person saw an ad for Marriott and

7 Masons?

8 A.   That's what it says, yes.

9 Q.   Did you ask Mr. Bowdoin if in fact he had any national

10 advertisers who were participating in ASD advertising programs

11 but not asking for rebates of their advertising purchases?

12 A.   I did not ask Mr. Bowdoin that question.

13 Q.   Isn't that question fundamental to whether they're

14 actually selling a product?

15 A.   No.

16 Q.   If the company has no customers, no customers who are not

17 asking for their money back, are they selling a product?

18 A.   Of course, they're selling a product.  They have many

19 customers who are asking for money back.  There are thousands

20 of members, of advertisers who chose not to participate in the

21 rebate program.  Those people were advertising for the inherent

22 value of the advertising.

23 Q.   Who told you that?

24 A.   Mr. Bowdoin told me that in that six hour meeting.

25 Q.   That representation is crucial to your opinion that ASD is

1  not a Ponzi operation, isn't it, sir?

2  A.   That would be a critical point in my evaluation, yes.

3  Q.   How many in your evaluation to determine that ASD is not a

4  Ponzi, how many advertisers does it need to have who are not

5  asking for their money back?

6  A.   How many?  I don't know.

7  Q.   Well, let's go back over your testimony yesterday.

8  They're giving out 65 percent of their revenue, right?

9  A.   They earmark 65 percent of their revenue for the rebate

10 program and referral program, yes.

11 Q.   So is it fair to say that if they have no expenses at all,

12 they need to have 35, they must have at least 35 percent of

13 their members not asking for rebates?

14 A.   I don't believe that's a necessity because of the

15 protection they have that they are only committing fifty cents

16 on every revenue dollar for the rebate program.

17 Q.   Doesn't that just mean that they're paying back the

18 65 percent slower than?

19 A.   It does mean slower, that would be accurate.

20 Q.   But it doesn't change the fact, sir, does it that they're

21 still paying back, committing to pay back 65 percent of their

22 revenue, correct?

23 A.   They are committing to pay back 65 percent of the revenue,

24 that is correct.

25 Q.   So if they are committing to pay back 65 percent of the

1  revenue, they need to have at least 35 percent of their

2  revenue, they need to have the rest of the, they need to have

3  at least a percentage of people who are not asking for their

4  revenue back, right?

5  A.   I'm not an economist or accountant, and I'm not sure if I

6  can agree or disagree with that.  I'm sorry.

7       I have analyzed the program and I see that they only pay

8  out 65 percent on a dollar coming in, and I believe that that

9  is critical to my analysis.

10      That is not by design insolvent as the government has

11  alleged.

12 Q.   Did you also agree to provide advice on Mr. Bowdoin's

13 operation of not just Ad Surf Daily or ASD Cash Generator, but

14 also La Fuente de Dinero?

15 A.   No.

16 Q.   Have you ever heard of La Fuente de Dinero?

17 A.   I heard that it is some Spanish language version of ASD,

18 but I am not fluent in Spanish and have no connection to that

19 and offered no services to that entity or part of the business.

20 Q.   I'm now showing you page 49 of the e-mails that were

21 submitted by claimant's counsel to the Court.

22      This appears to be an e-mail written on Friday, August 8,

23 2008 from a Joan Hughes, correct?

24 A.   Yes.

25 Q.   And in this e-mail Ms. Hughes indicates that first, while

1  there was an initial cost to purchasing ad packages, I knew

2  that over time I would recover these costs, correct?

3  A.   I do see that, counselor, yes.

4  Q.   And that in your testimony that appears to be sort of

5  where we're talking about where you say well, they purchase

6  advertising.  So the fact that they get their cost back over

7  time, doesn't mean that they didn't purchase advertising up

8  front, is that your testimony?

9  A.   My testimony is that the existence of the rebate program

10 doesn't negate the critical issue that this company is selling

11 advertising.

12 Q.   Okay.  So is it fair to say, let's just make that -- can't

13 miss this opportunity to make, get some crystallization here.

14     Your testimony is that the rebate program is irrelevant to

15 whether they're selling advertising?

16 A.   I didn't use the word irrelevant in any of my testimony so

17 I'm not saying that it's irrelevant.  It is the --

18 Q.   Wait a minute, you are now because you're going to say yes

19 or no.

20     Is the use of a rebate program irrelevant to whether

21 they're selling advertising?  Yes or no?

22 A.   It's not irrelevant.

23 Q.   In your websites you have a number of articles you've

24 written, correct?

25 A.   Yes, sir.

1  Q.   In those articles one of the things that you tell people

2  in your articles is that it's important to make sure that

3  you're actually, when you're operating a multilevel marketing

4  company that you're selling a product and not selling an income

5  opportunity; isn't that what you say?

6  A.   I say that, yes, I do say that.

7  Q.   Why are you concerned about your clients or potential

8  clients selling an income opportunity and not a product?

9  A.   I'm concerned because there's a large body of law in the

10 United States primarily at the state level that prohibits

11 individuals from selling multilevel income opportunities and

12 therefore, what you are selling has to be a legitimate product

13 of service.

14      THE COURT:  When you say a multilevel income

15 opportunity, to what would you be referring?  Is that a Ponzi

16 scheme?

17      THE WITNESS:  No.  It would be those are Amway

18 Distributor or Mary Kay Distributor or Shakley Distributor are

19 participating in a multilevel opportunity.

20      It's a home based distributorship, Your Honor, that's

21 what I'm referring to.

22      A multilevel income opportunity is a home based

23 distributorship, big Avon lady.

24      THE COURT:  I must have missed the end of the

25 sentence because you said state laws prohibit multilevel income

1  opportunities.

2        THE WITNESS:  From being sold, they're given away,

3  Your Honor.

4        They're given away all over the United States with one

5  nationally recognized exception; that is, that the companies

6  may charge a modest administration fee or they may require the

7  purchase of a sales and starter kit.  But there can be no huge

8  charge for the income opportunities.

9        So a Mary Kay beauty consultant opportunity buys their

10  starter kit and some companies charge an administrative fee.

11        ASD charged a modest administration fee to be a member.

12  BY MR. COWDEN:

13  Q.   When you went down to Quincy, Florida, this was in July of

14  2008, correct?

15  A.   Yes, counselor, I believe it was July 30th.

16  Q.   Did you have an opportunity and you indicated you spoke to

17  Andy Bowdoin, you spoke by telephone to a Mr. Garner and you

18  spoke to an individual named Juan Fernandez; is that right?

19  A.   Yes, sir.

20  Q.   Did you speak to anybody else while you were down there?

21  A.   When I was done Mr. Bill Levine and his son Aaron were

22  out, in and out of the meeting and Andy Bowdoin introduced me

23  to a few other people whose names I am not recalling at this

24  time as a courtesy saying Jerry Nehra is here and being our NA

25  attorney.

1    So yes, I did talk to more than just the people named, but

2  I'm not remembering their names specifically.

3  Q.   Do you remember speaking to a Mr. Haze Amos, former CFO of

4  Ad Surf Daily?

5  A.   I do not recall speaking to him, no.  I may have, but I'm

6  not recalling it at this time.

7  Q.   Your opinion that Ad Surf Daily is a legitimate multilevel

8  marketing company is based in part on your conclusion that Ad

9  Surf Daily is in the business of selling advertising, isn't

10 that correct?

11 A.   That is correct, counselor.

12 Q.   Would it change your opinion to know that Ad Surf Daily

13 was compensating its employees with ad packages?

14 A.   I don't think that I would change my opinion.  I'm not

15 sure how employees are compensated would modify my opinion.

16 Q.   Well, if you were to learn that Ad Surf Daily for example,

17 paid its CFO in part by giving away 25,000 ad packages to his

18 wife and 5,000 ad packages to each of his children, would that

19 effect your assessment that Ad Surf Daily is not in the

20 business of providing income opportunities, but is instead just

21 in the business of providing advertising?

22 A.   I think you want to rephrase that question because you

23 just reversed two phrases, but --

24 Q.   Is your answer I don't understand the question?

25 A.   My answer is I don't understand the question.

1    I believe you missed something.

2  Q.   Okay.  If you were to learn that Ad Surf Daily was

3  compensating its employees with ad packages, so now ad packages

4  are now a form of compensation, would that effect your opinion

5  as to whether Ad Surf Daily is an advertising company?

6  A.   It would not except that I want to call all of the ad

7  packages that are being sold or given away to employees to be

8  for the use that they're now intended; that is to advertise a

9  product of service or an opportunity for an underlined product

10 service or opportunity.

11    And with that condition and the fact that they are being

12 used as a form of compensation or reward for employees would

13 not change my opinion.

14 Q.   Did you ask Mr. Bowdoin what he was advertising himself in

15 his company Ad Surf Daily, what website he was using to

16 participate in the rebate program?

17 A.   I did not ask Mr. Bowdoin that question, no.

18 Q.   Did he tell you what he was advertising to participate in

19 the rebate program?

20 A.   Mr. Bowdoin's personal participation in the rebate program

21 did not come up in our conversation.

22 Q.   Would it effect your opinion as to whether Ad Surf Daily

23 was a legitimate multilevel marketing advertising company if

24 you were to learn that the president of the company was

25 participating in the rebate program but advertising a defunct

1  website?

2  A.   What was the last, advertising what?

3  Q.   A defunct website?

4  A.   A defunct website.  Would I not be happy that the

5  advertising was being used for its intended purpose?  I would

6  not be pleased with that.

7  Q.   Would you be disappointed to learn that advertising, that

8  people participated in the ASD rebate program or advertising

9  websites that sold no product whatsoever?

10  A.   I would not be pleased to hear about that, and if I had

11  continued and if the company had continued, I would have

12  advised that they put in controls to not allow that to happen.

13  Q.   When you looked at, before you gave your opinion to the

14  Court here that Ad Surf Daily is a legitimate multilevel

15  marketing company in compliance with all laws, did you have a

16  chance to look at the Ad Surf Daily News site?

17  A.   I don't recall seeing that site, no.

18  Q.   Did you become aware that Ad Surf Daily was suggesting to

19  its members, potential members that if they did not have a

20  website to advertise, they could pick one of these two?

21  A.   If they were legitimate websites that were selling a

22  product or service and opportunity, that would not be too

23  troubling to me.  It wouldn't change my opinion.

24  Q.   Let me show you this.  This is a, this document purports

25  to be from the ASD News, right?

1    A.    It purports to be that, yes.

2    Q.    And at the bottom of the document it says the website is

3    W-W-W dot A-D-S-U-R-F-D-A-I-L-Y-B-R-E-A-K-I-N-G-N-E-W-S dot

4    com?

5              THE COURT:  That doesn't actually show on the screen.

6              THE WITNESS:  That doesn't show on my screen.

7              MR. COWDEN:  That's why I read it.

8              THE WITNESS:  Is there a question?

9              THE COURT:  Hold it to the left.

10          Sorry.  No wonder we didn't see it.

11             THE WITNESS:  Is there a question pending?

12   BY MR. COWDEN:

13   Q.    I'm just putting it into the record and ask you to agree

14   that's what the document says?

15   A.    Yes, counselor.

16   Q.    Does this indicate, this document, if needed companies you

17   can advertise.  For those joining ASD who do not have a

18   personal business to advertise, you may advertise either

19   www.paydot.com, then there's a website to that, or www.mobill

20   with two ls cash.com, two ls and no e.  These are only

21   suggestions as there may be other company's products that you

22   find to advertise.

23          Is that what that document says?

24   A.    Yes, it does.

25   Q.    Now if you were to learn that or let's say does it trouble

1 you that Ad Surf Daily was suggesting websites to people who

2 could play in the rebate program if they didn't have a company

3 to pay for advertising for?  Let me try that again.  That one I

4 don't even know if I understand that question.

5    Does it trouble you that ASD was recommending if people

6 wanted to play in the rebate program, it was recommending

7 websites to them that they could throw into the rotator?

8 A.   Well, I'm disagreeing with your use of the word play in

9 your question.

10   It would trouble me only if what they, what the company was

11 recommending were not legitimate websites that sold the product

12 of service or an opportunity.

13 Q.   Well, let me ask you this.  What this seems to indicate is

14 it fair to say that what it seems to indicate that if people

15 want to participate in ASD's rebate program, and they don't

16 have a business themselves to advertise, they can pay to

17 advertise these two businesses.  That is what that purports to

18 say, right?

19 A.   Yes.

20 Q.   All right.  Why would somebody pay to advertise somebody

21 else's business if they were not going to get a hundred and

22 twenty five percent of their money back to do it?

23 A.   This says that there are -- this says that -- uses the

24 words products.  So it would mean that the person who is being

25 referred to some other business to advertise would be an

affiliate or participant in some other business and then it
seems to me that Ad Surf Daily is saying if you are not in
business and therefore want to advertise with me, why don't you
consider going into one of these businesses and then become an
advertiser with me.  That's what it appears to say to me.

If the underlying businesses that are being recommended are
valid and do sell a product or service or opportunity that
doesn't change my, that doesn't change my opinion.

Q.    You made a statement yesterday that ASD that your opinion
that said it was not selling income opportunities but instead
selling advertising was based in part on your review of a
thousand plus e-mails that you were provided by Ackerman
Senterfitt law firm, correct?

A.    Yes.

Q.    Would it change your opinion and we discussed yesterday
that that was about one percent of the ASD membership, correct?

A.    You did so represent.

Q.    You had heard that ASD's membership was in excess of a
hundred thousand members, right?

A.    Yes.

Q.    So a thousand e-mails is about one percent of the
membership, right?

A.    Yes.

Q.    And your opinion that ASD was selling ads and not selling
income opportunities was based in part on those e-mails and

1  people saying that advertising at ASD was good stuff, right?

2  A.   Yes.

3  Q.   Would it change your opinion to know that before those

4  e-mails were sent to the law firm, ASD posted on its News a

5  request that --

6          THE COURT:  Are you going to enter this in evidence?

7          MR. COWDEN:  Just through testimony, Your Honor.

8          MR. FAYAD:  Sorry, I can't hear.

9          MR. COWDEN:  Judge, I'm just going to ask him to ask

10 if, if it would effect his opinion to know.

11         MR. FAYAD:  No objection, Your Honor.

12         THE COURT:  All right.

13         THE WITNESS:  Are you waiting for me, sir?

14     Is there a pending question?

15 BY MR. COWDEN:

16 Q.   There's going to be one.

17    When you got the e-mails back from Ackerman Senterfitt did

18 you ask them how they came to have those e-mails?

19 A.   I did not have to so ask them because I was familiar with

20 how they requested them.  I've seen this before.

21 Q.   Okay.  So how did they request those e-mails?

22 A.   It's on the screen, counselor.

23 Q.   It's not in the record.  Let's get it in the record.

24    How did they request the e-mails?

25 A.   They sent a communication to members that says you may

have heard that Ad Surf Daily has been named in two lawsuits,

et cetera.  The Ad Surf Daily lawyers are receiving accurate

letters or memos of support from members who have had positive

experiences with Ad Surf Daily.

If you are willing to provide such, et cetera, send it to

this address.

Q.  So you understood before you relied on the thousand

e-mails that you looked at that ASD's lawyers had asked for

memos of support from members who have had positive

experiences, right?

A.  Yes.

Q.  And you looked at a thousand memos, at one percent of the

memos from these customers after they had been asked to send in

supportive, positive experience memos, right?

A.  I looked at all of the memos that were provided to me

which, which we've agreed is about one percent of the

membership, yes.

Q.  Are you concerned that your opinion though was, might have

been, that the e-mails that you reviewed given that ASD had

only asked for supportive, positive experience memos that your,

the world that you were looking at was a little bit tilted?

A.  I was not concerned because I was looking for evidence of

legitimate sale of advertising for its intended purpose and

this is what I found.

Q.  But you're not going to testify here today that one

1  percent if you have, if one percent of the membership of ASD

2  says that using ASD to advertise that suffices to determine

3  whether ASD is really selling advertising, right?

4          MR. FAYAD:  Object to the form of the question.

5      Government is not in a position to tell the witness what

6  he can and can't testify to.

7          THE COURT:  All right.  Why don't you reframe your

8  question.

9  BY MR. COWDEN:

10 Q.  Would you testify, would you agree -- well, do you believe

11 that you can look at one percent of the customers of a company

12 to determine whether they are selling a legitimate product?

13 A.  I didn't choose the one percent.  I looked at what was

14 sent to me and reached the conclusion that this is a legitimate

15 advertising business being purchased by people for its intended

16 purpose and getting the results that they expected.

17 Q.  And that opinion was based in part on your review of

18 e-mails from one percent of the customers, right?

19 A.  It was based on that, yes, counselor.

20 Q.  And before you reviewed those e-mails, you were aware that

21 those e-mails were solicited by an e-mail over the internet

22 that asked for positive experiences with ASD, right?

23 A.  I was aware of that yes, counselor.

24 Q.  Now you went down to Ad Surf Daily on, was it July 30th,

25 2008?

1  A.   Yes, I did.

2  Q.   Prior to that time you had never met Mr. Bowdoin; is that

3  right?

4  A.   That is correct.

5  Q.   You had some conversations with him over the phone?

6  A.   I did have one or two conversations before the visit, yes.

7  Q.   During those conversations that you had with Mr. Bowdoin

8  over the phone did you express to him concerns about the ASD

9  business model?

10  A.   No.

11  Q.   Before you went down to discuss with Mr. Bowdoin how ASD

12  worked, did you have any concerns about the ASD business model?

13  A.   No.

14  Q.   After you went down and spoke with Mr. Bowdoin for six

15  hours you and he agreed to design a retainer agreement in which

16  he's agreed to pay you $24,000, correct?

17  A.   Yes.

18  Q.   Did you have any concerns after speaking with Mr. Bowdoin

19  for that period of time in person on July 30th that you were

20  concerned about the ASD business model?

21  A.   Yes.

22  Q.   What were your concerns after speaking with Mr. Bowdoin?

23  A.   In looking at the terms of service I felt that there

24  should be more separation between advertiser and member, and I

25  discussed that with him and Mr. Garner who both agreed with me

1  and we were starting down the road of those modifications and

2  adjustments.

3  Q.   Well, what do you mean by more separation?

4  A.   A separate terms of agreement document for advertisers

5  only and a separate terms of agreement for members who are

6  people who have an opportunity to earn money.

7      The advertisers spend money and the members have a

8  potential to earn money and it is my practice with all of my

9  clients including this one to recommend that you keep as much

10 separation as possible between customers and income opportunity

11 participants because it is best to meet the legal requirements

12 of the anti-pyramid and multilevel marketing laws nationwide

13 that I deal with.

14 Q.   What concerned you in particular about ASD in the way it

15 was being operated when you were down there on July 30th, 2008?

16 A.   I thought I just answered that question.

17     Did you want me to repeat what I just said?

18 Q.   Well, let's try this.  Is your concern that the customers

19 of ASD and the members participating in the rebates were the

20 same people?

21 A.   They at times in the terms of service were referred to as

22 the same person, and I was recommending that we always refer to

23 them separately.

24 Q.   Why were you concerned that they were being referred to as

25 the same people?

1  A.   Because the body of law that I advise clients on is best

2  complied with when there's a clear distinction between who is

3  customer of the enterprise and who are the representatives or

4  the income opportunity seekers of the enterprise.

5     That is just what I do for all of my clients and what I

6  intended to do for this client.  Create more separation for

7  that reason.

8  Q.   In the body of law that you've been dealing with and in

9  your experience in representing multilevel marketing companies,

10  the income level opportunity for the multilevel marketing

11  company, the people who are participating in multilevel their

12  opportunity is a commission opportunity; isn't that correct?

13  A.   Yes.

14  Q.   You're not familiar with any multilevel marketing company

15  that you have ever represented that has both a commission

16  opportunity and this rebate opportunity that ASD had, right?

17  A.   This particular rebate opportunity was new to me.  I have

18  not had, not seen that before in my work, that's correct.

19  Q.   The commission opportunity that ASD, standing alone, the

20  commission opportunity would have been pay me a dollar for

21  advertising and the advertising is spent, right?  You show the

22  ad and the ad is spent, right?

23  A.   No, that's the customer side.  The income opportunity is

24  the --

25  Q.   The customer side for ASD would have been in a traditional

1  multilevel marketing company, give me a dollar and I'll show

2  your ad one time on the website, that's the customer?

3  A.   Right.

4  Q.   If you wanted an income opportunity, if you bring other

5  customers to me and they give me a dollar, I'll give you ten

6  percent of their dollar and for the second level five percent

7  of their sales, right?

8  A.   That is correct.

9  Q.   And that's your traditional multilevel marketing

10 opportunity, right?

11 A.   Traditional is a fair word, yes, counselor.

12 Q.   And as long as the company is not spending more than 85

13 percent of what it's taking in, it can pay those commissions,

14 right?  If the expense of the company are less than eighty-five

15 cent per dollar that they take in?

16 A.   Yes, that's true.

17 Q.   They're going to have fifteen cents to pay those

18 commissions, right?

19 A.   I agree.

20 Q.   Now in the ASD model they have that opportunity, correct?

21 A.   Yes.

22 Q.   But in addition in the rebate opportunity, they have a

23 chance to get the people who are participating in the rebate

24 program and I used playing but you didn't like that word, so

25 I'll use participating in the rebate program, they have an

1  opportunity not just to earn commissions, but to earn back

2  every cent they pay into ASD, right?

3  A.    They are given that opportunity, yes, counselor.

4  Q.    In the rebate program they're also given the opportunity

5  to earn an additional twenty-five percent of the dollar that

6  they paid in, right?

7  A.    Yes, yes.

8  Q.    Right.  So can you explain to me how that, how you believe

9  that is financially feasible?

10 A.    It is financially feasible because the terms of service

11 unequivocally state that the rebate program is funded only with

12 fifty cents of the dollar of future revenues.  And they say it

13 unequivocally and emphatically.

14 Q.    So if I understand your testimony correctly, you're

15 telling me it's financially feasible because ASD says it is; is

16 that your testimony?

17 A.    And that's the way that they were doing it according to

18 Mr. Bowdoin and others that I talked to on my visit.  They were

19 only putting aside fifty cents on the dollar for the rebate

20 program.  So it was on paper and it was actually happening that

21 way.

22 Q.    Let me step outside of ASD for a second and go over here.

23 Let me ask you this question.

24     If a company says if you give me a dollar I will give you

25 back a dollar twenty-five, you don't believe they can do that

1 if they don't have outside income to produce that twenty-five

2 percent extra, do you?

3 A.   That's true.

4    Counselor, I've been incredibly patient and incredibly

5 responsive and incredibly courteous, but someone other than me

6 will be determining whether ASD's use of a number one to five

7 and maybe the word free supports the Government's actions in

8 this case.

9    It's my testimony and it's my opinion that it does not.

10 Q.   Well, we are actually here to talk about your opinion

11 because your opinion is that ASD is not a Ponzi, right?

12 A.   That is my opinion.

13 Q.   And you've just testified that you've said that part of

14 your opinion as to why ASD is not a Ponzi is because you just

15 said because Andy Bowdoin told me it's not, right?

16          MR. FAYAD:  I object.  That's not what he testified.

17          MR. COWDEN:  Well, let's back up.

18          THE COURT:  All right.  We don't need -- yes,

19 withdraw the question.

20    We don't need that particular question.  The question is

21 it's not a Ponzi because Mr. Bowdoin said they put fifty

22 percent of their revenue into the rebate program.

23          THE WITNESS:  Yes, I agree to that.  That is and the

24 terms of service back up where Mr. Bowdoin said in a document

25 that has a contractual feel between its members and the company

1  they unequivocally make that statement.

2  BY MR. COWDEN:

3  Q.   If you were to learn that members had paid in let's say

4  $30,000 for advertising and received all of the $30,000 back

5  already and were now continuing to get $2,000 a month from ad

6  packages, where is that money coming from if it's not from

7  outside revenue?

8  A.   There's no dispute that the money that goes into the

9  rebate program comes from tomorrow's revenues at fifty cents on

10  the dollar.  I've never disputed that.

11      The money comes from advertising revenues.  It comes from

12  customer volume, people buying the product of this company

13  which is internet advertising.  That's the funding source of

14  the rebate program as I have stated many times.

15  Q.   When you went down and you spoke to Mr. Bowdoin, tell us

16  what he told you about ASD?

17  A.   I beg your pardon?  I'm sorry, who told me about ASD?

18  Q.   No.  You went down on July 30th, you had a conversation

19  with Andy Bowdoin.  It was about six hours?

20  A.   Yes, it was.

21  Q.   Tell us what he told you about ASD?  Did he tell you how

22  he started it?

23  A.   I cannot recall specifically all of the things that Andy

24  Bowdoin said to me.  He spent some time interrogating me about

25  my credentials.

1    He told me about the growth of the company and his desire

2  to do it right.  He told me about other law firms that he had

3  brought on board for SEC reasons and for reasons of liable and

4  slander allegations that he wanted to move on.

5    And he told me about his relationship with Mr. Garner and

6  he was in effect telling me that he was adding me to the team

7  of legal support that he had so that he could assure himself

8  that he was in compliance with all of the laws of the land.

9    I remember those segments of the conversation rather

10  vividly because I am always delighted to learn that there's

11  other lawyers in other fields of expertise that are advising my

12  clients so that they don't rely on me for areas outside of my

13  limited area of expertise.

14  Q.   Let's go through a couple of those because you've given me

15  a couple of talking points, there are possibilities, but you

16  said that he was concerned about making sure he was in

17  compliance with SEC rules and regulations, right?

18  A.   Yes.

19  Q.   What did he say about his concerns about compliance with

20  SEC rules?

21  A.   He said he had an opinion from a Miami law firm that he

22  was okay in that area.  And that he had had it reviewed by a

23  SEC specialist counselor, that's what he told me.

24  Q.   Well, if he had an opinion from the Miami firm and it had

25  been reviewed by SEC counsel, did he say why he was asking you

1  to look at that opinion or look behind that opinion?

2  A.   He didn't ask me to look at that opinion.  He was just

3  conveying that information that I was being added to the team

4  for my expertise which is direct selling and multilevel

5  marketing law.

6      And he didn't -- I guess we were communicating on the point

7  that I was not the Lone Ranger, I was not his own lawyer.

8  That's the point that I believe was being made and that's the

9  point that I was hearing.

10 Q.   What did Mr. Bowdoin tell you about his relationship with

11 Mr. Garner?

12 A.   He pointed out that Mr. Garner had issued an opinion

13 document and that Mr. Garner was a co-presenter on a video with

14 him that I ended up seeing.  And that I was authorized to speak

15 to Mr. Garner, work with him, treat him as a co-advertiser to

16 this venture and those kinds of things were said about Mr.

17 Garner.

18 Q.   Did you ask Mr. Bowdoin how long he had been operating the

19 company, ASD, Ad Surf Daily?

20 A.   I don't know that I specifically asked the question, but

21 it came up that he had been somewhat over a year, I believe I

22 think was about a year and a half.

23 Q.   Did Mr. and is it fair to say that Mr. Bowdoin brought you

24 down there and expressed an opinion that he had some concerns

25 about whether he was compliant with the laws?

1  A.    I believe Mr. Boa -- Levine urged Mr. Bowdoin to bring an

2  MLM specialist attorney on board so that that particular

3  discipline or area of the law would be opined by a unique

4  expert in the field, and there's only five of us in the country

5  that do what I do and Mr. Levine was recommending me.

6     I think that that happened when Mr. Levine learned that

7  although Mr. Bowdoin had many legal counsels in the areas of

8  specialty, that he did not have an MLM specialist attorney on

9  his retainer.

10     That's my understanding.

11  Q.    Did Mr. Bowdoin show you the legal opinion that you said

12  he referenced from a Miami law firm indicating that he was in

13  compliance with the securities laws?

14  A.    I don't mean to imply counselor that it was a written

15  opinion.  He said that he had an opinion from a Miami firm on

16  SEC issues.  I did not conclude that it was written or oral.

17  So I don't know.  And no, no opinion was shown to me.

18  Q.    You mention that Mr. Bowdoin showed you a video while you

19  were down at ASD; is that right?

20  A.    Yes.

21  Q.    And did you watch the video from start to finish?

22  A.    I did.

23  Q.    When he showed you the video did you access it over the

24  internet or did he just have it in his office on a computer?

25  A.    It was in his office on some large screen.  He may have

1  been accessing the computer, the internet, but I don't know

2  that.  It was being shown in his office on the screen.

3  Q.   After you saw the video did you have concerns about the

4  video?

5  A.   I would have modified one or two words.  I remember

6  telling him that I thought that it was in substance acceptable

7  and that I would probably adjust a word or two.

8  Q.   What would you change?

9  A.   I cannot remember at this time.  It might have been on the

10 issue of more separation between who is the customer and who is

11 the member that is usually where I focus on initially.

12 Q.   When you say you advise your clients it's possible to

13 focus on who is a customer and who is a member, there's a

14 reason for that?

15 A.   Would you like me to give you another reason?

16 Q.   That would be fine.

17 A.   Okay.

18 Q.   What's the reason why you think it's important?

19 A.   The reason is what you sell to a customer in the United

20 States when you're using a direct selling model can be sold at

21 any price that it is valued at.  You can sell an $1100 vacuum

22 cleaner, you can sell a 2,000 ad package, you can sell it at

23 any price as long as what you're selling on the customer side

24 is separated from and doesn't include an income opportunity.

25      Because you can't sell income opportunities.  They have

1  laws that control what you can charge, if anything, for the

2  income opportunities.  So the reason for the separation is so

3  that the, what you sell to customers can be sold at any price

4  that is appropriate for the product or the service.  That is

5  one significant reason for the separation.

6  Q.    The other significant reason -- let me see if I can guess

7  this and you tell me if my guess is correct.

8     But the other reason that it's important to separate it is

9  you have to make sure that you have a legitimate sale, right?

10 You have to have a customer?

11 A.    I would agree with that, yes.

12 Q.    You want to make sure that it's not just your members who

13 are paying in who are your customers.  If the member income

14 opportunity it turns out to be net ahead, they're not really

15 customers, right?

16 A.    You're trying to take me to the point of agreeing that

17 because someone participates in the rebate program and becomes

18 a net zero, they're not a valid customer.  I do not agree with

19 that, counselor, and I've told you I don't agree.

20 Q.    We'll use vacuum cleaners.  If you are selling a vacuum

21 cleaner to customers and charge a thousand dollars the price of

22 the vacuum cleaner is a thousand dollars?

23 A.    Right.

24 Q.    The revenue of the company is a thousand dollars, right?

25 A.    Yes.

1    Q.   If you sell a vacuum cleaner to a customer but you also

2    say if you are a member of our program, you can get the vacuum

3    cleaner for free and I'll pay you ten percent of every vacuum

4    cleaner you send to everybody else, you really haven't sold

5    them a vacuum cleaner, right?  You gave them a vacuum cleaner?

6    A.   You've made a sale and told him or her that if they do

7    something to earn a rebate that reach the equivalence of the

8    vacuum cleaner that you are then going to reward them.

9         Rebate programs as I have testified are not illegal.

10         THE COURT:  Gentlemen, we've actually been back and

11   forth across this point of view between the two of you.  It's

12   eleven o'clock.

13         Why don't we take a short break and, Mr. Cowden, you can

14   decide how much you need to go forward with your cross

15   examination.  And I would like the parties to confer over the

16   break to see whether or not they think that we'll complete this

17   hearing today.  So that I'll know how we're going.  Okay.

18         MR. COWDEN:  Thank you, Judge.

19         THE COURT:  Let's take a short break and be back at

20   ten after.

21         (Witness leaves the stand.)

22         (Recess at 11:00 a.m.)

23         MR. GOODMAN:  Your Honor, we have followed your

24   instructions and your suggestion and we have come up with a way

25   to streamline the rest of this cross examination.

1    The government will basically be giving to the Court the

2  DVD that Mr. Nehra watched during the break.  Mr. Nehra

3  identified that DVD he watched a sufficient portion so that he

4  can say that yes, that was the one that I saw.

5    We will do our very best and fully intend to finish

6  today.  As I indicated to Your Honor from the very beginning

7  it's very important that we complete this hearing today.  I am

8  doing everything that I can to get that done.  I am eliminating

9  witnesses, slashing witnesses, trimming my witness list and I

10 commit to you that from our side of the case, we'll get it done

11 today, Your Honor.

12    Thank you.

13       THE COURT:  Thank you.

14 BY MR. COWDEN:

15 Q.   Mr. Nehra, over the break have you had a chance to look at

16 the beginning of a video that the United States has brought

17 into today's courtroom, correct?

18 A.   I did.

19 Q.   You confirm for you us that that's the video that

20 Mr. Bowdoin showed you when you went down to Quincy, Florida in

21 July of 2008; is that right?

22 A.   Yes.

23 Q.   And it is your opinion that ASD, that Ad Surf Daily is a

24 legitimate multilevel marketing company and not a Ponzi or

25 pyramid operation is in part based on your review of that

1  video; is that right?

2  A.   Yes.

3  Q.   What we're going to do is just show you the front part of

4  the video and not going to show the rest, but let the Court

5  take it but the video as you recall starts with Mr. Bowdoin,

6  and then it turns to Mr. Garner, and then it goes back to

7  Mr. Bowdoin; is that right?

8  A.   Yes.

9       MR. COWDEN:   Okay.   Let's just start the beginning

10 part of the video.

11      Your Honor, I do have a transcript of the video that I

12 can hand out that might facilitate everybody following along.

13      I'm not seeking to introduce the transcript, but it

14 might assist the Court and counsel.

15      THE COURT:   All right.

16      MR. COWDEN:   If there's any --

17      THE COURT:   Do you want to watch the whole video?

18      MR. COWDEN:   Just the very beginning part, Judge.

19      THE COURT:   All right.

20      MR. COWDEN:   Like the beginning page of the

21 transcript where Mr. Bowdoin talks.

22      So I'll tender one to the Court and --

23      (Video played.)

24 BY MR. COWDEN:

25 Q.   We can stop it there.   In the video he introduces

1  Mr. Garner and Mr. Garner speaks; is that right?

2  A.    Yes.

3  Q.    The video you just watched the part where Mr. Bowdoin is

4  speaking, that's Andy Bowdoin, that's the person you met when

5  you went down to Quincy, Florida, right?

6  A.    Yes.

7  Q.    And Andy Bowdoin told you he was the president of Ad Surf

8  Daily, correct?

9  A.    Yes.

10  Q.    He hired you, the person that hired you, the guy in the

11  brown suit we just watched him on the video, right?

12  A.    Yes.

13  Q.    When the video, you saw that video when you were down in

14  Quincy, Florida on July 30th, 2008?

15  A.    Yes.

16  Q.    In the part that he was talking about did he mention the

17  word advertising?

18  A.    He may or may not.  I would have to look at the script.

19  He may or may not have.  He talked about the Ad Surf Generator,

20  an income opportunity.

21  Q.    He talked about income opportunity as in the very first

22  sentence of his speech?

23        MR. FAYAD:  Objection, Your Honor.  I thought we were

24  just going to look at the, to introduce it and not go into the

25  substance of it.

1    THE COURT:  Well, we're allowed to go into the

2  substance of it if that's what Mr. Bowdoin thinks he needs --

3  I'm sorry -- Mr. Cowden think he needs to do.

4       That's really a slip of the tongue, forgive me.

5       MR. FAYAD:  I withdraw the objection, Your Honor.

6       Thank you.

7  BY MR. COWDEN:

8  Q.   Right at the outset he says this is an income earning

9  opportunity; that's what he said, right?

10 A.   Yes.

11 Q.   And he mentioned it's a journey for financial freedom,

12 right?

13 A.   He said that, yes.

14 Q.   He said get started earning money, right?

15 A.   He said that.

16 Q.   He said begin earning money with this income opportunity,

17 right?

18 A.   He said that.

19 Q.   Those, all those income opportunity words sounds like he's

20 selling an income opportunity, doesn't it?

21 A.   One could interpret it that way.

22 Q.   The fact that he doesn't mention advertising makes it

23 sound like he's not really selling advertising?

24      MR. FAYAD:  Objection, Your Honor.  Objection, Your

25 Honor.

1           THE COURT:  Just a minute.

2           MR. FAYAD:  May I state my objection?

3           THE COURT:  Yes.

4           MR. FAYAD:  If we go further into the detail although

5   I thought we agreed we were not, then we'll need to show the

6   rest of the video particularly.

7           THE COURT:  I'm going to watch the whole video.

8   Don't worry about it.

9           MR. FAYAD:  I understand.

10          THE COURT:  I promise.

11          MR. FAYAD:  We appreciate that, but this is about the

12  witness' testimony.

13          THE COURT:  The witness is merely agreeing with what

14  is said on the video.

15       Mr. Cowden, I'm really going to watch it.

16          MR. COWDEN:  I withdraw the question.  So we don't

17  have an objection and ask you this question.

18  BY MR. COWDEN:

19  Q.   After you saw this video did you tell Mr. Bowdoin we need

20  to fix this or express some concerns to him about this video?

21  A.   Yes, I did.

22  Q.   Did you discuss with Mr. Bowdoin whether Ad Surf Daily had

23  a limit on how many ads somebody could buy at a time?

24  A.   I'm not remembering that we specifically talked about a

25  limit, no.

1  Q.    Did you ever learn during the course of your investigation

2  and review of the documents before you gave your opinion in the

3  declaration that you submitted to the Court, did you ever come

4  to learn that Ad Surf Daily had a limit on the amount of

5  advertising that a purchaser of advertising could buy?

6  A.    Yes.  I saw that in either the terms of service or in the

7  Customer Service Manual there is a limit and above the limit

8  required Mr. Bowdoin's personal approval.  I did see that

9  language.

10 Q.    Have you ever seen a company that's in the business of

11 selling a product to limit the amount of product that a

12 purchaser can buy?

13 A.    It happens frequently, yes.

14 Q.    Why is that?

15 A.    Well, in hard goods companies it often happen because of

16 the availability of the product to make sure that they're not

17 on back order and they don't disappoint people.

18 Q.    That would not be the case here with the advertising?

19 A.    This is not a hard good case, so it would not apply here.

20 But that is one of the reasons why companies put limits on

21 purchases of stuff.

22 Q.    Did you explore with Mr. Bowdoin or with anybody at Ad

23 Surf Daily why they put a limit on the amount of advertising a

24 customer could buy at one time?

25 A.    Why they put a limit on it, I don't believe we had that

1  discussion in my meeting with Mr. Bowdoin, no.

2  Q.   Does it cause you any concern about the fact that there

3  was a limit on the amount of product somebody could buy or the

4  amount of advertising that one somebody could buy in this case?

5  A.   Concern, I like limits.  I think the limit should have

6  been $9,000.

7  Q.   Why?

8  A.   Because at $10,000 they report to the, under the Patriot

9  Act transfers of money and it causes alarm with banks and

10  people like you.

11  Q.   Well, but if the company is in the business of selling as

12  much advertising as possible over the internet, why do you want

13  to limit the amount that anybody can buy to $9,000?

14  A.   It was my thought.  I did not express it to anyone, I'm

15  expressing it to you.

16     It would just seem that after the fact it might have been a

17  better idea to kind of slow this thing down.  The explosive

18  growth seemed to alarm your agency and alarm a number of other

19  people.  And one of the reasons why we're here is explosive

20  growth.

21          THE COURT:  Are we going to introduce into evidence

22  the video?

23          MR. COWDEN:  Your Honor, government moves Government

24  Exhibit 1 which is the Ad Surf Daily video portion of that we

25  just watched and tenders it to the Court.

1            THE COURT:  There's no objection?

2            MR. FAYAD:  There's no objection, Your Honor.

3            THE COURT:  All right.  The Court accepts Government

4  Exhibit 1 into evidence.

5            (Government Exhibit Number 1 received into evidence.)

6  BY MR. COWDEN:

7  Q.   I have marked this as Government Exhibit 2.  This is the

8  first front page of the website that you reference indicating

9  that you had seen, correct?

10 A.   Yes, sir.

11            MR. COWDEN:  Move to admit Government's Exhibit 2.

12        It's a document itself is five pages?

13            THE COURT:  All right.  Any objection?

14            MR. FAYAD:  Objection.

15            MR. GOODMAN:  I'd just like to see the other four

16 pages, Your Honor, bear with me.

17            MR. FAYAD:  I withdraw.  No objection.

18            THE COURT:  All right.

19            MR. GOODMAN:  Your Honor, in response to your

20 question we don't object to this particular exhibit.

21        As I understand it from Mr. Cowden, they downloaded

22 certain portions of the web page.  This first section is the

23 home page and then they went over to the right to the next

24 section and downloaded that and to the right and downloaded

25 that.

1          I think the next series of exhibits that Mr. Cowden has

2   is the screen print page for each next section of the web page.

3          The only problem is the one section that they did not

4   have right now is the one that says join for free.  So if they

5   make it a complete exhibit with that section, we don't object.

6   But if they're intending to introduce an incomplete portion of

7   the website without the for free portion, then we would object

8   for the reasons that I just indicated.

9          THE COURT:  Mr. Cowden.

10          MR. COWDEN:  Well, Judge --

11          THE COURT:  Did you plan to add the rest or not?

12          MR. COWDEN:  I don't know if I have the join for free

13   part.  May have it back at the office.

14          THE COURT:  Well, I'll take notice of the fact that

15   nobody disagrees that it would have said join for free in the

16   last screen.

17          MR. COWDEN:  Right.  What we're referring to is right

18   across of the website, you could click on any of these and the

19   first one is the home page which is Government Exhibit 2 here.

20          THE COURT:  Yes.

21          MR. COWDEN:  There's another page that talks about

22   the company, another page that talks about opportunity, join

23   for free, click, a contact us click which I also don't have and

24   then a frequently asked questions screen shot that I do have.

25          THE COURT:  So you have left out the join for free

1  and the contact us shots?

2         MR. COWDEN:  That's correct.

3         THE COURT:  All right.  With that adjustment and

4  recognition, I'll admit the exhibit.

5      Is the website still up?

6         MR. COWDEN:  No, it is not, Your Honor, that's the

7  problem.

8         THE COURT:  Okay.

9         MR. COWDEN:  For everybody today apparently.

10        THE COURT:  Right.

11        (Government Exhibit Number 2 received into evidence.)

12  BY MR. COWDEN:

13  Q.  Mr. Nehra, I'm just going to go back to your declaration

14  and ask you in your declaration you indicated that in your

15  opinion Ad Surf Daily is nothing but a traditional multilevel

16  marketing company; is that right?

17  A.  Yes, sir.

18  Q.  In your testimony today we discussed that it had a very

19  untraditional compensation plan in the form of the rebate

20  program, right?

21  A.  You have chosen the word untraditional, but that's

22  correct.

23  Q.  In your, you've been a multilevel marketing attorney for

24  over 20 years, correct?

25  A.  Yes.

1  Q.  And prior to your introduction to Ad Surf Daily, you have

2  never represented a client that had both a rebate program --

3  I'm sorry -- a referral compensation program and also a rebate

4  program built into the compensation structure; is that right?

5  A.  Yes.

6            MR. COWDEN:  I have no further questions.

7            THE COURT:  Thank you, sir.

8            MR. FAYAD:  Your Honor, may I?

9            THE COURT:  Redirect, yes.

10                      REDIRECT EXAMINATION

11  BY MR. FAYAD:

12  Q.  Just a moment to get spread out, Your Honor.

13      Mr. Nehra --

14  A.  Yes, sir.

15  Q.  -- you were engaged by ASD exactly when?

16  A.  I was engaged on July 30th, 2008.

17  Q.  That was the day you spent six hours at ASD?

18  A.  Yes, sir.

19  Q.  I think you testified about two hours into the six hours

20  you were engaged?

21  A.  Yes, sir.

22  Q.  So tell us the length of time that you spent looking,

23  engaged, then looking at data information, talking to people

24  such that you could describe or represent to the client ASD

25  what, whether they had any issues, problems that needed to be

1  corrected, fixed, strengthened, so forth?

2  A.   In addition to the six hours of that meeting?

3  Q.   Six or four sir?

4  A.   Well, it was -- well, four hours after retention, but the

5  total of six.  I read materials that I had in my possession on

6  the plane going home.  I worked the next day.  I spoke to

7  Mr. Garner and Mr. Peterson in extensive phone calls the next

8  day.

9     I started taking notes on the terms of service, on my task

10 to do a separate one just for members, that was -- I probably

11 on Thursday of my eight hours of work I believe about four

12 hours may have been, may have been dedicated to ASD.

13 Q.   Stop for one second if I could.  I'm sorry to interrupt so

14 we can move it along?

15 A.   Yes.

16 Q.   So we had Wednesday some part of the day or you say six

17 hours or so at least, Thursday and then Friday.  You've

18 testified earlier you also worked on the matter Friday?

19 A.   On Friday when I got off the plane in Las Vegas I was in a

20 different mode.  I was in the mode of dealing with the seizure.

21 Advising the client on options for representation.  So I was

22 off of the task that I was originally retained for and I was on

23 a new task.

24 Q.   Right.  What about the time -- how would you describe the

25 time with Mr. Peterson on Friday afternoon or evening?

1  A.   I would describe that time as crisis mode dealing with the

2  seizure and what the appropriate corporate response should be.

3  Q.   Okay.  So the total amount of time you spent reviewing

4  data, getting information in connection with your engagement

5  for, by ASD was a total of two days, three days?

6  A.   Approximately two days, yes.

7  Q.   So minimum of two, at most three, would that be fair to

8  say?

9  A.   That would be fair to say.

10  Q.   When you were asked questions throughout your testimony

11  about your opinion, when you testified about your opinion

12  you're discussing your opinion in the, as reflected in the

13  declaration, correct?

14  A.   Yes.

15  Q.   What does that opinion relate to, relate to which

16  engagement of the two that you described for us?

17  A.   The opinion in the declaration relates to the engagement

18  by the Ackerman law firm to render an independent expert

19  witness testimony on the comparison of the government's

20  complaint to the business model as I was able to review.

21  Q.   Sir, now in connection with that engagement, the

22  engagement by the Ackerman law firm to provide expert services

23  connected with the litigation, it was during that engagement

24  that you received any e-mails, correct?

25  A.   Yes, sir.

1  Q.   Did you receive any e-mails the two and a half days prior

2  to that when you were working on the engagement of you by ASD?

3  A.   I received two or three e-mails on Thursday from ASD

4  members who I didn't know saying I'm glad you're on board.

5     It was just like thanks for being on the team because they

6  somehow learned I had been retained.

7  Q.   That was a bad question, I'm sorry.

8     The 1,027 e-mails you referred to in your declaration,

9  those e-mails were received which of your engagements?

10  A.   The second engagement.

11  Q.   The amount of money you were paid for the ASD engagement,

12  24,000 I think you said, correct?

13  A.   I did.

14  Q.   For how long a period was the 24,000 to cover, what

15  lengths?

16  A.   One year, 2,000 a month for 12 months.

17  Q.   Did you, what if any work did you expect to do over the

18  remaining 360 days of the year that you were committed to for

19  the 24,000, what, if any, work generally short, brief, what if

20  any work were you expected to do?

21  A.   Is this in the context of knowing about the seizure or

22  before?

23  Q.   No, no, no.

24     Before the seizure you were engaged, you were paid $24,000

25  for a year's worth of work?

1  A.    Yes.  The $2,000 a month is to be unlimited access to me

2  by the client and other members of his staff that he authorizes

3  to advise on any and all issues having to do with multilevel

4  direct selling.

5  Q.    Sir --

6  A.    Until the end it includes four business trips.

7  Q.    -- in order to move this along, could you look at your

8  engagement by ASD.  I think --

9  A.    Yes, counsel.

10 Q.    -- the engagement describes the work you were expected to

11 perform the year, 24,000, 6,000, 2,000 a month, correct?

12 A.    Yes, it does.

13 Q.    How much of that work did you get done in two days?

14 A.    The review that I've described in my testimony, very

15 little.

16 Q.    That's the -- I expect that's your answer very little?

17 A.    Well, I mean, I was going to be available to them for 365

18 days and I was available to them for three days.

19 Q.    Here's the question?

20 A.    Okay.

21 Q.    You were engaged, you told them that was the work you were

22 going to perform; that is, that work meaning the work you

23 described in that engagement.

24    So during the rest of the year you were going to do all of

25 that stuff that you listed in the engagement, right?

1  A.   Of course.

2  Q.   So now you got very little done.  Had you been allowed to

3  continue the, that engagement had it been allowed to continue;

4  that is, in the absence of the seizure of the funds, would you

5  have completed the rest of the work described in the

6  engagement?

7  A.   Yes.

8  Q.   Would that have included more, a greater review of the

9  terms and service, more focused review of videos, maybe

10  communicating in the field, would it include those items as

11  well as other stuff?

12  A.   Yes, it would have, counsel.

13  Q.   Might you have had occasion to talk to members in the

14  years work that you were expected to do under that engagement?

15  A.   Yes.

16  Q.   Had you learned about some of the issues raised in the

17  e-mails shown to you, e-mails you received under the second

18  engagement, had you learned that information during the first

19  engagement what, if anything, would you have done?  That is,

20  information about e-mails with information about problems or

21  misunderstanding of the terms of service?

22  A.   I would have recommended changes to the structure of the

23  business to deal with those issues that were raised.

24  Q.   Sorry for jumping around, but I want to get a lot of stuff

25  in so we can move along.

1    I need to in my own mind clarify in your declaration second

2  engagement.  In your declaration you were opining as to a

3  particular legal issue in the litigation.

4    You said -- tell me what that issue is?

5  A.   The accusations in the Government's complaint that this

6  business venture is illegal and that it's a Ponzi scheme.

7  Q.   Is there a difference in your opinion between a Ponzi

8  scheme and a pyramid scheme?

9  A.   There are some differences, yes.

10 Q.   Were you asked in the engagement as part of the

11 engagement -- I'm sorry -- strike that.

12    Did the engagement, the second engagement to be an expert

13 include opining on a pyramid scheme?

14 A.   I don't think so.  I just think that I looked at the

15 elements of a Ponzi that I'm familiar with and that the

16 complaint stated and that I was dealing with those allegations.

17 Q.   If you said, if you were asked the question earlier about

18 expressing your opinion as to the opinion in the declaration

19 related to whether there was a Ponzi scheme or a pyramid

20 scheme, and you answered yes, your opinion related to that,

21 would it be more precise to say that it related to Ponzi or

22 pyramid or both or?

23 A.   My language that I chose in my declaration was focused on

24 the Ponzi scheme structure, but my opinion is that this is

25 neither a Ponzi scheme nor a pyramid.  It is a legitimate

1  direct selling venture.

2  Q.   Could you locate the terms of service as one of your

3  exhibits?

4  A.   Yes, counselor.

5  Q.   Sir, as between the terms service -- strike that.

6       The first engagement you reviewed terms of service,

7  legality statement, the video, you talked to the people in

8  Quincy that you referred to earlier, and did I leave anything

9  out, information that you had for the two days, the two days,

10 two and a half days of the, of the first engagement?

11           MR. COWDEN:  Your Honor, I just -- do you mean first

12 engagement or second engagement?

13 BY MR. FAYAD:

14 Q.   First engagement, sorry.  First engagement?

15 A.   That's an accurate representation of what I reviewed, yes.

16 Q.   You had occasion to visit the website looking for the

17 legality statement?

18 A.   I did.

19 Q.   Sitting here today and yesterday you were asked about a

20 sentence on the website having to do with free, becomes free

21 advertising.

22    Do you remember those questions?

23 A.   I do remember those questions.

24 Q.   As between statements on the website and terms of service

25 and your discussions what of that, what was the priority of

1  that information?

2  A.   The priority would be the terms of service document

3  because it is in effect a contractual relationship between ASD

4  and its members.

5  Q.   So in your two to two and a half days worth of work, that

6  was, that is the terms of service so paramount to you in terms

7  of the data that you actually got to see and work with and

8  crunch up in your mind?

9  A.   It was paramount to me, yes, counsel.

10  Q.   If you could look at the terms of service paragraph or

11  page 4 -- sorry.  Page four?

12  A.   Yes.

13  Q.   There's a paragraph number three?

14  A.   I see that, yes.

15  Q.   What, if anything, does that paragraph say about

16  investments in the company offering investments?

17  A.   It unequivocally denies that the company is selling

18  investment for offering investment opportunity.

19  Q.   What, if anything, does it say about cash rebates?

20  A.   It mentions that they are not guaranteed and that they are

21  limited to daily rebates and they are limited to people who

22  view other websites on the days that you view the required

23  number of websites.  So it's a description of the rebate

24  program, how it works.

25  Q.   All right.  Now moving back to that section on page 2,

1  giving details of the rebate program.  Page 2 of the first full

2  paragraph, second paragraph, third, fourth, fifth.

3     Is there information in those paragraphs about the period

4  of time the company would use to determine the amount of

5  dollars that were going to the rebate pool?

6  A.   Well, yes, the period of time is specifically referenced.

7  It says on a daily basis.

8  Q.   So on Tuesday the pool for Tuesday would be based on sales

9  for which day?

10 A.   Monday sales would be Tuesday's rebate program.

11 Q.   So when you say the rebate program is based on future, on

12 sales, you don't mean future sales or future revenue, do you?

13 A.   I mean daily revenue.

14 Q.   Okay, daily revenue?

15 A.   Daily revenue.

16 Q.   But you're not saying that, are you, that rebates are the

17 pool is determined by all future revenue?  I just want to be

18 clear?

19 A.   I did not say that, no.  It's daily.

20 Q.   If you said it you didn't mean it?

21 A.   No, it's daily revenue, fifty percent of which is set

22 aside for the rebate program.

23 Q.   If you would go to page 5, please.

24    Under member responsibility, responsibilities.  There's a

25 paragraph beginning with in order to be an advertiser of ASD.

1    What, if anything, does that paragraph say about the
2  requirement to be an advertiser?
3  A.   That's the critical program that I -- that's a critical
4  paragraph that I've highlighted in my notes says the
5  requirement is that you have a product, a program or an
6  opportunity to advertise.
7  Q.   And that appears under member responsibilities, is that
8  right?
9  A.   It does, and one of the reasons for my recommendation that
10 we do some separation was that this is a specific, this would
11 be more specific to an advertiser.
12   So the merging of the language is one of the minor flaws
13 that I would try to fix in my representation, my first
14 representation.
15 Q.   Sir, we've used words customer, advertiser, member, other
16 words to describe the ways people can participate in the ASD
17 model.
18   Is there some, can you give us at a top level a description
19 of the ways one can participate?  And I want to just know how
20 to sort out all of the words that have come up in my inartful
21 question?
22 A.   Customer is an advertiser, a member is an opportunity
23 seeker given two ways to make money, the referral program where
24 you don't even have to be an advertiser and the rebate program
25 if you also are an advertiser.

1  Q.   So a member can be an advertiser?

2  A.   Yes.

3  Q.   To be an advertiser if you sign the terms of service to

4  buy advertising, you have to have a product, service or

5  program?

6  A.   Yes.

7  Q.   Sign up and certify, assure; is that right?

8  A.   Yes.

9  Q.   You say income opportunity seeker?

10 A.   I use the term income opportunity seeker.  It's a phrase

11 in the legal jargon of what I do.

12    It means someone who is given an opportunity to make money

13 with a company enterprise versus someone who is given an

14 opportunity to spend money which is the customer.

15 Q.   Are you familiar with the phrase independent sales horse?

16 A.   Of course.

17 Q.   What does that mean?

18 A.   In this context it means an independent contractor

19 relationship with an entity where the independent contractor is

20 given an opportunity to bring business volume to the company

21 and receive commissions.

22 Q.   That would be the multilevel program that you described

23 earlier ten percent?

24 A.   Be the referral program.

25 Q.   Referral program.  So the income opportunity people

1  essentially they are the independent sales horse?

2  A.   They are, yes.

3  Q.   So to page, again page 4, halfway down the page beginning

4  paragraph begins as an advertiser, what, if anything, does that

5  paragraph say about responsibilities of an advertiser?

6  A.   Well, it just says that if you are participating in the

7  rebate program, it is your responsibility to read and

8  understand the program.

9     Did you want me to continue?

10  Q.   No, no, that's enough.

11      Go to the next sentence, if you sponsor other advertisers

12  is there an obligation or requirement that this paragraph

13  imposes on those who go out and sponsor others to bring to buy

14  advertising from ASD?

15  A.   Again, this is a paragraph that I would have cleaned up

16  somewhat because an advertiser doesn't sponsor other

17  advertisers.

18     A member sells advertising who is, would be a member who

19  goes out and finds another advertiser so I would clean up the

20  language somewhat.

21     But it basically says you who are doing that have the

22  responsibility to present the program in a knowledgeable manner

23  giving your referrals sufficient information so that they can

24  make an informed decision.

25     Can you read the last sentence?

1       THE COURT:  Wait, I need to interrupt for a second.

2       I didn't understand your last answer because I thought

3  earlier you said that a member, that a customer could earn

4  commissions.

5       THE WITNESS:  A customer, yes, Your Honor, can earn

6  commissions if they choose to become a member and then be

7  eligible for the referral program.

8       There's four levels, the free level, then three other

9  levels where they pay a modest monthly charge.

10      THE COURT:  To be in the commission program?

11      THE WITNESS:  Yes.  And --

12      THE COURT:  So that the income opportunities are only

13  available to members?

14      THE WITNESS:  That's correct, Your Honor.

15      THE COURT:  And how many customers are not members?

16      THE WITNESS:  I was not given that number.

17      THE COURT:  Would it make a difference to your

18  analysis if there are a hundred thousand members and five

19  customers?

20      THE WITNESS:  I would want the percentage to be

21  higher than that, but a program that has a very high percentage

22  of customers who are also in the income opportunity is not

23  illegal per se.

24      There's all other factors such as the ones we've been

25  discussing such as the legitimacy of the product or service.

1          THE COURT:  Right.

2       Sorry, I just got lost in the translation.

3          MR. FAYAD:  Well, Your Honor I often do.  So I

4  understand.

5  BY MR. FAYAD:

6  Q.   I was going to ask you, please, sir, I am asking you to

7  read the last sentence in that paragraph that you were just

8  reading, again page 4, halfway down as an advertiser

9  participating in the last statement, the last sentence in that

10 paragraph?

11 A.   Are you asking me to read it?

12 Q.   Yes, please?

13 A.   There is no excuse for false statements or

14 misrepresentations about the program.

15 Q.   What is the main purpose sense of that paragraph?

16          MR. COWDEN:  Objection.

17          THE COURT:  Right, I don't think this witness is

18 capable of answering that question.

19       He'd have to have somebody from Ad Surf Daily to do

20 that.

21          MR. FAYAD:  May I rephrase?

22          THE COURT:  Yes.

23 BY MR. FAYAD:

24 Q.   What did you understand the purpose of that paragraph to

25 be?

1  A.   This contractually gives the company the power to

2  discipline and even terminate people who violate that sentence.

3  Q.   What, if any, authority does it, what, if any,

4  responsibility does it place on advertisers, sponsors to read

5  and understand?  What is that saying about their

6  responsibility?  What did you understand that to say about

7  their responsibility?

8  A.   Know the program and tell the truth.

9          MR. FAYAD:  Can I ask the Court is there an exhibit

10 of the e-mail requesting letter?

11         THE COURT:  No, that's not, I don't believe that's an

12 exhibit.  Mr. Cowden showed it but you didn't make it an

13 exhibit.

14         MR. FAYAD:  May I borrow?

15         MR. COWDEN:  All of the e-mails I referenced are an

16 exhibit to, under one of the motions you guys filed.

17         THE COURT:  No, it's the e-mail that asks for members

18 to send in testimonials.  That's the one you mean, isn't it?

19         MR. FAYAD:  Yes.

20 BY MR. FAYAD:

21 Q.   Let me try -- you were asked earlier isn't it true that

22 the e-mail requesting member e-mails in connection with the

23 second engagement, the Ackerman engagement, you were asked

24 whether the e-mail asked for supported e-mails.

25     You remember being asked that?

A.   I was shown the request letter and it did use the word if

you have e-mails in support, please send them to the following

address, I did say that, yes.

Q.   Now, do you recall the word before e-mails?  No?

A.   Not without seeing it, no.

Q.   Let me say this, do you remember seeing the word accurate

before e-mails?

A.   Yes, the word accurate is in that request, yes.

Q.   So the request is for accurate e-mails in support of the

company?

A.   Yes.

Q.   In your, you've conducted reviews, investigations -- I

withdraw that.

          MR. FAYAD:  Your Honor, may I have a minute?  I

believe I'm close if not completed.  I just want to consult.

     (Pause.)

          MR. GOODMAN:  Mr. Cowden, can you find that request

for testimonies?

          MR. COWDEN:  I did.

          MR. GOODMAN:  Could we put it up on the screen,

please?

          THE COURT:  We only have one lawyer at a time with

each witness, sir.

          So you can sit down.  We have one lawyer.

          MR. GOODMAN:  Thank you, Your Honor.

1  BY MR. FAYAD:

2  Q.   Mr. Nehra, can I see --

3  A.   Yes, I have it in front of me, yes, counselor.

4  Q.   Do you see the word accurate in there?

5  A.   I most certainly do.

6  Q.   Just read the phrase, please, interested --

7  A.   Interested in receiving accurate letters or memos of

8  support from dash other members who have had positive

9  experiences with Ad Surf Daily.

10 Q.   Are you comfortable with the 1,027 e-mails as a

11 representative sample, preliminary representative sample of

12 e-mails from the customer base?

13 A.   Yes, I am comfortable with that.

14       MR. FAYAD:  One moment, Your Honor.

15       THE COURT:  Yes.

16     (Pause.)

17 BY MR. FAYAD:

18 Q.   Mr. Nehra, the e-mails that you received in connection

19 with the second engagement --

20 A.   Yes, sir.

21 Q.   -- what, if anything, were you suppose to do under the

22 second engagement to investigate the substance of those

23 e-mails?

24 A.   I was, I believe I was expected to use the e-mails sent to

25 me as a basis for my determination that this company is really

1  about the sale of internet advertising and that is the use to

2  which I put those e-mails.

3  Q.   So if -- strike that.

4      The e-mails that were presented to you earlier yesterday

5  and today where statements in the e-mails you were pointed to

6  statements in those e-mails which were not well stated or some

7  you disagreed with, was it your job to contact those members

8  and address any misunderstanding of statements in their

9  e-mails?

10 A.   I was not tasked to do that.

11 Q.   Were you, under the second engagement were you tasked to

12 take whatever problems you saw in the e-mails to the company,

13 to Mr. Bowdoin, anybody in the company?  Were you tasked to do

14 that?

15 A.   I was not.

16 Q.   How would you again, well, you've answered the question.

17         MR. FAYAD:  Nothing further, Your Honor.

18         THE COURT:  Thank you, sir.  All right.

19      Thank you very much.  I'm sorry we made you stay.  But

20 you're now free to go.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  Thank you, sir.

23      All right.  Did you have another witness?

24         MR. GOODMAN:  I did, Your Honor.

25         THE COURT:  All right.  Why don't you get your

1  witness.

2        MR. GOODMAN:  Your Honor, the next witness is the

3  corporate executive Chuck Osmin.

4        Being in order to keep the track of the exhibits and

5  being an A type personality, I wanted to number one, request

6  that the government supplement the evidentiary record by

7  submitting a copy of those missing screen prints that we talked

8  about.  I believe one was the join for free tab and the other

9  one was the contact us tab.

10       We can't access that now because the web page is down,

11 but I believe the government has those documents in its files.

12       THE COURT:  If Mr. Cowden can find it, he might

13 submit it, but that won't happen until after the hearing is

14 over.

15       MR. GOODMAN:  Yes.  Let me try to sharpen my request.

16       After the hearing is over, if they can file it as a

17 supplement, that's my request.

18       THE COURT:  Right.

19       MR. GOODMAN:  The other thing that we would offer,

20 Your Honor, into evidence as a Claimant Exhibit, I may have

21 lost track.  I'm not sure if we're up to number 2 or number 3.

22 Three.  I would offer the request for testimonials as an

23 exhibit to this hearing, Claimant's Exhibit Number 3.

24       THE COURT:  All right.

25       MR. GOODMAN:  If I might pass it to your deputy.

```
1              THE COURT:  Yes.

2              MR. COWDEN:  No objection.

3              THE COURT:  Thank you.

4              THE DEPUTY CLERK:  You're up to number 3, sir.

5              MR. GOODMAN:  Thank you.

6              THE COURT:  Did somebody go get your witness?

7              MR. GOODMAN:  My witness is right here, Your Honor.

8   It's the corporate representative.

9         And the other exhibit that we would offer, Your Honor,

10  as Claimant's Exhibit 4 which the government mentioned it to

11  you.  I'm well aware, Your Honor, that you are going to be

12  watching the full DVD, but in order to make the record

13  complete, we would offer as Claimant's Exhibit Number 4, the

14  actual transcript that Mr. Cowden prepared.

15        We think that's important because among other things, it

16  mentions from Mr. Garner discussions about the advertising

17  business and if there's no objection from the government, we

18  would have this as Claimant's Exhibit 4.

19             THE COURT:  I have no objection.

20        Do you have any objection?

21             MR. COWDEN:  No, Judge, we don't object.

22    I would note that as I was watching, listening to the video

23  there were sometimes a couple of words missing from the

24  transcript, but I have no objection to the exhibit.  I would

25  ask the Court to just --
```

1      THE COURT:  Okay.

2      MR. GOODMAN:  Finally, just in terms of making sure

3  that the evidence is getting in correctly, Mr. Fayad reminded

4  me that perhaps the engagement letter from Mr. Nehra was not

5  formally admitted.  I have to confess that I don't remember

6  that either way whether it was introduced by us or the

7  government.

8      I don't think there's any objection from either side, so

9  if it has not yet been formally admitted by either side, we

10  would introduce it as Claimant's Exhibit Number 5.

11      MR. COWDEN:  No objection.

12      THE COURT:  I think I have it in, it's a Number 2.

13    Is that correct, Ms. White?

14      MR. GOODMAN:  Number 2, I believe, Your Honor, is the

15  binder that the witness, that the witness --

16      THE COURT:  I had that as Number 1.

17      MR. GOODMAN:  That was the first binder, Your Honor,

18  from Mr. Grayson, that was his own binder that he prepared.

19    Number 2 is the larger loose leaf binder.

20      THE DEPUTY CLERK:  I have Number 2 as the retainer

21  agreement, counsel.

22      THE COURT:  I do too.  So we'll make the large binder

23  Number 5 if it didn't somehow get a specific number to it.

24      MR. GOODMAN:  Thank you, Your Honor.

25    Without further ado, Chuck Osmin.

1      Thank you, Your Honor.

2      (Claimant's Exhibit Numbers 3, 4 and 5 received into

3  evidence.)

4           CLAIMANT WITNESS CHARLES J. OSMIN SWORN

5                    DIRECT EXAMINATION

6  BY MR. GOODMAN:

7  Q.   Good morning?

8  A.   Good morning.

9  Q.   Tell us your name, please sir?

10 A.   Charles John Osmin.

11 Q.   Mr. Osmin, where do you live sir?

12 A.   I live at --

13      THE COURT:  Hold on one second.  We would have to

14 redact that from the final transcript and so at this point I'm

15 going to strike the answer from the witness as to his home

16 address so it's not in the final transcript and ask you to give

17 us your business address.

18      THE WITNESS:  My business address is 13 South Calhoun

19 Street, Quincy, Florida.

20      THE COURT:  Thank you, that's much better.  I don't

21 have to redact that.

22      What is your last name sir?

23      THE WITNESS:  Osmin, O-S-M-I-N.

24      MR. GOODMAN:  Thank you.  Appreciate the sensitivity.

25 BY MR. GOODMAN:

1  Q.   Mr. Osmin, Quincy is a suburb or small town outside of

2  Tallahassee, Florida.

3  A.   We are 20 miles from Tallahassee, Florida.  It's a town of

4  about 8500.

5  Q.   All right, who do you live there with in Quincy, Florida?

6  A.   I live there with my wife and three of my four children.

7  Q.   Ages?

8       THE COURT:  I don't need this.  I know he's a real

9  man.  I promise, I know that he's a real man.

10      Please, let's just talk about what we need to know.

11      MR. GOODMAN:  All right, Your Honor.

12      THE COURT:  Thank you.

13      MR. GOODMAN:  Can I get into just the briefest of his

14  background?

15      THE COURT:  His background is fine, but I don't need

16  to know his family.

17      MR. GOODMAN:  Thank you, Your Honor.

18  BY MR. GOODMAN:

19  Q.   Mr. Osmin, did you spend some time in the Armed Services?

20  A.   Yes, I did.  I spent 15 years in the military.

21  Q.   Which branches?

22  A.   Eleven and a half years in the Army, two years in the Navy

23  -- I'm sorry -- eleven and a half years in the Navy, two years

24  in the Navy Reserve and three years in Army Reserve.

25  Q.   Honorable discharges from all of those?

1 A.   All of them, yes.

2 Q.   All right, sir.

3    Did you work for the postal service?

4 A.   Yes, I did, for four years.

5 Q.   Fair enough.  What years?

6 A.   That would be from 2003 to 2008, late 2003 to mid 2008.

7 Q.   When did you first start working for Ad Surf Daily in

8 Quincy, Florida?

9 A.   April 21st, 2008.

10 Q.   In your job with Ad Surf Daily were you involved in the

11 customer service department?

12 A.   Yes, I was.  I was initially hired on for customer

13 service.

14 Q.   Later on, sir, in your tenure with Ad Surf Daily did you

15 become involved with a special group or a subdivision of the

16 customer service division?

17 A.   Yes, I did.  We realized that there was a need for the

18 liaison between customer service and accounting because of the

19 number of requests that we were getting from customers having

20 to do with accounting issues.

21    So I was set up in order to respond to the customer service

22 issues with access to accounting.  They transferred me actually

23 from the customer service department to administratively under

24 the accounting department and we referred to that as customer

25 service investigators or CSI.

1  Q.   All right, sir.  And if we counted up before the seizure

2  the number of customer service folks working in your CSI group

3  and the main part of the customer service group, more or less

4  how many Ad Surf Daily employees were involved in customer

5  service?

6  A.   In customer service or in my section?

7  Q.   Both, combined?

8  A.   Both, combined I would say upwards of 30.

9  Q.   All right.  So no doubt that there was an actual customer

10  service department at Ad Surf Daily?

11  A.   Yes, sir.

12  Q.   Now in the time that you were there from April -- by the

13  way, let me ask you this.

14     Since the time of the seizure, have you still remained

15  working at Ad Surf Daily?

16  A.   I have been there on a voluntary basis, yes.

17  Q.   So as of after the date of the bank account seizures and

18  the company basically closing up shop, have you been receiving

19  a salary?

20  A.   No.

21  Q.   Why are you continuing to work for the company for the

22  past two months without a salary given that you have a wife and

23  three children?

24  A.   I believe that I am supportive of the corporation.  I have

25  never seen anything that would lead me to believe that this was

1    anything other than a legitimate corporation.  And I'm able to

2    support the work that we're doing.

3        We're not independently wealthy, but my wife brings in

4    enough to cover our bills which allows me the opportunity to

5    work with the corporation in whatever capacity that they need

6    me.

7    Q.    Now would it be fair to say that in the time from April of

8    2008 when you began working for Ad Surf Daily and the time that

9    of the bank account seizures that the company experienced

10   explosive growth?

11   A.    Phenomenal growth.

12   Q.    From a customer service perspective did that phenomenal

13   growth generate problems?

14   A.    Yes, it did.

15   Q.    Tell us briefly what type of problems, Mr. Osmin?

16   A.    When I started in April we had roughly a dozen people

17   manning the phones to take care of customer complaints and

18   customer issues.

19       At that time there were roughly 20,000 members.  Within 90

20   days we were over 100,000 members and unfortunately, we

21   couldn't train people fast enough to keep up with that kind of

22   growth.

23       We were in the process of getting to a new building that

24   would allow us the space to expand our customer service

25   department.  But we were just inundated with customer service

1  issues, with customer service issues that related to our

2  growth.

3  Q.    Would it be fair to say that some of the problems caused

4  by the phenomenal growth was a lack of space, a lack of offices

5  basically busting at the seams?

6  A.    It was a lack of space, a lack of offices, a lack of

7  computer terminals.

8      We had to expand our phone system so that we could allow

9  more lines in.  They did that three times in the amount of time

10  that I was there.  Each time that required an order from the

11  telephone company to actually install more lines.  It was a

12  snowball.

13  Q.    How many hours, Mr. Osmin, per week more or less were you

14  working in the CSI subdivision of the customer service group?

15  A.    I was there 60 to 70 hours a week.

16  Q.    Mr. Osmin, in addition to being an employee in the CSI

17  customer service division, did you also yourself have

18  businesses that you advertised on the ASD rotator?

19  A.    Yes, I did.

20  Q.    How many businesses, Mr. Osmin?

21  A.    I had three different websites that I was advertising.

22  Q.    Would you explain to the Court which three websites and

23  briefly describe the nature of the product or service?

24  A.    Certainly.  The first website was a Whole Food Pharmacy

25  out of Tennessee was the name of the business.  I was a

1  independent contractor for them.  Basically selling whole

2  foods, organic processing, just good food, good stuff.

3      I was also involved with a water treatment company that was

4  called Xooma with an X, X-O-O-M-A, and I had my local business.

5  I had a part-time clowning business.  I have been a

6  professional clown for 15 years.

7  Q.   Real products, real companies, real businesses?

8  A.   Yes, sir.

9  Q.   Was having a website with an actual business or product or

10 service a requirement of ASD?

11 A.   Yes, it was.

12 Q.   Did ASD take steps to in effect police or enforce the

13 website requirement?

14 A.   They took a couple of different measures to do that.

15 Within just a few weeks of the time that we had the seizure, we

16 had instituted a part of the programming, the computer

17 programming itself.  Part of the program was that they were,

18 members were not allowed to surf if they didn't have a website.

19 They wouldn't be able to access that part of the web page.

20     Also we had, we had some distance employees, they weren't

21 right there at Quincy, but they were, basically their job was

22 to make sure that the websites that were put into the rotator

23 were legitimate.

24 Q.   And this may be obvious, but when you answered just a

25 minute ago that a few weeks or around a few weeks of the

1  seizure that something had been implemented, I assume you mean

2  a few weeks before the seizure?

3  A.    Prior to, yes.

4  Q.    Prior to?

5  A.    Yes.

6  Q.    And even though there was a mechanism to enforce or police

7  the website requirement, candidly did sometimes a member or a

8  participant slip through now and again?

9  A.    Could you rephrase that, please?

10  Q.    Sure.

11    Despite the requirement that people who surf have their own

12  websites, and despite the fact that there was an effort in

13  place to see that that actually happened, once in a while

14  something slipped through.

15    Would that be a fair statement?

16  A.    Prior to the change in the software itself, that could

17  have happened but once the software was in place, the capacity

18  was that they had to have a website in the rotator in order to

19  surf.

20  Q.    Was there a feature or component in the computer software

21  that would flag or alert or send out a warning if somebody was

22  trying to use the system without having a web page?

23  A.    It actually, the flag absolutely went to the member,

24  actually went to the member themselves.  It would show up on

25  their, what we call their back office.

1    After they logged in from the home page that has already

2  been shown, it would go to a, an account overview and on that

3  account overview it would tell them that they needed to have

4  the website in the rotator in order to surf.

5  Q.   And this feature that you're just talking about was put

6  into place a few weeks before the seizure?

7  A.   That's correct.

8  Q.   All right.

9    Would you explain to the Court the notion of an affiliate

10  website or an affiliated type of a website?

11  A.   Yes, there were on the breaking news site which is by the

12  way there when you went up on the rotator the first place that

13  it took you was the breaking news, back when, back when our

14  account was, website was operational.  It would take you to the

15  breaking news site.

16    There was a link on the breaking news site for affiliate

17  programs.  Those affiliate programs were there for people who

18  wanted to take advantage of our opportunity, but didn't have a

19  web page of their own.

20    What they would do is they would go to those affiliate

21  programs, paydot.com was one, I forget what the name of the

22  other one was, but in both cases they would become affiliates

23  of those businesses and they would advertise those business

24  sites on our rotator.  But they would actually become

25  affiliates of the other businesses.

1  Q.   So in effect, they would be a sales representative for the

2  products on that main web page?

3  A.   Correct.

4  Q.   So there were actual products even for those people who

5  needed ASD's help to get connected to a website?

6  A.   That's correct.

7  Q.   All right.

8         THE COURT:  Is this a good place to pause?

9         MR. GOODMAN:  Yes.

10        THE COURT:  Seems to me it was.  You were taking a

11  breath and thinking about a new area of questioning, so maybe

12  we should pause now for lunch.

13        You're excused for lunch, sir.  We'll break now.  It's

14  12:30, we'll be back at two.

15        MR. GOODMAN:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17      (Witness excused.)

18      (Luncheon recess.)

19      (Afternoon session reported by Catalina Kerr.)

20                         -oOo-

21

22

23

24

25

```
1                        I-N-D-E-X

2                                Direct   Cross   Redirect

3  On behalf of the Claimant:

4       Gerald Nehra

5          By  Mr. Cowden                   6
           By  Mr. Fayad                                60
6

7       Charles J. Osmin

8          By Mr. Goodman              82

9

10                       E-X-H-I-B-I-T-S

11                                              Received

12  On behalf of the Government:

13  Government Exhibit No. 1                       57
    Government Exhibit No. 2                       59
14

15

16

17  On behalf of the Claimant:

18  Claimant Exhibit Nos. 3, 4 and 5               82

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2          I certify that the foregoing is a true and correct

3  transcript, to the best of my ability, of the above pages, of

4  the stenographic notes provided to me by the United States

5  District Court, of the proceedings taken on the date and time

6  previously stated in the above matter.

7          I further certify that I am neither counsel for,

8  related to, nor employed by any of the parties to the action in

9  which this hearing was taken, and further that I am not

10 financially nor otherwise interested in the outcome of the

11 action.

12

13   _____          _____

14     Crystal M. Pilgrim, RPR              Date

15

16

17

18

19

20

21

22

23

24

25

**$**

$10,000 [1]   56/8
$1100 [1]   47/21
$2,000 [2]   43/5 64/1
$24,000 [4]   16/25 17/2
 37/16 63/24
$30,000 [2]   43/4 43/4
$9,000 [2]   56/6 56/13

**-**

----------------------------
 1/8
-oOo [1]   91/20

**0**

08-1345 [2]   1/4 3/2

**1**

1,000 [2]   17/21 18/8
1,027 [3]   17/24 63/8
 77/10
100,000 [1]   86/20
11:00 [1]   49/22
12 [1]   63/16
12:30 [1]   91/14
13 [1]   82/18
1345 [2]   1/4 3/2
15 [2]   83/20 88/6
1714 [1]   1/23

**2**

2,000 [3]   47/22 63/16
 64/11
20 [2]   59/24 83/3
20,000 [1]   86/19
20001 [1]   2/5
2003 [2]   84/6 84/6
2008 [12]   1/6 24/23 27/14
 36/25 38/15 50/21 52/14
 60/16 84/6 84/6 84/9 86/8
20530 [1]   1/17
21st [1]   84/9
22182-2683 [1]   1/20
24,000 [4]   63/12 63/14
 63/19 64/11
25 [1]   19/4
25,000 [1]   28/17
25th [1]   1/22
2683 [1]   1/20
28 [1]   18/18
29 [1]   18/12

**3**

30 [1]   85/8
30th [7]   27/15 36/24
 37/19 38/15 43/18 52/14
 60/16
32351 [2]   1/6 3/4
33131-1714 [1]   1/23
333 [1]   2/4
34 [1]   22/1
35 [1]   23/12
35 percent [2]   23/12 24/1
360 [1]   63/18
365 [1]   64/17

**4**

4704 [1]   2/5
49 [1]   24/20
4TH [1]   1/16

**5**

5,000 [1]   28/18
555 [1]   1/16
57 [3]   18/12 18/18 92/13
59 [1]   92/13

**6**

6,000 [1]   64/11
60 [2]   87/15 92/5
65 [2]   23/21 24/8
65 percent [5]   23/8 23/9
 23/18 23/23 23/25

**7**

70 [1]   87/15
700 [1]   1/19
76 [1]   18/12

**8**

8100 [1]   1/19
82 [2]   92/8 92/18
85 [1]   40/12
8500 [1]   83/4

**9**

90 [1]   86/19
9:35 [1]   1/6

**A**

A-D-S-U-R-F-D-A-I-L-Y-B-R-E...
 31/3
a.m [2]   1/6 49/22
Aaron [1]   27/21
ability [1]   93/3
able [7]   3/23 5/6 16/17
 20/15 62/20 86/1 88/19
about [73]   6/17 7/3 7/11
 11/7 11/24 13/13 14/6
 15/5 16/10 18/11 25/5
 26/7 30/10 33/16 33/21
 35/16 37/8 37/12 37/20
 38/14 42/10 43/16 43/17
 43/19 43/21 43/24 44/1
 44/2 44/5 44/16 44/19
 44/19 45/10 45/16 45/22
 45/25 47/3 52/16 52/19
 52/21 54/8 54/11 54/20
 54/24 56/2 58/21 58/22
 60/19 61/11 61/24 62/11
 62/11 63/21 65/16 65/20
 65/20 66/17 67/19 68/15
 68/19 69/3 70/1 72/5
 74/14 75/5 75/6 78/1 79/8
 80/16 83/4 83/10 90/5
 91/11
above [4]   19/4 55/7 93/3
 93/6
absence [1]   65/4
absolute [1]   7/8
absolutely [1]   89/23
acceptable [2]   5/2 47/6
accepts [1]   57/3
access [5]   46/23 64/1
 79/10 84/22 88/19
accessing [1]   47/1
according [1]   41/17
account [5]   85/17 86/9
 90/2 90/3 90/14
accountant [1]   24/5
accounting [4]   84/18
 84/20 84/22 84/24

accounts [1]   8/4
accurate [8]   23/19 35/2
 67/15 76/6 76/8 76/9 77/4
 77/7
accusations [1]   66/5
Ackerman [8]   4/18 6/20
 6/25 33/12 34/17 62/18
 62/22 75/23
acknowledge [1]   4/25
acquaintance [1]   11/10
across [2]   49/11 58/18
Act [1]   56/9
action [3]   3/2 93/8 93/11
actions [1]   42/7
actual [4]   80/14 85/9
 88/9 91/4
actually [15]   8/9 21/7
 22/14 26/3 31/5 41/20
 42/10 49/10 68/7 84/22
 87/11 89/13 89/23 89/24
 90/24
ad [53]   7/20 22/6 24/13
 25/1 28/4 28/7 28/8 28/12
 28/13 28/16 28/17 28/18
 28/19 29/2 29/3 29/3 29/5
 29/6 29/15 29/22 30/14
 30/16 30/18 32/1 33/2
 35/1 35/2 35/4 36/24
 39/22 39/22 40/2 43/5
 45/19 47/22 50/23 52/7
 52/19 54/22 55/4 55/22
 56/24 59/15 60/1 74/19
 77/9 84/7 84/10 84/14
 85/4 85/10 85/15 86/8
add [1]   58/11
added [1]   45/3
adding [1]   44/6
addition [3]   40/22 61/2
 87/16
additional [1]   41/5
address [6]   35/6 76/3
 78/8 82/16 82/17 82/18
adjust [1]   47/7
adjustment [1]   59/3
adjustments [1]   38/2
administration [2]   27/6
 27/11
administrative [4]   3/14
 4/6 5/18 27/10
administratively [1]
 84/23
admit [2]   57/11 59/4
admitted [3]   4/19 81/5
 81/9
ado [1]   81/25
ads [7]   21/7 21/8 21/11
 21/19 21/19 33/24 54/23
advantage [1]   90/18
advertise [14]   29/8 30/20
 31/17 31/18 31/18 31/22
 32/16 32/17 32/20 32/25
 33/3 36/2 70/6 90/23
advertised [1]   87/18
advertiser [17]   33/5
 37/24 45/15 69/25 70/2
 70/11 70/15 70/22 70/24
 70/25 71/1 71/3 72/4 72/5
 72/16 72/19 74/8
advertisers [11]   9/25
 10/5 18/6 22/10 22/20
 23/4 38/4 38/7 72/11
 72/17 75/4

**A**

advertising [60]  9/11
  9/14 9/22 10/1 19/3 19/7
  20/8 20/15 20/16 20/17
  20/24 21/13 21/14 22/10
  22/11 22/21 22/22 25/6
  25/7 25/11 25/15 25/21
  28/9 28/21 29/5 29/14
  29/18 29/23 29/25 30/2
  30/5 30/7 30/8 32/3 33/11
  34/1 35/23 36/3 36/15
  39/21 39/21 43/4 43/11
  43/13 52/17 53/22 53/23
  55/5 55/5 55/18 55/23
  56/4 56/12 67/21 71/4
  72/14 72/18 78/1 80/16
  87/21
advice [1]  24/12
advise [3]  39/1 47/12
  64/3
advised [1]  30/12
advising [2]  44/11 61/21
affects [1]  14/4
affidavit [4]  5/21 5/25
  9/6 9/16
affiliate [5]  33/1 90/9
  90/16 90/17 90/20
affiliated [1]  90/10
affiliates [2]  90/22
  90/25
after [16]  9/18 17/13
  17/22 35/13 37/14 37/18
  37/22 47/3 49/20 54/19
  56/16 61/4 79/13 79/16
  85/17 90/1
afternoon [2]  61/25 91/9
again [6]  32/3 72/3 72/15
  74/8 78/16 89/8
agency [1]  56/18
Ages [1]  83/7
ago [1]  88/25
agree [15]  9/19 9/20
  19/10 19/12 19/17 20/10
  24/6 24/12 31/13 36/10
  40/19 42/23 48/11 48/18
  48/19
agreed [5]  35/16 37/15
  37/16 37/25 54/5
agreeing [2]  48/16 54/13
agreement [5]  18/5 37/15
  38/4 38/5 81/21
ahead [3]  14/15 14/16
  48/14
aided [1]  2/7
Akerman [2]  1/18 1/21
al [2]  1/7 3/4
alarm [3]  56/9 56/18
  56/18
alert [1]  89/21
all [46]  3/24 5/3 6/2
  9/18 14/7 23/11 27/4 29/6
  30/15 32/20 34/12 35/15
  36/7 38/8 39/5 42/18 43/4
  43/23 44/8 51/15 51/19
  53/19 57/3 57/13 57/18
  59/3 64/3 64/24 68/25
  69/17 70/20 73/24 75/15
  78/18 78/23 78/25 79/24
  83/5 83/11 83/25 84/1
  84/2 85/1 85/9 90/8 91/7
allegations [2]  44/4

66/16
alleged [1]  24/11
allow [6]  5/7 15/23 19/2
  30/12 86/24 87/8
allowed [4]  53/1 65/2
  65/3 88/18
allows [1]  86/4
alone [1]  39/19
along [4]  51/12 61/14
  64/7 65/25
already [4]  4/2 10/22
  43/5 90/1
also [15]  10/7 19/7 21/1
  24/12 24/14 41/4 49/1
  58/23 60/3 61/18 70/25
  73/22 87/17 88/3 88/6
although [3]  4/25 46/7
  54/4
always [2]  38/22 44/10
am [10]  24/18 27/23 44/10
  50/7 50/8 74/6 77/13
  85/24 93/7 93/9
AMERICA [2]  1/3 3/3
among [1]  80/15
Amos [1]  28/3
amount [10]  55/4 55/11
  55/23 56/3 56/4 56/13
  62/3 63/11 69/4 87/9
Amway [1]  26/17
analysis [2]  24/9 73/18
analyze [1]  16/17
analyzed [1]  24/7
Andy [13]  11/11 11/17
  11/20 11/25 17/15 17/21
  27/17 27/22 42/15 43/19
  43/23 52/4 52/7
another [6]  6/8 47/15
  58/21 58/22 72/19 78/23
answer [8]  8/17 8/25
  20/19 28/24 28/25 64/16
  73/2 82/15
answered [4]  38/16 66/20
  78/16 88/24
answering [1]  74/18
anti [1]  38/12
anti-pyramid [1]  38/12
any [29]  5/1 7/8 8/7 14/4
  22/9 25/16 37/12 37/18
  39/14 47/21 47/23 48/3
  51/16 56/2 57/13 58/18
  60/25 62/24 63/1 63/17
  63/19 63/20 64/3 75/3
  75/3 78/8 80/20 81/8 93/8
anybody [7]  5/25 20/3
  20/6 27/20 55/22 56/13
  78/13
anymore [1]  9/19
anyone [1]  56/14
anything [10]  48/1 65/19
  67/8 68/15 68/19 70/1
  72/4 77/21 85/25 86/1
apparently [1]  59/9
APPEARANCES [2]  1/14 2/2
appears [5]  20/7 24/22
  25/4 33/5 70/7
apply [1]  55/19
appreciate [3]  5/14 54/11
  82/24
approach [1]  15/14
appropriate [4]  4/22 18/6
  48/4 62/2
approval [1]  55/8

Approximately [1]  62/6
April [4]  84/9 85/12 86/7
  86/16
architect [1]  4/14
are [88]  8/5 8/11 9/17
  9/21 9/21 9/24 9/25 10/3
  10/4 10/5 10/7 10/11
  17/10 17/11 19/8 20/9
  20/15 20/24 21/6 21/18
  21/25 22/16 22/17 22/19
  22/19 23/4 23/15 23/23
  23/25 24/3 25/18 26/7
  26/12 26/17 26/18 28/15
  29/4 29/7 29/11 31/20
  32/23 33/2 33/6 33/6 34/6
  34/13 35/2 35/5 35/18
  36/12 38/5 39/3 39/11
  40/14 40/23 41/3 42/10
  44/11 44/15 48/13 48/13
  48/20 49/2 49/8 49/9
  56/21 66/9 68/20 68/20
  68/21 69/16 69/16 70/25
  71/15 72/1 72/2 72/6
  72/21 73/12 73/15 73/18
  73/22 74/11 75/15 77/10
  80/11 83/3 85/21
area [5]  6/24 44/13 44/22
  46/3 91/11
areas [2]  44/12 46/7
aren't [1]  10/3
Armed [1]  83/19
Army [2]  83/22 83/24
around [2]  65/24 88/25
articles [3]  25/23 26/1
  26/2
as [71]  4/24 5/5 6/17
  8/14 10/8 10/20 13/1 14/7
  14/10 14/11 15/19 17/25
  18/1 18/4 18/7 21/17
  24/10 27/24 29/5 29/12
  29/22 31/21 38/9 38/10
  38/21 38/24 40/12 40/12
  42/14 43/14 45/15 47/23
  47/23 49/9 50/6 51/5
  52/21 56/11 56/12 57/7
  57/21 62/1 62/12 62/20
  65/10 65/11 66/2 66/10
  66/18 67/2 67/5 67/24
  72/4 73/24 73/25 74/8
  77/10 77/25 79/16 79/20
  79/22 80/10 80/13 80/18
  80/22 81/10 81/16 81/20
  82/15 84/24 85/17
ASD [88]  6/18 6/21 6/22
  6/23 8/9 8/19 10/11 10/14
  10/16 10/17 10/19 10/24
  11/2 11/9 11/10 11/17
  11/24 15/1 15/5 15/9 16/4
  16/8 16/10 16/14 16/24
  17/6 17/19 17/20 17/22
  19/1 19/20 22/10 22/25
  23/3 24/13 24/17 27/11
  30/8 30/25 31/17 32/5
  33/9 33/16 33/24 34/1
  34/4 35/19 36/1 36/2 36/3
  36/22 37/8 37/11 37/12
  37/20 38/14 38/19 39/16
  39/19 39/20 40/20 41/2
  41/15 41/22 42/11 42/14
  43/16 43/17 43/21 45/19
  46/19 50/23 60/15 60/17
  60/24 61/12 62/5 63/2

**A**

ASD... [10]   63/3 63/11
 64/8 68/3 69/25 70/16
 72/14 87/18 88/10 88/12
ASD's [6]   11/19 32/15
 33/18 35/8 42/6 91/5
aside [2]   41/19 69/22
ask [30]   5/6 8/15 9/7
 10/10 11/19 19/25 20/3
 20/6 21/6 21/9 22/9 22/12
 29/14 29/17 31/13 32/13
 34/9 34/9 34/18 34/19
 41/23 45/2 45/18 54/17
 59/14 74/6 75/9 80/25
 82/16 85/13
asked [21]   7/3 7/11 7/17
 15/1 16/21 18/24 19/10
 35/8 35/13 35/20 36/22
 45/20 58/24 62/10 66/10
 66/17 67/19 75/21 75/23
 75/24 75/25
asking [10]   20/10 22/11
 22/17 22/19 23/5 23/13
 24/3 44/25 74/6 74/11
asks [1]   75/17
assessment [1]   28/19
assist [1]   51/14
Assistant [1]   1/16
assume [1]   89/1
assuming [1]   8/11
assure [2]   44/7 71/7
attached [1]   18/13
attachment [1]   6/6
attained [1]   8/12
attorney [5]   21/17 27/25
 46/2 46/8 59/23
Attorneys [1]   1/16
August [1]   24/22
August 8 [1]   24/22
authority [1]   75/3
authorized [1]   45/14
authorizes [1]   64/2
availability [1]   55/16
available [4]   16/22 64/17
 64/18 73/13
Avenue [2]   1/22 2/4
Avon [1]   26/23
award [1]   19/2
aware [4]   30/18 36/20
 36/23 80/11
away [4]   27/2 27/4 28/17
 29/7

**B**

back [31]   3/12 6/9 22/17
 22/19 23/5 23/7 23/17
 23/21 23/21 23/23 23/25
 24/4 25/6 32/22 34/17
 41/1 41/25 42/17 42/24
 43/4 49/10 49/19 51/6
 55/17 58/13 59/13 68/25
 89/25 90/13 90/13 91/14
background [2]   83/14
 83/15
bad [1]   63/7
bank [3]   8/4 85/17 86/9
banks [1]   56/9
base [1]   77/12
based [14]   7/22 7/25 8/3
 21/15 26/20 26/22 28/8
 33/11 33/25 36/17 36/19

50/25 69/8 69/11
basically [6]   50/1 72/21
 85/18 87/5 88/1 88/21
basis [4]   16/19 69/7
 77/25 85/16
be [85]   4/4 4/8 4/19 5/1
 5/6 5/23 6/7 6/8 6/20
 6/23 7/7 8/12 8/20 9/1
 10/17 14/5 16/17 16/18
 17/9 17/11 18/6 23/2
 23/19 24/22 25/4 26/12
 26/15 26/17 27/7 27/11
 29/7 30/4 30/6 30/7 30/10
 30/22 30/25 31/1 31/21
 32/25 34/16 37/24 42/6
 46/3 47/16 47/20 48/3
 48/14 49/19 50/1 55/18
 60/25 62/2 62/7 62/9 64/1
 64/17 66/12 66/21 68/2
 69/8 69/19 69/17 69/25
 70/2 70/11 70/24 71/1
 71/3 71/22 71/24 72/18
 73/6 73/10 73/20 74/25
 80/11 84/6 86/7 87/3
 88/19 88/24 89/15 91/1
 91/14
bear [1]   57/16
beauty [1]   27/9
because [34]   5/5 9/24
 15/17 16/16 16/21 21/20
 23/14 25/18 26/9 26/25
 28/22 34/19 35/22 38/11
 39/1 41/10 41/15 42/11
 42/14 42/15 42/21 44/10
 44/14 47/25 48/17 55/15
 56/8 63/5 68/3 72/16 73/2
 79/10 80/15 84/18
become [7]   20/17 30/18
 33/4 73/6 84/15 90/22
 90/24
becomes [2]   48/17 67/20
been [30]   14/23 16/6 35/1
 35/13 35/19 39/8 39/20
 39/25 42/4 44/25 45/18
 45/21 47/1 47/9 49/10
 56/6 56/16 59/23 61/12
 61/12 63/6 65/2 65/3
 73/24 81/9 85/16 85/18
 88/5 89/1 90/2
before [33]   1/11 10/13
 10/16 10/25 11/17 11/20
 11/25 12/13 12/4 12/7
 12/19 15/15 16/4 16/7
 16/8 18/17 19/19 30/13
 34/3 34/20 35/7 36/20
 37/6 37/11 39/18 55/2
 63/22 63/24 76/4 76/7
 85/1 89/2 90/6
beg [1]   43/17
began [1]   86/8
begin [1]   53/16
beginning [7]   50/6 50/16
 51/9 51/18 51/20 69/25
 72/3
begins [1]   72/4
behalf [4]   6/21 92/3
 92/12 92/17
behind [1]   45/1
being [32]   6/17 12/13
 12/17 14/10 14/11 15/18
 15/18 15/21 18/15 21/1
 21/6 21/7 21/10 21/18

27/2 27/24 29/7 29/11
 30/5 32/24 33/6 36/15
 38/15 38/24 45/3 45/8
 47/2 63/5 75/25 79/4 79/5
 87/16
believe [26]   5/20 11/8
 11/10 19/22 20/7 20/9
 23/14 24/8 27/15 29/1
 36/10 41/8 41/25 45/8
 45/21 46/1 55/25 61/11
 75/11 76/15 77/24 79/8
 79/11 81/14 85/24 85/25
benefit [1]   3/24
besides [1]   8/8
best [4]   38/11 39/1 50/5
 93/3
better [2]   56/17 82/20
between [12]   18/6 37/24
 38/10 39/2 42/25 47/10
 49/11 66/7 67/5 67/24
 68/3 84/18
beyond [1]   19/4
big [1]   26/23
Bill [8]   11/11 11/13
 11/14 11/16 11/18 11/19
 11/24 27/21
bills [1]   86/4
binder [5]   81/15 81/17
 81/18 81/19 81/22
binders [1]   3/20
bit [1]   35/21
Boa [1]   46/1
board [3]   44/3 46/2 63/4
body [3]   26/9 39/1 39/8
Boone [1]   1/19
borrow [1]   75/14
both [7]   37/25 39/15 60/2
 66/22 85/7 85/8 90/22
bottom [1]   31/2
bought [1]   8/2
Boulevard [1]   1/19
bow [1]   5/23
Bowdoin [57]   11/11 11/17
 11/20 11/25 13/15 13/20
 13/20 15/2 15/4 16/8
 16/22 16/22 17/16 17/21
 21/3 21/6 21/9 22/9 22/12
 22/24 27/17 27/22 29/14
 29/17 37/2 37/7 37/11
 37/14 37/18 37/22 41/18
 42/15 42/21 42/24 43/15
 43/19 43/24 45/10 45/18
 45/23 46/1 46/7 46/11
 46/18 50/20 51/5 51/7
 51/21 52/3 52/4 52/7 53/2
 54/19 54/22 55/22 56/1
 78/13
Bowdoin's [3]   24/12 29/20
 55/8
branches [1]   83/21
break [6]   49/13 49/16
 49/19 50/2 50/15 91/13
breaking [4]   90/11 90/13
 90/15 90/16
breath [1]   91/11
brief [1]   63/19
briefest [1]   83/13
briefly [2]   86/15 87/23
bring [6]   9/14 9/22 40/4
 46/1 71/20 72/13
brings [1]   86/3
broke [1]   18/11

**B**

brought [4]   10/1 44/3
 45/23 50/16
brown [1]   52/11
building [1]   86/23
built [1]   60/4
business [35]   9/8 9/9
 9/14 9/23 10/1 11/17
 24/19 28/9 28/20 28/21
 31/18 32/16 32/21 32/25
 33/1 33/3 36/15 37/9
 37/12 37/20 55/10 56/11
 62/20 64/6 65/23 66/6
 71/20 80/17 82/17 82/18
 87/25 88/4 88/5 88/9
 90/23
businesses [8]   32/17 33/4
 33/6 87/18 87/20 88/7
 90/23 90/25
busting [1]   87/5
buy [9]   54/23 55/5 55/12
 55/24 56/3 56/4 56/13
 71/4 72/13
buying [1]   43/12
buys [1]   27/9

**C**

CA [1]   1/4
Calhoun [1]   82/18
call [2]   29/6 89/25
called [2]   11/14 88/4
calls [1]   61/7
came [3]   18/9 34/18 45/21
can [46]   5/16 6/11 14/7
 15/13 15/25 17/11 24/6
 27/7 31/17 32/16 36/6
 36/11 40/13 41/8 41/25
 47/20 47/21 47/22 47/22
 48/1 48/3 48/6 49/2 49/13
 50/4 50/8 51/12 51/25
 55/12 56/13 61/14 65/25
 70/16 70/18 70/19 71/1
 72/23 72/25 73/5 75/9
 76/17 76/24 77/2 79/12
 79/16 83/13
can't [8]   5/22 12/20 13/2
 25/12 34/8 36/6 47/25
 79/10
candidly [1]   89/7
cannot [2]   43/23 47/9
cap [1]   8/12
capable [1]   74/18
capacity [2]   86/5 89/17
car [2]   8/2 8/3
care [1]   86/17
case [5]   42/8 50/10 55/18
 55/19 56/4
cases [1]   90/22
cash [2]   24/13 68/19
cash.com [1]   31/20
Catalina [1]   91/19
cause [4]   21/11 21/17
 21/20 56/2
caused [1]   87/3
causes [1]   56/9
cent [2]   40/15 41/2
centered [1]   5/19
cents [6]   8/14 23/15
 40/17 41/12 41/19 43/9
certain [1]   57/22
certainly [2]   77/5 87/24

CERTIFICATE [1]   93/1
certify [3]   71/7 93/2
 93/7
cetera [2]   35/2 35/5
CFO [2]   28/3 28/17
challenge [1]   15/21
chance [5]   13/12 15/9
 30/16 40/23 50/15
change [12]   21/15 23/20
 28/12 28/14 29/13 30/23
 33/8 33/8 33/15 34/3 47/8
 89/16
changed [2]   18/10 21/15
changes [1]   65/22
channel [1]   9/12
charge [6]   27/6 27/8
 27/10 48/1 48/21 73/9
charged [1]   27/11
CHARLES [3]   82/4 82/10
 92/7
children [3]   28/18 83/6
 85/23
choice [1]   9/12
choices [2]   19/12 19/16
choose [3]   10/8 36/13
 73/6
chooses [1]   14/8
chose [4]   16/22 19/17
 22/20 66/23
chosen [2]   19/1 59/21
Chris [1]   17/22
Chuck [2]   79/3 81/25
Civil [1]   3/2
CLAIMANT [6]   6/12 79/20
 82/4 92/3 92/17 92/18
claimant's [9]   18/12
 19/19 24/21 79/23 80/10
 80/13 80/18 81/10 82/2
clarify [1]   66/1
clean [1]   72/19
cleaned [1]   72/15
cleaner [9]   47/22 48/21
 48/22 49/1 49/3 49/4 49/5
 49/5 49/8
cleaners [1]   48/20
clear [2]   39/2 69/18
clerk [1]   6/7
click [3]   58/18 58/23
 58/23
client [7]   7/15 17/3 39/6
 60/2 60/24 61/21 64/2
clients [7]   26/7 26/8
 38/9 39/1 39/5 44/12
 47/12
close [1]   76/15
closing [1]   85/18
clown [1]   88/6
clowning [1]   88/5
co [2]   45/13 45/15
co-advertiser [1]   45/15
co-presenter [1]   45/13
COLLYER [2]   1/11 11/8
COLUMBIA [2]   1/1 2/4
com [1]   31/4
combination [1]   19/1
combined [2]   85/7 85/8
come [6]   3/12 6/11 29/21
 49/24 55/3 70/20
comes [3]   43/9 43/11
 43/11
comfortable [2]   77/10
 77/13

coming [2]   24/8 43/6
commission [6]   19/6 39/12
 39/15 39/19 39/20 73/10
commissions [6]   40/13
 40/18 41/1 71/21 73/4
 73/6
commit [1]   50/10
committed [1]   63/18
committing [4]   23/15
 23/21 23/23 23/25
communicating [2]   45/6
 65/10
communication [2]   11/14
 34/25
companies [7]   27/5 27/10
 31/16 39/9 55/15 55/20
 88/7
company [62]   8/8 8/10
 9/15 9/23 10/1 10/17
 11/14 11/15 15/13 17/16
 18/2 18/24 19/20 20/16
 20/23 21/12 21/14 21/18
 22/16 25/10 26/4 28/8
 29/5 29/15 29/23 29/24
 30/11 30/15 32/2 32/10
 36/11 39/11 39/14 40/1
 40/12 40/14 41/24 42/25
 50/24 55/10 56/11 58/22
 59/16 68/16 68/17 69/4
 71/13 71/20 75/1 76/10
 77/25 78/12 78/13 85/18
 85/21 86/9 87/11 88/3
company's [1]   31/21
comparison [1]   62/19
compensated [1]   28/15
compensating [2]   28/13
 29/3
compensation [9]   9/10
 9/13 9/21 19/2 29/4 29/12
 59/19 60/3 60/4
complaint [5]   17/21 18/9
 62/20 66/5 66/16
complaints [1]   86/17
complete [4]   49/16 50/7
 58/5 80/13
completed [2]   65/5 76/15
compliance [10]   4/9 4/10
 4/13 4/14 4/22 30/15 44/8
 44/17 44/19 46/13
compliant [1]   45/25
complied [1]   39/2
component [1]   89/20
components [2]   19/2 19/8
compound [3]   19/5 19/15
 19/25
computer [6]   2/7 46/24
 47/1 87/7 88/16 89/20
computer-aided [1]   2/7
concern [5]   21/17 21/20
 38/18 56/2 56/5
concerned [9]   11/24 26/7
 26/9 35/18 35/22 37/20
 38/14 38/24 44/16
concerns [13]   11/3 11/4
 11/5 16/10 16/13 37/8
 37/12 37/18 37/22 44/19
 45/24 47/3 54/20
conclude [1]   46/16
conclusion [2]   28/8 36/14
condition [1]   29/11
conduct [1]   5/7

**C**

conducted [1]   76/12
confer [1]   49/15
confess [1]   81/5
confirm [1]   50/19
connected [2]   62/23 91/5
connection [5]   24/18 62/4
 62/21 75/22 77/18
consider [1]   33/4
Constitution [1]   2/4
consult [1]   76/15
consultant [2]   18/1 27/9
Cont'd [1]   6/13
contact [4]   58/23 59/1
 78/7 79/9
context [2]   63/21 71/18
continue [3]   65/3 65/3
 72/9
continued [3]   2/2 30/11
 30/11
continuing [2]   43/5 85/21
contractor [4]   9/12 71/18
 71/19 88/1
contractual [2]   42/25
 68/3
contractually [1]   75/1
control [1]   48/1
controls [1]   30/12
conversation [3]   29/21
 43/18 44/9
conversations [5]   13/21
 13/23 37/5 37/6 37/7
conveying [1]   45/3
copy [9]   4/1 4/2 4/2 6/8
 6/25 11/22 12/19 13/8
 79/7
corporate [3]   62/2 79/3
 80/8
corporation [3]   85/24
 86/1 86/5
correct [44]   6/19 7/2
 8/21 8/23 10/25 18/22
 19/11 19/21 20/6 21/2
 21/5 23/22 23/24 24/23
 25/2 25/24 27/14 28/10
 28/11 33/13 33/16 37/4
 37/16 39/12 39/18 40/8
 40/20 48/7 50/17 52/8
 57/9 59/2 59/22 59/24
 62/13 62/24 63/12 64/11
 73/14 81/13 90/7 91/3
 91/6 93/2
corrected [1]   61/1
correctly [3]   17/5 41/14
 81/3
cost [2]   25/1 25/6
costs [4]   19/3 19/4 20/16
 25/2
could [25]   3/12 5/4 15/6
 16/18 30/20 32/2 32/7
 44/7 53/21 54/23 55/5
 55/24 56/3 56/4 58/18
 60/24 61/13 64/7 67/2
 68/10 73/3 76/20 87/8
 89/9 89/16
couldn't [1]   86/21
counsel [12]   5/22 6/16
 14/23 14/25 24/21 44/25
 51/14 64/9 65/12 68/9
 81/21 93/7
counselor [22]   6/23 9/2

16/1 16/16 18/16 19/23
 22/4 25/3 27/15 28/11
 31/15 34/22 36/19 36/23
 40/11 41/3 42/4 44/23
 46/14 48/19 67/4 77/3
counsels [1]   46/7
counted [1]   85/1
country [1]   46/4
couple [4]   44/14 44/15
 80/23 88/14
course [7]   9/20 17/7 18/9
 22/18 55/1 65/1 71/16
court [26]   1/1 2/3 2/3
 4/1 4/1 4/11 4/22 4/23
 5/2 5/20 9/7 10/13 24/21
 30/14 50/1 51/4 51/14
 51/22 55/3 56/25 57/3
 75/9 80/25 87/22 90/9
 93/5
Court's [1]   3/25
courteous [1]   42/5
courtesy [2]   12/24 27/24
courtroom [3]   4/15 5/13
 50/17
cover [2]   63/14 86/4
COWDEN [16]   1/15 3/5 5/15
 13/1 13/7 49/13 53/3
 54/15 57/21 58/1 58/9
 75/12 76/17 79/12 80/14
 92/5
Create [1]   39/6
credentials [1]   43/25
crisis [1]   62/1
critical [5]   23/2 24/9
 25/10 70/3 70/3
cross [6]   6/13 14/3 14/8
 49/14 49/25 92/2
crucial [1]   22/25
crunch [1]   68/8
Crystal [2]   2/3 93/13
crystallization [1]   25/13
CSI [4]   84/25 85/2 87/14
 87/16
customer [41]   17/20 39/3
 39/23 39/25 40/2 43/12
 47/10 47/13 47/19 47/23
 48/10 48/18 49/1 55/7
 55/24 70/15 70/22 71/14
 73/3 73/5 77/12 84/11
 84/12 84/16 84/18 84/21
 84/23 84/24 85/2 85/3
 85/4 85/6 85/9 86/12
 86/17 86/18 86/24 86/25
 87/1 87/14 87/17
customers [23]   10/3 10/4
 10/5 10/7 10/8 10/11
 22/16 22/16 22/19 35/13
 36/11 36/18 38/10 38/18
 40/5 48/3 48/13 48/15
 48/21 73/15 73/19 73/22
 84/19

**D**

D.C [1]   1/5
daily [46]   7/20 24/13
 28/4 28/7 28/9 28/12
 28/16 28/19 29/2 29/5
 29/15 29/22 30/14 30/16
 30/18 32/1 33/2 35/1 35/2
 35/4 36/24 45/19 50/23
 52/8 54/22 55/4 55/23
 56/24 59/15 60/1 68/21

69/7 69/13 69/14 69/15
 69/19 69/21 74/19 77/9
 84/7 84/10 84/14 85/4
 85/10 85/15 86/8
dash [1]   77/8
data [3]   60/23 62/4 68/7
date [3]   85/17 93/5 93/13
day [5]   60/17 61/6 61/8
 61/16 69/9
days [14]   62/5 62/5 62/6
 63/1 63/18 64/13 64/18
 64/18 67/9 67/9 67/10
 68/5 68/22 86/20
DC [2]   1/17 2/5
de [2]   24/14 24/16
deal [2]   38/13 65/23
dealing [4]   39/8 61/20
 62/1 66/16
decide [1]   49/14
decision [1]   72/24
declaration [10]   55/3
 59/13 59/14 62/13 62/17
 63/8 66/1 66/2 66/18
 66/23
dedicated [1]   61/12
Defendants [2]   1/8 1/18
defense [2]   3/6 13/8
defined [1]   8/13
defunct [3]   29/25 30/3
 30/4
delighted [1]   44/10
denies [1]   68/17
department [5]   84/11
 84/23 84/24 85/10 86/25
deputy [3]   4/1 5/16 79/25
describe [5]   60/24 61/24
 62/1 70/16 87/23
described [5]   62/16 64/14
 64/23 65/5 71/22
describes [1]   64/10
description [2]   68/23
 70/18
design [3]   7/6 24/10
 37/15
desire [1]   44/1
despite [2]   89/11 89/12
detail [1]   54/4
details [1]   69/1
determination [1]   77/25
determine [5]   17/11 23/3
 36/2 36/12 69/4
determined [2]   17/22
 69/17
determining [1]   42/6
did [112]
didn't [24]   6/5 7/18 11/3
 13/22 16/13 17/24 19/24
 20/4 21/23 25/7 25/16
 31/10 32/2 36/13 40/24
 45/2 45/6 63/4 69/20 73/2
 75/12 81/23 88/18 90/18
difference [2]   66/7 73/17
differences [1]   66/9
different [4]   14/5 61/20
 87/21 88/14
diffusing [1]   15/14
Dinero [2]   24/14 24/16
direct [7]   9/9 45/4 47/20
 64/4 67/1 82/5 92/2
disagree [4]   19/12 19/17
 19/17 24/6
disagreed [3]   19/13 19/14

**D**

disagreed... [1]   78/7
disagreeing [1]   32/8
disagrees [1]   58/15
disappoint [1]   55/17
disappointed [1]   30/7
discharges [1]   83/25
discipline [2]   46/3 75/2
discuss [2]   37/11 54/22
discussed [6]   8/22 18/17
  20/18 33/15 37/25 59/18
discussing [2]   62/12
  73/25
discussion [1]   56/1
discussions [2]   67/25
  80/16
dispute [1]   43/8
disputed [1]   43/10
distance [1]   88/20
distinction [1]   39/2
distribution [1]   9/12
Distributor [3]   26/18
  26/18 26/18
distributorship [2]   26/20
  26/23
DISTRICT [6]   1/1 1/1 1/12
  2/3 2/4 93/5
division [2]   84/16 87/17
do [65]   4/24 5/4 7/19
  7/24 9/19 12/19 16/16
  16/19 17/5 19/15 19/22
  25/3 26/6 28/3 28/5 31/17
  32/22 33/7 36/10 38/3
  39/5 39/6 41/25 42/2 44/2
  46/5 46/5 48/18 49/6 50/5
  51/3 51/11 51/17 53/3
  56/12 58/24 61/10 63/17
  63/20 64/3 64/24 65/14
  67/11 67/20 67/22 67/23
  69/12 70/10 71/11 74/3
  74/19 76/4 76/6 77/4 77/5
  77/21 78/10 78/13 80/20
  81/22 82/11 83/5 84/20
  88/14 90/20
Docket [1]   1/4
document [15]   12/21 13/8
  14/3 14/18 18/12 30/24
  31/2 31/14 31/16 31/23
  38/4 42/24 45/13 57/12
  68/2
documents [6]   9/18 17/14
  17/15 18/8 55/2 79/11
does [27]   7/10 9/2 11/13
  13/2 21/11 21/15 21/17
  21/20 23/4 23/19 23/20
  31/16 31/24 31/25 32/5
  42/9 56/2 62/15 64/12
  68/15 68/19 70/1 70/9
  71/17 72/4 75/3 75/4
doesn't [15]   8/7 20/7
  21/20 23/17 23/20 25/7
  25/10 31/5 31/6 33/8 33/8
  47/24 53/20 53/22 72/16
doing [5]   11/16 41/17
  50/8 72/21 86/2
dollar [15]   8/2 8/14
  23/16 24/8 39/20 40/1
  40/5 40/6 40/15 41/5
  41/12 41/19 41/24 41/25
  43/10
dollars [4]   48/21 48/22

don't [50]   4/19 6/2 6/4
  7/19 9/19 12/11 12/21
  20/11 20/13 23/6 23/14
  28/14 28/24 28/25 30/17
  32/4 32/15 33/3 36/7
  41/25 42/1 42/18 42/20
  44/12 45/20 46/14 46/17
  47/1 48/19 49/13 54/8
  54/16 55/17 55/25 57/20
  58/5 58/12 58/23 66/14
  69/12 70/24 74/17 75/11
  78/25 80/21 81/5 81/8
  82/20 83/8 83/15
done [6]   27/21 50/8 50/10
  64/13 65/2 65/19
dot [2]   31/3 31/3
doubt [1]   85/9
down [32]   8/3 10/17 10/25
  15/2 15/9 16/4 16/8 16/13
  16/24 17/9 18/7 21/2 21/4
  27/13 27/20 36/24 37/11
  37/14 38/1 38/15 43/15
  43/18 45/24 46/19 50/20
  52/5 52/13 56/17 72/3
  74/8 76/24 79/10
download [3]   10/19 11/22
  15/6
downloaded [4]   10/23
  57/21 57/24 57/24
dozen [1]   86/16
duplicate [1]   3/25
during [7]   21/3 37/7 50/2
  55/1 62/23 64/24 65/18
DVD [3]   50/2 50/3 80/12

**E**

e-mail [16]   18/12 18/17
  18/21 18/25 19/18 19/24
  20/4 20/7 21/23 24/22
  24/25 36/21 75/10 75/17
  75/22 75/24
e-mails [47]   3/20 17/21
  17/24 18/8 19/19 21/23
  22/3 24/20 33/12 33/21
  33/25 34/4 34/17 34/18
  34/21 34/24 35/8 35/19
  36/18 36/20 36/21 62/24
  63/1 63/3 63/8 63/9 65/17
  65/17 65/20 75/15 75/22
  75/24 76/2 76/4 76/7 76/9
  77/10 77/12 77/18 77/23
  77/24 78/2 78/4 78/5 78/6
  78/9 78/12
E-X-H-I-B-I-T-S [1]   92/10
each [4]   28/18 58/2 76/23
  87/10
earlier [7]   61/18 66/17
  67/8 71/23 73/3 75/21
  78/4
earmark [1]   23/9
earn [10]   19/4 19/6 38/6
  38/8 41/1 41/1 41/5 49/7
  73/3 73/5
earning [3]   53/8 53/14
  53/16
economist [1]   24/5
effect [7]   5/11 7/16
  28/19 29/4 29/22 34/10
  44/6 68/3 88/12 91/1
effort [1]   89/12
eight [1]   61/11

eighty [1]   40/14
eighty-five [1]   40/14
either [7]   6/5 22/4 31/18
  55/6 81/6 81/8 81/9
elements [1]   66/15
eleven [3]   49/12 83/22
  83/23
eligible [2]   9/25 73/7
eliminate [1]   7/8
eliminating [1]   50/8
else [3]   7/13 27/20 49/4
else's [1]   32/21
emergency [1]   4/7
emphatically [1]   41/13
employed [1]   93/8
employee [1]   87/16
employees [7]   28/13 28/15
  29/3 29/7 29/12 85/4
  88/20
end [3]   18/21 26/24 64/6
enforce [2]   88/12 89/6
engaged [6]   60/15 60/16
  60/20 60/23 63/24 64/21
engagement [35]   62/4
  62/16 62/17 62/21 62/22
  62/23 63/2 63/10 63/11
  64/8 64/10 64/23 64/25
  65/3 65/6 65/14 65/18
  65/19 66/2 66/10 66/11
  66/12 66/12 67/6 67/10
  67/12 67/12 67/14 67/14
  75/23 75/23 77/19 77/22
  78/11 81/4
engagements [1]   63/9
enough [5]   6/3 72/10 84/5
  86/4 86/21
enter [1]   34/6
enterprise [3]   39/3 39/4
  71/13
entire [1]   10/21
entity [2]   24/19 71/19
equivalence [1]   49/7
Esquire [4]   1/15 1/15
  1/18 1/21
essentially [1]   72/1
estimation [1]   8/5
et [4]   1/7 3/4 35/2 35/5
evaluate [1]   21/12
evaluation [2]   23/2 23/3
even [10]   10/16 12/20
  17/6 21/1 21/10 32/4
  70/24 75/2 89/6 91/4
evening [1]   61/25
ever [10]   8/8 8/16 8/19
  16/14 17/3 24/16 39/15
  55/1 55/3 55/10
every [3]   23/16 41/2 49/3
everybody [3]   49/4 51/12
  59/9
everyone [1]   3/7
everything [1]   50/8
evidence [12]   12/17 12/18
  14/11 34/6 35/2 56/21
  57/4 57/5 59/11 79/20
  81/3 82/3
evidentiary [1]   79/6
exactly [1]   60/15
examination [7]   6/13 14/3
  14/8 49/15 49/25 60/10
  82/5
examining [1]   17/10

**E**

example [1]  28/16
except [1]  29/6
exception [1]  27/5
excess [1]  33/18
excuse [2]  12/9 74/13
excused [2]  91/13 91/17
executive [1]  79/3
exhibit [31]  12/10 12/11
  18/12 18/19 56/24 57/4
  57/5 57/7 57/11 57/20
  58/5 58/19 59/4 59/11
  75/9 75/12 75/13 75/16
  79/20 79/23 79/23 80/9
  80/10 80/13 80/18 80/24
  81/10 82/2 92/13 92/13
  92/18
exhibits [4]  3/19 58/1
  67/3 79/4
existence [1]  25/9
expand [2]  86/24 87/8
expect [2]  63/17 64/16
expected [5]  36/16 63/20
  64/10 65/14 77/24
expeditious [1]  6/9
expense [1]  40/14
expenses [4]  19/5 19/15
  20/16 23/11
experience [3]  35/14
  35/20 39/9
experienced [1]  86/9
experiences [4]  35/4
  35/10 36/22 77/9
expert [9]  3/11 6/18 6/20
  7/4 17/25 46/4 62/18
  62/22 66/12
expertise [3]  44/11 44/13
  45/4
experts [1]  7/16
explain [8]  4/10 4/21
  4/24 19/25 20/3 41/8
  87/22 90/9
explanation [1]  11/7
explore [1]  55/22
explosive [3]  56/17 56/19
  86/10
express [3]  37/8 54/20
  56/14
expressed [1]  45/24
expressing [2]  56/15
  66/18
extensive [1]  61/7
extra [2]  4/1 42/2
extremely [1]  15/14

**F**

facilitate [1]  51/12
fact [12]  10/16 14/24
  15/1 22/9 23/20 25/6
  29/11 53/22 56/2 56/16
  58/14 89/12
factors [1]  73/24
failure [1]  21/22
fair [12]  9/7 23/11 25/12
  32/14 40/11 45/23 62/7
  62/9 84/5 86/7 87/3 89/15
false [1]  74/13
familiar [4]  34/19 39/14
  66/15 71/15
family [1]  83/16
far [1]  13/2

farm [1]  7/12
fashion [1]  5/9
fast [1]  86/21
FAYAD [4]  1/18 3/6 81/3
  92/5
feasible [3]  41/9 41/10
  41/15
feature [2]  89/20 90/5
fee [3]  27/6 27/10 27/11
feel [1]  42/25
felt [1]  37/23
Fernandez [1]  27/18
few [10]  10/22 10/24 11/2
  17/14 27/22 88/15 88/25
  88/25 89/2 90/6
field [2]  46/4 65/10
fields [1]  44/11
fifteen [1]  40/17
fifth [1]  69/2
fifty [7]  8/14 23/15
  41/12 41/19 42/21 43/9
  69/21
file [1]  79/16
filed [3]  4/7 4/13 75/16
files [1]  79/11
final [3]  5/18 82/14
  82/16
Finally [1]  81/2
financial [1]  53/11
financially [4]  41/9
  41/10 41/15 93/10
find [7]  5/20 6/5 11/6
  16/18 31/22 76/17 79/12
finds [2]  5/21 72/19
fine [2]  47/16 83/15
finish [2]  46/21 50/5
firm [12]  4/18 5/11 6/20
  19/19 33/13 34/4 44/21
  44/24 46/12 46/15 62/18
  62/22
firms [1]  44/2
first [18]  18/17 24/25
  52/21 57/8 57/22 58/19
  65/18 67/6 67/10 67/11
  67/14 67/14 69/1 70/13
  81/17 84/7 87/24 90/12
five [17]  7/21 8/21 9/1
  9/3 14/23 14/24 14/25
  32/22 40/6 40/14 41/5
  41/25 42/1 42/6 46/4
  57/12 73/18
fix [2]  54/20 70/13
fixed [1]  61/1
fixing [1]  21/22
flag [2]  89/21 89/23
flaws [1]  70/12
Floor [1]  1/22
FLORIDA [13]  1/6 1/23 3/3
  10/25 27/13 50/20 52/5
  52/14 82/19 83/2 83/3
  83/5 84/8
fluent [1]  24/18
focus [2]  47/11 47/13
focused [2]  65/9 66/23
folder [1]  5/20
folks [1]  82/2
followed [1]  49/23
following [2]  51/12 76/2
food [2]  87/24 88/2
foods [1]  88/2
foregoing [1]  93/2
forget [1]  90/21

forgive [1]  53/4
form [4]  29/4 29/12 36/4
  59/19
formally [2]  81/5 81/9
former [1]  28/3
forth [2]  49/11 61/1
forward [2]  6/11 49/14
found [1]  35/24
four [10]  13/13 57/15
  61/3 61/4 61/11 64/6
  68/11 73/8 83/6 84/4
fourth [1]  69/2
free [15]  20/8 20/17 42/7
  49/3 58/4 58/7 58/12
  58/15 58/23 58/25 67/20
  67/20 73/8 78/20 79/8
freedom [1]  53/11
frequently [2]  55/13
  58/24
Friday [5]  24/22 61/17
  61/18 61/19 61/25
front [6]  7/1 10/6 25/8
  51/3 57/8 77/3
Fuente [2]  24/14 24/16
full [2]  69/1 80/12
fully [1]  50/5
fundamental [1]  22/13
funded [1]  41/11
funding [1]  43/13
funds [1]  65/4
further [8]  13/7 18/5
  54/4 60/6 78/17 81/25
  93/7 93/9
future [10]  4/12 69/11
  69/12 69/12 69/17

**G**

Garner [14]  11/21 27/17
  37/25 44/5 45/11 45/12
  45/13 45/15 45/17 51/6
  52/1 52/1 61/7 80/16
Garner's [4]  10/20 10/23
  15/6 18/2
Gary [1]  15/13
gave [10]  4/11 6/25 10/13
  15/4 15/5 19/12 19/19
  30/13 49/5 55/2
General [1]  8/4
generally [2]  8/5 63/19
generate [1]  86/13
generations [1]  19/6
Generator [2]  24/13 52/19
Gentlemen [1]  49/10
GERALD [2]  6/12 92/4
get [20]  6/10 16/14 25/6
  25/13 32/21 34/23 40/23
  43/5 49/2 50/8 50/10
  53/14 60/12 64/13 65/24
  78/25 80/6 81/23 83/13
  91/5
getting [6]  7/25 36/16
  62/4 81/3 84/19 86/23
GILCREASE [2]  1/6 3/3
give [10]  4/1 5/16 40/1
  40/5 40/5 41/24 41/24
  47/15 70/18 82/16
given [17]  4/2 4/11 5/10
  19/16 27/2 27/4 29/7
  35/19 41/3 41/4 44/14
  70/23 71/12 71/13 71/20
  73/16 85/22
gives [3]  8/9 8/11 75/1

**G**

giving [5]   23/8 28/17
 50/1 69/1 72/23
glad [1]   63/4
go [21]   11/6 14/15 14/16
 16/13 17/9 17/17 23/7
 41/12 44/14 49/14 52/24
 53/1 54/4 59/13 69/23
 72/11 72/13 78/20 80/6
 90/2 90/20
goes [3]   43/8 51/6 72/19
going [33]   3/19 4/8 5/23
 7/12 13/7 15/9 15/23
 16/17 25/18 32/21 33/4
 34/6 34/9 34/16 35/25
 40/17 49/8 49/17 51/3
 51/4 52/24 54/7 54/15
 56/21 59/13 61/6 64/17
 64/22 64/24 69/5 74/6
 80/11 82/15
good [15]   3/7 3/8 3/9
 3/10 3/16 3/17 6/15 6/16
 34/1 55/19 82/7 82/8 88/2
 88/2 91/8
GOODMAN [4]   1/21 3/6 5/24
 92/8
goods [1]   55/15
got [10]   8/2 11/8 16/17
 16/25 17/6 34/17 61/19
 65/2 68/7 74/2
gotten [1]   16/14
government [23]   1/15 4/2
 5/6 12/18 12/21 24/10
 36/5 50/1 56/23 56/23
 57/3 57/5 57/7 58/19
 59/11 79/6 79/11 80/10
 80/17 81/7 92/12 92/13
 92/13
government's [4]   42/7
 57/11 62/19 66/5
Grayson [5]   18/22 19/25
 20/7 20/9 81/18
great [1]   4/4
greater [1]   65/8
Greenback [1]   11/15
group [4]   84/15 85/2 85/3
 87/14
growth [9]   44/1 56/18
 56/20 86/10 86/11 86/13
 86/22 87/2 87/4
guaranteed [1]   68/20
guess [3]   45/6 48/6 48/7
guy [1]   52/10
guys [1]   75/16

**H**

hac [1]   4/20
had [71]   3/11 4/7 4/21
 6/17 13/12 15/9 16/4 16/6
 17/6 17/7 17/9 22/9 30/10
 30/11 33/18 35/3 35/8
 35/9 35/13 35/19 37/2
 37/5 37/7 39/16 39/18
 43/3 43/18 44/2 44/7
 44/21 44/22 44/22 44/24
 44/24 45/12 45/18 45/21
 45/24 46/7 46/15 50/15
 54/22 55/4 55/25 57/9
 59/18 60/2 60/25 61/5
 61/16 63/6 65/2 65/3
 65/13 65/16 65/18 67/9
half [6]   45/22 63/1 67/10
 68/5 83/22 83/23
halfway [2]   72/3 74/8
hand [1]   51/12
happen [3]   30/12 55/15
 79/13
happened [3]   46/6 89/13
 89/17
happening [1]   41/20
happens [1]   55/13
happy [1]   30/4
hard [2]   55/15 55/19
has [18]   5/6 14/23 17/23
 19/1 20/17 21/14 22/16
 24/10 26/12 35/1 39/15
 42/25 50/16 58/1 73/21
 79/11 81/9 90/1
have [155]
haven't [2]   8/3 49/4
having [6]   4/21 64/3
 67/20 84/19 88/9 89/22
Haze [1]   28/3
he [91]   4/19 4/24 4/25
 5/10 11/16 11/21 13/1
 13/2 13/22 14/7 14/8
 19/16 20/8 20/10 21/3
 21/21 22/9 29/14 29/15
 29/18 29/18 36/6 37/15
 42/16 43/16 43/21 43/21
 43/22 43/24 44/1 44/2
 44/2 44/4 44/5 44/6 44/6
 44/7 44/7 44/8 44/16
 44/16 44/19 44/21 44/21
 44/21 44/22 44/23 44/24
 44/25 44/25 45/2 45/2
 45/6 45/12 45/18 45/21
 45/24 45/25 46/8 46/12
 46/12 46/14 46/15 46/23
 46/24 46/25 50/3 50/3
 51/25 52/7 52/10 52/16
 52/16 52/18 52/19 52/19
 52/21 53/2 53/3 53/8 53/9
 53/11 53/13 53/14 53/15
 53/16 53/18 53/22 64/2
 79/12 81/18
He'd [1]   74/19
he's [8]   4/18 13/22 14/6
 37/16 53/19 53/23 83/8
 83/9
hear [3]   11/7 30/10 34/8
heard [4]   24/16 24/17
 33/18 35/1
hearing [12]   1/11 4/11
 4/11 4/12 18/13 45/9
 49/17 50/7 79/13 79/16
 79/23 93/9
hearsay [1]   14/1
help [2]   17/12 91/5
helps [1]   14/6
her [1]   49/6
here [19]   3/18 4/15 5/22
 7/6 10/6 13/22 17/17
 25/13 27/24 30/14 35/25
 41/22 42/10 55/18 55/19
 56/19 58/19 67/19 80/7
Here's [1]   64/19
high [1]   73/21
higher [1]   73/21
highest [2]   16/14 17/4
highlighted [2]   18/25
 70/4
him [21]   4/23 5/5 5/6 5/6
 5/12 13/2 14/6 15/23
 19/25 28/5 34/9 37/5 37/8
 37/25 45/14 45/15 45/15
 47/6 49/6 52/11 54/20
himself [2]   29/14 44/7
hire [1]   16/22
hired [8]   6/17 6/20 6/22
 6/23 10/17 52/10 52/10
 84/12
his [27]   5/4 5/7 5/7
 13/22 14/9 20/8 27/21
 28/17 28/18 29/15 34/10
 44/1 44/5 44/19 45/7
 45/10 46/9 46/24 46/25
 47/2 52/22 64/2 81/18
 82/15 83/13 83/15 83/16
Hold [2]   31/9 82/13
home [7]   26/20 26/22
 57/23 58/19 61/6 82/15
 90/1
Honor [60]   3/8 3/9 3/10
 3/13 3/16 3/18 4/7 4/17
 5/10 5/19 12/9 12/20 13/4
 13/10 13/16 14/14 15/17
 15/24 22/1 26/20 27/3
 34/7 34/11 49/23 50/6
 50/11 51/11 52/23 53/5
 53/24 53/25 56/23 57/2
 57/16 57/19 59/6 60/8
 60/12 67/11 73/5 73/14
 74/3 76/14 76/25 77/14
 78/17 78/21 78/24 79/2
 79/20 80/7 80/9 80/11
 81/14 81/17 81/24 82/1
 83/11 83/17 91/15
HONORABLE [2]   1/11 83/25
horse [2]   71/15 72/1
hour [1]   22/24
hours [13]   17/16 37/15
 43/19 60/17 60/19 60/19
 61/2 61/4 61/11 61/12
 61/17 87/13 87/15
how [34]   4/22 7/22 7/23
 7/25 9/21 11/8 17/11 21/6
 23/3 23/4 23/6 28/15
 34/18 34/20 34/21 34/24
 37/11 41/8 41/8 43/21
 45/18 49/14 49/17 54/23
 61/24 63/14 64/13 68/24
 70/19 73/15 78/16 85/4
 87/13 87/20
huge [1]   27/7
Hughes [2]   24/23 24/25
hundred [7]   7/21 8/21 9/1
 9/3 32/21 33/19 73/18

**I**

I'd [1]   57/15
I'll [11]   4/1 4/2 6/2
 40/1 40/5 40/25 49/3
 49/17 51/22 52/14 59/4
I'm [43]   5/19 5/23 12/13
 14/2 14/3 14/18 15/23
 20/11 22/1 24/5 24/5 24/6
 24/20 25/17 26/9 26/21
 28/2 28/5 28/14 31/13
 32/8 34/9 43/17 51/13
 53/3 54/7 54/15 54/24

**I**

I'm... [15]  56/14 59/13 60/3 61/13 63/4 63/7 66/11 66/15 76/15 78/19 79/21 80/11 82/14 83/23 86/1
I've [11]  4/2 10/15 11/12 12/4 12/4 34/20 42/4 43/10 48/19 64/14 70/4
I-N-D-E-X [1]  92/1
idea [1]  56/17
identified [4]  15/12 16/4 17/14 50/3
identify [4]  16/10 16/13 18/4 20/3
illegal [5]  9/8 19/8 49/9 66/6 73/23
implementation [1]  7/7
implemented [1]  89/1
implies [1]  10/21
imply [1]  46/14
important [5]  26/2 47/18 48/8 50/7 80/15
imposes [1]  72/13
improper [1]  13/1
inartful [1]  70/20
include [3]  47/24 65/10 66/13
included [1]  65/8
includes [1]  64/6
including [1]  38/9
income [31]  26/4 26/8 26/11 26/14 26/22 26/25 27/8 28/20 33/10 33/25 38/10 39/4 39/10 39/23 40/4 42/1 47/24 47/25 48/2 48/13 52/20 52/21 53/8 53/16 53/19 53/20 71/9 71/10 71/25 73/12 73/22
incomplete [1]  58/6
incredibly [3]  42/4 42/4 42/5
independent [7]  9/12 62/18 71/15 71/18 71/19 72/1 88/1
independently [1]  86/3
indicate [3]  31/16 32/13 32/14
indicated [5]  13/22 27/16 50/6 58/8 59/14
indicates [3]  14/22 18/18 24/25
indicating [2]  46/12 57/8
individual [1]  27/18
individuals [1]  26/11
informal [1]  5/23
information [11]  15/5 45/3 60/23 62/4 65/18 65/20 65/20 67/9 68/1 69/3 72/23
informed [1]  72/24
infrastructure [1]  21/21
inherent [1]  22/21
initial [1]  25/1
initially [2]  47/11 84/12
insolvent [1]  24/10
install [1]  87/11
instead [2]  28/20 33/10
instituted [1]  88/16
instructions [1]  49/24

intend [1]  50/5
intended [5]  29/8 30/5 35/23 36/15 39/6
intending [1]  58/6
intends [2]  4/24 12/18
interested [4]  11/16 77/6 77/7 93/10
internet [7]  9/11 36/21 43/13 46/24 47/1 56/12 78/1
interpret [1]  53/21
interrogating [1]  43/24
interrupt [2]  61/13 73/1
interview [1]  11/11
introduce [8]  4/23 12/18 14/2 51/13 52/24 56/21 58/6 81/10
introduced [4]  12/17 15/4 27/22 81/6
introduces [1]  51/25
introducing [1]  14/5
introduction [1]  60/1
inundated [1]  86/25
investigate [1]  77/22
investigation [1]  55/1
investigations [1]  76/12
investigators [1]  84/25
investment [2]  68/18 68/18
investments [2]  68/16 68/16
involved [4]  84/10 84/15 85/4 88/3
irrelevant [5]  25/14 25/16 25/17 25/20 25/22
is [251]
isn't [9]  10/4 15/2 22/13 23/1 26/5 28/9 39/12 75/18 75/21
issue [9]  5/23 7/12 7/14 7/17 8/1 25/10 47/10 66/3 66/4
issued [1]  45/12
issues [14]  17/6 17/8 17/11 17/23 46/16 60/25 64/3 65/16 65/23 84/20 84/22 86/18 87/1 87/1
it [222]
it's [46]  5/19 12/15 12/17 12/24 13/1 13/13 13/21 14/10 14/11 15/18 15/21 18/21 19/2 21/19 25/17 25/22 26/2 26/20 34/22 34/23 40/13 41/15 42/9 42/9 42/15 42/21 43/6 47/12 47/18 48/8 48/12 49/17 50/7 53/11 57/12 66/6 68/23 69/19 69/21 71/10 75/17 80/8 81/12 82/16 83/3 91/13
items [1]  65/10
its [13]  6/18 15/10 28/13 28/17 29/3 30/5 30/19 34/4 35/23 36/15 42/25 68/4 79/11
itself [3]  57/12 88/17 89/16

**J**

jargon [1]  71/11
Jerry [2]  14/22 27/24
Joan [1]  24/23

job [3]  78/7 84/10 88/21
John [1]  82/10
join [6]  58/4 58/12 58/15 58/22 58/25 79/8
joining [1]  31/17
JONATHAN [3]  1/21 3/6 5/24
journey [1]  53/11
Juan [1]  27/18
JUDGE [11]  1/12 5/13 6/5 10/6 11/8 14/3 34/9 49/18 51/18 58/10 80/21
July [9]  27/13 27/15 36/24 37/19 38/15 43/18 50/21 52/14 60/16
July 30th [7]  27/15 36/24 37/19 38/15 43/18 52/14 60/16
jumping [1]  65/24
just [60]  3/13 4/16 4/23 6/2 13/2 13/10 20/19 20/19 21/16 23/17 24/13 25/12 28/1 28/20 28/23 31/13 34/7 34/9 38/16 38/17 39/5 41/1 42/13 42/14 45/2 46/24 48/12 51/3 51/9 51/18 52/3 52/11 52/24 54/1 56/16 56/25 57/15 58/8 59/13 60/12 61/10 63/5 66/14 67/11 69/17 70/19 72/6 74/2 74/7 76/15 77/6 80/25 81/2 83/10 83/13 86/25 88/2 88/15 88/24 90/5

**K**

Kay [2]  26/18 27/9
keep [4]  3/23 38/5 79/4 86/21
Kerr [1]  91/19
kind [2]  56/17 86/21
kinds [1]  45/16
kit [2]  27/7 27/10
kitchen [1]  14/5
knew [1]  25/1
know [20]  7/18 12/21 13/2 23/6 28/12 32/4 34/3 34/10 45/20 46/17 47/1 49/17 58/12 63/4 70/19 75/8 83/8 83/9 83/10 83/16
knowing [2]  21/10 63/21
knowledgeable [1]  72/22

**L**

La [2]  24/14 24/16
lack [5]  87/4 87/4 87/6 87/6 87/6
lady [1]  26/23
land [4]  15/13 16/5 16/6 44/8
LANE [2]  1/6 3/3
language [5]  24/17 55/9 66/23 70/12 72/20
large [3]  26/9 46/25 81/22
larger [1]  81/19
Las [1]  61/19
last [9]  9/16 30/2 58/16 72/25 73/2 74/7 74/9 74/9 82/22

**L**

late [1]   84/6
later [3]   17/24 18/9
  84/14
law [21]   4/18 6/20 7/3
  7/4 7/12 7/17 8/1 8/7
  19/19 26/9 33/13 34/4
  39/1 39/8 44/2 44/21 45/5
  46/3 46/12 62/18 62/22
laws [10]   7/9 7/11 7/15
  26/25 30/15 38/12 44/8
  45/25 46/13 48/1
lawsuits [1]   35/1
lawyer [7]   4/18 4/19 5/1
  5/11 45/7 76/22 76/24
lawyers [3]   35/2 35/8
  44/11
lead [1]   85/25
leaf [1]   81/19
learn [9]   28/16 29/2
  29/24 30/7 31/25 43/3
  44/10 55/1 55/4
learned [4]   46/6 63/6
  65/16 65/18
least [4]   23/12 24/1 24/3
  61/17
leave [1]   67/8
leaves [1]   49/21
left [5]   5/20 5/22 6/17
  31/9 58/25
legal [13]   4/25 8/5 17/6
  17/8 17/11 17/23 19/20
  38/11 44/7 46/7 46/11
  66/3 71/11
legality [4]   6/18 17/19
  67/7 67/17
legally [2]   7/7 9/9
legitimacy [1]   73/25
legitimate [14]   26/12
  28/7 29/23 30/14 30/21
  32/11 35/23 36/12 36/14
  48/9 50/24 66/25 86/1
  88/23
length [1]   60/22
lengths [1]   63/15
less [3]   40/14 85/3 87/13
let [16]   8/15 10/10 16/20
  16/23 20/13 30/24 32/3
  32/13 41/22 41/23 48/6
  51/4 75/21 76/6 79/15
  85/13
let's [12]   17/17 23/7
  25/12 31/25 34/23 38/18
  42/17 43/3 44/14 49/19
  51/9 83/10
letter [19]   7/1 7/6 10/20
  11/21 12/2 13/12 13/13
  13/17 13/19 14/19 14/22
  15/6 15/12 15/16 16/7
  18/3 75/10 76/1 81/4
letterhead [7]   12/2 12/4
  12/6 12/8 13/3 14/19
  14/20
letters [2]   35/3 77/7
level [5]   26/10 39/10
  40/6 70/18 73/8
levels [2]   73/8 73/9
Levine [13]   11/11 11/13
  11/14 11/16 11/18 11/19
  11/24 13/19 16/21 27/21
  46/1 46/5 46/6

liable [1]   44/3
liaison [1]   84/18
life [1]   16/15
like [11]   13/3 40/24
  47/15 49/15 51/20 53/19
  53/23 56/5 56/10 57/15
  63/5
limit [11]   54/23 54/25
  55/4 55/7 55/11
  55/23 55/25 56/3 56/5
  56/13
limited [3]   44/13 68/21
  68/21
limits [2]   55/20 56/5
lines [2]   87/9 87/11
link [2]   15/5 90/16
list [2]   17/17 50/9
listed [1]   64/25
listening [1]   80/22
litigation [3]   4/19 62/23
  66/3
little [5]   5/19 35/21
  64/15 64/16 65/2
live [4]   82/11 82/12 83/5
  83/6
living [1]   16/16
LL [1]   14/23
local [1]   88/4
locate [1]   67/2
logged [1]   90/1
Lone [1]   45/7
long [4]   40/12 45/18
  47/23 63/14
look [19]   5/24 11/19
  11/21 12/9 13/2 15/1 15/9
  17/24 18/24 30/16 36/11
  45/1 45/1 45/2 50/15
  52/18 52/24 64/7 68/10
looked [13]   10/22 10/24
  17/14 17/14 17/15 17/19
  18/1 30/13 35/8 35/12
  35/15 36/13 66/14
looking [8]   21/11 21/19
  35/21 35/22 37/23 60/22
  60/23 67/16
loose [1]   81/19
lost [2]   74/2 79/21
lot [1]   65/24
low [1]   5/23
ls [2]   31/20 31/20
lunch [2]   91/12 91/13
Luncheon [1]   91/18

**M**

machine [1]   2/6
made [6]   3/24 21/16 33/9
  45/8 49/6 78/19
mail [16]   18/12 18/17
  18/21 18/25 19/18 19/24
  20/4 20/7 21/23 24/22
  24/25 36/21 75/10 75/17
  75/22 75/24
mails [47]   3/20 17/21
  17/24 18/8 19/19 21/23
  22/3 24/20 33/12 33/21
  33/25 34/4 34/17 34/18
  34/21 34/24 35/8 35/19
  36/18 36/20 36/21 62/24
  63/1 63/3 63/8 63/9 65/17
  65/17 65/20 75/15 75/22
  75/24 76/2 76/4 76/7 76/9
  77/10 77/12 77/18 77/23

77/24 78/2 78/4 78/5 78/6
  78/9 78/12
main [3]   74/15 85/3 91/2
make [20]   5/7 7/5 16/21
  19/7 25/12 25/13 26/2
  43/1 48/9 48/12 55/16
  58/5 70/23 71/12 72/24
  73/17 75/12 80/12 81/22
  88/22
makes [2]   8/20 53/22
making [2]   44/16 81/2
man [2]   83/9 83/9
manifest [1]   15/15
manner [1]   72/22
manning [1]   86/17
Manual [2]   17/20 55/7
many [11]   22/18 23/3 23/4
  23/6 43/14 46/7 54/23
  73/15 85/4 87/13 87/20
marked [2]   5/24 57/7
marketing [16]   14/23
  19/20 26/3 28/8 29/23
  30/15 38/12 39/9 39/10
  39/14 40/1 40/9 45/5
  50/24 59/16 59/23
Marriott [1]   22/6
Mary [2]   26/18 27/9
Masons [1]   22/7
materials [3]   7/15 17/10
  61/5
matter [5]   4/6 5/18 14/8
  61/18 93/6
matters [1]   3/14
may [25]   3/22 10/8 12/9
  13/10 27/6 27/6 28/5
  31/18 31/21 34/25 46/25
  52/18 52/18 52/19 52/19
  54/2 58/13 60/8 61/12
  61/12 74/21 75/14 76/14
  79/20 88/24
maybe [3]   42/7 65/9 91/11
me [91]   5/25 7/7 8/15
  10/10 11/12 11/12 11/18
  12/9 15/4 15/4 15/5 16/2
  16/20 16/21 16/22 16/23
  17/2 17/10 18/3 19/12
  20/10 20/13 21/3 21/20
  22/4 22/24 27/22 30/23
  30/24 32/3 32/10 32/13
  33/2 33/3 33/5 33/5 34/13
  35/15 36/14 37/25 38/17
  39/17 39/20 40/1 40/5
  40/5 41/8 41/15 41/22
  41/23 41/24 42/5 42/15
  43/17 43/24 43/24 44/1
  44/14 44/23 45/2 46/5
  46/17 47/15 48/6 48/7
  48/16 53/4 57/16 64/1
  66/4 68/9 72/9 74/11
  75/21 76/6 77/3 77/25
  79/15 81/4 84/22 85/13
  85/25 86/4 86/6 91/10
  93/4
mean [14]   23/17 23/19
  25/7 32/24 38/3 46/14
  64/17 67/11 69/12 69/13
  69/20 71/17 75/18 89/1
meaning [1]   64/22
means [3]   20/5 71/12
  71/18
meant [2]   19/16 20/1

**M**

measures [1]   88/14
mechanism [1]   89/6
meet [1]   38/11
meeting [5]   18/3 22/24
  27/22 56/1 61/2
member [23]   3/20 4/24
  10/9 17/19 27/11 37/24
  47/11 47/13 48/13 49/2
  69/24 70/7 70/15 70/22
  71/1 72/18 72/18 73/3
  73/6 75/22 89/7 89/23
  89/24
members [31]   18/6 19/2
  19/7 22/20 23/13 30/19
  30/19 33/19 34/25 35/3
  35/9 38/5 38/7 38/19
  42/25 43/3 48/12 61/10
  63/4 64/2 65/13 68/4
  73/13 73/15 73/18 75/17
  77/8 78/7 86/19 86/20
  88/18
membership [5]   33/16
  33/18 33/22 35/17 36/1
memorandums [1]   6/7
memos [8]   35/3 35/9 35/12
  35/13 35/14 35/15 35/20
  77/7
mention [3]   46/18 52/16
  53/22
mentioned [3]   4/8 53/11
  80/10
mentions [2]   68/20 80/16
merely [1]   54/13
merging [1]   70/12
met [5]   11/17 11/20 11/25
  37/2 52/4
Miami [5]   1/23 44/21
  44/24 46/12 46/15
MICHAEL [2]   1/18 3/6
mid [1]   84/6
might [11]   6/7 6/8 14/5
  35/18 47/9 51/12 51/14
  56/16 65/13 79/12 79/25
miles [1]   83/3
military [1]   83/20
mind [3]   16/11 66/1 68/8
mine [2]   8/15 16/6
mines [2]   15/13 16/5
minimum [2]   7/8 62/7
minor [1]   70/12
minute [5]   10/3 25/18
  54/1 76/14 88/25
misrepresentations [1]
  74/14
miss [1]   25/13
missed [2]   26/24 29/1
missing [2]   79/7 80/23
misunderstanding [2]
  65/21 78/8
MLM [2]   46/2 46/8
mode [3]   61/20 61/20 62/1
model [10]   9/8 9/9 10/11
  37/9 37/12 37/20 40/20
  47/20 62/20 70/17
modest [3]   27/6 27/11
  73/9
modifications [1]   38/1
modified [1]   47/5
modify [1]   28/15
moment [3]   12/17 60/12

77/14
Monday [1]   69/10
money [22]   4/9 7/20 8/9
  8/11 9/3 22/17 22/19 23/5
  32/22 38/6 38/7 38/8 43/6
  43/8 43/11 53/14 53/16
  56/9 63/11 70/23 71/12
  71/14
month [4]   43/5 63/16 64/1
  64/11
monthly [1]   73/9
months [2]   63/16 85/22
more [19]   6/3 8/9 8/11
  9/3 14/25 28/1 37/24 38/3
  39/6 40/12 47/10 65/8
  65/9 66/21 70/11 85/3
  87/9 87/11 87/13
morning [1]   3/7 3/8 3/9
  3/10 3/16 3/17 4/15 6/15
  6/16 82/7 82/8
most [6]   5/8 6/9 13/6
  17/3 62/7 77/5
motion [4]   1/11 4/7 18/13
  18/13
motions [2]   6/6 75/16
Motors [1]   8/4
move [5]   44/4 57/11 61/14
  64/7 65/25
moves [1]   56/23
moving [1]   68/25
Mr [10]   9/6 45/11 45/12
  45/13 45/15 45/16 58/9
  92/5 92/5 92/8
Mr. [109]
Mr. and [1]   45/23
Mr. Bill [1]   27/21
Mr. Boa [1]   46/1
Mr. Bowdoin [43]   13/15
  13/20 13/20 15/2 16/8
  16/22 16/22 21/3 21/6
  21/9 22/9 22/12 22/24
  29/14 29/17 37/2 37/7
  37/11 37/14 37/18 37/22
  41/18 42/21 42/24 43/15
  45/10 45/18 45/23 46/1
  46/7 46/11 46/18 50/20
  51/5 51/7 51/21 52/3 53/2
  54/19 54/22 55/22 56/1
  78/13
Mr. Bowdoin's [3]   24/12
  29/20 55/8
Mr. Cowden [12]   5/15 13/1
  13/7 49/13 53/3 54/15
  57/21 58/1 75/12 76/17
  79/12 80/14
Mr. Fayad [1]   81/3
Mr. Garner [8]   27/17
  37/25 44/5 51/6 52/1 52/1
  61/7 80/16
Mr. Grayson [4]   19/25
  20/7 20/9 81/18
Mr. Haze [1]   28/3
Mr. Levine [4]   13/19
  16/21 46/5 46/6
Mr. Nehra [15]   6/15 8/25
  13/13 13/14 13/20 13/21
  14/18 50/2 50/2 50/15
  59/13 60/13 77/2 77/18
  81/4
Mr. Nehra's [1]   14/4
Mr. Osmin [7]   82/11 83/1
  83/19 86/15 87/13 87/16

87/20
Mr. Peterson [2]   61/7
  61/25
Mr. Robert [1]   18/22
Mr. Schwartz [4]   4/15
  4/16 4/17 4/21
Ms. [2]   24/25 81/13
Ms. Hughes [1]   24/25
Ms. White [1]   81/13
much [10]   4/5 6/1 7/22
  7/25 38/9 49/14 56/12
  64/13 78/19 82/20
multilevel [24]   9/10
  19/20 26/3 26/11 26/14
  26/19 26/22 26/25 28/7
  29/23 30/14 38/12 39/9
  39/10 39/11 39/14 40/1
  40/9 45/4 50/24 59/15
  59/23 64/3 71/22
must [3]   13/8 23/12 26/24
MUTHYALA [2]   1/15 3/5
mutual [1]   11/10
my [66]   4/17 6/3 6/23
  7/14 7/15 8/5 8/6 9/17
  10/5 18/9 20/25 21/14
  23/2 24/9 25/9 25/16
  28/14 28/15 28/25 29/13
  30/23 31/6 33/8 33/8 38/8
  38/8 39/5 39/18 41/18
  42/9 42/9 42/12 43/25
  44/11 44/12 45/4 46/10
  48/7 50/9 54/2 56/1 56/14
  61/5 61/9 61/11 64/14
  66/1 66/23 66/23 66/24
  70/4 70/9 70/13 70/13
  70/20 77/25 79/15 79/17
  80/7 82/18 83/6 83/6 85/6
  86/3 88/4 93/3
myself [1]   16/21

**N**

NA [1]   27/24
name [4]   82/9 82/22 87/25
  90/21
named [4]   11/11 27/18
  28/1 35/1
names [2]   27/23 28/2
national [1]   22/9
nationally [1]   27/5
nationwide [1]   38/12
nature [1]   87/23
Navy [3]   83/22 83/23
  83/24
necessity [1]   23/14
need [18]   6/8 23/4 23/12
  24/1 24/2 24/2 42/18
  42/20 49/14 54/5 54/19
  66/1 73/1 83/8 83/10
  83/15 84/17 86/5
needed [5]   11/6 31/16
  60/25 90/3 91/5
needs [3]   4/19 53/2 53/3
negate [1]   25/10
NEHRA [20]   6/12 6/15 8/25
  9/6 13/13 13/14 13/20
  13/21 14/18 14/22 27/24
  50/2 50/2 50/15 59/13
  60/13 77/2 77/18 81/4
  92/4
Nehra's [1]   14/4
neither [2]   66/25 93/7
net [2]   48/14 48/18

## N

network [1]   14/22
never [6]   16/6 16/7 37/2
  43/10 60/2 85/25
new [6]   17/19 19/7 39/17
  61/23 86/23 91/11
news [7]   30/16 30/25 34/4
  90/11 90/13 90/15 90/16
next [7]   57/23 58/1 58/2
  61/6 61/7 72/11 79/2
no [75]   1/4 5/12 8/2 8/15
  8/17 8/18 8/25 10/10
  10/12 11/6 12/1 12/23
  13/16 16/6 16/12 17/6
  17/23 19/11 19/14 20/20
  21/9 22/15 22/16 22/16
  23/11 24/15 24/18 24/19
  25/19 25/21 26/17 27/7
  28/5 29/17 30/9 30/17
  31/10 31/20 34/11 37/10
  37/13 39/23 43/8 43/18
  46/17 46/17 54/25 56/1
  57/1 57/2 57/17 59/6 60/6
  63/23 63/23 63/23 69/14
  69/21 72/10 72/10 74/13
  75/11 75/17 76/4 76/5
  80/2 80/17 80/19 80/21
  80/24 81/11 85/9 85/20
  92/13 92/13
nobody [2]   21/19 58/15
None [1]   19/8
normally [1]   17/10
Nos [1]   92/18
not [130]
note [1]   80/22
notes [3]   61/9 70/4 93/4
nothing [2]   59/15 78/17
notice [1]   58/14
notion [1]   90/9
now [29]   6/3 6/11 8/19
  9/18 13/7 17/5 20/23
  21/10 24/20 25/18 29/3
  29/4 29/8 31/25 36/24
  40/20 43/5 58/4 62/21
  65/2 68/25 76/4 78/20
  79/10 85/12 86/7 89/8
  91/12 91/13
number [26]   15/12 16/4
  25/23 42/6 56/18 57/5
  59/11 68/13 68/23 73/16
  79/5 79/21 79/21 79/23
  80/4 80/13 81/10 81/12
  81/14 81/16 81/19 81/20
  81/23 81/23 84/19 85/2
numbered [2]   3/23 3/25
Numbers [1]   82/2
numerous [1]   17/7
NW [2]   1/16 2/4

## O

o'clock [1]   49/12
O-S-M-I-N [1]   82/23
oath [1]   9/7
object [8]   13/14 15/17
  36/4 42/16 57/20 58/5
  58/7 80/21
objection [22]   5/12 13/11
  34/11 52/23 53/5 53/24
  53/24 54/2 54/17 57/1
  57/2 57/13 57/14 57/17
  74/16 80/2 80/17 80/19

obligation [1]   72/12
obvious [1]   88/24
occasion [2]   65/13 67/16
October [1]   1/6
off [4]   7/25 18/11 61/19
  61/22
offer [4]   79/19 79/22
  80/9 80/13
offered [4]   15/18 15/18
  15/21 24/19
offering [2]   68/16 68/16
office [6]   6/10 46/24
  46/25 47/2 58/13 89/25
offices [2]   87/4 87/6
officials [1]   17/16
often [2]   55/15 74/3
okay [12]   25/12 29/2
  34/21 44/22 47/17 49/17
  51/9 59/8 62/3 64/20
  69/14 81/1
once [2]   89/13 89/17
one [56]   1/22 3/13 4/17
  6/6 9/3 17/4 19/22 26/1
  27/4 30/20 32/3 33/4
  33/16 33/21 34/16 35/12
  35/16 35/25 36/1 36/11
  36/13 36/18 37/6 38/9
  40/2 42/6 47/5 48/5 50/4
  51/22 53/21 55/20 55/24
  56/4 56/19 58/3 58/4
  58/19 61/10 61/13 63/16
  67/2 70/9 70/12 70/19
  75/16 75/18 76/22 76/24
  77/14 79/5 79/8 79/9
  82/13 90/21 90/22
ones [1]   73/24
only [18]   9/13 9/22 9/24
  9/24 12/4 19/16 23/15
  24/7 31/20 32/10 35/20
  38/5 41/11 41/19 46/4
  58/3 73/12 76/22
oOo [1]   91/20
operated [1]   38/15
operating [2]   26/3 45/18
operation [5]   6/19 16/10
  23/1 24/13 50/25
operational [1]   90/14
opine [1]   6/18
opined [1]   46/3
opining [2]   66/2 66/13
opinion [55]   8/6 10/13
  10/20 10/23 11/21 15/6
  18/3 19/20 22/25 28/7
  28/12 28/14 28/15 29/4
  29/13 29/22 30/13 30/23
  33/8 33/9 33/15 33/24
  34/3 34/10 35/18 36/17
  42/9 42/10 42/11 42/12
  42/14 44/21 44/24 45/1
  45/1 45/2 45/12 45/24
  46/11 46/15 46/15 46/17
  50/23 55/2 59/15 62/11
  62/11 62/12 62/15 62/17
  66/7 66/18 66/18 66/20
  66/24
opportunities [9]   26/11
  27/1 27/8 28/20 33/10
  33/25 47/25 48/2 73/12
opportunity [54]   5/7
  25/13 26/5 26/8 26/15
  26/19 26/22 27/9 27/16

29/9 29/10 30/22 32/12
  33/7 38/6 38/10 39/4
  39/10 39/12 39/12 39/16
  39/16 39/17 39/19 39/20
  39/23 40/4 40/10 40/20
  40/22 41/1 41/3 41/4
  47/24 48/14 52/20 52/21
  53/9 53/16 53/19 53/20
  58/22 68/18 70/6 70/22
  71/9 71/10 71/12 71/14
  71/20 71/25 73/22 86/4
  90/18
options [1]   61/21
oral [1]   46/16
order [9]   55/17 64/7
  69/25 79/4 80/12 84/21
  87/10 89/18 90/4
organic [1]   88/2
organized [1]   5/8
originally [1]   61/22
Osmin [13]   79/3 81/25
  82/4 82/10 82/11 82/23
  83/1 83/19 86/15 87/13
  87/16 87/20 92/7
other [32]   4/6 17/16 18/8
  27/23 31/21 32/25 33/1
  40/4 42/5 44/2 44/11
  44/11 48/6 48/8 56/18
  57/15 64/2 65/11 68/22
  70/15 72/11 72/16 73/8
  73/24 77/8 79/8 79/19
  80/9 80/15 86/1 90/22
  90/25
others [3]   3/23 41/18
  72/13
otherwise [1]   93/10
our [17]   3/11 4/7 5/11
  14/22 15/13 27/24 29/21
  49/2 50/5 50/10 86/4
  86/24 87/1 87/8 90/13
  90/18 90/24
out [22]   5/24 6/8 7/12
  11/6 16/18 19/3 20/15
  23/8 24/8 27/22 27/22
  45/12 48/14 51/12 58/25
  60/12 67/9 70/20 72/13
  72/19 87/25 89/21
out-of-pocket [2]   19/3
  20/15
outcome [1]   93/10
outset [1]   53/8
outside [5]   41/22 42/1
  43/7 44/2 83/1
over [21]   11/19 17/21
  23/7 25/2 25/6 27/4 36/21
  37/5 37/8 41/22 45/21
  46/23 49/15 50/15 56/12
  57/23 59/24 63/17 79/14
  79/16 86/20
overview [2]   90/2 90/3
own [5]   45/7 66/1 81/18
  89/11 90/19
owner [1]   11/7
owns [1]   11/14

## P

package [3]   19/23 22/3
  47/22
packages [8]   25/1 28/13
  28/17 28/18 29/3 29/3
  29/7 43/6
page [31]   18/12 18/17

80/20 80/24 81/8 81/11

**P**

page... [29]   18/18 18/25
 21/25 22/1 24/20 51/20
 57/8 57/22 57/23 58/2
 58/2 58/19 58/21 58/22
 68/11 68/11 68/25 69/1
 69/23 72/3 72/3 72/3 74/8
 79/10 88/19 89/22 90/1
 90/19 91/2
pages [7]   10/22 10/24
 11/2 13/13 57/12 57/16
 93/3
paid [18]   7/22 8/3 8/12
 8/20 9/1 9/21 20/16 20/24
 21/1 21/6 21/7 21/10
 21/18 28/17 41/6 43/3
 63/11 63/24
paper [2]   6/3 41/20
paragraph [18]   9/7 16/1
 68/10 68/13 68/15 69/2
 69/2 69/25 70/1 70/4 72/4
 72/5 72/12 72/15 74/7
 74/10 74/15 74/24
paragraphs [1]   69/3
paramount [2]   68/6 68/9
pardon [1]   43/17
parent [1]   11/15
part [22]   20/4 24/19 28/8
 28/17 33/11 33/25 36/17
 42/13 50/25 51/3 51/10
 51/18 52/3 52/16 58/13
 61/16 66/10 85/3 88/5
 88/16 88/17 88/19
part-time [1]   88/5
parted [1]   18/24
participant [2]   33/1 89/8
participants [1]   38/11
participate [7]   10/8
 22/20 29/16 29/18 32/15
 70/16 70/19
participated [1]   30/8
participates [1]   48/17
participating [9]   22/10
 26/19 29/25 38/19 39/11
 40/23 40/25 72/6 74/9
participation [1]   29/20
particular [6]   38/14
 39/17 42/20 46/2 57/20
 66/3
particularly [1]   54/6
parties [2]   49/15 93/8
partners [1]   4/17
pass [2]   5/25 79/25
past [3]   13/3 14/23 85/22
patient [1]   42/4
Patriot [1]   56/8
pause [4]   76/16 77/16
 91/8 91/12
pay [15]   8/9 23/21 23/23
 23/25 24/7 32/3 32/16
 32/20 37/16 39/20 40/13
 40/17 41/2 49/3 73/9
paydot.com [1]   90/21
paying [6]   7/20 21/3
 21/19 23/17 23/21 48/13
payment [1]   7/22
pending [2]   31/11 34/14
people [37]   7/20 8/13
 9/25 10/2 21/6 21/11
 22/21 24/3 26/1 27/23
 28/1 30/8 32/1 32/5 32/14

34/1 36/15 38/6 38/20
 38/25 39/11 40/23 43/12
 55/17 56/10 56/19 60/23
 67/7 68/21 70/16 71/25
 75/2 86/16 86/21 89/11
 90/17 91/4
per [3]   40/15 73/23 87/13
percent [33]   7/21 8/21
 9/1 9/3 19/4 23/8 23/9
 23/12 23/18 23/21 23/23
 23/25 24/1 24/8 32/22
 33/16 33/21 35/12 35/16
 36/1 36/1 36/11 36/13
 36/18 40/6 40/6 40/13
 41/5 42/2 42/22 49/3
 69/21 71/23
percentage [3]   24/3 73/20
 73/21
perform [2]   64/11 64/22
perhaps [2]   3/12 81/4
period [6]   19/7 19/9
 37/19 63/14 69/3 69/6
permission [1]   3/25
person [6]   22/6 32/24
 37/19 38/22 52/4 52/10
personal [3]   29/20 31/18
 55/8
personality [1]   79/5
persons [2]   9/14 9/22
perspective [1]   86/12
pertinence [1]   13/25
pertinent [1]   13/21
Peterson [3]   17/22 61/7
 61/25
Pharmacy [1]   87/24
phenomenal [3]   86/11
 86/12 87/4
Phillip [1]   4/14
phone [4]   37/5 37/8 61/7
 87/8
phones [1]   86/17
phrase [3]   71/10 71/15
 77/6
phrases [1]   28/23
pick [1]   30/20
Pilgrim [2]   2/3 93/13
Pinnacle [11]   11/14 12/2
 12/4 12/6 13/3 13/9 14/19
 14/20 14/24 15/1 15/4
place [6]   75/4 89/13
 89/17 90/6 90/12 91/8
plaintiff [2]   1/4 3/5
plan [10]   4/9 4/10 4/13
 4/14 4/22 7/6 9/13 9/22
 58/11 59/19
plane [2]   61/6 61/19
planned [1]   4/21
play [3]   32/2 32/6 32/8
played [1]   51/23
playing [1]   40/24
please [12]   5/25 20/20
 20/20 69/23 74/6 74/12
 76/2 76/21 77/6 82/9
 83/10 89/9
pleased [2]   30/6 30/10
plus [2]   18/8 33/12
pocket [2]   19/3 20/15
point [3]   21/2 45/6 45/8
 45/9 48/16 49/11 82/14
pointed [2]   45/12 78/5
points [1]   44/15
police [2]   88/12 89/6

Ponzi [15]   9/8 23/1 23/4
 26/15 42/11 42/14 42/21
 50/24 66/6 66/7 66/15
 66/19 66/21 66/24 66/25
pool [3]   69/5 69/8 69/17
portion [5]   18/25 50/3
 56/24 58/6 58/7
portions [1]   57/22
position [3]   21/12 21/14
 36/5
positive [7]   15/14 35/3
 35/9 35/14 35/20 36/22
 77/8
possession [1]   61/5
possibilities [1]   44/15
possibility [1]   7/8
possible [4]   6/7 38/10
 47/12 56/12
postal [1]   84/3
posted [1]   34/4
potential [6]   15/12 16/5
 17/25 26/7 30/19 38/8
power [1]   75/1
practice [2]   19/9 38/8
precise [1]   66/21
preliminary [1]   77/11
premium [1]   19/4
prepared [2]   80/14 81/18
present [2]   17/11 72/22
presentation [2]   5/4 5/8
presented [3]   12/12 19/18
 78/4
presenter [1]   45/13
president [2]   29/24 52/7
previously [2]   18/4 93/6
price [4]   47/21 47/23
 48/3 48/21
primarily [2]   18/2 26/10
print [2]   6/8 58/2
prints [1]   79/7
prior [11]   6/22 6/23 15/1
 15/7 15/9 37/2 60/1 63/1
 89/3 89/4 89/16
priority [2]   67/25 68/2
pro [1]   4/20
proactive [1]   15/14
probably [3]   17/7 47/7
 61/10
problem [2]   58/3 59/7
problems [7]   15/15 60/25
 65/20 78/12 86/13 86/15
 87/3
proceed [1]   15/23
proceeding [1]   13/1
proceedings [2]   2/6 93/5
process [1]   86/23
processing [1]   88/2
produce [1]   42/1
produced [1]   2/6
product [25]   9/11 22/14
 22/17 22/18 26/4 26/8
 26/12 29/9 29/9 30/9
 30/22 32/11 33/7 36/12
 43/12 48/4 55/11 55/11
 55/16 56/3 70/5 71/4
 73/25 87/23 88/9
products [5]   31/21 32/24
 88/7 91/2 91/4
professional [1]   88/6
profit [1]   7/25
program [60]   8/6 8/8 8/13
 8/19 9/24 9/25 10/9 11/7

# P

program... [52]   22/21
23/10 23/10 23/16 24/7
25/9 25/14 25/20 29/16
29/19 29/20 29/25 30/8
32/2 32/6 32/15 40/24
40/25 41/4 41/11 41/20
42/22 43/9 43/14 48/17
49/2 59/20 60/2 60/3 60/4
68/24 69/1 69/10 69/11
69/22 70/3 70/5 70/23
70/24 71/5 71/22 71/24
71/25 72/7 72/8 72/22
73/7 73/10 73/21 74/14
75/8 88/17
programming [2]   88/16
88/17
programs [8]   8/5 8/6
16/18 22/10 49/9 90/17
90/17 90/21
prohibit [1]   26/25
prohibits [1]   26/10
promise [2]   54/10 83/9
property [1]   18/14
proposed [2]   4/13 7/7
protection [1]   23/15
provide [4]   15/13 24/12
35/5 62/22
provided [4]   17/10 33/12
35/15 93/4
providing [2]   28/20 28/21
purchase [3]   25/5 25/7
27/7
purchased [1]   36/15
purchaser [2]   55/5 55/12
purchases [3]   19/7 22/11
55/21
purchasing [1]   25/1
purports [3]   30/24 31/1
32/17
purpose [5]   30/5 35/23
36/16 74/15 74/24
purposes [1]   5/4
pursuant [1]   4/9
put [13]   4/2 5/4 7/25 9/3
30/12 42/21 55/20 55/23
55/25 76/2 78/2 88/22
90/5
putting [2]   31/13 41/19
pyramid [7]   38/12 50/25
66/8 66/13 66/19 66/22
66/25

# Q

question [36]   8/15 10/10
10/21 16/2 20/14 20/19
21/9 21/16 22/12 22/13
28/22 28/24 28/25 29/17
31/8 31/11 32/4 32/9
34/14 36/4 36/8 38/16
41/23 42/19 42/20 42/20
45/20 54/16 54/17 57/20
63/7 64/19 66/17 70/21
74/18 78/16
questioning [3]   5/1 14/8
91/11
questions [8]   5/6 5/8
12/21 58/24 60/6 62/10
67/22 67/23
QUINCY [13]   1/6 3/3 10/25
27/13 50/20 52/5 52/14

67/8 82/19 83/1 83/5 84/8
88/21

# R

raised [2]   65/16 65/23
Ranger [1]   45/7
rather [1]   44/9
re [1]   21/12
re-evaluate [1]   21/12
reach [1]   49/7
reached [1]   36/14
read [10]   15/25 22/4 31/7
61/5 72/7 72/25 74/7
74/11 75/4 77/6
reading [1]   74/8
real [5]   83/8 83/9 88/7
88/7 88/7
realized [1]   84/17
really [8]   14/4 36/3
48/14 49/4 53/4 53/23
54/15 77/25
reason [11]   19/14 21/21
39/7 47/14 47/15 47/18
47/19 48/2 48/5 48/6 48/8
reasons [7]   12/25 44/3
44/3 55/20 56/19 58/8
70/9
rebate [53]   7/21 7/22
7/23 8/2 8/5 8/6 8/8 8/9
8/11 8/13 8/19 9/24 9/25
10/9 22/21 23/9 23/16
25/9 25/14 25/20 29/16
29/19 29/20 29/25 30/8
32/2 32/6 32/15 39/16
39/17 40/22 40/23 40/25
41/4 41/11 41/19 42/22
43/9 43/14 48/17 49/7
49/9 59/19 60/2 60/3
68/23 69/1 69/5 69/10
69/11 69/22 70/24 72/7
rebates [17]   8/20 8/25
9/21 9/21 20/23 20/23
21/1 21/3 21/10 21/18
21/19 22/11 23/13 38/19
68/19 68/21 69/16
recall [9]   3/22 7/19 14/6
18/15 28/5 30/17 43/23
51/5 76/4
recalling [2]   27/23 28/6
receive [2]   63/1 71/21
received [11]   17/3 43/4
57/5 59/11 62/24 63/3
63/9 65/17 77/18 82/2
92/11
receiving [3]   35/2 77/7
85/18
recess [2]   49/22 91/18
recognition [1]   59/4
recognized [2]   14/20 27/5
recollection [4]   14/9
14/12 14/13 15/18
recommend [1]   38/9
recommendation [1]   70/9
recommended [4]   11/11
11/21 33/6 65/22
recommending [5]   32/5
32/6 32/11 38/22 46/5
record [5]   31/13 34/23
34/23 79/6 80/12
recorded [1]   2/6
recover [3]   19/3 20/15
25/2

recovery [3]   19/5 19/15
20/1
redact [2]   82/14 82/21
Redirect [3]   60/9 60/10
92/2
reduce [1]   7/8
refer [1]   38/22
reference [1]   57/8
referenced [3]   46/12 69/6
75/15
references [2]   13/20
13/21
referral [7]   19/6 23/10
60/3 70/23 71/24 71/25
73/7
referrals [1]   72/23
referred [9]   11/8 11/10
18/8 32/25 38/21 38/24
63/8 67/8 84/24
referring [3]   26/15 26/21
58/17
reflected [1]   62/12
reframe [2]   20/13 36/7
refresh [1]   14/9
regular [1]   16/19
regulations [1]   44/17
relate [2]   62/15 62/15
related [5]   66/19 66/20
66/21 87/1 93/8
relates [1]   62/17
relationship [4]   44/5
45/10 68/3 71/19
relied [1]   35/7
rely [1]   44/12
remained [1]   85/14
remaining [1]   63/18
remember [9]   28/3 44/9
47/5 47/9 67/22 67/23
75/25 76/6 81/5
remembering [2]   28/2
54/24
Remind [1]   11/8
reminded [1]   81/3
render [1]   62/18
repeat [1]   38/17
rephrase [3]   28/22 74/21
89/9
report [1]   56/8
reported [1]   91/19
Reporter [1]   2/3
represent [2]   33/17 60/24
representation [6]   8/20
22/25 61/21 67/15 70/13
70/14
representative [4]   77/11
77/11 80/8 91/1
representatives [2]   9/13
39/3
represented [2]   39/15
60/2
representing [3]   20/9
21/18 39/9
request [11]   34/5 34/21
34/24 76/1 76/8 76/9
76/17 79/5 79/15 79/17
79/22
requested [1]   34/20
requesting [2]   75/10
75/22
requests [1]   84/19
require [1]   27/6
required [3]   55/8 68/22

**R**

required... [1]  87/10
requirement [7]  70/2 70/5
 72/12 88/10 88/13 89/7
 89/11
requirements [1]  38/11
Reserve [2]  83/24 83/24
respond [2]  5/8 84/21
response [4]  20/11 20/13
 57/19 62/2
responsibilities [3]
 69/24 70/7 72/5
responsibility [6]  69/24
 72/7 72/22 75/4 75/6 75/7
responsive [1]  42/5
rest [7]  24/2 49/25 51/4
 54/6 58/11 64/24 65/5
results [1]  36/16
retain [1]  11/12
retained [5]  17/9 17/24
 18/1 61/22 63/6
retainer [9]  16/14 16/25
 17/2 17/3 17/4 17/6 37/15
 46/9 81/20
retention [1]  61/4
return [2]  4/8 18/13
revenue [17]  23/8 23/9
 23/16 23/22 23/23 24/1
 24/2 24/4 42/22 43/7
 48/24 69/12 69/13 69/14
 69/15 69/17 69/21
revenues [3]  41/12 43/9
 43/11
reversed [1]  28/23
review [11]  7/15 13/12
 21/23 33/11 36/17 50/25
 55/2 62/20 64/14 65/8
 65/9
reviewed [12]  7/7 10/13
 10/16 10/21 11/2 19/18
 35/19 36/20 44/22 44/25
 67/6 67/15
reviewing [1]  62/3
reviews [1]  76/12
reward [2]  29/12 49/8
rewarding [1]  9/22
rewards [1]  9/13
right [112]
road [2]  18/7 38/1
Robert [1]  18/22
role [1]  18/9
Room [1]  2/5
ROSEMARY [1]  1/11
rotator [7]  32/7 87/18
 88/22 89/18 90/4 90/12
 90/24
roughly [2]  86/16 86/19
RPR [2]  2/3 93/13
rules [2]  44/17 44/20
run [1]  6/9

**S**

said [35]  7/3 7/6 7/11
 7/18 9/7 13/4 18/7 19/11
 19/12 26/25 33/10 38/17
 42/13 42/15 42/21 42/24
 43/24 44/16 44/21 45/16
 46/11 46/15 53/9 53/13
 53/14 53/15 53/16 53/18
 54/14 58/15 63/12 66/4
 66/17 69/20 73/3

salary [2]  85/19 85/22
sale [4]  35/23 48/9 49/6
 78/1
sales [9]  27/7 40/7 69/8
 69/10 69/12 69/12 71/15
 72/1 91/1
same [3]  38/20 38/22
 38/25
sample [2]  77/11 77/11
saw [9]  11/2 21/23 22/6
 47/3 50/4 52/13 54/19
 55/6 78/12
say [46]  5/22 7/10 7/14
 7/16 9/2 9/17 17/4 17/7
 20/19 23/11 25/5 25/12
 25/18 26/5 26/6 26/6
 26/14 31/25 32/14 32/18
 33/5 41/12 43/3 44/19
 44/25 45/23 47/12 49/2
 50/4 61/16 62/8 62/9
 66/21 68/15 68/19 69/11
 69/19 70/1 71/9 72/5 75/6
 76/3 76/6 85/8 86/7 87/3
saying [8]  7/19 25/17
 27/24 33/2 34/1 63/4
 69/16 75/5
says [22]  8/25 15/12
 15/16 16/1 19/1 20/23
 22/8 31/2 31/14 31/23
 32/23 32/23 34/25 36/2
 41/15 41/24 53/8 58/4
 69/7 70/4 72/6 72/21
scheme [10]  9/8 26/16
 66/6 66/8 66/8 66/13
 66/19 66/20 66/24 66/25
Schwartz [5]  4/14 4/15
 4/16 4/17 4/21
screen [13]  7/1 12/15
 18/15 31/5 31/6 34/22
 46/25 47/2 58/2 58/16
 58/24 76/20 79/7
script [1]  52/18
se [1]  73/23
seams [1]  87/5
search [2]  5/21 5/24
SEC [6]  44/3 44/17 44/20
 44/23 44/25 46/16
second [15]  40/6 41/22
 61/13 63/10 65/17 66/1
 66/12 67/12 69/2 73/1
 75/23 77/19 77/22 78/11
 82/13
section [7]  57/22 57/24
 58/2 58/3 58/5 68/25 85/6
securities [10]  7/3 7/4
 7/9 7/11 7/12 7/14 7/15
 7/17 8/1 46/13
see [16]  12/19 14/4 14/5
 22/6 24/7 25/3 31/10 48/6
 49/16 55/8 57/15 68/7
 68/14 77/2 77/4 89/13
seeing [4]  30/17 45/14
 76/5 76/6
seeker [3]  70/23 71/9
 71/10
seekers [1]  39/4
seeking [4]  4/8 14/2 14/3
 51/13
seem [1]  56/16
seemed [1]  56/18
seems [4]  32/13 32/14
 33/2 91/10

seen [16]  8/8 8/16 8/19
 8/24 12/2 12/4 12/4 12/6
 12/8 13/3 16/7 34/20
 39/18 55/10 57/9 85/25
segments [1]  44/9
seizing [1]  8/4
seizure [11]  61/20 62/2
 63/21 63/24 65/4 85/1
 85/14 88/15 89/1 89/2
 90/6
seizures [2]  85/17 86/9
self [1]  5/19
self-centered [1]  5/19
selfish [1]  5/19
sell [8]  33/7 47/19 47/21
 47/22 47/22 47/25 48/3
 49/1
sellers [3]  10/4 10/7
 10/11
selling [34]  9/9 21/12
 21/14 22/14 22/17 22/18
 25/10 25/15 25/21 26/4
 26/4 26/8 26/11 26/12
 28/9 30/21 33/10 33/11
 33/24 33/24 36/3 36/12
 45/4 47/20 47/23 48/20
 53/20 53/23 55/11 56/11
 64/4 67/1 68/17 88/1
sells [1]  72/18
send [7]  7/15 35/5 35/13
 49/4 75/18 76/2 89/21
sense [1]  74/15
sensitivity [1]  82/24
sent [5]  22/4 34/4 34/25
 36/14 77/24
sentence [8]  26/25 52/22
 67/20 72/11 72/25 74/7
 74/9 75/2
Senterfitt [6]  1/18 1/21
 4/18 6/25 33/13 34/17
separate [4]  38/4 38/5
 48/8 61/10
separated [1]  47/24
separately [1]  38/23
separation [9]  18/5 37/24
 38/3 38/10 39/6 47/10
 48/2 48/5 70/10
series [1]  58/1
service [53]  9/11 16/18
 17/20 17/20 18/2 18/5
 26/13 29/9 29/10 30/22
 32/12 33/7 37/23 38/21
 41/10 42/24 48/4 55/6
 55/7 61/9 65/9 65/21 67/2
 67/5 67/6 67/24 68/2 68/6
 68/10 71/3 71/4 73/25
 84/3 84/11 84/13 84/16
 84/18 84/21 84/23 84/25
 85/2 85/3 85/5 85/6 85/10
 86/12 86/24 86/25 87/1
 87/14 87/17 87/23 88/10
services [3]  24/19 62/22
 83/19
session [1]  91/19
set [3]  3/25 69/21 84/21
Shakley [1]  26/18
share [1]  6/3
sharpen [1]  79/15
shop [1]  85/18
short [4]  21/22 49/13
 49/19 63/19
shorthand [1]  2/6

**S**

shot [1]   58/24
shots [1]   59/1
should [5]   5/4 37/24 56/5
 62/2 91/12
show [12]   13/8 14/9 30/24
 31/5 31/6 39/21 40/1
 46/11 51/3 51/4 54/5
 89/24
showed [6]   10/17 18/3
 46/18 46/23 50/20 75/12
showing [2]   14/18 24/20
shown [7]   9/18 12/13
 46/17 47/2 65/17 76/1
 90/2
shows [1]   7/14
shut [1]   8/3
side [6]   39/23 39/25
 47/23 50/10 81/8 81/9
sign [2]   71/3 71/7
signatory [2]   13/15 13/17
signed [1]   18/21
significant [2]   48/5 48/6
significantly [1]   18/10
since [2]   19/16 85/14
sink [1]   14/5
sir [40]   3/12 6/11 9/17
 11/3 14/16 14/21 21/24
 21/25 23/1 23/20 25/25
 27/19 34/13 57/10 59/17
 60/7 60/14 60/18 60/21
 61/3 62/21 62/25 64/5
 67/5 70/15 74/6 76/23
 77/20 78/18 78/22 80/4
 82/9 82/11 82/22 84/2
 84/14 85/1 85/11 88/8
 91/13
sit [1]   76/24
site [5]   30/16 30/17
 90/11 90/15 90/16
sites [1]   90/24
Sitting [1]   67/19
situation [1]   21/22
six [10]   17/16 22/24
 37/14 43/19 60/17 60/19
 61/2 61/3 61/5 61/16
skimmed [1]   22/4
slander [1]   44/4
slashing [1]   50/9
slip [2]   53/4 89/8
slipped [1]   89/14
slow [1]   56/17
slower [2]   23/18 23/19
small [1]   83/1
snowball [1]   87/12
so [85]   5/1 6/1 7/25 10/6
 10/15 10/20 11/12 12/18
 13/2 13/14 15/5 15/9
 15/23 16/20 16/23 19/12
 23/11 23/25 25/6 25/12
 25/16 27/9 28/1 29/3
 32/24 33/17 33/21 34/19
 34/21 35/7 40/24 41/8
 41/14 41/20 44/7 44/12
 46/2 46/17 48/2 48/2
 49/17 50/3 51/22 54/16
 55/19 58/4 58/25 60/22
 61/1 61/13 61/16 61/17
 61/21 62/3 62/7 64/24
 65/2 65/25 66/14 68/5
 68/23 69/8 69/11 70/12

71/1 71/25 72/3 72/19
 72/23 73/12 74/3 76/9
 76/24 78/3 81/8 81/22
 82/14 82/16 84/21 85/9
 85/17 87/8 91/1 91/4
 91/11
software [3]   89/16 89/17
 89/20
sold [7]   27/2 29/7 30/9
 32/11 47/20 48/3 49/4
solicited [1]   36/21
some [29]   3/19 3/23 4/8
 8/12 10/8 11/3 15/4 17/15
 21/3 21/17 24/17 25/13
 27/10 32/25 33/1 37/5
 43/24 45/24 46/25 54/20
 61/16 65/16 66/9 70/10
 70/18 78/6 83/19 87/3
 88/20
somebody [9]   7/12 32/20
 32/20 54/23 56/3 56/4
 74/19 80/6 89/21
somehow [2]   63/6 81/23
someone [4]   42/5 48/17
 71/12 71/13
something [5]   6/7 29/1
 49/7 89/1 89/14
sometimes [2]   80/23 89/7
somewhat [3]   45/21 72/16
 72/20
son [1]   27/21
sorry [18]   12/13 20/12
 22/1 24/6 31/10 34/8
 43/17 53/3 60/3 61/13
 63/7 65/24 66/11 67/14
 68/11 74/2 78/19 83/23
sort [3]   4/24 25/4 70/20
sound [1]   53/23
sounds [1]   53/19
source [1]   43/13
South [1]   82/18
Southeast [1]   1/22
space [3]   86/24 87/4 87/6
Spanish [2]   24/17 24/18
speak [3]   16/8 27/20
 45/14
speaking [5]   28/3 28/5
 37/18 37/22 52/4
speaks [1]   52/1
special [1]   84/15
specialist [3]   44/23 46/2
 46/8
specialty [2]   6/24 46/8
specific [3]   70/10 70/11
 81/23
specifically [7]   8/6 8/13
 28/2 43/23 45/20 54/24
 69/6
speech [1]   52/22
spend [3]   38/7 71/14
 83/19
spending [1]   40/12
spent [7]   39/21 39/22
 43/24 60/17 60/22 62/3
 83/20
spoke [9]   15/2 17/15
 17/21 27/16 27/17 27/18
 37/14 43/15 61/6
sponsor [3]   72/11 72/13
 72/16
sponsors [1]   75/4
spread [1]   60/12

staff [1]   64/2
stand [4]   3/11 4/3 4/16
 49/21
standing [1]   39/19
start [4]   17/9 46/21 51/9
 84/7
started [5]   18/7 43/22
 53/14 61/9 86/16
starter [2]   27/7 27/10
starting [1]   38/1
starts [2]   18/18 51/5
state [5]   13/10 26/10
 26/25 41/11 54/2
stated [4]   43/14 66/16
 78/6 93/6
statement [13]   7/5 9/19
 9/20 15/19 17/19 19/10
 21/15 33/9 43/1 67/7
 67/17 74/9 89/15
statements [5]   67/24
 74/13 78/5 78/6 78/8
STATES [11]   1/1 1/3 1/12
 1/16 2/3 3/3 26/10 27/4
 47/20 50/16 93/4
stay [1]   78/19
staying [1]   5/12
stenographic [1]   93/4
step [1]   41/22
steps [1]   88/12
still [4]   9/20 23/21 59/5
 85/14
stop [3]   13/2 51/25 61/13
streamline [1]   49/25
Street [3]   1/16 11/15
 82/19
strengthened [1]   61/1
strike [4]   66/11 67/5
 78/3 82/15
structure [3]   60/4 65/22
 66/24
structured [1]   9/9
stuff [6]   34/1 55/21
 64/25 65/11 65/24 88/2
subdivision [2]   84/15
 87/14
submit [1]   79/13
submitted [4]   6/6 9/6
 24/21 55/3
submitting [1]   79/7
substance [4]   47/6 52/25
 53/2 77/22
substantive [2]   14/11
 15/19
suburb [1]   83/1
such [5]   7/6 35/5 60/24
 73/24 73/25
suffices [1]   36/2
sufficient [2]   50/3 72/23
suggesting [2]   30/18 32/1
suggestion [1]   49/24
suggestions [1]   31/21
suit [1]   52/11
Suite [1]   1/19
supplement [2]   79/6 79/17
support [7]   35/3 35/9
 44/7 76/2 76/9 77/8 86/2
supported [1]   75/24
supportive [3]   35/14
 35/20 85/24
supports [1]   42/7
suppose [2]   20/11 77/21
sure [12]   5/22 24/5 26/2

**S**

sure... [9]   28/15 44/16
 48/9 48/12 55/16 79/21
 81/2 88/22 89/10
surf [44]   7/20 24/13 28/4
 28/7 28/9 28/12 28/16
 28/19 29/2 29/5 29/15
 29/22 30/14 30/16 30/18
 32/1 33/2 35/1 35/2 35/4
 36/24 45/19 50/23 52/7
 52/19 54/22 55/4 55/23
 56/24 59/15 60/1 74/19
 77/9 84/7 84/10 84/14
 85/4 85/10 85/15 86/8
 88/18 89/11 89/19 90/4
SWORN [2]   6/12 82/4
system [2]   87/8 89/22

**T**

tab [2]   79/8 79/9
table [1]   5/23
take [12]   15/1 40/15
 48/16 49/13 49/19 51/5
 58/14 78/12 86/17 88/12
 90/14 90/18
taken [2]   93/5 93/9
taking [4]   7/20 40/13
 61/9 91/10
talk [4]   28/1 42/10 65/13
 83/10
talked [7]   6/17 41/18
 52/19 52/21 54/24 67/7
 79/7
talking [6]   18/11 25/5
 44/15 52/16 60/23 90/5
talks [3]   51/21 58/21
 58/22
Tallahassee [2]   83/2 83/3
task [3]   61/9 61/22 61/23
tasked [3]   78/10 78/11
 78/13
team [4]   4/25 44/6 45/3
 63/5
telephone [2]   27/17 87/11
tell [19]   6/3 11/16 11/18
 11/24 26/1 29/18 36/5
 43/15 43/21 43/21 45/10
 48/7 54/19 60/22 66/4
 75/8 82/9 86/15 90/3
telling [3]   41/15 44/6
 47/6
ten [5]   9/7 40/5 49/3
 49/20 71/23
tender [1]   51/22
tenders [1]   56/25
Tennessee [1]   87/25
tenure [1]   84/14
term [2]   21/22 71/10
terminals [1]   87/7
terminate [1]   75/2
terms [23]   17/20 18/2
 18/5 37/23 38/4 38/5
 38/21 41/10 42/24 55/6
 61/9 65/9 65/21 67/2 67/5
 67/6 67/24 68/2 68/6 68/6
 68/10 71/3 81/2
test [3]   14/11 14/13
 15/18
testified [10]   10/15
 10/20 11/12 18/4 42/13
 42/16 49/9 60/19 61/18

62/11
testify [4]   14/20 35/25
 36/6 36/10
testifying [1]   14/6
testimonials [2]   75/18
 79/22
testimonies [1]   76/18
testimony [24]   8/7 10/4
 10/5 10/6 13/22 14/4
 15/22 16/24 17/5 23/7
 25/4 25/8 25/9 25/14
 25/16 34/7 41/14 41/16
 42/9 54/12 59/18 62/10
 62/19 64/14
than [13]   6/3 6/9 8/9
 8/12 9/3 14/5 23/18 28/1
 40/12 40/14 42/5 73/21
 86/1
Thank [26]   4/5 5/14 5/16
 13/5 14/14 22/2 49/18
 50/12 50/13 53/6 60/7
 76/25 78/18 78/19 78/21
 78/22 80/3 80/5 81/24
 82/1 82/20 82/24 83/12
 83/17 91/15 91/16
thanks [2]   6/1 63/5
that [648]
that's [50]   5/1 7/22 8/25
 16/16 16/18 20/11 22/8
 23/14 26/20 31/7 31/14
 33/5 39/18 39/23 40/2
 40/9 40/16 41/17 42/3
 42/16 43/13 44/23 45/8
 45/8 46/10 50/19 52/4
 52/4 53/2 53/4 53/9 55/10
 59/2 59/9 59/21 64/16
 64/16 67/15 70/3 70/3
 72/10 73/14 75/11 75/11
 75/18 79/17 80/15 82/20
 90/7 91/6
their [29]   8/4 10/1 18/13
 19/9 22/11 22/17 23/5
 23/8 23/9 23/13 23/21
 24/1 24/3 25/6 27/9 28/2
 32/22 39/11 40/6 40/7
 42/22 75/5 75/7 78/8
 88/21 89/11 89/25 89/25
 90/19
them [18]   7/15 10/8 19/2
 32/7 34/18 34/19 34/20
 38/23 49/5 49/5 49/8
 64/17 64/18 64/21 76/2
 84/1 88/1 90/3
themselves [3]   15/15
 32/16 89/24
then [20]   4/13 5/5 12/19
 13/7 14/7 17/9 31/19 33/1
 33/4 49/8 51/6 51/6 54/5
 57/23 58/7 58/24 60/23
 61/17 73/6 73/8
there [51]   7/17 8/1 8/1
 16/2 16/17 17/9 22/19
 25/1 27/7 27/20 31/8
 31/11 31/21 32/23 34/14
 37/23 38/15 44/15 45/24
 51/25 55/7 56/2 66/7 66/9
 66/19 69/3 70/18 72/12
 73/18 74/13 75/9 77/4
 80/23 83/5 83/6 84/17
 85/9 85/12 85/16 86/19
 87/10 87/15 88/21 89/6
 89/12 89/20 90/11 90/12

90/16 90/17 91/4
there's [18]   26/9 31/19
 34/16 39/2 43/8 44/10
 46/4 47/13 51/16 57/1
 57/2 58/21 68/13 69/24
 73/8 73/24 80/17 81/8
therefore [2]   26/12 33/3
these [10]   9/18 13/23
 19/8 25/2 30/20 31/20
 32/17 33/4 35/13 58/18
they [103]
they're [18]   21/7 21/7
 22/13 22/18 23/8 23/17
 23/20 25/15 25/21 27/2
 27/4 29/8 40/17 41/4
 48/14 48/18 55/16 58/6
thing [2]   56/17 79/19
things [5]   15/8 26/1
 43/23 45/16 80/15
think [22]   4/19 5/3 12/25
 14/7 28/14 28/22 45/22
 46/6 47/18 49/16 53/3
 56/5 58/1 60/19 63/12
 64/8 66/14 66/14 74/17
 80/15 81/8 81/12
thinking [1]   91/11
thinks [2]   20/9 53/2
third [2]   1/22 69/2
this [100]
thoroughly [1]   13/12
those [48]   9/16 9/17 10/3
 10/3 10/4 15/8 19/4 19/5
 19/15 22/21 26/1 26/17
 31/17 33/25 34/3 34/18
 34/21 36/20 36/21 37/7
 38/1 40/13 40/17 44/9
 44/14 45/16 53/19 53/19
 63/9 65/10 65/23 66/16
 67/22 67/23 69/3 72/13
 77/22 78/2 78/6 78/7 79/7
 79/11 83/25 90/17 90/20
 90/23 90/23 91/4
though [4]   17/6 21/10
 35/18 89/6
thought [7]   18/5 38/16
 47/6 52/23 54/5 56/14
 73/2
thousand [12]   8/2 19/19
 19/22 33/12 33/19 33/21
 35/7 35/12 48/21 48/22
 48/24 73/18
thousands [1]   22/19
three [13]   62/5 62/7 63/3
 64/18 68/13 73/8 79/22
 83/6 83/24 85/23 87/9
 87/21 87/22
through [6]   3/19 17/17
 34/7 44/14 89/8 89/14
throughout [1]   62/10
throw [1]   32/7
Thursday [3]   61/11 61/17
 63/3
tilted [1]   35/21
time [34]   4/22 11/6 15/2
 21/4 25/2 25/7 27/24 28/6
 37/2 37/19 40/2 43/24
 47/9 54/23 55/24 60/22
 61/24 61/25 62/1 62/3
 69/4 69/6 76/22 83/19
 85/12 85/14 86/7 86/8
 86/19 87/9 87/10 88/5
 88/15 93/5

**T**

times [3]   38/21 43/14
 87/9
today [10]   16/24 35/25
 49/17 50/6 50/7 50/11
 59/9 59/18 67/19 78/5
today's [1]   50/17
told [17]   10/22 17/2 21/3
 22/23 22/24 42/15 43/16
 43/17 43/21 44/1 44/2
 44/5 44/23 48/19 49/6
 52/7 64/21
tomorrow's [1]   43/9
tongue [1]   53/4
too [2]   30/22 81/22
took [2]   88/14 90/13
top [2]   18/25 70/18
total [3]   61/5 62/3 62/5
town [2]   83/1 83/3
track [2]   79/4 79/21
traditional [4]   39/25
 40/9 40/11 59/15
train [1]   86/21
Training [1]   17/20
transcript [10]   1/11 2/6
 51/11 51/13 51/21 80/14
 80/24 82/14 82/16 93/3
transcription [1]   2/7
transferred [1]   84/22
transfers [1]   56/9
translation [1]   74/2
treat [1]   45/15
treatment [1]   88/3
trial [2]   4/18 4/25
trimming [1]   50/9
trips [1]   64/6
trouble [3]   31/25 32/5
 32/10
troubling [1]   30/23
true [4]   40/16 42/3 75/21
 93/2
truth [1]   75/8
try [7]   20/3 20/13 32/3
 38/18 70/13 75/21 79/15
trying [3]   5/20 48/16
 89/22
Tuesday [2]   69/8 69/8
Tuesday's [1]   69/10
turns [2]   48/14 51/6
twenty [8]   7/21 8/21 9/1
 9/3 32/22 41/5 41/25 42/1
twenty-five [6]   7/21 8/21
 9/3 41/5 41/25 42/1
two [32]   3/13 19/6 19/12
 19/16 28/23 30/20 31/20
 31/20 32/17 35/1 37/6
 47/5 47/7 49/11 60/19
 62/5 62/6 62/7 62/16 63/1
 63/3 64/13 67/9 67/9
 67/10 68/5 68/5 70/23
 83/22 83/23 85/22 91/14
type [3]   79/5 86/15 90/10

**U**

uncommon [1]   19/8
under [10]   9/7 56/8 65/14
 65/17 69/24 70/7 75/16
 77/21 78/11 84/23
underlined [1]   29/9
underlying [2]   21/21 33/6
understand [25]   7/23 7/24

12/20 13/24 14/10 15/25
 16/23 17/5 19/16 19/24
 20/4 20/23 21/1 28/24
 28/25 32/4 41/14 54/9
 57/21 72/8 73/2 74/4
 74/24 75/5 75/6
understanding [3]   19/14
 20/25 46/10
understood [2]   5/10 35/7
unequivocally [4]   41/11
 41/13 43/1 68/17
unfortunately [1]   86/20
unique [1]   46/3
UNITED [11]   1/1 1/3 1/12
 1/16 2/3 3/2 26/10 27/4
 47/19 50/16 93/4
unlimited [1]   64/1
until [3]   17/24 64/6
 79/13
untraditional [2]   59/19
 59/21
unusual [1]   19/8
up [30]   3/23 4/16 5/24
 7/14 7/21 8/20 9/1 10/17
 25/7 29/21 42/17 42/24
 45/14 45/21 49/24 59/5
 68/8 70/20 71/7 72/15
 72/19 76/20 79/21 80/4
 84/21 85/1 85/18 86/21
 89/24 90/12
upwards [1]   85/8
urged [1]   46/1
us [22]   3/23 3/24 4/11
 4/11 5/7 6/9 6/25 43/15
 43/21 46/4 50/19 58/23
 59/1 60/22 62/16 70/18
 79/9 81/6 82/9 82/17
 86/15 86/24
use [17]   4/3 13/8 14/3
 14/7 25/16 25/20 29/8
 32/8 40/25 42/6 48/20
 69/4 71/10 76/1 77/24
 78/1 89/22
used [8]   10/19 14/10
 14/11 16/6 29/12 30/5
 40/24 70/15
uses [1]   32/23
using [5]   12/22 13/14
 29/15 36/2 47/20
usually [1]   47/11
utilize [1]   19/1

**V**

vacuum [10]   47/21 48/20
 48/20 48/22 49/1 49/2
 49/3 49/5 49/5 49/8
valid [2]   33/7 48/18
value [1]   22/22
valued [1]   47/21
VASU [2]   1/15 3/5
Vegas [1]   61/19
venture [3]   45/16 66/6
 67/1
version [1]   24/17
versus [2]   3/3 71/13
very [13]   4/5 21/22 50/5
 50/6 50/7 51/18 52/21
 59/18 64/14 64/16 65/2
 73/21 78/19
vice [1]   4/20
video [30]   18/3 45/13
 46/18 46/21 46/23 47/3

47/4 50/16 50/19 51/1
 51/4 51/5 51/10 51/11
 51/17 51/23 51/25 52/3
 52/11 52/13 52/13 54/6
 54/7 54/14 54/19 54/20
 56/22 56/24 67/7 80/22
videos [1]   65/9
Vienna [1]   1/20
view [4]   21/6 49/11 68/22
 68/22
viewing [3]   20/24 21/7
 21/18
violate [2]   8/7 75/2
violation [1]   7/9
Virginia [1]   1/20
visit [3]   37/6 41/18
 67/16
vividly [1]   44/10
volume [4]   9/14 9/23
 43/12 71/20
voluntary [1]   85/16
vying [1]   6/9

**W**

W-W-W [1]   31/3
Wait [4]   10/3 12/16 25/18
 73/1
waiting [1]   34/13
want [15]   13/8 28/22 29/6
 32/15 33/3 38/17 48/12
 51/17 56/12 65/24 69/17
 70/19 72/9 73/20 76/15
wanted [6]   4/23 32/6 40/4
 44/4 79/5 90/18
wants [1]   13/2
warning [1]   89/21
warrant [2]   5/21 5/24
was [175]
Washington [3]   1/5 1/17
 2/5
watch [4]   46/21 51/17
 54/7 54/15
watched [5]   50/2 50/3
 52/3 52/11 56/25
watching [2]   80/12 80/22
water [1]   88/3
way [11]   5/5 6/9 7/24
 38/14 41/17 41/21 49/24
 53/21 81/6 85/13 90/12
ways [3]   70/16 70/19
 70/23
we [94]
we'll [7]   48/20 49/16
 50/10 54/5 81/22 91/13
 91/14
we're [9]   25/5 49/17 51/3
 53/1 56/19 58/17 79/21
 86/2 86/3
we've [5]   13/12 35/16
 49/10 70/15 73/24
wealthy [1]   86/3
web [7]   57/22 58/2 79/10
 88/19 89/22 90/19 91/2
website [37]   10/14 10/16
 10/19 10/21 10/24 11/2
 11/19 15/5 15/10 17/15
 21/2 29/15 30/1 30/3 30/4
 30/20 31/2 31/19 40/2
 57/8 58/7 58/18 59/5
 67/16 67/20 67/24 87/24
 88/9 88/13 88/18 89/7
 89/18 90/4 90/10 90/10

**W**

website... [2]   90/14 91/5
websites [12]   25/23 30/9
 30/21 32/1 32/7 32/11
 68/22 68/23 87/21 87/22
 88/22 89/12
Wednesday [2]   1/6 61/16
week [2]   87/13 87/15
weeks [5]   88/15 88/25
 88/25 89/2 90/6
welcome [1]   13/6
well [33]   5/3 9/21 12/11
 12/23 16/13 17/16 20/13
 23/7 25/5 28/16 32/8
 32/13 36/10 38/3 38/18
 42/10 42/17 44/24 53/1
 55/15 56/11 58/10 58/14
 61/4 61/4 64/17 65/11
 69/6 72/6 74/3 78/6 78/16
 80/11
went [18]   10/19 10/25
 15/2 16/4 16/8 16/24
 27/13 36/24 37/11 37/14
 43/15 43/18 50/20 52/5
 57/23 89/23 89/24 90/12
were [102]
weren't [3]   3/22 21/11
 88/20
what [95]
what's [2]   12/13 47/18
whatever [3]   12/25 78/12
 86/5
whatsoever [1]   30/9
when [50]   3/18 4/7 6/17
 7/11 7/14 8/2 10/24 11/2
 12/18 16/17 18/1 18/9
 18/11 18/24 19/18 19/24
 20/10 21/2 21/7 21/19
 26/3 26/14 27/13 27/21
 30/13 34/17 38/15 39/2
 43/15 46/6 46/23 47/12
 47/20 50/20 52/4 52/13
 52/13 60/15 61/19 62/10
 62/11 63/2 69/11 84/7
 86/8 86/16 88/24 90/12
 90/13 90/13
where [15]   8/9 16/18
 18/14 25/5 25/5 42/24
 43/6 47/11 51/21 52/3
 70/23 71/19 73/9 78/5
 82/11
whether [15]   22/13 25/15
 25/20 29/5 29/22 36/3
 36/12 42/6 45/25 49/16
 54/24 60/25 66/19 75/24
 81/6
which [27]   3/25 7/1 10/22
 13/22 18/7 19/1 35/16
 35/16 37/15 43/13 45/4
 56/24 58/19 58/23 62/15
 63/9 69/9 69/21 71/14
 78/2 78/6 80/10 83/21
 86/4 87/22 90/11 93/9
while [4]   24/25 27/20
 46/18 89/13
White [1]   81/13
who [50]   9/14 9/22 9/25
 10/2 11/11 11/13 13/17
 13/17 19/7 22/10 22/16
 22/19 22/20 22/23 23/4
 24/3 31/17 32/1 32/24

35/3 35/9 37/25 38/5 38/6
 39/2 39/3 39/11 40/23
43/17 47/10 47/10 47/13
 47/13 48/12 48/13 63/4
 68/21 71/12 71/13 72/13
 72/18 72/18 72/21 73/22
 75/2 77/8 83/5 89/11
 90/17 91/4
whole [4]   51/17 54/7
 87/24 88/1
whose [1]   27/23
why [20]   16/13 26/7 31/7
 32/20 33/3 36/7 38/24
 42/14 44/25 47/18 49/13
 55/14 55/20 55/23 55/25
 56/7 56/12 56/19 78/25
 85/21
wife [4]   28/18 83/6 85/22
 86/3
will [7]   7/7 8/20 9/1
 41/24 42/6 50/1 50/5
WILLIAM [2]   1/15 3/5
willing [1]   35/5
withdraw [5]   42/19 53/5
 54/16 57/17 76/13
within [2]   86/19 88/15
without [5]   58/7 76/5
 81/25 85/22 89/22
witness [28]   3/11 4/3 4/3
 5/5 6/12 6/18 6/21 12/14
 14/9 15/20 17/25 36/5
 49/21 50/9 54/13 62/19
 74/17 76/23 78/23 79/1
 79/2 80/6 80/7 81/15
 81/15 82/4 82/15 91/17
witness' [4]   14/11 14/13
 15/22 54/12
witnesses [3]   5/1 50/9
 50/9
won't [2]   5/1 79/13
wonder [1]   31/10
word [14]   16/6 25/16 32/8
 40/11 40/24 42/7 47/7
 52/17 59/21 76/1 76/4
 76/6 76/8 77/4
words [9]   9/16 9/17 32/24
 47/5 53/19 70/15 70/16
 70/20 80/23
work [24]   4/23 7/23 10/17
 11/13 39/18 45/15 61/11
 63/17 63/19 63/20 63/25
 64/10 64/13 64/21 64/22
 64/22 65/5 65/14 68/5
 68/7 84/3 85/21 86/2 86/5
worked [4]   14/24 37/12
 61/6 61/18
working [7]   15/13 63/2
 84/7 85/2 85/15 86/8
 87/14
works [1]   68/24
world [1]   35/21
worry [1]   54/8
worth [2]   63/25 68/5
would [107]
wouldn't [2]   30/23 88/19
written [5]   4/13 24/22
 25/24 46/14 46/16
wrote [1]   20/10
www.mobill [1]   31/19
www.paydot.com [1]   31/19

**X**

X-O-O-M-A [1]   88/4
Xooma [1]   88/4

**Y**

year [7]   17/4 45/21 45/22
 63/16 63/18 64/11 64/24
year's [1]   63/25
years [13]   14/23 14/24
 59/24 65/14 83/20 83/22
 83/22 83/23 83/23 83/24
 84/4 84/5 88/6
yes [155]
yesterday [22]   3/19 5/21
 6/17 6/25 7/3 7/11 7/17
 10/20 11/12 17/2 18/7
 18/11 18/14 18/15 18/24
 19/10 20/18 23/7 33/9
 33/15 67/19 78/4
yet [1]   81/9
you [501]
you're [21]   7/25 13/6
 13/7 20/10 25/18 26/3
 26/3 26/4 35/25 39/14
 41/14 47/20 47/23 48/16
 62/12 63/4 69/16 78/20
 80/4 90/5 91/13
you've [11]   16/14 25/23
 39/8 42/13 42/13 44/14
 49/6 59/23 61/17 76/12
 78/16
your [168]
yourself [1]   87/17

**Z**

zero [1]   48/18