# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08-1345 (RMC)** |
| ) | |
| **8 GILCREASE LANE, QUINCY** ) | |
| **FLORIDA 32351,** *et al.***,** ) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **ADSURFDAILY, INC, THOMAS A.** ) | |
| **BOWDOIN, JR., AND BOWDOIN** ) | |
| **HARRIS ENTERPRISES, INC.,** ) | |
| ) | |
| **Claimants.** ) | |

## MEMORANDUM OPINION

The United States alleges that Defendants – certain real properties in Florida and
South Carolina, and $53 million in funds from ten Bank of America accounts – are the proceeds of
wire fraud and subject to seizure and civil forfeiture *in rem* pursuant to 18 U.S.C. § 981(a)(1)(C).
Claimant AdSurfDaily, Inc. ("ASD") filed (1) an emergency motion for return of the funds so that
its business could continue to operate and (2) a motion to dismiss the complaint. The Court held a
two-day evidentiary hearing and now finds that it lacks legal authority under 18 U.S.C. § 981(f) to
order release of the seized funds and that ASD has failed to demonstrate that its assets are not
proceeds derived from unlawful activity. The Court also concludes that the motion to dismiss is
without merit. The motion for return of the seized funds and the motion to dismiss must be denied.

# I. FACTS

ASD describes itself as a multi-level marketing company that offers online advertising. It operates over the Internet (thereby engaging in transmissions by wire) at www.asdcashgenerator.com and through a related company, La Fuente Dinero, at www.lafuentedinero.com. According to these sites, ASD advertisers can earn large profits by (1) paying fees to advertise their own webpages, (2) earning rebates by surfing other advertisers' webpages, and (3) earning commissions by recruiting more advertisers to do the same. Compl. ¶ 15. ASD promotes its advertising program by offering advertisers a rebate of up to 125% on their advertising costs. The Government alleges that ASD does not sell any products or services sufficient to generate an income stream needed to support the rebates and commissions that it promises to pay its advertisers. *Id.* ¶ 17 [Dkt. #1].

On August 5, 2008, the Government filed its Complaint for Forfeiture *in Rem* under 18 U.S.C. § 981(a)(1) which authorizes the forfeiture of any property that constitutes or is derived from proceeds traceable to "specified unlawful activit[ies]," including wire fraud, 18 U.S.C. § 1343. *Id.* ¶ 1. The Defendant properties are certain real properties, including 8 Gilcrease Lane, Quincy Florida 32351; a condominium in Myrtle Beach, South Carolina; and personal properties consisting of approximately $53 million in funds from Bank of America accounts. *Id.* ¶¶ 4-5. The Government seized the funds in the Bank of America accounts pursuant to warrants issued by a United States Magistrate Judge. *Id.* ¶ 5.

The Complaint alleges that Thomas A. (Andy) Bowdoin, Jr., the President of ASD, owns the Defendant real properties and that he controlled the Bank of America accounts from which the assets were seized. *Id.* ¶ 6. The Complaint further alleges that Mr. Bowdoin, along with other

individuals not named, controls and operates ASD. *Id.* ¶ 18. Much of the rest of the Complaint is dedicated to alleging that ASD has been engaged in an illegal "Ponzi" scheme. *See, e.g., id.* ¶¶ 9-17.

On August 15, 2008, ASD, Thomas A. Bowdoin, Jr., and Bowdoin/Harris Enterprises, Inc. filed verified claims for the Defendant real properties and Bank of America funds that the Government seized.[1] *See* Verified Claims of Claimants [Dkt. # 6]. ASD claimed the approximate $53 million from the Bank of America accounts held by the Bank "in the names of Thomas A. Bowdoin, Jr., sole proprietor, d/b/a Adsurfdaily." *See* Verified Claim of ASD at 2 [Dkt. # 6-2]. The claim, signed by Mr. Bowdoin "(as President)," stated:

> Adsurfdaily, Inc. is the owner of the funds held on deposit at Bank of America in the names of Thomas A. Bowdoin, Jr., sole proprietor, d/b/a Adsurfdaily.
>
> All of the accounts were initially opened in the name of Thomas A. Bowdoin, Jr.
>
> The accounts and the funds in them were owned by Adsurfdaily, Inc. and were treated as corporate assets.
>
> The funds deposited into the bank accounts at issue were derived from the business operations of Adsurfdaily, Inc.
>
> Before the government served seizure warrants for the bank accounts at Bank of America, I had signed and submitted to Bank of America the necessary paperwork to formally change the technical name on the accounts to more correctly reflect the true and actual ownership status of these accounts. In other words, I had submitted documents which would have changed the official name on the accounts to Adsurfdaily, Inc.

---

[1] Bowdoin/Harris Enterprises, Inc. submitted a verified claim to the real property in Quincy, Florida; ASD submitted a claim to the funds held in the Bank of America accounts; and Mr. Bowdoin also submitted a claim to the funds held in the Bank of America accounts, declaring that the accounts were opened in his name but were owned by ASD and were treated as corporate assets.

> In an abundance of caution, Adsurfdaily, Inc. has requested
> that Thomas A. Bowdoin, Jr. also file a verified claim to
> these bank accounts in order to prevent a default should the
> United States take the position that only Mr. Bowdoin is a
> claimant because the account names were technically listed
> in his name (with an Adsurfdaily d/b/a) and the paperwork
> to officially change the specific name on the accounts to
> Adsurfdaily, Inc. had not yet been processed and finalized
> by Bank of America.

Verified Claim of Thomas A. Bowdoin, Jr. at 2. On August 18, 2008, ASD filed an Emergency

Motion for Return of Seized Funds to Save its Business and Jobs with Oversight and Monitoring

and/or for an Evidentiary Hearing, and Motion to Dismiss. *See* Dkt. #7. Since only ASD filed an

emergency motion for return of the seized funds and motion to dismiss, for purposes of the

instant Motion, Mr. Bowdoin is not before the Court. *See*, *e.g.*, ASD's Emergency Mot. for

Return of Seized Funds ("ASD's Emergency Mot.") at 1; Proposed Findings of Fact and

Conclusions of Law (by Claimant, ASD) [Dkt. # 32].

      In its Motion, ASD asserted that "[i]n a matter of a few days [since the seizure], ASD

has gone from a vibrant internet advertising business with approximately 100,000 members to a

hollow shell without a working office and without the means to resume its business . . . [and] is

hurtling down into a steep financial tailspin." ASD's Emergency. Mot. at 1. ASD therefore pleaded

that the Court order the immediate release of the seized assets, with certain oversight, or in the

alternative, that the Court hold an evidentiary hearing on whether the funds were properly seized.

*Id.* Although the Government opposed the pretrial return of the seized funds, it did not oppose

ASD's request for an evidentiary hearing. *See* Pl.'s Opp'n to ASD's Emergency Mot. [Dkt. # 14]

& Pl.'s Opp'n to Busby's Emergency Mot. for Return of Seized Funds at 2 [Dkt. # 19]. The Court

granted ASD's motion for an evidentiary hearing. *See* Minute Entry Order dated September 18, 2008. The Court allowed two days of testimony.

ASD offered testimony from four individuals: (1) Robert Grayson, an ASD member; (2) Gerald P. Nehra, an attorney who served as an expert witness on multi-level marketing and direct selling companies; (3) Chuck Osmin, an ASD customer service representative; and (4) Philip Schwartz, an attorney at the law firm representing ASD. Mr. Grayson praised the income he received via ASD; Mr. Osmin had insufficient knowledge of the planning and execution of ASD's business to contradict the Government's basic assertions; Mr. Nehra demonstrated the fallibilities of the professional expert witness, who was defensive on his client's behalf rather than neutral in his expertise; and Mr. Schwartz outlined a monitoring plan proposed by ASD if the money were returned to it. Neither ASD's President, Mr. Bowdoin, nor ASD's Chief Executive Officer, Juan Hernandez, testified at the hearing. *See* Emergency Mot. to Quash Subpoenas [Dkt. # 25]. The Government did not call any witnesses. Both parties submitted several exhibits to supplement the testimony. Various advertisers with ASD attended the hearing as a subset of many who had contacted the Court.

ASD produced evidence that it sells "ad packages," whereby an advertiser's webpage appears on a "rotator" for view by other advertisers. ASD pays its advertisers a rebate to view a minimum number of websites each day, thereby insuring that prospects will be viewing each site. In other words, ASD *sells* "ad packages" to advertisers and *pays* the advertisers to look at the webpages of other ASD advertisers. ASD also pays its advertisers commissions on personal sales of ad packages for referring other advertisers to ASD and, if they become "members" by paying a monthly fee, ASD pays them higher commissions on personal sales and referral commissions on

-5-

second level sales.

## II.  ANALYSIS

ASD requests that the Court dismiss the Complaint or alternatively, that the Court order the return of the seized funds to ASD pursuant to the proposed compliance plan.  ASD has failed to support its motion.

### A.  ASD's Legal Right to Claim the Seized $53 Million

As the facts recounted above make evident, the funds in question were held in accounts in the name of Mr. Bowdoin, not ASD.  Through Mr. Bowdoin's verified statements, ASD asserts that "[t]he accounts and the funds in them were owned by Adsurfdaily, Inc. and were treated as corporate assets."  Verified Claim of ASD at 2.  Nonetheless, at the time of seizure, the accounts remained in Mr. Bowdoin's name and he has filed no emergency motion for their return.

There is thus a very serious question of whether ASD has standing to claim the money seized from the Bank of America accounts.  Even if the monies were derived from ASD operations, they were deposited in accounts in Mr. Bowdoin's personal name and subject to his sole control.  Only valid claimants may challenge the seizure of assets in forfeiture cases.  Because the evidence is conflicting as to whether ASD has standing to claim the $53 million, the Court concludes that the ASD motion is procedurally weak.  However, the United States did not directly challenge ASD's standing for purposes of the instant proceeding, so the Court moves to the merits.

### B.  Motion to Dismiss

A claimant who establishes standing to contest the forfeiture of assets may move to dismiss the government's complaint under Rule 12(b) of the Federal Rules of Civil Procedure.

Supp. R. Certain Adm. & Mar. Cl. G(8)(b).[2]  ASD moves to dismiss, asserting that the Complaint here was not properly verified.  *See* Emergency Mot. at 10-12.[3]

Supplemental Rule G(2)(a) states that a complaint in a forfeiture action *in rem* must "be verified. . . ."  Title 28, United States Code, Section 1746 governs the meaning of the term "verified."  It states:

> [w]herever, under any law of the United States or under any rule, . . . any matter is required . . . to be supported, evidenced, established, or proved by the sworn declaration, *verification*, certificate, statement, oath, or affidavit, in writing of the person making the same . . ., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, *verification*, or statement, in writing of such person which is subscribed by him, as *true under penalty of perjury*, and dated, in *substantially* the following form: . . .
>
> (2) If executed within the United States . . .: "I declare (or certify, verify, or state) *under penalty of perjury that the foregoing is true and correct*.  Executed on (date).  (Signature)."

28 U.S.C. § 1746 (emphases added).

The Complaint's Verification states:

> I, Roy Dotson, a Special Agent with the United States Secret Service, *declare under penalty of perjury*, pursuant to 28 U.S.C. § 1746, *that the foregoing Complaint for Forfeiture In rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that *everything represented herein is true and correct* to the best of my knowledge and belief.

---

[2]  Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") governs Forfeiture Actions *In Rem*.  Rule G provides that "[t]o the extent that [Rule G] does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply."

[3]  Because the motion to dismiss argues that the Complaint is deficient, the Court treats it as a motion to dismiss for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

Compl. at 44.  The statement of Verification in the Complaint is sufficient under 28 U.S.C. § 1746 for three reasons.

First, § 1746 states that a statement of verification only must be in "substantially" the same form as the statement set forth in § 1746(2).  Thus, the statement of verification need not be identical to the statutory language to suffice.  *See*, *e.g.*, *Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004); *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

Second, there are two statements that are essential to a proper verification under § 1746: (i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury.  *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988).  A cursory glance at Agent Dotson's Verification shows that it plainly contains both of the required statements.

Third, the inclusion of qualifying language in the Verification of the Complaint does not render the Verification deficient.  ASD argues that the inclusion in the Verification of the phrase, "to the best of my knowledge and belief," is a qualifier that is "inappropriate in an Affidavit or declaration under penalty of perjury, and renders it meaningless."  *See* ASD's Emergency Mot. at 11.  ASD cites *Malek v. Martin Marietta Corp.*, 859 F. Supp. 458 (D. Kan. 1994), for support.  In that case, the plaintiff offered an affidavit pursuant to Rule 56 of the Federal Rules of Civil Procedure in which he swore that the statements he made in the affidavit were "true and correct to the best of my knowledge."  *Id.* at 460.  The court determined that such a qualifier was legally deficient because "it is the plaintiff's personal knowledge, and not his beliefs, opinions, rumors and speculation" which are "the proper subject of any affidavit."  *Id.* (citing Fed. R. Civ. P. 56(e)).

*Malek* does not support ASD's contention here because affidavits made pursuant to Rule 56(e) differ from unsworn verifications under 28 U.S.C. § 1746 in a critical respect: Rule 56 affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated," whereas § 1746 unsworn verifications may be pled "on information and belief," *see Cobell*, 391 F.3d at 260 ("28 U.S.C. § 1746 contemplate[s] as adequate certifications that are 'substantially' in the form of their provisions. A declaration or certification that includes the disclaimer 'to the best of [my] knowledge, information or belief' is sufficient under the . . . statute."). Furthermore, verified complaints must only "state sufficiently detailed facts to support a *reasonable belief* that the government will be able to meet its burden of proof at trial." Supp. R. Certain Adm. & Mar. Cl. G(2)(f) (emphasis added). Thus, the inclusion of the qualifying language, "to the best of my knowledge and belief," does not render the Complaint's Verification deficient.

Accordingly, ASD's motion to dismiss will be denied.[4]

## C. Motion for Immediate Release of the Funds

The Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, governs all requests for the pretrial release of property that has been seized for civil forfeiture. *See*, *e.g.*, *United States v. Douleh*, 220 F.R.D. 391, 396 (W.D.N.Y. 2003). In order to obtain the release of seized assets prior to the final adjudication of a forfeiture proceeding, a claimant must file a petition with the court in which the claimant "demonstrates" the "basis on which the requirements of [Section 983(f)(1)] are met." 18 U.S.C. §§ 983(3) & (6). Section 983(f)(1) authorizes a court to order the pretrial release

---

[4] To the extent that ASD seeks to dismiss the Complaint for failure to state a claim that it perpetrated wire fraud (or conspiracy to commit wire fraud), the Court denies that motion because the United States has properly stated a claim for wire fraud, as is fully explained below.

of seized property subject to civil forfeiture only when the claimant seeking release establishes that substantial hardship to the claimant outweighs the risk that the property will not be available should the government ultimately prevail at the summary judgment stage or at trial. *See, e.g.*, *United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260, 265 (4th Cir. 2004). However, this balancing test does not apply where a claimant seeks pretrial release of currency, other monetary instruments or electronic funds "unless such currency, or other monetary instrument, or electronic funds constitutes the assets of a legitimate business which has been seized." 18 U.S.C. §§ 983(f)(1)(E), (f)(8)(A).

The Government did not seize ASD; it seized only its assets. Thus, under the express terms of the statute, the Court has no authority to order the immediate release of the funds. ASD argues, however, that for all practical purposes, the Government has seized its business. Arguing this theory as a virtual truism, ASD contends that the only remaining question is whether it is a legitimate business, which it answers in the affirmative.

1. *Seizure of a "business"*

The Government seized the funds contained in the Bank of America accounts that were used for the operation of ASD. As a result, ASD argues that the Government effectively seized its "business," since it is unable to operate without the funds. It contends that the Government's argument to the contrary – the United States says it seized only money and not the business – is "a hyper-technical argument which elevates form over substance." ASD's Proposed Findings of Fact & Conclusions of Law ¶ 10. ASD notes that it has no functioning business without access to the seized funds and that no one will advance money to ASD for fear of another government seizure. *Id.*

The problem is that the argument runs afoul of the language of the statute. According to 18 U.S.C. § 983(f)(8), the Court may order pretrial release of funds only if they constitute "assets of a *legitimate business which has been seized.*" *Id.* (emphasis added). The noun that "which has been seized" modifies is "business" and not "assets." *See United States v. All Funds Seized from or on Deposit in Suntrust Account Number xxxxxxxx8359,* No. 05-2497 (D.D.C. Mar. 17, 2006). *But see United States v. One Hundred Fifty-Nine Thousand & Forty ($159,040) Dollars in U.S. Currency*, No. 05-2404, 2006 U.S. Dist. LEXIS 96857 (D.D.C. Aug. 1, 2006). Seizure of currency is not the same as seizure of a business.

Recognizing, however, that the Government seized only 68% of the claimant's liquid assets in *One Hundred Fifty-Nine Thousand*, *see* No. 05-2404, whereas here it is asserted that the Government seized 100% of ASD's liquid assets, the Court considers whether seizure of 100% of the currency of *this particular business* is equivalent to seizure of the business itself. The Government does not challenge the purported core business of ASD, *i.e.*, the sale of online advertising space. ASD has not demonstrated that it could not maintain that wholly lawful business without the rebate program that is under fire. If it is determined that the ASD business model, with rebates to advertisers and commissions to advertisers and members, does not constitute wire fraud, ASD could re-institute its full business model. However, its base business, which the Government has not estopped ASD from pursuing, remains on-line advertising. On this record, there is insufficient evidence that the Government seized ASD's "business" for purposes of 18 U.S.C. § 983(f)(8), and not merely its (or Mr. Bowdoin's) bank accounts.

2. *Legitimacy of the "Business"*

The Government alleges that ASD committed wire fraud. Anyone who "devised .

. . any scheme or artifice to defraud, or . . . obtain[ed] money or property by means of false or fraudulent pretenses, representations, or promises," and transmitted writings by means of interstate or foreign wires "for the purpose of executing such scheme or artifice" has committed wire fraud. 18 U.S.C. § 1343. The Government alleges that the fraud in this case is a Ponzi scheme.[5]

"A 'Ponzi scheme' typically describes a scheme where earlier investors are paid from the investments of more recent investors rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008); *see also Orlick v. Kozyak*, 309 F.3d 1325, 1327 n.2 (11th Cir. 2002); *see generally In re Ponzi*, 15 F. 2d 113 (D. Mass 1926). The devisers of a Ponzi scheme usually promise investors high rates of return and the "initial investors obtain a greater amount of money from the [P]onzi scheme than those who join the [P]onzi scheme later." *In re C.F. Foods*, 280 B.R. 103, 110 n.15 (E.D. Pa. 2002). But because there are not sufficient, or any, underlying assets to

---

[5] ASD objects to the Government's theory that it engaged in the unlawful sale of unregistered securities. It argues that this theory was announced by the Government for the first time at the evidentiary hearing. Because the Court concludes that ASD failed to make a threshold showing that it is not a Ponzi scheme, the Court need not decide whether the Complaint also alleges a sale of unregistered securities as one theory of fraud. However, by virtually all definitions, a Ponzi scheme is considered a form of securities fraud. *See*, *e.g.*, Christopher R. Leslie, *Den of Inequity: The Case for Equitable Doctrines in Rule 10b-5 Cases*, 81 Cal. L. Rev. 1587, 1587-88 (1993) ("A Ponzi scheme is *a form of securities fraud* which 'consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment.'") (internal citation omitted) (emphasis added); Lisa M. Fairfax, *"With Friends Like These . . .": Toward a More Efficacious Response to Affinity-Based Securities and Investment Fraud*, 36 Ga. L. Rev. 63, 72-73 (2001) (stating that "[w]hat separates [fraudulent investment schemes, including Ponzi and pyramid schemes,] from other *forms of securities fraud* is that the perpetrators target particular groups and rely on the trust inherent in the group to establish their credibility and promote their scam.") (emphasis added). It is, therefore, doubtful that ASD was ambushed or unfairly prejudiced by the Government presenting at the hearing its theory that ASD engaged in the unlawful sale of unregistered securities.

generate the funds necessary to pay the promised returns, "the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse." *Id.* Because the promised rates of return are in excess of any real investments, "a Ponzi scheme operator [is] insolvent from the inception of the scheme." *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993) (*citing Cunningham v. Brown*, 265 U.S. 1, 7 (1924) (describing the "remarkable criminal financial career of Charles Ponzi")).

ASD's expert witness Gerald Nehra provided a definition of a Ponzi scheme to include: (1) the promise of a return on investment to induce the participant to put money into the program; (2) the lack of any underlying legitimate product or service or asset sufficient to sustain the promised payouts; and (3) the necessity of a continuing flow of new investors/participants to fund the payouts.[6]  ASD's Emergency Mot., Ex. C (Decl. of Gerald P. Nehra, Esq. ("Nehra Decl.")).  For purposes of this motion, the Government does not disagree.

The first element of a Ponzi scheme is a promise of a return on investment.  In his declaration, Mr. Nehra stated that "*[t]he customers of the ASD business venture are the advertisers, and the income opportunity seekers of the ASD business venture are the members*[.]" *Id.* ¶ 5 (emphasis added).  Putting aside for the moment the fact that the simple dichotomy that Mr. Nehra described does not apply in this case, as it might in a traditional multi-level marketing program, ASD failed to provide sufficient evidence to support Mr. Nehra's theory of separation between advertiser (customer) and member (income opportunity seeker).  At the hearing, Mr. Nehra confirmed that he wrote an article, *"Do the Products Have 'Intrinsic Value,'"* which he posted on his website, and

---

[6] These elements are not specific to any particular jurisdiction.

which highlighted the need, when reviewing the legitimacy of any multilevel marketing company, to distinguish between (1) a product's customers – true customers – and (2) the income opportunity seeking members of a multilevel marketing company.  In his testimony, Mr. Nehra acknowledged that in his article, he opined that:

> Companies whose products (unless clearly indicated otherwise, "products" includes services) are sold to its representatives exclusively, with no true customers, pose a pyramid law challenge most everywhere. . . . Regulatory agencies in the United States and in other countries have interpreted laws and regulations to mean that some percentage of sales of a direct selling company (that also has a multilevel form of compensation) must be to persons outside of the program. . . . The two most common actual numbers are "more than 50 percent" or "70 percent." . . . Why is this issue so important?  Well, pyramids and endless chains are illegal in the United States and in most of the rest of the world.  You cannot "pay to play."

Tr. vol. 1, 147:8-12, 148:18 - 149:1, 150:11-21.[7]

One compares this advice with the ASD Terms of Service to ascertain the nature of the ASD business model.  First, the Terms of Service represent "an agreement between the advertiser and ASD."  Terms of Service at 1.  Second, the parties to the agreement are only ASD and the advertiser.  *Id.* ¶ 1.2.  "Rebates are paid to advertisers for viewing other advertisers' websites."  *Id.* at 1.  "An advertiser can receive 125% of their advertising cost in rebates by viewing 24 web sites of other advertisers on a daily basis for 15 seconds each.  An advertiser must have an active ad package to earn rebates."  *Id.*  "Advertisers will be paid rebates until they receive 125% of their ad purchases. . . . Your ad purchase will expire when you receive a 125% rebate of your advertising cost."  *Id.* at 2.  In addition:

---

[7] References to "Tr." are to the transcript of the evidentiary hearing, as follows: volume 1 – September 30; volume 2 – October 1, morning session; and volume 3 – October 1, afternoon session.

> *An advertiser may pay a monthly membership fee* and eliminate fees for cash outs, increase referral commissions and decrease the number of sites to view on a daily basis. The amount of your monthly membership fee determines the number of times you can cash out each week, the amount of your referral commissions and the number of sites you must view each day to receive your rebates. . . . All rebates paid to advertisers are for the service of viewing other advertiser's web sites. All commissions are for referring advertisers to ASD.

*Id.*

Obviously, all members are first advertisers – since only advertisers can become members by paying a monthly fee – even if not all advertisers become members.[8] ASD provided no evidence as to the breakout among its advertisers as to those who do or do not become members, and Mr. Nehra could not provide that information. *But see* Claimant's Hr'g Ex.8 (unaudited Balance Sheet – Income Statement through 7/31/2008) (showing, *inter alia*, income generated from membership fees). The Terms of Service offer multiple avenues for income: (1) become an advertiser and earn back (a) 125% of the cost of your advertising by viewing other advertisers' websites, plus (b) earn "a 3% referral commission on all of your personal sales only"; *or in addition* (2) become a "member" to eliminate fees, decrease the number of websites that must be viewed to earn rebates, and increase referral commissions on personal sales and on second-level sales of ad packages. *Id.* (Advertising Rebates & Referral Commissions). Membership fees range from $10 per month to $100 per month and provide increasing commission rates on personal sales (5% to 10%) and referral sales (3% to 5%). *Id.* (Referral Commissions).

---

[8] ASD allows "free members" to show one website, view websites, and earn credits, but not commissions. Terms of Service at 2 (Referral Commissions) & 3 (Ad Packages and Credits). "You receive 1 credit (1 showing of your web site) for each site you view. . . . Viewing up to 24 sites daily will provide you with enough credits to keep your web site showing each day." *Id.* at 2 (Ad Packages and Credits).

The Terms of Service destroy Mr. Nehra's neat distinction that "[t]he customers of the ASD business venture are the advertisers, and the income opportunity seekers of the ASD business venture are the members[.]" Nehra Decl. ¶ 5. Only advertisers can become members, and the enthusiastic testimony of Mr. Grayson suggests that all, or almost all, advertisers adopt the status of member to increase their earnings.

And even were that not the case, the member/advertiser separation that provides a presumption of legitimacy in a traditional multi-level marketing company, Tr., vol. 2, 39:25 - 40:8 (Nehra), is only partially curative for ASD's business model. In the ASD business model, advertisers who are members receive both rebates and commissions, a confluence of payment schemes that Mr. Nehra admitted was unique in his experience with multi-level marketing companies. Tr., vol. 1, 134:21 - 135:3; Tr., vol. 2, 39:25 - 40:8; 29:15-18, 60:1-5 (Nehra). Advertisers who participate in the rebate program can earn back 125% of the cost of their advertising simply by viewing other advterisers' websites. *See* Terms of Service at 1. These participants clearly are income opportunity seekers as well. Therefore, for the purposes of determining which advertisers are, in Mr. Nehra's words, "outside the program," even more significant than the percentage of advertisers who are also members is the percentage of advertisers who participate in the rebate program. The degree of separation between the advertisers and the rebate earners is substantial evidence of whether ASD participants are seeking an advertising venue or a return on an investment. And to this question of separation, the evidence, through the testimony of Mr. Grayson who explained the obvious (though short-lived) earning potential offered through the rebate program and Mr. Osmin who testified that many advertisers were cashing out their rebates, also suggests that all or almost all advertisers participate in the rebate program as an essential component of their

participation in ASD. In Mr. Grayson's own words, "[b]ut to dismiss [the rebate program] is not to talk about ASD anymore because ASD has a[n] [income] producing piece." Tr., vol. 1, 80:18-19 (Grayson).

Thus, ASD purports to operate a circular system: advertisers pay to advertise and become members, earn "rebates" of 125% of their advertising costs by viewing (but not buying from) other advertisers' sites, and earn commissions on sales of ad packages from their personal referrals and second level referrals. Even Mr. Grayson recognized that ASD's revenue growth was not sustainable and that when it decreased, ASD would have to decrease its rebates and/or commissions. *Id.*, 75:14-17, 75:22 - 76:8 (Grayson). He also opined that when that happened, ASD might no longer offer a cost-effective form of advertising. *See id.* at 75:25 - 78:13 (Grayson).

The lay testimony of Mr. Grayson belies the expert testimony of Mr. Nehra. Mr. Nehra repeatedly asserted that ASD does not "guarantee" rebates under the Terms of Service, *see* Terms of Service at 2 (Ad Packages and Credits) ("ASD does not guarantee any earnings and/or rebates"), but his testimony cannot be relied upon because (1) it is contradicted by come-on statements on the ASD website and Mr. Grayson's testimony and (2) it relied solely on the written words contained in the Terms of Service without independent investigation or review of ASD's business records to ascertain how ASD operates in fact before opining. On the current record, the Court must conclude that ASD promises a return on payments, in various forms, to induce a participant (advertiser or advertiser/member) to put money into the program. When its phenomenal growth spurt stops, even Mr. Grayson can see that ASD will collapse on itself. The Court finds that the ASD has failed to rebut the Government's allegation that it fulfills the first element of a Ponzi scheme.

The second element of a Ponzi scheme is that there is no underlying legitimate product or service or asset sufficient to sustain the promised payouts. ASD argues that it offers a legitimate advertising product or service and Mr. Nehra's testimony supported that argument, while Mr. Grayson testified that his participation was eventually dependent on payments *from* ASD and not his payments *to* ASD for advertising because without the former, the expense might be prohibitive.

Mr. Nehra's testimony cannot be relied upon, even without Mr. Grayson's realistic perspective. Mr. Nehra did not attempt to determine what percentage of ASD "advertisers" are also "members," without which information his attempted distinction between the two fails (especially since all "members" are "advertisers," even if not all "advertisers" are "members"). Nor did he attempt to determine what percentage of ASD "advertisers" participate in the rebate program with the expectation of receiving 125% of the money that they paid for advertising. Yet only advertisers who are **not** members *and* **not** participants in the rebate program might be considered "true customers." Thus, the rebate program disintegrates the traditional distinction between the income opportunity seeker and the "true customer" because in ASD's business structure, not only is the member who purchases ad packages and sells ad packages through referral commissions "pay[ing] to play," but so too is the advertiser (the purchaser of ad packages) who earns rebates for viewing other advertisers' webpages on the ASD rotator. Without a demonstrable cadre of true customers, it cannot be said that ASD has demonstrated that it offers a legitimate product to avoid satisfying the second element of a Ponzi scheme.

The third element of a Ponzi scheme is its dependence on a continuing flow of new participants to pay the earlier participants. *See* Tr., vol. 1, 119:14-21 (Nehra) ("a lynchpin of an

illegal pyramid opportunity Ponzi is the need for more income opportunity seekers constantly coming in"). Mr. Nehra insisted that ASD's business model is not dependent upon a continuing flow of new participants as long as the existing participants renew, but he later admitted that if advertisers merely renewed and ASD failed to sell new ad packages to new participants, it would be only a matter of time before such advertisers received a 125% payoff and had their ad packages cancelled or cashed out. *See id.* at 162:3-10 (Nehra). Thus, the record strongly suggests that absent continuous membership growth, ASD has no means to generate the returns that it represents it will pay to those who join its program. It thus has failed to demonstrate, on this record, that the ASD business model constitutes a legitimate business.

These conclusions are buttressed by other evidence in the record:

- In July 2008, while ASD was still operating over the Internet, it showed prospective advertisers a video of Mr. Bowdoin who invited viewers to "start earning money now with this income earning opportunity." He explained, "[i]t's actually very simple how our company can pay out so much money to our members and still have plenty of money to operate and keep expanding. We sell advertising and we pay fifty percent of our sales to our members [advertisers] as rebates. So, by paying fifty percent of our sales we can pay out indefinitely." Claimant's Tr. Ex. 4 (Transcript of "New Member Success Video by ASD") at 5. However, ASD actually promises to pay out 125% of an advertiser's costs although it uses only 50% of each day's revenue to support these repayments. All the payment of "50% of each day's revenue" does is prolong the time it takes to pay the returns – which does not change the fact that the returns are being funded by new advertisers' money.

- Mr. Grayson, testifying on behalf of ASD, reported that he had put $35,000 of his own money into ASD, that he had received about $25,000 back so far, and that he held a check for $8,000 that he was unable to cash before the government seized ASD funds. Based on his reinvestment in ad packages, Mr. Grayson testified that he also had an ad package balance worth approximately $200,000 which he estimated would earn him "roughly $75,000" during the second half of 2008 even though he already had recovered almost all of his payments to ASD. *See* Tr., vol. 1, 50:1-2, 50:20-23, 51:14-15, 53:3-14, 61:12-14, 73:6-15.

- Similarly, Chuck Osmin, who had been employed by ASD as a customer service representative for about three months before ASD funds were seized, testified that he was aware that ASD had paid many people the 125% returns it promised. *See* Tr., vol. 3, 29:12-

13, 34:21 - 35:7. In fact, when ASD "advertisers" had no business to advertise, Mr. Osmin said that ASD would suggest two websites for such "advertisers" to use to permit them to "take advantage of our opportunity." *See* Tr., vol. 2, 90:11 - 91:6; Tr., vol. 3, 15:10-20. Mr. Osmin had put some of his own money into ASD and netted a return of about 700%. *Id.*, 47:19 - 48:2.

- Mr. Osmin was the only ASD representative to testify. He did not know whether ASD had any revenue sources other than from the sale of ad packages and membership fees. He did not know any specifics about these revenue sources or the separate values of each.[9] He could not verify any information about ASD's finances, such as its balance sheet or income statement. He did not provide any information about the amount of funds needed for ASD to continue to operate. He did not know of any ASD board of directors.

ASD's evidence failed to demonstrate that it operates a legitimate business, and not an illegal Ponzi scheme.

### 3. *Balancing Test under Section 983(f)(1)*

Although the Court has determined that ASD is not entitled to a pretrial release of its assets, in an effort to discover some mechanism by which the Court could release *some* of ASD's funds, the Court considers whether, if all else were ignored, ASD would be entitled to relief under § 983(f)(1)'s balancing test.

Section 983(f)(1)(A) requires a claimant to have a "possessory interest" in the seized property. 18 U.S.C. § 983(f)(1)(A). The Court assumes for present purposes that ASD and Mr. Bowdoin each have a "possessory interest" in the funds seized from the ten Bank of America

---

[9] Philip Schwartz, an attorney with the Akerman Senterfitt law firm who expressed expertise with federal securities laws, testified on ASD's behalf concerning a future monitoring program for ASD if the funds were released. Mr. Schwartz offered an unaudited financial statement prepared by ASD (presumably for the fiscal year 2008 through July 31, 2008), which indicated that, as of July 31, 2008, ASD had received $100,888,592.23 in income from the sale of ad packages and had total assets of $41,879,631.31. However, because Mr. Schwartz had never received ASD documentation on its operation, as requested, and had never analyzed its operation before the government seizure, he was unable to corroborate the numbers in the financials.

accounts that are currently held in Thomas Bowdoin's name.

Section (f)(1)(B) requires a claimant to "have sufficient ties to provide assurance that the property will be available at the time of trial." 18 U.S.C. § 983(f)(1)(B). Because ASD's motion is premised on the plan that only a small portion of the funds will be available for use in order to implement the court-approved compliance plan prepared by Mr. Schwartz, the Court agrees that, at least with respect to the $2 million that would be used to create the Plan, ASD has met this requirement.

Section (f)(1)(C) requires a claimant to demonstrate that "the continued possession by the Government pending final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business. . . ." 18 U.S.C. § 983(f)(1)(C). Although the Court questions whether the seizure of ASD's funds has completely prevented ASD from operating an advertising business, there is no doubt that ASD cannot fulfill its current obligations to pay commissions and rebates without these funds. Equally as important, the Court recognizes and empathizes with the substantial hardship that ASD's employees have endured since ASD's assets were seized in July 2008. Many employees have either lost their jobs or continued to work for no pay. In the small town of Quincy, Florida, job opportunities are in limited supply. The Court does not underestimate the financial hardship that these employees have faced.

Excluding Section 983(f)(8) which was discussed above, the final requirement of Section 981(f)(1) is that the "claimant's likely hardship from continued possession by the Government or the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the [forfeiture] proceeding." 18 U.S.C. § 983(f)(1)(D). Here, ASD's arguments must fail.

"Section 983(f) places great emphasis on ensuring the preservation of any released property pending final disposition of forfeiture proceedings." *Undetermined Amount of U.S. Currency*, 376 F.3d at 265. This priority is evidenced by, *inter alia*, the authority the statute grants the courts to "enter any order necessary to ensure that the value of the property is maintained while the forfeiture action is pending." *Id.* (quoting 18 U.S.C. § 983(f)(7)(A)) (internal quotations omitted). Although the Court may order the release of liquid assets, including currency, monetary instruments and electronic funds, even if those assets would not be available for return in precisely the same form, the Court is not authorized to order the release of funds that are guaranteed to dissipate upon their release with no guarantee of an equivalent replacement. *See Undetermined Amount of U.S. Currency*, 376 F.3d at 265.

In *Undetermined Amount of U.S. Currency*, the claimants sought the release of bank account funds in order to pay attorneys' fees which, as the claimants admitted, would certainly be "lost" upon release. *Id.* They reasoned that if the court ultimately ordered forfeiture, the court could satisfy the forfeiture order by substituting other assets owned by the claimants for those funds that had been released. *Id.* The United States Court of Appeals for the Fourth Circuit rejected this argument, stating that "Section 983(f) . . . gives no indication that it permits substitution of assets in this matter." *Id.* at 265-66. As in *Undetermined Amount of U.S. Currency*, ASD will use the released funds to pay attorneys and other professionals to assess the legality of ASD's current business operations, develop a new business plan and design a workable infrastructure that will either prevent, or lift ASD out of, insolvency. The $2 million certainly will not be available at trial if those funds are released.

The Fourth Circuit intimated, however, that "substitution of assets might in some

circumstances be appropriate." *Id.* at 266. This is not such a circumstance. The $2 million that ASD seeks to utilize are funds that were paid to ASD by advertisers and members. ASD has not demonstrated sufficiently that ASD is a legitimate business. Thus, the Court cannot release the funds to be used by the Company in its current form. And, if the plan to revamp ASD's business proves unsuccessful, the citizens who paid that money will receive no advertising benefits and no return on their advertisement purchases. Quite simply, the money will be "lost" forever. Despite the obvious hardships endured by the employees of ASD and a great number of its members, the Court cannot ignore its oath to uphold the law, nor can it rightly take the hardships of some and transfer them unto others.[10]

### III. CONCLUSION

For the foregoing reasons, the Court will deny Claimants' Motion to Dismiss and their Emergency Motion for Return of Seized Funds [Dkt. # 7]. The Court will also deny Claimants' Petition to Determine Proportionality as premature [Dkt. # 27]. A memorializing order accompanies this Memorandum Opinion.

Date: November 19, 2008                                      /s/
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge

---

[10] For all of the reasons stated herein, and because a § 983(g) petition to determine whether a forfeiture is constitutionally excessive should be considered only after a forfeiture has been decreed, the Court will deny Claimants' Petition to Determine Proportionality as premature [Dkt. # 27]. *See* 18 U.S.C. § 983(g); *see also United States v. One Parcel of Prop. Located at 35 Ruth St., Unit 30 Bristol, Conn. with All Appurtenances & Improvements Thereon*, No. 3:06cv1844, 2008 U.S. Dist. LEXIS, at *1 (Aug. 25, 2008); *cf. United States v. Funds in the Amount of $170,926.00*, 985 F. Supp. 810, 813 (N.D. Ill. 1997).