1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2    ------------------------X
     UNITED STATES OF AMERICA,      Docket No. 08-01345
3                    Plaintiff,

4          v.               Washington, D.C.
                             **October 1, 2008**
5                            2:00 p.m.

6    8 GILCREASE LANE, QUINCY,
     FLORIDA 32351, ET AL
7                    Defendant.
     ------------------------X
8
            *EVIDENTIARY HEARING (AFTERNOON SESSION)*
9        *BEFORE THE HONORABLE ROSEMARY M. COLLYER*
              *UNITED STATES DISTRICT JUDGE*
10
     APPEARANCES:
11   For the Plaintiff:    U.S. ATTORNEY'S OFFICE
                           By:  Mr. William Rakestraw Cowden
12                              Mr. Vasu B. Muthyala
                           555 Fourth Street, N.W.
13                         Washington, D.C.  20530
                           202.514.7700
14                         *william.cowden@usdoj.gov*
                           *vasu.muthyala@usdoj.gov*
15
     For the Defendants:   AKERMAN SENTERFITT
16                         By:  Mr. Jonathan Goodman
                                Mr. Michael Louis Fayad
17                         Tysons Corner Office
                           8100 Boone Boulevard, Suite 700
18                         Vienna, VA  22182
                           703.790.8750
19                         *jonathan.goodman@akerman.com*
                           *michael.fayad@akerman.com*
20
     Court Reporter:       Catalina Kerr, RPR
21                         U.S. District Courthouse
                           Room 6716
22                         Washington, D.C.  20001
                           202.354.3258
23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

# C O N T E N T S

COURT REPORTER'S CERTIFICATE......................... 93

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Chuck Osmin | | | | |
| By Mr. Goodman | 3 | | | |
| By Mr. Muthyala | | 5 | | |
| Philip Schwartz | | | | |
| By Mr. Goodman | 59 | | | |
| By Mr. Cowden | | 75 | | |

GOVERNMENT'S

| EXHIBITS: | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 3 | ASD Web Page | 51 | 51 |
| 4 | "Opportunity" Tab of ASD Web Pg. | 52 | 52 |
| 5 | "Frequently Asked Questions" Tab of ASD Web Pg. | 52 | 53 |
| 6 | Legality Statement | 53 | 53 |
| 7 | "Join Free" Tab of ASD Web Pg. | 53 | 54 |

CLAIMANT'S

| EXHIBITS: | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 6 | Philip Schwartz Resume | 60 | 60 |
| 7 | Notice of Filing Compliance Plan | 60 | 61 |
| 8 | Balance Stmt. & Income Stmt. | 66 | 66 |

```
 1                  P-R-O-C-E-E-D-I-N-G-S

 2             (2:00 P.M.; OPEN COURT.)

 3             THE COURT:  Go right ahead, sir.

 4                     CHUCK OSMIN,

 5    having been duly sworn, testified as follows:

 6                 DIRECT EXAMINATION (CONT'D.)

 7    BY MR. GOODMAN:

 8     Q    Mr. Osmin, when we were talking about your background

 9    before the lunch break, I neglected to ask you a question.

10    Let me do that now.

11             Did you have any prior experience as an Amway

12    dealer?

13     A    Yes, I did.

14     Q    During what years?

15     A    Late 1982, '83 until roughly '89 or '90.

16     Q    Was that a positive or negative experience for you, sir?

17     A    It was a positive experience for me.

18     Q    So you had good experience with multilevel marketing?

19     A    Yes.

20     Q    When the police or law enforcement in this case executed

21    the search warrant at Ad Surf Daily, were you interviewed by a

22    police officer?

23     A    Yes, I was.

24     Q    Did you do so voluntarily?

25     A    Yes, I did.
```

1   Q   Did you cooperate?

2   A   Yes, I did.

3   Q   Did you answer truthfully?

4   A   Yes, I did.

5   Q   What did you tell that police officer?

6   A   I was asked my name and I was asked if I liked working at

7   ASD, to which I replied "yes."  I've stated on several

8   occasions publicly and privately that this was the job that

9   I'd been looking for for 30 years because of the work

10   environment and the people that I was working with.  And he

11   asked me if I was a member, and I said yes, and he asked how

12   much I had -- how many ad packs I had personally purchased,

13   and I told him 50.

14   Q   Mr. Osmin, in addition to having companies selling

15   products and services on the Ad Surf Daily rotator, are there

16   also some nonprofit organizations like churches which have

17   websites on the ASD rotator?

18   A   Yes, there are.

19   Q   Why did ASD decide to pay rebates when the site was down

20   and the customers could not surf to qualify for rebates during

21   those times in July of 2008?

22   A   That was decided as a customer service issue.  We -- the

23   corporation felt that the people that had purchased

24   advertising were not getting -- were not getting their

25   dollars' worth because our sites were down and that was a form

1    of compensation for that.

2    Q    And was this an ongoing situation or one that lasted just

3    a few weeks that the site was down?

4    A    It lasted just while the site was down.

5    Q    Mr. Osmin, what has happened to ASD since the bank

6    accounts were seized approximately two months ago?

7    A    Pretty much a total shutdown.  We've had volunteers that

8    have been coming into the office, three primarily that are

9    there almost every day.  That would be myself, Mr. Talbert and

10   Mrs. Pacevich, and then we've had others that have come in as

11   they can because they had to seek other employment.

12   Q    And this may be obvious, but are the members getting the

13   benefit of traffic to their websites?

14   A    No.

15   Q    What would happen to the employees if the company was not

16   allowed to resume operations with the return of some funds

17   under a compliance plan within the next few weeks?

18   A    We would remain unemployed.  Quincy is not a large town

19   and there's not a lot of employment opportunity there.

20             MR. GOODMAN:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22                         CROSS-EXAMINATION

23   BY MR. MUTHYALA:

24   Q    Good afternoon, sir.

25   A    Good afternoon.

1  Q   I want to talk to you a little bit about your websites

2  that you advertised.  You talked about the Whole Food

3  Pharmacy, Xooma, and I believe another page.  Do you remember

4  that testimony?

5  A   Yes.

6  Q   Have you ever advertised those sites before joining ASD?

7  A   I joined Xooma and the Whole Food Pharmacy after I became

8  employed with ASD, and I created my site for my clowning

9  business while I was an employee at ASD.

10 Q   So, essentially, once you had an opportunity to

11 advertise, you created sites for it; is that right?

12 A   For the clowning business, that's correct.  For the other

13 two, they are actually generated by the companies that I

14 represent.

15 Q   And those were created after you heard about ASD and you

16 learned about the opportunities that ASD offered?

17 A   They -- I joined after I was -- I joined the two direct

18 marketing companies after I was employed with ASD, so yes.

19 Q   Because you learned from ASD that you needed to post

20 websites in order to earn the rebates; is that correct?

21 A   No, that was not my reasoning for creating those

22 websites.

23 Q   One of the reasons; not the only reason?

24 A   I was -- when I joined Whole Food Pharmacy and when I

25 joined Xooma, by joining, they create a proprietary website

1  for their distributors.  The clowning website was one that I

2  created in order to promote my clowning business.

3  Q   Okay.  Tell me how much money have you earned from your

4  Whole Food Pharmacy business?

5  A   That, I am -- as far as earnings, nothing.  I've been

6  purchasing the products for my own use.

7  Q   Okay.  And how about for Xooma, how much have you earned

8  from that business?

9  A   Xooma, I have not -- I've -- I have developed three

10  customers.  The cost of Xooma is very small.  It's a 25-dollar

11  a month supplement and I've probably made less than $100.

12  Q   But you were simultaneously posting these websites on

13  ASD; is that correct?

14  A   That's correct.

15  Q   And you were earning rebates from ASD; is that correct?

16  A   That's correct.

17  Q   How much did you earn in rebates from ASD, your total

18  rebates that you've earned for what you call advertising?

19  A   I don't have those figures.

20  Q   More than $200?

21  A   I would say probably more than $200 with -- when you take

22  into consideration that I had also sponsored referrals with

23  ASD.

24  Q   Including your sponsors, would you say it's more than

25  $1,000?

1   A   No.

2   Q   Including your sponsors, would it be more than $500?

3   A   I don't believe so.

4   Q   Now, you said you -- you purchased the 50 ad packages?

5   A   Yes, I did.

6   Q   Were you also given ad packages?

7   A   Yes, I was.

8   Q   Who gave you those ad packages?

9   A   They were a part of my compensation for working at

10  rallies -- well, one rally in Miami and the convention in

11  Tampa.  That was, it was explained to me, as a bonus for my

12  participation in those events.

13  Q   And what was this compensation or bonus, as you call it,

14  how much was it for each rally?

15  A   It was 600 ad packs for the Tampa convention, and it was

16  1,000 for the Miami rally.

17  Q   And did you receive any other bonuses in the form of ad

18  packages?

19  A   No.

20  Q   Now, including those 1600 ad packs that you received, now

21  we're at 1600 that you received from the company, 50 that you

22  purchased yourself?

23  A   Right.

24  Q   How many ad packages did you receive from referrals?

25  A   Roughly 2,000.

1   Q   So now we're at --

2   A   I'm sorry.  Yeah, 2,000.

3   Q   So we're at 3,650 ad packages?

4   A   Yes.

5   Q   And you were earning rebates on those ad packages; is

6   that correct?

7   A   Yes.

8   Q   And did you withdraw any of those rebates?

9   A   I withdrew, one time, $400.

10  Q   So that's from the 3650, you took out $400?

11  A   Yes.

12  Q   And does that bring the number down, your ad packages

13  down to 3250?

14  A   No.  The way the ad packages work, when you purchase ad

15  packs, that becomes kind of a base number for your -- each

16  time you purchase ad packs, it's a separate entry on your ad

17  pack total.  The number of active ad packages that you have

18  doesn't necessarily mean that that number is going to

19  translate into whatever the rebates would be.

20          In other words, if I bought a thousand ad packs

21  today, that is the base date, so to speak, for those ad packs.

22  If I buy another thousand a month or two down the line, my

23  total active ad packages may be 2,000; however, I will have

24  accrued rebates for the -- for the time in between.  Those --

25  those ad packs will expire when they reach 125 percent in

1    total rebates.

2    Q   As a company representative, please explain to us, let's

3    work with that 1,000-dollar figure.  You go to ASD, give the

4    company $1,000.  Tell us what happens, as an advertiser,

5    someone comes to the company and says, "I want to buy 1,000 ad

6    packs"?

7    A   You would -- assuming that you were already registered on

8    our website, we would post that to your account and they would

9    start earning the rebates and you would start -- well,

10   considering if you were surfing, you would receive the rebates

11   up through -- until the value was 125 percent.

12   Q   Now, we've talked about the rebate portion of it.  Let's

13   talk about the advertising portion.

14   A   Okay.

15   Q   Until three weeks ago -- I'm sorry, three weeks before

16   the search warrant, let's take that time frame.

17   A   Okay.

18   Q   This is before the system was implemented that allowed

19   ASD to check whether anyone actually posted a website onto the

20   system; is that correct?

21   A   That was when we implemented not allowing them to surf

22   without a site.

23   Q   Not allowed to surf, i.e., not allowed to earn a rebate?

24   A   Right.

25   Q   Okay.  So there was a time, three weeks before the search

warrant -- I'm sorry, the seizure warrant was executed, when

there was no system in place at ASD to ensure that when people

paid in or purchased ad packs, that they also had to post a

web page on the system?

A    I don't know.

Q    I thought that was your testimony earlier?

A    My testimony earlier, sir, was that it was roughly three

weeks before the seizure that they implemented that part of

the software.  I don't know before that if there were any

checks and balances.  I wasn't involved in that.

Q    You were -- you started the company when, April 2008?

A    Yes, as a customer service representative.

Q    As a customer service representative.  And three weeks

before the search -- the seizure warrant was executed, what

was your title?  What were your duties?

A    I was the -- the actual title was "Accounting/Customer

Service Team Leader."

Q    And you knew about the program that was implemented to

make sure folks were -- had web pages on the site; is that

right?

A    Yes.

Q    But before that, you don't know -- it's your testimony,

as a company representative, you don't know whether there was

any system in place; is that right?

A    That's correct.

1  Q   Did you -- how did you learn that the company implemented

2  a system that checked to make sure folks had websites posted?

3  A   It was announced that that was the intention of the

4  corporation.

5  Q   Who announced it?

6  A   That would have been Juan Fernandez, our CEO.

7  Q   How did he announce it?

8  A   In a meeting.

9  Q   And did he say why this change was implemented?

10 A   We were trying to ensure compliance.

11 Q   With what?

12 A   With our terms and conditions, terms and service.

13 Q   Which part of the terms and service were you trying to

14 imply -- assure compliance with?

15 A   The part that says that to earn rebates you have to have

16 a website that you're advertising.

17 Q   And that's what -- that's what Juan Fernandez said?

18 A   To that effect.  I'm not quoting.

19 Q   Okay.  But then ASD offered folks that don't have an --

20 have a website to advertise, the option to choose from two

21 websites, right?

22 A   Yes.  There were affiliate websites.

23 Q   So, first you come up with a system that ensures that

24 people have websites, is that right, about three weeks before

25 the search warrant?

1    A    Yes.

2    Q    And then you come up with websites to give these folks

3    that don't have?

4    A    No, the affiliate -- the affiliate program was in place

5    prior to us enforcing the website.

6    Q    That was the -- that was actually in place before there

7    was -- before Juan Fernandez announced there was going to be a

8    program to ensure that folks had websites, ASD was already

9    offering folks websites?

10   A    The affiliate program was in place at the time of my

11   employment.

12   Q    Now, we've been talking about websites to ensure that

13   folks have websites when they want to surf and earn rebates,

14   right?

15   A    Correct.

16   Q    Did anyone make sure that those websites actually were

17   linked to actual businesses or that there were actual

18   businesses that were on those websites?

19   A    My understanding was that there were a team that were

20   reviewing the websites to ensure that they were legitimate

21   businesses, but I don't have any specifics about that.

22   Q    Did you hear about folks posting My Space pages on ASD?

23   A    I know that people had, and they were subsequently told

24   to -- that those were not valid websites for advertisement.

25   Q    And how do you know that?

1    A    Through discussions within -- within some of the meetings

2 that we had.

3    Q    Meetings with who?

4    A    Staff meetings.  We would have periodic customer service

5 staff meetings, usually more than once a week, to go over

6 issues that came up during the week, and that was one of the

7 things that were covered in the staff meetings was that My

8 Space pages were not, in most part, valid -- valid websites

9 for advertisement.

10           There were some that -- that they deemed as being

11 valid in the sense that it was a, for instance, various

12 entertainers had My Space pages where they had links to

13 purchase their CDs, things like that; however, we -- we did

14 discourage that also.  We -- we encouraged them to have a

15 separate website that was a commercial-type website.

16    Q    And in those situations, when people did not have

17 commercial-type websites, was the discussions meeting to refer

18 them to Pay.com and Mobile Cash?

19    A    No.  As customer service representatives, we could tell

20 them what the rules were and we could encourage them to follow

21 those rules; however, we -- at our level, we had no

22 enforcement tools at our disposal.  We had to refer those to

23 our IT team.

24    Q    And what did the -- actually, let me stop there for a

25 second.

1        MR. MUTHYALA:  Brief indulgence, Your Honor.

2        (PAUSE.)

3  Q  (BY MR. MUTHYALA)  Are you familiar with a general

4  knowledge test that was administered to customer service

5  representatives of ASD?

6  A  I knew about that.  That was actually administered after

7  I had been transferred to the accounting department.

8  Q  You did hear about a test that was administered?

9  A  I heard about it.

10  Q  And did you know that one of the questions on this test

11  was, and I'm quoting, the question is, "If you don't have a

12  personal business or a website, what companies can you

13  advertise?"

14        And then there is a blank and a blank.  "Where can a

15  member find this info?"

16        Did you ever hear that question before?

17  A  I believe I had.

18  Q  And what are the -- what's the answer to that question?

19  A  That would be the two sites that were on the affiliate

20  program, pay. -- .com and Mobile Cash.

21  Q  And --

22  A  And the other answer to that question is as to where --

23  Q  There was no other question.

24  A  Where do you find them?

25  Q  I'm sorry, go ahead.

1    A    You find them under affiliate -- the affiliate program's

2    link that was on the Breaking News site.

3    Q    And this test was administered to customer service

4    representatives; is that correct?

5    A    Yes.

6    Q    And what happened if customer representatives failed this

7    test one time?

8    A    I -- again, I was not in the customer service department

9    at that time.  I believe --

10   Q    But you heard about that?

11   A    I believe they were allowed to take it again.

12   Q    And then what if they failed the second time?

13   A    That, I don't know.

14   Q    Was there ever a case where someone was terminated for

15   failing the general knowledge test, or as the company would

16   refer to it, meet academic standards?

17   A    I have no firsthand knowledge of that.  I was not in that

18   department.

19   Q    Did you ever speak to anyone in the company, including

20   Mr. Bowdoin, about that?

21   A    No.

22            THE COURT:  Let me just interrupt for one question.

23   What was the title of the position you held at the time the

24   company shut down?

25            THE WITNESS:  I was a team leader.

```
 1              THE COURT:  Okay.  And what did --
 2              THE WITNESS:  And it was Accounting/Customer Service
 3   Team Leader.
 4              THE COURT:  Thank you.
 5   Q    (BY MR. MUTHYALA)  Who sits on the board of directors of
 6   Ad Surf Daily?
 7   A    I don't know.
 8   Q    Is that because there is no board of directors of Ad Surf
 9   Daily?
10   A    I -- I've never asked.
11   Q    You're representing the company as you sit here today;
12   isn't that right?
13   A    I am an employee of the company, yes.
14   Q    And you're actually sitting here today as a
15   representative of ASD; is that right?
16   A    I suppose.
17   Q    And have you ever heard of a board meeting occurring at
18   ASD?
19   A    No.
20   Q    Have you ever heard of any board members at ASD?
21   A    Not -- No.
22   Q    Now, when ASD originally began, they were paying rebates
23   of up to 150 percent -- Strike that.  Let me ask a different
24   question.
25              When did ASD begin business?
```

1    A    My understanding, it was October 2006.

2    Q    And who was the president of ASD at the time?

3    A    Mr. Andy Bowdoin.

4    Q    And has Mr. Andy Bowdoin been the president of ASD the

5    entire time?

6    A    To my knowledge, yes.

7    Q    And does Mr. Bowdoin have any background in advertising?

8    A    I don't know.

9    Q    Does Mr. Bowdoin have any experience offering securities?

10    A    I don't know.

11    Q    When ASD first began, was there a board?

12    A    I wasn't there at that time.

13    Q    Sitting here today, do you know if when ASD first began

14    there was a board?

15    A    No, I don't.

16    Q    You began with the company in April of 2008?

17    A    That's correct.

18    Q    Okay.  At that time, was ASD offering rebates of up to

19    150 percent or of up to 125 percent?

20    A    The ad packs would expire at 125 percent.

21    Q    The ad packs would expire at 125 percent.  Explain that

22    to us.

23    A    When you purchase an ad pack, you -- and you qualify for

24    the rebates, your rebates will be paid provided that the

25    rebates are paid and provided that you have qualified for the

1   rebates up to 125 percent of the value of the ad pack that you

2   purchased.

3   Q   And then what happens?

4   A   It expires.  It is no longer part of the equation for the

5   rebates.

6   Q   So, I have one web page I want to advertise on ASD.  I

7   give ASD $100.  When does my advertisement, one advertisement

8   stop showing?

9   A   That depends on a number of factors.  It depends on you

10   surfing, because as you surf, you earn credits that you apply

11   to your website.  If all you did was purchase 100 ad packs,

12   you would get 100 views on the rotator.

13   Q   Okay.

14   A   And that would be the end.

15   Q   Okay.  That would be the end.  If I purchased 100, don't

16   do anything, I get 100 views on the ad -- on the viewer and

17   that would be the end --

18   A   Correct.

19   Q   Correct?  I buy 100 ad packs, I surf every day, what's my

20   required surfing every day?

21   A   Depending on your member level, anywhere from 12 to 24

22   sites per day.

23   Q   I'm the lowest member level.

24   A   24 sites per day.

25   Q   I have to look at 24 sites per day?

1   A   That's correct.

2   Q   But I can pay ASD money and surf less sites, right?

3   A   There is a membership level -- there are four membership

4   levels that would allow you to surf less, yes.

5   Q   An advertising company that pays me not to surf; an

6   advertising company that pays me not to look at ads?

7   A   No, sir, you're paying us to not have to look at the ads.

8   Q   Exactly.  I'm paying you -- I, the customer, am paying Ad

9   Surf Daily, an advertising company, to not look at ads?

10  A   A membership fee.  That's separate from the ad packs.

11  Q   You're absolutely right.  You're calling it a membership

12  fee.

13  A   That's separate from the ad packs.  It does not go on

14  your ad pack balance.

15  Q   Exactly.  But what I'm doing essentially is you're taking

16  my money, you call it membership fees, and then I have to do

17  less work, right?

18  A   Correct.

19  Q   I don't have to look at advertisements?

20  A   Yes, you do.

21  Q   I have to look at less advertisements if I pay you money?

22  A   Correct.

23  Q   Okay.  So let's say I don't want to give you the money

24  and I want to look at advertisements.  So now back to the

25  $100.  I gave you $100 and I'm not giving you any membership

1  fees but I'm willing to look at 24 web pages a day, 15 seconds

2  a pop, right?

3  A    That's correct.

4  Q    I go through, click, click, click, look at all the web

5  pages; end of the day, what happens?

6  A    You would have 124 credits on your credit balance.

7  Q    Uh-huh.

8  A    You would have had as many as -- I think the average was

9  24 views of your website.

10  Q    I would have had 24 views of my website?

11  A    Yes.

12  Q    What do you mean?

13  A    I mean the -- the rotator, the software that they used

14  for the rotator would put your website in front of the members

15  an average of 24 times daily and that would use the 24 credits

16  that you had earned.

17            THE COURT:  What about the $100?

18            THE WITNESS:  The $100 would turn into 100 ad packs,

19  which is the base for the commissions that -- or the rebates

20  that would be paid the following day.  He asked me at the end

21  of the day.

22  Q    (BY MR. MUTHYALA)  At the end of Day One I have -- Okay.

23  So I put in $100 --

24            MR. MUTHYALA:  I'm sorry, Your Honor.  Should I

25  continue?

1    THE COURT:  Go right ahead because now I thought I

2 understood it and I guess I don't.  You put in $100 and now

3 I'm entitled to 100 things called ad packs, which really means

4 that my website -- the first page of my website gets on this

5 rotator to be -- to be viewed by some number of members 100

6 times?

7    THE WITNESS:  Correct.

8    THE COURT:  Is that -- that's once a day for 100

9 days?

10    THE WITNESS:  No.

11    THE COURT:  100 times in one day?  What are we

12 talking about?

13    THE WITNESS:  Normally, the average was 24 times per

14 day.  It averages out to about once an hour that your site

15 comes up -- the front page of your site comes up on the

16 rotator.

17    THE COURT:  So that gives me essentially four days.

18 If I paid $100, it will give me 100 ad packs, which give me

19 100 times to be on the website and it happens 24 times a day,

20 that gives me four days?

21    THE WITNESS:  No.  When you --

22    THE COURT:  Of course not.

23    THE WITNESS:  Your Honor --

24    THE COURT:  I'm sorry.  I thought I understood it,

25 and now I know I don't.  Go on.

1          THE WITNESS:  Well, you probably do, but the terms

2   are confusing.

3          THE COURT:  Okay.

4          THE WITNESS:  There's a difference between ad packs

5   and credits.  You earn ongoing credits when you surf, which

6   allows you to put your website in front of people 24 times a

7   day if you're surfing 24 times.  So the --

8          THE COURT:  Let's just talk about paying a 100

9   before we get into -- we get into looking at anybody else's

10  ads.  I paid $100, I have 100 ad packs, right, I'm using the

11  right term?

12         THE WITNESS:  Yes.

13         THE COURT:  How many -- that lets me have 100 views

14  of my website.

15         THE WITNESS:  Your Honor, along with those 100 ad

16  packs, you also get 100 credits, and it's the credits that are

17  applied to viewing your website.  The ad packs are there

18  representing what you have purchased before they're used, and

19  it remains there until such time as you have earned rebates

20  accumulated to 125 percent of your initial purchase.

21         But the operative thing that is used to put your

22  website onto the rotator is not ad packs, per se, it's

23  credits, and you're -- each day when you're surfing, you're

24  accruing more credits that allows more views of your website.

25         THE COURT:  So if I buy -- pay $100, so I have what

are called 100 ad packs.  For operating purposes, I really get
100 credits.

     THE WITNESS:  Correct.

     THE COURT:  And the 100 credits allows my website to
be shown 24 times a day.

     THE WITNESS:  Correct.

     THE COURT:  And if I didn't do any viewing of
anybody else's websites, I would run out when I ran out of 100
credits?

     THE WITNESS:  That's correct.

     THE COURT:  Which is about four days?

     THE WITNESS:  That's correct.

     THE COURT:  Okay.  But if in the meantime I do
surfing and so I'm watching other people's websites, then I
can earn 24 credits a day, which gives me 124 credits at the
end of the first day.

     THE WITNESS:  Correct.

     THE COURT:  Well, actually it gives me 100 credits
because I've used up 24 of them.

     THE WITNESS:  Correct.

     THE COURT:  So if I look at 24 websites a day, I'm
sort of treading water.  I'm using up 24, I'm adding 24 but
I'm treading water.  I'm not making any progress.

     THE WITNESS:  As far as advertising your own
business on your website, yes, but by surfing the 24 sites

1  every day, you are qualifying for the rebates, which is a

2  different part of the program.

3          THE COURT:  Right.  Okay.  So the same -- the

4  surfing gives me not only credits for running my website, but

5  it also gives me something we'll call rebate chunks.  It's

6  actually credits for rebates, rebate chunks, which is my 100

7  ad packs as against the totality of the number of ad packs and

8  I get some tiny little percentage, right?

9          THE WITNESS:  Correct.

10          THE COURT:  Right.  It's a proportionate payment.

11          THE WITNESS:  Correct.

12          THE COURT:  Well, I sort of understood it.  I wasn't

13  quite as far off as it sounded as if I were going to be.

14  Q   (BY MR. MUTHYALA)  Okay.  So, essentially --

15          THE COURT:  Did I understand it, everybody?  Oh,

16  good.  They think I understood it.  Okay.  We're together.

17          MR. COWDEN:  Let the record reflect it didn't take

18  three weeks, Judge.

19          THE COURT:  Well, I've been listening.

20          (LAUGHTER.)

21  Q   (BY MR. MUTHYALA)  So, essentially, as the judge said,

22  you're treading water with the 24 ad packs a day.  You

23  essentially keep -- it doesn't expire in four days as the judge

24  originally thought.  It keeps on going because you're able to

25  get 24 views, 24 credits, you're good, you're good, you're good.

1    It would go on indefinitely but for the terms and conditions

2    which state, "Your ad package will expire when you receive

3    125 percent rebate of your advertising cost."  Is that right?

4    A    Correct.

5    Q    Your ad packages -- the company's obligation to show a

6    customer's web page only stops once the customer has received

7    125 percent?

8    A    The companies -- the company will continue to show your

9    website as long as you have credits to allocate to the viewing

10   of your website.  What stops is the payment of the rebates.

11   Q    Exactly.  But the rebates stop at 125 and your ad package

12   or this --

13   A    There's -- that's what we call an active ad package.  On

14   the -- on the member's what we refer to as the back office or

15   their account overview, if you go into the account overview,

16   there was what they called an ad package history.

17   Q    Uh-huh.

18   A    That history shows several things.  It shows the amount

19   of the ad package purchased, it shows the accumulated rebates

20   that have been charged to that ad pack or actually credited to

21   that ad pack, and it shows whether that ad package has

22   expired, and when it expires, it drops off your active ad

23   package.

24         Now, there was another total at the bottom that was

25   total ad packages.  That's all the ad packages you purchased

whether they expired or not, so there were two totals on

there.

Q    Okay.  But essentially the company or the advertisement,

ad package for that $100 that you've given the company, you

won't make more than 125 percent?

A    Correct.

Q    Okay.  And then at that point, that ad package expires?

A    Correct.

Q    Okay.  And now, the same thing would happen if someone

put in $10,000; is that right?

A    Correct.

Q    One web page, $10,000, the exact same scenario plays out?

A    Correct.

Q    You only get 24 views of your web page?

A    There was what we called a PTC.  Now, most of -- most of

the people that I dealt with understood that when they

purchased a large amount of ad packs, that they were going to

participate in the, what we called, Pay To Click.  And what

that was, that was a separate part of the website where you

could put up your website and you would give credits to other

members for clicking on your specific website.

        In other words, instead of waiting for it to come up

in the rotator, you can allow anywhere from one to an infinite

number of credits, however many you had, to pay people to look

at your website.

1  Q   But at the end of the day, whether you gave $100 or

2  $10,000, the company's obligation to show the web page would

3  cease once 125 percent was returned?

4  A   The company's obligation to pay rebates would cease at

5  125 percent.  The company's obligation to show your website

6  was contingent upon the credits that you allocated to your

7  website.

8  Q   Could people cash out their credits?

9  A   No.

10      THE COURT:  Why not?  You said you cashed out some

11  of yours?  Why couldn't people cash out theirs?

12      THE WITNESS:  You don't cash out the credits.  There

13  were three balances on the back office.  There was the active

14  ad packages, after that there was the credit balance, which

15  was the number of credits that you've earned, and the third

16  was a cash balance.  That's where your rebates were paid.

17      You don't cash out your credits.  You cash out your

18  cash balance, which is -- that's where the rebates and the

19  commissions were paid.

20      THE COURT:  Got it.

21  Q   (BY MR. MUTHYALA)  So now we've talked about this 125

22  number a lot.  A lot of people were getting this 125 percent,

23  right?

24  A   There were ad packages that were expiring daily, yes.

25  Q   Exactly.  And so those ad packages are expiring because

1  people are getting 125 percent?

2  A   They have been -- they had been paid their 125 percent in

3  the rebates, yes.

4       THE COURT:  They had been paid the 125 percent in

5  the rebate but they didn't necessarily cash them out.  They

6  could just be in their cash balance.

7       THE WITNESS:  Or they could purchase other

8  advertising with them.  They term that as a rollover sometimes

9  or an upgrade.

10      THE COURT:  Okay.

11 Q   (BY MR. MUTHYALA)  Did a lot of people actually cash out?

12 A   Some did.  I mean, there were -- there were -- yes, there

13 were cash-outs.

14 Q   ASD was sending out checks every single day?

15 A   Yes.

16 Q   Substantial amounts of checks every single day?

17 A   I don't know totals, but I would assume so, yes.

18 Q   There was actually a backlog; you were running behind

19 schedule on sending out people's cash-outs?

20 A   That happened shortly after the Tampa convention in June.

21 Our site was down for approximately 10 to 13 days for

22 upgrading.

23 Q   And there was a -- essentially people were coming and

24 asking for their money back?

25 A   No, no.  What was happening was there was -- during that

 1   time our site was down, they could not request a cash-out.

 2   The first day when we came back up online, we had over 800

 3   cash-out requests in an office that at that time was four

 4   people, and they had to process the paperwork, they had to

 5   send it to accounts payable.

 6   Q   And was this during the 20,000 members or 100,000-member

 7   time frame?  When was this?

 8   A   That was -- we probably had 50- to 60,000 at that time.

 9   The -- that was right at the beginning of the membership

10   explosion.

11   Q   And --

12   A   And that is what initially caused the backlog in our

13   cash-out system.

14   Q   Where was this extra 25 percent coming from that was

15   being paid out to people, because obviously people putting in

16   100, taking out 125, where was the extra $25 coming from?

17   A   It was coming from the 50 percent of the revenues.

18   Q   Where does that come from?

19   A   Where does the revenue come from?

20   Q   Yes.

21   A   From people buying ad packs and from whatever other

22   income sources ASD had.  I'm not --

23   Q   Let's talk about that other income sources that ASD had.

24   What other income sources ASD had other than members?

25   A   I don't know specifics on those.  I was never involved.

1   Q   Tell us what you know generally about the topic.

2   A   I had a conversation with one of the -- one of

3   Mr. Bowdoin's -- I don't know whether he's a business partner

4   or just an affiliate.  His name is Nate Boyd.  For quite

5   awhile I was in touch with him.  Before Mr. Peterson came

6   aboard, he was a compliance officer, and in my capacity as

7   customer service, it was necessary for me to make contact with

8   him several times with compliance issues, and I asked him

9   directly the question about the other source of income, and he

10   told me that they were there.

11         He didn't -- he wasn't specific as to what they

12   were, and he said that, you know, we -- we, as a company, have

13   not disclosed those to the general public, and that -- I

14   trusted Nate Boyd enough to know that if he said they were

15   there, they were probably there.

16   Q   Did you prepare at all before you came in today?

17   A   Did I prepare?

18   Q   Prepare for the testimony today?

19   A   I had conversations with my attorney, yes.

20   Q   Other than conversations with the attorneys, did you have

21   any conversations with anyone at ASD?

22   A   No, not specific -- not specific to my testimony, no.

23   Q   Did you talk generally about your testimony, about the

24   type of questions that the prosecutors would ask and the type

25   of things the judge would want to know?

1    A    No, not with anyone at ASD.

2    Q    Did you talk to Andy Bowdoin before you came here today?

3    A    No.

4    Q    You didn't think it was important to talk to the

5    president of the company when you're coming to court to

6    testify about the company?

7    A    I was lower-level management and he's the president of

8    the company and I didn't see him that often.  Over the past

9    six weeks, he was mainly coming into the office to confer with

10   the CF- -- the current CFO, Gary Talbert or to, you know,

11   meetings that he had with other people.

12   Q    How about before the six weeks -- before these last six

13   weeks when the company was actually functioning, did you talk

14   to Andy Bowdoin?

15   A    We spoke.  He was in the office almost every day.  His --

16   it usually took him anywhere from 10 to 15 minutes to get to

17   his office because he would go around shaking hands and asking

18   people how they were.  He's a very amiable man.

19   Q    Did he ever talk to you about income sources for the

20   company?

21   A    No.

22   Q    Did you ever attend any rallies or conventions?

23   A    I was at the Tampa convention and I was at the Miami

24   rally.

25   Q    Did you listen to Mr. Bowdoin speak at the Miami rally?

1    A    No, sir.

2    Q    So you have -- sitting here today, is your testimony you

3  don't know any income source that ASD has, other than members

4  themselves?

5    A    Well, I know that GreenBackStreet was one that was to be

6  bringing in revenue.

7    Q    How much revenue was GreenBackStreet supposed to be

8  bringing in?

9    A    I don't know.

10    Q    Did you ever ask him?

11    A    No.

12    Q    You were in customer service, right?

13    A    Yes.

14    Q    People call you about ASD?

15    A    Yes.

16    Q    They ever ask you how does the company make money?

17    A    No.

18    Q    No one ever asked that?

19    A    That --

20    Q    In your eight -- April through August, five months that

21  you were at ASD, no one ever asked -- when someone called

22  customer service, never asked you how did the company make

23  money?

24    A    Usually when people were calling me, it was because they

25  were trying to straighten things out in their own account.  It

1    wasn't -- I wasn't the information man in the company as far

2    as, you know, like what you'd see at the airport, someone, you

3    know, that's -- just answering general questions.

4            They were calling me or e-mailing me on specific

5    issues with their account.

6    Q    What type of specific issues about their account did most

7    people call about?

8    A    Most of the time it was ad packs that hadn't been posted

9    yet or they would -- they would contact me about cash-outs;

10   however, I was not in the cash-out department and I would send

11   them to the appropriate person.

12   Q    You were here when Mr. Nehra was testifying?

13   A    I was.

14   Q    And you remember Mr. Cowden and him were going back and

15   forth and back and forth and back and forth and back and

16   forth --

17           MR. COWDEN:  Objection.

18           (LAUGHTER.)

19   Q    (BY MR. MUTHYALA)  -- about the 125 percent?

20   A    Yes.

21   Q    People in ASD were getting 125 percent, right?  You

22   testified to that a few minutes ago?

23   A    Yeah.  There were ad packs that expired, yes.

24   Q    Yeah, tons -- a lot of people getting 125 percent.

25           MR. GOODMAN:  Objection to the form of the question,

1  "tons" and "a lot."

2          THE COURT:  All right.  We'll take out "tons" and

3  put in "a lot."

4          MR. MUTHYALA:  I'm sorry.

5          (LAUGHTER.)

6  A    There were ad packs that were expiring every day.  That

7  was a -- that was a natural course of business.

8  Q    (BY MR. MUTHYALA)  Okay.  We've heard a lot about the

9  50 percent.  The way ASD pays the rebates is on 50 percent of

10  yesterday's revenue, as you called it?

11  A    Correct.

12  Q    Right?  And you haven't said this yet but I think you'll

13  agree with me when I say, according to ASD, on the days when

14  there is no revenue, people don't get anything, right?

15  A    As a matter of policy, that's correct.  If there were --

16  if there were no revenue, there would be no rebates.

17  Q    Okay.  And --

18          THE COURT:  Is it not true as a matter of practice?

19          THE WITNESS:  The reason I say that, Your Honor, is

20  there were times when what we termed global credits were

21  issued, and I think that's what counsel was getting at, and

22  those were customer service issues.

23          THE COURT:  So that you were crediting people for

24  watching things that they couldn't watch.

25          THE WITNESS:  Well, for not being able to do what we

1   were doing as a service to them.

2           THE COURT:  So where did the money come from if

3   there were no revenue the prior day?

4           THE WITNESS:  My understanding as to where that

5   money came from, there is -- in the formula that's -- that's

6   set out in our documents, there is a 5 percent fund that, for

7   lack of a better explanation, is a rainy day fund.

8           THE COURT:  Right.

9           THE WITNESS:  And that -- that was where --

10          THE COURT:  It's used as unidentified.

11          THE WITNESS:  Ma'am?

12          THE COURT:  It's used as unidentified.

13          THE WITNESS:  Exactly.  And that was where those --

14  those global credits were coming from.

15  Q   (BY MR. MUTHYALA)  So it's not true that you only get paid

16  from ASD if there was money from the day before.  There's this

17  reserve account which every single day 5 percent of ASD's funds

18  are going into.  That's essentially a way to keep on paying,

19  right?

20  A   That's -- I don't know all of the functions of the

21  reserve account.  That is -- it is my understanding that when

22  global credits were applied, that that was where they were

23  coming from.

24  Q   Let's help you out with the understanding of your

25  company's reserve accounts.  Here is a short line about it.

1    And while you're looking at this, I'll try to find the place

2    with some more information.

3          Looking at the -- this paragraph right here.

4    (Reading) To maintain the stability of the program..."

5          THE COURT:  What document are you looking at?

6          MR. MUTHYALA:  I am looking at Government

7    Exhibit No. 2, Your Honor.

8          THE COURT:  Thank you.

9          MR. MUTHYALA:  Sorry.  And this will be admitted

10   into evidence.  I think it already has been.

11         THE COURT:  I think it has been.

12   Q    (BY MR. MUTHYALA)  Yes. (Reading)  To maintain the

13   stability of the program, the daily rebate will be capped at

14   8 percent.  Any excess will go into a reserve account to be used

15   when rebates are extremely low.

16         So ASD's policy is that they will use the rebates

17   when -- I'm sorry, they'll use the reserve account when

18   rebates are extremely low.

19         So would you agree with me now that ASD doesn't -- I

20   don't want to do a double negative.  ASD pays even though

21   there may not have been sales the day before?

22   A    They had mechanisms in place that would allow them to

23   issue the global credits on days when our members could not

24   surf or when revenues could not be posted to the accounts.

25   Q    The reserve account was created to pay -- I'm sorry.

1    "Yes" or "no" answer.  The reserve account was created for

2    when revenue was low?

3    A    Correct.

4    Q    And in fact, let me get back to something we talked about

5    earlier.  I'm sorry.  I don't mean to jump around.

6         We talked about those ad packs expiring once people

7    received 125 percent, right?

8    A    Yes, sir.

9    Q    So days when people can't show their web page and people

10   can't go surf the web -- surf their web because ASD was down

11   for those two-week period, people were losing their packages,

12   they were getting rebates back, so their packages were

13   starting to expire even though their web page wasn't being

14   shown; is that right?

15   A    Again --

16   Q    "Yes" or "no" first.

17   A    I would have to say "no" to that question.

18   Q    Why?

19   A    The ad packs were not what was allowing them to be shown

20   on the rotator.  The reason for the global credits was for

21   compensation for the advertising time that they were losing.

22   It was -- it did not -- it was -- it was applied to the

23   individual ad packages for rebate purposes, but they lost no

24   credits when their advertisements were not in the rotator.

25   Q    So it's almost like the rebates are completely separate

1    and apart from the advertising?

2    A    No.  It's not completely separate.

3    Q    One second now.  You're not -- because these people are

4    suffering and they're not --

5                MR. GOODMAN:  Excuse me.  Objection.  Can the

6    witness finish giving the answer, please?

7                THE COURT:  I think he finished.  Why don't we go

8    on.  This is cross-examination.  Go ahead.

9    Q    (BY MR. MUTHYALA)  Now -- oh, I totally lost my train of

10   thought.  I'll come back to that in a second.

11               Okay.  Now, here it is.  125 percent.  You're paying

12   it when people can't look at their -- can't look at their web

13   pages.  That's an obligation that ASD has no matter what.

14   What is the company doing for folks when the web page cannot

15   be shown?

16               MR. GOODMAN:  Objection to the form of the question,

17   Your Honor.

18               THE COURT:  All right.  Yes.  You're not asking your

19   question.  You're making a statement and then you're asking a

20   different question.

21               MR. MUTHYALA:  Let me ask a question then.

22   Q    (BY MR. MUTHYALA)  Essentially, ASD is paying 125 percent.

23   We've established that already.

24   A    Correct.

25   Q    Right.  When the web page is down, ASD isn't doing

1  anything special for its members, right?  It's still -- was

2  going to pay the 125, it's paying the 125.  The advertising is

3  not working; ASD is just paying it out?

4  A   It's paying whatever percentages for those days, those

5  individual days.

6  Q   Exactly, and it's always -- historically, always been

7  around 1 percent during a weekday and about .5 percent on the

8  weekend; is that right?

9  A   With exceptions, yes.

10 Q   Has ASD ever paid more than 2 percent on any day?

11 A   Yes.

12 Q   What days are those?

13 A   I don't have the -- I don't have the date with me, but

14 I've seen -- I've seen 2.13 percent as one particular number

15 that stays in my mind.

16 Q   How about more than 2.5 percent?

17 A   That, I don't believe I've seen, other than -- now, when

18 the global credits are applied, they're applied in a lump sum

19 percentage, and I've seen 8 percent on those.

20 Q   But over a period -- that's supposed to be divided over a

21 period of five days?

22 A   Exactly.

23 Q   Exactly.  So, it's not really 8 percent, right?

24 A   Right.

25 Q   For one day.

1          What's your understanding of how many people are in

2    ASD only for the advertising and not the rebates?

3    A    I don't know.  I really have no figures on that.  That

4    was not my -- my position in customer service, I dealt with

5    people whether they were in it for the rebates or were in it

6    for the advertising.  It mattered not to me.  My -- my concern

7    was taking their issues and getting them corrected so that

8    they could go on with whatever they were doing.  I never

9    asked.

10   Q    Did you ever hear anyone talk about just the advertising,

11   no, I'm not interested in the rebates?

12   A    Yes, I have.

13   Q    On how many occasions have you heard that?

14   A    On several.  It's -- it's -- I'm going to say it's a

15   common occurrence for someone to get involved with ASD for the

16   advertising, not realizing that they could make rebates.  I've

17   spoken to several members that that's how they got involved

18   was to advertise their website.

19   Q    And do any company names come to mind?

20   A    Green Gopher Health.  Mr. --

21   Q    Green Gopher Health, that's the gentleman, Mr. --

22   A    That's --

23          THE COURT:  Grayson.

24   Q    (BY MR. MUTHYALA)  Mr. Grayson.  Mr. Grayson who testified

25   earlier?

1    A    He's one I've had a lot of conversations with in the past

2    while doing customer service for him and his organization.  He

3    was -- he was one of them that told me that he was in for

4    several weeks before he even put any money into it because he

5    was in it for the advertising.

6            Another one is Tom Ray was -- I think he was six

7    weeks just doing advertising before he realized that there was

8    a potential to get rebates.

9    Q    When you say "advertising," you mean the free part of the

10   advertising?

11   A    Exactly.

12   Q    Okay.  Valid point.  Absolutely.  But now, people that

13   paid for the advertising, Mr. Grayson -- you were here, we

14   were all here, once he started paying for the advertising, he

15   always admitted, he was like, "I was in it for the rebates as

16   well as the advertising"; is that not true?

17           MR. MUTHYALA:  I'm sorry, is there an objection?  I

18   didn't finish my own question.

19           MR. GOODMAN:  It was a premature objection.  You did

20   an auto turn and you changed the question in the middle and

21   saved yourself.

22   A    Mr. Grayson was --

23           THE COURT:  I think we're all learning that you're

24   in law school.

25           (LAUGHTER.)

```
 1              THE COURT:  All right.  We'll say there aren't
 2     objections being made that could be made, so don't think this
 3     is real life.
 4              MR. MUTHYALA:  Absolutely.
 5              THE COURT:  Okay.  Do you remember the question?
 6              THE WITNESS:  Your Honor, if this is not real life,
 7     please wake me up and let me be in Quincy.
 8              THE COURT:  This is real.
 9     Q    (BY MR. MUTHYALA)  Do you remember the question?
10     A    Mr. Grayson was participating in the rebates, yes.
11     Q    Okay.  Now, talking about people who were paying for
12     advertising, did you -- did you speak to many people, as you
13     said, who were in it just to pay to have their site
14     advertised?  Why would -- Sorry.  Let me stop there.
15     A    Yes, I spoke to many people that had paid for
16     advertising.
17     Q    And that weren't also interested in the rebate?
18     A    The rebates were an intrinsic part of the overall
19     business model.
20     Q    Yes, but my question is -- Sorry.  Go ahead.
21     A    And because of that, the rebates were discussed, yes.  I
22     don't -- I don't have insight to why people would -- why
23     business people would do the things that they're doing with
24     their advertising.  That wasn't my -- that wasn't what I was
25     trying to do.  I was trying to help them with any -- any
```

1    issues that they had.

2    Q    Someone can advertise their business on ASD for free?

3    A    That's correct.

4    Q    Why would they then give ASD money, other than the fact

5    that they want the rebate?

6    A    One of the -- again, with the Pay To Click program that

7    we had, there were times when you would need to have more

8    credits than what you would be earning by surfing.  If you

9    wanted to take advantage of the Pay To Click program, which to

10   the best of my knowledge was a very good way of getting your

11   site in front of targeted audiences, because people could pick

12   and choose what they wanted to click on to see that web page.

13            I mean, when you went into that part of the back

14   office, it would come up with a whole list of banner-type ads

15   that were -- you know, one might be Bonzo & Company, one might

16   be Green Gopher Help, and in order to put your site into the

17   Pay To Click stream, so to speak, you would allocate credits,

18   usually multiple credits to a single viewing of your site.

19   Q    When you say "targeted audience," do you mean someone

20   would do a search for healthcare items and they'd pop up on a

21   website in ASD?

22   A    No, there was no search engine on there, but what you

23   could do is you could go down the list, however many pages of

24   the banner ads there were, and you could pick and choose what

25   you wanted to look at.

1          Therefore, I say "targeted audience" in the sense

2    that they're not necessarily clicking on your ad just because

3    they want to see your ad.  If you have a -- if you have a

4    widget company and they're looking for a widget, they'd click

5    it.

6    Q    But there's no way to find that widget company unless you

7    scrolled and scrolled and scrolled on a page?

8    A    For however many ads there were, yes.

9          THE COURT:  How many free advertisers are there or

10   were there?

11         THE WITNESS:  I don't have numbers, Your Honor.  I

12   know that there are free advertisers.  I know that there were

13   quite a few.  I myself joined for free and was -- I had my --

14   my clowning website was actually the first website that I put

15   up there and I was doing it for free.  This was before I ever

16   got ad packs as a bonus or -- there was -- there were two

17   weeks before I ever got a bonus, you know, with -- where the

18   company actually gave me ad packs, but I was -- I was putting

19   my clowning site into the rotator in the hopes of someone

20   locally seeing the website.

21   Q    But the website wasn't capable of just showing to certain

22   geographical areas; is that right?

23   A    No.  That was something that we were hoping to be able to

24   do.

25   Q    You said "we were hoping to do," who are you talking

1    about?

2    A    We, as a corporation.  We -- that was one of the things

3    discussed in some of our meetings was that we were -- we were

4    looking for the function to be able to separate,

5    geographically, the different websites so that the advertising

6    would be more -- more localized.

7    Q    Ever hear of Andy Bowdoin talking about investing funds

8    in -- Sorry -- investing member funds into call centers --

9    into a call center in South America, ever hear anything about

10   that?

11   A    No.

12   Q    You read the Government's complaint, did you not?

13   A    Not all of it.  I read the main body of it.

14   Q    In that complaint there was a portion of Mr. Bowdoin at

15   the Miami rally and there's a transcript that someone on the

16   web transcribed of what he said at the Miami rally.  Did you

17   get a chance to read that?

18   A    I don't recall that, Counselor.

19   Q    Did you ever hear of Andy Bowdoin talking about investing

20   funds from ASD into an international bank?

21   A    There was -- yes, there was, if you're referring to

22   Antigua.  That was -- that was in order to have a

23   processing of -- I don't know exactly what it's called, but

24   that -- that account was set up in order to be able to accept

25   a Visa card at the rallies.

1   Q   What about Andy Bowdoin talking about investing in the

2   real estate market?

3   A   We had recently purchased a four-story building, and they

4   were -- they had discussed buying distressed properties and

5   using those as -- as an investment to basically wait out the

6   housing market and sell at a profit.

7   Q   And this was using the money that was coming in from ASD

8   members?

9   A   That was a separate corporation.

10  Q   What corporation was that?

11  A   I believe it was called Bowdoin Harris or Harris Bowdoin.

12  Q   And where was the money from Bowdoin Harris going to come

13  from?

14  A   I don't know.  I wasn't involved with them.

15  Q   But when Mr. Bowdoin talked about investing in real --

16  the real estate market, was he talking about using the master

17  money?

18  A   I don't know.

19  Q   Now, getting back a little bit to this -- something we

20  talked about earlier.  You put in $50, right?

21  A   Yes, sir.

22  Q   And you pulled out $400?

23  A   Yes, sir.

24  Q   700 percent return.

25  A   I received --

1   Q   "Yes" or "no"?

2   A   That would be whatever the percentage is, yes.

3   Q   And you never asked Andy Bowdoin where that money came

4   from?

5   A   I knew where that came from.  I didn't have to ask Andy

6   Bowdoin.  That came from the bonuses that were -- that were

7   given to me for my performance.  They gave me ad packages,

8   which gave me rebates for which I was able to cash out.

9   Q   So, Andy Bowdoin was treating the ad packages,

10  essentially, as compensation, as money, right?

11  A   He was treating them as ad packs that were gifted to me,

12  yes.

13  Q   And he was treating it as cash?

14  A   No.  I treated it as cash when I got my check.

15  Q   Exactly.  So you were looking for it into cash, right?  I

16  mean -- Let me back up.  You went to this rally you worked.

17  Normally people get cash when they work, right?

18  A   I did get paid.  That was a bonus.

19  Q   And normally people get bonuses in cash, right?

20  A   Sure.

21  Q   And in this case, you got a bonus in cash as well, right?

22  A   Sure.  It was a bonus in ad packs, yes.

23  Q   And that was essentially -- Strike that.  Who's Tiffany

24  Osmin?

25  A   Tiffany Osmin is my niece.

1    Q    And you gave her ad packages; is that right?

2    A    Yes, I did.

3    Q    What for?

4    A    I wanted her to see how ASD worked.  I gave her 10 ad

5    packages.

6    Q    Did she have a -- did she have a business?

7    A    I don't know.

8    Q    Because --

9    A    She was advertising -- she was -- she told me she was

10   going to advertise my business; however, she never surfed, so

11   you know, those 10 ad packs are still sitting right there.

12   They never earned anything.

13   Q    Who is Jonathan Osmin?

14   A    Jonathan is my son.

15   Q    How old is he?

16   A    He is 19.

17   Q    And you gave him some ad packages as well?

18   A    Yes, I did.

19   Q    What for?

20   A    I initially set him up with, I believe, 10 ad packs.  I

21   gave him 50 ad packs for his birthday, and he is

22   advertising -- the site on the rotator that he's using is

23   Bonzo & Company because he is part of Bonzo & Company.  He

24   does face painting and clowning.  Does a great balloon animal.

25   Q    A great what?

1    A    Balloon animal.

2              MR. MUTHYALA:  Brief indulgence, Your Honor.

3              THE COURT:  Uh-huh.

4              (PAUSE.)

5    Q    (BY MR. MUTHYALA)  Sir, you had an opportunity to look at

6    the ASD web page; is that right?

7    A    That's correct.

8    Q    And Government Exhibit No. 3 is what appears on the

9    company link of the ASD web page.  Take a look at that screen

10   if you don't mind.  Is that right?

11   A    That's correct.

12             THE COURT:  Hold on.  We're having a little

13   technical glitch here.  Can you still get it?  Catalina, can

14   you still take it down?

15             COURT REPORTER:  Yes, I can, Judge.

16             THE COURT:  Never mind, then, keep going.

17   Q    (BY MR. MUTHYALA)  Sir, around what time did you see this

18   web page -- this ASD web page and it looked like this?

19   A    I don't know if I'm --

20   Q    Do you understand the question?  Let me try to re-ask the

21   question.

22             When is the last time you looked at the ASD web page

23   and you saw what I'm showing you in Government Exhibit 3?

24   A    It has been quite awhile.  I looked at it when I was

25   first employed with the company.  After that, I had no

1   occasion to go back.

2   Q   So around April of 2008?

3   A   Yeah.

4   Q   This is an accurate depiction of what you saw on the web

5   page?

6   A   I believe so.  The print is kind of small, but I mean,

7   it's -- I remember the picture of Mr. Bowdoin and going into

8   some background about the company.

9            MR. MUTHYALA:  Your Honor, at this time the

10  Government moves Government Exhibit No. 3 into evidence.

11           THE COURT:  All right.  Any objection?

12           MR. GOODMAN:  I don't object, Your Honor, just so

13  long as the Government, after this hearing, files the other

14  page print from the link that we have not yet seen.

15           MR. MUTHYALA:  Your Honor, actually, we have those

16  here now with me.  I will show them to the witness and admit

17  them along with the entire set.  I'll show them to counsel as

18  well.

19           THE COURT:  All right.

20           (GOVERNMENT EXHIBIT 3 ADMITTED.)

21           MR. MUTHYALA:  We do not have the contact page.  I

22  think counsel's main objection was to the "Join Free" page.

23  We never saved the "Contact Us" page.

24           THE COURT:  Right.

25  Q   (BY MR. MUTHYALA)  Sir, I'm showing you next Government

1   Exhibit No. 4, which is the "Opportunity" tab of the ASD web

2   page as you remember it from April 2008; is that correct?

3   A    That appears -- Yes.  That appears to be the one.

4            MR. MUTHYALA:  Your Honor, at this time I am moving

5   in Government Exhibit No. 4 into evidence.

6            THE COURT:  All right.  Government Exhibit 4 is

7   received.

8            MR. GOODMAN:  No objection, Your Honor.

9            THE COURT:  Without objection.

10           (GOVERNMENT EXHIBIT 4 ADMITTED.)

11  Q    (BY MR. MUTHYALA)  And sir, Government Exhibit No. 5 is

12  the "Frequently Asked Questions" page from the Ad Surf Daily web

13  page as you remember from April 2008; is that correct?

14  A    That would be correct.

15           MR. MUTHYALA:  And at this time Government moves

16  Exhibit No. 5 into evidence, Your Honor.

17           THE COURT:  Without objection?

18           MR. GOODMAN:  I don't know, Your Honor.  Mr. Fayad

19  was attempting to get my attention and I can't listen to

20  counsel and --

21           THE COURT:  All right.  Why don't you listen to

22  Mr. Fayad and tell me if you have an objection, all right?

23           MR. GOODMAN:  I apologize, Your Honor.

24           THE COURT:  That's all right.

25           (PAUSE.)

1      MR. GOODMAN:  No objection, Your Honor.

2      THE COURT:  Thank you.  Government Exhibit 5 will be

3  admitted without objection.

4           (GOVERNMENT EXHIBIT 5 ADMITTED.)

5      MR. MUTHYALA:  Thank you, Your Honor.

6  Q   (BY MR. MUTHYALA)  Sir, did you ever have an opportunity

7  to see the legal statement that was posted on the ASD web page?

8  A   The one by Mr. Garner?

9  Q   Yes.

10  A   I have seen it, yes.

11  Q   I'm showing you what's been marked as Government Exhibit

12  No. 6.  Does that appear to you to be the legal statement from

13  Mr. Garner that was posted on the ASD web page?

14  A   That appears to be it.

15      MR. MUTHYALA:  Your Honor, at this time I'm moving

16  Government Exhibit No. 6 into evidence.

17      THE COURT:  All right.  It will be received.  I

18  think it's already in evidence, but I'll take Government

19  Exhibit 6.

20           (GOVERNMENT EXHIBIT 6 ADMITTED.)

21      MR. MUTHYALA:  Thank you.

22  Q   (BY MR. MUTHYALA)  And sir, Government Exhibit No. 7 is

23  the Join Free Tab of the ASD web page; is that correct?

24  A   That's correct.

25      MR. MUTHYALA:  Move Government Exhibit No. 7 into

evidence, Your Honor.

MR. GOODMAN:  No objection.

THE COURT:  All right.  Government Exhibit 7 is received.

(GOVERNMENT EXHIBIT 7 ADMITTED.)

MR. MUTHYALA:  And I have no further questions for this witness, Your Honor.

THE COURT:  Thank you.  Well, it's 25 after.  Do you have any redirect?

MR. GOODMAN:  I don't.

THE COURT:  All righty.  Actually, I have a few questions.  I just want to make sure, again, that I've got this.

All right.  So I can be an advertiser and just advertise and I pay money for my advertisements.  I get one -- a view for every dollar I pay, period?

THE WITNESS:  You get one credit for every dollar you pay and that translates into one view, yes, Your Honor.

THE COURT:  All right.  It's -- we can change the names around, but I pay $100, I get 100 views?

THE WITNESS:  Correct.

THE COURT:  Okay.  Now, if I want to be a member, I can either be a free member or a paying member?

THE WITNESS:  Correct.

THE COURT:  What's the benefit of being a paying

member as opposed to a free member?

THE WITNESS:  The membership levels, there were four.  The training level was the free member.  As a trainee, you would surf 24 sites per day in order to qualify for the rebates.  You would make 3 percent on your first level as a commission only.  There is no second level on the trainee level, and you were allowed to cash out from your cash balance on Monday only.

The second level was what we called the executive director.  That was $10 a month as a membership fee.  It allowed you to -- you still had to surf 24 sites.  It allowed you to receive commissions on first and second level, and again you would cash out on Mondays only.

THE COURT:  And are the commissions 10 and 5 percent?

THE WITNESS:  No, they were -- let me see if I'm recalling this correctly.  It was 4 percent -- I'm sorry.  5 percent on the first level, and I believe it was 3 percent on the second.

THE COURT:  Okay.

THE WITNESS:  And also, on the trainee, I'm sorry, there was a 2 percent processing fee for trainees.  That goes away at the 10-dollar level.

THE COURT:  So 2 percent processing fee --

THE WITNESS:  For --

1           THE COURT:  -- for all commissions paid?

2           THE WITNESS:  Actually for cash-outs, I believe, is

3     where that was assessed.

4           THE COURT:  Okay.

5           THE WITNESS:  The third level was the VIP level,

6     which was $25 a month.  You receive 7 percent on your first

7     level.  I believe it was 5 -- 4 percent on your second

8     level -- 4 percent on your second level.  You could cash out

9     Monday, Wednesday and Friday and there were no processing fees

10    and you only had to surf 18 sites per day to qualify for the

11    rebates.

12          THE COURT:  So was there a processing fee for the

13    second level?

14          THE WITNESS:  No, ma'am.  There was only processing

15    fees on the trainee level.

16          THE COURT:  Okay.

17          THE WITNESS:  The fourth level is the Executive VIP,

18    which is the one that's been most talked about, with

19    10 percent on the first level, 5 percent on the second level,

20    no processing fees.  You would surf 12 sites per day and you

21    could cash out Monday through Friday.

22          THE COURT:  I thought somebody said something about

23    having to see 75 sites a day.

24          THE WITNESS:  No, you had -- the maximum that you

25    could surf was 72 sites per day.

1          THE COURT:  To get more credits.

2          THE WITNESS:  Exactly.  They designed that for

3    people that had more than one website.  The trainee level, I

4    believe, was capped at one website.

5          The two intermediate levels, I believe, were capped

6    at three, and then the Executive VIP, you could -- you could

7    actually put five sites into the rotator.  They did the 72

8    surfing cap -- 72-site surfing cap in order to accommodate

9    the -- those people that would have three websites in the

10   rotator at 24 a day.

11         THE COURT:  Thank you.  That tells me what I needed

12   to know.  Thank you, sir.

13         THE WITNESS:  Thank you.

14         THE COURT:  You're excused.  Now we'll take a break

15   for 10 minutes, okay.

16         THE DEPUTY CLERK:  All rise.

17         (A BRIEF RECESS WAS TAKEN.)

18         THE COURT:  Okay.  Everybody, I don't know if we're

19   going to finish by 4:30, but I have to finish at 4:30 today

20   because I have another appointment that I need to make that I

21   had yesterday that I never made, I never got to, and so I

22   really, really, really, I have to get there.  It's only on the

23   fifth floor, but I have to get there nonetheless, so at

24   4:30 we are going to have to break.

25         I don't anticipate that we will be done.  My

schedule the next two days is packed.  How do your schedules

look on Monday?  That's the soonest I have room in this

courtroom.

MR. COWDEN:  Your Honor, Bill Cowden with the United

States.  I understand they have one more witness.  My

suggestion would be that we do the witness, we finish the

witness and then what we could do is we could order the

transcripts on an expedited basis and the two parties could

propose findings of fact and conclusions of law for Your Honor

on an expedited basis and you could take the matter under

advisement and we'd be done today.

MR. GOODMAN:  Agreed.

THE COURT:  That's fine by me.  All right.

Why don't you call your last witness, then.

MR. GOODMAN:  Yes, Your Honor.  Phil Schwartz.

THE COURT:  Mr. Schwartz, please come forward, sir.

(WITNESS SWORN BY THE DEPUTY CLERK.)

THE COURT:  I had one question I meant to ask the

last witness and didn't.  Perhaps you'll be good enough to

just give me the answer.

Does someone at the Executive VIP level have to pay

a monthly fee?

THE WITNESS:  Yes, ma'am.  That's $100.

THE COURT:  Thank you.

COURT REPORTER:  Was that $400?

1          THE COURT:  100.  Sorry.  Go ahead.

2                    PHILIP SCHWARTZ,

3    having been duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MR. GOODMAN:

6    Q   Good afternoon.  Tell us your name, please.

7    A   Philip Schwartz.

8    Q   Mr. Schwartz, in the interest of time, with the Court's

9    permission, I'm just going to briefly lead him through some

10   questions about his background.

11         THE COURT:  Go ahead.

12   Q   (BY MR. GOODMAN)  Mr. Schwartz, you're a lawyer?

13   A   Yes, sir.

14   Q   You're a partner of mine at Akerman Senterfitt?

15   A   Yes, sir.

16   Q   You're mostly a corporate business lawyer, correct, sir?

17   A   That is correct.

18   Q   You have been a corporate business lawyer who has given

19   seminars and lectures and those sorts of things?

20   A   Yes, sir.

21   Q   You have been involved in various regulatory matters,

22   compliance plans and investigations with various state and

23   federal agencies, am I right?

24   A   That is correct.  I've worked with a number of companies

25   that have been in regulatory -- have had regulatory issues and

1    helped them work through those issues.

2    Q    Including the use of a compliance plan?

3    A    Including the use of a compliance plan.

4    Q    And you have been involved in investigations with

5    businesses accused of, among other things, running a Ponzi

6    scheme?

7    A    Yes, sir.

8    Q    In front of you, Mr. Schwartz, is a black looseleaf

9    binder, and under the "Phil Schwartz" tab you will see that

10   the very first document there is your resume.

11              MR. GOODMAN:  Your Honor, we would offer

12   Mr. Schwartz's resume as Exhibit 6 -- Claimant's Exhibit 6.

13              THE COURT:  Any objection?

14              MR. COWDEN:  No objection.

15              THE COURT:  Thank you.

16              (CLAIMANT'S EXHIBIT 6 ADMITTED.)

17   Q    (BY MR. GOODMAN)  You will also see, Mr. Schwartz, that

18   right underneath Exhibit 6 is something called, "The Notice of

19   Filing Compliance Plan."

20              MR. GOODMAN:  Your Honor, we would offer that as

21   Claimant's Exhibit 7, which I believe is already in the record

22   because we filed it with the clerk as of last week.

23              THE COURT:  We'll accept it as an exhibit at this

24   hearing.

25              MR. GOODMAN:  Thank you.

1          (CLAIMANT'S EXHIBIT 7 ADMITTED.)

2     Q    (BY MR. GOODMAN)  Mr. Schwartz, I take it that you are the

3     primary drafter and architect of the proposed compliance plan?

4     A    I am.

5     Q    Let me just quickly flag for you what I do not want you

6     to do.  I do not want you to simply read what is in the

7     compliance plan because Her Honor is capable of reading that

8     compliance plan in due course.  Are we clear?

9     A    Absolutely.

10    Q    All right.  So, with those restrictions, Mr. Schwartz,

11    and in the interest of time, please explain to us the basis of

12    the compliance plan and why you believe it is a mechanism

13    which can help this company get back onto its feet?

14    A    Thank you, Jonathan.

15         You know, when -- when this case began, and I

16    obviously was watching all the pleadings flowing back and

17    forth, it became very clear to me that this was a case, from

18    the standpoint of the business, where if something didn't

19    happen very quickly, the business was going to be lost because

20    effectively the business would be gone because the money was

21    seized.  No one would do business with this company unless

22    there was some methodology to bring the company back into the

23    good graces of the Government in an appropriate forum and with

24    appropriate checks and balances.

25         And so there was a discussion about the need to

develop an appropriate compliance plan. It was in the motion that our firm filed on behalf of the company, and it was further flushed out in the compliance plan that was filed with the Court some weeks ago.

The primary purpose of the plan is to accomplish three things, Your Honor. First of all, it is intended to protect the interests of the business, including the membership base from being lost. This is a situation, a social network, if you will, on the internet in which it goes away quickly if the business disappears for a long period of time. So there is an interest to be protected on behalf of the business and its membership base.

The second is that there needed to be a roadmap for how this business would be rehabilitated and a methodology that would provide not only oversight for the process but ultimately Court approvals built into the process so that at such time as the company began to re-emerge and began doing business, there would have been a thorough vetting with oversight and Court approval before that happened.

And third, to maintain the status quo while all these issues are sorted out. We'll talk about that issue first because it's the simplest one.

The Government has said, in some of their pleadings, the money will be gone if it's given back to the company, and I understand their concern. I think on behalf of the company

1  and on behalf of the members, there is a concern that money be

2  available ultimately for the funding of an appropriate

3  business plan going forward, that that money be at interest

4  and transparent so that everyone knows the money is there for

5  the appropriate purposes and it only gets used, except for a

6  small portion, at such time as a plan for the future of the

7  business is developed and that plan is approved by the Court.

8          So, only a small portion of the assets are available

9  under the plan for use to come up with and establish the

10  future business plan.  We picked $2 million as a proposal in

11  this case because the company is going to need to hire some

12  employees.  One of the parts of the plan is a need to bring in

13  an accounting firm that will help vet the numbers and make

14  sure that we understand what the balance sheet looks like

15  immediately prior to the seizure so we understand who is owed

16  what among the members.

17          There will obviously be legal fees associated with

18  it and there will be the costs associated with the monitor.

19  So, it's not an insubstantial number, but in the overall

20  context of this business, it's -- it's a small percentage of

21  the dollars, and those dollars can't be used under this

22  proposed plan unless there is a budget which is approved by

23  a -- an independent monitor appointed by the Court.

24          So, at the end of the day, even the use of the

25  $2 million is subject to oversight and it can't get used

1  unless somebody, independent -- and we don't want to have to

2  come back to the Court every time that we need to make an

3  expenditure under this plan, so that's the purpose, in

4  essence, of having a monitor who will participate in the

5  process to deal with all of those issues, taking ultimately

6  the ultimate decision back to you.

7          And that will include, by the way, in terms of the

8  overall funds, the funds that the company has in Antigua, such

9  as they are, because a lot of that money has already been

10  taken out by members who have reversed their credit card

11  transactions with the company.  So that's a forever developing

12  reducing number at this moment, but at some point all of the

13  money will be sitting in some kind of an escrow so that

14  everybody knows where it is and everybody knows it's at

15  interest and it's safe.

16          A small portion will be on the site for use to fund

17  this interim process in which the business plan for the future

18  operation of the company will be developed and everybody's

19  interest will be protected until such time as an ultimate

20  decision is made by the Court that the Court is comfortable

21  with the company emerging from this semi-paralysis that it's

22  in at this moment.

23          I must say that one of the issues that I focused on

24  fairly quickly that no one has talked about in terms of the

25  economics of this program is when you have relatively fixed

costs associated with the operation of the business and those

costs are relatively low in relation to the income, the more

throughput you have of dollars, even if you take out

significant amounts for rebates, say the 50 percent -- the 50

cents out of every dollar, and let's even assume the ultimate

levels and the memberships, the 10 percent and the 5 percent,

that takes it to 65 percent, that 35 percent becomes very

large very fast when your costs are fixed.  There are

economies of scale.

        I did ask the company, prior to this hearing, and we

did receive, over the weekend, a July 31 financial statement.

Obviously, that financial statement has not been vetted.  It

is a balance sheet and an income statement and it's obviously

unaudited and it will need to, as part of this plan, be vetted

by an accounting firm -- an independent accounting firm that

needs to come in and help us through that process.  We have

identified a regional firm based in south Florida that is very

well known, has substantial experience both with forensic

issues and accounting issues, a firm call Rachlan, Cohen &

Holtz.  They are referenced in the filing that the company

made, that is prepared to jump in subject to obviously being

appropriately retained.  But as I --

Q    Just bear with me for a minute.

A    Sure.

Q    The balance statement and income statement that you just

1   referenced.

2           MR. GOODMAN:  Your Honor, we would like to introduce

3   that as Claimant's Exhibit 8.  I have already given the

4   Government a copy before Mr. Schwartz took the stand, and if I

5   may hand the copies up to your deputy.

6           THE COURT:  All right.  Okay.

7           MR. COWDEN:  No objection.

8           THE COURT:  What's the date of this?

9           THE WITNESS:  7/31/08, Your Honor.

10          THE COURT:  Thank you.

11          (CLAIMANT'S EXHIBIT 8 ADMITTED.)

12   A   And as you would have expected, again, because of the low

13   nature of the fixed costs, it shows for the first seven months

14   of 2008, substantial profitability, almost $20 million of net

15   income before taxes, and it shows a net worth after all the

16   cash balances due to members are paid out and all these other

17   liabilities of about nine-and-a-half million dollars, so you

18   would expect to see that because there are no guarantees of

19   the 125 percent and you're only paying out a certain

20   percentage of a dollar earned.

21          So, even if you give away some of your revenues at a

22   certain level because your costs are low, you're going to make

23   money, and the company -- and again, this hasn't been vetted

24   yet and it needs to be vetted, but it's consistent with what

25   you would expect to see under those circumstances.

1    So, we have a business, call it a social network --

2   I've heard 75,000 members, I've heard 100,00 members, but that

3   social network of small advertisers is more than sufficient

4   critical mass to expect that over time it will both continue

5   to grow among its members but also it will attract other forms

6   of advertising and other types of revenues that internet

7   businesses generally receive.  And I don't know where the

8   break point is where you have sufficient members to reach

9   that, but having been involved with a number of internet

10   businesses, with the social networks, the ability to reach

11   those members who are participating in the business is usually

12   important today.

13    And frankly, social networks are at the forefront of

14   the internet advertising world.  We only have to look at the

15   Facebooks and the My Spaces of the world to understand that

16   these are the next generation of large advertising businesses.

17   It is different than bricks and mortar businesses.  I remember

18   10 years ago when the internet businesses -- when many

19   internet businesses were starting, people wandered how these

20   sites would ever make money and everybody said the advertising

21   will come, the advertising will come, and in many cases it

22   didn't, but in a lot of -- in a number of cases it did.

23    And so you have, with this core of businesses, with

24   this core of members, a substantial opportunity, and that

25   opportunity, from a business perspective, on behalf of the

1  company, will be gone if this company is not able to move

2  forward on an accelerated track through this compliance plan

3  to get its business back into the good graces of the

4  Government and move forward as a good corporate citizen.

5  Q    (BY MR. GOODMAN)  Mr. Schwartz, excuse me for just a

6  minute.  The Court has earlier heard that there were

7  approximately 1200 e-mails received by an e-mail address set up

8  by our law firm in the first five or six days after the seizure.

9  A    I think it was more than that in the first five or six

10  days.  It was probably 2500 to 3,000.

11  Q    But as we sit here today, do you have just a ballpark

12  figure of how many e-mails the firm has received to that

13  e-mail address?

14  A    The last time I looked, it was a little bit north of

15  4,000.

16  Q    All right.  Please continue.

17  A    Okay.  So back to the compliance plan.

18           The plan is intended to provide what I call a

19  roadmap for the rehabilitation of the business.  And you have

20  to recognize that no one will do business with this company

21  until this cloud created by the Government's action is lifted.

22           The plan allows the company to only go back into

23  business if the Court ultimately allows it to do so.  And what

24  the plan does is it says that the company is going to have to,

25  at this point, because of the Government's action, take a step

back, make sure that the business plan works, is vetted, is

thought out so that when it goes back out and becomes

effective, all of the issues that need to be -- be considered

and ultimately determined how they'll be handled are already

in place.

So, for example, the business plan, the terms of

service, the compliance that the company goes through, all of

those things need to be looked at, beefed up, make sure they

work.  To the extent that a stronger compliance function in

the company is necessary, and I believe, going forward, that

it is necessary, that all has to be put together so that if

there were issues, that those issues don't happen again.

The company's infrastructure needs to be fixed.  The

company grew very fast and it had the kinds of problems that

you often see with businesses that grow very fast.  Their

infrastructure was apparently not developed sufficiently to

support the kind of growth they were going through and it

showed in some of the, I'm going to use the word "chaos" that

occurred in those couple of weeks as the company was growing

so quickly.  That infrastructure needs to be there before the

company reopens.

The third is that the members who don't want to

consider -- continue as members, this plan will need to

include some methodology for an orderly withdrawal of those

members who decide that for whatever reason they don't want to

continue to participate, because one of the things that will
have to happen is any member that continues going forward is
going to have to resubscribe, if you will, to the terms of
service to make sure that everybody understands that this is
an advertising site and that they're paying for advertising.

And so some members may not want to continue.  I
don't know how many.  I was amazed that we got as many e-mails
as we did.  I expected we might get 50 or 100 e-mails to that
site.  4,000 e-mails is a lot.  I mean, I can't say anything
more than anecdotally, the fact that there are members here
today, this is a passionate group of members and there are a
significant number of them.  We've gotten calls from many of
them.  I suspect that the Government has and I suspect you
have, Your Honor.

The members want to participate in this business, so
we will have to develop a cash-out plan.  If someone wants to
leave, we will have to make sure that the terms of service,
the infrastructure, the compliance function are all -- you
know, are all right.  We, as I said, will need to make sure
the accounting is vetted.  I don't want to rely on internal
company financial statements under these circumstances.  I
want a good quality independent accounting firm that's going
to look at all of this and be prepared not only to report to
us and to the monitor and ultimately to the Court, but I want
to make sure that the numbers are in fact accurate.

1    So, you know, obviously there's a cloud over the

2    company, and therefore, anything the company says is going to

3    be suspect, so we need to bend over backwards to make sure

4    that the data is thoroughly vetted before it's ultimately

5    considered by the Court in that regard.

6    Finally, the company is going to have to develop

7    strong management to make sure things are done right.  This

8    business, from a corporate standpoint, has -- as is not

9    atypical of businesses that grow very quickly, has been a

10   little more informal in its corporate activities than it needs

11   to be.  It will need to add strength to management, it will

12   need to add oversight through a board of directors, a code of

13   ethics, and that will all have to be part of a plan, and it

14   can be part of a plan if it's a structured plan whereby the

15   company emerges, if you will, clean after this process.

16   If -- if -- no one will participate with the cloud

17   over their head of the company, but folks will participate if

18   they see a compliance plan being considered and adopted by the

19   Court ultimately that resolves the company's issues and moves

20   the company forward, and so that will have to be part of it.

21   Speaking very quickly to the issue of Mr. Bowdoin,

22   we -- it is clear that Mr. Bowdoin is under a cloud at this

23   point, and therefore, he needs to participate in the business,

24   but he clearly can't be the man in charge, even though he is

25   the majority shareholder of the company.  And so we have

1    provided for him to be a consultant to the company as part of

2    this compliance plan, subject to a determination by a court

3    appointed monitor as to what is appropriate compensation for

4    his services in that regard, and that's, of course, part of

5    the interim -- both the interim dollars that are referred to

6    in the plan and ultimately the future business operations

7    plan.

8    Q    What about a member committee and counsel for that member

9    committee?

10   A    Well, I'm going to get there.  We -- we included the

11   concept of a Court appointed monitor in the plan because we

12   wanted -- we didn't want to have to come to the Court every

13   time we had an issue with how the plan is being developed.

14        Obviously, the company and I, as its counsel, and

15   those that work with me will be driving the company to put the

16   plan together, to vet the plan, but we're company counsel, and

17   under the circumstances, in this type of a situation, we felt

18   that a monitor could effectively oversee what, in essence, the

19   company and we, on behalf of the company, were doing, and

20   they'll be there not only to advise the Court on their own

21   views on those issues but also to help move the process along

22   and ultimately to give the Court whatever recommendations that

23   monitor thinks appropriate with respect to the ultimate

24   disposition of the matter.

25        We also talked about and included in the plan a

1  concept that I have used in other cases before in the

2  securities context.  This is not a securities issue,

3  obviously.  This is an alleged Ponzi scheme, but the issue of

4  interested parties participating in the development of the

5  plan and the ultimate process is an important one in this case

6  where so much of the assets of the business are tied to the

7  fact that it has this large membership advertising base, and

8  so it was our view and my view that the members needed to have

9  input and a voice into this process.

10         And so the plan contemplates an -- a member steering

11  committee, representative of the different kinds of members

12  that existed, that committee will have to be vetted, that

13  committee will obviously have to be -- and I can't tell you

14  who ought to be on it today because we haven't gotten into the

15  details but I would expect to work with the company and have

16  discussions with various groups of members and bring to the

17  monitor a proposed slate of appointees to a committee that

18  will have input into the process.

19         It's the company's plan, it's the company's

20  responsibility, it's the company's business.  The members are

21  customers, they're members, but ultimately it's the company's

22  business, but the members have important things to say and we

23  want them to have input.  In our view, that member committee

24  needs to be robust, it needs to have an active participation,

25  an active input.  It probably, if my recommendations follow

1    through, should have its own counsel so that its interests --

2    it can, you know, not only through the members, speak to the

3    company about what they like, dislike about the future

4    business operations plan and the cash-out plan that are

5    contemplated, but also to the Court, through its lawyer, so

6    the Court has a -- has a fixed point as opposed to hearing

7    from individual members, a fixed point of a counsel who will

8    be paid for by the company but will be there to represent the

9    interests of the members.

10            And at the end of the process, this plan

11   contemplates that when the future business operations plan,

12   including the cash-out portion of the plan and all those other

13   things I just talked about in terms of how the business will

14   operate going forward, all of that will be brought to the

15   Court for final approval with the monitor, obviously, having

16   the opportunity to weigh in and give Your Honor his views, the

17   Government will have an opportunity to give you their views.

18            At the end of the day it provides a methodology for

19   bringing this case to closure and allowing this business to

20   move forward in an organized orderly fashion.  It protects

21   everybody's interest, and at the end of the day, if it works,

22   it allows this company to emerge successfully as a good

23   corporate citizen going forward.

24   Q   Mr. Schwartz, keeping in mind the streamlined nature of

25   your testimony, are there any other significant points about

1    this compliance plan and the roadmap that you have not yet

2    explained but that you think would be important?

3    A    All right.  I hope I've -- I hope I've walked the Court

4    and everyone through those things at this point, unless anyone

5    has any questions.

6    Q    Well, I think the Government may have some cross-examine,

7    I suspect.

8            MR. GOODMAN:  But Your Honor, I'm going to pass the

9    witness to Mr. Cowden, but before I forget, I know that you're

10   leaving at 4:30.  I didn't want to leave without thanking you

11   and your staff for being so courteous.

12           Everybody has been wonderful and it's a pleasure

13   appearing in front of you, Your Honor.  Thank you so much for

14   your time.

15           THE COURT:  Thank you, sir.

16           Mr. Cowden, did you have any questions?

17           MR. COWDEN:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. COWDEN:

20   Q    Mr. Schwartz, good afternoon.

21   A    Good afternoon.

22   Q    The Ad Surf Daily statement that we offered to -- you

23   guys offered to the Court today, that comes from the company,

24   right?

25   A    That is the company's.  I received it on Saturday.

1    Q    Okay.  The balance sheet indicates that the -- there is

2    due from the Bowdoin Harris Enterprise $426,446.04, correct?

3    It's on the first page, a column towards the bottom of the

4    main column under "current assets."

5    A    Yes.  That there is a "due from" of approximately -- out

6    of 41-and-a-half million dollars of assets, there is a due

7    from Bowdoin Harris Enterprises of $426,000, that's correct.

8    Q    Do you know if the company's asked Mr. Bowdoin for that

9    money back?

10   A    I have not seen this balance sheet until Saturday, so as

11   far as I know, nothing has been done with respect to any of

12   these issues.  We're seeing it realtime.

13   Q    The balance sheet that the company submits on page 3

14   indicates that package sales on the English side of

15   $83 million and on the Spanish side of $17 million; is that

16   right?

17   A    That's what it appears to be, that's correct.

18   Q    So the total package sales, over $100 million, correct?

19   A    That is correct.

20   Q    And you understand, from your testimony today and from

21   looking at the ASD website, that ASD indicates that if you

22   surf, you will get 125 percent of your money back, right?

23   A    I know that they pay rebates of 50 percent of the ad

24   revenues and there is some other potential membership fees

25   that could bring it up, I guess, if you take it to its

1  finality to 65 percent.

2  Q   Well --

3  A   I wouldn't characterize 125 percent as anything more than

4  a cap on what you can earn.

5  Q   But you've heard testimony that they, in fact, are paying

6  that cap and they have been historically paying that cap and

7  ad packages are expiring as they pay 125 percent?

8  A   Some people have earned that, that's correct, and there

9  are future ad --

10  Q   Sir, we've only got 20 minutes, so I'm going to ask you

11  some "yes/no" questions and then if there is some time for

12  follow-up, but I do want to focus on a couple of things.

13  A   Sure.

14  Q   And I understand that everybody's talking about, "Oh, the

15  125 percent doesn't matter," because they're saying, "Well,

16  we're only taking half our money to pay the 125 percent," but

17  you don't believe that, do you, sir?

18  A   I believe that they're paying 50 cents out of a dollar

19  that they receive.  I believe that it's capped at 125 percent.

20  That doesn't mean people will earn 125 percent.  It means they

21  have the opportunity to earn.  The fact that people are

22  earning the 125 percent means that people are buying more

23  advertising.  That's a good thing.

24  Q   The people who are earning 125 percent are earning

25  125 percent because they paid a dollar into Ad Surf Daily,

1  right?

2  A   And they surfed and they received their rebates.

3  Q   If they paid more, they could actually surf less, right?

4  A   You're -- you're getting into the details of how they

5  earn those rebates.

6  Q   But those --

7  A   Let us simply agree that they can earn rebates through

8  the surfing process up to 125 percent.  I mean, I'm not here

9  to really speak to that issue, although I'm happy to.

10  Q   But that issue is actually crucial to whether the company

11  can continue to operate, isn't it, sir?

12  A   What the rebates are about is the rebates are contras to

13  revenue, so at the end of the day, you have to have sufficient

14  revenue after you pay out rebates and other expenses

15  associated with membership payments to make a profit on the

16  business.

17        If you have 100 million dollars in sales and your

18  costs associated with the GNA, the operating expenses, let's

19  say they're $3 million or $4 million or $5 million, you can

20  give away an awful lot of your profit before you start losing

21  money.

22  Q   Can you give back 125 percent of your profit?

23  A   You're not giving back 125 percent of your profit.

24  Q   Well, let me ask you this --

25  A   You're giving back --

1    Q   Can you give back 125 percent of your sales and have a

2    profit?

3    A   You're giving back 50 percent of your sales up to

4    125 percent to any particular member who purchased an ad pack.

5    Q   Can you -- can you give back 125 percent of your -- if

6    somebody gives you a dollar --

7    A   You're making -- your statement indicates to me you don't

8    understand the concept here.  You're comparing apples to

9    oranges here.

10   Q   Can ASD continue to do business and offer free

11   advertising?

12   A   It can continue to do business and pay out 50 percent of

13   its revenues, and to the extent that someone earns 125 percent

14   because there's additional ad sales, it can continue to

15   operate, yes.

16   Q   Well, then, what's a Ponzi, sir?

17   A   I'm not an expert in Ponzi schemes.  I have been

18   involved --

19   Q   You're a securities lawyer, are you not?

20   A   I am a securities lawyer, that is correct.

21   Q   Let's talk about securities for a second because you're

22   proposing that the company can do business in the future,

23   right?

24   A   I am proposing that a plan be put together that will

25   allow the company to do business in the future.

1    Q   The way the company was doing business on July 27th,

2   2008, can they continue to do business that way legally?

3    A   I never -- I've never reviewed that issue to reach that

4   conclusion.  That was not the issue that I was ever asked

5   to -- that I have looked at at this point.  I have focused on

6   the future of the business.

7           You know, I was originally asked that question about

8   two weeks before the Government seized -- seizure, but I never

9   got an opportunity to get there because I never got any data

10  to be able to start to focus on that issue.  From the point in

11  time that the seizure took place, my focus has been on moving

12  the business forward into the future.  To the extent that

13  there were issues with the business as it was run prior to the

14  31st, they will need to be fixed.  That's what the process

15  is about.  That's what the oversight is about.  That's what

16  the monitor is about.  That's the work that will need to be

17  done, some of the things that Mr. Nehra talked about.  That's

18  the work that will need to be done so that a proper future

19  business operations plan can be developed.

20   Q   How long was ASD operating before it called you in to

21  take a look at things?

22   A   I was contacted by ASD in late June.  I was leaving on a

23  vacation, and so I told them I could not meet with them until

24  sometime in mid July.  I met with them for about an hour in

25  mid July, had a brief discussion about the business, asked

them for a bunch of information, my focus being on the issue

of, was the -- was what they were involved with, could it be

determined to be a security -- didn't hear from them.

I have a very active business practice and I was

very busy during that period, and to be honest with you, I

wasn't calling them every day, "Where is the data, where is

the data, where is the data."  I was waiting for them to come

back to me with the data.

And then I got the call that the Government seizure

had taken place and everything from there has been about both

dealing with the issues associated with that seizure and

figuring out how this business, which has value, from what I

can see at this point, that has opportunity, from what I can

see at this point, how it can move forward.

All of those issues of, you know, do changes need to

be made, any business can be made better.  But you're -- your

question is, to me, a little bit troublesome.  First of all,

you've only alleged it's a Ponzi scheme.  You haven't said

anything about securities, to my knowledge, in your complaint,

but leaving that issue aside --

Q    Let me ask you.  I know you're talking and I appreciate

it because it's all written down and we can get it, but let me

ask you a question about that.

Now, you read the lawyer's website, the legality

statement that ASD put out, right?  You've seen that before?

1   A    I have seen the legality statement.  I didn't see it

2   until well after the case was filed, but I have seen it.

3   Q    Okay.  And you saw the front pages of ASD where they say

4   "advertising is free," right?

5   A    I saw the website after the -- after the Government

6   seizure.

7   Q    Okay.

8   A    I didn't have access to --

9            THE COURT:  You have seen it.

10           THE WITNESS:  I have seen it at this point.

11  Q    (BY MR. COWDEN)  And on the lawyer's website, on the

12  website that they posted with the legality statement, the lawyer

13  said ASD is in compliance with all laws, all securities laws,

14  all state laws.  It's a well run company.  Essentially, the

15  lawyer said, "We've looked at this, my team of lawyers, and this

16  company is compliant with the law," and you saw him say that,

17  right?

18  A    I've read the statement, yes.

19  Q    All right.  And the Government's complaint says that

20  ASD -- that the funds in this case are forfeitable because ASD

21  was committing wire fraud, right?

22  A    Among other violations alleged.

23  Q    Okay.  It's wire fraud, though, right?  The federal hook

24  here, federal law doesn't say it's unlawful to run a Ponzi

25  scheme; it says it's unlawful to commit wire fraud, right?

1    A    In a civil case you've alleged that, that's correct.

2    Q    Okay.  Now, if you're in violation of securities laws or

3    you're running a Ponzi scheme but you're saying you're not and

4    you do it over the internet, you've committed wire fraud,

5    right?

6    A    You want to get to the question of was the business legal

7    or illegal ahead of the seizure of the assets.  I think you'll

8    find from our pleadings that we believe very strongly that it

9    was a legal business and that's why we've alleged what we've

10   alleged in our responses to the seizure.  That's why the

11   motion was filed.

12         At the end of the day, I guess that's what the

13   Court's going to determine, and part of the process in the

14   compliance plan is intended to provide a roadmap for reaching

15   that issue, along with all of these others, in an organized

16   fashion that if it's determined by the Court that this

17   business was not illegal, that there is something left to

18   save.

19   Q    If the -- does your compliance plan propose, or your

20   future operation of the plan propose allowing people to -- the

21   rebate program?  You've heard us talk.  I mean, we don't

22   really -- I mean, I think you sensed this probably, is that we

23   understand that we've got the multilevel marketing

24   opportunities where you can get referral commissions of

25   10 percent and 5 percent in this program, and you've heard

1    Jerry Nehra talk about his expertise in referral companies,

2    right?

3    A    Go on.

4    Q    But you heard that, right?

5    A    Uh-huh.

6    Q    Yes?

7    A    Yes.

8    Q    And then there's also this program, the rebate program in

9    this company where you can get back the dollar that you put in

10   and an additional 25 percent and that the way that that's paid

11   is they pool revenue, and then depending on how much you

12   bought in, you get a share of that slice of the pie until you

13   get your 125 percent, and then you're done.  You've heard that

14   part, right?

15   A    I have heard whatever testimony took place today.

16   Q    Okay.  That part of this program, does that have any

17   place in your proposed compliance program?

18   A    The future business operations plan needs to be

19   developed.  One of the things that needs to be looked at

20   carefully is making sure that it's right going forward.

21   Whether that should be part of it, whether it should be

22   changed remains to be developed with appropriate oversight,

23   with member input and ultimately with court approval.

24   Q    So, is it fair to say that you're asking the Court to

25   release funds so that you can spend the money to develop this

1    program that hasn't been developed yet?

2    A    The company is asking the Court to release a small

3    portion of the funds that will allow it to develop that plan

4    while this process of fighting over whether this was legal or

5    not takes place, because if this doesn't get resolved quickly,

6    there isn't going to be anything to save.

7              Nine months from now, if there's a trial and the

8    Court determines that this was a legal business, and I'll

9    assume that for purposes of my response, it doesn't matter.

10   There won't be a business left.

11   Q    The business in this case -- So, let me make sure I

12   understand this.  You don't know what the future business

13   would be.  You want the Court to release some funds so that

14   people can figure out if they can figure out a way to make

15   this business run compliant with the law.  That's the plan?

16   A    The plan is to finish the work that I believe was already

17   starting at the company, to make sure it's right and to do it

18   in an organized and orderly fashion.  Yes, that will take a

19   few dollars, a small percentage of the dollars to allow.  But

20   if it doesn't happen, there won't be anything to save.  So,

21   it's a paid victory if nine months from now the Court

22   determines this was a legal business.  If you don't go through

23   that process, you won't have a business to save.

24   Q    Would it be possible for Mr. Bowdoin to give you the

25   $600,000 that he apparently owes to -- or the $426,000 that he

owes to ASD for you to determine whether there is a way?

A    I know nothing about that $600,000 at this point.  I

can't respond to that question.  What I can respond to is that

the business needs to take a small amount of dollars to

properly create a business plan going forward that can be

presented so that if it's determined that this was legal,

which I believe it will be before it's over, but let's assume

that for purposes, that there's something to save.

        I mean, the company can't do this without funds.

The company is going to need a certain amount of funds.  The

monitor is going to have to be paid, the accountants are going

to have to be paid, the lawyers are going to have to be paid,

the staff is going to have to be paid, the programmers are

going to have to be paid.  There are a number of folks that

will have to participate in this, and it doesn't happen free.

The company will need the funds.

        THE COURT:  Okay.  So this is an argument you're

making to me and I'm about to run out of time, but I would

like to ask a question or two.

        THE WITNESS:  Sure.

        THE COURT:  If one operated on instead of your view

of the Government's complaint, which you say doesn't really

charge the company properly because you know how it operates,

or you think you know how it operates or something, I'm not

quite sure.

1    THE WITNESS:  I haven't focused as much on that

2 portion of it.

3    THE COURT:  Yeah, but you're defending how it

4 operates.

5    THE WITNESS:  Yes.

6    THE COURT:  So, put that aside because you actually

7 don't know.  Forgive me.  You're not actually in a position to

8 comment on that.  Okay.

9    Assume with me for just a minute that the

10 Government's complaint is right and that this is wire fraud

11 and a Ponzi scheme, therefore, against federal law and state

12 law.  Let's assume, for purposes of the question -- I haven't

13 ruled on anything, anybody -- just for purposes of the

14 question that they're right.

15    So, by giving -- what you're talking about, the

16 asset that this company has is that it knows all these people,

17 but if it's a Ponzi scheme or if it's wire fraud, this

18 business cannot be saved, it's going to have to be a

19 materially different business and these people might not be

20 interested.

21    I mean, you see my problem?  You're asking for two

22 million dollars -- two or three or whatever it turns out to

23 be, to reformulate the business in some way.

24    THE WITNESS:  To allow for an orderly process so

25 that the business can be successfully reopened if Your Honor

1    ultimately concludes that the legality of the business is

2    legal.  To not do it, essentially, means there is a decision

3    that it's illegal even if it turns out that it was legal

4    because there is no business left to operate.

5         So, yes, you're taking a small portion of the

6    dollars, a portion, I would argue, by the way, is likely to be

7    profit earned by the company from the operation of the

8    business to make sure that that opportunity is there for the

9    business if, in fact, till this dispute is determined, that

10   this is a legal business.

11        THE COURT:  Okay.  So let's -- I'll take it as a --

12   an undetermined, and as of this moment, undeterminable fact as

13   to whether or not the business was engaged in wire fraud

14   and/or was a Ponzi scheme.  I can't determine that, don't have

15   final briefs, don't know the answer to that question.

16        If that's so, why is it not possible for Ad Surf

17   Daily, through you and your colleagues, to just negotiate with

18   Mr. Cowdoin to say, "Listen, you're going to put us completely

19   out of business.  Let us take some of this money.  Let us

20   revamp this thing so everybody's satisfied it's not illegal

21   and go on with life?  You can always figure out your

22   litigation later, but don't kill us off in the meantime."

23        Why is this not a settlement negotiation rather than

24   a presentation to the Court?

25        MR. GOODMAN:  Your Honor, I can answer that

question.

THE COURT:  I cannot get into settlement discussions.

MR. GOODMAN:  I'm not going to tell you the results. All I can tell you is I always do that before trial and I always followed my practice in this case.

THE COURT:  Okay.  So the parties aren't in a position to settle?

MR. COWDEN:  Judge, there's another problem here. If the United States takes the position that people, when they gave a dollar to ASD were expecting a 1.25 back, that's a fundamentally different model than somebody who was paying for advertising and not expecting money back, so...

THE COURT:  I agree with you that --

MR. COWDEN:  One of the questions here is do we give this money back to Andy Bowdoin for him to start a legitimate when apparently he didn't go to Akerman Senterfitt before he was running this thing for 18 months to give them some time to look at it and say, "Holy moly, you're running a securities business.  You're saying you're not.  That's a wire fraud. We've got a problem here.  Let's see if we can call up the Department of Justice before they come through the door."

It was a little too late.  That's not -- I mean, we've got now people who paid money in and expected a return not to buy an ad for ASD, and so if that money then goes to

1    Andy Bowdoin to start a legitimate business, then these people

2    are -- then we're -- then they're twice -- twice --

3              THE COURT:  Twice --

4              MR. COWDEN:  Twice damages.

5              THE WITNESS:  I would argue with you, money is not

6    going to Andy Bowdoin.  It's going to Ad Surf Daily because

7    it's Ad Surf Daily's business.

8              THE COURT:  Okay.  And I understand your answer and

9    I understand the issue about the monitor and I understand why

10   it's not between you and it's in front of me and so that

11   answers that question.  Thank you, sir.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Thank you for your assistance.

14             All right.  Everybody, what about briefing?  I

15   really need to be out of here so we need to identify a

16   schedule, an expedited schedule so that this can be decided.

17             MR. GOODMAN:  Your Honor, I believe -- at least I

18   can speak for myself -- that we will be able to submit, and

19   it's up to the court, of course, whether you want a

20   post-hearing memorandum of law as opposed to proposed findings

21   of fact and conclusions of law.  Whatever you tell me to

22   submit --

23             THE COURT:  I just need proposed findings of fact

24   and conclusions of law, and they can be in numbered

25   paragraphs.

1        MR. GOODMAN: Very well. I believe that I will be

2  able to submit that, obviously, without record citations,

3  without the benefit of a transcript because time is of the

4  essence, and as competent and efficient as the court reporters

5  may be, I don't want to wait two weeks for a transcript before

6  submitting the proposed findings and conclusions.

7        THE COURT: Yeah. Having not asked for expedited

8  treatment ahead of time, we probably had not set it up so you

9  would be able to get transcripts very quickly.

10       Mr. Bowdoin [sic], would you be in -- I'm sorry, you

11  didn't give a deadline actually.

12       MR. GOODMAN: It's 4:30.

13       THE COURT: It is. It's 4:30 on Wednesday, and I

14  need to be out of here.

15       MR. GOODMAN: Yes. I believe that I will be able to

16  submit proposed findings and conclusions within one week, Your

17  Honor.

18       THE COURT: One week. All right. And you'd come

19  second. What's yours?

20       MR. COWDEN: Judge, why don't we try to just do it

21  at the same time and just do joint, submit them at the same

22  time.

23       THE COURT: All righty. Joint.

24       MR. COWDEN: That will speed it up.

25       THE COURT: That will speed it up.

1          MR. COWDEN:  And I'm Cowden, for the record.

2          THE COURT:  I know this.  Ladies and gentlemen, I

3     actually know the parties.  I really understand who the

4     parties are, and I apologize for my misstatements.

5          Thank you, everybody.  It was nice to see you-all.

6          MR. GOODMAN:  Thank you once again, Your Honor.

7          THE COURT:  You're most welcome.  I look forward to

8     your pleadings.

9          THE DEPUTY CLERK:  All rise.

10         THE COURT:  And I am going to have to take these

11    arguments under advisement until you're able to file things,

12    so that I'm going to need to extend the time to render a

13    decision on the emergency motion under 18 U.S.C. 983 F 5 at

14    least until two weeks after I get your briefs, although I

15    understand your point about speed.  Just giving myself two

16    weeks, in case.

17         MR. GOODMAN:  Understood, Your Honor.

18         THE COURT:  Thank you.

19         MR. COWDEN:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         (PROCEEDINGS END AT 4:33 P.M.)

22                        *-*-*-*-*

23

24

25

CERTIFICATE OF REPORTER

I, Catalina Kerr, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____   _____
Catalina Kerr                     Date